Volume 2

Pages 145 - 308

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE                    )
ANTITRUST LITIGATION                       )   NO. 21-md-02981-JD
_____     )
                                           )
THIS DOCUMENT RELATES TO:                  )
                                           )
Epic Games, Inc. vs. Google LLC, et al.,   )
Case No. 3:20-cv-05671-JD                   )
                                           )
In Re Google Play Consumer Antitrust       )
Litigation, Case No. 3:20-cv-05761-JD       )
                                           )
State of Utah, et al. v. Google LLC,       )
et al., Case No. 3:21-cv-05227-JD           )
                                           )
Match Group, LLC, et al. vs. Google LLC,   )
et al., Case No. 3:22-cv-02746-JD           )
_____     )

                         San Francisco, California
                         Tuesday, January 31, 2023

                  TRANSCRIPT OF PROCEEDINGS

          IN RE EVIDENTIARY HEARING ON CHAT PRESERVATION

APPEARANCES:

For Plaintiff Epic Games in C 20-05671 JD:
                         CRAVATH SWAINE AND MOORE LLP
                         825 Eighth Avenue
                         New York, New York 10019
                    BY:  LAUREN ANN MOSKOWITZ, ATTORNEY AT LAW
                         GARY A. BORNSTEIN, ATTORNEY AT LAW

         (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
1    APPEARANCES:  (CONTINUED)

2    For Plaintiff Epic Games in C 20-05671 JD:
                          FAEGRE DRINKER BIDDLE & REATH LLP
3                         Four Embarcadero Center
                          27th Floor
4                         San Francisco, California 94111
                    BY:   PAUL J. RIEHLE, ATTORNEY AT LAW
5

6    For the Consumer Class Plaintiffs in C 20-05761-JD:
                          KAPLAN FOX AND KILSHEIMER LLP
7                         850 Third Avenue
                          14th Floor
8                         New York, New York 10022
                    BY:   HAE SUNG NAM, ATTORNEY AT LAW
9                         AARON L. SCHWARTZ, ATTORNEY AT LAW

10                        BARTLIT BECK LLP
                          1801 Wewatta Street
11                        Suite 1200
                          Denver, Colorado 80202
12                  BY:   KARMA M. GIULIANELLI, ATTORNEY AT LAW
                          GLEN E. SUMMERS, ATTORNEY AT LAW
13
                          BARTLIT BECK LLP
14                        54 West Hubbard Street
                          Suite 300
15                        Chicago, Illinois 60654
                    BY:   JOHN D. BYARS, ATTORNEY AT LAW
16                        LEE MASON, ATTORNEY AT LAW

17   For Plaintiff Brian McNamara/In Re Google Play Consumer
     Antitrust Litigation, C 20-07361 JD:
18                        COTCHETT, PITRE & MCCARTHY LLP
                          San Francisco Airport Office Center
19                        840 Malcolm Road
                          Burlingame, California 94010
20                  BY:   NANCI E. NISHIMURA, ATTORNEY AT LAW

21   For Plaintiffs in Carroll/In Re Google Play Consumer Antitrust
     Litigation, C 20-07379 JD:
22                        PRITZKER LEVINE LLP
                          1900 Powell Street, Suite 450
23                        Emeryville, California 94608
                    BY:   ELIZABETH C. PRITZKER, ATTORNEY AT LAW
24

25            (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

```
 1   APPEARANCES:   (CONTINUED)

 2   For State of Utah and the Plaintiff States in C 21-05227-JD:
                          OFFICE OF THE UTAH ATTORNEY GENERAL
 3                        160 East 300 South
                          Fifth Floor
 4                        Salt Lake City, Utah 84114
                     BY:  LAUREN M. WEINSTEIN
 5                        BRENDAN P. GLACKIN
                          ASSISTANT ATTORNEYS GENERAL
 6

 7   For Match Group, LLC in C 22-02746-JD:
                          HUESTON HENNIGAN LLP
 8                        620 Newport Center Drive, Suite 1300
                          Newport Beach, California 92660
 9                   BY:  DOUGLAS J. DIXON, ATTORNEY AT LAW

10

11   For Defendants:
                          MORGAN LEWIS & BOCKIUS LLP
12                        One Market Street, 28th Floor
                          Spear Street Tower
13                        San Francisco, California 94105-1596
                     BY:  BRIAN C. ROCCA, ATTORNEY AT LAW
14                        MICHELLE PARK CHIU, ATTORNEY AT LAW

15                        MUNGER TOLLES & OLSON LLP
                          350 South Grand Avenue
16                        Fiftieth Floor
                          Los Angeles, California 90071
17                   BY:  GLENN D. POMERANTZ, ATTORNEY AT LAW
                          GREGORY P. STONE, ATTORNEY AT LAW
18                        JAMIE B. LUGURI, ATTORNEY AT LAW

19                        MUNGER, TOLLES & OLSON LLP
                          560 Mission Street, 27th Floor
20                        San Francisco, California 94105
                     BY:  JUSTIN P.  RAPHAEL, ATTORNEY AT LAW
21

22   Also Present:        Jimmy Mendoza
                          Josh Stanhill
23

24

25
```

# I N D E X

Tuesday, January 31, 2023 - Volume 2

|                                          | PAGE | VOL. |
|------------------------------------------|------|------|
| Closing Argument by Mr. Summers          | 169  | 2    |
| Closing Argument by Mr. Pomerantz        | 241  | 2    |

PROCEEDINGS

| | |
|---|---|
| 1 | **Tuesday - January 31, 2023**                                    **1:30 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---o0o---** |
| 4 | **THE CLERK:**  Calling Civil 20-5671, Epic Games, Inc. vs. |
| 5 | Google LLC; Civil 20-5761, In Re Google Play Consumer Antitrust |
| 6 | Litigation; Civil 21-5227, State of Utah vs. Google LLC, |
| 7 | Multidistrict Litigation 21-2981, In Re Google Play Antitrust |
| 8 | Litigation, and Civil 22-2746, Match Group, LLC vs. Google LLC. |
| 9 | Counsel? |
| 10 | **THE COURT:**  Just one second.  I forgot one thing.  I'll be |
| 11 | right back. |
| 12 | (Recess taken at 1:31 p.m.) |
| 13 | (Proceedings resumed at 1:32 p.m.) |
| 14 | **THE COURT:**  Okay.  Appearances. |
| 15 | **THE CLERK:**  Counsel, please state your appearances for the |
| 16 | record. |
| 17 | **MR. SUMMERS:**  Your Honor, Glen Summers of Bartlit Beck |
| 18 | representing consumers.  And I'll be arguing today on behalf of |
| 19 | the plaintiffs. |
| 20 | With me is Karma Giulianelli, who you've met, Lee Mason, |
| 21 | also Hae Sung Nam of Kaplan Fox. |
| 22 | **MR. BORNSTEIN:**  Good afternoon, Your Honor.  Gary |
| 23 | Bornstein for Epic Games. |
| 24 | **MS. MOSKOWITZ:**  Good afternoon, Your Honor.  Lauren |
| 25 | Moskowitz for Epic Games as well. |

**PROCEEDINGS**

1        **MR. DIXON:**  Afternoon, Your Honor.  Doug Dixon of

2    Hueston Hennigan for Match Group, LLC, plaintiffs.

3        **MS. WEINSTEIN:**  Good afternoon, Your Honor.  Lauren

4    Weinstein and Brendan Glackin on behalf of the states.

5        **MR. POMERANTZ:**  Good afternoon, Your Honor.  Glenn

6    Pomerantz on behalf of Google.  And with me are my colleagues

7    from our firm Justin Raphael, Greg Stone, Jamie Luguri, and

8    Jimmy Mendoza, who will be running the technology here today.

9        **MR. ROCCA:**  Hello, Your Honor.  It's Brian Rocca and

10   Michelle Park Chiu of Morgan Lewis for Google.

11        **THE COURT:**  Okay.  Before we start, let me just -- I have

12   a couple of questions.

13        By the way, at the end, we'll talk a little bit about case

14   management too.  Okay?

15        So this is for Google, a question about this Ho

16   declaration, H-o, Docket Number 429-2, filed a couple of days

17   ago.  So I'm not really understanding this declaration,

18   Mr. Pomerantz.  What is Mr. Ho telling me?

19        **MR. POMERANTZ:**  Yeah, let me -- I think it'll be easier.

20   I'll get a slide up here.

21        **THE COURT:**  429-2.

22        **MR. POMERANTZ:**  Yeah.  So, Mr. Mendoza, if you can put up

23   Slide 5, please.

24        So I think what Your Honor is referring to primarily is

25   Exhibit A, which is a list of 383 custodians, which is what

**PROCEEDINGS**

1    Mr. Ho put together by looking at the data that was available.

2        And what we found is that Google sent hold notices and

3    instructions to 383 employees who they thought potentially had

4    knowledge that would be relevant to the case.

5        And so we went -- and the issue, as Your Honor will see,

6    is what happened with preservation of chats after this lawsuit

7    was filed.

8        And what we did is, for each custodian, we said:  How many

9    chats have been preserved that that custodian was a participant

10   in?

11       And so if Your Honor looks at the slide here, I'll go

12   through each column and you'll see what we were doing here.  So

13   we'll start -- we just picked one random page.  This is

14   starting with Custodians 22 through 35.

15       Is that up on Your Honor's screen?

16       **THE COURT:**  Yes, I have it.  Thank you.

17       **MR. POMERANTZ:**  So there were two types of chats at

18   Google.

19       **THE COURT:**  This is Exhibit A; right?

20       **MR. POMERANTZ:**  Yes, Exhibit A.

21       **THE COURT:**  Okay.  Go ahead.

22       **MR. POMERANTZ:**  The one type of chat you'll see in the

23   right-hand column that's highlighted is threaded chats, and

24   what those are, are rooms that are created for people --

25   employees at Google to get together who are all working

1    together on something.  And because those chats -- those rooms

2    are designed for work collaboration, the history is always on

3    for threaded chats.  Those histories, they're on and they

4    were -- and they are always -- and they are preserved because

5    of the legal hold that's in place in this case.

6        So Custodian 22 has participated in 621 chats that were in

7    a threaded room, and therefore they were automatically

8    preserved.

9        And then you see in the first column that's highlighted,

10   the one-to-one or group chats, those are what I'll call

11   non-threaded chats.  "One-to-one" means it's just two people

12   chatting with each other, and "group" means it's at least three

13   people.

14       And those non-threaded chats, the history has to be turned

15   on by somebody who's participating in that chat in order for it

16   to be preserved.

17       We don't know for certain, Your Honor, whether it was

18   Custodian 22 who turned on history or whether it was somebody

19   else who was participating in that chat; but what we do know is

20   that that participant participated in 583 chats in which

21   somebody turned history on and, therefore, it was preserved.

22       **THE COURT:**  Well, that's the question -- one of the

23   questions I had.  So, okay.  So you know that Custodian 22

24   affirmatively acted to -- or somebody he was talking to or she

25   was talking to affirmatively acted to preserve that one-to-one

1  or group chat.  But how many times did Custodian Number 22 or

2  the people he or she was communicating with decide not to do

3  that?

4       **MR. POMERANTZ:**  We don't have that information.

5       **THE COURT:**  Okay.

6       **MR. POMERANTZ:**  And the question that Your Honor --

7       **THE COURT:**  They did it 583 times, but it's possible they

8  had 10,000 other chats that they didn't turn it on for and

9  they're lost in history.

10      **MR. POMERANTZ:**  Correct, Your Honor.

11      And what we have seen from the testimony is that most of

12  the chats that they participated in, they wouldn't turn history

13  on.  It's just -- it's just not a substantive chat.

14      **THE COURT:**  Now, what is the difference between threaded

15  and group?

16      **MR. POMERANTZ:**  So threaded is a part of the Chat product

17  in which you create a room.  And Mr. Lopez showed you one

18  example -- I think it's Exhibit 106, but I'm not a hundred

19  percent sure -- that had "Design Systems" as the subject matter

20  of the room.

21      **THE COURT:**  All right.  Okay.  So "threaded" is just

22  another way of referring to that room setup that we talked

23  about?

24      **MR. POMERANTZ:**  Correct.

25      **THE COURT:**  Okay.

1    **MR. POMERANTZ:**  Correct.  That's exactly right.

2    **THE COURT:**  And for the first column, one-to-one or

3    group -- and a group can be an unlimited number of people;

4    right?

5    **MR. POMERANTZ:**  It could be.  I don't believe there's a

6    technological limit on it.

7    And one thing I want to point out about that first column

8    is if I'm participating in a chat and it's on a topic that is

9    in the hold notice but somebody else has already turned history

10   on, then there's nothing for me to do because once history's

11   on, it's on unless somebody turns it off.

12   So if Custodian 22 received a chat and history was already

13   on, then he would just -- he or she would just leave history

14   on.

15   **THE COURT:**  No, I understand.  But that one-to-one or

16   group column does not give any information about the number of

17   chats that were not preserved?

18   **MR. POMERANTZ:**  That's correct, Your Honor.

19   **THE COURT:**  And it also doesn't give any information about

20   the number of people participating in the chats?

21   **MR. POMERANTZ:**  That is correct, Your Honor.

22   **THE COURT:**  Okay.  Now, you all seem to agree that there

23   are just 21 people we're talking about with respect to this,

24   21 custodians?

25   **MR. SUMMERS:**  No, Your Honor.

1      **THE COURT:**  You don't?

2      **MR. SUMMERS:**  There were 37 --

3      **THE COURT:**  I thought you all agreed that there were

4  21 post-filing custodians.

5      **MR. SUMMERS:**  There were 37 agreed ESI custodians.

6      What happened is later, we made requests for supplemental

7  productions; and we had discussions with them and we agreed to

8  search terms and the group of custodians that would be

9  producing documents from those refreshed productions, if you

10  will.

11      But there were 37 total ESI custodians.  And, of course,

12  discovery's been ongoing.  We've been receiving updated

13  productions to this day, and there may be additional

14  productions before this trial is had.  So we think the universe

15  of 37 is relevant.  The 21 may be the most relevant,

16  Your Honor, but we think both numbers are significant.

17      **MR. POMERANTZ:**  And to clarify, I think we're in agreement

18  here.  There are only 21 that have been identified as having to

19  produce documents that postdate the filing of the complaint.

20  And I think they've only asked for -- and they aren't all

21  custodians for the same requests.

22      For example -- I'll give you one example.  One of the

23  requests they had was, after the filing of the complaint,

24  Google took some action against a Korean developer because they

25  weren't following the billing policy.  So they wanted documents

**PROCEEDINGS**

 1   about that.  So the parties talked, and we figured out what

 2   custodian or custodians would have the most relevant documents,

 3   what search terms should we use, what time period should we

 4   use, and then we produced the documents.

 5       And so that -- you know, what happened is, after the

 6   filing of the complaint, a handful of developments occurred;

 7   and they said, "We want discovery on those developments."

 8       And we sat down and we talked to them, and a limited

 9   number of custodians, a limited set of search terms, and a

10   limited time period were established for each request.

11       And that's what has happened since the filing of the

12   complaint in terms of discovery about things that happened

13   after --

14       **THE COURT:**  Here's what I need to know:  How many people

15   are we concerned about for the chats?

16       Now, I know that some ungodly number, 300-plus people got

17   a hold notice, but how many people do you actually care about?

18       **MR. SUMMERS:**  Our understanding, Your Honor, was that they

19   were preserving ESI as to 37 custodians, the 37 agreed ESI

20   custodians.

21       **THE COURT:**  37.

22       **MR. SUMMERS:**  It happens to be that the production

23   requests, as they were negotiated over time to date, have

24   involved only 21 of those individuals since the initial

25   productions; but we expected preservation as to 37, not the

1   380.

2       **THE COURT:**  Are you okay with that, Mr. Pomerantz, 37?

3       **MR. POMERANTZ:**  Well, yes and no.  We have -- Google

4   didn't distinguish its preservation efforts between the 37 that

5   we made custodians and the remaining 300-some-odd that were

6   still under litigation hold.  And the reason why is, as has

7   happened in this lawsuit, sometimes you don't think of somebody

8   as necessarily a custodian, and then something happens and they

9   say:  Hey, we want to add this person as a custodian.

10      So we actually did the same preservation efforts for all

11  383.  But in terms of the discovery in this case, they picked

12  21 for post-complaint discovery.  We agreed.  I should say we

13  negotiated and agreed that these 21 would be the ones subject

14  to post-complaint discovery.

15      **THE COURT:**  Okay.  Let me try it again, because my sense

16  is the plaintiffs are offering you a little bit of a plus by

17  telling you that all I have to worry about are 37 people rather

18  than 350 or whatever.

19      I mean, I can write the order for whatever number.  I just

20  want you to tell me what you agree on.  If you want me to write

21  an order --

22      **MR. POMERANTZ:**  I would tell --

23      **THE COURT:**  -- with respect to 350 people did or did not

24  have their chats preserved properly, I can do that; or the

25  plaintiffs are suggesting it may be just a universe of 37

 1   people.  Which one would you like to pick?  You need to pick

 2   one.

 3       **MR. POMERANTZ:**  Stated that way, I think the right answer

 4   is 21 --

 5       **THE COURT:**  21.

 6       **MR. POMERANTZ:**  -- because those are the only ones that

 7   were subject to post-complaint discovery.

 8       **THE COURT:**  Now, who are these 16?

 9       **MR. POMERANTZ:**  I think -- I'm sure --

10       **THE COURT:**  I'm asking the wrong person.

11       **MR. POMERANTZ:**  No.  And I won't get you the names but --

12       **THE COURT:**  No, no, no.  Just one second.

13       I saw 21 in the briefs.  How come there's another 16

14   plaintiffs coming up?

15       **MR. POMERANTZ:**  I could tell you, Your Honor.  I think he

16   would agree with this.

17       For the pre-complaint discovery, there were 37 people

18   picked.

19       **THE COURT:**  Pre-complaint.

20       **MR. POMERANTZ:**  And then there were activities, actions,

21   decisions, agreements that Google did prior to the filing of

22   the complaint in August of 2020.  So there was 37 -- and

23   there's no question about whether there was any spoliation

24   about those pre-complaint because there was no obligation to be

25   preserving the chats beyond whatever our ordinary business

 1   practices were.

 2        Post-complaint, they picked 21 of the 37 to also be part

 3   of the post-complaint discovery.

 4        **MR. SUMMERS:**  Your Honor, I disagree with that somewhat.

 5        At the outset, we agreed to a set of 37 ESI custodians.

 6   Those were the 37 people.

 7        **THE COURT:**  When you say "at the outset," when?  Just give

 8   me a date.

 9        **MR. SUMMERS:**  Shortly after the negotiation of the ESI

10   order or in connection with it.

11        And we --

12        And, Aaron, if you could try to find that date, please.

13        But the point is, Your Honor, we agreed that those would

14   be the ESI custodians.  Those would be the 37 people from whom

15   ESI would be collected and produced.

16        Later, it just happened to come to pass that the

17   individual refresh searches that we negotiated happened to only

18   include 21 of those people.

19        And I should footnote that, you know, Match came into the

20   case a little bit later, and there were some additional

21   custodians added to the list.  So these numbers may not be

22   quite as precise as we may be suggesting.

23        But we certainly believed that all ESI was being preserved

24   as to the 37 agreed ESI custodians.

25        **THE COURT:**  Is that written down somewhere?  Do you have

**PROCEEDINGS**

 1   an e-mail or something?

 2        **MR. SUMMERS:**  Well, no, Your Honor.  What we have --

 3        **THE COURT:**  A list?

 4        **MR. SUMMERS:**  -- of course, is the --

 5        **THE COURT:**  Do you have the list?

 6        **MR. SUMMERS:**  -- original ESI order.

 7        **THE COURT:**  How about a list of people?

 8        **MR. SUMMERS:**  We negotiated --

 9        **THE COURT:**  Do you have a list?  I mean, how do you know

10   who the 37 are?  You must have had a list somewhere that you

11   shared --

12        **MR. SUMMERS:**  We do, Your Honor.

13        **THE COURT:**  -- with Google.

14        **MR. SUMMERS:**  And I have it on a slide, if you'd like to

15   look at it.

16        **THE COURT:**  Well, no.  A list you shared with Google.  Is

17   that right?

18        **MR. SUMMERS:**  Yes.  We have an agreed list of the 37.  It

19   was Exhibit A to their interrogatory responses.

20        **THE COURT:**  Why don't you put it up for me.  Do you have

21   that?  If you don't have it, that's fine.

22        **MR. SUMMERS:**  Well, I have the list in a demonstrative,

23   Your Honor, and I don't think there'll be any dispute as to who

24   the people are.  If we can go ahead and present.

25        **THE COURT:**  Okay.

1    **MR. SUMMERS:**  What we have --

2    **THE COURT:**  On the left?

3    **MR. SUMMERS:**  What we have on the left are the 37 agreed

4    ESI custodians, and these are set forth in Exhibit A to an

5    interrogatory response that Google provided us.

6    **THE COURT:**  All right.  But the names on the left in the

7    yellow and white, that's the full list; is that right?

8    **MR. SUMMERS:**  That's the full list.

9    What we have in Exhibit C on the right, Your Honor, are

10   those for whom Google has represented in their interrogatory

11   responses that they recalled turning history on at some point

12   in time during the custodial period.

13   **THE COURT:**  All right.  So are we okay, Mr. Pomerantz?

14   Can we agree that that Exhibit A list is the universe I need to

15   be concerned about?

16   **MR. POMERANTZ:**  I think the universe you need to be

17   concerned about is 21 because they were the only ones that were

18   subject to post-complaint discovery.

19   **MR. SUMMERS:**  And, Your Honor, as to that issue, I've put

20   up on the screen those lists.  The list on the left is the

21   21 individuals.  And this is taken from Mr. Rocca's declaration

22   which lists them.  And then Exhibit C on the right is, again,

23   Exhibit C to their interrogatory responses identifying which

24   ones they say recalled --

25   **THE COURT:**  Can you go back to that prior slide with the

1    37?

2         So what is this Exhibit A?

3         **MR. SUMMERS:**  That was an exhibit to their interrogatory

4    responses.

5         You'll recall at the December 11, 2021, status conference,

6    you required them to answer interrogatories.  We served

7    interrogatories, and we asked them how many of the custodians

8    turned history on.

9         And they responded, saying that they couldn't tell for

10   sure; there was no way to track; but that -- and then they

11   identified in Exhibit C the people that they said recalled

12   having turned history on during the custodial period.

13        **THE COURT:**  All right.  Well, why would I not use that

14   response, Mr. Pomerantz?

15        **MR. POMERANTZ:**  I don't have any question as to who was

16   searched as part of the pre-complaint discovery.

17        I think the question was, the spoliation that's alleged in

18   this motion only really applies to the 21 who were

19   post-complaint custodians who were searched, and that was by

20   agreement of the parties.

21        **THE COURT:**  Where is -- okay.  Where is this agreement?

22   It must be written down somewhere.

23        **MR. POMERANTZ:**  Yeah.

24        **THE COURT:**  E-mail?  Something?

25        **MR. POMERANTZ:**  I don't know if it's in the record or not.

1    I'll ask somebody here to check to see if it's in the record in

2    front of --

3         THE COURT:  Well, I need to see it because I --

4         MR. POMERANTZ:  I don't think there's any dispute --

5         THE COURT:  I thought this was going to be a simple

6    question.  21 or --

7         MR. POMERANTZ:  I can tell Your Honor, if we can't find

8    something that specifically says, we can easily submit it,

9    because I think the parties are in agreement as to who the

10   people were who were searched for post-complaint developments.

11        Oh, Your Honor, I guess -- I'm told that Mr. Rocca's

12   declaration, Exhibit 18, lists the 21 people who were subject

13   to post-complaint discovery.

14        THE COURT:  No, no, I understand that.  But where is the

15   list that says, "Here are the people that are relevant to the

16   chat issue"?  You don't have that list.  There was no --

17        MR. SUMMERS:  We can endeavor to get the document where we

18   agreed to the list of custodians.  There were ongoing

19   negotiations a long time ago.  There might be an e-mail or a

20   letter that confirmed --

21        THE COURT:  All right.  Well --

22        MR. POMERANTZ:  Your Honor, just I think the way this

23   probably went is that each time there was a new request, we

24   negotiated a limited set of custodians.  And so each request,

25   there would be an agreed-upon list.  When you add those up,

1   there's 21 people who were -- who were --

2       **THE COURT:**  Your colleague says there are 37 people.

3       **MR. POMERANTZ:**  That includes the pre-complaint discovery

4   period as well, where there's no dispute about spoliation.

5       **THE COURT:**  Is that right?

6       **MR. SUMMERS:**  Right.  I think it's a question, Your Honor,

7   of what we are talking about.  Right?

8       They identified a set of custodians, the 383.  That was

9   their determination of who to send litigation holds to.

10      We then, after we had some idea who the various people

11  were, agreed to the 37 ESI custodians.

12      The group of 21 are a subset of people from whom documents

13  later were produced over the course of the litigation over the

14  last couple of years.  But we have never agreed to limit --

15  that the preservation obligation should be limited to those 21.

16      Again, things are continuing to unfold.  Things are still

17  happening.  Some of those other people in the group of 37 are

18  still very important.  There may be people outside of the 37

19  that are important.

20      But the 37 was our effort to -- that's the group we agreed

21  to limit ESI production from initially in discovery.

22      **THE COURT:**  All right.  Well --

23      **MR. SUMMERS:**  If that's clear.

24      **THE COURT:**  Okay.  I mean, the best I'm going to be able

25  to do is say it's at least 21.  I don't know -- it's unclear to

 1  me why this is such a mystery.

