# EXHIBIT 16
# PUBLIC REDACTED VERSION

ATTORNEYS' EYES ONLY

Page 1

```
 1               UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2                 SAN FRANCISCO DIVISION
 3
    IN RE GOOGLE PLAY STORE    :   Case No.
 4  ANTITRUST LITIGATION       :   3:21-md-02981-JD
                               :
 5                             :
    This Document Relates To:  :
 6                             :
    State of Utah et al. v.    :
 7  Google LLC et al.          :
    Case No. 3:21-cv-05227-JD  :
 8                             :
    Match Group, LLC et al. v. :
 9  Google LLC et al.          :
    Case No. 3:22-cv-02746-JD  :
10                             :
    Epic Games Inc. v. Google  :
11  LLC et al.                 :
    Case No. 3:20-cv-05671-JD  :
12                             :
    In Re Google Play          :
13  Consumer Antitrust         :
    LItigation                 :
14  Case No. 3:20-cv-05761-JD  :
15
16          ** ATTORNEYS' EYES ONLY **
17             TUESDAY, APRIL 4, 2023
18
19        Video Recorded and Remote Zoom
    Deposition of HAL J. SINGER, Ph.D., taken
20  pursuant to Notice, at the law offices of
    Munger, Tolles & Olson LLP, 601 Massachusetts
21  Avenue NW, Washington, DC, commencing at
    approximately 9:11 a.m., on the above date,
22  before Rose A. Tamburri, RPR, CM, CCR, CRR,
    USCRA Speed and Accuracy Champion and Notary
23  Public.
24
25
```

ATTORNEYS' EYES ONLY

Page 2

```
 1    APPEARANCES:
 2
 3
         UTAH OFFICE OF THE ATTORNEY GENERAL
 4       BY:  LAUREN WEINSTEIN, ESQUIRE
         160 East 300 South, 5th Floor
 5       P.O. Box 140872
         Salt Lake City, Utah  84114
 6       Representing the State of Utah
 7
 8       BARTLIT BECK LLP
         BY:  KARMA M. GIULIANELLI, ESQUIRE
 9       1801 Wewetta Street, Suite 1200
         Denver, Colorado  80202
10       karma.giulianelli@bartlitbeck.com
         Representing Interim Co-Lead Class
11       Counsel for Plaintiffs and the Proposed
         Class in In re Google Play Consumer
12       Antitrust Litigation
13
14
         HUESTON HENNIGAN LLP
15       BY:  TATE HARSHBARGER, ESQUIRE
         523 West 6th Street, Suite 400
16       Los Angeles, California  90014
         tharshbarger@hueston.com
17       (Via Remote Zoom)
         Representing Match Group Inc., et al.
18
19
         CRAVATH, SWAINE & MOORE LLP
20       BY:  ERIC ZEPP, ESQUIRE
         Worldwide Plaza
21       825 Eighth Avenue
         New York, New York  10019
22       ezepp@cravath.com
         Representing Plaintiff Epic Games
23
24
25
```

ATTORNEYS' EYES ONLY

Page 3

1    APPEARANCES, CONTINUED:

2

3        MUNGER, TOLLES & OLSON LLP
         BY:  JUSTIN P. RAPHAEL, ESQUIRE

4        560 Mission Street, 27th Floor
         San Francisco, California  94105

5        Representing the Defendants
         Google LLC et al.

6

7

8    ALSO PRESENT:

9

         BRYAN BLOOM, ESQUIRE

10       Attorney General's Antitrust
         Bureau of New York

11

12       GLEN FORTNER, Videographer

13

     (Via Remote Zoom)

14

15       BRANDON KRESSIN, ESQUIRE

16       TATE HARSHBARGER, ESQUIRE

17       ADAM HOEFLICH, ESQUIRE

18       STEPHEN MYERS

19       DR. KEVIN CAVES

20

21

22

23

24

25

ATTORNEYS' EYES ONLY

**Page 4**

1

# I N D E X

2

3    TESTIMONY OF:   HAL J. SINGER, Ph.D.

4

        By Mr. Raphael.....................7, 423

5

        By Ms. Giulianelli...................423

6

7

8

# E X H I B I T S

9

EXHIBIT NO.          DESCRIPTION              PAGE NO.

