# EXHIBIT 6

NBER WORKING PAPER SERIES

GDPR AND THE LOST GENERATION OF INNOVATIVE APPS

Rebecca Janßen
Reinhold Kesler
Michael E. Kummer
Joel Waldfogel

Working Paper 30028
http://www.nber.org/papers/w30028

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
May 2022

Some of the authors received financial support from the state government of Baden-Wuerttemberg, Germany, through the research program 'Strengthening Efficiency and Competitiveness in the European Knowledge Economies' (SEEK). The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2022 by Rebecca Janßen, Reinhold Kesler, Michael E. Kummer, and Joel Waldfogel. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

GDPR and the Lost Generation of Innovative Apps
Rebecca Janßen, Reinhold Kesler, Michael E. Kummer, and Joel Waldfogel
NBER Working Paper No. 30028
May 2022
JEL No. O31,L82

<u>**ABSTRACT**</u>

Using data on 4.1 million apps at the Google Play Store from 2016 to 2019, we document that GDPR induced the exit of about a third of available apps; and in the quarters following implementation, entry of new apps fell by half. We estimate a structural model of demand and entry in the app market. Comparing long-run equilibria with and without GDPR, we find that GDPR reduces consumer surplus and aggregate app usage by about a third. Whatever the privacy benefits of GDPR, they come at substantial costs in foregone innovation.

Rebecca Janßen
ZEW Mannheim
L7 1
68161
Mannheim
Germany
rebecca.janssen@zew.de

Michael E. Kummer
EFRY 1.17
University of East Anglia
Norwich NR47TJ
United Kingdom
and ZEW Mannheim
M.Kummer@uea.ac.uk

Reinhold Kesler
University of Zurich
Plattenstrasse 14
Zurich CH-8032
Switzerland
reinhold.kesler@business.uzh.ch

Joel Waldfogel
Frederick R. Kappel Chair in Applied Economics
3-177 Carlson School of Management
University of Minnesota
321 19th Avenue South
Minneapolis, MN 55455
and NBER
jwaldfog@umn.edu

# 1   Introduction

In an effort to better protect user privacy, the European Union (EU) enacted the General Data Protection Regulation (GDPR) in May of 2018. The regulation restricted the use of personal information, potentially reducing revenue, and required developers of mobile applications ("apps") to engage in potentially costly compliance activities.[1] This raised the possibility that GDPR would cause non-compliant products to exit, and would curb further product entry into, the app market. While the protection of privacy was of course the direct intent of GDPR, the new law could also bring about an unintended consequence: A reduction in the volume of app entry could hamper innovation and undermine the availability of new and potentially valuable apps to consumers, particularly if the quality of apps – like many digital products – were unpredictable at the time of entry.

In many markets, it is difficult to predict which new products will succeed; and unpredictability of new product success can have important consequences for the welfare benefits of entry. When success is unpredictable, an increase in the number of new products, even those with modest ex ante commercial prospects, can deliver products with substantial realized value.[2] For the most part, digitization has delivered reductions in entry costs, inducing substantial additional entry in a variety of media product categories. GDPR may be like the digitization in reverse. By raising developers' costs and reducing their revenue, the regulation may have induced exit and may have prevented the entry of a "lost generation" of valuable apps. We explore this possibility, asking how GDPR has affected the welfare of participants in the app market.

We use the Google Play Store selling apps as our study context. Our data consist of 4.1 million apps available at the Store between July 2016 and October 2019, along with measures of their usage based on both the volume of user ratings and cumulative installations.[3] We ask four descriptive questions, then incorporate resulting estimates

---

[1] Similar legislation is under consideration, or in effect, in the U.S., Japan, and Australia. See https://www.nytimes.com/2019/12/29/technology/california-privacy-law.html.

[2] See Arrow (1969); Bergemann and Hege (2005); Kerr et al. (2014); Manso (2011, 2016); Weitzman (1979). Aguiar and Waldfogel (2018) measure the welfare benefit from increased product entry into recorded music.

[3] Our app usage measures, based on volumes of user ratings or cumulative installations, are indirect. For clarity in exposition, we refer to "usage," and we provide further detail on the measures in the data section.

into a structural model. First, we document the impact of GDPR on app exit, the flow of new app entry, and the resulting number of apps available. Second, we explore what happened to the privacy-intrusiveness of apps. Third, we turn to evidence of the welfare impacts of GDPR, asking whether lost apps would have been valuable to consumers. In particular, we ask whether smaller post-GDPR app birth cohorts account for fewer eventual aggregate installations and fewer highly successful apps. Fourth, we look for evidence of higher app development costs from increased realized usage, per app, after GDPR's implementation. We then turn to structural welfare estimation. We estimate a nested logit model of app usage; and we use the demand model, along with an entry model with imperfect ex ante predictability of product quality, to measure GDPR's impact on consumers and producers.

We have five broad findings. First, GDPR sharply curtailed the number of available apps, via two mechanisms. When it took effect, GDPR precipitated the exit of over a third of available apps; and following its enactment, the rate of new entry fell by 47.2 percent, in effect creating a lost generation of apps. Second, consistent with the unpredictability of app success, the falloff in app entry prevented the launch of both ultimately-successful and ultimately-unsuccessful apps. The numbers of apps reaching ten thousand or one hundred thousand cumulative installations within, say, four quarters of birth fell nearly as much as the decline in overall entry. Third, apps became less intrusive after GDPR, although the decline in intrusiveness was partly the continuation of a pre-existing trend. Fourth, average usage per app rose for the vintages launched after the imposition of GDPR, consistent with GDPR raising app development costs. Fifth, using the structural entry model, we estimate that the depressed post-GDPR entry rate would give rise to a long-run 32 percent reduction in consumer surplus and a 30.6 percent reduction in aggregate usage and therefore revenue. Whatever the benefits of GDPR's privacy protection, it appears to have been accompanied by substantial costs to consumers, from a diminished choice set, and to producers from depressed revenue and increased costs.

The paper proceeds in seven sections after the introduction. Section 2 describes the major provisions of the GDPR, explains how the GDPR would be expected to raise costs and reduce revenue, and presents links to relevant literature. Section 3 introduces a theoretical framework describing app entry, exit, and welfare, to guide our measurement exercises. Section 4 describes the data used in the study. Section 5 presents our empirical

2

strategy and descriptive results on exit, entry, usage, and app intrusiveness before and after GDPR. Section 6 presents structural welfare estimates. Section 7 explores the sensitivity of the baseline results to various modeling assumptions, and Section 8 concludes.

# 2   Background

## 2.1   The app market

There are two large distinct mobile app platforms for Apple and Google (Android) mobile operating systems, respectively. Both platforms offer substantial numbers of products, and many new apps enter each quarter. The number of apps in the Google Play Store increased from 300,000 in 2012 to 2.2 million in 2016. During 2016 and 2017, new app entry averaged 200,000 per quarter.[4]

Apps generate revenue from a combination of user charges (e.g., download prices and in-app purchases) and in-app advertising; and the collective market is large. Combined revenue from the user side to both platforms grew from \$43.6 billion in 2016 to \$83.6 billion in 2019, with roughly two thirds of it generated for Apple devices.[5] Aggregate mobile advertisement revenue (across both platforms) grew from \$80.7 billion in 2016 to \$189.2 billion in 2019.[6] Applying Google's share of user-based revenue to all revenue, the Google-relevant revenue rose from \$42.8 billion in 2016 to \$95.9 billion in 2019. Over the 2016-19 period, just over two thirds of total app revenue was from ads.

The number of Android users, and therefore potential users of Play Store apps, reached 1 billion in June 2014, 2 billion in May 2017, and 2.5 billion in May 2019.[7]

## 2.2   GDPR

The EU enacted the GDPR in an effort to protect the personal data of European citizens and harmonize privacy laws across member states. The regulation strengthened users' privacy rights and obligated app developers to take security measures. Under

---

[4]See http://web.archive.org/web/20170629084648/https://www.appbrain.com/stats/number-of-android-apps.

[5]See https://sensortower.com/blog/app-revenue-and-downloads-2017 and https://sensortower.com/blog/app-revenue-and-downloads-2019.

[6]See http://www.statista.com/statistics/303817/mobile-internet-advertising-revenue-worldwide/.

[7]See https://www.zdnet.com/article/google-io-android-stands-at-one-billion-active-users-and-counting/, https://www.theverge.com/2017/5/17/15654454/android-reaches-2-billion-monthly-active-users, and https://www.theverge.com/2019/5/7/18528297/google-io-2019-android-devices-play-store-total-number-statistic-keynote.

GDPR, app developers must guarantee users their rights of access, rectification, erasure, restriction of processing, data portability, and the right to object; and developers are obliged to protect user data "by design and default."[8] Compliance with these provisions could raise operation costs at both the app and developer levels. The law applies to all firms processing personal data of EU residents regardless of the firm's headquarter location.[9] GDPR gives the EU powers to investigate, and in the case of violations, to impose fines of up to the larger of 4 percent of annual revenue or 20 million EUR.

**Timing:** The law was passed on April 27th, 2016 and went into effect on May 25th, 2018. We have three measures showing that awareness of the law grew during the period between passage and the enactment.[10] First, the volume of Google searches on "GDPR," in Figure 1, shows that interest rose slightly from 2016 onwards, then jumped substantially in the quarter it took effect. Second, app developers' online expressions of concern about GDPR – the volume of comments including the term "GDPR" at, for example, Stack Overflow (Android tag) and Reddit (r/androiddev) – jumped similarly. Third, the volume of editing on Wikipedia for the English-speaking article on GDPR moved similarly over time. Each measure of GDPR interest peaks in the quarter GDPR took effect. It is clear that developers were aware of GDPR's arrival.

**Anticipated effects on app developers' costs and revenues:** The new regulation, by its nature, could be expected to raise developers' costs and to reduce their revenue. Although our study covers the global app market, we explored the effects felt by practitioners with a survey of 650 German app developers in October 2019 and may be conservative as they are reported by surviving app developers.[11] Asked about challenges of compliance with GDPR, 85 percent listed "administrative burdens," 48 percent noted "additional costs," and 36 percent indicated a "lack of knowledge about the regulation's details." In particular, developers mentioned costs for data protection officers and legal advice, and many reported spending a substantial amount of time on implementing GDPR compli-

---

[8]See legal text: `https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32016R0679`.

[9]This extraterritorial scope of the regulation makes it difficult to find "untreated" apps, a point we return to below.

[10]See Appendix A.1 for more details.

[11]See Appendix A.2 for more details, in particular Figures A.1 through A.4.