 2       **MR. SUMMERS:**  I think on the --

 3       **THE COURT:**  But in any event, yeah.

 4       **MR. SUMMERS:**  -- issue of obligation, it was clearly at

 5  least 37.

 6       On the issue of prejudice, there were 21 people from whom

 7  documents have been produced since litigation began.  And to

 8  the extent the obligation to preserve kicked in at the filing

 9  of litigation, the prejudice has been as to those 21.  Those

10  are the people from whom we did not receive discovery.

11       But, you know, we negotiated all of this with the

12  understanding that we were going to be getting chats from these

13  people, and we might have negotiated production from a larger

14  group if we had not known that they had been preserved.

15       So it's hard to re-create what would have happened in time

16  if this issue had been brought to our attention a year and a

17  half ago.

18       **THE COURT:**  Okay.  All right.  Let's get back to business.

19  Those are my questions.

20       Now, we were about to do closings.  We're ready for that?

21       Okay.  Go ahead.

22       **MR. SUMMERS:**  Your Honor, may I just briefly address

23  the Court's question about Exhibit A?

24       **THE COURT:**  Yes.

25       **MR. SUMMERS:**  Just to respond briefly.

1          There's some serious problems with Exhibit A to the Ho

2     declaration.

3          Number one, Your Honor, the data has been anonymized or

4     anonymized.  I forget how to pronounce the word.

5          **THE COURT:**  You're talking about Exhibit --

6          **MR. SUMMERS:**  But it's been made anonymous.

7          **THE COURT:**  You're talking about the Ho declaration?

8          **MR. SUMMERS:**  Correct, Your Honor, Exhibit A.

9          If we look at the left column, they don't give us the

10    names of the custodians.  And some of the custodians produced a

11    larger number -- or were on a larger number of chats that ended

12    up getting produced, and some were on very few.  Like, if you

13    look at whoever Custodian 15 is, only ten chats, involved in

14    ten chats that were produced in this litigation, one-on-one and

15    group, of course.

16         The other thing is that we see a much larger number of

17    chats in the threaded room category than in the one-on-one and

18    group, and that suggests, Your Honor, perhaps that there was

19    massive destruction.  We're seeing such a large disparity in

20    the numbers.  We have no way of knowing what would be typically

21    expected.  They've given us no metrics to know what you would

22    expect.  But we see a tiny fraction in terms of the number of

23    one-on-one and group chats that were produced relative to

24    threaded rooms.

25         Three, we think there may be an overcounting issue.  For

1   example, if Ms. Giulianelli and I are chatting and we go back

2   and forth ten times in one little thread, is that ten on their

3   list or one?  We think it's ten.  So these numbers may

4   represent very, very few conversations.

5       The other thing, Your Honor, as you pointed out, it

6   doesn't show what was destroyed.  This is just, it happened to

7   be somehow that something got produced, someone had history on,

8   and that just doesn't answer the Court's question.

9       Thank you, Your Honor.

10      **THE COURT:**  Okay.  All right.

11      Okay.  Moving party.

12      **MR. SUMMERS:**  Your Honor, with the Court's permission,

13  we'd like to hand up a copy of our presentation and a binder of

14  the exhibits that we'll be referring to during the

15  presentation.

16      **THE COURT:**  Of course.

17      Okay.  Thank you.

18      **MR. SUMMERS:**  Your Honor, before I begin, do we have a

19  sense for how much time we have?  I apologize in advance.  My

20  presentation --

21      **THE COURT:**  Well, how long are you planning on?  Let's put

22  it that way.

23      **MR. SUMMERS:**  My presentation is long, probably 45

24  minutes, Your Honor.

25      And if I might indulge the Court's patience, I know you've

 1   heard a lot and I know you understand the gist of the issues

 2   already, but this is a weighty issue and there's a lot of

 3   evidence that you haven't really seen.  And I want to make sure

 4   the record is complete and that you have a full record before

 5   you before --

 6       THE COURT:  Evidence I haven't seen?

 7       MR. SUMMERS:  Yes.

 8       THE COURT:  Is it in the record?

 9       MR. SUMMERS:  In the briefing.

10       THE COURT:  I'm only going to do what's in the record.

11       MR. SUMMERS:  No.  Everything is in the briefing or, you

12   know, been submitted somewhere.  But --

13       THE COURT:  By the way, let me just jump in on that.

14       Okay.  That's fine.  I will move you along if I am so

15   motivated.

16       Somebody submitted a dec- -- somebody's deposition

17   transcript.  I think there was a witness who didn't show up for

18   some reason.

19       MR. SUMMERS:  Google submitted the deposition -- or we

20   did, the deposition of Mr. Lim, Tian Lim.

21       THE COURT:  Yeah.  Okay.  Here's what I need you to do,

22   though.  You need to just jointly highlight the portions you

23   want me to read.  Okay?  So just redo that, and just put a

24   little yellow or some shading on the -- I don't want to read

25   the whole thing.  I don't have time for it, and I don't think I

1    need to.  So just highlight the relevant parts, and I'll take a

2    look at it.  Okay?  So just do that.  We'll set some deadlines

3    at the end, but just be prepared to do that.

4        Okay.  Go ahead.  Why don't you launch.

5        **MR. SUMMERS:**  Thank you, Your Honor.

6                        **<u>CLOSING ARGUMENT</u>**

7        **MR. SUMMERS:**  Your Honor, you understand the gist of the

8    issue here.  Google, with the flip of a switch, could have

9    automatically preserved one-on-one and group chats.  They chose

10   not to do so, and that was an intentional, calculated decision.

11   And the result of that was to leave it up to individual

12   custodians to take affirmative steps to preserve those chats,

13   whether it be to turn history on or to cut and paste or to

14   forward to e-mail; and in the absence of some affirmative step

15   by a non-lawyer, the evidence would be deleted.  And all of

16   this happened while they were under an obligation to preserve.

17       Now, that much, you know; but there's important

18   evidence --

19       **THE COURT:**  By the way, what is the start date for the

20   preservation obligation?

21       **MR. SUMMERS:**  Your Honor, as you know, litigation was

22   commenced in August of 2020.

23       However, on October of 2019, the United States Department

24   of Justice filed a CID.  And I could fast-forward to it if

25   you'd like to see it, Your Honor.  But it had a request,

 1  Request 37, that called for all documents relevant to

 2  competition with the Play Store, the document description.  The

 3  definition of "documents" included chats and instant messages.

 4  And it specifically included a preservation order component.

 5      Now, in addition to that, the witnesses have testified,

 6  the custodians in this case have testified that they've been

 7  under multiple litigation holds for years.  If Google had been

 8  playing by the rules, these chats would exist going back many

 9  years.  That's how we got e-mails in this case, Your Honor.

10  Their e-mail retention policy is 18 months.  We wouldn't have

11  e-mails for much of the relevant time period if their

12  custodians had not been under litigation holds in other cases.

13      THE COURT:  Let me ask you this.  Now, you represent Epic;

14  right?

15      MR. SUMMERS:  I'm for consumers, Your Honor.

16      THE COURT:  Consumers.

17      MR. SUMMERS:  The consumer class.

18      THE COURT:  All right.  Who represents Epic?

19      All right.  Before you filed -- before Epic filed its

20  suit -- that was the first one; right? -- did you send Google a

21  letter, a pre-suit letter saying, "Here's our

22  concern," whatever it might have been, but something indicating

23  that litigation was imminent?

24      MR. BORNSTEIN:  There was correspondence -- can you hear

25  me, Your Honor?

1      THE COURT:  Yes, but you need to say who you are.

2      MR. BORNSTEIN:  Sorry.  Gary Bornstein for Epic.

3      There was correspondence, Your Honor, prior to the

4  lawsuit.  It was not specifically focused on the subject of

5  litigation.  There was correspondence over Epic's concerns

6  about the Play Store and the anticompetitive practices.

7      THE COURT:  When did those start?

8      MR. BORNSTEIN:  The first that was directly targeted to

9  the issues that are now in play was in the summer of 2020.

10     THE COURT:  Okay.  So a couple of months before you filed?

11     MR. BORNSTEIN:  That's correct.

12     THE COURT:  All right.  I mean, I think that's -- CID may

13  or may not be a driver.  I haven't decided.  But certainly,

14  cautionary letters, inquiry letters, demand letters, to the

15  extent they could be characterized that way, from a litigant in

16  this case is a much clearer trigger.

17     MR. BORNSTEIN:  Well, Your Honor, the one thing I would

18  add on that -- I'm speaking not for my own client here, but we

19  are joined by the states as our co-plaintiffs.  And the states

20  were participants in the civil investigative demand process

21  that Mr. Summers has referred to.  So there are litigants

22  before Your Honor who were responsible for that request

23  prior --

24     THE COURT:  Going back to October 2019?

25     MR. BORNSTEIN:  That's correct.  I'll let the states

 1   correct me if I have that wrong, but that is my understanding.

 2       **THE COURT:**  Okay.

 3       **MR. SUMMERS:**  And, Your Honor, as you'll see later in my

 4   presentation, I don't think the start date of the preservation

 5   obligation will matter in terms of your findings or the

 6   relevant evidence.

 7       **MR. POMERANTZ:**  Your Honor, if I may just briefly respond

 8   to the Epic counsel.

 9       I would direct Your Honor's attention to Judge Gonzalez

10   Rogers' order in the *Apple vs. Epic* case.  She is quite harsh

11   on the way Epic secretly put a hotfix into their app that was

12   for both Google and Apple's app stores and then surprise

13   everybody by suddenly launching their own alternative billing

14   system, which then led to the lawsuit.

15       So I think it's fair to say that the lawsuit that Epic

16   filed was a big surprise.  And it's all spelled out in

17   Judge Gonzalez Rogers' opinion.

18       **THE COURT:**  This lawsuit was a big surprise to Google?

19       **MR. POMERANTZ:**  Yes, Epic's lawsuit.

20       What happened there, Your Honor -- you can just read it.

21   You don't have to take my word for it.  Just read that

22   decision, and you'll see her very troubled about the way that

23   Epic brought about this lawsuit and the Apple lawsuit as well.

24       **THE COURT:**  Okay.  Go ahead.

25       **MR. SUMMERS:**  Your Honor, if I made proceed, what I'd like

 1    to cover this afternoon, number one, is the issue of intent;

 2    the issue of prejudice, number two; and then I'll briefly touch

 3    on reasonableness; and then, four, I'd like to talk about the

 4    litigation misconduct issue; and, finally, I'd like to turn to

 5    remedies.

 6        Turning to the issue of intent, Your Honor, I think what

 7    everyone has to keep in mind here is that we're dealing with a

 8    cold, calculated decision not to retain chats.  We're not

 9    talking about negligence.  We're not talking about an

10    inadvertent mistake.  We're not talking about sloppiness.

11    Google's policy, hold policy for chats expressly excludes

12    off-the-record, one-on-one, and group chats.  So we're dealing

13    with a calculated decision that those materials will never be

14    retained in litigation.  This is Exhibit -- Defendant's

15    Exhibit 1.

16        Number two, you have to understand that Google

17    systematically trains its employees -- and I've never seen

18    anything like this -- trains its employees to be very careful

19    about e-mail and, more specifically, to shift sensitive

20    communications from e-mail to off-the-record chats.

21        What I'm showing you -- this is Plaintiffs' Exhibit 120.

22    It's in evidence -- is the "You Said What?!" training program.

23    It's an interactive training program provided to Google

24    employees annually.  And they go through the program, and

25    they're given a series of questions to answer, multiple choice,

1    and they provide responses, and then they certify their

2    compliance.

3        And what we'll see is that at the very beginning of the

4    training, Google explains why they're receiving the training.

5    And they're receiving the training because Google is constantly

6    at the courthouse and they often have to produce employee

7    communications as evidence.  So we have training, the whole

8    purpose of which -- or at least a large purpose of which is to

9    avoid the creation or preservation of evidence in litigation.

10       And what are they taught?  If we look at the slide in

11   front of you, you'll see -- this is page 13 from the

12   presentation -- they are trained in one of the exercises that

13   rather than sending a sensitive e-mail, it is better to send

14   the sensitive communication by chat.

15       Now, it turns out this isn't the perfect answer.  The

16   perfect answer is to go talk face to face, but it's better than

17   e-mail.  And what's almost more interesting, Your Honor, is to

18   see why they say it's not the perfect answer.  It's not the

19   best answer because there's still a record.  It can still be

20   preserved.

21       So this is very illuminating about the corporate culture

22   at Google and the way in which its employees are trained.

23       Now, they came back -- you may recall Ms. Moskowitz,

24   representing Epic, tried to ask Mr. Rosenberg on the stand some

25   questions about this document.  And when she turned to the

1    training materials, he said it didn't look like the materials

2    he had received.  And Google made kind of a big deal of that in

3    their brief.

4        Well, we went and looked, and it turns out Google tracks

5    compliance with this program.  According to --

6        THE COURT:  Before you do that, on that prior slide --

7        MR. SUMMERS:  Yes, Your Honor.

8        THE COURT:  -- what is that word "hide" doing in there?

9        MR. SUMMERS:  I'm sorry.  Which word?

10       THE COURT:  "Hide."  Go back to that -- what's the word

11   "hide" doing there?

12       MR. SUMMERS:  I think this is an interactive program where

13   boxes pop up.

14       THE COURT:  Oh, hide the box.

15       MR. SUMMERS:  Right.  So they're boxes that come and go.

16       THE COURT:  Okay.  Go ahead.

17       MR. SUMMERS:  No worries, Your Honor.  But anyway --

18       THE COURT:  Seems a little express.

19                        (Laughter.)

20       MR. SUMMERS:  Anyway, with the interactive program, at the

21   end you click "Complete" after you've gone through the program.

22   And so Google maintains data about how many of its employees

23   comply with this training, go through the training.  And

24   according to data provided to their audit committee, the audit

25   committee of the board of directors, 98-plus percent of their

1    employees, including over 98 percent of the vice presidents,

2    completed the "You Said What?!" training in 2020.  And if you

3    look at the right side of the screen, we have the data for

4    2019.  It's substantially the same.

5         So this is not some occasional thing that somebody

6    somewhere saw.  This is systemic training given to the entire

7    organization annually.

8         And what's interesting, Judge, is that we see that it is

9    complied with.  We see examples in their documents of

10   executives enforcing compliance with this guidance.

11        What you have in front of you is Plaintiffs' Exhibit 9.

12   And in this -- it's a draft document that's being put together

13   to update business development managers for the Google Play

14   Store, and it references that an executive summary will be

15   going to Don and Sameer.  Sameer Samat is the vice president

16   who effectively runs the Google Play Store.

17        And we see that right at the beginning of the document,

18   they solicit comment; but they say (as read):

19             "Be careful.  This doc is not privileged.  For

20        anything sensitive, please move to chat/video call."

21        Turning to the next, I have another example for you,

22   Plaintiffs' Exhibit 31.  This is a roundtable -- a document --

23   a briefing book prepared in advance of a roundtable discussion

24   that will be led by Don Harrison, then, I think, senior

25   vice president, now president, of global partnerships, the

1  person who's interfacing with all of the potential conspirators

2  out there in an antitrust case.

3      And in the draft briefing book, a reference is made to an

4  individual from Line Corporation who's going to be attending.

5  And a note is made by someone that Line is a competitor, that

6  they try to maintain a sensitive relationship with them.  And

7  someone deletes that and puts in a comment (as read):

8          "Since this is a sensitive topic, I prefer to

9      discuss off-line or via Hangout."

10     Hangout is chats.

11     We see more examples.  This is a -- we have Plaintiffs'

12  Exhibit 219 before Your Honor.  This is a chat.  And people

13  start talking about the Apple litigation.  And Mr. Yang jumps

14  in (as read):

15         "Reminder:  Do not speculate on legal matters

16     over e-mail or saved chats."

17     So this is not just about moving from e-mail to chat.

18  It's about moving from e-mail to off-the-record chats so that

19  evidence will not be preserved.

20     Another example, Your Honor, and this is a big one.  This

21  is February of 2001, during the pendency of this case.

22  (Official Reporter interrupts for clarification of the record.)

23     **MR. SUMMERS:**  February of 2001.

24     **MR. BORNSTEIN:**  2021.

25     **MR. SUMMERS:**  2021.  I'm getting old.

1    And the author is talking about Apple believing that the

2    Apple App Store is no longer of any value, that it doesn't help

3    with discovery of apps, that it is just a frictional annoying

4    moment that's kind of annoying.

5        That's -- I mean, that's an issue in this case.  Does the

6    Google Play Store provide value to developers and users, or is

7    it just -- are they just a middleman?

8        And Sameer Samat -- again, the guy who basically runs the

9    Play Store, VP of product development for the Play Store, a

10   very senior executive -- responds (as read):

11        "Please keep in mind this chat history is not

12        off."

13       And this is very telling, Your Honor.  Mr. Samat does not

14   say:  Hey, guys, this looks like it may relate to litigation.

15   Make sure we're saving this.

16       He doesn't say:  Hey, guys, this seems to relate to that

17   litigation hold we got.  We shouldn't be talking about it on

18   chat.  Let's move this to e-mail.

19       He says:  History is not off.

20       And there could be no better evidence of the corporate

21   culture that's been created at Google, and it is a culture of

22   concealment.

23       Moving on to the issue of prejudice, Your Honor.

24       THE COURT:  Okay.  So I'm going to assume, unless you tell

25   me otherwise, these are your best -- I'm not saying exclusive,

1   but this is your best evidence of intent; right?

2        **MR. SUMMERS:**  Not exclusive, but the best -- I will show

3   you more of the Communicate with Care training later,

4   Your Honor, and I'll show you Exhibit --

5        **THE COURT:**  And everything in this booklet that you've

6   handed me has all been admitted into the record?

7        **MR. SUMMERS:**  Either -- I believe either -- I'm not sure

8   about everything, Your Honor.  It's either been admitted with

9   witnesses or submitted as exhibits in connection with our

10  various papers.  And there are a few things at the end, there

11  are a couple of documents that were stipulated, in terms of

12  admission, at the last hearing and a handful -- there may be a

13  handful of things that aren't.  They all would have been

14  things -- the two exceptions, I'm being told, are the audit

15  committee materials, which just came to light because we got

16  their reply brief the other day.

17       **THE COURT:**  All right.  Go ahead.

18       **MR. SUMMERS:**  Finally, Your Honor, on the issue of intent,

19  I'm going to touch on the litigation misconduct later in the

20  presentation.  The litigation misconduct is perhaps the very

21  strongest evidence of intent.  Why didn't they tell us about

22  this issue when we started negotiating the ESI order?  Why did

23  they lie to us and the Court at least three times?

24       And I'm sorry for using the "L" word.  I usually try not

25  to.  But these are very significant misrepresentations, and

1     I'll get to that later.

2          But we not only have the training and the intentional

3     diversion of communications to chat where there's a policy of

4     not retaining the chats, but then we have the cover-up.

5          And innocent people don't conceal what they did.  It's the

6     guilty, it's those who are conscious of wrongdoing that try to

7     conceal what they've been doing.  And so we'll get to that in

8     a minute, Your Honor.

9          Turning to the issue of prejudice, first, it's important

10    to understand Google Chat is a business tool.  You can have a

11    personal account and have it on your phone; but at Google, it

12    is on the employees' desktops right with Gmail.

13         What we have here is a screenshot from a Gmail account.

14    And if you look on the far left, you'll see the employee can

15    toggle between Gmail and Chat that easily.  They're seamlessly

16    integrated.  And they have much the same functionality.  You

17    can attach documents to either one.  You can type whatever you

18    want in either one.  You can send calendar invites either way.

19    The functionality is largely overlapping.

20         **THE COURT:**  And there's no limit to the chat size, no

21    character limit?

22         **MR. SUMMERS:**  To our knowledge, no limit, Your Honor.

23         Now, we also see in the documents countless examples of

24    substantive business communications conducted by chat.

25         This is Plaintiffs' Exhibit 11 admitted into evidence.

1   This was a discussion of a meeting with Samsung.  You see

2   references to Sundar.  That's the CEO of the company.  We see

3   the attendees are Larry, Larry Page, one of the founders and a

4   board member; Sundar, the CEO; Hiroshi.  That's Hiroshi

5   Lockheimer, the head of the entire business unit that includes

6   Play.

7        And what do we see?  There's talk of a briefing book and

8   discussion, candid discussion of what Samsung wants:

9   $1 billion.  What do they want $1 billion for?  Revenue share

10  not to compete.

11       The briefing book is lacking that.  I can put it on

12  e-mail.  Samsung's anchored at a billion.  What will it take to

13  get a deal done?

14       I mean, this is very, very candid critical conversation.

15  The links to the documents are included so we can see the

16  evolution of the briefing book, see what's included, what's

17  not.

18       If we continue, I'd like to direct the Court's attention

19  to Plaintiffs' Exhibit 106.

20       **THE COURT:**  Where does it say Samsung wants a billion

21  dollars not to compete?

22       **MR. SUMMERS:**  Who says that?

23       **THE COURT:**  Where does it say that?

24       **MR. SUMMERS:**  Well, what it says, Your Honor, is, they're

25  talking about MADA, the MADA and rev share.  Rev share -- these

1    are agreements that are at issue in the case.  And with rev

2    share, what they do is they go to OEMs.  They say:  Don't load

3    your own -- don't load anyone else's app store on your devices,

4    don't preload, and we'll pay you a bunch of money for doing

5    that.

6         That's a gross oversimplification, but that's the gist of

7    the rev share --

8         THE COURT:  Rev share is shorthand for an exclusive deal?

9         MR. SUMMERS:  It is shorthand for revenue sharing to avoid

10   competition, yes, Your Honor.

11        THE COURT:  In other words, an exclusive placement deal?

12        MR. SUMMERS:  Exactly, Your Honor.

13        THE COURT:  And what is M-A-D-A?

14        MR. SUMMERS:  The MADA is the mobile application

15   distribution agreement, also at the very heart of the case,

16   Your Honor.  That is the -- that's basically the agreement that

17   they require OEMs to enter into to get the Google suite of

18   software that's really needed to have a functioning device.

19        THE COURT:  "OEM" being phone manufacturers?

20        MR. SUMMERS:  Correct, Your Honor.

21        THE COURT:  Okay.

22        MR. SUMMERS:  And, again, these go to the heart of the

23   case.  The MADA and the rev share are -- they're squarely

24   pleaded in the complaint and are at the very heart of the case.

25   And this is how they've essentially secured their dominant

 1  position over the years.

 2      **THE COURT:**  Okay.  Go ahead.

 3      **MR. SUMMERS:**  Here's another example, Your Honor.

 4      **THE COURT:**  Okay.  So, fine, they're having this

 5  conversation.  You actually have it; so I'm not seeing what the

 6  prejudice is.

 7      **MR. SUMMERS:**  Well --

 8      **THE COURT:**  You have it.  I mean --

 9      **MR. SUMMERS:**  We have it but --

10      **THE COURT:**  -- this is the problem I'm having a little

11  bit.

12      Now, I know we don't know what we can't know.  That's

13  always an issue in discovery.  But you do have all of this.  I

14  imagine this will be a trial exhibit.  So what is it that

15  you're prejudiced by?

16      **MR. SUMMERS:**  Well, and I will show you some examples

17  where we think we're missing things, Your Honor.

18      **THE COURT:**  Okay.  But why are you showing me this one?

19  You actually have this.

20      **MR. SUMMERS:**  I'm just making the point here that

21  substantive -- critical substantive business communications we

22  know are conducted via chat.  That's --

23      **THE COURT:**  Okay.  I understand that.  But you're getting

24  them, is what this is telling me.

25      **MR. SUMMERS:**  Well, the issue, again, in every -- in every

1  spoliation case is we don't know what was destroyed,

2  Your Honor.  All we know are the fragments that remain.

3     And the fact that there's one of these that survived

4  automatic deletion means that there were probably dozens more

5  like it that we don't have that may cover any --

6     **THE COURT:**  I mean, but --

7     **MR. SUMMERS:**  -- range of subjects.

8     **THE COURT:**  -- as you said, this goes right to the heart

9  of your case, and that --

10    **MR. SUMMERS:**  It is relevant, yes.

11    **THE COURT:**  -- adverse evidence -- you consider it adverse

12 evidence; maybe even a smoking gun -- is in your hands.

13    So what is the prejudice?

14    **MR. SUMMERS:**  Some has slipped through, Your Honor.

15    But I will show you that we believe and we think the Court

16 can reasonably infer that countless -- all sorts of chats that

17 went to issues in this case have been destroyed.

18    And, again, just for the limited purpose of showing that

19 relevant information is conducted by -- would be contained in

20 chats, I'd point to Exhibit 106.  Here we have -- one of the

21 issues in this case, Google has started to make individual

22 deals with developers.  And they say that's because of

23 competition.  And we say, no, it's not because of competition.

24    Here we have a very candid e-mail saying that (as read):

25        "Sameer" -- again, the VP of product development

1        for the Play Store -- "has asked Purnima," another

2        VP, "to do what it takes to ensure Rakuten," a

3        developer, "does not go to the government to complain

4        against Play."

5        Why are they getting a bespoke deal?  Not because of

6   competition, but because of litigation, government PR-type

7   issues.  Again, very relevant to the case.

8        To move quickly --

9        **THE COURT:**  Is this an e-mail or a chat?

10       **MR. SUMMERS:**  That is a -- it looks like a chat,

11  Your Honor, and that's our point.

12       **THE COURT:**  I thought you said e-mail, but this is a chat?

13       **MR. SUMMERS:**  I'm sorry.  This is a chat.

14       **THE COURT:**  Yeah.  Okay.

15       **MR. SUMMERS:**  It's a chat.  I'm sorry.