10

   DX-1112     Merits Reply Report of Hal        6
11             J. Singer, Ph.D.
12   DX-1113     University of Utah Campus        20
               Directory

13

   DX-1114     Logit Chapter from Kenneth       92
14             Train Textbook
15   DX-1115     Apple Slide Deck - Bates        253
               Nos. DX-4526.001 - 138

16

   DX-1116     Daniel L. McFadden Nobel        410
17             Prize Lecture, December 8,
               2000

18
19
20
21
22
23
24
25

ATTORNEYS' EYES ONLY

Page 5

```
 1

 2   DEPOSITION SUPPORT INDEX

 3

 4   DIRECTION TO WITNESS NOT TO ANSWER

 5   Page      Line

 6   None

 7

 8   REQUEST FOR PRODUCTION OF DOCUMENTS

 9   Page      Line      Description

10   None

11

12

13

14

15   STIPULATIONS

16   Page      Line

17   None

18

     PREVIOUSLY MARKED EXHIBITS REFERRED TO

19

     EXHIBIT NUMBER                  PAGE REFERENCED

20

     DX-1059                              22

21

22

23

24

25
```

ATTORNEYS' EYES ONLY

Page 6

1              (Whereupon, a document was marked,

2    for identification purposes, as Exhibit

3    DX-1112.)

4              THE VIDEOGRAPHER:  Good morning.

5              We are going on the record at 9:11

6    on March 4th, 2023.  {Sic}

7              Please note that the microphones

8    are sensitive and may pick up whispering and

9    private conversations.  Please mute your

10   phones at this time.

11             Audio and video recording will

12   continue to take place unless all parties

13   agree to go off the record.

14             This is Media Unit 1 of the video

15   recorded deposition of Hal Singer, in the

16   matter of In Re: Google Play Store Antitrust

17   Litigation, filed in the United States

18   District Court, Northern District of

19   California.

20             The location of the deposition is

21   Munger Tolles.

22             My name is Glen Fortner

23   representing Veritext and I'm the

24   videographer.  The court reporter is Rose

25   Tamburri from the firm Veritext.

ATTORNEYS' EYES ONLY

Page 7

1           I'm not related to any party in

2    this action, nor am I financially interested

3    in the outcome.

4           Counsel will be noted on the

5    stenographic record.

6           Will the court reporter please

7    swear in the witness and then counsel may

8    proceed.

9                         -   -   -

10          ...HAL J. SINGER, Ph.D., after

11   having been duly sworn and/or affirmed, was

12   examined and testified as follows...

13                        -   -   -

14                   EXAMINATION

15                        -   -   -

16   BY MR. RAPHAEL:

17       Q.   Good morning.

18       A.   Good morning.

19       Q.   Can you state your name for the

20   record.

21       A.   Sure.  Hal Jason Singer.

22       Q.   And, Dr. Singer, you've been deposed

23   a number of times; is that right?

24       A.   Yes.

25       Q.   How many, would you estimate?

ATTORNEYS' EYES ONLY

Page 51

1    and the resulting effect on damages was even

2    smaller.

3         Q.    And you don't recall why you made

4    those changes?

5         A.    I have a -- I have a hazy

6    recollection that it had something to do with

7    new and better data than what we had used at

8    the class certification stage.

9         Q.    Okay.

10              Now, one of your damage models

11   that measures overcharges assumes that there

12   are separate app distribution and in-app

13   after-markets; is that right?

14        A.    Did you say one?  I'm sorry.

15        Q.    Yeah, one of your damage models, or

16   maybe some of -- let me ask a better question.

17              Some of your damage models assume

18   that there are separate app distribution and

19   in-app after-markets?

20        A.    Yeah.  I would say, just to be clear,

21   almost all, right, so you gotta flip it around

22   and say almost all.

23              There -- there are a few --

24   there's maybe one or two that I offer in the

25   alternative, if the fact-finder determines

ATTORNEYS' EYES ONLY

Page 52

1    that it's --it's one market that I could

2    offer -- I could at least speak to damages in

3    that scenario.

4               But the -- but the base case, the

5    baseline for almost all the models is two

6    separate markets.

7        Q.    But you do have one iteration of your

8    damages model in which you have assumed that

9    there is one market for both app downloads, as

10   well as transactions after the app download;

11   right?

12       A.    I mean, if I could just put it in my

13   favorite term --

14       Q.    Sure.

15       A.    -- in-app distribution and in-app --

16   in-app services, yes.

17       Q.    Okay.  And in the -- let me start

18   again.

19               In the damage model that assumes

20   that there's one market for app distribution

21   and in-app services, does that assume that

22   there's no unlawful tying?

23       A.    Well, for one case, I -- the way that

24   I motivate it is I say assuming the

25   fact-finder concludes there is one market.  So

ATTORNEYS' EYES ONLY

Page 53

1   I think that if there is one market, you can't

2   have tying.

3               But in another case where I'm

4   solving for the -- the subsidy, I say that

5   that one would be consistent with two markets.

6   The only reason why I say for one subsidy is

7   the idea that it would be strange for Google,

8   or whoever is -- yeah, Google to restrict the

9   subsidy to only, say, work for initial

10  downloads and not allow them to use it for

11  subsequent ancillary purchases.

12      Q.   Right.

13              But on the -- on the damages model

14  that estimates overcharges in a world where

15  there is one market for app distribution and

16  in-app services, in that scenario, you're

17  assuming that there's no unlawful tying?

18      A.   I think that's fair, that in the --

19  or I think I call it the single take rate

20  model.

21      Q.   Right.

22      A.   But I think that in that -- in that

23  model, I tell the reader that this is done in

24  the contingency that the fact-finder

25  determines there is a single market.  And so

ATTORNEYS' EYES ONLY

Page 54

1    in that case, you couldn't have a tie if

2    there's a single market.