Figure 1: Interest in GDPR on different platforms



**Notes:** The vertical line highlights the quarter after the enactment of the GDPR on May 25th, 2018.

ance.[12] One in seven of the developers reported having removed an app from the market due to new requirements and costs, and one in eleven reported choosing not to launch a developed app.[13] The second major provision of GDPR affects how developers can use the data collected from users. Under GDPR, developers must obtain user consent to continue processing user data. These new rules may restrict developers' deployment of targeted advertisement and may reduce expected revenue (Böhmecke-Schwafert and Niebel, 2018; Goldberg et al., 2020). Several developers in our survey, particularly those generating revenue in data-intensive ways, experienced reduced revenue under GDPR. For example, 38 percent of developers using ads for revenue generation, and almost all apps selling data to third parties, reported a decline in revenue with their post-GDPR monetization strategies.[14] European authorities have enforced the GDPR's provisions. According to the GDPR Enforcement Tracker by CMS, as of April 2022, they had imposed more than €1.6 billion in 1054 fines "for a wide range of GDPR infringements."[15] Fines for non-compliance with GDPR by app developers have also been imposed: For

---

[12]Survey respondents report needing to update privacy policy information for every app not already in compliance as well as Google Analytics settings. Moreover, developers needed to designate a data protection officer, entrusted with guaranteeing users' rights and the security of the data.

[13]One of our survey respondents wrote 'Removed several small apps completely in order to minimize the risk and because of the uncertain as well as non-transparent legal situation.'

[14]Some studies find an increase in the value of remaining customers that offsets the decrease in the number of customers (Aridor et al., 2020; Godinho de Matos and Adjerid, 2021).

[15]See https://www.enforcementtracker.com/.

5

example, €225 million for WhatsApp and $7 million for Grindr.[16]

## 2.3   Related literature

Our study is related to four strands of literature. First, our study is part of a literature on the welfare benefit of new products when success is unpredictable. While canonical contributions ask how particular products, for example, minivans (Petrin, 2002) or new telecommunications services (Hausman, 1997) raise the value of the choice set to consumers, an alternative approach is to incorporate the stochastic nature of new product quality, asking how changes in the tendency for products to enter affects welfare. This is the approach of Aguiar and Waldfogel (2018), who estimate the welfare benefit of digitization's reduced entry costs in the recorded music market. Valuing entry with unpredictable product quality also echoes the approach of a literature treating entrepreneurship as "experimentation" (Arrow, 1969; Bergemann and Hege, 2005; Ewens et al., 2018; Kerr et al., 2014; Manso, 2011, 2016; Weitzman, 1979).

Second, our study is part of a growing literature examining the impact of GDPR on various outcomes, including the concentration of the market for web technology services (Batikas et al., Forthcoming; Johnson et al., 2020), firms' ability to collect data (Aridor et al., 2020; Godinho de Matos and Adjerid, 2021), the profits of e-commerce firms (Goldberg et al., 2020), interconnection agreements between networks on the Internet (Zhuo et al., 2021), venture investments (Jia et al., 2021), and the ability of web publishers to continue financing content creation (Lefrere et al., 2020). We also document the effects of GDPR on various outcomes, including entry, exit, and product usage in the app market, along with impacts on consequent welfare.

Third, our paper relates to an extensive literature on consumer demand for online privacy and the effects of privacy regulation on service providers in digital markets (Acquisti et al., 2016; Goldfarb and Tucker, 2011; Tucker, 2012, 2014). Momen et al. (2019) document that the enactment of GDPR resulted in moderately reduced usage of privacy-sensitive permissions by app developers, and Sørensen and Kosta (2019) document that fewer third-party libraries were present among affected websites. Batikas et al. (Forth-

---

[16]See the respective press releases by the data protection authorities, https://www.dataprotection.ie/index.php/en/news-media/press-releases/data-protection-commission-announces-decision-whatsapp-inquiry and https://www.datatilsynet.no/en/regulations-and-tools/regulations/avgjorelser-fra-datatilsynet/2021/gebyr-til-grindr/.

coming) and Johnson et al. (2020) document the same impact for third parties, although they find the reduction to be temporary.

Fourth, our paper contributes to the literature about the app market per se. Kummer and Schulte (2019) document the role of app data collection in revenue generation. Leyden (2019) examines how platform choices affect incremental innovation in apps, Ershov (2021) documents that a rearrangement of the app store that facilitated consumer search also promoted app entry, and Bresnahan et al. (2021) study platform choice and tipping tendencies for developers. Other relevant studies of the app market include Carare (2012), who measures the impact of bestseller ranks on sales and Ghose and Han (2014), who estimate welfare effects of apps and the influence of advertising and in-app purchases on demand.

# 3   Theoretical framework

Based on the foregoing discussion of GDPR, we expect GDPR to have two distinct but related effects. First, it will raise the cost of operating existing apps, whose developers may or may not be in compliance with GDPR standards for maintaining privacy. Second, it will raise development costs and reduce the revenue available from launching new apps. Both mechanisms will eliminate low-value apps – those with few users and presumably generating little revenue – but the mechanisms affect entry and exit differently. Moreover, they will have larger effects on the value of the app choice set, the less predictable is app success at the time of development.

## 3.1   GDPR, entry, and exit

A developer contemplating the creation of an app forms an estimate of the revenue ($r$) the app will generate. That estimate is true revenue ($\rho$), plus a random error: $r = \rho + \epsilon$. App development has a fixed (sunk) cost of development which, prior to GDPR, is given by $C_0$. An app enters if its expected revenue is bigger than development costs $C_0$. Equilibrium arises when there are no profitable opportunities for entry.

When GDPR goes into effect, $C_0$ rises to $C_1$, and revenue falls by $\Delta$, so expected revenue falls from $r$ to $r' = r - \Delta$. These features of the economic environment affect entry and exit differently. First, consider entry. Once a developer knows that GDPR will go into effect, the developer knows that an app's prospective revenue less cost is

7

smaller than it would have been, absent GDPR. Some potential products that seemed promising before GDPR was on the horizon no longer have expected revenue in excess of costs, so entry falls. Because apps generate revenue over time after installation, the announcement of the new law can depress entry even prior to the law going into effect. In short, facing higher entry costs and lower revenue per user, developers will only launch apps with higher expected usage than before GDPR.

Effects on exit are different. Note that the incremental cost of development under GDPR is $\Delta C = C_1 - C_0$. Apps already in existence prior to GDPR are earning (realized) $\rho$ per period. Absent GDPR, already-existing apps continue operating until they are obsolete. When GDPR goes into effect, the developer now compares the new stream of realized revenue $\rho - \Delta$ against the cost of bringing the app into compliance, which is positive even if less than the full cost of new development. Unlike for entry, where revenue must be predicted, the realized revenue of existing apps is known, so existing apps with low value exit when the law goes into effect but not before.

As before, equilibrium means no opportunities for profitable entry. Because of higher costs in relation to revenue, the equilibrium under GDPR has fewer apps available and higher development costs – and usage – per app. When the GDPR is in force, the marginal entering app could need more users, for two reasons. First, development costs are higher. For a given level of revenue per user, an app needs more users to generate sufficient revenue to cover costs. Second, GDPR may reduce the revenue available per user, making it necessary for a marginal entering app to have more users to cover its costs.

## 3.2   GDPR and welfare

The welfare generated by the app market consists of the consumer surplus enjoyed by app users, plus the profits of developers (their revenues less the costs they incur to create and operate apps). GDPR may also improve privacy in ways that are socially valuable but which consumers do not appreciate (and therefore escape our quantification through consumer surplus). Our welfare analysis provides a measure of the cost of GDPR to consumers and producers, which policy makers can balance against other objectives. Here, we discuss effects on consumer surplus and on producers.

8

**Reduced consumer welfare from a diminished choice set:**   Because of the unpredictability of app quality at entry, GDPR's depressing effect on the number of apps available – and, in particular, its depressing effect on entry – can have a substantial effect on the value of the app choice set to consumers. The apps that exit upon GDPR implementation are those with low realized value, so it is not worth the cost of bringing them into compliance. Because these apps have little usage by consumers, their exit may have little effect on welfare.

The effects operating through depressed entry are potentially more consequential. Developers compare expected revenues to costs and enter only if their (potentially lower) expected revenues exceed the new cost threshold. After GDPR, fewer apps have expected revenue in excess of the new cost threshold, which leads to less entry. The apps that would have entered previously but do not enter when facing GDPR's higher costs, make up the "lost generation" of apps.

The missing apps have low *expected* revenue, but if success is not entirely predictable, many of the lost apps would have been valuable to consumers. Extreme examples make this clear. If app success were completely unpredictable, then a shock that reduced entry by $x$ percent would reduce the number of valuable apps, in the long run, by $x$ percent as well. Indeed, if $x$ is the percentage reduction in entry across birth cohorts and $y$ is the percentage reduction in the cohort share of total usage, then the test for complete unpredictability is whether $x = y$. If so, then "nobody knows anything;" and the lost generation of apps would have been as useful, on average as those that entered. If success were entirely predictable, by contrast, the reduction in entry would eliminate only apps expected, correctly, to have few users. Then the decline in usage $y$ would be much smaller than the decline in entry $x$.

If app success is unpredictable at the time of entry, then the birth cohorts that are contracted because of GDPR will account for less subsequent usage. In particular, the amount of usage accounted for by the smaller birth cohorts will be smaller than it would have been if the birth cohorts had been of their traditional size. Moreover, if app success is unpredictable, we expect reductions in the number of entering apps ultimately attaining both high and low installation levels.

Even if GDPR prevents the entry of some apps that would have been widely used, that is not sufficient to demonstrate a substantial effect on consumer welfare. The app

9

environment includes thousands of products. If the missing apps have close substitutes among the apps that continue to be made available, then consumers may not be substantially harmed by the reduction. Consequently, our welfare measurement framework needs to incorporate possible substitutability across apps.[17]

**Welfare costs borne by producers:**   The second possible welfare cost of GDPR arises from the additional costs – and potentially reduced profits – incurred by developers. Effects on profits depend strongly on predictability. If app success is completely unpredictable, then all apps have the same expected revenue at the time of entry. Entry would occur as long as expected revenue exceeded expected costs. Because the marginal and average apps would have the same expected revenue, the Nash equilibrium entry condition – that $N$ apps are profitable while $N + 1$ apps are not – would guarantee not only zero profits for the marginal entrant but zero profits on average as well. That is, with complete unpredictability, profits would be zero with or without GDPR.

With some predictability, inframarginal apps generate more revenue on average than the marginal app. Under the strong assumption that costs are the same across apps, this would give rise to equilibrium profits. But it is also possible that inframarginal apps have higher costs than the marginal app, so profits implied by an equal cost approach provide an upper bound. In section 7.2 we use estimates of the fixed costs implied by the expected revenue of the marginal entrant to provide upper-bound profit estimates.

Our empirical work below has two parts, following our data description in Section 4. First, we document impacts on entry, exit, the app choice set available to consumers, usage of the diminished entry cohorts, and average usage per app (cf. Section 5). We then turn to structural analysis aimed at quantifying long run impacts of GDPR on welfare (in Section 6), along with a discussion of robustness in Section 7.