16       **THE COURT:**  Go ahead.  Okay.  Yeah.

17       **MR. SUMMERS:**  To continue, we have evidence from several

18  key witnesses who have told us that they use substantive --

19  that they use chats for substantive business communication.

20       Mr. Mattson, for example, when he was asked, he said:

21  Yes, we use it for substantive communication.

22       We asked:  Can you give us examples?

23       He said (as read):

24            ". . . whatever is relevant to the work that's

25       going on."

1      You might recall that Mr. Lopez gave similar testimony

2  when he said it could be anything under the sun.

3      And Mr. Mattson testified that his colleagues communicate

4  in a similar way.

5      To continue, we discussed earlier the Lim deposition.

6  When you view the Lim deposition, you'll see that he also

7  admitted to using chats for business purposes on a daily basis

8  and that he never turned history on.

9      You heard from Mr. Rosenberg in court.  Never changed the

10  default history.  He's one of the 37 ESI custodians.  He's also

11  one of the 21.  He's at the heart of a lot of the issues in

12  this case, right there with Mr. Samat.  Never turned history

13  on.

14      There are others.  Mr. Kolotouros, the former

15  vice president of Android partnerships.

16      (As read):

17      "QUESTION:  How long have you had history off in your

18      Google chats?

19      "ANSWER:  I think for as long as I've been using

20      Google Chat.

21      "QUESTION:  Have you ever turned history on?

22      "ANSWER:  Not that I recall."

23      Witness after witness testified that they never turned

24  history on.

25      And, again, Mr. Kolotouros is one of the 37 agreed ESI

1   custodians.

2       Mr. Bankhead, both one of the 37 and one of the 11.

3       (As read):

4       "QUESTION:  And did you use Google Chat regularly?

5       "ANSWER:  Yes.

6       "QUESTION:  Do you know whether your chats were preserved?

7       "ANSWER:  No.

8       "QUESTION:  Did you ever change your messaging history

9       settings to on?

10      "ANSWER:  Not that I recall."

11      Witness after witness who were asked said they never

12  turned history on.

13      Again, when we served our interrogatories on Google, the

14  document preservation interrogatories, we asked them questions

15  just like the Court did.  They told us they had no way to track

16  when history was turned on or off.  They told us that they

17  would instead give us a list of those who could recall turning

18  history on.

19      That data, as we've already discussed, showed that only 11

20  of the 37 agreed ESI custodians ever, ever during the custodial

21  period turned history on according to their recollection.

22      In the latest rounds of briefing, we focused on the 21,

23  and the data is much worse for them when you focus on 21.  Only

24  three of the 21 -- only three of the 21 custodians who are the

25  subject of refresh updated productions during the course of

 1   this litigation ever, according to Google, turned history on.

 2        And it gets worse when you look at the 21 and you start

 3   looking at who the real -- the heavy hitters are.  They're

 4   almost entirely in the category of people who say they never

 5   turned history on -- the president, the CFO, the top VPs --

 6   all on the left side, with one exception, Ms. Kochikar.

 7        Ms. Kochikar is the vice president of Google Play Apps and

 8   Games, and she's a very important figure in this litigation, as

 9   I'll show you.

10        But what's interesting is we --

11        **THE COURT:**  So, I'm sorry.  Only the three in blue ever

12   activated preservation for chat?

13        **MR. SUMMERS:**  Correct, Your Honor, according to their

14   recollection.  Once.  Recall ever doing it.

15        **THE COURT:**  And that could have been just for one message;

16   right?

17        **MR. SUMMERS:**  Correct, Your Honor, as far as we know.

18        But it's worse, Your Honor, because we deposed

19   Ms. Kochikar and we asked her if she ever turned history on.

20   And I'd like to play that testimony for you.

21             (Video was played but not reported.)

22        **MR. SUMMERS:**  That was a "no."

23             (Video was played but not reported.)

24        **MR. SUMMERS:**  Yes, set to delete.

25        **THE COURT:**  Okay.  But you have her down here as having

1  turned it on at one point.

2      **MR. SUMMERS:**  Google put her down as having turned it on

3  in their interrogatory responses to us.  My point is, I don't

4  know -- we don't know what to make --

5      **THE COURT:**  Oh, I see.  Google represented that she had

6  done it, and you're saying that --

7      **MR. SUMMERS:**  She's testified under oath she never did.

8  And I believe her deposition was after we got the interrogatory

9  responses.

10      And so we're sitting here scratching our heads.  We don't

11  know what to believe, Your Honor.  Every witnesses we asked

12  says:  No, no, no, no, no, no, no, never, never, never.  It's

13  always been set to off.

14      They say:  Here are some people that turned it on.

15      And we ask, and they, at least in the case of Ms. Kochikar

16  say:  No, I never turned it on.

17      **THE COURT:**  All right.

18      **MR. SUMMERS:**  Now --

19          (Video was played but not reported.)

20      **MR. SUMMERS:**  Sorry.

21      To continue, Your Honor, I just want to talk -- I want to

22  give you an example of where we think things are missing.  We

23  learned in discovery -- in discovery, we found some

24  communications between Google and Facebook suggesting that they

25  had made an oral agreement not to compete.

1       And I've put on the screen --

2       **THE COURT:**  Not to compete over what?

3       **MR. SUMMERS:**  Not to compete in the distribution of apps,

4   Your Honor.

5       **THE COURT:**  Facebook?

6       **MR. SUMMERS:**  Facebook.  And I'll tell you why, very

7   briefly.

8       Facebook is often preloaded onto people's phones.

9   Facebook has the ability -- has install permissions.  It has

10  the ability to update itself without going through the

11  Play Store.

12      And to fast-forward, Google discovered, through

13  communications with Facebook -- this is back in 2013 --

14  discovered that Facebook had the capability, with its install

15  permissions, to offer its own app store to distribute and

16  update apps --

17      **THE COURT:**  Third-party apps.

18      **MR. SUMMERS:**  -- without going through Google.

19      **THE COURT:**  Third-party apps?

20      **MR. SUMMERS:**  Yes.  They become a gateway.

21      **THE COURT:**  In other words, set up a competing app market?

22      **MR. SUMMERS:**  Correct, Your Honor.  That it could become a

23  competing gateway to the distribution of apps.

24      **THE COURT:**  My page 35 has scenery on it.  Is this 35?

25      **MR. SUMMERS:**  You know, Your Honor, I think that after we

 1   printed the deck, I moved a few things around.

 2        **THE COURT:**  That's fine.  What page is this?

 3        **MR. SUMMERS:**  It should be in very close proximity.  Maybe

 4   34 in your deck, Your Honor, or 33.

 5        **THE COURT:**  34.  Okay.  That's fine.  Don't worry about

 6   it.  Go ahead.  All right.

 7        **MR. SUMMERS:**  And, Your Honor, they discovered this

 8   issue -- and just to look at this e-mail since I have it on the

 9   screen, we see Hiroshi Lockheimer and Jamie Rosenberg.  Jamie

10   Rosenberg, VP of Android; Hiroshi Lockheimer, above him.  And

11   they say (as read):

12             "Last time we had an issue, we had to get

13        someone involved.  Probably best if folks keep

14        discussion off of e-mail to the extent possible."

15        And then what do we find?  We ask Ms. Kochikar about this,

16   and she admits that there was an executive verbal agreement

17   dating back to Hiroshi and Jamie regarding install and update

18   permissions.

19        And we asked her more questions, and we try to pin her

20   down on what the agreement is.

21        And she says (as read):

22             "Well, Facebook has agreed, I think, to focus

23        more on the 1P and allow for Google solutions on the

24        3P."

25        Very vague.  Let's talk about what 1P is and what 3P is.

 1   1P is updating your own app.   3P means updating or delivering

 2   third-party apps.

 3        So we have an apparent executive oral agreement between

 4   horizontal competitors where there's some kind of a deal.   And

 5   we want to know what the deal is, Judge.   And when we look for

 6   e-mails, boy, there really aren't a lot of Google e-mails

 7   internally about it.

 8        **THE COURT:**  All right.  So how does --

 9        **MR. SUMMERS:**  But we know that they decided --

10        **THE COURT:**  How does that e-mail on page 34 relate to

11   this?

12        **MR. SUMMERS:**  I want the chats, Your Honor.  We want the

13   chats.  We know that Mr. Lockheimer, we know that Mr. Rosenberg

14   communicated via chat, and we don't have their chats.  Both of

15   them, both of them admitted they never turned chat history on.

16   Both of them are on the --

17        **THE COURT:**  No.  I'm asking a different question.

18        Substantively, how does the communication on page 34

19   relate to that testimony you just showed me?

20        **MR. SUMMERS:**  Because of the discrepancy -- when you say

21   "page 34" --

22        **THE COURT:**  The one with the reference to --

23        **MR. SUMMERS:**  Right.

24        **THE COURT:**  -- Jamie Rosenberg, Lockheimer, Kent Walker.

25        **MR. SUMMERS:**  How does it relate to the case, Your Honor?

 1        THE COURT:  No, no.  You just showed me that testimony

 2   about 1P and 3P.

 3        MR. SUMMERS:  Right.

 4        THE COURT:  How does this e-mail content relate to that?

 5        MR. SUMMERS:  Your Honor, if you look in the bottom

 6   call-out, they say (as read):

 7             "Right now Facebook appears to be using it" --

 8        "it" referring to the install permissions -- "only

 9        for self-updates . . . ."

10        THE COURT:  And that would be the 1P?

11        MR. SUMMERS:  Correct.  But it would be relatively

12   straightforward to simply start downloading other APKs, instead

13   of their own, and installing those via the same avenue; i.e.,

14   the Facebook app could become an app store.

15        THE COURT:  In other words, a 3P?

16        MR. SUMMERS:  3P.

17        THE COURT:  And this predates the ostensible agreement

18   that was testified about?

19        MR. SUMMERS:  Correct, Your Honor.

20        So what happens is -- and this is what we know.  This

21   issue surfaces at Google.  They get very animated about it.  We

22   know that Mr. Lockheimer and Mr. Rosenberg, they have

23   communications with Facebook.

24        And then we know that later, after these meetings occur,

25   that Facebook stays in its lane, updating only the Facebook

1    app, and Google goes about its business with the Play Store.

2    And we know that Ms. Kochikar calls it some kind of an

3    agreement where Facebook focuses more on the 1P and allows for

4    Google to focus on 3P or -- in the words of her e-mail to

5    Facebook.

6         Now, if we go back to --

7         **THE COURT:**  This is ten years ago.

8         **MR. SUMMERS:**  I know.  I know.

9         **THE COURT:**  It's 2013.

10        **MR. SUMMERS:**  But the slide I'm putting in front of you,

11   Judge, the earlier slide, the e-mail from Ms. Kochikar, it's

12   June of 2020.  And what's happening here in this e-mail, if you

13   look at the exhibit, she finds out, they hear from Facebook

14   that Facebook is working on 3P issues again, and she enforces

15   the agreement.  She goes to Facebook.  This is an e-mail from

16   her to Facebook saying, "Cut it out, kids."

17        Now, who told Ms. Kochikar about the agreement?  How did

18   she find out about it?  It's possible that it was through oral

19   discussions with Mr. Lockheimer and/or Mr. Rosenberg, but it's

20   also possible that they were chatting with her, and we haven't

21   seen those chats, Your Honor.

22        **THE COURT:**  Well, okay.  Just tell me what you think -- so

23   you're saying you didn't get any chats on this issue?

24        **MR. SUMMERS:**  Correct, Your Honor.

25        **THE COURT:**  Okay.  And it just stands to reason, in your

1    view, that there must be something for such an existential

2    threat -- my word, not yours -- to the App Store at Google?

3         **MR. SUMMERS:**  Yes.  I think it's highly likely -- we

4    believe it's highly likely that there were relevant chats that

5    have been destroyed.  We certainly have not seen them in the

6    production.

7         **THE COURT:**  Now, again --

8         **MR. SUMMERS:**  Unless they're communicated somehow --

9         **THE COURT:**  -- you have this entire string of e-mails; you

10   have the deposition testimony.  You have a lot to work with.

11        So what is it you're -- look, here's the thing.  The world

12   is not perfect.  You know that better than I do.  So if you got

13   80 percent of what you need, why is the 20 percent -- it'd be

14   great to have it.  It would be lovely to be able to find a

15   soundbite.  And I'm saying all that's legitimate.  You're trial

16   lawyers.  You want that.  I understand it.

17        But if you didn't get that little extra, why is that

18   necessarily prejudicial?

19        **MR. SUMMERS:**  Your Honor, I would suggest that we have

20   10 percent of it, and I'll tell you why.  Because everyone else

21   is suffering amnesia.  I've put Ms. Kochikar's testimony on the

22   screen because she said "yes" and refused to lie.  But the

23   Facebook people are now suffering amnesia.  Mr. Lockheimer --

24        **THE COURT:**  What does that mean?

25        **MR. SUMMERS:**  -- and Mr. Rosenberg are suffering amnesia.

1     THE COURT:  I don't know what that -- what does that mean?

2     MR. SUMMERS:  They don't remember anything, Your Honor,

3  when it comes to this subject, or very little.  They don't

4  remember the meetings or what was said.  And the chats would

5  destroy their credibility, Your Honor --

6     THE COURT:  Why --

7     MR. SUMMERS:  -- and prove the existence --

8     THE COURT:  But why is that going to be in a chat?  Why is

9  that exclusively in a chat?  Why isn't that in an e-mail?

10     MR. SUMMERS:  They didn't use e-mail, Your Honor.  We have

11  very few e-mails, very few --

12     THE COURT:  Hold on.

13     MR. SUMMERS:  -- internal e-mails.

14     THE COURT:  You have cited e-mails.  You've shown me

15  e-mails.  They did use e-mails.

16     MR. SUMMERS:  Your Honor, that's because --

17     THE COURT:  That is an e-mail on page 31.

18     MR. SUMMERS:  And, Your Honor, that's because --

19     THE COURT:  So my question is:  Why assume -- maybe

20  there's some.  That's not an unreasonable inference.  But why

21  are you assuming that the hottest smoking guns are necessarily

22  only on chat?

23     MR. SUMMERS:  Again, going back -- first of all, we have

24  this e-mail because it's an e-mail from Ms. Kochikar to

25  Facebook.  And as far as we know, the two of them were not

 1   communicating by chat.

 2       It's the internal communications that we are missing

 3   amongst Googlers about Facebook.  And we have enough to know

 4   that something happened, but we have witnesses who are not

 5   recalling what the agreement was and what was discussed and

 6   what was agreed to.  And they're -- you know, the chats would

 7   have a strong bearing, we believe, on this.

 8       **THE COURT:**  And you got zero chats on this Facebook

 9   app store --

10       **MR. SUMMERS:**  To my knowledge, zero of any significance,

11   yes.

12       **THE COURT:**  You're adding a modifier.  Did you get any

13   chats or chats you just didn't think were --

14       **MR. SUMMERS:**  Not to my knowledge.

15       **THE COURT:**  -- good?

16   No chats at all?

17       **MR. SUMMERS:**  Hmm?

18       **THE COURT:**  No chats at all?

19       **MR. SUMMERS:**  Not to my knowledge, Your Honor.

20       **THE COURT:**  Okay.

21       **MR. SUMMERS:**  And, again, the training -- we have to go

22   back to the training materials.  They were trained to discuss

23   sensitive things by chat, not e-mail.

24       **THE COURT:**  Well, I'd say the training wasn't great

25   because you got a lot of e-mails.  So I'm not sure that that's

1   working out in your direction.

2       **MR. SUMMERS:**  We'll talk about this, Judge, but we --

3   I think we would disagree about the number that -- we see very

4   little candid discussion --

5       **THE COURT:**  I know you disagree, but you have to give me

6   some metrics.  You can't just say 10 percent and pull that

7   number out of the air.  Maybe that's right.  Maybe it's not.

8       But it's a vastly different thing to say you got

9   80 percent of what you need and are entitled to or you got

10  10 percent of what you need and are entitled to.  And you're

11  not helping me fix that line.  That's what I want you to do.

12  And that is the prejudice line.

13      **MR. SUMMERS:**  And sadly, they have constructed this

14  system, Your Honor.

15      **THE COURT:**  I understand.

16      **MR. SUMMERS:**  They've --

17      **THE COURT:**  Let me just finish my thought.

18      I understand that.  I'm not asking you to do what you

19  can't do.  But you do have to give me a best estimate and tell

20  me why that is your best estimate.  Simply saying, "We know

21  that there's a lot of discussion going on but we don't know how

22  much and we don't know who and we don't know when" is not great

23  for you.  You need to give me something a little bit more than

24  that if you can.  If you can't, then that's okay.

25      **MR. SUMMERS:**  I would offer that I think one of the half

1   dozen witnesses that are key to this subject has given us a

2   semblance of what really happened.

3          **THE COURT:**  You mean Ms. Kochikar?

4          **MR. SUMMERS:**  Correct.

5          **THE COURT:**  Yes.  Okay.  All right.

6          **MR. SUMMERS:**  Moving on, Your Honor, I just wanted to

7   touch again on the issue of the training.  The document I

8   showed you earlier, the who-said-what training that everyone

9   was put through annually, that's not the only training document

10  that tells people to communicate with care.

11         Another example is Plaintiffs' Exhibit 8, and I've put it

12  on the screen.  This is interesting because this is a

13  presentation that is given to brand-new Google employees.  They

14  call people that work at Google "Googlers," and they call the

15  new people "Nooglers," I believe.  And, again, they're taught

16  to communicate with care.

17         And if you look at this one in this particular example,

18  they're being taught how to give documents that they create the

19  indicia of privilege.  But the key point for present purposes

20  is, they're taught if something is sensitive, be very careful

21  with your e-mails.

22         And, again, from the testimony we saw earlier --

23         **THE COURT:**  Well, but it doesn't say "Go use Chat," does

24  it?

25         **MR. SUMMERS:**  This particular document does not, but the

 1   who-said-what --

 2       **THE COURT:**  It's not particularly suspicious for a

 3   corporation to say, "Be careful of what you say in an e-mail."

 4   It's just not.

 5       So, okay.  What's next on prejudice?

 6       **MR. SUMMERS:**  Your Honor, again, in terms of the date, we

 7   have the DOJ CID, which I've put on the screen.  As you'll see,

 8   paragraph 36 covers documents relating to competition with the

 9   Play Store, and the definition of "documents" include chats.

10   Elsewhere in the document there is a preservation demand.  And,

11   again, the custodians were subject to numerous litigation holds

12   before that.

13       But what I'd like to turn to, Your Honor, is a slightly

14   different issue.  Google says that the prejudice in this case

15   is very limited because the core issues occurred before the

16   filing of the complaint.  Well, it turns out, Your Honor, that

17   a lot of important things have happened after the filing of the

18   complaint that have triggered requests for supplemental

19   production.

20       You may recall that Google cut the headline take rate from

21   30 percent to 15 percent for the first million in developer

22   revenue during the pendency of the case.  They later cut the

23   take rate on subscriptions to 15 percent, again, during the

24   pendency of this case.  Google is going to rely on this

25   evidence to suggest that competition is at work and that there

 1   was no pass-through.

 2        Our contention is that these changes were engineered

 3   knowing that they would have minimal, if any, impact on Google

 4   but that they would be good for litigation and PR.  And --

 5        **THE COURT:**  Minimal impact in terms of their market share?

 6        **MR. SUMMERS:**  Revenue, because there are lots of

 7   developers that offer apps that don't have any revenue, and so

 8   when you start saying we're going to cut the take rate on the

 9   first million of revenue, what you do is you can say:  Well,

10   90 percent of developers aren't paying 30 percent; they're only

11   paying 15 percent.  But when you actually look at the revenue

12   impact to Google, it's absolutely de minimis.  These are all

13   just engineered for litigation and PR purposes.

14        But we'd like to see the candid chats about why they were

15   doing this.  And I haven't put them in the deck, but we --

16   you know, we have documents in which Mr. Samat says basically

17   to keep this stuff off e-mail.

18        To continue --

19        **THE COURT:**  Well, I imagine there may have been even more

20   candid chats between businesspeople.

21        **MR. SUMMERS:**  That's precisely what we think exists,

22   Your Honor.

23        **THE COURT:**  Right?

24        **MR. SUMMERS:**  But we don't have them.

25        We also know that during the pendency of the case -- one

 1   of the issues here is the tie, a tying arrangement between the

 2   App Store and Google Play billing.  All the money has to go

 3   through Google.  And during the pendency of the case,

 4   South Korea passed a law prohibiting that.

 5        Pursuant to that, Google offered user choice of billing,

 6   and they cut the take rate by 4 percent.  Again, they're going

 7   to use that as economic evidence to suggest that the proper

 8   take rate for the Play Store is 26 percent and that 4 percent

 9   should be allocated to the tie.  They're going to try to use

10   it -- and, again, this was all constructed for purposes of

11   litigation.  We would like the internal, candid chats.  We

12   don't have them.

13        And more recently, Google has launched a pilot program to

14   offer choice of billing.  Again, we think these things all were

15   done in the context of litigation and they were engineered --

16   everything Google has been done -- has done has been engineered

17   for purposes of litigation or with litigation in mind; and yet,

18   we don't get the candid chats.

19        More importantly, perhaps, throughout the litigation,

20   Google has continued to enter into the agreements with OEMs at

21   issue in this case, the terms of which have changed.  They've

22   also continued to enter into agreements with large developers

23   to try to prevent them from offering unique content to

24   competitive stores.

25        **THE COURT:**  But you have all of that.

1        MR. SUMMERS:  We have the agreements.  We don't have the

2   discussions of why the terms were done, what the purpose of

3   these deals is, the anticompetitive nature of them.

4        THE COURT:  Well, you have e-mails about the agreements.

5        MR. SUMMERS:  Again, Your Honor, scant.  We have some, but

6   they are very careful not to say things in e-mail.

7        THE COURT:  What about deposition testimony?

8        MR. SUMMERS:  They're very skilled witnesses, Your Honor.

9   We have some, but I don't think the witnesses have been candid.

10  Again, I don't know how to prove that to you empirically.

11       THE COURT:  Well, you can't, but I understand.

12       MR. SUMMERS:  Yep.

13       THE COURT:  Okay.  All right.  Go ahead.

14       MR. SUMMERS:  Your Honor, and, again, these events all

15  triggered updated productions during the course of the

16  litigation.  Each time one of these things happened or as we

17  learned they were entering into new agreements, we asked for

18  updated productions; and they agreed, recognizing that the

19  information was relevant.

20       To continue, Google has had a whole series of secret or

21  secretive projects, reexamining its business model and its

22  economic arrangements with developers and OEMs, and they all

23  have code names.  They've been maintained, again, in some great

24  secrecy.  We have been asking about these, and we've used these

25  terms, the code names, as search terms, and we've gotten

1    updated productions.  But, again, we see very, very, very few

2    chats and very few e-mails.

3        **THE COURT:**  Give me one -- I don't want to dwell on this

4    too much, but just pick one of these as an example of what the

5    project might have been.

6        **MR. SUMMERS:**  Project Hug.

7        **THE COURT:**  Hug?  Okay.

8        **MR. SUMMERS:**  Hug.  Down toward the bottom, Your Honor,

9    second from the bottom.

10       As you know, developers like Epic and Match have been

11   unhappy with the 30 percent take rate.  Google calls it

12   developer agitation.  And they've talked about and had looked

13   at ways to distribute their apps differently.

14       And what Google has done with Project Hug, they studied,

15   first, what kinds of deals -- let's just take the top few

16   developers, the ones we're really afraid of, and let's see what

17   sort of financial inducements we can offer them not to do deals

18   with alternate play stores.

19       What Google is afraid of, Your Honor, is always exclusive

20   content or special deals.  So if people are using Google Play

21   and they can buy an app or download something on their app at a

22   certain price, if another play store is out there but it's the

23   same -- the exact same content at the exact same price, users

24   are not going to switch play stores.  They're going to stay

25   with Google Play by default.  But if the Samsung Galaxy Store

 1   offers a promotion -- there's a hot game that all the kids want

 2   to have -- and Samsung says we're going to make it available

 3   cheaper, kids will switch.

 4        So in Project Hug, what they have done is they've said:

 5   Let's figure out what we need to do to prevent developers from

 6   offering competitive app stores anything to distinguish

 7   themselves from the Play Store.

 8        That's key to our case.  And, again, we think that these

 9   projects --

10        **THE COURT:**  You're saying this was a project to persuade

11   developers not to offer consumers lower prices?

12        **MR. SUMMERS:**  Not -- yes, to convince developers not to

13   offer exclusives to other play stores, to prevent other play

14   stores from being able to effectively compete against --

15        **THE COURT:**  Exclusives, but not necessarily -- you were

16   talking about lower prices, but is that --

17        **MR. SUMMERS:**  It could be, yes.  Yes, it could be special

18   content like a game gets launched first on some other store; it

19   could be the game is better on another store; or it could be a

20   lower price.  If everything is the same between stores --

21        **THE COURT:**  And how was the Hug accomplished?  Through

22   financial incentives?

23        **MR. SUMMERS:**  Yes, financial incentives, Your Honor.

24        **THE COURT:**  Did they actually sign any of these

25   agreements?

1    **MR. SUMMERS:**  Yes, Your Honor.

2    **THE COURT:**  With who?

3    **MR. SUMMERS:**  I couldn't give you the names.  I'm not an

4    expert in Project Hug.

5    Do we --

6    **THE COURT:**  That's fine.  All right.

7    **MR. SUMMERS:**  Lauren, would you like to --

8    **THE COURT:**  Just one example would be -- yeah.