3        Q.    Understood.

4                With respect to these overcharge

5    models we've been discussing, you're trying to

6    measure whether consumers paid more for app

7    subscriptions or in-app purchases as a result

8    of Google's anti-competitive conduct?

9        A.    Let me -- let me just hear it back; I

10   might be getting -- I might be getting tired.

11   But let me just hear it back.  I'm sorry.

12       Q.    Sure.

13               With respect to overcharges, what

14   you're trying to measure is whether consumers

15   paid more for app subscriptions or in-app

16   purchases as a result of Google's challenged

17   conduct?

18       A.    I think ultimately, we are trying to

19   get overcharges from the consumers'

20   perspective, but I just want to make sure that

21   your -- your question allowed for the

22   possibility that the overcharge can -- can

23   work through two separate mechanisms; one is

24   through an inflated take rate that gets baked

25   into the inflated app prices.  But -- but

ATTORNEYS' EYES ONLY

**Page 196**

1        Q.      That's what I wanted to ask you.

2                   You don't have to do a formal

3    SSNIP test to correctly define a relevant

4    market?

5        A.      Correct.  In many cases, you can

6    apply what are called the Brown Shoe factors

7    which -- which could get a Court to -- to

8    agree to the existence of a market without any

9    recourse to the HMT.  You probably enjoy me

10   saying that better than Hypothetical

11   Monopolist Test, but that's the last time,

12   HMT.

13       Q.      Can you explain to the jury what the

14   Android App distribution market is?

15       A.      Sure.  It is a market in which a

16   platform brings together app developers and

17   users so that they can discover types of apps

18   that they enjoy using and can engage in an

19   exchange of trade to where they're both better

20   off.

21       Q.      Who are the buyers and who are the

22   sellers in the Android App distribution

23   market?

24       A.      Well, that's a bit of a -- oh, yes,

25   who are the buyers and the sellers.  It's a

ATTORNEYS' EYES ONLY

Page 197

1   bit of a trick question or tricky question

2   because it's a two-sided market.  So you could

3   think about both developers and users as being

4   the consumers on each side of the platform.

5           But if you're asking who the

6   supplier is in that market, I mean, Google

7   Play Store is the obvious one, right, but it

8   could be any Android App distribution

9   provider, as I've defined that market.

10      Q.   Are in-app purchases or subscriptions

11  part of the Android App distribution market?

12      A.   No.

13      Q.   What price do consumers pay in the

14  Android App distribution market?

15      A.    The price for access is effectively

16  free of charge if you ignore that very

17  minuscule subsidy that Google is offering.

18  But if you take the subsidy into

19  consideration, you can think of that as a

20  negative price of accessing the platform.

21      Q.   And that's the price for the user

22  side; right?

23      A.   Correct.

24      Q.   And the price on the developer side

25   for the app distribution market are the

ATTORNEYS' EYES ONLY

**Page 286**

1    first day of the Android market.  It's

2    conceivable that Android market predates the

3    MADA, but -- but -- but I think that it --

4    this was all happening around the same time.

5          Q.   Do you know whether Google was

6    offering carriers ██  ████  █  █████  █

7    █████  █████  █  █████  █  █████  at any

8    time after it launched the MADAs?

9          A.   Oh, yes, they did that for several

10   years.  I think that they didn't take the rev

11   share with carriers down to -- to zero until

12   about 2012.  And what happened then is that

13   Google determined that the carriers no longer

14   represented a threat to Google at that point.

15         Q.   Right.

16              So that --

17         A.   But -- but that is consistent with

18   them also having market power and choose --

19   and -- and imposing a super competitive take

20   rate on developers, right?

21         Q.   In paragraph 26 here, though, you

22   said, "In earlier years, before Google

23   acquired monopoly power, they retained, at

24   most, ████  █████  █  █████."

25              So in the paragraph 26 here,

ATTORNEYS' EYES ONLY

**Page 342**

1  change in your hypothetical, was whether

2  Google would withdraw access to the APIs if

3  the OEM refused to take the bundle of GMS,

4  including Play.

5      Q.   Are you aware of any promise by

6  Google that it would always make all -- all of

7  its public APIs available publicly?

8      A.   I'm not aware of such a promise.

9      Q.   Are you aware of any promise that

10  Google made that it would never profit from

11  the Google Play Store?

12      A.   I -- I'm not aware of a promise.  I'm

13  aware of record evidence that suggests that it

14  wasn't Google's original intention to make

15  money on the Play Store, but I don't know if

16  that was broadcast to -- to developers that

17  way as a promise.

18      Q.   And are you aware of any promise that

19  Google made to the cellular carriers that it

20  would always offer them ██████████ of its

21  revenue from the Play Store?

22      A.   No.  I actually think that that --

23  that my reading of the record evidence, that

24  came as a surprise to the carriers.

25      Q.   Are you offering the opinion that