# 4   Data

## 4.1   Data collection and preparation

To measure GDPR's effect on the app market, we need to observe product exit, entry, and app usage. We derive these measures, along with app characteristics, from

---

[17]In Section 7.3 we explore the possibility that GDPR corrects inefficiently excessive entry.

information at the Google Play Store. The creation of the dataset is complicated and requires some description.

Because there is no available catalog of all apps, we created a list – which serves as the backbone of the database – using the following iterative process. We started with a substantial but potentially incomplete initial list of apps from AndroidPIT.[18] To assemble our full list of apps, we queried the Play Store for apps on our list. Each query returned a list of "similar apps;" and we added the suggested apps not already in our data to our list. We repeated this process quarterly between October 2015 and July 2016, until the list stabilized, i.e. the only apps suggested by Google not already on our list were new products.

Using our eventual list, we queried the Play Store quarterly between the third quarters of 2016 and 2019 for each app. In each quarter, we added newly-appearing suggestions – new entrants – to our data. As a result, we have quarterly data on each app's availability, a categoric measure of cumulative installations, and the continuous number of user ratings each app had received. In addition, we observe privacy features, price, and, for a subsample, also the developer's country of origin.[19] Once we observe an app, we obtain its birth quarter.[20]

Even with our comprehensive list of apps, the data collection process gives rise to two kinds of missing data. First, once we begin observing an app, we sometimes miss data collection on that app, usually for just a quarter. This occurs in 6.82 percent of quarterly observations. This is a simple problem that we solve by interpolation: We linearly interpolate cumulative ratings for missing quarters, and we carry forward the categoric installation measure.

Second, because new apps enter our dataset via Google's related app suggestions, we do not always observe an app in its birth quarter. We first observe 44 percent of the apps in their birth quarters and another 26 percent in their second quarters. All told, we observe 89 percent in their first four quarters of life. Once we observe an app, we can fill in the missing data by imputation: We linearly interpolate between observed cumulative

---

[18]See https://web.archive.org/web/20130819094306/http://www.androidpit.de/de/android-market/paid-android-apps-BOOKS_AND_REFERENCE.

[19]See Appendix A.3 for more details.

[20]We obtain entry dates for nearly 3.8 million apps from an app's page on AppBrain and an additional 300,000 entry dates from metadata at the Play Store page. If we look at the first appearance of apps with missing age, they are scattered across the whole observation period rather than towards the end.

installation and number of ratings measures, treating cumulative totals at entry as zero.

The delay in first observing apps creates another, more consequential problem. We can only include an app in the sample once we observe it. We are interested in the volume of entry over time, and the sample ends five quarters after the GDPR goes into effect. Unless we account for the problem of delayed first observation, we risk mistaking delayed observation for reduced entry after GDPR. We deal with this "delayed observation problem" by comparing volumes of entry first seen in, say, their second quarter of life; we discuss this further in Section 4.2. We measure the date of an app's exit as the quarter of its last appearance in our data.

**Supplementary aggregate data:** The basic data described above are derived from information we collected from the Google Play Store. To ensure that the patterns we document are not specific to either our data collection process or to the Google environment, we also obtain two kinds of supplementary aggregate data. First, we have independent measures of the numbers of apps available, as well as entering and exiting the Google Play Store, by quarter from July 2016 until 2020, from AppBrain.[21] Second, we obtain information from AppMonsta on the birth dates of apps available on Apple's App Store from January 2018 until 2020.[22] This gives us the number of apps entering on Apple around and following GDPR. We describe the patterns observed in these data sources alongside measures from our basic Play Store data below.

**App usage measures:** Ideally, we would observe hours spent using each app during each period. Short of that – but in keeping with most demand estimation – we would observe the analogues of purchase in the app context, namely consumer installation of apps. We would then use new installations during a quarter as our "usage" measure. Our data don't even allow this measure. Instead, we have two related but imperfect measures of usage reflecting the cumulative installations of an app. The first is a categorical measure of cumulative installations.[23] The categoric cumulative installations allow us to measure how widely an app has been adopted, for example whether it has reached ten or one

---

[21]These data are available at `https://web.archive.org/web/*/https://www.appbrain.com/stats/number-of-android-apps`.

[22]These data can be obtained from `https://appmonsta.com/`.

[23]The categorical measure has the following bins: 5, 10, 50, 100, 500, 1,000, 5,000, 10,000, 50,000, 100,000, 500,000, 1 million (m), 5m, 10m, 50m, 100m, 500m, 1 billion (b), 5b, and 10b.

hundred thousand cumulative installations within, say, four quarters of its launch. Some of our analyses – in particular, the demand estimation and associated welfare analysis – require a continuous measure of app usage. For this we turn to the number of user ratings an app received, which we exploit as a continuous proxy for total cumulative usage. The two usage measures are highly correlated (see Figure A.5 in the Appendix). The strong relationship between the cumulative numbers of ratings and installations provides evidence that the continuous ratings-based measure is informative about app usage.

**Privacy measures and other control variables:**   We document the evolution of privacy measures surrounding the enactment of GDPR using the presence of a privacy policy and the number of privacy-sensitive permissions requested by an app upon the installation.[24] We also observe each app's price (usually zero), and the country of origin for a large fraction (40.1 percent) of developers.

Table 1 summarizes the data. Panel A reports averages across all 4,098,275 apps that appear in the data. The average quarterly change in ratings is 117.32. Just over half of apps request at least one privacy-sensitive permission. Six percent of apps have a positive download price. Evaluated across all waves in our panel, the average app is 6.77 quarters old.

Our descriptive analyses use data aggregated by both their quarters of birth (which we term their "vintages" $v$) and calendar quarter of observation ($t$).[25] Panel B of Table 1 reports averages of variables at this level of aggregation. At the $t$-by-$v$ level, we observe an average of 58,034 entering apps. Of these 13,171 have reached 10,000 installations by quarter $t$, and 4,276 have reached 100,000 installations. Summing across the apps in a birth cohort, the aggregate quarterly usage (based on the change in the numbers of ratings) is 7.6 million; and the average quarterly usage per app is 368.

**Available apps as a starting point:**   Before turning to nuances of the delayed observation problem discussed above, we document the evolution of the entire market. Figure 2 shows the number of distinct apps available over time. The figure has a vertical line at the quarter just before GDPR took effect; and the pattern is striking, even bearing in

---

[24]We follow Kummer and Schulte (2019), and define privacy-sensitive permissions based on their potential to undermine a user's privacy (e.g., phone identity, location, contacts, or messages).

[25]See Section 4.2 for further information about vintages.

Table 1: Summary statistics

| Variables | Mean | SD | N |
|---|---|---|---|
| | *by App* | | |
| Change in Ratings (Usage) | 117.32 | 6794.29 | 3374897 |
| # Installations | 1.3e+05 | 8.9e+06 | 4095148 |
| % Apps with Privacy-Sensitive Permissions | 0.52 | 0.49 | 4097930 |
| % Paid Apps | 0.06 | 0.24 | 4097506 |
| Age in Quarters | 6.77 | 5.94 | 3909771 |
| | *by Time-Vintage* | | |
| # Apps Entering | 58034.70 | 49668.81 | 469 |
| # Apps Reaching 10k Installations | 13171.68 | 8360.03 | 469 |
| # Apps Reaching 100k Installations | 4276.62 | 2366.98 | 469 |
| Aggregate Usage | 7.6e+06 | 4.8e+06 | 469 |
| Average Usage | 368.96 | 682.62 | 469 |
| % Apps with Privacy-Sensitive Permissions | 0.52 | 0.05 | 469 |

**Notes:** This table shows the main variables that we use in the analysis at the app and time-vintage (tv) level. We observe 4,098,275 apps over the entire period. The number of ratings is missing if the app has none or when the measure cannot be imputed as an average between two periods because the app is not observed in a second period.

mind the possibility that the last few quarters are depressed by delayed observation. At the start of our sample period in July 2016, our data on the contain 2.1 million apps in the Google Play Store, while AppBrain reported 2.2 million.[26] The number of Play Store apps in our sample then rises to 2.8 million in the fourth quarter of 2017, then falls by almost one million – about 32 percent – by the end of 2018. Available apps in AppBrain saw a similar decline, by 31 percent between the beginning of 2018 and the end of 2018.[27]

While Figure 2 suggests a clear effect of GDPR, it leaves a number of questions unanswered. First, the drop in available apps is the net result of changed exit and changed entry, which the raw total obscures. Second, the total number of available apps understates the number of recently-entering apps toward the end of the sample. Third, while a drop in the number of available product choices is suggestive of a harm to consumers, drawing such a conclusion requires a few additional steps, including documenting that the missing apps would have been widely used and that their absence would leave consumers worse off in light of potential substitutability. In the remainder of the paper, we explore these concerns more systematically, beginning in this section with the development of measures of entry and usage that deal with the delayed observation problem.

---

[26]See http://web.archive.org/web/20160625194024/https://www.appbrain.com/stats/number-of-android-apps.

[27]See https://web.archive.org/web/20190117122626/https://www.appbrain.com/stats/number-of-android-apps.

Figure 2: Apps available and GDPR



**Notes:** The figure shows the number of apps we observe over time including imputed observations. The vertical line highlights the quarter after the enactment of the GDPR on May 25th, 2018.

## 4.2   Measures of exit, entry, and app usage

Exit is straightforward to measure: an app exits after the last quarter we observe it. Measures of entry and app usage are more complicated. Before turning to the analysis we outline how we develop measures of entry and app usage that circumvent the delayed observation problem.

**Using vintage data to measure entry patterns after GDPR:**   The solid line in Figure 3 shows the known number of entering apps by birth quarter, observed by the third quarter of 2019. Entry occurring toward the end of the data collection period has less time to be observed than earlier entry. The solid line declines sharply after GDPR, reflecting both a possible effect of GDPR on entry as well as the delayed observation problem.

The problem that the delay in first observing apps creates for observing the timing of entry can be addressed using data on the birth cohort, or "vintage" of each app. Because it takes time for apps to be observed in the data, we can disentangle the effects of delayed observation and GDPR by constructing time series with constant windows of observation. Some notation facilitates further discussion. Define $N_{tv}$ as the number of apps entering in period $v$ (their "vintage") and observed in period $t$.[28] This time series can be calculated

---

[28]We include imputed observations, but only for periods after the app was first observed. Imputing

through the end of the data collection period.

We can track the evolution of entry across vintages from $N_{tv|t-v=k}$ for each age $k$. For example, the line labelled "0" in Figure 3 shows the entry in each quarter that is observed in its birth quarter, or $N_{tv|t-v=0}$. If the sample ends at period $T$, then the series $N_{tv|t-v=k}$ is only available until period $T-k$. The line labelled "1" shows the volume of entry in each quarter that is first observed in either its birth quarter or the next quarter. This constant-observation window series can be calculated through the second quarter of 2019. Figure 3 shows both the importance of the delayed observation problem and points to our proposed solution. We can document the time pattern of entry by comparing entry volumes along time series observed during equal-sized intervals after entry. Finally, we can combine these time series to create an entry index that we can use for measuring the impact of GDPR.