9    **MS. MOSKOWITZ:**  Activision Blizzard/King, Riot, and

10   SuperStar were three we named in our amended complaint alleging

11   this very issue.

12   **THE COURT:**  All right.  So they all got a Hug agreement,

13   so to speak?

14   **MR. SUMMERS:**  Right.  They get a bear hug.

15   **THE COURT:**  And what's the prejudice here?  So you know

16   all about this.

17   **MR. SUMMERS:**  These are secretive projects that the Google

18   people are avoiding e-mail.  And we think that they

19   communicated by chat, and we think the chats were destroyed.

20   **THE COURT:**  Do you have any -- we've seen a couple of

21   e-mails where someone has expressly said, "Let's move to chat."

22   Do you have any of those e-mails for any of these projects?

23   **MR. SUMMERS:**  I've mentioned that I think we have -- we

24   have one where Mr. Samat didn't want people to discuss the

25   announcement of the take rate cuts.

1      I can't think of any specifically with respect to these

2   projects.

3      **THE COURT:**  Okay.  Go ahead.  We should think about

4   getting to consequences.

5      **MR. SUMMERS:**  Yes, Your Honor.  And we're moving pretty --

6   we've got a little bit to cover, but we're moving.

7      Your Honor, again, just to recap, Google executives

8   testified that they regularly used Chat for business

9   communications.  We know that -- we know that in practice they

10  have steered communications to off-the-record chats.  We know

11  that they are trained to steer communications to off-the-record

12  chats.

13     We know that this was all according to "You Said What?!"

14  in the context of avoiding the creation or preservation of

15  evidence that could be used against Google in litigation.

16     And we know that almost all of the relevant custodians,

17  whether you look at the 37 or the 21, never turned history on

18  to preserve chats during the relevant time period.

19     And we know that there are relevant events occurring after

20  the litigation began, if that's the trigger.  There were lots

21  of relevant events occurring that triggered supplemental

22  productions.

23     I think from this record, Judge, you can clearly and

24  should clearly infer that relevant material was destroyed and

25  that we were prejudiced as a result.  I don't know how, in a

1   spoliation context, we could do any better than this without a

2   witness who just confessed.  And as you know from your criminal

3   docket, that seldom occurs until they're caught.

4          And, again, Your Honor, Google has not suspended automatic

5   deletion to this day.  This is not an "Oh, gosh, we're sorry;

6   we didn't know you expected us to hold on to that stuff."  To

7   this day, they continue to automatically delete chats.

8          Now, turning to the issue of reasonableness, Your Honor,

9   you know the story here.  Google custodians can turn their

10  default history from off to on simply by joining a group.  It's

11  called the G Chat history default on group.  They join this

12  group, and then their default switches from off to on.

13         In addition, administrators can go in and do it for them.

14  Very simple.

15         So all Google had to do was tell a chat administrator to

16  move the 37 or the 21 --

17         **THE COURT:**  Let me ask this.  I want you to be done by

18  3:00, if you don't mind.

19         **MR. SUMMERS:**  Yes, Your Honor.

20         **THE COURT:**  Let me ask you this:  At any time did Google

21  give you what would be a burden demonstration?  For example:

22  We would love to preserve chats or we would love to negotiate

23  about preserving chats, but it's going to cost us $10 million a

24  week, and we're going to have petabytes of information that we

25  can't search.  They won't be searchable.  It will just be a

1     Mount Everest of chaotic data.

2         Anything along --

3         **MR. SUMMERS:**  Never, Your Honor.  Never.

4         Again -- and we'll get to this in a minute -- they hid the

5     issue from us.  They never disclosed the issue for over a year.

6     We had to claw at them and claw at them; and only when we had

7     them pinned down with a specific question -- Have you

8     suspended? -- did we get a straight answer about deletion.  And

9     then we got lies after that about what was really going on

10    here.  I'll get to that in a moment.

11        But when it comes to burden, they have made no showing

12    that there is any additional burden to preserving

13    off-the-record chats than there is to preserving e-mail or

14    on-the-record chats.  And Mr. Lopez testified on the stand that

15    they automatically preserve both e-mails and the threaded rooms

16    and other on-the-record chats.

17        **THE COURT:**  But just to be clear, you, prior to this

18    hearing, never got any of that information from Google?

19        **MR. SUMMERS:**  There was -- they never -- they never

20    suggested there was any sort of burden.

21        **THE COURT:**  Okay.

22        **MR. SUMMERS:**  They did suggest that they had a

23    technical -- there was a technical reason why they couldn't,

24    and we know now that that's not true.

25        To move on, Mr. Lopez testified that they did nothing to

1   make sure that the custodians turned the default history to on.

2   He also admitted that they basically left it up to Google

3   employees to decide whether to save.

4       And, Your Honor, we know, in the ordinary case, it's not

5   reasonable to ask non-lawyer individual custodians to decide

6   what ESI to preserve and what not to preserve.  Number one,

7   they are not familiar with the intricacies of the case.  They

8   do not know what may have evidentiary value in an antitrust

9   case, which can be very complicated.

10      Recall, Mr. Rosenberg didn't feel comfortable expressing

11  any opinions on the subject, and he's already been deposed and

12  was prepared.

13      Mr. Lopez, as a lawyer, didn't feel comfortable --

14      **THE COURT:**  Well, look, here's the shorthand.  You never

15  let the witness decide what to keep.

16      **MR. SUMMERS:**  Right.

17      **THE COURT:**  I'm with you on that.

18      **MR. SUMMERS:**  And it's worse here, Your Honor.

19      **THE COURT:**  That's just a basic litigation proposition.

20      **MR. SUMMERS:**  These are busy vice presidents and higher.

21  But worse, Your Honor, in the ordinary case, you don't allow

22  that to happen.  In this case, the custodians at issue are

23  being accused of participating in antitrust violations, in

24  anticompetitive conduct, and they've been trained to shift

25  sensitive communications from e-mail to chat specifically.  To

1    give them the decision whether to preserve is like asking the

2    wolves to guard the sheep.  You can't create a culture of

3    concealment and then tell those people:  Well, click the button

4    if you have to save.

5        And if you look at Exhibit -- Defendant's Exhibit 2,

6    Your Honor, which is their policy document on chat retention,

7    it says you shall only -- you should only save chats if they're

8    relevant to your work and you need them or there's a litigation

9    hold.

10       And then you go to the section where it asks about

11   changing the default history.  Look at the first sentence,

12   Your Honor.  First sentence, when the person asks -- this is a

13   user (as read):

14           "Can I change my defaults?

15           "Yes, but be mindful about the risks of

16       overretaining chat conversations."

17       This is just three paragraphs or so after the portion that

18   says they should only retain them if they're subject to a

19   litigation hold or they absolutely have to.

20       So there is a culture here of:  Don't save them.  Wink,

21   wink.  Save them if you're under a litigation hold.

22       Moving forward, Judge, to answer your question, when

23   Mr. Lopez was here on the stand under Google's examination,

24   they tried to create the impression that there was some burden.

25   And he said, well, it would be "difficult from an admin

 1    perspective" because there's just so many people under

 2    litigation hold.

 3         And Ms. Moskowitz, from our side, followed up on

 4    cross-examination.  She said:  Are you basically saying it's

 5    too many clicks of a button?

 6         And look how evasive he was (as read):

 7              "As a non-engineer, I can't actually answer the

 8         technical issues that you're describing."

 9         What?  We just wanted to know what the gist of these

10    so-called administrative burdens were, and all he could come up

11    with was:  An admin issue.  I can't tell you what it is.

12         That's their showing of burden, Your Honor.

13         To move on, you know, they say we don't cite any

14    authority.

15         THE COURT:  You can gloss that.

16         MR. SUMMERS:  Okay.

17         THE COURT:  Look --

18         MR. SUMMERS:  I want to talk about the --

19         THE COURT:  Let me just -- I've raised it a number of

20    times.  It's what I'm most interested in getting guidance on.

21         The remedy needs to be proportionate to the harm.  And the

22    harm is -- just thinking out loud.  I'm not tying my hands,

23    certainly, or yours.  The harm is, as is always the case when

24    you don't know what you don't know, a bit difficult to put a

25    metric on.

 1          So I've already told you this will not be a terminating

 2     sanction.  I don't think there's any confusion about that.

 3          The only thing that I can see that makes some sense, and

 4     all things being equal, if I decide -- and it's an "if," it's

 5     conditional -- if I decide Google is culpable, all things being

 6     equal, they get the lion's share of the doubt.  In other words,

 7     the remedy will be -- if I have to have a weak remedy or a

 8     slightly overinclusive remedy, a slightly overinclusive remedy

 9     is the right way to go for a wrongdoer.  Now, that's if I

10     decide, if and only if I decide something has gone wrong, which

11     I haven't made up my mind on.

12          But if I do, I really can't see much more than a

13     permissive, not mandatory, not directive, but a permissive

14     adverse inference, "permissive" meaning one of those very short

15     sentences.  I've used it before in some civil cases.

16          "If you find that Google did not adequately

17          preserve certain documents, you may conclude that the

18          contents of those documents were adverse to whatever,

19          Google's interests."

20          That's not the instruction.  I'm just telegraphing.

21          So I can't see going beyond that if I find culpability.

22          MR. SUMMERS:  Your Honor, I don't want to get hung up on

23     "may" versus "shall."

24          THE COURT:  Well, no.  You all had "should."  I'm not

25     going to say "should."  "Should" is too much of a finger on the

1   scale.  I'm just not going to do that.  I think it's "may."

2   The jury can use its discretion.

3        **MR. SUMMERS:**  But one thing we proposed in our

4   instruction -- I think our instruction is very measured.

5        **THE COURT:**  No.  But you said "should."  I'm uncomfortable

6   with that.

7        **MR. SUMMERS:**  Okay.  So let's say we strike "should" and

8   just focus on "may."

9        Our instruction parallels the conduct at issue here.  And

10  I think it's a very fair and measured instruction.  It explains

11  what chats are.  It explains that they were not retained.

12       **THE COURT:**  I don't think so.  You're going to have to put

13  on a little case to the jury.  You're going to have to tell the

14  jury -- let them decide did, in fact, Google not preserve

15  documents and chat.  I mean, you've done a minihearing on it

16  already.  It won't be terribly different from what you might do

17  in front of a jury.

18       And then I might open the door.  I think this is the most

19  proportionate remedy I can think of.  I want your guidance on

20  this.  This is what -- I'm just giving you my views so you can

21  react to it, is to say:

22            "Okay.  If you find that the plaintiffs have

23       demonstrated that Google didn't do something right

24       with the documents, you may conclude that that

25       happened because the contents were adverse to

1        Google."

2        I just can't see doing much more than that.

3        **MR. SUMMERS:**  Your Honor, if I may, number one, that will

4   not come close to curing the prejudice here.

5        **THE COURT:**  Why not?

6        **MR. SUMMERS:**  Why not is because what they have done --

7   this is systemic spoliation of the worst kind.

8        **THE COURT:**  We don't know that.

9        **MR. SUMMERS:**  Calculated --

10       **THE COURT:**  We don't know that.

11       **MR. SUMMERS:**  This is a policy of spoliation, Your Honor.

12       **THE COURT:**  It was an exhortation, and we don't know if it

13  was ever an execution.  That's the difference.

14       It's one thing to say "Shred."  It's another thing to say,

15  "Here's the proof that the shredding actually happened."

16  That's a very different thing.

17       **MR. SUMMERS:**  Judge --

18       **THE COURT:**  I understand you shouldn't be saying "Shred"

19  to begin with.  There's no doubt about that.  But the next

20  crucial step is, in fact, things were shredded that cost you

21  something in court.

22       **MR. SUMMERS:**  Judge, we --

23       **THE COURT:**  So you're asking me just to assume that the

24  shredding was wholesale, and I'm not going to do that.

25       **MR. SUMMERS:**  Judge, we have, in terms of post-filing

 1   production, according to at least what I'm being told, 86,000

 2   e-mails that were produced.

 3        **THE COURT:**  Total so far?

 4        **MR. SUMMERS:**  Total.  And about 400 chats.

 5        When I've said that we don't have the chats, like, they

 6   just -- there's -- the chats aren't there.  They were not

 7   saved, at least chats that are of any significance.

 8        **THE COURT:**  Listen, let me spot you this to help you help

 9   me.  I'm going to help you help me.

10        I will assume -- let's just assume for purposes of

11   discussion that nine out of ten chats weren't saved.  What I

12   need to know is that the nine that weren't saved meant

13   something to you.  We can't tell.  We just can't tell.

14        There's some indication that some portion of those nine

15   probably had something that you would have liked and been --

16   more importantly, been entitled to see.  But that's why I have

17   to have a more measured response.  Going any farther than that

18   just spots you a 90 percent credit when I'm not sure that the

19   facts bear that out.

20        **MR. SUMMERS:**  Judge, I think we've put on very strong

21   evidence of intent.  And I'd like to touch on the litigation

22   misconduct, which is even further evidence of intent and

23   evidence -- and which supports independently a sanction.

24        **THE COURT:**  All right.  I'll tell you what.  I do want to

25   give you some time to do that.

1          Let's just take a ten-minute break.

2          And then, Mr. Pomerantz, we're going to roll right into

3     you without another break.  Okay?

4          Let's just take ten minutes, and I'll be back at 3:10.

5          **THE CLERK:**  All rise.  Court's in recess.

6                    (Recess taken at 2:56 p.m.)

7                    (Proceedings resumed at 3:05 p.m.)

8          **THE COURT:**  Okay.  Closing thoughts, please.

9          **MR. SUMMERS:**  Judge, thank you for your patience.

10         Just briefly on the issue of litigation misconduct.  Back

11    in the fall of 2020, Google served up a draft ESI order.  It

12    expressly provided that chats and other instant messages were

13    to be deemed not readily accessible and not subject to

14    preservation.  And we said "no."  And they agreed in the order

15    to remove that provision such that chats would be treated like

16    all other ESI and be subject to preservation.

17         For months --

18         **THE COURT:**  Now, that was not with an explanation about

19    leaving it up to each custodian.

20         **MR. SUMMERS:**  No.  And they told us nothing -- they should

21    have raised the issue with us right then.  When we said "No, we

22    want preservation of chats and instant messages" and they said

23    "Okay," they should have said "But there's this issue," and we

24    could have brought it to Your Honor.  They didn't.

25         Now, months later we started to get the documents and look

1    at the documents, and we said we couldn't find chats.  Starting

2    in April of 2021, we started asking questions.

3          **THE COURT:**  I'm sorry.  Just to interrupt, again, when you

4    say "Google agreed," is there a document that you have for

5    that?

6          **MR. SUMMERS:**  We -- what we have -- we have the

7    Giulianelli declaration, Your Honor, goes through this.  And,

8    yes, there was discussions back and forth.

9          In the final ESI order, chats and instant messages were

10   removed from the list of things that were exempt from

11   preservation, and Mr. Rocca agrees with that in his

12   declaration.

13         April of 2021, we start asking questions.  Where are the

14   chats?  Where are the chats?  We went back and forth with them

15   over and over and over again.  This is set forth in the

16   Giulianelli declaration.

17         And they kept saying:  We're preserving; we're producing.

18         And we kept saying:  Where are they?  Where are they?

19   Where are they?

20         Finally, finally, on April 13th, several months later,

21   they said to us -- I'm sorry -- August of 2013, they said to us

22   (as read):

23              "Chats are kept by default for only 24 hours in

24         the usual course of business.  To the extent a

25         custodian was using chats before the lawsuits were

1     filed, Google had no obligation to preserve those

2     chats.  Thus, we do not expect that we would have

3     records of pings discussed in e-mails" -- pings are a

4     term that they use for chats sometimes -- "that were

5     dated prior to this lawsuit."

6     So the explanation they gave us was:  You won't see a lot

7 of chats because before the lawsuit was filed, we didn't have a

8 preservation obligation and they were deleted automatically.

9     We went to them -- and that was a falsehood, Your Honor.

10 They mis- -- they suggested to us that they had suspended

11 deletion through that communication.

12     And we went to them and we said:  We understand your

13 explanation.  We also understand that Google's policy was

14 suspended.

15     What we meant there was automatic deletion had been

16 suspended.  This is now October of '21.

17     They responded (as read):

18     "We issued a hold notice.  We have no reason to

19     think the production is deficient.  This should put

20     an end to the discussion."

21     It didn't end the discussion.  The team here was

22 incredibly tenacious, Your Honor, like I've never seen before.

23     And we finally had a meet-and-confer on October 21 of '21;

24 and on that meet-and-confer, they finally sheepishly admitted

25 to us that the chats were still being automatically deleted.

1    They --

2        **THE COURT:**  How did that come up?  Were you on that?

3        **MR. SUMMERS:**  I was not present, but it's been described

4    to me.  And, again, this was in the nature of we wanted answers

5    and we wanted to know why there weren't any chats and why we

6    weren't seeing any, even after the litigation began.  And that

7    was the explanation we got.

8        We then went back to them again with that question.  We

9    said --

10       **THE COURT:**  You first learned in October of 2021 that the

11   chats were not being systematically preserved?

12       **MR. SUMMERS:**  Correct, Your Honor, that automatic deletion

13   was continuing, even after the lawsuit was filed.

14       And when I tell you -- I could -- if you go through the

15   Giulianelli declaration, it's there.  I had a longer version of

16   this dec that went through the letters.  It was just back and

17   forth and back and forth.

18       We kept saying:  Where are they?  What's going on?

19       And they kept saying:  Oh, they've been produced.  They've

20   been produced.  They're being saved.

21       **THE COURT:**  Is there anybody here on the plaintiff side in

22   that October meet and confer?

23       **MR. SCHWARTZ:**  I was on that call, sir.

24       **THE COURT:**  Oh, come on up.  So, make your appearance.

25       **MR. SCHWARTZ:**  Hello.  My name is Aaron Schwartz.  I'm

 1   with Kaplan Fox & Kilsheimer for consumer plaintiffs.

 2       **THE COURT:**  All right.  So in this call -- you were on the

 3   whole time?

 4       **MR. SCHWARTZ:**  Yes, sir.

 5       **THE COURT:**  Don't call me "sir."

 6       **MR. SCHWARTZ:**  Yes, Your Honor.

 7       **THE COURT:**  I'm Your Honor.

 8       Okay.  So at that point, did you all on the plaintiff side

 9   ask that all the chats be preserved?

10       **MR. SCHWARTZ:**  Yeah.  We had been asking for months

11   whether Google had preserved all the chats, and their response

12   was that they produced everything that was responsive at that

13   time and that there was no further chats to produce.

14       And we were under the understanding at least, as,

15   you know, the timeline points out --

16       **THE COURT:**  Let's step back.  I asked a different

17   question.

18       Did you all -- once Google said, "Oh, it turns out we're

19   actually not systematically preserving all the chats," did you

20   all on the plaintiff side say, "As of right now, we're

21   requesting that Google preserve all chats"?

22       **MR. SCHWARTZ:**  I don't recall phrasing it like that.  What

23   I do recall was shortly after the first deposition in this case

24   happened, there were questions asked about chats, and we

25   brought it to Your Honor's attention, you know, at the next

 1  status conference.

 2     **THE COURT:**  When did you all on the plaintiff side --

 3  thank you.

 4     When did you all on the plaintiff side expressly ask

 5  Google to ensure that all the chats were being systematically

 6  preserved.

 7     **MR. SUMMERS:**  Your Honor, we did that when we negotiated

 8  the ESI order in October of 2021.

 9     **THE COURT:**  I know.  But you found out in October 2021,

10  for whatever reason, it wasn't happening.  When after that --

11  it didn't happen in that meet-and-confer.

12     **MR. SUMMERS:**  We had the Lim deposition, and we

13  immediately started having meet-and-confers with them about

14  coming to you, Your Honor, and raising the issue with the

15  Court.

16     **THE COURT:**  You didn't ever at any point say, "Okay.  By

17  the way, please start doing it now"?  That never happened?

18     **MR. SUMMERS:**  I'd like to, after the hearing, to

19  double-check our correspondence.  I'm sure we did.

20     **THE COURT:**  Well, there are 4,000 plaintiffs' lawyers at

21  your table.  Somebody must know.  Is the answer "yes" or "no"?

22     **MR. SUMMERS:**  I don't know, Your Honor.

23     **THE COURT:**  Well, who does know on the plaintiff side?

24  Somebody in this collection of lawyers must know.  If you don't

25  know, that means I'm going to conclude it never happened.

1        So it never happened?  You all never said --

2        **MR. SUMMERS:**  The tenor --

3        **THE COURT:**  -- "Okay.  Turn it on now if you haven't done

4   it so far"?

5        **MR. SUMMERS:**  The tenor of these discussions was clearly

6   such that they knew we expected them to be preserved.

7        **THE COURT:**  All right.  Let's wrap it up, please.

8        **MR. SUMMERS:**  Yes, Your Honor.  Anyway, after telling us,

9   after telling us, we asked them:  Have you turned it off?  Have

10  you changed the default settings?

11       And they came back to us -- this is the November 11, '21

12  Rocca letter to us -- and they said they did not -- had not

13  changed the settings.  They said (as read):

14           "Google does not have the ability to change

15       default settings for individual custodians with

16       respect to the chat history setting."

17       And then in paragraph 2, they said (as read):

18           "Google employees need to apply the history-on

19       setting on a chat-by-chat basis."

20       And, Your Honor, that's just palpably false.  Mr. Lopez

21  admitted that they can change the chat history to on for all

22  the employees subject to litigation holds.

23       **THE COURT:**  Let me --

24       **MR. SUMMERS:**  It was a word game.

25       **THE COURT:**  I'm just going to jump around here a little

 1  bit, if you don't mind.

 2      When did you first tell me about all this?

 3      **MR. SUMMERS:**  We raised the issue with Your Honor in the

 4  December 9 joint statement, December 9 of 2021, and we had a

 5  status conference on December 11, 2021.

 6      And in that December 9th status conference -- joint

 7  statement, Your Honor, what Google told you is they said all

 8  available preservation methods had been employed, and they

 9  tried to dissuade you from hearing the issue.

10      And I'm not casting fingers at opposing counsel, but

11  Mr. Pomerantz said, "I don't" -- at the hearing said, "I don't

12  even know why we're here, why we're talking about it."

13      So, Your Honor, we have, from our perspective --

14      **THE COURT:**  What did I say?

15      **MR. SUMMERS:**  You said --

16      **THE COURT:**  Remind me what I said.

17      **MR. SUMMERS:**  You said serve them with interrogatories and

18  get the answers to interrogatories.

19      We went through that discovery, and then we came back to

20  Your Honor.

21      **THE COURT:**  All right.

22      **MR. SUMMERS:**  And, Your Honor, in my view, we have four

23  serious instances of litigation misconduct.

24      They should have in candor raised the non-preservation

25  issue back in the fall of 2020.

1      They then, in August of 2021, misled us by saying that

2  chats had not been preserved prior to the commencement of the

3  litigation.

4      When we pinned them down and asked them specifically and

5  got an answer, they then said that they couldn't change the

6  default settings, trying to get rid of this issue.

7      And then they represented to Your Honor that they had used

8  all available preservation methods, again, in an effort to

9  prevent this from seeing the light of day.

10     Three or four clear misrepresentations designed to conceal

11 and obfuscate.

12     **THE COURT:**  Who's sending -- is there one person on

13 Google's side who's sending all these communications?

14     **MR. SUMMERS:**  No, Your Honor.  It's a collection of people

15 from Mr. Rocca's firm.  But, again, we're not casting

16 aspersions at them.  Google is a large business with a

17 sophisticated in-house department --

18     **THE COURT:**  I'm not asking you to cast aspersions.  I'm

19 asking you to help me out.  Who on the plaintiff side, lawyer

20 side was sending these letters?

21     **MR. SUMMERS:**  Mr. Rocca submitted the November 11, 2021,

22 letter.

23     And was he on the August 13 also, Team?

24     I believe so.

25     **THE COURT:**  Who negotiated the 2020 events, the ESI

1   drafts?

2       **MR. SUMMERS:**  Mr. Rocca and members of his team.

3       **THE COURT:**  Okay.  Any very last thoughts?

4       **MR. SUMMERS:**  Very last thoughts, Your Honor, on the

5   remedy.  Under Rule 37, a finding of prejudice allows you to

6   order a remedy to cure the prejudice.  A finding of intent

7   allows you to give an adverse inference instruction.  We agree

8   that some proportionality is needed, but with a finding of

9   intent, you do not need to find prejudice to impose an adverse

10  inference instruction.

11      The other thing is that if we look at the cases, Judge,

12  the only thing that will begin to remedy this at all is the

13  jury hearing from you, from the judge sitting in the case, what

14  they did and what the consequences of it should be.  It is not

15  enough to let us try an issue because we're going to have very

16  limited time.  No one wants to have trials within trials and

17  trials about chats.

18      **THE COURT:**  Okay.  Let me just jump in on that.  I thought

19  about this.  It's not going to be a trial within a trial.

20  Here's a trial within a trial:  Google Play Store and let's do

21  three weeks on what happened at Apple.  That's a trial within a

22  trial.  We're not going to do that.

23      This is, in my view -- and, look, I'm just having the

24  pleasure of meeting you, but I'm going to assume that you're an

25  experienced courtroom lawyer.  You certainly come across that

 1  way.  You ask three questions of every witness.  What's chat?

 2  Did you ever turn it on?  Did you ever preserve any of this?

 3  Just ask three questions, figuratively.  Maybe it's five.  I

 4  don't know.  But tail end of every examination or somewhere in

 5  the examination.  Then at the end of it, then you roll out your

 6  argument.

 7      I'm satisfied this is not a time suck, to put it

 8  colloquially.  It's just not going to be.  You can do it.