Figure 3: Entry and delayed observation



**Notes:** The solid line shows the apps observed by the end of the sample period by when they entered. The solid line can decline either because entry is falling or because of the delay in observing apps. The other time series in the figure circumvent the delayed observation problem by restricting attention to apps that are first observed within $k$ quarters after birth. For example, the "0" line shows the apps born each quarter that are first observed in their birth quarter. The vertical line highlights the quarter after the enactment of the GDPR on May 25th, 2018.

Figure 4 compares our entry measures for Google's Play Store with AppMonsta measures for Apple's App Store. Until the middle of 2017 entry average roughly 200,000 apps per quarter on each platform. As the GDPR approached, entry fell on both platforms; and by late 2018 quarterly entry had fallen by half on each platform. AppBrain data

back to the known app birth date would obscure the delayed observation problem for apps born near the start of the observation period and would undermine the comparability of $N_{tv}$ across vintages.

on the number of entering apps on Google's Play Store confirm the basic measures in our data, showing entry falling from roughly 200,000 per quarter prior to the GDPR to about 100,000 per quarter afterwards.[29] In line with predictions of forward-looking entry in Section 3.1, entry falls by all measures – and on both platforms – prior to the enactment of the GDPR. The common pattern on both platforms indicates that it is the GDPR, rather than platform-specific enforcement, that depresses entry.

Figure 4: Entry on Google's Play Store and Apple's App Store



**Notes:** The solid line shows the apps retrieved from the Google Play Store by the end of the sample period when they entered (cf. Figure 3). The dashed line, in contrast, shows entry in Apple's App Store. The vertical line highlights the quarter after the enactment of the GDPR on May 25th, 2018.

**Usage of entering app cohorts over time:** Our two app usage measures, categoric cumulative installations and the number of ratings received, give us two ways to document how app usage – and the usage of apps from particular birth cohorts – evolve over time. First, we use a variant on the idea above to document the installation success of an entry cohort. Define $N_{tv}^\tau$ as the number of apps born in quarter $v$ observed to have $\tau$ or more cumulative installations by quarter $t$. That is, we examine not only the evolution of entry but the the evolution of entry that achieves different levels of success.

Second, we document the evolution of app cohort usage with continuous measures based on ratings. Define $q_{jt}$ as our raw usage measure (the number of new ratings app $j$ received in quarter $t$), and define the aggregate usage of vintage $v$ apps in quarter $t$

[29]See        https://web.archive.org/web/20180109202516/http://www.appbrain.com/stats/number-of-android-apps        and        https://web.archive.org/web/20191223023602/https://www.appbrain.com/stats/number-of-android-apps.

17

as $Q_{tv} = \Sigma_{j \in v} q_{jt}$. Then we can compare the "usefulness" of different cohorts based on different usage across birth cohorts, conditional on age $(t - v)$. We also calculate app or cohort usage measures relative to market size. That is, $s_{jt} = q_{jt}/M_t$, and $S_{tv} = Q_{tv}/M_t$, where $M_t$ is the number of Android users, or "market size" in quarter $t$.[30]

Then a simple way to measure the relative usage of different birth cohorts is to ask how the usage share for apps born in, say, the previous quarter evolves over time ($S_{t,v|t-v=1}$). Figure 5 illustrates this idea with our log usage measures for apps that are 1 through 3 quarters old, against their birth quarters. For example, the solid line shows the evolution of the log share of overall usage in period $t$ that is attributable to apps born at vintage $v$. These measures appear to decline after GDPR, indicating that apps born after GDPR account for declining shares of overall usage. As with the entry measures, we will combine usage data from apps of all ages into indices for measuring the impact of GDPR on vintage usefulness.

Figure 5: Usage of age 1-3 apps by vintage



**Notes:** The figure shows the log share of usage accounted for by app cohorts as they are 1, 2, and 3 quarters old. The vertical line highlights the quarter after the enactment of the GDPR on May 25th, 2018.

---

[30]The market size is drawn from the number of Android users announced by Google, and we linearly interpolate between these announcement dates (cf. Section 2.1).

# 5    Empirical strategy and results

## 5.1    Setup

Ideally, we would document the effects of GDPR on various outcomes using a research design with treated and untreated regions of the world. That is, we would compare the market for, say, EU-based apps targeted only to EU consumers with, say, Asian apps targeted exclusively to Asian consumers. We will provide some comparisons along these lines below, but it is worth pointing out at the outset that, as numerous other event studies of GDPR find (Batikas et al., Forthcoming; Johnson et al., 2020), the world lacks untreated regions. GDPR seems to have had substantial extra-territorial effects, including – surprisingly – in places where neither the developer nor the users are protected by GDPR.[31] Lacking a control group, we will appeal to other evidence that the sharp changes in entry and exit around GDPR are its effects.

## 5.2    Exit

As Figure 6 shows, app exit – which had averaged about 100,000 per quarter up to the third quarter of 2017 – rose sharply to 600,000 apps no longer observed in the second quarter of 2018 just after GDPR took effect in May 2018. In the year surrounding the arrival of GDPR, 1.4 million apps exited, roughly 1.1 million over the baseline rate of app exit.[32]

The sharp spike in exit in Figure 6 as GDPR takes effect is *prima facie* evidence that GDPR is the cause. Standard practice, however, is to document effects relative to patterns in untreated areas. To attempt this, we examine exit patterns for the subsample of apps whose developers have known locations and are located in the EU, and we compare this to exit patterns for apps whose developers are in six non-EU countries culturally or linguistically distinct from the EU: Israel, India, Japan, Korea, Russia, and Taiwan. While 42.1 percent of EU-developed apps exit in the year following GDPR, the analogous

---

[31]While our main dataset reflects apps available at the Play Store accessed by Germans – whom GDPR protects – we verified that apps exiting from the Play Store available to Germans also exited the stores targeting countries outside the EU (see Appendix A.3 for more details).

[32]AppBrain also documents a net exit of more than 1.2 million apps around the GDPR enactment: https://web.archive.org/web/20190117122626/https://www.appbrain.com/stats/number-of-android-apps. We obtain very similar patterns if we infer exit from three, four, or five quarters of absence from the dataset, rather than the remainder of the sample period. The timing of the apparent impact is consistent with our theoretical prediction that GDPR would bring about exit at the imposition rather than before.

Figure 6: App exits



**Notes:** The figure shows the number of apps that are no longer observed in the remaining quarters. The vertical line highlights the quarter after the enactment of the GDPR on May 25th, 2018.

figure averages between 37.7 and 50 percent in the other six countries, confirming the difficulty in finding an untreated part of the world.

The absence of distinct "treatment" and "control" contexts makes it important that we take care to avoid attributing to GDPR effects that arise from other causes. For example, Google itself instituted policies policing apps for potential privacy violations. Yet, these policy changes occurred either substantially before, or long after, GDPR took effect and cannot explain the exit spike in Figure 6.[33]

Beyond its timing, several other patterns of the mass app exit suggest that the exit spike is GDPR-induced. First, apps requesting privacy-sensitive information are more likely to exit sooner: Of the apps operating in the last pre-GDPR quarter, 29.7 percent of those requesting at least one privacy-sensitive permission exited within one quarter, compared to 15.6 percent of those requesting none. Second, even though a third of all the apps in the market exited in the three quarters around the enactment of GDPR, their

---

[33]Google has encouraged exit of privacy-intrusive apps, but these actions were either long before or long after GDPR. In early 2017, Google announced that it would penalize apps without valid privacy policies by "limiting their visibility." Developers were given until March 15, 2017 – a year before GDPR took effect – to "link to a valid privacy policy" or to simply remove privacy-sensitive permissions requests. Developers ignoring the warning were "at risk of being hidden from view in the app store or removed altogether" (Osborne, 2017). A Google Play project manager reported that Google had taken down "more than 700,000 apps that violated the Google Play policies" during 2017 and about 200,000 apps during 2016 (Ahn, 2018). In late 2019, more than one year after GDPR enactment, Google announced a tightening of the review process for apps that would cause developers to wait "up to 7 days or longer" for app approval (Siddiqui, 2019).

aggregate market share is small (on average 3.3 percent), consistent with our prediction that the cost of GDPR compliance would drive low-usage apps from the market. Third, apps having in-app purchases, and thus less reliant on intrusive data practices for revenue, are less likely to exit around GDPR enactment compared to those without in-app purchases. Fourth, apps that exited around GDPR saw considerably fewer updates prior to enactment than remaining apps, suggesting that their developers chose to forgo costly compliance upgrades.

## 5.3   Effects of GDPR on entry and app usage

Because of our inability to find an untreated part of the world that serves as a control group, our basic approach to determine whether GDPR depressed entry is to ask whether entry fell following GDPR. To this end we aggregate data to the birth cohort ($v$) by calendar quarter ($t$) level, then estimate models of the form

$$(1) \qquad\qquad y_{tv} = \mu_{t-v} + \eta_v + \epsilon_{tv},$$

where $y_{tv}$ is one of our outcomes of interest (entry, etc.), $\mu_{t-v}$ is an age effect, $\eta_v$ is a vintage effect, and $\epsilon_{tv}$ is an error term. After controlling for age with the $\mu$ terms, the $\eta$ terms show the evolution of each outcome ($y$) across birth cohorts (Waldfogel, 2012).

We examine five different dependent variables relevant to entry and usage – success – of apps. The first is entry, measured by $ln(N_{tv})$. The second and third are the number of apps born in $v$ reaching 10,000 and 100,000 cumulative installations by $t$ ($ln(N_{tv}^{10,000})$ and $ln(N_{tv}^{100,000})$). The fourth and fifth are the continuous usage measures based on changes in ratings, both raw and normalized by market size ($ln(Q_{tv})$ and $ln(S_{tv})$).

We perform two exercises on each measure. First, we estimate the flexible model 1, and we examine how the coefficients $\eta_v$ evolve across vintages with the imposition of GDPR, which we report graphically. Second, we replace the $\eta_v$ terms with a post-GDPR indicator, $\delta^{tv} = 1$ if the birth vintage $v$ occurs after GDPR. We report these coefficients in Table 2.

Figure 7 shows the vintage coefficients for entry ($ln(N_{tv})$), normalizing the last pre-GDPR quarter to zero. Prior to the law taking effect, the $\eta_v$ terms are nearly zero; after GDPR takes effect, entry falls. As Table 2 shows, overall log entry falls by 0.639

(standard error = 0.148), or by 47.2 percent, following GDPR.

Figure 7: App entry by vintage



**Notes:** The figure shows the vintage coefficients from model 1 with the dependent variable being equal to the logarithmic number of apps by vintage over time. The coefficients are normalized w.r.t. the quarter just before the enactment of the GDPR.