 9      And then -- look, there are few things as powerful as an

10  invitation to an adverse instruction.  Now, whether the jury

11  does it or not is totally up to their discretion within the

12  boundaries of the evidence.

13      But why is that not adequate?  I'm just not hearing a

14  reason why.

15      **MR. SUMMERS:**  Your Honor, they've been doing this forever,

16  for as long as we know, according to their own declarations.

17      **THE COURT:**  I know, but this is not the court of

18  cumulative Google guilt.  This is just this case.

19      I understand what you're saying, and they forthrightly --

20  I asked the question:  Have you ever in any case at any time

21  done the preservation of these chats?  And they said no.

22      **MR. SUMMERS:**  And, Your Honor --

23      **THE COURT:**  So that's true.  I'm with you on that but --

24      **MR. SUMMERS:**  With a slap of the wrist, you know what's

25  going to happen?  They're going to continue.

1      **THE COURT:**  How is an adverse inference instruction a slap

2    on the wrist?  It is far more than a slap on the wrist.

3      **MR. SUMMERS:**  I am absolutely convinced that a --

4      **THE COURT:**  You know how hard it is to get an adverse

5    inference instruction?  You should know.

6      **MR. SUMMERS:**  I know it's hard, Your Honor.

7      **THE COURT:**  So why would you characterize it as a wet

8    noodle discipline?  It's not.

9      **MR. SUMMERS:**  I think it depends how it's written, Judge.

10     If we look at the *Meta* case, for example, or the *Porter*

11   case, we had detailed adverse -- detailed instructions -- in

12   the case of *Meta*, it wasn't really an adverse inference

13   instruction -- detailed instructions explaining to the jury

14   what the conduct was such that the aggrieved party didn't have

15   to retry the issue.

16     And I would respectfully urge that here what the Court

17   should do, rather than having us do this again, is to tell them

18   "This is what Google did.  And the Court has found that it did

19   X, Y, and Z, and you may infer from that that they destroyed

20   evidence that was unhelpful to them."

21     That has some teeth.

22     But, Judge, they've done this forever.  It's been a

23   corporate policy according to their litigation hold document,

24   policy itself.  And this is going to continue with a slap on

25   the wrist.  They're going to continue to use Chat.  They're

 1    going to continue to train their people to not preserve and to

 2    just shift everything to off-the-record chats and let them

 3    vanish into the ether.

 4         And I think, Judge, you really have to strongly consider

 5    what an inadequate remedy will do here, not only with Google,

 6    but throughout corporate America.

 7         Instant messaging platforms are the new e-mail.  We used

 8    to write letters and memos, and we got casual, just like our

 9    clothing got more casual, and we started writing e-mails.  Chat

10    at businesses today --

11         **THE COURT:**  Listen.

12         **MR. SUMMERS:**  -- Chat and Slack is the new e-mail.

13         **THE COURT:**  Let me just jump in.

14         I understand that, and that's why we're here.  I'm

15    putting, as you are, an enormous amount of time and resources

16    into this because this issue does come up and I have decided

17    this is the time to address it, partly because of the record

18    that I've seen.  So I understand all of that.

19         Nevertheless, we're not here to fix corporate America, as

20    you put it, or address a lifetime practice of Google.  This is

21    this case, this remedy.

22         So anything else?

23         **MR. SUMMERS:**  The only thing I'll say --

24         **THE COURT:**  I've got to let Mr. Pomerantz and his side

25    have a chance.

1   **MR. SUMMERS:**  Your Honor, we do believe that there's been

2   severe prejudice.  But on the issue of intent, it couldn't be

3   any stronger.  Training to not use e-mail and to use Chat

4   instead to avoid issues in the courtroom and then a cover-up.

5   Conscious, knowing.  They wanted this to not see the light of

6   day.  So they just keep doing it in every case that came.

7       And under Rule 37, with a finding of intent, you can give

8   a very strong, but measured and appropriate adverse inference

9   instruction.  And given the litigation misconduct, you have the

10  inherent authority to apply additional sanctions, and I think

11  you should.

12      **THE COURT:**  Can I just -- I know you're -- let me just ask

13  you this:  If we did it the way you're proposing, what would --

14  why would it be a permissive inference?  At that point it would

15  be basically a mandatory inference.  That's what's giving me

16  serious pause.

17      **MR. SUMMERS:**  We hear you with "may," and we're okay with

18  "may."

19      **THE COURT:**  Well, you're saying "may" after -- you want me

20  to give a list of here are ten findings from the Court.  And by

21  the way, do what you want with them.

22      What do you think the jury's going to do?  They're going

23  to say:  You heard what the judge said; so I guess we'll just

24  check this box "yes."

25      **MR. SUMMERS:**  Well, look, the findings that you make in

 1   this ruling do have preclusive effect.  And there's nothing --

 2   we shouldn't have to try this issue again.

 3        **THE COURT:**  What if they were stipulated facts?  A lot of

 4   the facts are not even in dispute.

 5        **MR. SUMMERS:**  But stipulated, it'll seem just like --

 6   you know what?  When Google brought Mr. Lopez up here and he

 7   said that they could flip a switch, you know why he did that?

 8   Because we had Mr. Schnell, an expert, ready to come up and do

 9   a demonstration proving that they had been lying to us.

10        We have been pulling teeth to get to the truth here,

11   Your Honor.  And to allow them to stipulate and make it look

12   like they're being forthcoming would be --

13        **THE COURT:**  No, no, no.  What I meant was, here are some

14   examples, just off the top of my head.  I'm not in any way

15   predicting, or anything, or tying my hands; certainly not

16   yours.

17        Stipulation is:  The hold notice said each witness could

18   make a personal decision about turning preservation on or off.

19   Google had the technological ability to turn it on for

20   everybody if it chose to do so.  Google did not turn on

21   systematically -- did not systematically preserve chats.

22        I mean, those basic -- just all of that.  That's a

23   stipulation of fact.  It's one portion of the jury

24   instructions.

25        A little bit down the line, there's an adverse inference

1  instruction, a permissive one.  What's wrong with that?

2      You know, when the judge speaks, it can have too much of a

3  volume, particularly for jurors.  That's why we all, as judges,

4  are very careful about that.

5      But if they're stipulated facts -- I understand up to this

6  hearing you may have had to -- felt like you were beating on a

7  piñata to get the truth out.  But now it's here.  So there's a

8  lot of agreement that I've heard from both sides on what

9  actually happened.

10     **MR. SUMMERS:**  Google did something bad, and it's

11  appropriate for them to look bad, to a certain extent, in front

12  of the jury in a measured way.

13     **THE COURT:**  Well, if they stipulate "Yes, we didn't do

14  this.  Yes, we didn't do this.  Yes, we didn't do this" --

15     **MR. SUMMERS:**  Then they look honest, Your Honor, when what

16  they did here was dishonest and the coverup was dishonest.

17     **THE COURT:**  They look honest?

18     **MR. SUMMERS:**  They look honest when they stipulate.

19     **THE COURT:**  By being forthright?

20     **MR. SUMMERS:**  When they're coming forward and being --

21     **MS. GIULIANELLI:**  Your Honor, may I --

22     **THE COURT:**  Yes.

23     **MS. GIULIANELLI:**  May I say one thing, because we've --

24     **THE COURT:**  Sure.

25     **MS. GIULIANELLI:**  I think I was prepared to address a

1  couple of things on remedy, and so --

2       THE COURT:  All right.  Go ahead, yeah.

3       MS. GIULIANELLI:  -- I think Your Honor has --

4       THE COURT:  You need to make sure you -- yeah.

5       MS. GIULIANELLI:  It's going to be very fast.

6       THE COURT:  No, no, no.  Make your appearance.

7       MS. GIULIANELLI:  Oh.  Karma Giulianelli from Bartlit

8  Beck.

9       And I think we've waded into the specific remedy a little

10 bit which is a key question here.  And I think that Your Honor

11 is right on focusing on the facts, and not just the stipulated

12 facts but what we have proven.

13      So let's set aside any adverse inference, whether it's

14 "may" or "must" or "shall."

15      The first -- we have proposed -- and we can wordsmith the

16 wording and see if we can even come up with a stipulation.  But

17 the first six instructions that we've proposed just track the

18 facts.  And we think that it is very important for the jury to

19 be read those facts, not an adverse inference, not even a

20 "may," nothing about what they may infer.  And the reason for

21 that, of course, is because we have very complex antitrust

22 things to try.

23      And we can ask witnesses at the end, of course, "Did you

24 preserve chats or not preserve chats?"

25      But having the jury understand, just reading the facts

 1   from the judge at the beginning is very important.  Here is

 2   what happened.  Google has this product Chats.  Google has the

 3   ready ability to preserve chats.  Factual.

 4        And even in the cases -- now, we think, I think, as

 5   Mr. Summers has shown, there is plenty of intent.  But let's

 6   set that aside.  Even in the cases that Google cites, *Meta* and

 7   the *Porter/City of San Francisco*, in those cases, there was

 8   destruction of evidence, just like here.  I don't think there's

 9   any debate about that.  But in those cases, the Court found,

10   Northern District of California, there was just negligence.

11        So let's just assume just negligence.  We disagree with

12   that.  We think it goes beyond that.  But in those two cases,

13   what the Court did was simply read the jury what happened, the

14   factual -- no inference, just the factual:  Here's the

15   chronology.

16        So we think that that is easy and is what --

17        **THE COURT:**  Okay.  The most I would do is what I was

18   outlining.  Look, this is all -- this is like a *Wall Street*

19   *Journal* op-ed piece.  I'm not going to do anything close to

20   this.  Okay?  I'm just not.  The most I might do is exactly

21   what I indicated.  You can turn the button on.  They didn't do

22   it.  They left it up to the witnesses.  That's it.

23        I mean, I think you'd do better getting a stipula- --

24   well, we don't have to decide this now because trial is not

25   going to be for a while, but --

1      **MS. GIULIANELLI:**  And I think if we can work on --

2      **THE COURT:**  -- I'm certainly not going to read them this

3  that you proposed.

4      I mean, that's just way too -- it's too much -- it's too

5  one-sided.

6      **MR. SUMMERS:**  We could probably pare down the language,

7  Your Honor, and come to something that's a little more

8  streamlined.

9      **MS. GIULIANELLI:**  And we could work with Google to see if

10  they'll stipulate to some of the facts about what --

11      **THE COURT:**  Well, that's what I had in mind.

12      **MS. GIULIANELLI:**  Okay.

13      **THE COURT:**  Okay.  Thank you.

14      Mr. Pomerantz, who's going to handle it for the defendant?

15      **MR. POMERANTZ:**  I will do so, Your Honor.

16      **THE COURT:**  Let me just -- I want to hear what you have to

17  say.  You'll have plenty of time.

18      But I just -- why -- I asked this last time, and I'm

19  hoping to get an answer this time.  Why did you not just --

20  when I say "you," I know you weren't personally involved at

21  that point.  It predates your involvement.  But why did Google

22  not just disclose this issue in the fall of 2020 and say,

23  "Look, here's the deal with Chats"?  Why didn't you just do

24  that?

25      **MR. POMERANTZ:**  Your Honor, I will give you a short answer

1   and then a longer answer.

2       **THE COURT:**  Let me just say, don't tell me you didn't.

3   Why didn't Google just say, "Here's Chats.  This is what we can

4   do.  This is what we don't want to do"?  Why didn't you just

5   put it on the table and be an honest player?  Why didn't that

6   happen?

7       **MR. POMERANTZ:**  Your Honor, I wish we had disclosed it

8   back then because I would still be --

9       **THE COURT:**  Two of us do.

10      **MR. POMERANTZ:**  I hear you, Your Honor.

11      **THE COURT:**  We wouldn't be here today.

12      **MR. POMERANTZ:**  I hear you.  We would have been making the

13  same arguments then, that what we did and what we have done is

14  reasonable and proportional under the rules and certainly of no

15  prejudice to the plaintiffs.

16      **THE COURT:**  I understand that, Mr. Pomerantz, but here's

17  the issue:  Making that argument two years ago and preserving

18  possibly two years of chats is a big difference from being here

19  now and having all of that gone --

20      **MR. POMERANTZ:**  You don't have --

21      **THE COURT:**  -- never to be found again.

22      **MR. POMERANTZ:**  I agree with you wholeheartedly.

23  Here's what happened.

24      **THE COURT:**  So just tell me why.

25      **MR. POMERANTZ:**  Here's what happened, Your Honor.  And

1   I think this is consistent with the declarations of both

2   parties and the correspondence that's been put in.

3        The parties met to go over the ESI order.  They ultimately

4   reached an agreement on the ESI order.

5        We didn't ask them:  What are you doing to preserve

6   e-mails and documents and chats?  And they didn't ask us.  And

7   no one, therefore, disclosed to it.

8        What we were left with was each side having to do what the

9   rules require.  And what the rules require is to do what's

10  reasonable and proportionate.

11       What Google did is they took everything that was available

12  to them at that time, including chats, at the time the lawsuit

13  was filed, e-mails, chats, and every other document and data,

14  and they locked it in a vault, actually called Vault.  And it

15  was all there then and it's all there today.  And so it's all

16  there.

17       And then the question was:  Okay, what about going

18  forward?  And we kept doing the same thing for all of those

19  things except the history-off chats, which is the thing we

20  discussed.  We felt the approach of asking the employees to

21  not, like, decide "Hey, what do you think is relevant about

22  this lawsuit?"  That's not what we did.  It's not what the

23  declaration of Greg Johnson says that's been submitted to

24  Your Honor.  What we did is we put in a hold notice a list of

25  topics that we drew from their complaint, from the Epic

 1   complaint.  These are the topics.  If you are engaged in a chat

 2   where the history is off, turn history on.

 3       **THE COURT:**  Let me just jump in because we know a lot

 4   about this now.

 5       Here's what I understand the situation to be.  The

 6   lawsuits fly in in the summer -- late summer, early fall of

 7   2020.  Okay?  They don't know on the plaintiff side what you

 8   all do with chat.  They don't know.  It's your company, your

 9   chat, your rules.  All right?  You know.  You know that unless

10   somebody affirmatively decides, all the chats are deleted

11   within 24 hours.  You know that; the plaintiffs don't.

12       You waltz into these ESI and document preservation

13   discussions at the start of the case, just as you should, and

14   you never tell them:  You should know we have this little thing

15   at Google called Chat.  It's got a short fuse.  Unless you

16   affirmatively act, it's gone.  And you didn't do that, and I

17   don't understand why not.  I just -- why did you not say that?

18       **MR. POMERANTZ:**  And I guess all I can say, Your Honor, is

19   because neither side asked the question --

20       **THE COURT:**  You have the person here who was there.

21       **MR. POMERANTZ:**  I know.  But I've also read his

22   declaration.  I've talked to him.  I am confident that --

23       **THE COURT:**  I did not get an answer, and I find it quite

24   mysterious.  And I can only conclude there was a reason that

25   you didn't want to do it and you didn't want to preserve the

1    chats, because I have not heard a rational explanation for why

2    you just didn't say:  Can I tell you about our chat system?

3    Here's how it works.  What do you want to do about it?  Here's

4    our view.  It doesn't mean anything.  People talk about gossip.

5    It's expensive.  So we don't really want to do it.

6        Just have the -- Mr. Pomerantz, you and I have been around

7    the block a million times.  You know that's what you do at the

8    beginning of a case.  You tell the other side so that we don't

9    have to have hearings like this three years into the case,

10   "Here's our situation."

11       I don't understand -- I've not heard a single credible

12   explanation for why that didn't happen, which leads me to infer

13   it was an intentional effort not to preserve chat.

14       **MR. POMERANTZ:**  Your Honor, I am absolutely certain that

15   it wasn't intentional.

16       **THE COURT:**  How could it not have been?  You made no

17   effort --

18       **MR. POMERANTZ:**  I guess what I would say, Your Honor, is

19   I've been working with this team for the last year.  We have

20   done everything we can to turn over anything the other side

21   has, and we've worked through so many issues.  I've seen the

22   behavior day in and day out.

23       You know, this case has involved a lot of discovery

24   questions that never hit Your Honor's desk.  And the reason why

25   is because there's reasonable people on their side and there's

1    reasonable people on our side and we work it out.

2        I don't think there was any intent back then to say, "I

3    don't want to tell them this."  There's nothing in the record

4    that suggests that's happening, and there's nothing in my

5    experience that would suggest that's what happened either with

6    Mr. Rocca and his firm or anybody I've met at Google.  I just

7    think people didn't talk about it, and I wish they had, and I

8    don't believe there was any intent.

9        **THE COURT:**  Okay.  I'm with you on that second point.  I'm

10   not going to ask again.  And maybe there's no answer and I'll

11   accept that.  But I just need to know why people just didn't

12   talk about it, because you have documents -- Google has

13   internal document policies that expressly reference Chat as an

14   alternative to e-mail, expressly guide people to using Chat, as

15   we've seen.  We've seen all the evidence, Google training and

16   other documents saying:  Hey, if it's sensitive, you might want

17   to use Chat.

18       It's plain as day to any objectively reasonable lawyer,

19   any objectively reasonable lawyer, that Chat is going to

20   contain possibly relevant evidence; and yet it's never

21   mentioned just because.  I don't -- it's just very hard for me

22   to understand the "just because" part.  That's all that I'm

23   saying.

24       **MR. POMERANTZ:**  I will do my best to persuade you

25   otherwise through my presentation.  I will probably be not as

 1    long as Mr. Summers, but I have some details that I want to

 2    share with you.

 3         **THE COURT:**  All right.

 4         **MR. POMERANTZ:**  Details that you didn't see from

 5    Mr. Summers.

 6         **THE COURT:**  Okay.

 7         **MR. POMERANTZ:**  So, Your Honor --

 8         **THE COURT:**  Do you have a hard copy, by the way?

 9         **MR. POMERANTZ:**  I do.  I'm sorry.  Yes.

10         **THE COURT:**  If you have two of them, that would be great.

11    Okay.  Thank you.

12         **MR. POMERANTZ:**  Your Honor, I apologize for the size.  I

13    have a smaller one because I couldn't handle the big ones up

14    here, but I have the same slides you do.

15    Does anybody else need slides?

16         **THE COURT:**  Oh, okay.  Yeah.

17         **MR. POMERANTZ:**  Slides over there?  Okay.

18         **THE COURT:**  All right.  Go ahead.

19         **MR. POMERANTZ:**  All right.  Thank you, Your Honor.

20                          <u>**CLOSING ARGUMENT**</u>

21         **MR. POMERANTZ:**  So you just heard plaintiffs' counsel

22    weave together portions of documents and testimony to accuse

23    Google of some pretty serious things.  And the question,

24    Your Honor, is whether he fairly captured all of the relevant

25    facts.  Your Honor, respectfully, I don't think he has, and

1   I'll try to explain why in my presentation today.

2        So I have a roadmap that kind of leads you to where I want

3   to go in this argument.  I want to start with four key issues

4   that I think help to frame the entire discussion.  And then I

5   want to talk about whether any sanctions should be issued.  I

6   know Your Honor has said that's still an open question, and

7   I --

8        **THE COURT:**  Yes, it is an open question.

9        **MR. POMERANTZ:**  And I'm going to endeavor to persuade you

10  that one should not be issued, both because what Google did was

11  reasonable and proportional and, also, because the plaintiffs

12  did not suffer any prejudice.

13       And then I'll turn to the disclosures that he mentioned

14  that we have made to the plaintiffs and the Court.

15       And then I'll address the question I know Your Honor is

16  interested in, which is if a sanction should issue, what should

17  it be.

18       Now, before I go to this roadmap, I actually want to start

19  with Slide 28 because this sheds a lot of light about whether

20  what you're getting is all of the facts.  So if you turn to

21  Slide 28, Your Honor, this is the training material that

22  plaintiffs' counsel spends quite some time on.  And I want to

23  go into this with a little bit more care.

24       So this is a section of the training materials that's

25  about "Avoid Communicating When You're Angry or Tired."  That's

 1   what the whole subject of this is.

 2        And so if you turn to Slide 29 --

 3        **THE COURT:**  This is in the same training cassette or deck

 4   that had the "Use Chat for sensitive information"?

 5        **MR. POMERANTZ:**  Yes, yes.  He spent quite a bit of time on

 6   this -- I'm going to go through this segment because you'll see

 7   what really happened here.

 8        So in this section, what they're talking about is you're

 9   angry.  And so you see on this slide here, Your Honor, which is

10   Slide 29, that they give a hypothetical.  Your boss, which they

11   call your team lead, he took the night off to go to a

12   basketball game, but you and your colleagues had to stay there

13   working.  And you're kind of angry at him, and so you draft an

14   e-mail that is not particularly polite and has some errors in

15   it.

16        And so then they -- basically, in this training they say:

17   Well, what do you think you should -- what should you tell this

18   employee to do?

19        And the first choice that they give you, which is -- now

20   I'm moving to Slide 30 -- is just go ahead and send the e-mail.

21   And you'll see that that's red over on the left.  You see how

22   on the left it says "Send the e-mail" and that's red?  That

23   means don't do it; that's the wrong answer.  And you'll see

24   that the box basically says:  Don't send the angry e-mail late

25   at night.  That's not the right answer.

 1        So then you go to the next slide, and that's the one that

 2   says:  Don't send the e-mail now.  Wait and send it in the

 3   morning when you kind of have a clearer mind.

 4        And, Your Honor, I know that you worked in a law firm at

 5   one point in your career.  That's the instruction I give to a

 6   lot of associates.  I learned it the hard way.  That is, you

 7   get into these angry meet-and-confer discussions and you send

 8   off some flaming e-mail to the other side, and that's not the

 9   right answer.  If you sleep on it, you'll send a much better

10   e-mail and more productive e-mail the next morning.

11        And so that's what the second one is; it's green.  It's

12   okay to send the e-mail.  Just wait till the next morning

13   because you won't be as angry.

14        And then there's the third one.  And the third one -- and

15   that's now on Slide 32 -- says "Talk to the team lead in the

16   morning."  And that's also green.  That's a good answer.  Don't

17   put all your anger into an e-mail.  Talk to the guy the next

18   morning.  That's a good one.  That's green.

19        And, Your Honor, there's nothing wrong with saying to

20   someone:  I wouldn't put that down in writing.  I would go talk

21   to someone.  That's the better way to handle something that's

22   sensitive.  We hear that all the time.

23        And, Your Honor, if you look at Slide 33, this is a chat

24   that Epic produced.  Okay.  They also have produced chats.  And

25   their person there says (as read):

1          "[Hey, this is a] sensitive matter so best via

2      Zoom if you are interested."

3      Let's not put it down in writing.  Let's go talk about it

4  on Zoom.  There's nothing wrong with that.  There's nothing

5  wrong with that.  It's okay to say:  Look, let's not debate

6  this in writing.  Let's just talk it over.  Let's do it in

7  person.  It's sensitive.  And that's what -- and that's what

8  Epic did, and that's what Google often instructs its employees

9  to do.

10      And then, if you go now back to the training materials,

11  this is the fourth one.  This is the one that plaintiffs'

12  counsel directed you to.  This is on Slide 34.  And it says on

13  that one -- you can see that it's red, Your Honor.  It's red.

14  What it says is:  This is the wrong answer.  You shouldn't do

15  this.  You shouldn't just go ahead and chat off the record.

16  It's better than sending the angry e-mail, but actually, the

17  training materials are not recommending it.  So what the

18  training materials are recommending is to send the e-mail the

19  next morning.

20      Your Honor, you can't find that as something where they're

21  instructing them to take these things to someplace where

22  they're not preserved when what they're telling you is it's

23  okay to send it by e-mail where it is preserved.  That's not

24  the point.  The point is don't do it when you're angry.  Wait

25  until the next morning.  That's the whole point of these

1   training materials.

2       And what they're doing here, Your Honor, like they do in

3   many others, is they're ripping a sentence out of a document

4   and they're trying to get you to say, "Oh, my gosh, that's

5   terrible.  Let's punish Google," when if you understand it in

6   context, this is good training.  This is good training.  Some

7   of it's very similar to what I do with associates and what I

8   learned myself.  And that's what's going on here.

9       So I just ask you, Your Honor, the whole point of my

10  presentation is --

11      **THE COURT:**  Well, let me just jump in.  I understand what

12  you're saying about the training deck, but your colleagues

13  presented a number of snippets from e-mails where high-placed

14  Google executives said:  This is a little hot to handle.  Let's

15  go to chat.  So --

16      **MR. POMERANTZ:**  Well, some of them say --

17      **THE COURT:**  -- that is actually consistent with what the

18  plaintiffs' theory is.

19      **MR. POMERANTZ:**  I'm going to go over those, Your Honor --

20      **THE COURT:**  All right.  Okay.

21      **MR. POMERANTZ:**  -- in a bit, but what I want to point out

22  up-front --

23      **THE COURT:**  Yes.

24      **MR. POMERANTZ:**  -- is most of them say, "Let's go talk

25  about it" or "Let's take it offline."

1    I think that was the word.  Take it offline.  That's

2    similar to the Epic chat:  Too sensitive.  Let's do it on Zoom.

3    And that's what happens a lot, Your Honor.

4        And most of the documents they showed you predated the

5    filing of this lawsuit, significantly predated the filing of

6    this lawsuit.

7        So it's just a matter of in the business context, what are

8    the things you want to just talk to each other about through

9    e-mail and what would you rather sit down and talk about in

10   person.

11       **THE COURT:**  Well, no, no.  But what the plaintiff showed

12   did not say:  Let's grab a coffee and talk about this.  It

13   said:  Let's move our online discussion out of e-mail into the

14   online chat forum.