This entry decline is large, but that does not make it consequential. The important question for welfare is whether GDPR diminished entry of apps that would have achieved ex post success. We explore this via the number of entering apps from each birth cohort achieving 10,000 or 100,000 cumulative installations. These are fairly restrictive measures of success. In our data, roughly a fifth of each cohort's apps attain ten thousand, and just five percent attain one hundred thousand cumulative installations within four quarters of birth. As above, we address the delayed observation problem by using the number of apps born in $v$ and observed to have surpassed $\tau$ installations by quarter $t$.

Figure 8 shows the vintage coefficients for measures of successful entry, apps reaching 10,000 or 100,000 thousand cumulative installations as of quarter $t$. As with entry overall, entry of ultimately-successful apps is stable prior to GDPR, then falls afterward. This provides clear evidence that the post-GDPR decline in entry reduced both the numbers of ex post successful and ex post unsuccessful apps. Moreover, this provides strong evidence that app success is unpredictable, so that an entry reduction can deliver large welfare impacts. As Table 2 shows, entry of apps attaining 10,000 (100,000) installations falls by 43.7 (40.0) percent after GDPR.

Figure 9 shows the vintage pattern for the continuous measures of usage, $Q_{tv}$ and $S_{tv}$, respectively. Both are stable until GDPR, then decline afterward. As Table 2 shows,

22

Figure 8: Entry of apps reaching installation levels by vintage

(a) 10k installations                    (b) 100k installations



**Notes:** The figure shows the vintage coefficients from model 1, with the dependent variables being equal to the logarithmic number of ultimately-successful apps by vintage over time. The threshold for success is achieving 10,000 installations and 100,000 installations, respectively.

absolute usage for post-GDPR cohorts falls by 32.4 percent, while usage relative to market size falls by 45.3 percent.

Figure 9: Usage by vintage

(a) raw ($Q_{tv}$)                    (b) relative to M ($S_{tv}$)

**Notes:** The figure shows the vintage coefficients from model 1, with the dependent variables being equal to the raw usage ($ln(Q_{tv})$) and the usage normalized by market size ($ln(S_{tv})$).

A few points are in order. Entry falls substantially after GDPR. By all four usage or success measures, the post-GDPR cohorts find lower usage than their pre-GDPR counterparts. The measures based on apps reaching installation thresholds indicate that the numbers of successful apps entering fall by about 40 and 44 percent rather than the 47 percent by which overall entry declines. Yet, the continuous measure ($S_{tv}$) that is directly relevant to welfare measurement falls by an amount similar to – and statistically indistinguishable from – the reduction in entry. This has an important interpretation. That a 47.2 decline in entry across cohorts delivers cohorts whose usage is 45.3 percent lower

23

is consistent with complete unpredictability of app success at entry. GDPR's halving of entry prevents the births of as many would-be successful as would-be unsuccessful apps. This is direct evidence that GDPR will have a substantial impact on welfare.[34]

Complete unpredictability is not only consistent with the continuous usage measure but also simplifies the calculation and exposition of welfare results in Section 6. Still, the declines in the number of successful apps are smaller than the overall decline, suggesting some predictability. Hence, we explore the implications of the threshold measures for both predictability and for the welfare effect of GDPR in Section 7.

Table 2: Vintage regressions for entry, usage, average usage, and privacy

| Variables | (1) $log(N_{tv})$ | (2) $log(N_{tv}^{10k})$ | (3) $log(N_{tv}^{100k})$ | (4) $log(Q_{tv})$ | (5) $log(S_{tv})$ | (6) $log(\bar{q}_{tv})$ | (7) $\%_{tv}^{P-SPerm.}$ |
|---|---|---|---|---|---|---|---|
| Post-GDPR Dummy | -0.639*** | -0.575*** | -0.510*** | -0.392*** | -0.603*** | 0.489*** | -0.065*** |
| | (0.148) | (0.098) | (0.075) | (0.071) | (0.078) | (0.153) | (0.008) |
| Age Dummies | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| $R^2$ | 0.941 | 0.923 | 0.881 | 0.605 | 0.614 | 0.700 | 0.184 |
| $N$ | 469 | 469 | 469 | 469 | 469 | 469 | 469 |
| Post-GDPR Change | -0.472 | -0.437 | -0.400 | -0.324 | -0.453 | 0.631 | |
| SE | 0.0779 | 0.0550 | 0.0451 | 0.0478 | 0.0429 | 0.249 | |
| Entry Equality | | 0.0640 | 0.129 | 0.402 | 0.191 | | |
| SE | | 0.0392 | 0.0582 | 0.136 | 0.145 | | |

**Notes:** Each column reports a regression of the vintage-by-time aggregates on indicators for age and an indicator for whether the birth vintage is post-GDPR. The born post-GDPR coefficient gives the post-GDPR impact relative to all pre-GDPR quarters. The dependent variables are logarithmic number of apps (column 1), logarithmic number of apps attaining 10,000 installations (2), logarithmic number of apps attaining 100,000 installations (3), logarithmic raw usage (4), logarithmic usage normalized by market size (5), logarithmic average usage per app (6), and the share of apps requesting privacy-sensitive permissions (7). The row labelled post-GDPR change shows the percentage effect implied by the GDPR coefficient calculated as $e^{post-GDPR} - 1$. The entry equality row tests whether the column's GDPR coefficient is equal to the GDPR entry coefficient for entry in the first column. Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

## 5.4   Expected costs and average usage per app

If developers' app launch decisions are undertaken with an eye toward profit, then higher development costs – and potentially lower revenue per user – under GDPR should be reflected in higher usage, per app, for apps born after GDPR.

The vintage coefficients in Figure 10 show how average usage per app evolves before and after the imposition of GDPR. While there are fluctuations prior to GDPR, average usage rises just before GDPR and sharply toward the end of the sample period. If we

---

[34]Note that the depressed entry continues beyond our sample period, with app entry averaging only about 60,000 per quarter during 2020 according to data by AppBrain. See https://web.archive.org/web/20201027022203/https://www.appbrain.com/stats/number-of-android-apps.

replace the vintage variables with a GDPR dummy, the GDPR coefficient in Table 2 is 0.489 (0.153), indicating a 48.9 percent increase in new usage per app for apps launched after GDPR. Consistent with our theory, GDPR raises the average usage per app.

Figure 10: Average usage per app by vintage



**Notes:** The figure shows the vintage coefficients from model 1, with the dependent variable being equal to the average usage per app by cohort.

## 5.5   Privacy

The main purpose of GDPR is the protection of user privacy, and our data allow us to examine how the privacy characteristics of available apps, or apps used, have changed over time.

When we regress the share of apps requesting privacy-sensitive permissions on age and vintage indicators, the resulting vintage coefficients, in Figure 11, show that the privacy intrusiveness of apps has declined over time and after the imposition of GDPR. While some of the decline appears to be explained by a pre-existing trend, the post-GDPR coefficient of -0.065 in Table 2 is negative and statistically significant (and the coefficient is -0.023 when we include a time trend).

We can see the post-GDPR reduction in privacy intrusiveness in another way. Roughly 50 percent of apps entering before GDPR request at least one privacy-sensitive permission, compared with close to 44 percent of those entering afterward. Weighting entering apps by their usage, the decline in intrusiveness is larger: 57 percent before and 47 percent after. Looking at all apps operating – and not just at entrants – the usage-weighted share

Figure 11: Privacy-sensitive permissions by vintage



**Notes:** The figure shows the vintage coefficients from model 1, with the dependent variable being equal to the share of apps requesting privacy-sensitive permissions by vintage.

of apps requesting privacy-sensitive permissions was 75 percent prior to GDPR and 71 percent afterward.

There is thus some evidence that GDPR affected user privacy, and we return to this in our discussion at Section 7.4.

**Summary of descriptive findings:** It is clear that the Android app market was substantially reshaped in the wake of GDPR. First, exit rose sharply at GDPR's imposition: The number of apps available fell by a third in the quarters immediately following implementation. Second, after GDPR, app entry fell by 47.2 percent, and the reduction in entry also curtailed the entry of ultimately-successful apps, although somewhat less than the decline in entry overall. Moreover, the usage of the entry-depressed cohorts fell by 45.3 percent. Third, average users per app rose by about a quarter for apps born after the imposition of GDPR. Finally, apps became somewhat less intrusive after GDPR, part of which reflects a pre-existing trend. These facts are suggestive of welfare impacts on consumers and firms; and with the addition of some structure, we can estimate welfare impacts directly.

26

# 6   Welfare

The welfare generated by apps has two parts, the surplus to consumers ($CS$) from the (generally) free apps, as well as the profits that developers earn ($PS$), largely from ad sales. That is, $W = CS + p\Sigma q_j - \Sigma C$, where $q_j$ is the usage for app $j$ and $p$ is an aggregate "price" translating usage to revenue. Given a demand model, along with results from the previous section, we can estimate effects of GDPR on consumers and producers.

## 6.1   Demand

Quantifying the impact of GDPR on welfare requires a demand estimation approach that embodies the possibility of substitution across apps. We use a nested logit demand model to compare consumer surplus in a baseline pre-GDPR period to a counterfactual long-run post-GDPR period in which 47.2 percent of apps were eliminated. In our baseline case we assume that apps are removed at random.

In particular, we estimate a nested logit random utility model following Berry (1994). In each quarter, consumers choose whether to obtain an app among $J+1$ choices ($J$ apps and the outside good). In this approach we treat our usage measures – the change in cumulative ratings for each app – as though it were proportional to quantity of apps downloaded. The utility that consumer $i$ derives from app $j$ is:

$$(2) \qquad\qquad u_{ij} = \delta_j + \zeta_i + (1 - \sigma)\epsilon_{ij}$$

The outside good, no new app, gives utility of 0.

In this equation, the mean utility of each product is given by $\delta_j = x_j\beta - \alpha p_j + \xi_j$, where $x_j$ contains characteristics of app $j$, $p_j$ is the download price of app $j$, $\xi_j$ is the component of mean utility unobserved to the researcher, and $\epsilon_{ij}$ is an i.i.d. extreme value error. For consumer $i$, the variable $\zeta_i$ is common across all apps and has a distribution function that depends on $\sigma$. The apps are potentially substitutable for one another, and the degree of substitutability is summarized in the parameter $\sigma$. If $\sigma$ is zero, then the nested logit resolves to the plain logit; when $\sigma$ is 1, apps are perfect substitutes for one another. The more substitutable apps are for one another, the smaller the effect of a reduction in the number of products on consumer surplus. This gives rise to a closed-form equation that we can use for the estimation:

(3) $$ln(s_{jt}) - ln(s_{0t}) = x_{jt}\beta - \alpha p_{jt} + \sigma ln(\frac{s_{jt}}{1 - s_{0t}}) + \xi_{jt}$$

We calculate app $j$'s share in quarter $t$ ($s_{jt}$) as the quarterly change in the scaled number of ratings divided by the number of Android users. The term $s_{0t}$ is the outside share in quarter $t$. The vector $x_{jt}$ contains app category dummies, and $p_{jt}$ is the price of app $j$ in quarter $t$ (which is 0 for most apps).