15       **MR. POMERANTZ:**  Your Honor --

16       **THE COURT:**  And that's different to me because that one is

17   presumptively not preserved, where e-mail is presumptively

18   preserved.  So --

19       **MR. POMERANTZ:**  And even --

20       **THE COURT:**  -- a fair inference -- I'm not saying I'm

21   necessarily making it, but a fair inference is the writers

22   wanted to be in a situation where their online communications

23   were presumptively not going to be preserved.

24       **MR. POMERANTZ:**  And if that happened when you weren't

25   subject to any litigation hold and you were just doing it

 1   because you didn't want it to be preserved for whatever reason,

 2   there's nothing wrong with that.  There's nothing wrong with

 3   that, at least in this court.  At least in this court.

 4       And there's a very big difference between something like

 5   that and saying, "So you're going to disregard a litigation

 6   hold."  None of those documents say, "You should disregard a

 7   litigation hold and take it to a history-off chat."

 8       **THE COURT:**  Okay.  But, yes, I can appreciate that.  The

 9   problem is, you, as Google, know there is this other online

10   forum that is presumptively not preserved.  And yet when this

11   case started, you didn't disclose that to me or to your

12   colleagues on the other side.  And more importantly, you didn't

13   actually preserve it.  That's the problem.

14       I understand things happen five years, ten years before

15   this case started where someone said:  Hey, let's be more

16   discrete and flip to chat.  The issue is you know that happens;

17   you didn't share it with me, which is what galls me the most,

18   to be honest; and you didn't stop it from not being deleted.

19   That's the issue.

20       **MR. POMERANTZ:**  Your Honor, as to that last point, what

21   has been deleted that shouldn't have been deleted, I want to

22   get to that.  What is the evidentiary record in front of

23   Your Honor on that point?  That's a very important point, and

24   I'm going to show you some things about what the plaintiffs say

25   about that.

1          So let me go back now, if I could, to Slide 3,

2     Mr. Mendoza.

3          **THE COURT:**  3?

4          **MR. POMERANTZ:**  Yes, Slide 3.

5          I had said that on my roadmap, I wanted to hit four points

6     up-front because these four points, I think, frame so much of

7     the questions raised by this motion.

8          And the first, Your Honor, is to focus on the fact that

9     this lawsuit was filed on August 13, 2020.  It's the first

10    lawsuit.  That was the Epic complaint.  And, Your Honor, that

11    complaint necessarily focused on actions that Google took

12    before the complaint was filed.  That's what you do in a

13    complaint; you talk about what's happened.

14         And in that complaint, they challenged conduct by Google

15    going all the way back to 2008.  They talked about agreements

16    with OEMs, agreements with developers, and other actions that

17    Google took.  Those were the core of the case, Your Honor.

18    And, Your Honor, they remain the core of the case.  The core of

19    this case is as framed by the complaint.

20         Now, Google, as soon as that complaint was filed,

21    preserved millions of documents that existed at that time,

22    whatever existed as of August 2020.  So what existed were

23    e-mails, Google Drive documents.  Those are like word

24    processing documents, agreements, PDFs, all of that.  Terabytes

25    of data, all of that was preserved and any chats that were

 1  available at that time.

 2      So what chats would be available at that time?  Any chat

 3  that had history on or that, either by -- because it was a

 4  threaded chat so it's automatically on or it's not a threaded

 5  chat and somebody had put history on.  All of that was

 6  immediately preserved.

 7      **THE COURT:**  Well, that doesn't really say much,

 8  Mr. Pomerantz, because we know that a fraction of the people

 9  turned history on for their chats.

10      **MR. POMERANTZ:**  But there was no obli- --

11      **THE COURT:**  It was not an ingrained practice.  Quite the

12  contrary, apparently.  The ingrained practice was you don't

13  preserve your chats.  That's what the evidence has been so far.

14      **MR. POMERANTZ:**  No, it's not, Your Honor, because the Ho

15  declaration, which I'll get to, shows -- data tells you

16  something.

17      **THE COURT:**  Here's the problem the Ho declaration.  It

18  does not tell me what was not preserved.

19      **MR. POMERANTZ:**  No.  But what it does --

20      **THE COURT:**  That's the variable that matters most.

21      **MR. POMERANTZ:**  No.  But what it does tell you is that

22  people are turning history on, because you wouldn't have

23  300,000 chats after the filing of the lawsuit for these people

24  if somebody didn't turn history on.  And so the idea that

25  people aren't turning history on is just not consistent with

 1   the data.  And the data doesn't lie.  The data tells you --

 2       **THE COURT:**  But you have to turn the history on for each

 3   chat string.  Okay?  So the fact that one person turned it on

 4   for one or two or 500 strings is of no value to me in

 5   determining, as I said earlier, the 10,000 or million or

 6   10 million other chat strings for which a decision was made not

 7   to preserve it because the participants didn't want to.

 8       Here is the problem.  Let me just put it more basically.

 9   I said this earlier, and I know you must agree with this.  You

10   don't let witnesses decide what evidence to preserve.  Look at

11   it for e-mails.  In what discovery world -- certainly not the

12   one that you and I live in -- would it ever be permissible to

13   say to someone "Well, we have a lawsuit but you only preserve

14   the e-mails that you think you want to"?  You would never let

15   that happen.  And I don't understand why chat is treated

16   differently.

17       **MR. POMERANTZ:**  And, Your Honor, I'm going to get to that

18   because chats are different.  And not only is there evidence in

19   this specific case about it, but there's other materials out

20   there which show that people today still, from an evidentiary

21   preservation standpoint, don't treat chats like e-mails.

22       But, Your Honor, the point here that I'm making is that at

23   the time the lawsuit was filed, whatever was happening in the

24   past in terms of history-off or history-on chats doesn't raise

25   a spoliation issue.  We're entitled to do whatever is

1    reasonable for a business to do before we have a litigant --

2       **THE COURT:**  Except -- if I may jump in, except you did

3    have holds from related cases, holds from government

4    investigations that arguably also required you to turn chat

5    on -- turn chat preservation on, and you didn't.

6       **MR. POMERANTZ:**  But, Your Honor --

7       **THE COURT:**  So you should have at some point captured

8    things, even though this lawsuit was not even on the table yet,

9    that would have been relevant.

10      **MR. POMERANTZ:**  But, Your Honor, the question for a

11   spoliation motion is:  When did we reasonably anticipate the

12   issues that were raised in this case?

13      So they filed a motion, a spoliation motion.

14      **THE COURT:**  Okay.  I have to jump in.  This is not a

15   spoliation motion.  This is a failure to preserve as required

16   by the Federal Rules of Civil Procedure and, specifically, the

17   electronic storage requirements of Rule 37.

18      Spoliation is a little bit outdated.  It has a body of law

19   and a body of standards that aren't necessarily applicable

20   here.  So, please, let's not cabin it.  I understand what

21   you're saying, but I want to be clear --

22      **MR. POMERANTZ:**  Fair.

23      **THE COURT:**  -- I am not treating this as a traditional

24   spoliation because that's not right.

25      **MR. POMERANTZ:**  And I didn't mean to --

1      **THE COURT:**  No, I understand.  Okay.  I just want to be

2   clear about that.

3      **MR. POMERANTZ:**  Plaintiffs filed a motion.  Nowhere in

4   that motion did they argue that we were supposed to have

5   started to preserve documents before the filing of the lawsuit.

6   It wasn't argued in their --

7      **THE COURT:**  The reference to the 2019 CID.

8      **MR. POMERANTZ:**  Not in their motion.  Not in their reply

9   brief.  Not in their first answers to Your Honor's questions.

10      Last Friday night, for the first time, they tried to move

11   the date back from October -- from August of 2020 to October of

12   2019.  Three problems with that.

13      It's just not their motion, Your Honor.  You can't -- when

14   you're coming in and seeking a sanction like they're seeking,

15   you can't make it a moving target.  They never raised it until

16   last Friday night.  That's number one.

17      Number two, that CID has 66 different requests.  One

18   mentions Play.  The beginning of the CID, it's Exhibit 2 to

19   their reply declaration, it says what they're investigating,

20   and it says they're investigating online search and

21   advertising.

22      The DOJ has actually filed two lawsuits against Google.

23   One is about search, and one is about advertising.  Neither one

24   of them are part of this MDL.

25      **THE COURT:**  All right.  Well, let's make life easy and

1    just say August 2020.

2         **MR. POMERANTZ:**  Fair.

3         **THE COURT:**  Nothing changed.

4         **MR. POMERANTZ:**  Okay.  But --

5         **THE COURT:**  So --

6         **MR. POMERANTZ:**  And what I'm saying is --

7         **THE COURT:**  -- why didn't anything change?

8         **MR. POMERANTZ:**  -- there is no argument in this motion

9    that we spoliated -- or didn't preserve any evidence that we

10   should have preserved prior to August of 2020.

11        We have produced millions of documents that focus on that

12   period, which is the core of the case because that's what the

13   complaint was focused on.

14        And so the point I'm making here, Your Honor, is that this

15   alleged failure to preserve chats only pertained to that little

16   period that you see on the right-hand side of this slide.  It's

17   only with respect to those handful of developments that

18   occurred thereafter.

19        Mr. Summers gave you a timeline that showed you a few

20   things that happened thereafter.  He didn't show you anything

21   that happened before 2020 on his timeline.  His timeline

22   started at 2020.

23        But, Your Honor, the core of this case is about agreements

24   that we have with OEMs, the so-called MADA and the DDA, the

25   developer agreements and other agreements and other projects,

1    all of which occurred before August of 2020.

2         Mr. Summers mentioned Project Hug, and I'm going to get to

3    that in a minute.  Project Hug was developed in the first half

4    of 2019.  All of the documents that show what Google did and

5    why Google did it with respect to Project Hug are in that

6    period of time.

7         And we've produced tons of documents about that.  I've sat

8    through hours and hours and hours of depositions where they

9    have taken those Hug documents, put them in front of witnesses,

10   and asked them questions.

11        And they're going to go to the jury and they're going to

12   say:  These documents, these e-mails, these presentations,

13   they're true.  Look what they said.

14        That's what they're going to do, Your Honor.  They just

15   asked for leave to amend the complaint to add a claim about

16   those Hug agreements.  And they said, Your Honor:  We're just

17   doing this to conform to the evidence.  We already have the

18   evidence.  We just want to add this claim to conform to it.

19        **THE COURT:**  Here's what I'm going to ask you now.  This,

20   in my view, goes to the proportionality issue.  Okay?  So

21   that's what I'm asking.

22        **MR. POMERANTZ:**  Okay.

23        **THE COURT:**  All right?  There's just no dispute, as I

24   understand it, that you all did not preserve, systematically

25   preserve chats from August 2020 apparently through today.

 1   Despite all the conversation, it's still not happening.

 2        So you heard me press your colleagues about:  What have

 3   you been denied?  And I have pointed out what you just pointed

 4   out.

 5        You're telling me what you've been denied based on things

 6   that you've gotten through discovery.  All right?  You know all

 7   this stuff.  You think there's a treasure trove out there.

 8   Whether there is or isn't, it's very hard for me to decide.  I

 9   may not be able to in the end.  But clearly, some documents

10   weren't preserved.

11        So I haven't heard a word yet that explains why, starting

12   in August 2020 through today, chat was not systematically

13   preserved.

14        **MR. POMERANTZ:**  So let me tell you what we did and didn't

15   do with the preservation of chats.

16        **THE COURT:**  I think I've got a good idea.  You sent out a

17   hold notice and you said:  Everything's going to be preserved.

18   However, it's up to you, Custodian, to decide whether you turn

19   history on or not.

20        **MR. POMERANTZ:**  Not quite, Your Honor.

21        If you look at Slide 4.  So we can't forget about threaded

22   chats, Your Honor.  Threaded chats are the ones that are

23   specifically designed to have business communications amongst a

24   group of people about a particular activity that they're all

25   working on.  And there is no dispute that we have preserved all

 1    of those chats, and they've been reviewed consistent with

 2    whatever the search parameters were that we've agreed upon with

 3    the plaintiffs.  So there's this body of chats that are

 4    designed to be business oriented, business focused that have

 5    been automatically preserved.  That's one thing we did.

 6          Then you get to the history-on -- the non-threaded chats.

 7    And what we have done there is we've said:  Look, if history is

 8    ever on, preserve it.  So if history is ever on, that chat is

 9    preserved and is available to be reviewed.

10          **THE COURT:**  For that one chat thread.

11          **MR. POMERANTZ:**  For that chat thread.

12          **THE COURT:**  And you and I -- let's analogize this roughly

13    to texting.  Maybe you and I don't do this, but I know people

14    who send 500 texts a day.  So that's 500 opportunities not to

15    preserve under Google's protocol.  So I'm not --

16          **MR. POMERANTZ:**  I text with my children, and that's about

17    it, Your Honor, because --

18          **THE COURT:**  Well, I know.

19          **MR. POMERANTZ:**  -- that's the generation.

20          **THE COURT:**  We're in a different group.  I guarantee you,

21    our children are texting a lot more.

22          **MR. POMERANTZ:**  I know, Your Honor.

23          **THE COURT:**  So that's 500 -- and those are the Google

24    people.  So that's 500 people -- 500 chats -- I'm just making

25    this up for discussion, obviously -- 500 chats.  Each and every

1   time that user has to make a conscious decision:  Am I going to

2   archive this or not?

3       **MR. POMERANTZ:**  So not quite, Your Honor.

4       So what we said to them in the hold notice, what we said

5   in the hold notice was two things.  First, we gave them a list

6   of the topics of the case.  They didn't have to guess what's

7   relevant.  So here's the topics.

8       And then we said, the first instruction is --

9       **THE COURT:**  I have to push back.  I mean, I understand

10  "Here's the topic," but you're asking a lay witness, who's not

11  a lawyer, who probably isn't all that thrilled about being a

12  witness to begin with, you're asking that witness:  Okay,

13  here's the topic, MADA agreements and their ability to exclude

14  competition, however you phrased it.

15      Some poor engineer or businessperson somewhere is going to

16  have to make a decision:  Well, I'm talking to my colleague

17  here about X and it's about the Play Store.  It's a lot more

18  complicated for that person to work out whether that falls

19  within your topic list than I think you're giving credence too.

20      **MR. POMERANTZ:**  Well, I think it depends on the topics.

21  But I hear you.  I understand the point you're making.

22      **THE COURT:**  All right.

23      **MR. POMERANTZ:**  But what we told them to do, the first

24  instruction was:  Don't use chats to communicate on this topic.

25  Just don't use it.  And we forget that that's the first

1   instruction.

2        **THE COURT:**  Who said that?  Which witness said that?

3        **MR. POMERANTZ:**  Mr. Lopez.

4        **THE COURT:**  Where did he say that?

5        **MR. POMERANTZ:**  I can give you the citation.  I think we

6   have it.  But it was very -- that was after you and Mr. Rocca

7   had a colloquy about subject-matter waiver, because we wanted

8   you to know the two things our employers are told to do.

9        **THE COURT:**  I have never seen the hold notice, so I'm

10  working with tea leaves.

11       **MR. POMERANTZ:**  We were -- we -- I think what --

12       **THE COURT:**  You didn't give it to me.  It's too late now.

13       **MR. POMERANTZ:**  It's in his testimony.

14       **THE COURT:**  It's very hard for me to say:  Count on us and

15  we did all the right things in the hold notice which, by the

16  way, Your Honor, you've never seen.  I can't -- it's hard to do

17  business that way.  I'm sure you appreciate that.

18       **MR. POMERANTZ:**  So on page 43 of the January 12 hearing

19  transcript, Mr. Lopez testified as follows (as read):

20            "So in the legal hold notice, there are two

21       specific instructions related to chats.

22            "One is that folks on legal hold are asked not

23       to use the product to discuss any topics that are

24       related to their legal hold.  And also, if they do

25       find themselves in a conversation that strays into a

1          topic related to the legal hold, they're asked to

2          turn history on at that point to make sure that those

3          messages are properly preserved."

4       So that's what he said.  There's two core instructions,

5    and I have it on Slide 4.  And so the first one is:  Don't use

6    it.  So if an employee followed that one, you wouldn't see any

7    chats.

8       **THE COURT:**  All right.  Look, I'll take the witness's word

9    for it.  There is no chance for cross-examination because your

10   opponents did not actually have the hold notice, so they

11   couldn't tell you whether that was fair or not.  But I'm

12   assuming that it will be because he was under oath and the

13   presumption is he's testified truthfully.

14      You're still leaving discretion up to witnesses that they

15   do not have for Excel spreadsheets or e-mails or presentations

16   to the board or meeting minutes and every other form of

17   document that is traditionally handled in discovery.

18      And I don't -- this is the problem.  I don't understand

19   why this was carved out and all of that off-loaded to the

20   discretion of the individual witness which you would never do

21   with any other document.

22      **MR. POMERANTZ:**  Your Honor, a couple of points which I

23   have later here in my outline but I'm going to go there now.

24      **THE COURT:**  Yeah.

25      **MR. POMERANTZ:**  First, Rule 37, as it was amended in 2015,

1   was designed to say:  Look, we've got to figure out what's

2   reasonable and proportionate for each situation, and that

3   doesn't mean perfection.  So if you have the ability to

4   automatically preserve some form of communication, does Rule 37

5   require that you do so?

6       And Your Honor pointed to e-mails, and I think there's

7   been a body of case law and a lot of developments where I think

8   we all recognize now that if you can automatically preserve

9   e-mails, you have to do so.  You have to do so.

10      But let's go with something else.  Let's take Zoom calls.

11  There's a record button on Zoom calls.  You can automatically

12  preserve Zoom calls.  But just because you can automatically

13  preserve Zoom calls, the law is not there right now.  The law

14  is not there right now that you have to automatically preserve

15  Zoom calls.  Nobody does that.

16      Chats --

17      **THE COURT:**  Can I just jump in?

18      Yes, technology changes.  New ways of communication come

19  up.  You proceed at your own risk.

20      But you say that perfection is not demanded.  I don't

21  quibble with that.  We're people.  Perfection is never going to

22  be attainable, even if it we're demanded.  So we're on the same

23  page.

24      What is demanded is candor and forthrightness.  So you

25  know as well as I do, what do you do in that situation with

 1  Zoom?  You have a conversation with the other side and say:

 2  What do you want to do about Zoom?

 3      And you tell me early at the case management conference:

 4  Here's our situation.  We're concerned about it.  What does

 5  the Court think we ought to do with Zoom?

 6      You don't file a document telling me everything is great

 7  and all preserved, which is what happened in this case back in

 8  October of 2020, I think.  So that's an issue.

 9      And when that doesn't happen, when that level of candor

10  and forthrightness isn't there, it invites, maybe even compels

11  a conclusion that there was a reason that that wasn't

12  discussed, and the reason was not in the interest of preserving

13  evidence.

14      **MR. POMERANTZ:**  Your Honor, I don't know how else to

15  proceed.  That did not happen here.  That did not happen.  I

16  wasn't there.

17      **THE COURT:**  I understand that.

18      **MR. POMERANTZ:**  But I understand what happened there, and

19  I am convinced it did not happen there.

20      I know that Mr. Rocca, if he was up here talking -- I'm

21  not inviting him, but if Mr. Rocca was up here talking, he

22  would sit there and say:  Your Honor, I wish I had floated this

23  to all of you two years ago.

24      We know that.  But it wasn't intended, Your Honor.

25      **THE COURT:**  May I on that point then ask you, why then in

 1   October 2021 -- maybe it happened.  I don't know, but you'll

 2   have to tell me.  Why didn't someone say in this

 3   meet-and-confer that we talked about in October 2021, why

 4   didn't someone on your side, Google side say, "Hey, you know

 5   what?  We may not have done something a hundred percent the way

 6   that we'd like to have done it.  Here's the deal with chats.

 7   Okay.  We lost some water under the bridge here.  But okay,

 8   here's the situation"?

 9        It didn't even happen then.  Nobody came to the well even

10   then and said:  You know what?  I'm not admitting anything.

11   All the lawyerly caveats.  And don't hold this against me, and

12   I'll deny it if you put it -- Here's the thing.  We have these

13   chats and we didn't do it.  Now maybe is the time for us to --

14   that didn't happen either.

15       **MR. POMERANTZ:**  Well, let me tell you what happened.  And,

16   again, I'm like Mr. Summers; I wasn't there.  But I think I

17   understand what happened.  And I don't think the chronology is

18   as Your Honor thinks it is.

19        So in the fall of 2020 when we negotiated the ESI

20   agreement, it wasn't mentioned.  Neither side asked questions.

21   Neither side mentioned it.

22        Now roll forwards to April of 2021.  Everybody agrees that

23   that's the first time this issue got raised after the ESI.  And

24   what happened then, Your Honor, is at that point in time, the

25   discovery that we had agreed to produce was through the filing

1    of the complaint.  It's common in lawsuits that you use that as

2    the cutoff date for document productions.  So everything we

3    were producing to them was through that date.

4        And over the course of the next couple of months, they

5    said -- they said:  Look, we're looking for the chats.  Where

6    are the chats in this pre-complaint filing?

7        And so as they said in, I think it was August, there is a

8    letter that says:  The reason why you're not finding chats in

9    this pre-complaint period is because we had a 24-hour delete

10   for these history-off chats so they wouldn't be there.  They

11   were being deleted in the ordinary course of Google's business.

12   And so that was answering the question that was asked then,

13   which is:  Why aren't we seeing it in this pre-complaint

14   production?

15       Then in October they sent us a letter, and I think

16   Mr. Summers showed that.  And it says:  Well, we understand

17   that you were automatically -- that you stopped this 24-hour

18   delete after the complaint was filed.

19       I don't know where they got that understanding from

20   because they don't ever show a representation we made, but that

21   understanding of theirs was not correct.

22       Two weeks later there was a meet-and-confer, and we told

23   them:  No, you're incorrect.  We didn't suspend the 24-hour

24   delete.

25       And that is -- and we believe that that was a reasonable

 1   and proportionate approach to the preservation of a certain

 2   type of chat.  Not all chats, but of a certain type of chats.

 3        So that's what happened.  It was, we answered whatever

 4   they were asking us.  Why aren't chats in the pre-complaint

 5   production?  Because we had a 24-hour delete during that period

 6   of time in the ordinary course.  Later they said:  We

 7   understood you suspended it.  That was wrong.  Two weeks later

 8   in a meet-and-confer, we told them that they were incorrect.

 9        I don't think -- you know, like, we can all try to take

10   these facts and try to use them to our advantage.  But

11   typically, what we do is the other side asks you a question and

12   you answer it, and you should answer it honestly.  That's what

13   we do.  And that's what happened here.  They asked a question;

14   we answered it.

15   **THE COURT:**  I have to disagree.  It is not a matter of the

16   other side asking the right question.  You have preexisting

17   evidentiary preservation duties.  Whether they ask or not, you

18   have the duty.  And it's because you know what you have and

19   they don't.  It's plain as day.  You know what's in your

20   document files, electronic or otherwise, and you know you have

21   an obligation to preserve it.  It's not up to -- the obligation

22   is not triggered just because someone on the other side of the

23   V on the caption happens to ask the right question.  That's

24   just not right.

25   **MR. POMERANTZ:**  No, but there's two different things going

 1   on here, Your Honor.  I agree with you, we have the obligation

 2   to do whatever is reasonable and proportionate, as Rule 37

 3   directs.  We believe we met that obligation.

 4         **THE COURT:**  But the problem is --

 5         **MR. POMERANTZ:**  There's a different question --

 6         **THE COURT:**  -- you didn't share that with anyone.

 7         **MR. POMERANTZ:**  That's a different question, Your Honor,

 8   and I'm going to get to that when you get to remedies, because

 9   I think there's two different questions here.

10         Whether what we did is actually something that Rule 37

11   allows us to do, or at least they didn't suffer any prejudice.

12   Those are Questions 1 and 2.

13         A separate question is:  Well, did we tell it to them at

14   the time when we should have?  That's a different question.

15   And I think if that's the problem, it suggests a different

16   remedy, and that's what I want to address here.

17         I'm going to skip over Slide 5 because I've already gone

18   over this with Your Honor.  You understand what Mr. Ho's

19   declaration shows.

20         And I'm going to go to, here, Slide 6.  And this is my

21   fourth introductory point.  I guess I'm past introductions.

22   But it's very important to distinguish between remedies that

23   are tied to an intent to deprive -- that is 37(e)(2) -- and

24   remedies that aren't tied to that.

25         And, Your Honor, there's case law out there now since the

1  2015 amendments that tell you what kind of evidence suggests

2  and supports a finding of an intent to deprive the other side

3  of evidence, as Rule 37(e)(2) requires.

4      And, Your Honor, the cases that they cite have the kind of

5  facts that you see on the left-hand column.  The cases they

6  cite say:  The defendant didn't issue a legal hold notice at

7  all.  That's the *Colonies Partners* case.  Or they did issue a

8  legal hold but it was many months or years later.  Or they

9  erased hard drives or laptops.  Or they maintained a policy

10 after they previously had already been sanctioned for that

11 retention policy.

12     We didn't do any of those things, Your Honor.  The facts

13 on our side are the kind of facts that one would say don't

14 support an intent to deprive.  We are in 37(e)(1) at most, not

15 37(e)(2).  And that's important as you think through the

16 remedies.

17     When we -- we did issue a hold to 383 people, and no one

18 here is questioning the timeliness of that hold.  We did

19 automatically preserve everything that existed before the

20 complaint was filed, and we did instruct our employees on

21 preservation.

22     I understand Your Honor has concerns about that

23 instruction.  And I would compare it, Your Honor, just so

24 Your Honor sees, with handwritten notes.  There's nothing we

25 can do with handwritten notes other than tell employees:  Hey,

 1   if you write something down, you need to save it.  What else

 2   can we do as lawyers other than tell our employees to do

 3   handwritten notes and what to do when they create them?