The parameter $\sigma$ is particularly important for our exercise, and its estimation requires a plausible source of exogenous variation in the number of apps available, $N$, arising for reasons related to supply rather than demand for apps. GDPR, by raising the cost of launching and continuing apps, makes the number of apps a reasonable instrument that we can use to identify the $\sigma$ parameter.

Given the model, we can calculate the quantity of each product as:

(4) $$q_j = Ms_j = \frac{e^{\delta_j/(1-\sigma)}}{D}\frac{D^{1-\sigma}}{1 + D^{1-\sigma}},$$

where $\delta_j = ln(s_{jt}) - \sigma ln(\frac{s_{jt}}{1-s_{0t}}) - ln(s_{0t})$, $D = \Sigma e^{\delta_j/(1-\sigma)}$, and $M$ is market size (the number of Android users).

Table 3 presents estimates, and all reported specifications include indicators for each of the nearly 50 app categories. Column (1) uses OLS, and the resulting estimate of $\sigma$ is nearly 1, while the price coefficient is negative. Column (2) presents the first-stage regression of the inside share ($ln(\frac{s_j}{1-s_0})$) on the log number of apps, and the instrument works, in the sense that time periods with more apps have significantly smaller average app shares. Instrumenting the inside share, in column (3), delivers a $\sigma$ estimate of 0.361 (standard error = 0.004). This estimate indicates partial substitutability of apps for one another.

We also estimated a two-level nested logit demand model in column (4) with the outside good and each of the app categories as nests and using the number of apps available in each category, and overall, as instruments. The resulting substitution parameters – for the substitution across and within nests – were statistically indistinguishable and therefore provided no reason for using a two-level, rather than a one-level, nested logit model.

28

## 6.2   Consumer surplus and costs

Given the estimated demand model, we can estimate the $CS$ associated with a choice set. The nested logit formula for consumer surplus is

$$(5) \qquad CS = ln\left[1 + (\sum e^{\frac{\delta_j}{1-\sigma}})^{1-\sigma}\right]\left[\frac{M}{\alpha}\right].$$

In this equation the summation occurs over $j$ apps available in a particular quarter. We do not have a compelling instrument for the price, so we do not rely heavily on our estimate of the dollar value of $CS$. Instead, we focus on the proportionate change in $CS$. If $CS_0$ is the quarterly consumer surplus from the pre-GDPR choice set and $CS_1$ is the $CS$ from the choice set contracted due to long-run GDPR effects, it is easy to see that the parameter $\alpha$ cancels from the proportionate change in $CS$: $CS_1/CS_0$.

Table 3: Nested logit estimations

|  | OLS | 1st Stage | IV | IV (2-Level) |
|---|---|---|---|---|
| $ln(\frac{s_j}{1-s_0})$ | 0.99573 |  | 0.36079 |  |
|  | (0.00003)*** |  | (0.00355)*** |  |
| App Price | -0.00019 |  | -0.00606 | -0.00608 |
|  | (0.00002)*** |  | (0.00019)*** | (0.00091)*** |
| $ln(\#Apps)$ |  | -0.52898 |  |  |
|  |  | (0.00324)*** |  |  |
| $ln(s_j/s_c)$ |  |  |  | 0.41358 |
|  |  |  |  | (0.09603)*** |
| $ln(s_c/(1-s_0))$ |  |  |  | 0.35866 |
|  |  |  |  | (0.08004)*** |
| Category Dummies | Yes | Yes | Yes | Yes |
| $R^2$ | 0.99 | 0.00 | 0.61 | 0.60 |
| $N$ | 13,753,320 | 13,754,377 | 13,753,320 | 13,751,441 |

**Notes:** This table shows the results of the demand estimation corresponding to equation 3. Column (3) instruments an app's inside share with the total number of apps in the market. The first stage of this IV-regression is shown in column (2). Column (4) shows the results of a nested logit which uses app-categories as nesting structure, such that $s_c$ represents an app's in-category share $s_c = \Sigma_{j \in C} s_j$. The table uses only 13,753,320 observations (cf. Table 1), because taking the logarithm of the usage measure leaves only the 43.8 percent of observations with positive values. Robust standard errors in parentheses. *** p<0.01, ** p<0.05, * p<0.1.

To evaluate the long run effect of GDPR on consumer surplus, we start with a pre-GDPR choice set (corresponding to the second quarter of 2017), and we calculate the pre-GDPR consumer surplus ($CS_0$). In our baseline approach we model the long run

effect of GDPR – with steady-state entry depressed by 47.2 percent – by removing 47.2 percent of apps from the pre-GDPR choice set. By the "long run" we mean the amount of time until available apps include only apps which entered in depressed birth cohorts. For example, if apps lasted ten quarters, then the long run would arrive ten quarters after GDPR. In reality, the apps in the sample are on average 6.5 quarters old, and the 90th percentile app is 15 quarters old. Hence, the long run analysis describes an effect that would emerge over a relatively long period.

Taking an average across 500 draws, GDPR reduces the quarterly $CS$ from \$45.0 billion to \$30.6 billion, or by 31.93 percent. Interpretation of this as a long run result bears some emphasis. This estimate does not measure the impact felt a year or two after the change in regulation. Instead, the estimate shows that reducing entry by about half in a context with substantial product quality unpredictability would *eventually* – in the long run equilibrium when the choice set includes births from diminished cohorts – reduce $CS$ by close to a third.

What about costs and profit? In our baseline approach, with complete unpredictability, the marginal entering app has the same expected usage (and revenue) as the average app. Consequently there are zero profits both before and after GDPR; and GDPR therefore has no effect on profits. That said, GDPR reduces entry and raises average usage per app. Without GDPR, the average usage per app is 222, while under GDPR it rises to 292. Hence, aggregate usage falls by 30.6 percent.[35] If the revenue per user did not change with GDPR, this would also would be consistent with GDPR raising costs by the excess of 292 over 222, or by 30.55 percent.

# 7   Robustness

Our baseline estimate assumes a) our particular estimate of the substitution parameter ($\sigma$) and b) the assumption that app success is completely unpredictable. Here we explore the sensitivity of our results to alternative assumptions about the demand model and the predictability of app success at entry.

---

[35]Note that 47.2 percent of 292 is 30.6 percent below 222.

## 7.1   Robustness to $\sigma$ and the share of products removed by GDPR

Our baseline $\Delta CS$ estimate is built around a substitution parameter $\sigma = 0.361$ and the assumption that GDPR reduces entry – and therefore the long run number of available products – by 47.2 percent and at random. Together, these assumptions deliver a long run $CS$ reduction of 32 percent.

Figure 12 shows how this finding changes using different substitution parameters (from $\sigma = 0.25$ to $\sigma = 0.75$), as well as for different proportionate random reductions in available apps, rather than the baseline 47.2 percent reduction. For example, if apps are substantially more substitutable for one another than in our baseline estimates (if $\sigma = 0.75$, rather than 0.361), then the reduction in $CS$ with a 47.2 percent reduction in apps is about 13 percent. By contrast, if $\sigma = 0.25$, then a 47.2 percent reduction in apps reduces $CS$ by about 34 percent.

Figure 12: CS, $\sigma$, and app removal



**Notes:** The vertical line denotes the share of apps remaining after GDPR. The differently formatted lines correspond to varying substitutability parameters.

The result also depends on the extent to which GDPR reduces the choice set. A random one-third reduction in the choice set with baseline $\sigma$ would reduce $CS$ by a fifth, rather than the baseline reduction of just over a third of CS. It is clear from Figure 12 that the long run effect of GDPR on $CS$ is substantial for a wide range of substitution parameters and reductions in the number of available apps.

## 7.2   Partial predictability

Our basic descriptive estimate provides reasonable evidence that app success is unpredictable. This, in turn, makes it easy to model the counterfactual choice set under GDPR: remove 47.2 percent of apps at random. But the descriptive results on the decline in entry of successful apps – in columns (2) and (3) of Table 2 – suggest partial predictability.

Partial predictability complicates the counterfactuals because modeling GDPR requires a way to order apps according to their ex ante promise. Rather than removing 47.2 percent of apps at random, we need a way to order apps according to their ex ante expected quality to predict which of the existing apps would have entered under GDPR.

We assume that each app has some true quality represented by its mean utility, or "quality," $\delta_j$, and we assume this is predictable ex ante with error. The developer has a quality estimate $\delta_j' = \delta_j + \kappa\varepsilon_j$, where $\delta_j$ is true quality, $\varepsilon_j$ is a standard normal error, and $\kappa$ is a scale parameter. When $\kappa$ is small, then developers can predict app success well. Then a reduction in entry arising from GDPR would eliminate apps predicted, accurately, to be ultimately unsuccessful. The apps eliminated by GDPR would have lower usage than remaining apps. By extension, the marginal entering app would have lower expected usage than the average app. This, in turn, means that our estimate of the fixed cost of entry, inferred from the expected revenue of the marginal app, would be below the expected revenue of inframarginal apps. Hence, profits would be possible.

If $\kappa$ were large, developers could not accurately predict app quality. A reduction in entry arising from GDPR would remove the apps predicted to have the least appeal, but these predictions would be noisy, so the apps removed would be only slightly worse than average. The parameter $\kappa$ summarizes the degree of predictability; we can also summarize this degree of predictability using the correlation of predicted and realized app quality: $\rho = corr(\delta_j, \delta_j')$.

Among our descriptive results were the findings that 47.2 percent reduction in entry would deliver a 43.7 (40.0) percent reduction in the number of apps achieving 10,000 (100,000) installations. We can conduct simulations of 47.2 percent app removals with our pre-GDPR choice set for a range of correlations $\rho$ and calculate the proportionate reductions in apps attaining 10,000 and 100,000 installations. Figure 13 shows the results;

and a correlation of 12 percent delivers the observed reductions in successful apps.

Figure 13: Reduction in ultimately-successful apps and predictability



**Notes:** The horizontal lines denote the share of ultimately-successful apps removed inferred from Table 2. The vertical line highlights the implied predictability ($\rho$) corresponding to the share of ultimately-successful apps removed.

Given the estimate of $\rho$ (and the associated $\kappa$), we can revisit our estimate of the impact of GDPR on CS. That is, we can take a draw of $\varepsilon_j$, order apps by expected quality $\delta'_j = \delta_j + \kappa\varepsilon_j$, removing the bottom 47.2 percent, then calculate the resulting consumer surplus. We repeat this exercise 500 times for each of a range of values of $\rho$ between zero (complete unpredictability) and unity (complete predictability). Figure 14 shows how the percentage reduction in CS varies with quality predictability. The vertical line is at the value of $\rho$ implied by the reduction in successful apps. The resulting change in consumer surplus, 17.5 percent, is about half of the baseline loss.