 4       So the question with chats is whether they're like

 5   handwritten notes or whether you automatically say:  No,

 6   because there was a technological way to automatically preserve

 7   them; and therefore, you must do that.  And I don't think

 8   that's what Rule 37 stands for, not after the 2015 amendments.

 9       So I want to start, Your Honor, with that question, which

10   is whether what we did was reasonable and proportional, as

11   those terms are used in Rule 37 and the advisory committee

12   notes that accompany Rule 37.

13       And, Your Honor, looking at Slide 9, there's no -- we're

14   not here -- I'm sorry.  Is this -- Slide 8.  I'm sorry,

15   Your Honor.  My mistake.

16       There's no question that in 2015 there was a change in

17   Rule 37.

18       **THE COURT:**  I'm with you on all this.  It'd be better,

19   I think, to focus on the evidence.

20       **MR. POMERANTZ:**  Okay.  All right.  I will move past that.

21       **THE COURT:**  Yeah.

22       **MR. POMERANTZ:**  So, Your Honor, let's talk about chats.

23   And I'm going to put aside the threaded chats because we all

24   know that those are automatically preserved.

25       Now, we've seen chats -- your Honor commented this to

 1    Mr. Summers.  We've seen chats produced in this case, and those

 2    chats do have business substance in them.  We are not disputing

 3    that some chats have business substance in them, but we also

 4    need to look at the whole record here.  And the whole record

 5    has testimony after testimony that the predominant use of these

 6    one-on-one and group chats are for things that are entirely not

 7    substantive.

 8        And the key here, Your Honor, is they shouldn't cherrypick

 9    and we shouldn't cherrypick.  The key is to look at the

10    entirety of the evidence.  What does that evidence actually

11    show you?

12        And here, in terms of the deposition testimony of our

13    witnesses, we think it's overwhelmingly clear that the

14    predominant use of these one-on-one and group chats is

15    something that's not substantive.

16        Now, they showed you a Samsung chat.  That was one of the

17    ones he showed you.  It was from 2016.  I think Your Honor saw

18    that it was from 2016.  But somebody turned history on because

19    it was a chat that they wanted to save.  And we had it and we

20    produced it in this case.

21        They talk about Ms. Kochikar, and they showed you her

22    testimony.  She was asked whether you change the default

23    setting.  That's what the question was in the deposition.  And

24    she said:  No.  That would mean instead of the default always

25    being history off, the default would be history on.

 1    And Mr. Summers showed you a section of our guidelines

 2 that allow you to do that.  But that's different than whether

 3 you turn history on for a particular chat because it's on a

 4 topic that you're supposed to turn history on.  She wasn't

 5 asked that question.

 6    And then they talked about Facebook.  They spent a lot of

 7 time on Facebook.  Your Honor, that was a 2013 e-mail.  As

 8 Your Honor said, it was ten years ago.  And they tried to say

 9 that:  Well, maybe there could have been chats now that would

10 show that somehow Facebook and Google had an agreement that

11 Facebook wouldn't open up a competing app store.

12    Your Honor, Facebook has been deposed -- people from

13 Facebook have been deposed in this case.  There's documents

14 that have been produced.  Facebook has never said:  We can't

15 open up a competing app store if we want to.  They've always

16 been free to do so.  It's been Facebook's own decision.

17    And so he's just sort of stretching to try to create:

18 Well, maybe there's a chat that's inconsistent with what

19 Facebook and Google both say.  But they've got tons of

20 e-mails about the --

21    **THE COURT:**  Well, here's the issue.  I understand what

22 you're saying, but you can't -- you cannot demonstrate to me

23 that that isn't the case.  This is the problem.

24    I'm happy to, for the sake of discussion right at this

25 moment, Mr. Pomerantz, accept all of the corralling of chat.

 1   Let's just, for the sake of discussion, assume e-mail was

 2   predominant, chat was secondary.  Okay?  Chat had social

 3   components that e-mail didn't in some cases.

 4       The irreducible fact is still chat was used on occasion

 5   for important business communications potentially relevant to

 6   this case and there was no systematic preservation of the

 7   chats.

 8       You both have the same problem.  The plaintiffs can't tell

 9   me whether there's a gold mine of missing chats, and you can't

10   tell me that all of the missing chats are irrelevant.  Neither

11   of you can answer that question.

12       **MR. POMERANTZ:**  No, but the --

13       **THE COURT:**  So on the balance, though, Google did not do

14   what is reasonable in the situation, which is disclose its

15   policies and practices with respect to chats to the plaintiffs

16   so you could have a dialogue about it and I could get involved.

17   I don't think that's an entirely freestanding question.

18   I think that goes directly to your discovery obligations.

19       And secondly, you didn't preserve what arguably contained

20   potentially relevant evidence.  It may not have been -- may not

21   have been a mountain of evidence, but it certainly wasn't zero

22   evidence.  It had something that we'll never know, and that has

23   to be addressed.

24       **MR. POMERANTZ:**  Your Honor, you put your finger on it when

25   you were talking about the 80 percent/20 percent or

 1    10 percent/90 percent discussion with Mr. Summers, and I'll get

 2    to this in the prejudice part of this.

 3         But you actually have some guidance here.  It's in the

 4    advisory committee notes.  And what it tells you is that when

 5    there is an abundance of other evidence, then it can be

 6    appropriate for you to say to the other side:  Where's your

 7    proof that there's real prejudice here?  Where is your proof?

 8    It's actually in the advisory committee notes.

 9         So when you're sitting there and you say, "Look, none of

10    us know.  Maybe there was a chat that was deleted that really

11    was quite relevant to this case, and maybe a custodian forgot

12    to turn history on.  Maybe that happened.  Maybe it happened

13    twice.  Maybe it happened ten times," but that's just -- we're

14    all here speculating about that.

15         And what the law says is when you have an abundance of

16    other evidence, that they have to do more.  They can't sit

17    there and say:  I'm missing a soundbite.  There might have been

18    a soundbite that I could put in front of the jury.

19         They can't do that when there's an abundance of other

20    evidence.  That's what the advisory committee notes say.

21         THE COURT:  Well, the law also says you can't be cavalier

22    about your discovery obligations and then say:  Oh, it's no

23    harm, no foul.  You got a little something.

24         MR. POMERANTZ:  But there's two different questions,

25    Your Honor.

1        The first is:  Is what we did reasonable and proportional?

2   Let's say Your Honor decides no, it's not.

3        There's a separate question about prejudice, and there's

4   law and there's advisory committee notes.  And when you have --

5   and what that law says to Your Honor is that when they find the

6   kind of prejudice that would justify a sanction, it's because

7   there's a specific piece of evidence that has been destroyed

8   that has relevance to the case.  That is, you know there's some

9   prejudice.

10       Can we put Slide 17 up?

11       So if you look at Slide 17, Your Honor -- I'm skipping

12   around in my outline, but I want to hit this issue while

13   Your Honor is focused on it.

14       What we do in Slide 17 is we look at the cases that the

15   plaintiffs have cited.  And what they do in each of those cases

16   where they find prejudice is they find a piece of evidence that

17   actually is relevant that some other piece of evidence doesn't

18   replace.

19       And they say -- for example, in the *Porter* case, there was

20   a lost audio recording, and that was the only way to

21   definitively establish the timing of a key event.

22       In the *Kelly* case, what was destroyed was the primary, if

23   not only, source of the e-mails during the ten years of the

24   Ponzi scheme.

25       And in the *Premera Blue Cross* case, what was destroyed was

 1    a hard drive that was the only evidence of what the hackers

 2    did.

 3        Then look at the right.  What the plaintiffs themselves

 4    say is:  It's impossible to know whether we were prejudiced.

 5        **THE COURT:**  Mr. Pomerantz, I get it.  But I'm sorry, it's

 6    just not a proposition that I'm accepting that it's okay to

 7    destroy 20 percent of evidence.  That's just not right.

 8        **MR. POMERANTZ:**  I'm sorry.

 9        **THE COURT:**  It's okay to destroy 20 percent or 10 percent

10    or even 5 percent of the evidence.  I'm not going to accept

11    that.

12        **MR. POMERANTZ:**  We don't know if any of the evidence --

13        **THE COURT:**  In other words, you don't have to burn the

14    building down before you get a sanction.  You can just make it

15    hard to walk through the door in an unnecessary way that causes

16    the presentation of the case to be materially impacted.

17        It's not an all-or-nothing -- you're making this out to be

18    some kind of binary question, which is:  If we didn't destroy

19    everything, we're good.  And I just -- that's not right.

20        **MR. POMERANTZ:**  No.  And, Your Honor, I don't want to

21    overstate the argument.  What it means is that Your Honor has

22    to look at what is the actual prejudice that the plaintiffs

23    have --

24        **THE COURT:**  I've been asking all day.

25        **MR. POMERANTZ:**  And then you --

 1          **THE COURT:**  So tell me what you think -- I mean, look,

 2   something didn't go right.  Now you tell me why they're not

 3   harmed by it.

 4          **MR. POMERANTZ:**  Your Honor, I'm totally out of my --

 5          **THE COURT:**  That's fine.

 6          **MR. POMERANTZ:**  -- order here.

 7          **THE COURT:**  We're all discussing among friends.

 8          **MR. POMERANTZ:**  I want to go to the --

 9          **THE COURT:**  Tell me why they're not harmed.  I pressed

10   your colleagues here for their view of prejudice.  Tell me why

11   they weren't prejudiced.

12          **MR. POMERANTZ:**  Well, I don't -- the reason why they're

13   not prejudiced is because they have a huge amount of evidence

14   that they have in their possession that they themselves claim

15   support every element of their claim.

16          Let me give you an example.  I hate to tell you this, but

17   they've designated 11 experts.

18          **THE COURT:**  We're going to take that up.  I do have to

19   reserve --

20          **MR. POMERANTZ:**  So --

21          **THE COURT:**  It's one of the things we're going to talk

22   about.

23          **MR. POMERANTZ:**  Okay.  So we have 22 expert reports from

24   them.

25          **THE COURT:**  I thought it was 18.

1        **MR. POMERANTZ:**  Well, there's 11 experts.  They each have

2    two reports.  So they have 22 reports.  There's a total of 18

3    experts.

4        **THE COURT:**  Reports.  Okay.  Yeah.  All right.

5        **MR. POMERANTZ:**  So they have 22 reports.  Those reports

6    cite over 2,000 Google documents; e-mails, presentation decks.

7    And what their experts say is:  Google's own documents are true

8    and they support every one of my opinions.  And those opinions

9    go to every core issue in the case.

10        Epic filed a preliminary injunction motion last summer,

11    remember, about Bandcamp, and they had to support their

12    likelihood of success on the merits.  They submitted a

13    declaration that attached 78 Google documents.  They said:

14    We're likely to succeed on all of the elements of our claim

15    just by Google's documents alone.

16        And so what you're sitting here is that we know that

17    they're sitting there on an enormous amount of evidence that

18    they themselves claim prove their case.  They've used over a

19    thousand Google documents in depositions.  They're going to

20    come to trial, and they're going to take a lot of those

21    documents, and they're going to say to the jury:  Those are

22    true.  Those are true.  Believe what these documents say.

23    Don't believe what their witnesses are saying on the stand.

24        They have tons and tons of evidence.  And so then on the

25    other side -- I don't think it's 80/20.  I think it's 99.999,

 1   because we don't know that there's any chats that have any

 2   significance that were not retained.  There's no evidence of

 3   that.  We're all just speculating.  So even -- so we don't

 4   know.

 5         THE COURT:  But we're speculating because you didn't do

 6   the right thing and preserve the documents.  That's why

 7   we're -- this is the issue.  It's not just throwing up your

 8   hands and saying:  Who knows?  The reason we can't answer that

 9   question is because the documents were not properly preserved.

10         MR. POMERANTZ:  Your Honor --

11         THE COURT:  That's why we're here.

12         MR. POMERANTZ:  Can I jump to what I think is a remedy

13   that addresses your concern?

14         THE COURT:  Yes.

15         MR. POMERANTZ:  So we've produced whatever we found,

16   whatever chats we found in those 21 custodians' files.

17         THE COURT:  I have not heard anything to the contrary

18   about that.

19         MR. POMERANTZ:  And there were hundreds of them.  I think

20   there were 700-some-odd chats from those 21 in this

21   post-complaint period.

22         We also know that we have a whole bunch of other people

23   who we believe had relevant knowledge of some -- potentially

24   relevant knowledge of issues in the case that also have chats

25   that have been preserved.  None of those have been reviewed by

1  us or produced in this case because they weren't the 21

2  agreed-upon custodians.

3      So one remedy that we threw out there was that Your Honor

4  could say:  Look, produce the chats from 20 more -- 21 more

5  custodians, and let the plaintiffs pick which 21 they are, the

6  ones that have most involvement in these post-complaint

7  developments that they're focused on in that period.

8      And we can run the search terms and do the review and

9  produce more chats.

10      The remedy for potentially missing chats could be more

11  chats.  They're sitting there.

12      **THE COURT:**  You have those?

13      **MR. POMERANTZ:**  They're sitting there.

14      **THE COURT:**  What does that mean, "they're sitting there"?

15      **MR. POMERANTZ:**  We have them.  They've been preserved.

16      **THE COURT:**  Okay.  But --

17      **MR. POMERANTZ:**  It's the ones that are in the Ho

18  declaration.  They're all chats that have not been reviewed

19  because they're not one of the 21.  So we have the chats that

20  are preserved.

21      And if Your Honor wants a trial-related --

22      **THE COURT:**  Wait.  You say they're all in the Ho -- what

23  is that?  So let's look at Exhibit A in the Ho declaration.

24      So whose chats have not been produced?  Everything 22 on?

25      **MR. POMERANTZ:**  Yes.  Yes.

1      **THE COURT:**  None of those have been produced?

2      **MR. POMERANTZ:**  Correct.  None of those have been reviewed

3  or produced.

4      **THE COURT:**  Including --

5      **MR. POMERANTZ:**  I'm sorry.

6           (Co-counsel confer off the record.)

7      **MR. POMERANTZ:**  Okay.  Through 44.  So, through 44.

8  Wait, wait.  Hold on one second, Your Honor.

9      **THE COURT:**  So 45 on?  Oh, okay.  Yeah.

10          (Co-counsel confer off the record.)

11     **MR. POMERANTZ:**  I'm sorry.

12  Yes.  So for the post-complaint period, which is what

13  we're talking about here, we have reviewed the chats that are

14  in existence for Custodians 1 through 21.

15     We have not reviewed or produced for 22 through 383, and

16  that was the agreement.

17     **THE COURT:**  So for 22 on, none of the threaded chats, none

18  of the one-on-one -- no chats of any sort?

19     **MR. POMERANTZ:**  That was the agreement.

20     But, Your Honor, we still have them.  But by agreement --

21  you know, the parties negotiate these things because there's a

22  burden with each custodian.  So we figure out the number of

23  ones, and it goes both ways.

24     So we're sitting there.  So we have a remedy that I think

25  is most tailored here and doesn't put a thumb on the scale on

 1  the merits at trial, which is give them more chats.

 2       And then, Your Honor, what you're giving them is evidence.

 3  You're not putting an instruction to the jury with the

 4  imprimatur of the Court.  You're saying:  Okay, guys.  You say

 5  you're missing some chats.  Here's some more.

 6       Now, Your Honor, they're not the identical chats.  I'm not

 7  going to say they're the identical chats.  But we don't know if

 8  any of the chats of the 21 that were originally agreed upon

 9  that weren't preserved -- we don't know if any of them were

10  relevant.

11       **THE COURT:**  Let's pause on this for a moment.

12       What do you think, plaintiffs?  I mean, that's --

13       **MR. SUMMERS:**  Your Honor, this is ridiculous.

14       **THE COURT:**  That's a lot of chats.

15       **MR. SUMMERS:**  The 21 custodians are the people that we

16  believed had relevant information.  The others are the people

17  that have irrelevant information.

18       The idea that instead of getting data from the CEO and all

19  the vice presidents who run this product and that, instead,

20  we're going to get some custodian, some janitor's chats or some

21  low-level engineer's chats, this is so absurd I'm amazed that

22  Mr. Pomerantz can even articulate it in this Court with a

23  straight face.

24       **THE COURT:**  Yeah.  There's --

25                     (Laughter.)

PROCEEDINGS

 1      **MR. SUMMERS:**  That's how I feel about it, Your Honor.

 2      **THE COURT:**  Who's on this list?

 3      **MR. POMERANTZ:**  So, Your Honor --

 4      **MR. SUMMERS:**  We negotiated the 21 because we wanted their

 5   documents.

 6      **MR. POMERANTZ:**  So, Your Honor --

 7      **THE COURT:**  But you got those chats for the 21.

 8      **MR. SUMMERS:**  We did not.

 9      **THE COURT:**  You didn't get all these chats in the Ho

10   declaration?

11      **MR. POMERANTZ:**  Your Honor, for -- I'll explain to you

12   what we did.

13      **THE COURT:**  1 through 21, they got all those?

14      **MR. POMERANTZ:**  1 through 21, what we did is we took all

15   these chats, we applied the search terms that we had agreed

16   upon with them to the relevant custodians.  And if any of the

17   chats were responsive to their request, they were produced,

18   just like you do with -- that's how production works in every

19   case, and that's what we did here.

20      So if you look at all these chats -- and I haven't added

21   them up, but let's say there's 30,000 chats there, something

22   like that -- they were reviewed using the search terms; and

23   then if they had -- if they were responsive to one of their

24   requests, they were produced.

25      **MR. SUMMERS:**  And Mr. Samat is smart enough that he's not

1  going to talk about a secret deal with Facebook on an

2  on-the-record saved chat.

3     **MR. POMERANTZ:**  Your Honor, just to be clear,

4  Custodians 22 through 383 are not custodians.  Sorry.  They're

5  not janitors.  They're not people who were -- who have

6  irrelevant positions.  Some of these people are very senior

7  executives.

8     And most importantly, Your Honor, so what we really are

9  focusing on is:  Why did they want this post-complaint

10 discovery?  It's because of the events that Mr. Summers put on

11 his chart.

12    **THE COURT:**  Let me just jump in.  I'm just thinking out

13 loud.  Just thinking out loud.  Okay?  Maybe we'll stage it.

14 Maybe you'll -- so your proposal would be to take 22 through

15 380, or whatever, and run the same search terms?

16    **MR. POMERANTZ:**  Not quite.  What I would suggest,

17 Your Honor, is there's some that are going to be more involved

18 in these events that Mr. Summers is concerned about.  We'll

19 share with them who we think are the most -- people who are

20 involved.

21    **THE COURT:**  Why not just run -- it's just an electronic

22 search.  Why not just run all of them?

23    **MR. POMERANTZ:**  Well, it's not just an electronic search.

24 So first thing what you do is you have to run the search terms

25 and the time periods and all of that.  That will then lead

1    to -- I don't know how many.  And then they have to be reviewed

2    by somebody to determine whether they're responsive to their

3    requests.

4        **THE COURT:**  Aren't you doing predictive coding?  Are you

5    still sitting down with 20 contract lawyers in a warehouse

6    reviewing all this stuff?  I mean, this is 2023.  I'm serious.

7        **MR. POMERANTZ:**  We may -- I -- I -- we have not done

8    predictive coding for these, Your Honor.

9        **THE COURT:**  You've not been using predictive --

10       **MR. POMERANTZ:**  In any event, we could do it.  We could do

11   it.

12       But all I'm saying, Your Honor, is that to me, if you're

13   looking --

14       **THE COURT:**  I just think this might be a good natural

15   experiment.  Okay?  You're asking -- I mean, you're asking for

16   the equivalent of, you know, the Abrams tank being shipped to

17   Ukraine.  Before we get there, maybe we'll do -- how about this

18   as a first step?

19       They'll run the searches for all 300-and-whatever are

20   left, 22 through 300X.  They'll produce that.  You can go

21   through it.

22       And maybe this will be a cost-shifting thing too.  Maybe

23   they'll pay for all this.  We'll get to that in a minute.  I

24   mean your time too.

25       See what you find.  If you find -- this could bolster your

1  case in some ways.  If you find a lot of chats that are

2  indicative of something going awry, that would be good.  If it

3  turns out, as Mr. Pomerantz suggests -- he hasn't suggested it.

4  But if it turns out, as Mr. Pomerantz probably hopes, that you

5  get nothing, then that is some indicator to me that maybe the

6  chat function is not quite the treasure trove you thought.

7       I can't see why not to do this.

8       Now, I do think it may be fair that Google pay for all of

9  this, but we can get to that in a minute.

10      Yes, please.

11      **MR. SUMMERS:**  Just one thing, Your Honor.

12      **THE COURT:**  Yes.

13      **MR. SUMMERS:**  Keep in mind, just to be clear, these other

14  custodians and other people, to the extent they were

15  communicating off the record, those chats are gone.  The only

16  thing --

17      **THE COURT:**  I understand that.

18      **MR. SUMMERS:**  -- they might have left are these threaded

19  chats and a few chats here and there that got preserved for one

20  reason or another.

21      And we think the treasure trove is in the off-the-record

22  category that was systemically deleted.

23      **THE COURT:**  Yes, I know.  But this is an experiment to

24  test that proposition.

25      So you'll go through these; and if you find some things

1  that are consistent with some of the other items you presented,

2  that will help me see the way to different inferences than I

3  might otherwise make.  If you go through all of this and there

4  isn't a lick of chat that goes your way, then that's going to

5  also --

6      **MR. SUMMERS:**  Your Honor --

7      **THE COURT:**  -- be a basis for guiding my inferences.

8      **MR. SUMMERS:**  Just to be clear, like, in the threaded

9  rooms, that's by subject matter.  There is going to be no

10 subject -- there's going to be no threaded room for negotiating

11 rev share deals with Samsung.  There's going to be no

12 threaded room for negotiating secret deals with Facebook.

13 There's going to be no threaded room for anything nefarious.

14     **THE COURT:**  We're not talking about just threaded rooms.

15 We're also talking about the one-on-one and groups chats, of

16 which there are tens of thousands.

17     **MR. POMERANTZ:**  300,000, Your Honor.

18     **MR. SUMMERS:**  And for some custodians --

19     **THE COURT:**  Just on the one-one-one side.

20     **MR. SUMMERS:**  -- very few.

21     **THE COURT:**  300,000 just on the one-on-one side.  Not the

22 threaded rooms; just on the one-on-one side.  The threaded

23 rooms look like might be two or three times that.

24     **MR. POMERANTZ:**  800,000.

25     **MR. SUMMERS:**  Very few for our 21 custodians.

**PROCEEDINGS**

1     **THE COURT:**  Well, I think that may be a staging thing that

2     we might try.

3     Now, what about -- how long is this going to take?

4     Sure.

5     (Co-counsel confer off the record.)

6     **MR. POMERANTZ:**  Approximately one month, Your Honor.

7     **THE COURT:**  One month?  That long?

8     **MR. POMERANTZ:**  I asked the people who know better than I

9     do, Your Honor.  And, again, because we are still many months

10    from trial, you know, and we're only trying to figure out a

11    trial remedy, I think giving them more evidence is the best

12    remedy they could have, and it's consistent with trying the

13    case on the merits.  And so I think this is worth it.

14    But I would ask for a month, Your Honor.  I think there's

15    still time for Your Honor to resolve any issue after that.

16    (Co-counsel confer off the record.)

17    **MR. POMERANTZ:**  Oh.  Two weeks.

18    **MR. SUMMERS:**  And, Your Honor --

19    **THE COURT:**  Two weeks.  Two weeks?

20    **MR. POMERANTZ:**  I just got something that said two weeks.

21    **THE COURT:**  Two weeks.

22    **MR. SUMMERS:**  Your Honor, I think we also need to know, is

23    there any possibility -- they mentioned this last Ho

24    declaration we got last week, that they actually have a log

25    going back 55 days.  We'd never heard about that.

1    **THE COURT:**  They have what?

2    **MR. SUMMERS:**  They have a log --

3    **THE COURT:**  A log?

4    **MR. SUMMERS:**  -- that goes back 55 days.

5    **THE COURT:**  Where is that?

6    **MR. SUMMERS:**  I think we're starting to learn why they

7    didn't bring a technical person to the hearing last time

8    around.

9    **THE COURT:**  Where is --

10   **MR. SUMMERS:**  I'm sorry.  Not the Ho declaration.  The

11   Chen declaration.

12   **THE COURT:**  Oh, okay.

13   **MR. SUMMERS:**  The Chen declaration --

14   **THE COURT:**  Chen declaration?

15   **MR. SUMMERS:**  -- they admitted that they now have a log --

16   a data log that goes back 55 days.

17   **THE COURT:**  Okay.

18   **MR. SUMMERS:**  I think we need to know what data they

19   actually have going back 55 days, and if we're going to get

20   anything, we ought to get the off-the-record chats, to the

21   extent they exist, for the past 55 days.

22   **THE COURT:**  Where is that in the Chen declaration?

23   **MR. POMERANTZ:**  Your Honor, in paragraph 4 of the Chen

24   declaration.

25   **THE COURT:**  What's the docket number on that?

1   **MR. POMERANTZ:**  It looks like it's 429-4.

2   **THE COURT:**  429-4.

3   Oh, okay.  Yes.  So where is that in Chen?

4   **MR. POMERANTZ:**  So in paragraph 4, Your Honor.  Let me --

5   **THE COURT:**  Oh, 55 days.

6   All right.  So paragraph 4 says --

7   **MR. POMERANTZ:**  I guess --

8   **THE COURT:**  -- "systemwide back-end log."