Partial predictability also has implications for the effect of GDPR on costs and profits. With complete unpredictability, the marginal and average app have the same usage, and there are no equilibrium profits. With partial predictability, by contrast, the marginal app has lower usage than the average. As a result, costs – based on the implied fixed cost of the marginal app – fall short of revenue. This provides an estimate of profits, albeit one that embeds the assumption that inframarginal apps have the same costs as the marginal app.

Using $\rho = 0.12$, the average and marginal revenue per app are 222 and 46.5, respectively, without GDPR. We can translate this into revenue with a measure of revenue per usage that delivers pre-GDPR revenue. Assuming that all apps have costs equal to the marginal app, this delivers profits of \$11,734 million. This profit estimate is an upper

33

Figure 14: Reduction in $CS$ and predictability



**Notes:** The vertical line highlights the implied predictability (rho) corresponding to the share of ultimately-successful apps removed. The intersection gives the corresponding loss in consumer surplus.

bound as it assumes that inframarginal apps have the same costs as the marginal app. Simulating GDPR, the average and marginal revenue per app are 350 and 210.5, respectively, delivering a profit upper bound of \$4,933 million. Hence, our simulation indicates that profits fall by 58 percent under GDPR. This is, again, an upper bound, given that inframarginal apps may have higher costs than the marginal app.

## 7.3   Does GDPR curb inefficiently excessive entry?

It is well understood in theory that in the presence of fixed costs, free entry can deliver excessive numbers of products (Mankiw and Whinston, 1986). App costs are entirely fixed, so this is a context where inefficiently excessive entry is possible. The foregoing analysis shows a welfare cost of reduced entry based on $CS$ foregone relative to the pre-GDPR status quo. It is possible, however, that the pre-GDPR status quo included too many products. On the margin, products may have had higher costs than their welfare benefits, including both marginal revenue and additional $CS$.

Figure 15, on the possible contrast between actual and optimal entry, depicts the relationship between entry and revenue, as well as welfare (revenue plus $CS$) for levels of entry between zero and pre-GDPR entry. We create the figure by simulating revenue and $CS$ for random draws at integer percentages of observed pre-GDPR entry. We then smooth revenue and welfare with local linear regressions. We assume, as above, that revenue per app is equal, so that total app revenue $R$ and $CS$ each depend on the number

34

of apps operating $N$. With free entry, actual entry prior to GDPR is depicted as $N_0$, which dissipates profits, so that $R(N)/N = C$. The optimal level of entry would occur where the change in welfare with additional entry equals the cost of developing an additional app, or where $\Delta W \equiv \Delta CS + \Delta R = C$. For comparison, the revenue-maximizing level of entry – sought by a monopolist – would occur where $\Delta R = C$.

Figure 15: Excess entry



How large would $CS$ need to be to rationalize pre-GDPR entry as efficient? If we approximate $W$ as proportional to revenue, i.e. $W = AR$, then we can find the value of $A$ such that $\Delta W = C$ at pre-GDPR entry. Based on the relationship between fixed costs of app development $C$ and $\Delta R$ at pre-GDPR entry, we calculate that $A = 1.863$. If pre-GDPR $CS > (A-1)R(N)$, then pre-GDPR entry was not excessive. While we lack confidence in our estimate of the price coefficient and therefore in our estimate of $CS$, we can still provide bounds. If pre-GDPR $CS$ had been less than 28 percent of our estimate – equivalently, $\alpha$ was more than 3.49 times as high as its estimated value – then pre-GDPR entry would have been excessive.

## 7.4   Privacy and our welfare estimates

Our welfare analyses of GDPR are based on comparing the $CS$ from the full pre-GDPR choice set with about half as many apps remaining in the long run after GDPR goes into effect. Apps that remain continue with their pre-GDPR characteristics. If continuing apps become less privacy intrusive, and if consumers value these improvements, then our

estimates may overstate the welfare cost of GDPR. We explore this possibility in this section.

Above we document that the propensity for entering apps to request privacy-sensitive permissions fell by 6.5 percent with the imposition of GDPR. In principle, we could put privacy characteristics directly into the estimated utility function. This would allow us to adjust the change in $CS$ to account for the decrease in intrusiveness. However, when we put privacy characteristics into the demand model, the coefficient is persistently positive, suggesting that consumers value forgoing their privacy. Even when we include app fixed effects the coefficient is positive but insignificant. Because we cannot find direct evidence from consumer behavior that consumers attach value to their privacy, we cannot directly adjust our estimates of the change in $CS$ for improvements in privacy.

Alternatively, we can compare our estimates of the welfare loss from GDPR with estimates from elsewhere of the consumer benefit arising from reduced privacy intrusiveness. We find a reduction in $CS$ of \$14.37 billion per quarter, or \$57.48 billion per year, across the 2 billion users. Hence, our measure of $CS$ – which omits any consumer benefit from improved privacy – falls by \$28.74 per user annually.

How much of this might be offset by reductions in privacy intrusiveness? Prior to GDPR, apps in our data average 1.42 privacy-sensitive permissions; and this falls to 1.32 afterwards. Consumers reportedly use an average of 45 apps.[36] Two existing studies provide a range of estimates of the consumer costs of privacy intrusiveness. Kummer and Schulte (2019) and Savage and Waldman (2015), respectively, suggest that each privacy-sensitive permission costs consumers between \$0.25 and \$2.50 per year. Hence, the change in app intrusiveness with GDPR would be worth between \$1.13 and \$11.25 per consumer annually, which is substantially below our estimate of the welfare loss from reduced innovation.[37]

## 8   Conclusion

GDPR has had substantial effects on Google's app market. In the year following its implementation, about a third of existing apps exited the market; and following GDPR's enactment, the rate of app entry fell by nearly half. Moreover, GDPR-diminished en-

---

[36]See https://www.simform.com/blog/the-state-of-mobile-app-usage/.
[37]For example, \$11.25 = 45 apps × (1.42 - 1.32) × \$2.5.

try cohorts account for 45 percent less app usage than their pre-GDPR counterparts, indicating that the missing apps would have been valuable. Finally, apps entering after GDPR have higher average usage per app, suggesting increased development costs. We incorporate these patterns into a structural model of app demand and entry, and we find that GDPR reduces consumer surplus and app usage by almost a third in a long-run equilibrium with substantially fewer apps because all pre-GDPR entry has been replaced by depressed post-GDPR entry.

We have two broad conclusions, one about innovation in general and the other about GDPR in particular. First, we conclude that GDPR, whatever its beneficial impacts on privacy protection, also produced the unintended consequence of slowing innovation. That said, we are hesitant to draw policy conclusions about the advisability of GDPR from our results alone. A full evaluation of GDPR requires a tallying of the potential beneficial effects on privacy, along with its various unintended consequences such as increases in market concentration (Batikas et al., Forthcoming; Johnson et al., 2020), undermining revenue models for content production (Lefrere et al., 2020), and – here – reducing beneficial innovation.

Second, we take our findings as additional evidence that when product quality is unpredictable, the ease of entry is an important determinant of the ex post value of the products made available to consumers. Factors reducing entry costs deliver large welfare benefits, while factors hindering entry – such as GDPR – can deliver substantial welfare losses.

# References

**Acquisti, Alessandro, Curtis Taylor, and Liad Wagman**, "The Economics of Privacy," *Journal of Economic Literature*, 2016, *54* (2), 442–92.

**Aguiar, Luis and Joel Waldfogel**, "Quality predictability and the welfare benefits from new products: Evidence from the digitization of recorded music," *Journal of Political Economy*, 2018, *126* (2), 492–524.

**Ahn, Andrew**, "How we fought bad apps and malicious developers in 2017," [https://android-developers.googleblog.com/2018/01/how-we-fought-bad-apps-and-malicious.html](https://android-developers.googleblog.com/2018/01/how-we-fought-bad-apps-and-malicious.html) 2018.

**Aridor, Guy, Yeon-Koo Che, and Tobias Salz**, "The Effect of Privacy Regulation on the Data Industry: Empirical Evidence from GDPR," *NBER Working Paper No. 26900*, 2020.

**Arrow, Kenneth J**, "Classificatory notes on the production and transmission of technological knowledge," *American Economic Review*, 1969, *59* (2), 29–35.

**Batikas, Michail, Stefan Bechtold, Tobias Kretschmer, and Christian Peukert**, "Regulatory Spillovers and Data Governance: Evidence from the GDPR," *Marketing Science*, Forthcoming.

**Bergemann, Dirk and Ulrich Hege**, "The financing of innovation: Learning and stopping," *RAND Journal of Economics*, 2005, pp. 719–752.

**Böhmecke-Schwafert, Moritz and Crispin Niebel**, "The General Data Protection's (GDPR) Impact on Data-Driven Business Models: The Case of the Right to Data Portability and Facebook," *ITU Journal*, 2018, *1* (2), 1–9.

**Bresnahan, Timothy, Joe Orsini, and Pai-Ling Yin**, "Heterogeneous Applications and Platform Market Stability: Mobile Apps," *Working Paper*, 2021.

**Carare, Octavian**, "The Impact of Bestseller Rank on Demand: Evidence from the App Market," *International Economic Review*, 2012, *53* (3), 717–742.

**de Matos, Miguel Godinho and Idris Adjerid**, "Consumer Consent and Firm Targeting after GDPR: The Case of a Large Telecom Provider," *Management Science*, 2021.

**Ershov, Daniel**, "Consumer Product Discovery Costs, Entry, Quality and Congestion

in Online Markets," *Working Paper*, 2021.

**Ewens, Michael, Ramana Nanda, and Matthew Rhodes-Kropf**, "Cost of experimentation and the evolution of venture capital," *Journal of Financial Economics*, 2018, *128* (3), 422–442.

**Ghose, Anindya and Sang Pil Han**, "Estimating Demand for Mobile Applications in the New Economy," *Management Science*, 2014, *60* (6), 1470–1488.

**Goldberg, Samuel, Garrett Johnson, and Scott Shriver**, "Regulating Privacy Online: An Economic Evaluation of the GDPR," *Working Paper*, 2020.

**Goldfarb, Avi and Catherine E Tucker**, "Privacy regulation and online advertising," *Management Science*, 2011, *57* (1), 57–71.

**Hausman, Jerry A**, "Valuing the effect of regulation on new services in telecommunications," *Brookings Papers on Economic Activity*, 1997, *1997*, 1–54.

**Jia, Jian, Ginger Zhe Jin, and Liad Wagman**, "The Short-Run Effects of GDPR on Technology Venture Investment," *Marketing Science*, 2021, *40* (4), 661–684.

**Johnson, Garrett, Scott Shriver, and Samuel Goldberg**, "Privacy & market concentration: Intended & unintended consequences of the GDPR," *Working Paper*, 2020.

**Kerr, William R, Ramana Nanda, and Matthew Rhodes-Kropf**, "Entrepreneurship as experimentation," *Journal of Economic Perspectives*, 2014, *28* (3), 25–48.