9   Is that what you're talking about?

10   **MR. SUMMERS:**  Yes, Your Honor.

11   **THE COURT:**  And you'd like to get that too?

12   **MR. SUMMERS:**  Yeah.  I think we should get the log data,

13   and I think we should get a deposition of whoever can explain

14   the log data.  I think we should have depositions about this

15   training.

16   **THE COURT:**  Training?

17   **MR. SUMMERS:**  The Communicate with Care.

18   And you said what training?  I think we should -- if we're

19   going to test and get more information, let's test and get more

20   information.

21   **MR. POMERANTZ:**  Your Honor, first of all, let me just step

22   back.  He's just kind of going on and on and on.

23   Let us get -- in two weeks, we can get him chats.  I think

24   that should be the starting point.  We can all --

25   **THE COURT:**  Well, this is actually a good lead-in to our

1    scheduling discussion.

2        I don't want to stage this too much.  So here is what I

3    would like to do.

4        You two get together -- okay? -- and work out a plan.  The

5    plan will consist of producing those e-mails -- chats that we

6    talked about in two weeks, some arrangement on this rolling

7    log, maybe some depositions.  Okay?  You identify, plaintiffs,

8    what topics you would like and get those scheduled.

9        And the presumption will be -- your working proposition, I

10   should say.  Your working proposition is going to be more is

11   better right now.  All right?  There will be limits.  If it's a

12   hundred people, whatever -- figuratively speaking -- you can

13   get me involved.  Just work it out.  All right?

14       And that means they get the logs, they get some depo time,

15   they get those e-mail -- they get the chats.  I'm sorry.  I

16   keep saying "e-mail."  They get the chats.  And it's all done

17   fairly quickly.  Okay?

18       **MR. POMERANTZ:**  Yes, Your Honor.

19       **MS. GIULIANELLI:**  Your Honor, is Google able to tell us

20   how many of those 300-some custodians as of today have turned

21   history on, or are they all still on auto-delete --

22       **THE COURT:**  You can add that to --

23       **MS. GIULIANELLI:**  -- for the off-the-record chats?

24       **THE COURT:**  -- to your discussion.  All right?

25       That's all for you to work out a plan.  And I think after

**PROCEEDINGS**

1  we get through this, the situation for trial-related sanctions,

2  should that still be on the table, will be a lot clearer.

3      **MR. SUMMERS:**  And, Your Honor, one more thing.  Shouldn't

4  they turn history on?  These chats are still being destroyed

5  every day.  They've never -- and I think that's the proof --

6      **THE COURT:**  They proceed at their own peril.  You would

7  think they would do it, but it's not my client.

8      **MR. SUMMERS:**  The Court can certainly order it,

9  Your Honor.  If the Court believes that it's an appropriate ESI

10  practice, then I think you can --

11      **THE COURT:**  Well, I mean, realistically, at this point in

12  the litigation, you think you're going to get anything?

13      **MR. SUMMERS:**  Once they know that it's on, probably not.

14  They're pretty clever.  But -- and the word will go out to the

15  Googlers to stop using chat.

16      **THE COURT:**  How about this?  Add that to your discussions.

17  Okay?

18      **MR. SUMMERS:**  Yes, Your Honor.

19      **THE COURT:**  I will reserve judgment on that, but you let

20  that -- lets you two talk in the first instance.

21      **MR. SUMMERS:**  Just one thing on that, Your Honor.  That is

22  the proof of prejudice.  They've made a cold, calculated

23  decision that it's better to run the risk of punishment in

24  this Court and others, that it is better to destroy the

25  evidence than to run the risk of what might happen in

**PROCEEDINGS**

1  litigation.  They know what's in those chats; they have a

2  sense; and they have chosen destruction over compliance.

3      **THE COURT:**  The day will come when I will answer those

4  questions.  I guarantee it.  We're just going to take a little

5  deeper dive, just to make me comfortable, if nothing else,

6  about where we're going to end up in this multidistrict

7  litigation that's going to have a lot of echo effects in all

8  probability.  Okay?  So we're going to do that.

9      But you get it done in short order.  So you get that

10  meet-and-confer -- are you two in the same town?  You're not.

11      **MR. POMERANTZ:**  We talk regularly.

12      **MR. SUMMERS:**  We have the same name.

13      **MR. POMERANTZ:**  We have almost the same name.  He's

14  missing an "N" in his.

15      **THE COURT:**  All right.

16      **MS. MOSKOWITZ:**  Your Honor, very briefly, and we can talk

17  about it, but I just want to put it out there.  Can we have no

18  responsiveness review?  Can we just get the --

19      **THE COURT:**  What?

20      **MS. MOSKOWITZ:**  No responsiveness review.

21      **THE COURT:**  Well, I was thinking, you have an agreement

22  that any privileged things will be disgorged.

23      **MS. MOSKOWITZ:**  Yes.  That's what we'd like.  We can get

24  those --

25      **THE COURT:**  I mean --

1    MR. POMERANTZ:  Your Honor, we said we'll do it in two

2  weeks.  We'll do it in two weeks.  We'll get them exactly what

3  they asked for in their discovery requests.  Anything that's

4  responsive to their requests, we will get to them in two weeks.

5  I think that's appropriate.

6    THE COURT:  You talk about that, but two weeks or better.

7  Okay?

8    But on the privilege issue, in the unlikely event --

9  I think it's unlikely, based on my long experience, that a

10  privileged document or communication is in that -- it just gets

11  handed back.  Okay?  There's no questions asked.  Nobody uses

12  it.  Nobody copies it.  Nobody mentions it.  It just gets

13  returned.

14    MR. POMERANTZ:  We've been working that way with them

15  throughout this case.

16    THE COURT:  Okay.  So that might cut --

17    MR. POMERANTZ:  So that has not been a problem.

18    THE COURT:  That might cut down on the time a little bit.

19    MR. POMERANTZ:  That has not been a problem, Your Honor.

20    THE COURT:  Now, I just would like you to close, if you

21  don't mind, because I want to talk about scheduling before it

22  gets too late.

23    Why didn't you tell anybody?  Why did you sit on this?

24  And it's not a separate question.  In my view, it goes to the

25  heart of your -- when I say "you," I'm talking about Google,

1     not you personally.

2          **MR. POMERANTZ:**  No, I understand, Your Honor.

3          **THE COURT:**  It goes to the heart of handling discovery

4     appropriately in an important, massive MDL case.

5          **MR. POMERANTZ:**  So, Your Honor, I would say that when you

6     say why didn't we tell them, I think it's fair to say from the

7     record that's now in front of the Court, we did tell them on

8     October 21, 2021.  And we also gave them additional information

9     on November 11th of 2021.  So the question --

10         **THE COURT:**  What about the --

11         **MR. POMERANTZ:**  -- is, is what happened before that?

12         **THE COURT:**  -- preceding 14 months before that?

13         **MR. POMERANTZ:**  The answer is, is before that.  And all I

14    can say to you is the disclosures that could have been made at

15    the outset were not.  It wasn't by intent.  And thereafter, we

16    straightforwardly answered every question that they asked.

17         **THE COURT:**  You say it wasn't by intent, but someone made

18    a decision not to do it.  That's intent.

19         **MR. POMERANTZ:**  You know, I don't know that that's what

20    happened, Your Honor.  I don't know that there was a decision

21    made:  Let's not do it.  I don't believe that's what happened.

22         **THE COURT:**  Well, then someone was reckless,

23    Mr. Pomerantz.  I mean, not negligent.  Reckless.  Knowing that

24    there's this pipeline of communications that no one gave a

25    minute's worth of thought to, that's not negligent; that's

1    reckless, which is equally culpable.

2        I don't get it.  And you don't have an answer.  That's

3    fine.  I'm not trying to squeeze blood from a turnip.

4        Okay.  All right.  Let's talk about scheduling.

5        **MR. BORNSTEIN:**  Your Honor, if I may, I just wanted to

6    answer a factual question that Your Honor had posed to the --

7        **THE COURT:**  Yes, please.

8        **MR. BORNSTEIN:**  -- plaintiff group earlier.

9        Yes.  This related to what happened after the October 21,

10   2021 --

11       **THE COURT:**  Oh, sure.  Yes.

12       **MR. BORNSTEIN:**  -- meet-and-confer and whether there were

13   further communications on this.

14       **THE COURT:**  Right.

15       **MR. BORNSTEIN:**  So there was a letter that the plaintiffs

16   sent on October 29, following up on the meet-and-confer.  In

17   response, we received a letter.  It was in Mr. Summers'

18   presentation on November 11 telling us, and I quote (as read):

19           "Google does not have the ability to change the

20           default settings for individual custodians with" --

21       **THE COURT:**  Oh, I remember that, yeah.

22       **MR. BORNSTEIN:**  (As read):

23           -- "respect to the chat history."

24       Right?

25       So we followed up again.  On November 29 we sent a letter

1   asking them, on the assumption that finally something would

2   have changed, we said (as read):

3            "Please tell us when custodians took steps to

4        disable the automatic deletion function and what

5        steps Google took in order to verify or ensure that

6        each custodian did, in fact, begin preserving his or

7        her instant messages."

8        We didn't get a satisfactory answer, and that's what led

9   us to the December 2021 management -- case management statement

10  and then conference with Your Honor.  We brought this to

11  Your Honor's attention.

12       In the case management statement, Google said, contrary to

13  Mr. Pomerantz's statements today (as read):

14           "We agree that chats are subject to

15       preservation."

16       The idea that Zoom is different and all that --

17       **THE COURT:**  Where do they say that?

18       **MR. BORNSTEIN:**  This is in a December 9, 2021, case

19  management statement.  It's Docket 159 in the MDL.

20       **THE COURT:**  159.

21       **MR. BORNSTEIN:**  1-5-9, that's right.

22       And the statements to the Court were first (as read):

23           "We agree that the chats are subject to

24       preservation, and Google in fact took reasonable

25       steps" --

PROCEEDINGS

```
 1        THE COURT:  What paragraph is that?

 2        MR. BORNSTEIN:  I believe it's on page 10, Your Honor.

 3   I'm working from memory on that one.

 4        THE COURT:  Okay.  That's fine.

 5        MR. BORNSTEIN:  But it's page 10 and 11, I think are the

 6   relevant pages.

 7        THE COURT:  So, go ahead.

 8        MR. BORNSTEIN:  Right.  So this was the statement to

 9   the Court after we've now negotiated this.

10        (As read):

11             "Google agrees that relevant instant messages

12        and chats are subject to preservation."

13        Fine.  We agree too.

14        (As read):

15             "Google, in fact, took reasonable steps to

16        preserve such messages."

17        That was the representation.  And they went on and said

18   that Google has used, quote (as read):

19             ". . . all available preservation methods via

20        its legal hold tool and active management by legal

21        counsel at every step of the process."

22        So when we talk about our efforts to try to get an answer

23   here, even when we were in front of the Court, we didn't get

24   one.  We knew that they had stopped deleting -- excuse me --

25   that they had continued to delete and they hadn't turned it
```

1    off, but we still had to try to get an answer.

2        **THE COURT:**  I understand --

3        **MR. BORNSTEIN:**  So I just wanted to give Your Honor the

4    response to the question.

5        **THE COURT:**  I understand what you're saying, but my sense

6    is that's just part and parcel of the original position that

7    putting it on each individual witness to make the call was

8    reasonable and appropriate.  And they're just sticking with

9    that, even though, arguably, it's becoming increasingly

10   apparent that that was both unreasonable and not the right

11   thing to do.

12       **MR. BORNSTEIN:**  I think that's right, Your Honor.

13       There are two additional points, though.

14       One is, I was just responding to the factual question you

15   posed.

16       The other is, the initial statement in October of 2020,

17   that was a general statement about all evidence and

18   preservation obligations.  And we all do this at the beginning

19   of the case.

20       The December 21, 2021, representations to the Court were

21   specifically about the chat concept.  But still --

22       **THE COURT:**  I'm sorry.  I'm going to push back on that.

23       I really -- I'm not saying you're saying this, but this

24   idea that the first case management conference is kind of a

25   freebie and you throw in the boilerplate, that doesn't fly with

1    me.  That's the most important document I get in the case,

2    arguably, because that's how I meet you.  All right?

3         So when you tell me in your first document that you have

4    done everything possible that you need to do and are required

5    to do to preserve evidence, I'm not expecting that to be

6    subject to footnotes.  I'm not expecting that to be a

7    geranyl bromide.  I'm not expecting that to be TBD later.

8    That's your representation to me out of the gate, and that's

9    what I bank on.

10        So I don't buy this idea that you can tell me in the first

11   case management conference statement -- and I read all of these

12   religiously -- that everything's good when it's not.  So I'm

13   sorry.  I don't do that.

14        **MR. BORNSTEIN:**  Well, I couldn't agree --

15        **THE COURT:**  So that started in October of 2020 with me,

16   not later in the case.

17        Now, you may have put a finer edge on the knife.  That's a

18   different issue.  But out of the gate, when you tell me we're

19   good, I'm trusting you; and if that trust has been betrayed,

20   there are going to be consequences, which is why we're here

21   today.

22        **MR. BORNSTEIN:**  Your Honor --

23        **THE COURT:**  The reason there are consequences is not

24   because I personally am offended.  That is completely

25   irrelevant.  It gums up the fair and efficient disposition of

1  cases, and it makes me spend time on proceedings like this when

2  I have 400 other cases, literally, that require as much

3  attention as you do.  That's the issue.

4       **MR. BORNSTEIN:**  Your Honor, I agree with you on that.

5       **THE COURT:**  Not to mention fairness just to the litigants.

6  Those are the issues.

7       Okay.

8       **MR. BORNSTEIN:**  Thank you, Your Honor.

9       **THE COURT:**  All right.  Let's talk about the schedule.

10      The proposed trial date is fine with me.  So let's bank on

11  that.  We have a lot of --

12      **MR. GLACKIN:**  You ordered it, Your Honor.

13      **THE COURT:**  What's that?

14      **MR. GLACKIN:**  Brendan Glackin for the states, Your Honor.

15      You ordered the trial date.  It wasn't proposed by us.

16      **THE COURT:**  Oh, okay.  I did?

17                         (Laughter.)

18      **THE COURT:**  Excellent.

19      **MR. GLACKIN:**  So I'm sure it's fine by you.

20      **THE COURT:**  That's even better.

21      Okay.  Oh, here it is.

22      **MR. GLACKIN:**  We wanted to talk about it, actually, but --

23      **THE COURT:**  Well, look, I've got to be honest with you.

24  The very last trial I did was an antitrust trial, before I

25  joined the bench, and it started the Monday after Thanksgiving

1    and it went through January 8th.  So that's just the way it is.

2    All right?  That's all I can do for you.  You're going to have

3    to do it.  And the idea that holidays are good for one side or

4    the other, it just doesn't fly in my experience.

5         So those are going to be the dates.  Plan on it.

6         Now, we have a lot of mechanics to work out.  Who's going

7    to go first?  What are we going to do about equitable issues?

8    But that schedule is fine.

9         I do want to have a word about -- somebody told me there

10   are 18 experts total.

11        **MR. GLACKIN:**  That's correct, Your Honor.

12        **THE COURT:**  What are you going to do about -- how are you

13   going to handle the hot tubs?

14        **MR. GLACKIN:**  Your Honor, we, the plaintiffs, wanted to

15   raise this with you today because my fear, our fear is that if

16   we don't start getting our arms around what that proceeding

17   looks like and finding a date for it that works for the people

18   that you want there, we're going to find ourself in a

19   position -- ourselves in a position where it becomes harder and

20   harder to schedule it.

21        **THE COURT:**  Let me ask you this:  Why are there 18

22   experts?

23        **MR. GLACKIN:**  Why are there 18 experts?

24        **THE COURT:**  Yeah.  Look, it's a big case, but it's not an

25   unprecedented case.

1      **MR. GLACKIN:**  Well, Your Honor --

2      **THE COURT:**  So you have one -- you have maybe two

3  merits -- two liability experts, two market experts, people to

4  talk about the econ concepts.

5      **MR. GLACKIN:**  Your Honor, so there are 11 experts on the

6  plaintiff side.  I believe there are seven experts just on

7  Google's side.  We have three plaintiff groups on this side.

8  If we had the same number of experts proportionally as Google,

9  there would be 21 of them.  So we're being relatively

10  restrained.

11      **THE COURT:**  I don't feel like I'm getting a bargain.  So

12  just tell me why there are 18 experts.

13      **MR. GLACKIN:**  Well, Your Honor, we have -- there are

14  different economists for each of the three plaintiff groups.

15      **MS. MOSKOWITZ:**  Four groups.

16      **MR. GLACKIN:**  Excuse me.  The four plaintiff groups.  I

17  stand corrected.

18      **THE COURT:**  Well, this is a concern of mine.  There are

19  going to be four different economists giving four different

20  sets of opinions about the market?

21      **MR. GLACKIN:**  Your Honor, I don't know that that will be

22  how it goes down at trial, especially given the length of trial

23  that you have forecasted for us.  I don't think -- I actually

24  think on the market definition, I think the economists are

25  pretty aligned.  But I don't think we're going to have four

1   economists saying the same thing over and over and over again,

2   if that's what you're wondering, because we're not going to

3   have time.

4       THE COURT:  Well, that's not going to happen.

5       But I'm also concerned about four economists coming in and

6   saying different things on the same side.  What is a jury

7   supposed to do with that?

8       MR. GLACKIN:  Your Honor, you're absolutely correct that

9   this trial presents some challenges.

10      THE COURT:  Yeah, but these are challenges that you're

11  creating that aren't necessary.  That's my point.

12      So I want you to work through this.  I'm not following

13  this at all.

14      MR. GLACKIN:  Okay.

15      THE COURT:  Why there would be four different experts on

16  the same side opining more or less on the same set of issues,

17  that does not make any sense to me whatsoever.  If there's

18  non-overlap, of course, it's fine.

19      MR. GLACKIN:  I mean, Your Honor, for example, I mean,

20  Epic and Match are developers.  They are not consumers.  They

21  are not -- their claims are not comprehended by the states.  So

22  they have economists that speak to the effect of the conduct on

23  them.

24      THE COURT:  I just said that's perfectly fine.  But

25  there's a core of opinions about the market, about exclusionary

1  conduct, about barriers to entry, about all those things that

2  there should be one person speaking on.  I'm perfectly fine

3  with differences.  Of course.  You're not similarly situated.

4  But the core, they cannot possibly have four people coming in

5  and saying:  Well, I'm about 80 percent with the prior guy, but

6  here's my view on the 20 percent on market definition.  That's

7  not going to happen.

8      **MR. GLACKIN:**  So I agree with Your Honor that we are not

9  going to have four different experts reciting their opinions

10  which are all the same or different about market definition.

11  That's not practical.

12      We did not, at the stage of retaining experts, decide that

13  all four plaintiffs were going to retain one expert for market

14  definition, for example.

15      **THE COURT:**  I think you've got some work to do.  This is

16  an unmanageable burden, and it's just not going to fly.

17      Now, right now we have the concurrent proceedings

18  scheduled for when?

19      **MR. GLACKIN:**  We don't have it.

20      **MR. POMERANTZ:**  We don't have that.  I mean, Your Honor --

21      **THE COURT:**  What's the proposed -- it's June; right?  Is

22  that what you want?

23      **MR. POMERANTZ:**  No, we didn't propose a date.  What we

24  thought is we needed a little guidance from Your Honor about

25  who you would like to see.  We didn't know if what you wanted

**PROCEEDINGS**

1   was just those experts that are relevant to a *Daubert* motion or

2   whether you want to get educated on basic economic and other

3   issues of the case.

4        **THE COURT:**  The primary function is for the *Daubert*

5   motions.  Now, I gather you all on plaintiff side aren't going

6   to do any *Daubert*s.  Is that right?

7        **MR. GLACKIN:**  Correct, Your Honor.

8        **THE COURT:**  Okay.  So --

9        **MR. POMERANTZ:**  And we haven't made a decision yet, Your

10  Honor, but we have to make the decision by April 20th, which is

11  the date that we proposed to file that.  And so what we were --

12  if Your Honor only wants to hear from experts that are relevant

13  to a *Daubert* motion, we will be able to work with the

14  plaintiffs very quickly after April 20th to figure out which

15  experts need to be there, and then work with the experts and

16  Your Honor's Clerk to find a date that works in your calendar

17  for that hot tub.

18       And then we'll schedule the summary judgment argument and

19  *Daubert* argument reasonably after that.

20       **THE COURT:**  Well --

21       **MR. GLACKIN:**  Excuse me.

22       **THE COURT:**  It's fairly dramatic to have one side say no

23  *Daubert* motions.

24       **MR. POMERANTZ:**  I was happy to hear that.

25       **THE COURT:**  Why isn't it reciprocal?

1      **MR. POMERANTZ:**  Well, because we think they've done some

2   things that we haven't done that merit a *Daubert* motion.

3      We probably will be filing a *Daubert* motion, maybe more

4   than one, but we haven't decided yet.  We haven't even taken

5   their deposition yet of most of their experts.

6      **THE COURT:**  You have their reports, though; right?

7      **MR. POMERANTZ:**  We have the reports; so we have some

8   ideas.  But until you test it in the deposition room, we don't

9   know for sure which ones we're actually going to move,

10   you know, in a *Daubert* motion on.  But we will obviously have

11   to do it by April 20th.

12      **THE COURT:**  Well, if you haven't done it, please read my

13   *Daubert* decisions, because I'm a very strong believer in the

14   benefits and utility of cross-examination versus exclusion.

15      So if you're just going to come in and try to *Daubert*

16   someone because they didn't look at certain types of evidence

17   the right way, in your view, or didn't take into account

18   factors X, Y, and Z, it's going to be a prompt, short denial.

19      **MR. POMERANTZ:**  We will definitely --

20      **THE COURT:**  If they have some exotic theory that no

21   economist of any credibility would ever use, then maybe we have

22   something to talk about.

23      But that is -- I'm being a bit glib, but that really is --

24      **MR. POMERANTZ:**  No.  We'll --

25      **THE COURT:**  -- the touchstone.

 1      MR. POMERANTZ:  -- keep that in mind, Your Honor.

 2      THE COURT:  Okay?  So --

 3      MR. GLACKIN:  Your Honor?

 4      THE COURT:  All right.  Yes.

 5      MR. GLACKIN:  So the concern I have about kicking this

 6  issue until they actually file their motions is that we already

 7  know right now that it's very, very hard to get particular

 8  groups of experts together over the summer.

 9      And so, for example, if Your Honor -- to my mind as a

10  practitioner, the *Daubert* -- the unmeritorious *Daubert*, of

11  course, that I most strongly suspect we will get is one on

12  damages.

13      If we're going to have a damages hot tub, we do not at the

14  moment have a date in July or August that works for all of the

15  experts and all of the lawyers.  We could set it in June.

16      And my concern about kicking this can down the road until

17  April is that by the time we get their motions in April and we

18  talk to them, that either Your Honor will not be available in

19  June or that the experts who right now are available in June

20  won't be, which is why if we're -- my preference -- I guess I

21  would suggest two ways out of this.

22      One is to give them a date earlier than filing their

23  motion to tell us what they're going to move on.  And I'll

24  note, for example, that I think almost all the experts in this

25  case are right now set for deposition prior to the middle of

**PROCEEDINGS**

 1  March.  So we've -- a lot is happening, and they -- if they

 2  don't have enough information now, they'll certainly have

 3  enough information soon.  So one option would be to give them a

 4  faster date to tell us so we can start planning this.

 5       The other option would be to pick -- if Your Honor

 6  suspects that he is going to want a hot tub on damages, would

 7  be to set it right now for June 27th when we have not been told

 8  any expert or any lawyer is unavailable, if that is a date

 9  available for Your Honor.

10       **THE COURT:**  You all need to trim down your experts first.

11  Then you can have a conversation.

12       He can't decide -- Mr. Pomerantz can't -- is not going to

13  know.  You may get rid of the one person he's thinking about

14  *Daubert*ing.  I just don't know.

15       Get your list done, and then you two can talk, and if

16  there's some roadblock, you can have them in.

17       The experts are going to have to work around my schedule.

18  So if they can't make it, they can't make it.  That's just the

19  way it is.  Okay?  You're going to have to make that happen.

20       Okay.  Anything else for today on scheduling,

21  Mr. Pomerantz?

22       **MR. POMERANTZ:**  No, Your Honor.

23       **THE COURT:**  Plaintiffs?

24       **MR. GLACKIN:**  No, Your Honor.

25       **THE COURT:**  Okay.  Now, do you need me to set deadlines,

**PROCEEDINGS**

1     or how are you going to do all this meet-and-confer on the --

2        **MR. POMERANTZ:**  I think we have the guidance, Your Honor.

3     We talk regularly.  We'll talk, if not today, tomorrow.

4        **THE COURT:**  All right.  How about -- just give me a plan,

5     stipulated plan by -- what is today?  Tuesday?  How about

6     Monday?  Is that all right, plaintiffs?

7        **MR. POMERANTZ:**  That's fine, Your Honor.

8        **THE COURT:**  Okay with that?

9        **MR. GLACKIN:**  Very good, Your Honor.

10       **THE COURT:**  Okay.  Thank you.  That was very useful.  I

11     appreciate it.

12       **THE CLERK:**  All rise.  Court's in recess.

13           (Proceedings adjourned at 4:57 p.m.)

14             ---o0o---

15           **CERTIFICATE OF REPORTER**

16       I certify that the foregoing is a correct transcript

17     from the record of proceedings in the above-entitled matter.

18

19     DATE:  Thursday, February 2, 2023

20

21

22     _____

23       Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
           Official United States Reporter

24

25