**Kesler, Reinhold, Michael Kummer, and Patrick Schulte**, "Competition and Privacy in Online markets: Evidence from the Mobile App Industry," *ZEW Discussion Paper No. 19-064*, 2019.

**Kummer, Michael and Patrick Schulte**, "When private information settles the bill: Money and privacy in Google's market for smartphone applications," *Management Science*, 2019, *65* (8), 3470–3494.

**Lefrere, Vincent, Logan Warberg, Christobal Cheyre, Veronica Marotta, and Alessandro Acquisti**, "The Effect of the European General Data Protection Regulation on the Online Publishing Industry," *Working Paper*, 2020.

**Leyden, Benjamin T**, "There's an app (update) for that: Understanding product updating under digitization," *Working Paper*, 2019.

**Mankiw, N Gregory and Michael D Whinston**, "Free entry and social inefficiency,"

*The RAND Journal of Economics*, 1986, pp. 48–58.

**Manso, Gustavo**, "Motivating innovation," *The Journal of Finance*, 2011, *66* (5), 1823–1860.

_ , "Experimentation and the Returns to Entrepreneurship," *The Review of Financial Studies*, 2016, *29* (9), 2319–2340.

**Momen, Nurul, Majid Hatamian, and Lothar Fritsch**, "Did App Privacy Improve After the GDPR?," *IEEE Security Privacy*, 2019, *17* (6), 10–20.

**Osborne, Charlie**, "Google plans purge of Play Store apps without privacy policies," `https://www.zdnet.com/article/google-plans-purge-of-play-store-apps-without-privacy-policies/` 2017.

**Petrin, Amil**, "Quantifying the benefits of new products: The case of the minivan," *Journal of Political Economy*, 2002, *110* (4), 705–729.

**Savage, Scott J and Donald M Waldman**, "Privacy tradeoffs in smartphone applications," *Economics Letters*, 2015, *137*, 171–175.

**Siddiqui, Aamir**, "Google Play Store approval for new apps will now take more time," `https://www.xda-developers.com/google-play-store-approval-new-apps-time/` 2019.

**Sørensen, Jannick and Sokol Kosta**, "Before and After GDPR: The Changes in Third Party Presence at Public and Private European Websites," *Proceedings of the 2019 World Wide Web Conference*, 2019, pp. 1590–1600.

**Tucker, Catherine E**, "The Economics of Advertising and Privacy," *International Journal of Industrial Organization*, 2012, *30* (3), 326–329.

_ , "Social networks, personalized advertising, and privacy controls," *Journal of Marketing Research*, 2014, *51* (5), 546–562.

**Waldfogel, Joel**, "Copyright protection, technological change, and the quality of new products: Evidence from recorded music since Napster," *The Journal of Law and Economics*, 2012, *55* (4), 715–740.

**Weitzman, Martin L**, "Optimal search for the best alternative," *Econometrica*, 1979, *47* (3), 641–654.

**Zhuo, Ran, Bradley Huffaker, Shane Greenstein, and KC Claffy**, "The Impact

of the General Data Protection Regulation on Internet Interconnection," *Telecommunications Policy*, 2021, *45* (2), 102083.

# A   Appendix

## A.1   Additional information on timing

The official law of GDPR was passed in April 2016 but came into effect only in May 2018. Hence, most of those affected were able to inform themselves about the regulation and necessary adjustments to be implemented already some time before. If this transition period was used, one could cast doubt on the assumption of GDPR serving as an exogenous shock in May 2018. In order to investigate the timing as to when GDPR affected the app market, we collected different indicators about the awareness of the consequences stemming from the GDPR. Figure 1 shows results on three measures with the maximum of each time-series serving as the benchmark for our observation period.

First, as GDPR is of enormous scope for firms as well as individuals, it is, therefore, of general public interest. This can be approximated by searches for 'GDPR' on Google as the most popular search engine worldwide. The figure shows that although the number of searches rose slightly from 2016 onwards, there is a big jump only around the enactment. While Google searches mainly absorb the demand side for information, Wikipedia can serve as a measure of information provision. In this sense, we analyzed the editing behavior on Wikipedia which may represent the status quo of common knowledge and details of GDPR, where we find the same pattern as before. Lastly, we are interested in app developers' awareness about GDPR in particular. Developers could have adjusted apps already some time before the enactment of GDPR if sufficient information was around and they were willing to do so. To analyse this, we used web-scraped data of large online developer forums (Stack Overflow with 'android' tag, Reddit subreddit 'r/androiddev', and 'android-forum') and analyzed, when posts and comments included 'GDPR' as a keyword. As depicted graphically, the peak around GDPR relative to the pre-period is even more pronounced in this case. Developers have not talked about GDPR until the beginning of 2018 and only started shortly before enactment. Overall, our findings serve as anecdotal evidence that the awareness of GDPR was rather limited during the transition period and, especially for app developers, was of interest only when forced to comply.

## A.2   Developer survey

To shed further light on the experiences of companies who have to comply with GDPR, we conducted a survey among app developers with regard to GDPR. This offers additional information about the benefits and challenges coming with the new privacy regulation. In the following, we will provide further details on the data and results.

### A.2.1   Data

We conducted the survey on consequences of GDPR for apps in the Google Play Store in October 2019. The questionnaire was sent to German app developers identified in the Google Play Store during the time period from October 2015 to January 2019. For the analysis, we can use about 650 valid answers. In the survey, we asked for basic information like developer types, the point in time of entering the Google Play Store or the number of apps as well as information regarding their users, data usage, revenue and specific consequences of GDPR. The study was implemented in LimeSurvey, an online-survey tool, and contained 31 different questions.

### A.2.2   Developer types and apps

To get an impression what types of developers exist in the Google Play Store the respondents had to select themselves into the four categories (i) hobby developer, (ii) self-employed with employees, (iii) self-employed without employees, and (iv) company.

Figure A.1: Distribution of developer types



Figure A.1 shows that most of the respondents develop apps in their free-time (39.2%) or within a company (37.9%). Self-employed individuals rather work on their own without

43

any employees (19.8% vs. 3.0%). Furthermore, the majority of self-employed developers without employees (60.6%) develop apps as a sideline job.

The beginning of their activity on the Google Play Store ranges from the opening of the platform in 2008 to the time of our survey, with an increase until the end of 2017 and a decline afterwards.

Figure A.2 shows the share of developers with a given number of published apps from our survey. On average, developers created 5.8 apps with a median of 2 apps and a maximum value of 250 apps. Only 73.0% of their apps ever published are still available in the Play Store.

Figure A.2: Distribution of apps published



As GDPR has an extraterritorial scope, where all companies have to comply which serve users within the EU, we were interested in the origin of app users. Of course, the results are not representative as we only surveyed developers in Germany. Therefore, it is not surprising that 99.2% of developers have Europeans among their user group. The other regions (North America, South America, Asia, Africa, and Australia) are stated in 20% to 40% of cases. About 6% percent of developers do not know their users' origin.

### A.2.3   Data usage

GDPR dictates stringent regulations regarding data usage and sharing by the controller along with demands for transparent disclosure. This means that developers and apps, which use and share users' data a lot, may be more affected and concerned compared to those which do not. Figure A.3 depicts the collecting and use of personally identifiable information. 62.4% of developers do not collect this kind of data at all. Of those who do, the majority need personal data for the app's functionality (70.5%). Other

reasons for data collection are distribution of information and ads (22.7%), data selling to third parties (0.8%), communication with customers (32.7%), and business partners (9.2%), as well as improvements of products and services (34.7%).

Figure A.3: Data collection and usage



### A.2.4   GDPR and its consequences

99.2% of respondents know about the introduction of GDPR, 60.6% of respondents see it as an effective instrument for better data protection. While more than 80% of developers do not see any changes in demand for their apps or the level of data collection, there are still quite some effects on their everyday work. 13.7% of developers have removed at least one of their apps temporarily. This may be due to necessary adaptions in order to comply with the new regulations. For 6.5% of respondents even a complete deletion of at least one of their apps was necessary. Others did not launch prepared apps due to GDPR (8.6%).

Figure A.4 shows the participants' answers to questions regarding challenges and costs associated with GDPR. The three most prevalent challenges are administrative burdens (86.0%), additional costs (47.5%), and a lack of knowledge about the regulation's details (36.9%).

As the right panel of Figure A.4 depicts, costs associated with GDPR may come from additional staff, necessary technical equipment, or external service providers (e.g., acting as data protection officer which has to be in place for many companies). These types of costs have in common that they can be assumed to be fixed costs for companies. Hence, larger companies or developers with several apps may benefit from fixed cost degression compared to small and single-app developers.

45

Figure A.4: Challenges and costs associated with GDPR



### A.2.5   Revenue

Not all of the respondents make revenue by developing and selling apps, this is only the case for 42.6%. In case of revenue generation, sources are in-app-prices (45.0%), advertisements (43.3%), app prices (41.6%), paid memberships (13.1%), or data selling to third parties (1.0%). The revenue strategies remain constant, even after GDPR. When asking for changes in revenue streams the majority of respondents do not record larger differences. Nevertheless, 37.9% of respondents with revenues have seen a lower importance of advertisements for revenue generation, while at least 17.7% register increases in paid memberships.

## A.3   Additional information on data

**Data validation:**   As we web-scrape the English-speaking version of the Google Play Store from Germany[38], there may be concerns about the external validity of the data and results. First, we look into outside sources like AppBrain confirming our set of available apps to be complete and similar patterns to be present (cf. Sections 4.1 and 5). Second, we repeat our web-scraping from the US and several other non-European countries to verify that exited apps did not appear elsewhere.

**Imputation:**   As described in Section 4.1, we have two kinds of missing data. 'Missing in-between' observations are imputed by considering the app's observations before and after the 'gap.' We observe and impute 6.82 percent of in-between missings. Installations and ratings are interpolated with the average, whereas all the other measures are carry-

---

[38]Additional details about the data collection routine are provided in Kesler et al. (2019).

forwarded. We impute missing observations that result from apps that are already born but not yet observed, using the information from the first observation and the known date of birth. We imputed 9.69 percent of observations before the app is observed. Installations and ratings are interpolated with the three-month average based on the first (real) observation, while the other measures get the value of the first (real) observation.

**Measuring usage:** Figure A.5 shows for the first period of observation the relationship between the log of cumulative ratings for each app (along with 90th and 10th percentiles) and the cumulative installation quantity category. The relationship between the two measures of usage is strong and monotonic, which inspires confidence, that they are informative of usage.

Figure A.5: Ratings and cumulative installations in first quarter



**Locating developers:** In order to retrieve the country of origin by a developer, we first look at the contact address given on the app's Play Store page. However, in most of the cases, a developer did not report a contact address as it is not mandatory. In that case, the next best guess is to take the last part of the app's e-mail (some of which might hint to a country such as 'co.uk' or '.de'). Lastly, we look at the first part of the Google ID (starting with 'de.' for example) that can be definitely associated with a specific country. In total, we are able to successfully locate 40.1 percent of developers.