# Exhibit D1
# Public Redacted Version

1   Karma M. Giulianelli (SBN 184175)
    karma.giulianelli@bartlitbeck.com
2   **BARTLIT BECK LLP**
    1801 Wewatta St., Suite 1200
3   Denver, CO 80202
    Telephone: (303) 592-3100
4
    Hae Sung Nam (*pro hac vice*)
5   hnam@kaplanfox.com
    **KAPLAN FOX & KILSHEIMER LLP**
6   800 Third Avenue, 38th Floor
    New York, NY 10022
7   Telephone: (212) 687-1980
8   *Co-Lead Counsel for the Class in In re Google Play Consumer Antitrust Litigation*
9
    Paul J. Riehle (SBN 115199)
10  paul.riehle@faegredrinker.com
    **FAEGRE DRINKER BIDDLE & REATH**
11  **LLP**
    Four Embarcadero Center, 27th Floor
12  San Francisco, CA 94111
    Telephone: (415) 591-7500
13
    Christine A. Varney (*pro hac vice*)
14  cvarney@cravath.com
    **CRAVATH, SWAINE & MOORE LLP**
15  825 Eighth Avenue
    New York, NY 10019
16  Telephone: (212) 474-1000
17  *Counsel for Plaintiff Epic Games, Inc. in Epic Games, Inc. v. Google LLC et al.*

    Brendan P. Glackin (SBN 199643)
    bglackin@agutah.gov
    **OFFICE OF THE UTAH ATTORNEY**
    **GENERAL**
    160 E 300 S, 5th Floor
    P.O. Box 140872
    Salt Lake City, UT 84114-0872
    Telephone: (801) 366-0260

    *Counsel for the Plaintiff States*

    Douglas J. Dixon (SBN 275389)
    ddixon@hueston.com
    **HUESTON HENNIGAN LLP**
    620 Newport Center Drive, Suite 1300
    Newport Beach, CA 92660
    Telephone: (949) 229-8640

    *Counsel for Plaintiffs Match Group, LLC, et al.*

18

19

20

21

22

23

24

25

26

27   [Additional counsel appear on signature page]

28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD<br><br>*In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD<br><br>*State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD<br><br>*Match Group, LLC et al. v. Google LLC et al.*, Case No. 3:22-cv-02746-JD | Case No. 3:21-md-02981-JD<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:  Hon. James Donato |

1

**TABLE OF CONTENTS**

2

                                                                                    **Page**

3 TABLE OF AUTHORITIES ...................................................................................................... iv

4 INTRODUCTION AND STATEMENT OF ISSUES ............................................................. 1

5 LEGAL STANDARD ................................................................................................................ 3

6 ARGUMENT ............................................................................................................................. 4

7 I.    Google Is Not Entitled to Summary Judgment that § 4.5 of the DDA Is Lawful ........................ 4

8        A.    Plaintiffs' Section 2 Claims Are Not "Refusal-to-Deal" Claims ..................................... 4

9        B.    Plaintiffs' Section 1 Claims Challenge Cognizable Concerted Action .......................... 6

10 II.   Google Is Not Entitled to Summary Judgment on the *Per Se* Claims ........................................ 7

11 III.  Google Is Not Entitled to Summary Judgment on Timeliness Grounds .................................... 12

12 IV.   Google Is Not Entitled to Summary Judgment on Standing ...................................................... 16

13 V.    Google Is Not Entitled to Summary Judgment on Plaintiffs' Tying Claims ............................ 21

14       A.    Google Play and GPB Are Separate Products ................................................................ 21

15       B.    Google Coerces Use of GPB ........................................................................................... 23

16 VI.   Google's Motion Should Be Denied Under Rule 56(d) .............................................................. 24

17 CONCLUSION ........................................................................................................................ 25

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211 (1899)...................................12

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) .........................6, 24

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999) ...........................19

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ..............................................................3

*Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019) ........................................................... passim

*Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332 (1982) ................................................11

*Aryeh v. Canon Business Solutions*, 55 Cal.4th 1185 (2013) ...............................................21

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)....................................................................................17

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102 (9th Cir. 2021) ...............9

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979).........................14, 15

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) ..............................................3, 19, 20

*Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674 (9th Cir. 1976) ............................3

*Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008).....................................24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................................3

*Chamber of Com. v. City of Seattle*, 890 F.3d 769 (9th Cir. 2018) .......................................12

*Chelson v. Oregonian Pub. Co.*, 715 F.2d 1368 (9th Cir. 1983).......................................20, 21

*City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th Cir. 1992)...........................2, 4, 13

*City of E. Chicago v. E. Chi. Second Century*, 878 N.E.2d 358 (Ind. Ct. App. 2007) ...........15

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977).................................................12

*Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421 (9th Cir. 1995)....................................6

*Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008) .........17

*Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986) ..............................................9

*Eichman v. Fotomat Corp.*, 880 F.2d 149 (9th Cir. 1989).........................................3, 13, 14

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262 (9th Cir. 2022) ............20

*Epic Games, Inc. v. Apple Inc.*, 2023 WL 3050076 (9th Cir. Apr. 24, 2023) ................................. passim

*Esco Corp. v. United States*, 340 F.2d 1000 (9th Cir. 1965) ..................................................... 9

*Fennelly v. A-1 Mach. & Tool Co.*, 728 N.W.2d 163 (Iowa 2006) ........................................ 15

*Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975 (W.D. Wash. 2022) ....................................... 9

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) ................................................................ 11

*FTC v. D-Link Sys., Inc.*, 2018 WL 6040192 (N.D. Cal. Nov. 5, 2018) .................................... 4

*FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. 2020) ............................................................ 6, 12

*Glen Holly Entertainment v. Tektronix*, 343 F.3d 1000 (9th Cir. 2003) .................................... 19, 21

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ................................... 14

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612 (9th Cir. 1990) ...................................... 23

*In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015) .................................. 12

*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*, 2022 WL 3215002 (N.D. Cal. Aug. 9, 2022) ............... 21

*In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051 (N.D. Cal. 2015) ............................................ 21

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) ................................................ 18

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015) ............................. 9

*In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978) ................................................ 18

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059 (N.D. Cal. 2007) .................................... 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ........................ 18

*Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) ....................................................... 17

*Kauffman-Stachowiak v. Omni Hotels Mgmt. Corp.*, 2016 WL 4269504
   (N.D. Cal. Aug. 15, 2016) ..................................................................... 25

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ........................................................... 14

*Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743 (N.D. Cal. 2022) .......................................... 13

*Klein v. Meta Platforms, Inc.*, 2022 WL 17477101 (N.D. Cal. Dec. 6, 2022) .......................... 4

*L.A. Memorial Coliseum Commission v. NFL*, 791 F.2d 1356 (9th Cir. 1984) ...................................... 20

*Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123 (4th Cir. 2021) ......................................... 14

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213 (C.D. Cal. 2003) ............ 21

*Nat'l Coll. Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) ............................... 10

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) .................................................. 13

*Nat'l Soc'y of Pro. Engineers v. United States*, 435 U.S. 679 (1978) ...................................... 11

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) .................................................................... 9

*Oliver v. SD-3D LLC*, 751 F.3d 1081 (9th Cir. 2014) ........................................................ 12, 14

*Optronic Techs. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021) ..................... 8, 9, 11

*Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir. 1984) .................................................... 20

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) ............................................................ 2, 8, 11

*Re/Max Int'l v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) ............................................ 15

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ...................................................................... 17

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963 (9th Cir. 2008) ...................... 23

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376 (9th Cir. 1981) .......... 9

*Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648 (N.C. 1992).......................... 15

*Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980) .......................... 18

*Snow v. Align Tech., Inc.*, 586 F. Supp. 3d 972 (N.D. Cal. 2022) .......................................... 11

*Solid Rock Ch., Disciples of Christ v. Friendship Pub. Charter Sch., Inc.*,

 925 A.2d 554 (D.C. 2007) .................................................................................................. 15

*State Dept. of Health & Human Svcs. v. Thompkins*, 695 S.E.2d 133 (N.C. 2010)................ 16

*State v. LG Elecs., Inc.*, 375 P.3d 636 (Wash. 2016)............................................................. 15

*Teradata Corp. v. SAP SE*, 2018 WL 6528009 (N.D. Cal. Dec. 12, 2018).............................. 23

*Toscano v. Professional Golfers Association*, 201 F. Supp. 2d 1106 (E.D. Cal. 2002) .......... 7

*Toscano v. Professional Golfers Association*, 258 F.3d 978 (9th Cir. 2001) ...................... 6, 7

*United States v. Bates*, 429 F.2d 557 (9th Cir. 1970) ............................................................ 10

*United States v. Lischewski*, 2020 WL 1433272 (N.D. Cal. Mar. 24, 2020)............................ 10

*US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019) ................................. 15

*US Airways, Inc. v. Sabre Holdings Corp.*, 2017 WL 1064709 (S.D.N.Y. Mar. 24, 2017)................... 15

*US Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 874945 (S.D.N.Y. Mar. 24, 2022).................... 15

*Verizon Commc'ns Inc. v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) .......................... 5, 6

*Visa U.S.A. Inc. v. First Data Corp.*, 2006 WL 1310448 (N.D. Cal. May 12, 2006)............................ 20

vi

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321 (1971) .................................................... 13, 14

**Statutes, Constitutional Provisions, and Rules**

15 U.S.C. §§ 1 et seq. ................................................................................................................ passim

15 U.S.C. §§ 12 et seq. .............................................................................................................. passim

Ariz. Rev. Stat. § 12-510 .................................................................................................................. 15

Cal. Bus. & Prof. Code § 16700 ................................................................................................. 12, 21

D.C. Code § 12–301 ......................................................................................................................... 15

Fed. R. Civ. P. 56(a) .......................................................................................................................... 3

Fed. R. Civ. P. 56(d) ........................................................................................................................ 25

La. Const. Art. 12, § 13 .................................................................................................................... 15

Miss. Code Ann. 15-1-51 ................................................................................................................. 15

Miss. Const. Art. 4, § 104 ................................................................................................................ 15

N.C.G.S. § 75-16.2 ........................................................................................................................... 16

Wash. Code Civ. P. § 4.16.160 ........................................................................................................ 15

**Other Authorities**

Am. Bar Ass'n, Model Jury Instructions in Civil Antitrust Cases (2016 ed.) ................................... 9

Areeda & Hovenkamp, *Antitrust Law* (2022) ............................................................................. 13, 14

Ninth Cir. Manual of Model Civil Jury Instructions (2017 ed.) ....................................................... 9

1     Plaintiffs Epic Games, Match, Plaintiff States, and Consumer Plaintiffs hereby oppose
2   Defendants' Motion for Partial Summary Judgment.  For the convenience of the Court, Plaintiffs file a
3   single consolidated brief.  However, Google's Motion includes some arguments that are directed to only
4   some Plaintiffs.  Accordingly, while all Plaintiffs join the arguments in Sections I, III, V, and VI below
5   that address common issues, only Epic and Match join Section II, and only the Plaintiff States and
6   Consumer Plaintiffs join Section IV.  Plaintiffs reserve and do not waive any rights, arguments, or issues
7   pertaining to sections they have not joined.

8                              **INTRODUCTION AND STATEMENT OF ISSUES**

9     For nearly 15 years, Google has deployed a web of unlawful anticompetitive practices to
10   monopolize the markets for Android app distribution and in-app payment solutions.  Through exclusivity
11   and preferred payment arrangements with OEMs, payments to wireless carriers to disincentivize them
12   from launching or supporting competing app stores, unnecessary technological barriers to the installation
13   of competing app stores, agreements not to compete with potential app-store entrants, exclusionary
14   contracts with developers, and more, Google has ensured that Google Play is the only viable way to
15   distribute apps on Android and, through its tie, it has forced consumers and developers to use Google
16   Play Billing ("GPB") for all in-app sales and purchases of digital content in those apps.  Plaintiffs will
17   prove all that at trial.

18     Google now attempts to prevent the jury from learning the full scope and history of its scheme
19   under the guise of a "targeted motion."  (Mot. 1.)  As this Court has recognized, a complex antitrust case
20   seldom contains "a pure issue of law with no genuine dispute of fact."  (Dkt. 164 Tr. of Proceedings,
21   Dec. 16, 2021.[1])  This case is no exception.  Google's Motion rests on disputed facts and incorrect
22   statements of law.  All five of its arguments for summary judgment fail:

23     *First*, Google incorrectly contends that Plaintiffs seek to impose on Google a duty to deal with
24   rivals.  (Mot. 6-9.)  This argument rests on a mischaracterization of Plaintiffs' challenge to a provision
25   of Google's Developer Distribution Agreement ("DDA") that prohibits the distribution of app stores on

---

27     [1] Unless noted otherwise, citations to "Dkt." refer to the ECF number of documents filed on the MDL
28   docket, 3:21-md-02981-JD; citations to "Match Dkt" refer to the ECF number of documents filed on
     3:22-cv-02746-JD; and citations to "Ex." refer to exhibits from the Declaration of Michael J. Zaken filed
     in conjunction with this brief.

Google Play.  By twisting Plaintiffs' complaints to focus on one provision of one contract—ignoring that provision's role in Google's broader web of anticompetitive conduct—Google urges the Court to ignore the forest for a tree.  Google's "focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect" must be rejected.  *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).  Rather than an isolated refusal to deal, the DDA is one agreement (among several) in furtherance of a monopoly, and thus violates Section 2 of the Sherman Act.  And Google may not defeat Plaintiffs' Section 1 claims by recasting a provision of a *contract* between Google and developers as a unilateral refusal to deal.  As the Ninth Circuit recently confirmed with respect to a nearly identical agreement, Section 1 applies to *all* contracts that unreasonably restrain trade, including contracts of adhesion like the DDA.  *Epic Games, Inc. v. Apple Inc.*, 2023 WL 3050076, at *16 (9th Cir. Apr. 24, 2023) ("*Epic v. Apple*").

     *Second*, Google moves for summary judgment on Epic's and Match's[2] claims that Google's "Project Hug" agreements with three would-be competitors—Riot, Activision, and Supercell—were agreements not to compete that are *per se* illegal.  (Mot. 9-13.)  But the law is clear:  horizontal agreements not to compete are *per se* illegal.  *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990).  At best, Google's Motion raises disputed issues of fact regarding whether these Project Hug agreements are vertical or horizontal.  On summary judgment, that is not enough to foreclose *per se* treatment of these agreements.  Plaintiffs will prove at trial that these three competitors considered opening competing app stores on Android and communicated that fact to Google, then—in exchange for consideration from Google—agreed not to do so.  The jury must decide whether the agreements at issue are mere vertical distribution agreements or rather horizontal agreements not to compete.

     *Third*, Google vaguely challenges as untimely "Plaintiffs' [c]laims [r]elated to [e]arly-Android [c]arrier [a]greements."  (Mot. 14-17.)  Google's Motion is an improper attempt to exclude evidence of a core component of its ongoing anticompetitive scheme.  No Plaintiff has brought claims for injunctive relief or damages predicated on the carrier agreements *alone*.  Rather, the carrier agreements were part of Google's years-long effort to acquire and maintain monopoly power, which continues today.  Because

---

[2] "Match" refers only to the four Match plaintiff entities.  (*See* Dkt. 380.)

1    Google's violation is continuing, Plaintiffs can recover for damages accrued within the limitations

2    period, even if caused, in part, by pre-limitations-period conduct.  *See, e.g.*, *Eichman v. Fotomat Corp.*,

3    880 F.2d 149, 160 (9th Cir. 1989) ("When a plaintiff alleges a continuing violation of the law, an overt

4    act . . . restart[s] the statute of limitations.").

5        *Fourth*, Google asserts that the Consumer and State Plaintiffs lack antitrust standing to recover

6    damages for in-app purchases ("IAPs") and subscriptions because the in-app payment solution market

7    they pleaded does not involve direct sales from Google to consumers.  (Mot. 17-20.)  This too is

8    incorrect.  Because the overcharged consumers pay Google directly for their purchases, those consumers

9    have antitrust standing to seek damages under the Sherman and Clayton Acts.  *See Apple Inc. v. Pepper*,

10   139 S. Ct. 1514, 1521 (2019).  And because consumers' injuries are "inextricably intertwined" with

11   Google's anticompetitive conduct, they have standing under *Blue Shield of Virginia v. McCready*, 457

12   U.S. 465, 484 (1982) and its progeny.

13       *Fifth*, Google moves against Plaintiffs' claims that Google illegally ties Google Play—an app

14   store that makes other apps available for download—to GPB, a payment solution for digital goods within

15   apps.  (Mot. 20-24.)  Google argues that Google Play and GPB are one product *as a matter of law*.  But

16   that is a distinctively factual question for the jury, and ample evidence shows that the opposite is true—

17   indeed, in *Epic v. Apple*, the Ninth Circuit concluded that Apple's app store and in-app payment solution

18   are separate products.  2023 WL 3050076, at *27-30.  Google's argument that it does not "coerce[] or

19   force[]" (Mot. 23) all developers to use GPB likewise fails in light of the Ninth Circuit's rejection of a

20   similar argument in *Epic v. Apple* and multiple disputes of material fact.

21       All of Google's arguments lack merit, and the Court should deny Google's Motion in its entirety.

22                                    **LEGAL STANDARD**

23       A court may grant summary judgment only "if the movant shows that there is no genuine dispute

24   as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

25   *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In making that assessment, "[t]he evidence of

26   the non-movant is to be believed" and "all justifiable inferences are to be drawn in [its] favor."  *Anderson*

27   *v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  "These general standards for the granting of summary

28   judgment become even more strict in the antitrust context."  *Calnetics Corp. v. Volkswagen of Am., Inc.*,

532 F.2d 674, 683 (9th Cir. 1976).  "[T]rials are the best way to resolve legal disputes."  *FTC v. D-Link Sys., Inc.*, 2018 WL 6040192, at *1 (N.D. Cal. Nov. 5, 2018).

## ARGUMENT

**I.      Google Is Not Entitled to Summary Judgment that § 4.5 of the DDA Is Lawful**

Google first attacks a claim that Plaintiffs have not made.  According to Google, Plaintiffs claim that "Google's policy of refusing to distribute other app stores through the Google Play store is anticompetitive and violates Section 1 and 2 of the Sherman Act." (Mot. 7.)  In fact, Plaintiffs' Section 2 claims more broadly target the wide array of efforts that Google has undertaken to impede competing app stores from being distributed on Android devices.  Excluding those app stores from Google Play is just one element of Google's anticompetitive scheme.  And neither Plaintiffs' Section 1 nor Section 2 claims attack a unilateral Google "policy"; the DDA is a *contract* by which developers are forced to forgo competition with Google.

### A.      Plaintiffs' Section 2 Claims Are Not "Refusal-to-Deal" Claims

Google asserts that its decision not to "distribute its rivals' app stores" cannot give rise to Section 2 liability because Google "ha[s] no obligation under the antitrust laws to 'share its network with competitors.'" (Mot. 7.)  Google attempts to isolate a single act—the prohibition on "distribut[ing] other app stores through the Google Play store"—from the complex and large web of anticompetitive practices that Google has implemented to foreclose competition and maintain Google's monopoly power. (Mot. 6-7.)  Google's "focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect" is "not . . . proper."  *City of Anaheim*, 955 F.2d at 1376; *see Klein v. Meta Platforms, Inc.*, 2022 WL 17477101, at *2 (N.D. Cal. Dec. 6, 2022) (denying motion to dismiss plaintiffs' Section 2 claim where defendant's denial of access to software was part of the alleged anticompetitive course of conduct).

Plaintiffs have alleged, and will prove at trial, that Google effectively foreclosed *all* meaningful avenues by which competing app stores can reach Android devices—preinstallation by OEMs, downloading via Google Play, or direct downloading from the web.  For example, Google:

- Conditioned OEMs' access to the only commercially viable version of Android on their agreement to preinstall Google Play on the home screen of their Android devices (Ex. 1

Kolotouros Tr. 119:15-20; Ex. 2 GOOG-PLAY-000128863.R at -8877.R);

- Paid most major OEMs to make Google Play the exclusive app store on their devices (Ex. 1 Kolotouros Tr. 249:3-252:9; Ex. 3 Gentzkow Tr. 192:23-193:16);

- Signed agreements to prevent key developers from opening their own app stores (*see, e.g.*, Ex. 4 GOOG-PLAY-007035840 at -5840; Ex. 6 GOOG-PLAY-004146689.R at -6694.R to -6698.R; Ex. 3 Gentzkow Tr. 93:22-94:4; 95:1-14; 98:15-99:4; *see also* Ex. 8 Bernheim Rpt. ¶¶ 441-43); and

- Imposed technological frictions that impede consumers from directly downloading competing app stores from the web (*see, e.g.*, Ex. 10 Kochikar Tr. 54:12-55:10).

Complementing these exclusionary restrictions is Section 4.5 of the DDA, an agreement between Google and developers that prohibits the distribution of competing stores through Google Play. Specifically, it provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  (Ex. 51 DDA Section 4.5.)  Google engineer Dan Morrill explained that the "intent of that clause is indeed 100% protectionist" and was "explicitly intended to prevent people from using the [Android] Market"—the predecessor to Google Play—"to distribute a competing app store."  (Ex. 11 GOOG-PLAY-004283892 at -3892.)

Plaintiffs do not assert liability against Google for Section 4.5 of the DDA *on its own*; rather, Plaintiffs challenge the thicket of restrictions Google employs to foreclose competing stores, which includes Section 4.5.  Plaintiffs seek to remove this web of restrictions so that competing stores—and ultimately all Android developers—can choose *not* to deal with Play, such that Android can be the open platform Google has always promised it would be.

Google's web of anticompetitive conduct makes this case completely different from the refusal-to-deal cases Google cites.  In *Trinko*, for example, customers of Verizon's rivals alleged that Verizon—which was required by law to share its network with its competitors—had violated Section 2 solely on the basis that it unilaterally delayed orders placed by its competitors' customers. *Verizon Commc'ns Inc. v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 402, 404 (2004).  Here, by contrast, Google has implemented a broad and multifaceted anticompetitive scheme to *foreclose* Android app distribution that

1   is not a mere refusal to deal; instead, it involves a wide variety of interlocking technological and

2   contractual restrictions on OEMs, developers, and consumers.  These restrictions, imposed across the

3   Android ecosystem, are different in kind from the mere "insufficient assistance" in *Trinko*.  *See id.*

4   at 410.  Google's reliance on *FTC v. Qualcomm* likewise fails because there the Ninth Circuit examined

5   (and reversed) a finding by the district court that independent of any other conduct, "Qualcomm's refusal

6   to license rival chipmakers violates . . . an antitrust duty to deal under § 2 of the Sherman Act."  969

7   F.3d 974, 987 (9th Cir. 2020).  Plaintiffs do not claim such an independent duty to deal, but only that

8   Google's DDA provisions are actionable as part of its broader anticompetitive scheme.

9                    **B.      Plaintiffs' Section 1 Claims Challenge Cognizable Concerted Action**

10          Google argues that any effort by Plaintiffs "to evade *Trinko* by resorting to Section 1 of the

11  Sherman Act . . . would be unavailing . . . because Plaintiffs are ultimately challenging Google's

12  unilateral policy and design decision."  (Mot. 7-8.)  Not so.  Plaintiffs challenge the DDA, which is a

13  contract.  The fact that Google coerces developers to enter into the contract is irrelevant to Section 1,

14  which prohibits "[e]very contract . . . in restraint of trade," whether coerced or not.  15 U.S.C. § 1.

15  Indeed, established Section 1 claims such as tying and exclusive dealing are almost always based on

16  contracts of adhesion.  *See, e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th

17  Cir. 2016); *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1427 (9th Cir. 1995).  And the Ninth

18  Circuit has now rejected Google's exact argument in *Epic v. Apple*, holding that the district court "erred

19  when it held that a non-negotiated contract of adhesion," like the DDA, "falls outside of the scope of

20  Section 1." 2023 WL 3050076, at *16.  That holding dooms Google's Motion on this ground.

21          The only Ninth Circuit case Google cites, *Toscano v. Professional Golfers Association*, 258 F.3d

22  978 (9th Cir. 2001), does not support its position.  There, a golfer who failed to qualify for the Senior

23  PGA Tour brought Section 1 claims against firms that sponsored individual golf tournaments on the

24  ground that they accepted PGA Tour terms that allegedly harmed competition among golfers.  *Id.* at 981-

25  83.  Importantly, in that decision, the court did not evaluate Toscano's claims against the entity that, like

26

27

28

Google, imposed the rules at issue.  *Id.* at 984.  Indeed, Toscano's Section 1 claims against that entity, the PGA Tour, were *not* dismissed.  *See* 201 F. Supp. 2d 1106 (E.D. Cal. 2002).

## II.     Google Is Not Entitled to Summary Judgment on the *Per Se* Claims

Epic and Match assert that Google entered agreements not to compete with developers Riot, Activision, and Supercell (the "Potential Entrants") that are *per se* illegal under Section 1.  Plaintiffs will show at trial that the Potential Entrants informed Google of their intention to launch competing Android app stores and that, in response, Google paid off the Potential Entrants in exchange for their agreements not to launch those app stores.  Ample evidence supports this claim:

**Riot.**  In 2018, Riot "told [Google] it was planning to launch its own Android app store."  (Ex. 5 Koh Tr. 285:4-9.)  In response, Google "pulled all stops," including giving Riot $10 million in marketing funds "to get Riot to stop their inhouse 'app store' efforts."  (Ex. 47 GOOG-PLAY-007424789 at -4789.)  Google understood that, as a result, Riot "agreed to put aside their off-Play distribution platform and launch on Play."  (Ex. 4 GOOG-PLAY-007035840 at -5840.)  To date, Riot has not launched an Android app store.

████████████████████████████████████████████████████████

Zerza Tr. 199:2-6.)  Activision ████████████████████████████████████

████████████████████████  (Ex. 13 AB-GOOG-000492 at -0495), and ████████████████

████████  (Ex. 12 Zerza Tr. 46:8-47:24).  Activision then informed Google that it was "considering launching a mobile distribution platform in Q1 [but that] decision is dependent on if they can find the right deal/solution with [Google]."  (Ex. 15 GOOG-PLAY4-002193650 at -3650.)  Google understood Activision's threat, recognizing that "[i]f this deal falls through" Activision "will launch their own mobile distribution platform."  (Ex. 46 GOOG-PLAY-007280918 at -0919.)  In response, Google agreed to provide Activision with $360 million in benefits in a written agreement that prohibited Activision from removing its apps from Google Play and from making content available on another store that is not also on Google Play.  (Ex. 48 GOOG-PLAY-007847561 at -7561.)  The agreement reflects Google's and Activision's mutual understanding that Activision would *not* launch its own Android app store.  To date, Activision has not launched an Android app store.

**Supercell.**  In 2019, Supercell informed Google that it was working on launching a web store

that would offer "digital items for purchase that could be used in game on Android," from which "Google would not make money." (Ex. 10 Kochikar Tr. 177:21-178:5.) "Google was concerned that Supercell's decision . . . could attract the attention of other large developers to follow suit." (*Id*. at 178:6-10.) As a result, Google entered into an "emerging markets" deal with Supercell around the middle of 2022. (*Id*. at 179:5-7.) Among other things, Google offered Supercell "up to ███████████████████████" in exchange for a written commitment not to launch content exclusively on its own or on any other store besides Google Play, reflecting Google's and Supercell's mutual understanding that Supercell would not launch a competing app store. (*Id*. at 179:10-13, 181:24-182:6.) To date, Supercell has not launched an Android app store.

Under Section 1, agreements not to compete between actual or would-be competitors are "[o]ne of the classic examples of a *per se* violation." *Palmer*, 498 U.S. at 49; *see also Optronic Techs. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 481 (9th Cir. 2021) (*per se* illegal agreement not to compete with an entity with "technical capability to manufacture the same" product). Nonetheless, Google argues the jury should not even be allowed to consider this evidence as proof of *per se* illegal agreements for three reasons, none of which is sound.

*First*, Google argues that the relevant "agreements are vertical in nature" or at least "hybrid" agreements with both horizontal and vertical elements because the Potential Entrants are also Google's customers. (Mot. 11.) Google then asserts that such "hybrid" agreements must be "evaluated under the rule of reason." (Mot. 11-12.) But agreements not to compete with potential competitors are illegal *per se*, even when such agreements have vertical elements. *Palmer*, 498 U.S. at 47 (agreement between a national bar review company and a regional competitor to make the regional entity a distributor of the national company in exchange for payments and a commitment not to expand outside of Georgia deemed *per se* illegal); *see also Optronic*, 20 F.4th at 479-81 (parties to a *per se* illegal agreement not to compete shared a vertical supply relationship because the consideration for the agreement included "'prepayments' . . . for unshipped telescopes"). In those cases, it was irrelevant that the illegal agreements involved parties in a vertical relationship (the license to goods and intellectual property in

1    *Palmer* and the sale of telescopes in *Optronic*)—agreements not to compete are "*per se* antitrust

2    violations when engaged in by horizontal competitors." *Optronic*, 20 F.4th at 476.[3]

3         None of the cases Google relies on suggests otherwise.  Those cases discuss concerted refusals

4    to deal, not agreements not to compete.  *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1479-80 (9th

5    Cir. 1986) (allegations that "both [defendants] refused to sell [plaintiff] the parts he sought and that they

6    were aware of each other's refusals"); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d

7    1376, 1382 (9th Cir. 1981) ("'group boycott' rationale"); *Frame-Wilson v. Amazon.com, Inc.*, 591

8    F. Supp. 3d 975, 987 (W.D. Wash. 2022) (quoting *Dimidowich*).  Unlike agreements not to compete,

9    which are categorically *per se* illegal, "courts are reluctant to pigeonhole all concerted refusals to deal

10   as [*per se* illegal]." *Dimidowich*, 803 F.2d at 1480.  Epic and Match do not allege concerted refusals to

11   deal.  Rather, the evidence will show that each Potential Entrant was a would-be competitor that was

12   actively planning to launch an app store to compete directly with Google Play.  (Ex. 13 AB-GOOG-

13   000492 at -0495; Ex. 5 Koh Tr. 285:4-9.)  Thus, the agreements with the Potential Entrants were

14   horizontal agreements not to compete subject to *per se* treatment.  *See* Ninth Cir. Manual of Model Civil

15   Jury Instructions, §  14 (2017 ed.) (citing Am. Bar Ass'n, Model Jury Instructions in Civil Antitrust

16   Cases, ch. 2.C, instr. 3 (2016 ed.) (*per se* instruction appropriate where plaintiff proves "defendants

17   are . . . competitors *or potential competitors*" (emphasis added))).

18        *Second*, Google contends that Epic's and Match's interrogatory responses confirm that the rule

19   of reason applies because "[w]hen asked to identify all the terms of the alleged agreements not to launch

20   competing Android app stores, Epic and Match merely pointed to the written [Hug] contracts," which

21   do not contain specific provisions that literally prohibit competing app stores.  (Mot. 12.)  Google is

22   wrong.  To begin, there is no requirement to identify specific, written contract provisions that prevent

23   competition to maintain a *per se* claim for restraint of trade. *See Esco Corp. v. United States*, 340 F.2d

24

---

25   [3] Google's cases acknowledge that an agreement between competitors is horizontal.  *Ohio v. Am.
26   Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018) ("horizontal restraints involve agreements between
     competitors not to compete in some way"); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th
27   1102, 1108 (9th Cir. 2021) ("[a] horizontal restraint is an agreement among competitors on the way in
     which they will compete with one another"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798
28   F.3d 1186, 1191 (9th Cir. 2015) ("horizontal market division[s] are *per se* illegal").  None holds that the
     *per se* rule cannot apply where one party to a horizontal restraint is also a customer of the other.

1000, 1007 (9th Cir. 1965) ("It is not necessary to find an express agreement, either oral or written, in order to find a conspiracy [to restrain trade]."); *see also United States v. Lischewski*, 2020 WL 1433272, at *3-4 (N.D. Cal. Mar. 24, 2020). Monopolists like Google have an interest in keeping their illegal, anticompetitive agreements secret; "[e]vidence of a conspiracy must ordinarily be based on inferences drawn from competent circumstantial evidence." *United States v. Bates*, 429 F.2d 557, 558-59 (9th Cir. 1970).

Here, there is ample circumstantial evidence for a trier of fact to find the existence of a *per se* illegal contract, even absent a specific contractual provision. Epic's response to Google's Interrogatory No. 28 directs Google to *both* the written Hug agreements *and* "its Response to Interrogatory No. 30," which lists evidence outside of the contracts' text that the Potential Entrants secured payments from Google in exchange for agreements not to compete. (Dkt. 480-12 Epic's R&Os to Google's Fifth Amended Interrogatories, Nos. 28, 30.) Match's response similarly directs Google to the written Hug agreements and the same additional evidence. (Dkt. 480-13 Match's R&Os to Google's Contention Interrogatories, Nos. 24, 26.) Epic's and Match's responses point to a full suite of evidence Plaintiffs have unearthed showing that Google entered into agreements not to compete.

Even if Epic and Match *had* limited their contentions to the written terms of the Project Hug agreements themselves, summary judgment would still be inappropriate because the intended purpose and inevitable consequence of those terms was to prevent the Potential Entrants from launching competing Android app stores. Google attempts to sidestep this argument by inaccurately recasting Epic's and Match's allegations. Google argues that showing an agreement has an *actual* anticompetitive effect on the market is insufficient. But what Epic and Match will show based on Google's internal documents is that the "*intended* effect" of the agreements was to block competing app stores. (Mot. 12.) A jury can infer from this intent that the agreement between Google and its would-be competitors was a naked restraint on competition, not a restraint that is ancillary to a legitimate purpose. (Ex. 47 GOOG-PLAY-007424789 at -4789.) Moreover, direct proof of anticompetitive intent is not even necessary. *Cf. Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 101 (1984) ("[G]ood motives will not validate an otherwise anticompetitive practice[.]"). If two competitors form an agreement with terms that inevitably result in one party not competing with the other, a jury can

reasonably conclude that the parties had the mutual intent to agree not to compete, which is *per se* illegal. *Nat'l Soc'y of Pro. Engineers v. United State*s, 435 U.S. 679, 692 (1978) (certain agreements are *per se* illegal due to their "nature and *necessary effect*" on competition (emphasis added)).  The record evidence is more than is required to prove a *per se* violation of the antitrust laws.

*Third*, Google claims that the *per se* rule cannot apply because the relevant agreements "involve multi-faceted incentives from Google to its customers," and there is "no tradition of courts condemning agreements in which a firm offers incentives to customers willing to make investments in the firm's product."  (Mot. 13.)  Again, Google is trying to prevent the jury from deciding a material issue of disputed fact:  whether the agreements were an offer of "incentives to customers" as Google suggests or, instead, agreements not to compete, as Plaintiffs intend to prove.  That factual issue is crucial because courts regularly condemn as *per se* illegal agreements in which a firm offers complex incentives to secure an agreement not to compete, as Google has done here.  *See, e.g.*, *Optronic*, 20 F.4th at 479-81.  Indeed, *Palmer* involved customers who received non-monetary benefits (a license to IP and course materials) in exchange for an agreement not to compete.  498 U.S. at 47.

Google argues that *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), holds that any agreement backed by "multi-faceted value exchanges" falls under the rule of reason.  (Mot. 13.)  Nothing in *Actavis*, however, establishes such a rule regarding "multi-faceted" contracts.  In fact, the Court there stated that an agreement's complexity must not "immunize the agreement from antitrust attack."  *Id.* at 147.  Moreover, "*Actavis* concerned the unique context of 'reverse payment' settlements—settlements of patent infringement litigation that require 'the claimed infringer not to produce the patented product until the patent's term expires' in exchange for payment."  *Snow v. Align Tech., Inc.*, 586 F. Supp. 3d 972, 982 (N.D. Cal. 2022).  Google did not pay to settle litigation—it paid to shut down competition.

*Finally*, Google asserts that "[t]he Ninth Circuit has noted that *per se* treatment is particularly unsuited to dynamic markets, 'especially in technology markets.'"  (Mot. 11.)  The Supreme Court, however, has already rejected Google's argument.  *See Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 350-51 (1982) ("[T]he argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules.").  There is no need to rejustify the *per se* rule for the type of agreements Google struck—basic market allocation

1   agreements that have been *per se* illegal since the 19th century.  *See Addyston Pipe & Steel Co. v. United*

2   *States*, 175 U.S. 211 (1899).  Notably, Google's sweeping statement is wholly unsupported by the cases

3   it cites, which concern purely vertical restraints evaluated under the rule of reason, *see Qualcomm*, 969

4   F.3d 974, *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 59 (1977); or apply no substantive antitrust

5   law, *see Chamber of Com. v. City of Seattle*, 890 F.3d 769, 787 (9th Cir. 2018).  Accordingly, Google's

6   Motion seeking dismissal of the *per se* claims should be denied.[4]

7          **III.    Google Is Not Entitled to Summary Judgment on Timeliness Grounds**

8          Google argues that "any claim based on" its revenue sharing agreements ("RSAs") with carriers

9   is time-barred.  (Mot. 14.)  Google's Motion should be denied for three independent reasons:  (1) Google

10  improperly attempts to withhold from the jury important evidence of its unlawful scheme to acquire and

11  maintain monopoly power; (2) Google ignores its numerous overt acts in furtherance of its ongoing

12  scheme, which continues to this day; and (3) consumers and developers paid Google supracompetitive

13  prices within the limitations period and can recover for damages accrued within the limitations period,

14  even if caused, in part, by pre-limitations-period conduct.[5]

15         *First*, Google's Motion fails to consider the carrier agreements in the context of Plaintiffs' claims.

16  The carrier agreements are part of a larger, *ongoing* scheme to achieve and maintain Google's market

17  power in the Android App Distribution Market in violation of Section 2.[6]  (Ex. 16 GOOG-PLAY4-

18  000339905 at -9905 ("The reason we paid T-Mobile rev-share is to keep them from creating their own

19  store where they would get far more than 25%."); Ex. 56 Singer Rpt. at 24-26 (carrier and OEM

20  agreements "dissuaded (and in some cases prevented) them from developing, promoting, or offering

21  alternative App stores, including their own stores").)  Indeed, Google's documents confirm that it "cut

22

---

23      [4] This aspect of Google's Motion is limited to whether a *per se* instruction may be sought after the evidence comes in at trial.  (Mot. 9-13.)  Plaintiffs reserve the right to brief the appropriate standard if it is not *per se*.

24      [5] For the same reasons that Plaintiffs' claims are timely under the Clayton Act, Google is not entitled to a laches defense, *see Oliver v. SD-3D LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014), and Plaintiffs' state-

25  law claims are timely, *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1208 (N.D. Cal. 2015) (noting Cartwright Act statute of limitations is "functionally identical").

26      [6] *See* Dkt. 172 2d Am. Consumer Compl. ¶ 218 ("Google's contractual restrictions on OEMs, Mobile Network Carriers and developers further Google's monopolization of the Android Application

27  Distribution Market") Counts 1-11 (no carrier-specific claims); No. 3:21-cv-05227, Dkt. 188 1st Am. State Compl. Counts 1-8 (no carrier-specific claims); Dkt. 378 Epic's 2d Am. Compl. Counts 1-13

28  (same); Dkt. 380 Match's 1st Am. Compl. Counts 1-15 (same).

carriers in to disincentivize building their own stores." (Ex. 43 GOOG-PLAY-000439987.R at -0012.R.) Google now seeks to conceal this evidence from the jury. Setting aside that Google's request is a *motion in limine* masquerading as a motion for partial summary judgment, the jury is permitted to learn about the agreements that led to Google's present monopoly, even assuming *arguendo* they "fall outside the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002); *see* Areeda & Hovenkamp, *Antitrust Law* ¶ 320 (2022) ("[A plaintiff can] rely on pre-limitation conduct in order to establish the exclusionary practices portion of a monopolization claim."). Google's attempt to keep the jury from learning about the full history of its conduct should be rejected. *See City of Anaheim*, 955 F.2d at 1376.

*Second*, Google has committed numerous overt acts during the limitations period to obtain and maintain monopoly power. "When a plaintiff alleges a continuing violation of the law, an overt act . . . restart[s] the statute of limitations and the statute of limitations runs from the last overt act." *Eichman*, 880 F.2d at 160. Plaintiffs' claims are timely if *any* of those acts fell within the limitations period. *See Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 795-97 (N.D. Cal. 2022) (analyzing five separate overt acts in determining whether Section 2 claims were timely). Google has committed overt anticompetitive acts within the limitations period and continues to commit them through today. (*See, e.g.*, Ex. 1 Kolotouros Tr. 86:17-87:2 (discussing the Sony and Sharp RSAs signed in 2020); *see also* Ex. 53 Singer Rpt. at 93-112 (identifying RSAs with OEMs, MADA agreements, and other anticompetitive actions within the limitations period).) Thus, there is no basis to dismiss *any* of Plaintiffs' claims on statute-of-limitations grounds.

*Third*, Google's ongoing supracompetitive commission—enabled in part by the carrier agreements—is an additional overt acts that independently makes Plaintiffs' carrier agreement claims timely. The continued extraction of supracompetitive prices permits Plaintiffs to recover damages incurred within the limitations period, even if caused, in part, by pre-limitations conduct. *See, e.g.*, *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321 (1971). In *Zenith*, the issue before the Supreme Court was whether the statute of limitations "permit[s] Zenith to recover all of the damages it suffered during the years 1959-1963 even though some undetermined portion of those damages *was the proximate result of conduct occurring more than four years prior*." *Id.* at 333 (emphasis added). The Court held

that Zenith could recover because claims for damages "accrue only on the date they are suffered." *Id.* at 339; *see Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) ("Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955."); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[E]ach overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the illegality at much earlier times." (citation omitted)).

Plaintiffs will prove at trial that Google's commission is supracompetitive because of Google's anticompetitive conduct, including but not limited to the RSAs.  (*See, e.g.*, Ex. 53 Singer Rpt. at 87-93 (analysis of carrier agreements), 128-60 (modeling but-for commission rates).)  Every time Google extracted its supracompetitive commission, Google committed an overt act in furtherance of a continuing antitrust violation.  "[E]ach time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of that act." *SD-3C*, 751 F.3d at 1086.  "[A] purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979); *see also Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 131 (4th Cir. 2021) ("[E]ach time that Actelion sold Tracleer at a supracompetitive price after its patent expired, it illegally exercised monopoly power . . . thus committing an overt act that caused injury and violated the antitrust laws."); Areeda & Hovenkamp, *Antitrust Law* ¶ 320 (2022).[7]

The cases Google cites for the proposition that "it is irrelevant as a matter of law whether the carrier revenue-sharing contracts had some effect that lingered into the limitations period" (Mot. 15) concern a narrow exception to the usual rule that is inapplicable to this case.  In those cases, ongoing supracompetitive charges were found not to be individual overt acts because they were governed by negotiated pre-limitations contracts signed by the plaintiff and defendant.  *Eichman*, 880 F.2d at 160

---

[7] No plaintiff in this case seeks to use facts about the carrier agreements to recover damages prior to the four-year limitations period.  (*See* Ex. 53 Singer Rpt. at 203 (seeking Consumer and State damages starting August 16, 2016, four years prior to first consumer complaint); Ex. 18 Schwartz Rpt. at 229-30 (seeking Match damages starting July 7, 2017).)  Moreover, Epic does not seek to recover any monetary damages.

1   (defendant's "passive receipt of profits" from pre-limitations lease agreement with plaintiff was not an
2   overt act); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) ("[W]e think of the
3   performance of a contract as a manifestation of the 'overt act,' the decision to enter the contract, rather
4   than an independent overt act of its own.").[8]  In those cases, the terms of the contract set the overcharge,
5   and therefore the only overt act was the signing of the contract.  *US Airways*, 2022 WL 874945, at *6
6   (S.D.N.Y. Mar. 24, 2022) ("A defendant does not commit an overt act restarting the statute of limitations
7   each time a plaintiff pays a defendant a supracompetitive price *pursuant to an anticompetitive contract*
8   *to which they are a party*." (emphasis added)).   Here, the payments at issue are not governed by
9   performance of the RSAs' terms, nor did any Plaintiff sign the RSAs.   And, even in *US Airways*,
10  substantial evidence concerning the pre-limitations-period contracts was admitted at trial to prove
11  liability for the remaining timely claims.  *See* 2017 WL 1064709, at *17 & n.11 (S.D.N.Y. Mar. 21,
12  2017) (evidence that defendant used market power "to impose the full-content contractual terms in the
13  2006 [time-barred] agreement, which further ingrained its market power").

14          *Finally*, Arizona, the District of Columbia, Indiana, Iowa, Louisiana, Mississippi, North
15  Carolina, and Washington benefit from the doctrine of *nullum tempus occurrit regi—a* doctrine Google
16  ignores and that provides that limitations periods do not run against the State.  *See Rowan Cty. Bd. of*
17  *Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648, 652-58 (N.C. 1992); *Fennelly v. A-1 Mach. & Tool Co.*, 728
18  N.W.2d 163, 168 (Iowa 2006); *Solid Rock Ch., Disciples of Christ v. Friendship Pub. Charter Sch., Inc.*,
19  925 A.2d 554, 559 (D.C. 2007); *City of E. Chicago v. E. Chi. Second Century*, 878 N.E.2d 358, 380 n.21
20  (Ind. Ct. App. 2007), *rev'd on other grounds*, 908 N.E.2d 611 (Ind. 2009); *State v. LG Elecs., Inc.*, 375
21  P.3d 636, 641-44 (Wash. 2016); La. Const. Art. 12, § 13; Miss. Const. Art. 4, § 104; Miss. Code Ann.
22  15-1-51; Ariz. Rev. Stat. § 12-510; D.C. Code § 12–301; Wash. Code Civ. P. § 4.16.160.   That rule
23  defeats Google's argument that those Plaintiffs' state-law claims are untimely.   And because the early
24  RSAs are relevant to those state law claims, Google cannot keep that evidence from the jury.[9]

25

26      [8] The other case Google cites, *Re/Max Int'l v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999), concerns
    a suit by a competitor, not a purchaser.  *Id.* at 999-1001.  "Although the business of a monopolist's rival
27  may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed
    until the monopolist actually exercises its illicit power to extract an excessive price."  *US Airways*, 2022
    WL 874945, at *6 (quoting *Eastman Kodak*, 603 F.2d at 295).
28      [9] For Indiana, *nullum tempus* applies only to its state-law antitrust claims, not its consumer
    protection claims.

1

Google's treatment of North Carolina law (Mot. 14 n.15) merits particular discussion.  N.C.G.S.

2

§ 75-16.2 provides a four-year limitations period for "any civil action" under the state antitrust and

3

consumer protection laws.  The statute means the opposite of what Google contends.  The "any civil

4

action" language is not specific enough to bind the State because it does not explicitly name the State as

5

subject to the time limit.  *See State Dept. of Health & Human Svcs. v. Thompkins*, 695 S.E.2d 133, 135-

6

37 (N.C. 2010) (citations omitted); *see also id.* (limitations period for "all claims" does not override

7

*nullum tempus*).  North Carolina's state-law claims are not subject to a limitations period.

8

Accordingly, Google's Motion on this ground should be denied.

9

**IV.    Google Is Not Entitled to Summary Judgment on Standing**

10

Over two years ago, Google moved to dismiss the Developer Plaintiffs' overcharge damages

11

claims, including those relating to in-app content and subscription sales, on the theory that *only*

12

*consumers* had standing to pursue them.  Google told the Court that the "Supreme Court's reasoning in

13

*Apple* [*Inc. v. Pepper*] applies directly here, and bars Developer Plaintiffs' damages claims . . . [because]

14

consumers pay Google directly and then Google remits payment back to developers."  (3:20-cv-05792-

15

JD, Dkt. 71-1 at 3 ("Google MTD").)  According to Google back then, "'[t]he absence of an intermediary

16

is dispositive.'"  (Google MTD at 3 (quoting *Pepper*).)  Apparently not anymore.  Google *now* contends

17

that consumers "lack standing to recover antitrust damages for purchases of subscriptions and [IAPs]"

18

because they do not "participate" in the market for in-app payment solutions, in which competition has

19

been restrained.  (Mot. 17.)  Of course, IAPs comprise the vast majority of the commerce at issue.

20

(Ex. 52 Rysman Rpt. ¶ 53 (nearly 86% of Google's monthly app revenue comes from in-app content

21

purchases).)

22

Google is wrong.  Consumers who pay overcharges have antitrust standing because they *pay*

23

*Google directly* for products that are priced above competitive levels due to Google's antitrust violations.

24

Because no "intermediary" stands between them and Google, consumers have antitrust standing.

25

Google's authority simply confirms this fact.  And, in any event, consumers' injuries are "inextricably

26

intertwined" with Google's anticompetitive conduct—including the tie-in of GPB for IAPs—such that

27

they have standing under *McCready* and its progeny as well.  Finally, federal rules cannot be used to bar

28

state-law claims in jurisdictions, including California, that have expressly expanded consumer standing.

### A. Consumers Have Standing To Recover Damages for IAPs and Subscriptions

Section 4 of the Clayton Act provides a broad right of action for redress of antitrust injuries: "any person who shall be injured in his business or property by reason of anything forbidden in antitrust laws may sue therefore." 15 U.S.C. § 15(a). Congress enacted that provision specifically to "creat[e] an effective remedy *for consumers* who were forced to pay excessive prices by the giant trusts." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983) (emphasis added). Thus, where a plaintiff "alleges a wrongful deprivation of her money because the price of the [product] she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury in her 'property' under §4." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979). The Supreme Court has recognized one general exception: "when an antitrust violation occurs in a multi-tiered distribution system," the *Illinois Brick* rule bars the claims of a consumer who buys from an innocent intermediary. *Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1122 (9th Cir. 2008).

In *Pepper*, the Supreme Court analyzed whether consumers such as those here have standing to bring claims for purchases they made through an app store like the Play Store. 139 S. Ct. at 1518-19. There, Apple argued that *Illinois Brick* barred consumers' claims because app developers set app prices. *Id.* at 1519. The Supreme Court rejected this argument, holding that "iPhone owners pay the alleged overcharge directly to Apple. The absence of an intermediary is dispositive." *Id.* at 1521. Indeed, the Court held that both consumers and developers could pursue damages against Apple: "[t]he consumers seek damages based on the difference between the price they paid and the competitive price. The app developers would seek lost profits that they could have earned in a competitive retail market. *Illinois Brick* does not bar either category of suit." *Id.* at 1525.

Here, as in *Pepper*, consumers have standing to recover damages for IAPs and subscription purchases—just as Google acknowledged two years ago. Consumers paid money *to Google* for both initial downloads and IAPs of content or subscriptions. (Ex. 20 Loew Tr. 100:1-24 (Google collects payments for in-app content); Ex. 21 Singer Tr. 48:24-49:13 ("Google is brokering through the tie-in all of these in-app transactions. So I think the money is going to run through Google itself, and then . . . after Google takes its 30 percent take rate, it's going to remit the residual to the developer.").) For both

types of transactions, Google forced the consumer to use GPB, pursuant to a contract with Google governing the terms of payment.  (Ex. 22 GOOG-PLAY3-000013195 (Google Payments Terms of Service).)[10]  And for both categories of transactions, consumers paid overcharges to Google because of its anticompetitive conduct.

Google tries to distinguish *Pepper* on the basis that the Court described Apple as a "monopolistic *retailer*," arguing that "Plaintiffs here do not allege any market in which Google is a retailer to consumers of IAPs or subscriptions."  (Mot. 20.)  But Google overlooks the "dispositive" fact:  "the absence of an intermediary."  (Google MTD at 3 (quoting *Pepper*, 139 S. Ct. at 1521).)  Nothing in *Pepper* turned on the allegation that Apple served as a "retailer."  What matters under *Pepper* is, as Google said two years ago, that "consumers pay Google directly and then Google remits payment back to developers."  (*Id.* (quoting *Pepper*, 139 S. Ct. at 1521).)  This accords with longstanding precedent, such as *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), holding that if the violator transacts in different markets, including markets not restrained by the violation, it can be held liable at every level. *Id.* at 326 & n. 6; *see also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002); *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 16-17 (3d Cir. 1978); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F.  Supp. 2d 1109, 1117-18 (N.D. Cal. 2008).

Google's contrary reading of *Pepper* relies entirely on Google's insistence that antitrust standing is limited to buyers or competitors in the relevant market where the defendant's anticompetitive conduct occurs, ignoring that consumers are market participants and pay Google directly for IAPs and subscriptions, as discussed in Part B below.  Yet this supposed requirement finds no support in the case law; in fact, the very cases Google cites expressly reject it.  For instance, Google purports to quote *American Ad Management* in support of its argument that Plaintiffs can recover only for injuries in an antitrust market in which they buy or sell.  (Mot. 17.)  But that is the *opposite* of what the Ninth Circuit held.  In *American Ad Management*, the Ninth Circuit rejected the notion that a plaintiff must be a "competitor or consumer" in the relevant market to have standing, describing it as nothing more than a "rough gloss on the *Associated General*/*Bhan* 'market participant' test."  *Am. Ad Mgmt., Inc. v. Gen.*

---

[10] These terms apply to all Google Payments without specifically referencing GPB by name.

*Tel. Co. of Cal.*, 190 F.3d 1051, 1057-58 (9th Cir. 1999) ("[I]t is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff."). Consequently, the Ninth Circuit held that a broker had standing to challenge a restraint that lowered the price of ads and, in turn, plaintiff's commissions—even though the broker did not buy or sell ads. *Id.* at 1057.

Google also points to *Glen Holly Entertainment v. Tektronix* for the proposition that "[c]onsumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." (Mot. 18 (quoting 343 F.3d 1000, 1008 (9th Cir. 2003)).) Yet that case held it was an *error* to "limit a purchaser/consumer's actionable antitrust injury to situations where the purchaser/consumer has made or intends to make purchases in the relevant market," explaining that "this understanding of antitrust injury is too restrictive." *Id.* at 1010.

Notably, Google concedes that consumers can pursue damages arising from app purchases. But under Google's market definition, app purchases are made in the same market as in-app and subscription purchases. (Ex. 23 Tucker Rpt. ¶¶ 373-83 ("Plaintiffs' Separation of the Android App Distribution and In-App Payment Processing Markets is Flawed").) This means that, by Google's logic, consumers would have antitrust standing to seek overcharge damages for IAPs and subscription purchases if Google were correct about the relevant market in this case. This convoluted result is precisely why antitrust standing does not turn on such distinctions: regardless of how the relevant market is defined, as "the immediate buyers from the alleged antitrust violators . . . [consumers] may sue." *Pepper*, 139 S. Ct. at 1521.

### B.     Consumers "Participate" in the Market for In-App Payment Solutions

Even if *Pepper* did not establish that Plaintiffs have standing as direct purchasers, the Supreme Court has long recognized that even plaintiffs who make *no* purchases from a defendant have standing where their injury is—as here—"inextricably  intertwined" with the conduct at issue. In *McCready*, a subscriber in an employee insurance plan challenged a scheme to restrict health insurance reimbursement for psychologists. 457 U.S. at 467. The defendants argued that the subscriber was not a psychologist or a buyer of health insurance, and therefore lacked antitrust standing. The Supreme Court disagreed. Because the denial of reimbursement was "the very means" by which the conspiracy was carried out, the subscriber's injury was "a necessary step in effecting" the anticompetitive ends, and she had standing to

1    sue.  As the Supreme Court explained, it was sufficient that the subscriber was "within that area of the

2    economy endangered by th[e] breakdown of competitive conditions."  *Id.* at 479-80.

3         Shortly after *McCready*, the Ninth Circuit held that plaintiffs may have antitrust standing where

4    "it is clear that their interests would directly be served by enhanced competition in the market," even if

5    they "are neither consumers nor competitors in the relevant market."  *Chelson v. Oregonian Pub. Co.*,

6    715 F.2d 1368, 1371 (9th Cir. 1983).  The Ninth Circuit has applied this rule expansively.  In *Ostrofe v.*

7    *H.S. Crocker Co.*, for example, the court held that a whistleblower discharged by a cartelist could

8    essentially bring a wrongful termination claim under the Clayton Act.  740 F.2d 739, 745-46 (9th Cir.

9    1984).  And in *L.A. Memorial Coliseum Commission v. NFL*, the Ninth Circuit ruled that a football venue

10   could challenge an NFL rule affecting NFL members.  791 F.2d 1356, 1363 (9th Cir. 1984); *see also*

11   *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1267, 1274-75 (9th Cir.

12   2022) (consumers' injury "inextricably intertwined" with power company's "unlawful scheme to reduce

13   solar-energy competition"); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1066 (N.D. Cal.

14   2007) (consumers' injury "inextricably intertwined" with boycott of retailer); *Visa U.S.A. Inc. v. First*

15   *Data Corp.*, 2006 WL 1310448, at *9 (N.D. Cal. May 12, 2006) (merchant acquirer could pursue

16   damages caused by restraint of competition in the market for network processing).

17        In this case, the harm to consumers is "integral" to, and "inextricably intertwined" with, Google's

18   unlawful conduct in the market for in-app payment solutions.  *McCready*, 457 U.S. at 479, 484.  Like

19   *McCready*, collecting payments via GPB is "a necessary step in effecting the ends" of Google's

20   anticompetitive conduct, making plaintiffs' injury "inextricably intertwined" with the violation.  *Id.*

21   Consumers must pay overcharges, to Google, every time they make an IAP or buy a subscription, even

22   years after they download the relevant app from Google.  Dr. Singer calculated "overcharges from the

23   consumers' perspective" (Ex. 21 Singer Tr. 54:13-20), while Dr. Rysman's variety model showed how

24   consumers would benefit in a world absent Google's anticompetitive conduct through an increase in the

25   supply of apps (Ex. 41 Rysman Tr. 286:5, 291:15-20).  There is little doubt that consumers in this case

26   would be "directly served by enhanced competition."  *Chelson*, 715 F.2d at 1371.  Consumers

27   accordingly have federal antitrust standing to seek damages in the in-app payment solution market.

28

### C. Consumers Also Have Antitrust Standing in Repealer Jurisdictions

Google asserts in passing that its arguments apply equally to the Cartwright Act. (Mot. 18.) But the cases Google cites predate the California Supreme Court's decision in *Aryeh v. Canon Business Solutions*, 55 Cal.4th 1185, 1195 (2013). Since then, federal courts in this district regularly reject Google's position. *See In re Cal. Gasoline Spot Mkt. Antitrust Litig.*, 2022 WL 3215002, at *3 (N.D. Cal. Aug. 9, 2022); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1073 (N.D. Cal. 2015). Furthermore, applying *Associated General Contractors* to the Cartwright Act here would undo California's express expansion of consumer remedies. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1224 (C.D. Cal. 2003) ("Under California law, an indirect purchaser participates (indirectly) as a customer in the relevant market, and thus may suffer a cognizable antitrust injury.").[11] And Google ignores the dozens of other laws of the 38 jurisdictions other than California under which the States bring damages claims. Even if the Court accepted Google's incorrect arguments about federal and California law, Google has not even carried its burden as the moving party with respect to these other jurisdictions. Accordingly, the Court should deny Google's Motion on standing.

### V. Google Is Not Entitled to Summary Judgment on Plaintiffs' Tying Claims

Google argues that it should be granted summary judgment on Plaintiffs' tying claims because "Google Play and GPB are not 'two distinct products or services'" and Plaintiffs cannot show "that Google Play and GPB are tied." (Mot. 20-24.) Google fails to show that no reasonable juror could disagree with its contentions, which require the resolution of disputed facts. In addition, the Ninth Circuit's decision in *Epic v. Apple*, among other precedent, forecloses Google's arguments. Indeed, Google relies on the district court's findings in *Epic v. Apple* that the Ninth Circuit held were "either clearly erroneous or incorrect as a matter of law." 2023 WL 3050076, at *28.

### A. Google Play and GPB Are Separate Products

Google contends that Google Play and GPB are not separate products. (Mot. 20-23.) The Ninth Circuit expressly rejected a substantively identical contention in *Epic v. Apple*. There, the Ninth Circuit held that Apple's "App Store and [Apple's payment solution] clearly can be separated because Apple

---

[11] *Metro-Goldwyn-Mayer* is otherwise inapposite as it concerned the operator of a platform used to distribute copyrighted works attempting to challenge a refusal to license copyrighted works to a licensor that used the platform. 269 F. Supp. 2d at 1217, 1220.

1   *already does* so in certain contexts, namely that [Apple's payment solution] is not required for in-app

2   purchases of physical goods."  2023 WL 3050076, at *28 (emphasis in original).

3   The same is true for Google—it has never required developers selling or consumers buying

4   physical goods to use GPB, and indeed *forbids* its use for such transactions.  (Ex. 25 Payments Policy.)

5   It was only after this litigation was filed that Google began requiring developers selling digital content

6   that may be "consumed outside the app itself" to use GPB, and accordingly, consumers were only then

7   required to use GPB to purchase such content.  (Ex. 26 GOOG-PLAY-000064254 at -4254 (Prior

8   Payments Policy).)  And prior to 2012, Google did not require *any* developer to use GPB.  (Ex. 50

9   Android Developers Blog, "In-App Billing on Android Market:  Ready for Testing.")  *See Epic v. Apple*,

10  2023 WL 3050076, at *28 (discussing Apple's historical practice of "permit[ing] developers to use their

11  own in-app payment systems").  In fact, Google did not offer in-app payment processing until years *after*

12  launching its app store.  (Ex. 42 Android Developers Blog, "Android Market: Now available for users";

13  Ex. 28 Android Developers Blog, "In-app Billing Launched on Android Market.")

14  As in *Epic v. Apple*, the evidence here also shows there is substantial demand for non-GPB

15  payment systems.  2023 WL 3050076, at *28.  Many developers now subject to Google's tie historically

16  have used non-GPB systems (exclusively or alongside GPB), including Match,[12] Spotify, ███████

17  █████ Epic Games, ████████████ and even ████████████████████ (Ex. 44 GOOG-

18  PLAY-000838161 at -8161; Ex. 29 GOOG-PLAY-007346079 at -6084, -6087 to -6088; *see also* Ex. 30

19  Feng Tr. 173:23–174:10, 223:20–225:8, 306:25–307:4; Ex. 45 GOOG-PLAY-003334312 at -4314.)

20  Developers (including Match and Spotify) have also expressly requested to use their own non-

21  GPB systems.  (Ex. 49 GOOG-PLAY-011270137 at -0139 to -0140 (email to Google requesting that

22  Match continue using non-GPB systems); Ex. 31 Alzetta Tr. 32:2-17 (discussing agreement allowing

23  Spotify to use non-GPB systems); *see also* Ex. 10 Kochikar Tr. 252:23-253:1.)  Further, in 2022, Google

24  introduced the User Choice Billing program, which allows certain developers to offer non-GPB systems

25  alongside GPB and allows consumers to decide which payment solution to use—further showing there

26

27  ───────────
    [12] For example, Match.com and OurTime have offered non-GPB payment systems since the apps
    were first published on Google Play in 2010 and 2014, respectively.  (Match Dkt. 12-2

28  Foster Decl. ¶¶ 32, 33, 36.)

is separate demand.  (Ex. 32 "Enrolling in User Choice Billing Pilot.")

Google cites *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963 (9th Cir. 2008), to argue that Google Play and GPB are not separate products "as a matter of law."  (Mot. 20-21.) To start, this is a question of fact.  *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 615-16 (9th Cir. 1990) ("Kodak's argument [that two products form a single product market] presents, at best, a disputed issue of fact."), *aff'd*, 504 U.S. 451 (1992).  *Rick-Mik* also is factually inapposite because, unlike here, it involved a franchise, which "almost by definition, necessarily consist[s] of 'bundled' and related products or services—not separate products."  532 F.3d at 974.

If anything, *Rick-Mik* supports Plaintiffs.  It instructs courts to consider "'indirect evidence of consumer demand for the tied product separate from the tying product.'" 532 F.3d at 975.  That "includes firm behaviors," including whether "'competitive firms always bundle the tying and tied goods' together." *Teradata Corp. v. SAP SE*, 2018 WL 6528009, at *12 (N.D. Cal. Dec. 12, 2018) (quoting *Rick-Mik*, 532 F.3d at 965).  Here, other Android app stores have distributed apps without offering in-app billing services.  (*See* Ex. 33 Dury Tr. 33:14-16; Ex. 34 Christopolous Tr. 215:5-216:4.)  And in-app billing service providers exist that do not distribute apps.  (*See* Ex. 52 Rysman Rpt. ¶ 247 (discussing, *e.g.*, Square's In-App Payments API).)

In sum, the evidence Plaintiffs offer now—at the summary judgment stage—is even stronger than the evidence on which the Ninth Circuit relied to find separate products following a full bench trial in *Epic v. Apple*.  Summary judgment, therefore, is inappropriate.

### B.      Google Coerces Use of GPB

Google also argues there is no "tie" because Google does not "coerce or force" *all* developers that use Google Play to use GPB; rather, "[m]any" apps are "available for free and do not monetize in-app activity."  (Mot. 23.)  Again, Google relies on a portion of the district court decision in *Epic v. Apple* that the Ninth Circuit expressly rejected.  Like Google, Apple argued "that there is no tie because 'thousands of developers . . . offer no [IAPs]'" and are therefore not required to use Apple's payment system.  *Epic v. Apple*, 2023 WL 3050076, at *28 n.20.  The Ninth Circuit easily disposed of this argument in a footnote, explaining that Apple's developer agreement "essentially provides: 'Apple will sell your app-distribution transactions only if you buy your in-app-purchase processing *requirements*

1    from Apple.'"  *Id.*  The same is true here:  if a developer on Google Play (such as Match) offers digital

2    goods for sale in the app, Google forces that developer to use GPB as the payment solution.  (*See* Ex. 51

3    DDA Section 4.1; Ex. 25 Payments Policy (Google webpage explaining that "[s]tarting June 1, 2022,

4    any app that is still not compliant will be removed from Google Play"); Ex. 35 GOOG-PLAY-

5    011378120 at -8122 (email from Google threatening to remove the Bandcamp app from Google Play if

6    it did not integrate GPB).)  Moreover, Google does not claim there is a technological need for the tie.

7          Regardless, whether Google coerces the use of GPB is a question of fact that should not be

8    resolved at summary judgment.  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 914 (9th Cir.

9    2008) (reversing summary judgment on tying claim in part because of disputed fact issues regarding

10   coercion).  For example, Google argues that "developers can pursue many monetization strategies

11   beyond the sale of [IAPs]" that do not require use of GPB.  (Mot. 24.)  But triable issues of fact exist as

12   to whether developers can avoid Google's tie by implementing these monetization strategies without

13   facing unreasonable hurdles or costs.  *See Aerotec*, 836 F.3d at 1179 (a tie exists "when a seller 'adopts

14   a policy that makes it unreasonably difficult or costly to buy the tying product . . . without buying the

15   tied product.'").  Match, for example, has developed its business based on an IAP monetization strategy

16   that it implemented more than a decade ago and have invested significant resources, time, and money to

17   develop and maintain.  (*See, e.g.*, Match Dkt. 12-2 Foster Decl. ¶¶ 32, 33, 36.)  Epic Games, too, relies

18   on an IAP monetization strategy for its mobile apps (Dkt. 378 Epic's 2d Am. Compl.¶ 11(a); Dkt. 386

19   Defendants' Answer to Epic's 2d Am. Compl. ¶ 11; *Epic v. Apple*, 2023 WL 3050076, at *3), and it

20   would not want to degrade its users' experiences by including advertisements within its apps.

21         Google's arguments for summary judgment as to Plaintiffs' tying claim fail under Ninth Circuit

22   precedent and ignore triable issues of material fact.  This prong of Google's Motion too should be denied.

23         **VI.    Google's Motion Should Be Denied Under Rule 56(d)**

24         On May 9, 2023, nine days before this opposition brief was due, Google informed Plaintiffs for

25   the first time that "due to errors," Google "will be producing additional documents in the coming weeks,"

26   and that "Google's prior collections did not include certain documents in Google Drive, including

27   Microsoft Office and PDF files, as well as certain files located in shared/team drive folders."  (Ex. 37

28   May 9, 2023 Email from G. Pomerantz to Plaintiffs and May 10, 2023 Letter from G. Bornstein to

1  Google; *see also* Ex. 38 May 18, 2023 Letter from G. Bornstein to Google.)  Google has since confirmed

2  that to date, it has identified at least 160,000 custodial documents that hit on Plaintiffs' search terms and

3  that it had failed to collect and review, and that the final count will be higher—potentially significantly

4  so.  Google also confirmed that these errors affected *every* custodian's collection because, among other

5  "errors," Google failed to collect documents from the custodians' hard drives.  Google has not yet

6  produced any of these newly collected documents.

7       Federal Rule of Civil Procedure 56(d) permits courts to deny a summary judgment motion if the

8  non-moving party shows that "it cannot present facts essential to justify its opposition."  Fed. R. Civ.

9  P. 56(d).  "[S]ummary judgment is disfavored where relevant evidence remains to be discovered."

10  *Kauffman-Stachowiak v. Omni Hotels Mgmt. Corp.*, 2016 WL 4269504, at *7 (N.D. Cal. Aug. 15, 2016).

11  While Google's Motion should be denied for the reasons explained above, it would be manifestly unfair

12  to Plaintiffs for the Court to enter judgment in favor of Google on any of Plaintiffs' claims when Google

13  failed to produce these documents nearly two years after representing to the Court that it had "completed

14  substantial production of custodian documents" (Dkt. 56 at 3), in addition to the numerous Chats that

15  Google intentionally destroyed.[13]

16  <div align="center">**CONCLUSION**</div>

17       Google's Motion for Partial Summary Judgment should be denied in its entirety.

18

19

20

21

22

23

24

25

26

27

28

---

[13] Deferral of the motion would be an inadequate remedy.  Plaintiffs intend to try this case in November as the Court has ordered.  The schedule should not be placed at risk due to Google's late production of documents.

1    Dated:  May 18, 2023              CRAVATH, SWAINE & MOORE LLP
                                            Christine Varney *(pro hac vice)*
2                                           Gary A. Bornstein *(pro hac vice)*
                                            Yonatan Even *(pro hac vice)*
3                                           Lauren A. Moskowitz *(pro hac vice)*
                                            Justin C. Clarke *(pro hac vice)*
4                                           Michael J. Zaken *(pro hac vice)*
                                            M. Brent Byars *(pro hac vice)*
5

6

7                                      FAEGRE DRINKER BIDDLE & REATH LLP
                                            Paul J. Riehle (SBN 115199)
8
                                       Respectfully submitted as to Sections I, II, III, V, and VI,
9
                                       By: */s/ Gary A. Bornstein*
10

11                                          *Counsel for Plaintiff Epic Games, Inc.*

12

13   Dated:  May 18, 2023              BARTLIT BECK LLP
                                            Karma M. Giulianelli
14
                                       KAPLAN FOX & KILSHEIMER LLP
15                                          Hae Sung Nam

16                                     Respectfully submitted as to Sections I, III, IV, V, and VI,

17                                     By: */s/ Karma M. Giulianelli*
18                                          Karma M. Giulianelli

19                                          *Co-Lead Counsel for the Class in In re Google Play*
                                            *Consumer Antitrust Litigation*
20

21

22   Dated:  May 18, 2023              PRITZKER LEVINE LLP
                                            Elizabeth C. Pritzker
23
                                       Respectfully submitted as to Sections I, III, IV, V, and VI,
24
                                       By: */s/ Elizabeth C. Pritzker*
25                                          Elizabeth C. Pritzker

26                                          *Liaison Counsel for the Class in In re Google Play*
                                            *Consumer Antitrust Litigation*
27

28

1

2

Dated:  May 18, 2023          OFFICE OF THE UTAH ATTORNEY GENERAL
                                              Brendan P. Glackin
                                              Lauren M. Weinstein

3

4

                                        OFFICE OF THE ARIZONA ATTORNEY GENERAL
                                              Jayme L. Weber

5

                                        Respectfully submitted as to Sections I, III, IV, V, and VI,

6

                                        By: */s/ Brendan P. Glackin*
                                              Brendan P. Glackin

7

8

                                        *Counsel for the Plaintiff States*

9

10

Dated:  May 18, 2023          HUESTON HENNIGAN LLP
                                              Douglas J. Dixon

11

                                              Christine Woodin
                                              Joseph A. Reiter

12

13

                                        Respectfully submitted as to Sections I, II, III, V, and VI,

14

                                        By: */s/ Douglas J. Dixon*
                                              Douglas J. Dixon

15

16

                                        *Counsel for Plaintiffs Match Group, LLC et al.*

17

18

19

20

21

22

23

24

25

26

27

28

1

**E-FILING ATTESTATION**

2      I, Gary A. Bornstein, am the ECF User whose ID and password are being used to file this

3  document.  In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that each of the signatories

4  identified above has concurred in this filing.

5

6                                              */s/ Gary A. Bornstein*
                                               Gary A. Bornstein
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit D2
# Public Redacted Version

# EXHIBIT 1

```
                                              Page 1

 1

 2   UNITED STATES DISTRICT COURT

 3   FOR THE NORTHERN DISTRICT OF CALIFORNIA

 4   SAN FRANCISCO DIVISION

 5   -------------------------------------------X

     IN RE GOOGLE PLAY STORE      Case No.

 6   ANTITRUST LITIGATION         3:21-md-02981-JD

 7

     THIS DOCUMENT RELATES TO:

 8   Epic Games Inc. v. Google LLC, et al.,

     Case No: 3:20-cv-05671-JD

 9

     In re Google Play Consumer

10   Antitrust Litigation,

     Case No: 3:20-cv-05761-JD

11

     In re Google Play Developer

12   Antitrust Litigation,

     Case No: 3:20-cv-05792-JD

13

14   State of Utah, et al., v.

     Google LLC, et al.,

15   Case No: 3:21-cv-05227-JD

16   -------------------------------------------X

17

18   *HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER*

19

20   REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

21                JAMES KOLOTOUROS

22                February 2, 2022

23                9:01 a.m. Eastern Standard Time

24

25   Reported by:  Fran Insley
```

Page 6

```
 1
 2      Daniel Ottaunick, also Cravath.
 3           MR. J. BYARS:  John Byars from
 4      Bartlit Beck LLP on behalf of consumers.
 5           MR. BATES:  Good morning.  Kyle
 6      Bates from Hausfeld for developers and
 7      with me is my colleague, Amy Ernst, also
 8      from Hausfeld.
 9           MR. ALTEBRANDO:  Michael Altebrando
10      on behalf of the State of Utah and the
11      plaintiff states.
12           MR. POMERANTZ:  All right.  If
13      that's all the plaintiffs, I'm Glenn
14      Pomerantz on behalf of the defendants and
15      also representing Mr. Kolotouros at this
16      deposition.  Here with me is my colleague,
17      Nick Sidney, and also appearing for Google
18      is Kate Smith, in-house counsel.
19           THE VIDEOGRAPHER:  Thank you,
20      counsel.  The parties have stipulated and
21      agreed that the court reporter may take
22      the deponent's oath remotely.  Will the
23      court reporter please swear in the
24      witness.
25   J I M   K O L O T O U R O S,
```

```
 1          KOLOTOUROS - HIGHLY CONFIDENTIAL
 2    the Witness herein, having first been duly
 3    sworn by the Notary Public, was examined and
 4    testified as follows:
 5    EXAMINATION BY MS. MOSKOWITZ:
 6         Q.    Good morning, Mr. Kolotouros.
 7         A.    Good morning.
 8         Q.    I've just said your name, but if you
 9    wouldn't mind, please, stating your name, full
10    name for the record.
11         A.    Jim Kolotouros.
12         Q.    And can you provide your address?
13         A.    My home address or my current
14    address for the -- where I'm seated?
15         Q.    I was going to ask where you were
16    currently sitting second, but if you could give
17    your work or home address as you prefer.
18         A.    I am currently in the law offices of
19    Morgan Lewis on 1400 Page Mill Road in Palo
20    Alto, and my work address is 1600 Amphitheater
21    Parkway, Mountain View, California, 94043.
22         Q.    Is there anyone in the room with you
23    now?
24         A.    No, there is not.
25         Q.    If someone does enter the room, do
```

```
                                           Page 86
 1          KOLOTOUROS - HIGHLY CONFIDENTIAL
 2   been any references by LG, Motorola, or Lenovo
 3   to us with respect to Epic and Chris did not
 4   recall any references by LG, Motorola, or
 5   Lenovo.  And we also discussed the extent to
 6   which in the premier tier of their revenue
 7   share deals, there were devices which those
 8   OEMs did not elect to include in their premier
 9   tier as part of the revenue share deal.
10        Q.    Anything else that you can recall
11   discussing with Mr. Li?
12        A.    No, not -- not in that meeting, no.
13        Q.    And you only had one meeting with
14   him in preparation for your corporate testimony
15   today?
16        A.    That is correct.
17        Q.    Can you tell me what you recall
18   about your discussion with Mr. Kawamura for
19   your testimony here today?
20        A.    We discussed the Sony and Sharp
21   revenue share deals that he had worked on when
22   they were signed in 2020, I believe, and the
23   extent to which there might have been
24   conversations related to -- or that they had
25   with us in connection with Epic that he did not
```

```
 1          KOLOTOUROS - HIGHLY CONFIDENTIAL
 2    recall having any in.
 3          Q.    In terms of Samsung specifically,
 4    were there any of these meetings that you used
 5    to get up to speed and prepare to testify as a
 6    corporate representative about?
 7          A.    No, not with -- not with Chris Li or
 8    the other two sets of people.
 9          Q.    Did you do anything to prepare to
10    testify as to Google's relationship with
11    Samsung?
12          A.    I did not.
13          Q.    Just going back to the specific
14    notice.  Do you still have that open in front
15    of you?
16          A.    I do, yes.
17          Q.    If you can scroll down -- not
18    scroll.  It's the same page, topic 15.  Do you
19    see that topic?
20          A.    Yes.
21          Q.    And are you aware that you were
22    designated by Google to testify on this topic
23    as well?
24          A.    Yes.
25          Q.    And then finally to close up this
```

1          KOLOTOUROS - HIGHLY CONFIDENTIAL

2        A.    If it's between a folder and an

3    application, it's hard to tell what a user is

4    likely to know is in the folder.  I don't think

5    users know what's in the folder except that it

6    has some Google services there.  So, I think,

7    again, it's the relevant -- relativeness of

8    what else is available or present to the user

9    that the OEM decides on their side.

10        Q.    Let's skip the folder then.  Google

11   Play is not in the folder, it's the actual icon

12   that needs to be installed on the default home

13   screen under the MADA, correct?

14        A.    That is correct.

15        Q.    And it's required to be on the home

16   screen as opposed to a later screen because

17   users are more likely to see and use it when

18   it's on the default home screen, right?

19        A.    I think that's for the Play Store, I

20   think that's fair, yes.

21        Q.    And in terms of the folder then

22   again, the folder that contains various Google

23   apps, you do not have a view that it is better

24   to have that folder on the home screen than it

25   is to have that folder on a later screen?

Page 249

1                KOLOTOUROS - HIGHLY CONFIDENTIAL

2       look at a specific agreement.

3            Q.    I'm trying to understand whether

4       it's your position that when an app -- when a

5       device is enrolled in an RSA of any sort,

6       whether it's your position that an OEM is never

7       prevented from installing a competing app to a

8       Google app?

9            A.    That is incorrect.

10           Q.    There are such restrictions in

11      certain tiers for devices enrolled in those

12      tiers, correct?

13           A.    Not for all Google apps on the

14      device, no.

15           Q.    For certain Google apps, there are

16      such restrictions that prevent OEMs from

17      agreeing to preinstall apps that compete with

18      those apps?

19           A.    To the extent the OEM elects to

20      enroll a device in a revenue share tier above

21      the basic core optimized, there are for

22      specific applications or utilities restrictions

23      on what else could be preloaded by the OEM;

24      that is correct.

25           Q.    The bottom of this executive summary

```
                                             Page 250
 1          KOLOTOUROS - HIGHLY CONFIDENTIAL
 2   summarizes the asked the business council; is
 3   that right?
 4          A.    Yes.
 5          Q.    And the idea here is that Google
 6   asked -- the Google team asked the business
 7   council for permission to send ████████████  in
 8   2020 which would grow to ███████████  in 2023;
 9   is that right?
10          A.    Yes, that's what the slide says.
11          Q.    And all of that money would take the
12   form of revenue share both from Google Search
13   and Google Play for devices enrolled, correct?
14          A.    I believe that is correct, yes.
15          Q.    And it says here that "Google would
16   pay revenue share to secure platform
17   protections for Search and Play and critical
18   acts protections on more devices."  Do you see
19   that?
20          A.    Yes.
21          Q.    So this revenue share that was being
22   requested would secure protection for Google
23   Play, correct?
24          A.    It would secure platform defaults
25   for Search and device by device -- on a device
```

1              KOLOTOUROS - HIGHLY CONFIDENTIAL

2    by device basis preinstall prominens for Play;

3    that is correct.

4         Q.    Not only preinstallation but

5    exclusivity at some of the tiers for Google

6    Play, correct?

7         A.    As part of the out of box

8    experience, there would be a limitation on

9    other applications or utilities with package

10   install permissions; that is correct.

11        Q.    And again the second bullet here

12   specifically says that there would be an

13   additional amount of revenue share that would

14   be offered to secure Play exclusivity, right?

15        A.    On the second bullet?

16        Q.    Yes.   Under the ask?

17        A.    Yes, that speaks to the terms that

18   would be associated with some deals.

19        Q.    And one of those terms is Play --

20   Google Play exclusivity, correct?

21        A.    As part of the out of box

22   experience, yes.

23        Q.    Meaning no other app store or app

24   launcher or app installer could be preinstalled

25   by an OEM who had enrolled into this tier,

1              KOLOTOUROS - HIGHLY CONFIDENTIAL
2      correct?
3           A.    To the extent the OEM enrolled a
4      device, a specific device within this
5      particular tier, there would be an out of box
6      restriction on the ability to preload other
7      apps with install package permissions.
8           Q.    Including app stores for example?
9           A.    Yes.
10          Q.    So the first bullet refers to the
11     platform tier, that is the entry level tier,
12     proposed entry level tier of the RSA?
13          A.    That is correct, yes.
14          Q.    And the -- it's referenced to be a
15     platform tier because the change here was
16     instead of allowing OEMs to opt into an RSA on
17     a device by device basis, they would have to go
18     into this basic level of RSA across all of that
19     OEM devices, correct?
20          A.    Across all of their Android
21     compatible GMS devices, correct, correct.
22          Q.    And that OEM had already entered
23     into an ACC to prevent fragmentation, correct?
24          A.    To prevent developer fragmentation.
25     That is correct, yes.

Page 325

```
 1

 2

 3                    C E R T I F I C A T E

 4          I, FRAN INSLEY, hereby certify that the

 5   Deposition of JAMES KOLOTOUROS was held before

 6   me on the 2nd day of February, 2022; that said

 7   witness was duly sworn before the commencement

 8   of testimony; that the testimony was taken

 9   stenographically by myself and then transcribed

10   by myself; that the party was represented by

11   counsel as appears herein;

12          That the within transcript is a true

13   record of the Deposition of said witness;

14          That I am not connected by blood or

15   marriage with any of the parties; that I am not

16   interested directly or indirectly in the

17   outcome of this matter; that I am not in the

18   employ of any of the counsel.

19          IN WITNESS WHEREOF, I have hereunto set

20   my hand this 3rd day of February, 2022.

21

22

23   _____

24                    FRAN INSLEY

25
```

Page 327

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

------------------------------------------X

IN RE GOOGLE PLAY STORE      Case No.

ANTITRUST LITIGATION         3:21-md-02981-JD

THIS DOCUMENT RELATES TO:

Epic Games Inc. v. Google LLC, et al.,

Case No: 3:20-cv-05671-JD

In re Google Play Consumer

Antitrust Litigation,

Case No: 3:20-cv-05761-JD

In re Google Play Developer

Antitrust Litigation,

Case No: 3:20-cv-05792-JD

State of Utah, et al., v.

Google LLC, et al.,

Case No: 3:21-cv-05227-JD

------------------------------------------X

*HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER*

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

JAMES KOLOTOUROS

VOLUME II

February 3, 2022

9:02 a.m. Pacific Standard Time

Reported by:  Fran Insley

Page 332

1

2              THE VIDEOGRAPHER:   Good morning.

3      Here begins Volume II of the video

4      recorded virtual remote individual and

5      30(b)(6) deposition of Jim Kolotouros

6      appearing for Google, Inc. from his

7      location in Palo Alto, California.   This

8      deposition is taken by the plaintiffs In

9      RE: Google Play Store Antitrust

10     Litigation.   Case No. 3:21-md-02981-JD in

11     the United States District Court, Northern

12     District of California.

13              Today is Thursday, February 3rd,

14     2022.   The time is approximately 9:02 a.m.

15     Pacific Standard time.   My name is Howard

16     Brodsky and I'm the legal video specialist

17     in association with Veritext Legal

18     Solutions with offices located in New

19     York, New York.   The court reporter is

20     Fran Insley in association with Veritext.

21              All appearances remain the same as

22     in Volume I of this proceeding and the

23     witness has been sworn under oath to be

24     truthful on the record.   Please proceed.

25   J I M   K O L O T O U R O S,

```
                                              Page 333
 1              KOLOTOUROS - HIGHLY CONFIDENTIAL
 2     the Witness herein, having been previously
 3     sworn by the Notary Public, was examined and
 4     testified as follows:
 5     CONTINUED EXAMINATION BY MS. MOSKOWITZ:
 6          Q.    Good morning, Mr. Kolotouros.
 7          A.    Good morning or good afternoon.
 8          Q.    Thank you.  You are aware that you
 9     are still under oath from yesterday's swearing?
10          A.    I am.
11          Q.    And do you agree to all of the same
12     sort of ground rules that we discussed earlier
13     yesterday?
14          A.    I do.
15          Q.    Thank you.  If you could go into
16     your -- and do you understand that you are
17     still testifying as a 30(b)(6) witness for the
18     moment?
19          A.    I do.
20          Q.    Thank you.  Can you please go into
21     your Exhibit folder and you should see -- this
22     is for today's, Exhibit 626.  For the record,
23     it's Google Play 000416651 through 6697.  Do
24     you see that?
25                (Whereupon Exhibit 626 was marked
```

1    KOLOTOUROS - HIGHLY CONFIDENTIAL
2        Q.    And he says, "If exclusivity is
3    overreach, defaulted and prominent placement
4    would be great;" is that correct?
5        A.    That is correct, yes.
6        Q.    And then you say, "Let's shoot for
7    3rd party protection and user-friendly/idyllic
8    implementations from the get-go"?
9        A.    Yes.
10       Q.    Correct?  And second line, "Can you
11   reflect those terms in the term sheet?  Or let
12   Sidney know to include it;" is that correct?
13       A.    Yes.
14       Q.    And is Sidney, Sidney Lee?
15       A.    That is correct, yes.
16       Q.    Okay.  And then above, Lucy Jin
17   e-mails saying, "Jim, we are working on
18   refining the language and will have it ready
19   before EOD and reflected in the Term Sheet,"
20   and EOD stands for end of day; is that correct?
21       A.    That is correct.
22       Q.    And then she asks a question, second
23   paragraph, "Quick clarification, when you say
24   1st party vs. 3rd party exclusivity, the 3P
25   obviously refer to non-Google, non Xioami

```
                                        Page 442
 1            KOLOTOUROS - HIGHLY CONFIDENTIAL
 2   services such as Amazon.  But for 1st party
 3   exclusivity, do you mean Xioami's 1P services;"
 4   is that correct?
 5        A.    Yes.
 6        Q.    So, she reads this to be in relation
 7   to an exclusivity term that would impact
 8   Amazon; is that correct?
 9        A.    That is correct, yes.
10        Q.    Okay.  And above that you reply
11   with, "Your interpretation is correct," is that
12   right?
13        A.    Yes.
14        Q.    So, under this framework, Xiaomi can
15   put its own AOSP version of Lens on the devices
16   as long as it was not in default; is that
17   correct?
18        A.    Xiaomi could under -- I don't know
19   what funding made its way into the term sheet
20   or what finally was manifested in the contract,
21   but it would imply that it would be Google's VR
22   or visual search product as the default and
23   with Xiaomi's alongside of another default.
24        Q.    Okay.  Thank you.  So, Xiaomi could
25   not preload Amazon's competing products under
```

1            KOLOTOUROS - HIGHLY CONFIDENTIAL

2     this agreement as it is being discussed in this

3     e-mail; is that correct?

4          A.    To the extent that Xiaomi elected to

5     enroll the device in the tier within which this

6     term was included, that enrollment would

7     preclude the presence or preload of the Amazon

8     service out of box.

9          Q.    And so earlier you mentioned that

10    this was just about Lens, Google Lens, the

11    exclusivity provisions being discussed; is that

12    correct?

13         A.    I believe so, yes.

14         Q.    But did the agreement with Xiaomi

15    require exclusivity for any other Google apps

16    or Google Play?

17         A.    I think that within the Xiaomi deal

18    there was a -- the Premier tier did include

19    exclusivity for additional services.

20              MR. ALTEBRANDO:  Okay.  Let's go off

21         the record for a minute and I'm going to

22         discuss with co-counsel before we talk

23         again.  Thank you again, Mr. Kolotouros.

24              THE VIDEOGRAPHER:  The time is

25         11:27.  We are off the record.

1          KOLOTOUROS - HIGHLY CONFIDENTIAL

2               (Off the record.)

3               THE VIDEOGRAPHER:  The time is

4     11:38.  We are on the record.

5          Q.    Thank you.  Okay.  So yesterday when

6     you were going through your CV with counsel for

7     Epic, you said you recalled putting together a

8     deck that was listed in your CV as Android 101;

9     is that correct?

10         A.    That is correct.

11         Q.    And you do recall that deck?

12         A.    I do recall that deck, yes.

13         Q.    And you said yesterday that you had

14    presented it internally at Google; is that

15    correct?

16         A.    That is correct.

17         Q.    If we could quickly go to

18    Plaintiff's Exhibit 647.  It should already be

19    loaded because I loaded it before the break,

20    and I'll just read into the record that this is

21    Plaintiff's Exhibit 647 GOOG-PLAY-000128863.R.

22         A.    It's still loading, so give me one

23    moment, please.

24         Q.    And just for the record this is a

25    deck titled "Android 101" which the meta-data

```
                                                Page 445

 1              KOLOTOUROS - HIGHLY CONFIDENTIAL
 2     indicates was created around 5/15/2019.
 3                  (Whereupon Exhibit 647 was marked
 4          for identification.)
 5          A.     Okay.
 6          Q.     And now that you have it up, is this
 7     the deck that you were referring to?
 8          A.     Yes.
 9          Q.     Okay.  And it says, "Prepared by the
10     Android Global Business Team (jimk,
11     lichristopher, sidneylee)."
12          A.     Correct.
13          Q.     So, this deck was prepared and
14     approved by yourself, Christopher Li, and
15     Sidney Lee; is that correct?
16          A.     Yes.
17          Q.     Okay.  And this deck was created in
18     the ordinary course of business at Google; is
19     that correct?
20          A.     Yes.
21          Q.     If we could go down to 884.R.
22          A.     Okay.
23          Q.     Okay.  And it says, "Android was
24     built to help secure more users for Google
25     services;" is that correct?
```

```
                                              Page 446
 1            KOLOTOUROS - HIGHLY CONFIDENTIAL
 2        A.    Yes.
 3        Q.    On this chart there are subheadings
 4   with titles like "Search" and "Assistant" with
 5   icons underneath; is that correct?
 6        A.    Yes.
 7        Q.    And these icons appear to be
 8   specific Google Play apps and services; is that
 9   correct?
10        A.    Yes.
11        Q.    And the green bubbles indicate
12   contracts that govern that app for service in
13   the GMS; is that correct?
14        A.    I'm sorry, can you repeat the
15   question, please?
16        Q.    Of course.  And the green bubbles
17   underneath those icons indicate contracts that
18   govern that app or service in GMS; is that
19   correct?
20        A.    I think the green bubbles represent
21   different kinds of agreements that might
22   administer, if not the licensing, the promotion
23   of those apps, yes.
24        Q.    Okay.  And at the very bottom it
25   says, "Android also owns the API's,
```

Page 492

1

2                   C E R T I F I C A T E

3            I, FRAN INSLEY, hereby certify that the

4     Deposition of JAMES KOLOTOUROS was held before

5     me on the 3rd day of February, 2022; that said

6     witness was duly sworn before the commencement

7     of testimony; that the testimony was taken

8     stenographically by myself and then transcribed

9     by myself; that the party was represented by

10    counsel as appears herein;

11           That the within transcript is a true

12    record of the Deposition of said witness;

13           That I am not connected by blood or

14    marriage with any of the parties; that I am not

15    interested directly or indirectly in the

16    outcome of this matter; that I am not in the

17    employ of any of the counsel.

18           IN WITNESS WHEREOF, I have hereunto set

19    my hand this 4th day of February, 2022.

20

21

22    _____

23           FRAN INSLEY

24

25

# Exhibit D3
# Public Redacted Version

# EXHIBIT 2



GOOG-PLAY-000128863.R



GOOG-PLAY-000128864.R



GOOG-PLAY-000128865.R



## Google Search and Services in early 2000s....

A SINGLE SERVICE ON A SINGLE WEBPAGE ON A SINGLE BROWSER ON A SINGLE OS

**Evolution of a desktop strategy:**

- We had access via Windows (IE) and then Mac (OS X/Safari) but always worried about getting blocked by 3rd party OS/browser platforms
- Netscape Navigator = Google's first search distribution deal. Firefox and Safari search deals came later
- Google Toolbar & Protector provided access to IE users
- Initiated Chrome browser so that i) service & feature innovation, and ii) user access to search/services would not be throttled by IE
- ChromeOS eventually evolved from Chrome browser

Google

Confidential + Proprietary





## A very new landscape in 2007

**Market Landscape:** iPhone launches in June 2007 which accelerates adoption of smart devices on multiple platforms

### IMPLICATIONS

- Same platform concerns as desktop; access and innovation
- Impossible to scalably get great experiences/apps in front of users - app team had to optimize each app for every single device / platform permutation ("fragmentation")
- **What can Google do to focus its solutions/services innovations?**
- **What would make sense for Google as an App developer?**

Google

Confidential + Proprietary

Android Open Source Project (AOSP) provided the solution to evolving market conditions for many...

- **Created a solution to address platform and developer fragmentation:** Bought by Google in 2005
- **Ally with key ecosystem partners:** Created an alliance with a consortium of partners in 2007 to make an open source platform for ecosystem partners to participate and compete in the rapidly growing smartphone industry
- **Create friendly policies to encourage adoption by OEM's, developers, SOC's, etc.,:**

Google



## Android Open Source Project (AOSP) provided the solution to evolving market conditions for many...

- **Created a solution to address platform and developer fragmentation:** Bought by Google in 200[illegible]
- **Ally with key ecosystem partners:** Created an alliance with a consortium of partners in 2007 to make an open source platform for ecosystem partners to participate and compete in the rapidly growing smartphone industry
- **Create friendly policies to encourage adoption by OEM's, developers, SOC's, etc.,**

Make it open source and free

Google

Confidential + Proprietary

## What is AOSP?



- The Android Open Source Project (AOSP) consists of 3 key elements:
  - (1) An operating system,
  - (2) middleware, and
  - (3) open-source apps (e.g., dialer, email, gallery, and messaging services).

- Manufacturers, carriers, and third-party developers can use these components as-is or can customize them into their own proprietary versions without a license from Google.

- Amazon is one example of a company which uses AOSP to built out their own proprietary version (FireOS)

Google

Confidential • Proprietary

What is compatibility? Why & where does it matter?

> Device compatibility is important to ensure that developers have confidence that their app will work perfectly on a specific form factor; it allows developers to focus their creativity and innovation while accessing a maximum universe of devices & users

Google

Confidential + Proprietary

## Compatibility stretches across different form factors as well

The Android platform works across several device form factors – **mobile devices (smart phones, tablets), wearables, TVs, and auto**; therefore, the Android compatibility requirements apply to these device types as well

    

**Note:** Wear, Auto, Audio, and TV are unique in that GMS-equivalents for wearables and TV's requires more than just a MADA (more on this later)

Google                                                              Confidential • Proprietary

CONFIDENTIAL

Google Mobile Services (GMS) layered on top of AOSP



- The Android Open Source Project (AOSP) consists of 3 key elements:
  - (1) An operating system,
  - (2) middleware, and
  - (3) open-source apps (e.g., dialer, email, and messaging services).
- Manufacturers, carriers, and third-party developers can use these components as-is or can customize them into their own proprietary versions without a license from Google.
- Google Mobile Services (GMS) apps, in contrast, are Google's proprietary apps

Google

Confidential + Proprietary



We believed Google Applications would enhance the user experience on mobile phones and tablets

**What is GMS?**

- **GMS is a collection of Google applications** for Android
  - ○ Most GMS apps are optional and available a la carte
  - ○ Some GMS apps are only available in a bundle; but there is no obligation for OEM's to pre-load these

- GMS works beautifully on *compatible* Android smartphones / tablets and is intended to provide the best possible mobile experience on smartphones (feature phones are in play again too!)

- App updates are administered by Google Play
  - ○ E.g., Google Maps cannot be updated on a device if Play is also not installed

- There is not a single agreement with any OEM that requires them to pre-load any GMS app on their device

**GMS MANDATORY APPS**





Google

Confidential + Proprietary

GOOG-PLAY-000128875.R

## Google Play Services / GMS Core is an important element of Play

**What is Google Play Services / GMS Core?**

- **Play Store provides a set of Google APIs** that help support functionality of **all** Android applications (aka GMS Core APIs, Google Play Services)
  - Ads
  - Maps
  - Analytics
  - Location, etc.,

- Used by GMS, and hundreds of thousands of 3rd party apps

- 826 out of the top 1000 Android apps use 1 or more GMS Core APIs (Facebook, WhatsApp, Twitter, and many other apps)

GmsCore API Usage (3P)
- Only apps evaluated by Marmot (mostly limited to apps in active in Google Play Store)

Nr Applications using GmsCore API

| | Count ▼ |
| --- | --- |
| -- All | 506,142 |
| gms.ads | 414,936 |
| gms.common | 263,587 |
| gms.maps | 194,262 |
| gms.gcm | 140,341 |
| gms.analytics | 97,374 |
| gms.location | 93,457 |
| gms.plus | 74,466 |
| gms.games | 52,385 |
| gms.auth | 26,121 |
| gms.appstate | 21,409 |
| gms.internal | 15,834 |
| gms.b | 6,446 |
| gms.a | 5,472 |
| gms.wallet | 4,597 |
| gms.drive | 4,263 |
| gms.cast | 3,853 |
| gms.wearable | 3,600 |

Google

Confidential • Proprietary

GOOG-PLAY-000128876.R



## GMS requires signing a set of agreements with Google - ACC and MADA are the two main ones

**What does Google get**

**Android Compatibility Commitment (ACC)**

**Compatibility:** Company will **only distribute Android devices that are Android-Compatible Devices.** i.e., if a device uses Android (even without GMS), it must be compatible (pass the compatibility test suite; comply with CDD). Exceptions are granted on a case-by-case basis

**Mobile Application Distribution Agreement (MADA)**

**Pre-load + Placement:** Pre-load i) GMS mandatory apps, and ii) search widget, Play store, and Google Collection on the default home screen (i.e., invoked by the home button)

**but…**

Companies do not need to sign any other agreements, such as MADA, although almost all OEMs take this step. Carriers and retailers do not/cannot sign the ACC

**MADA gives OEMs a device-by-device choice.** OEM can pre-load any other application in addition to Google services; there's no obligation for an OEM to load GMS on any device. **Zero exclusivity within the MADA**

Google

Confidential + Proprietary

## Common misconceptions with Android & GMS

| STATEMENT | TRUE | FALSE | REALITY |
|---|---|---|---|
| If a partner signs up for a GMS license, all their devices must include GMS | ☐ | ☑ | Partner can choose whether or not to pre-load GMS onto their devices on a **device-by-device** basis |
| An Android device that does not have GMS pre-installed is a fork of Android | ☐ | ☑ | A device is defined as a fork of Android if the underlying ROM (software image) is not Android-compatible |
| Google requires some app exclusivity as part of the GMS licensing process | ☐ | ☑ | There are no exclusivity provisions as part of the MADA agreement. However, we do offer to select partners a revenue share opportunity in exchange for some exclusivity clauses. The revenue share agreement is **separate from** GMS licensing. |

Google

Confidential • Proprietary



CONFIDENTIAL



GOOG-PLAY-000128880.R

Huawei Case Study – what will they be able to do / not do?



Google



GOOG-PLAY-000128882.R



GOOG-PLAY-000128883.R





GOOG-PLAY-000128885.R





GOOG-PLAY-000128887.R



GOOG-PLAY-000128888.R



CONFIDENTIAL

GOOG-PLAY-000128889.R



GOOG-PLAY-000128890.R





*Note: "CN OEMs" inc. Xiaomi, Oppo, Vivo, Gionee, TCL, ZTE, Lenovo/Moto, Transsion, OnePlus, Coolpad, Wiko, and Meizu*





CONFIDENTIAL

GOOG-PLAY-000128894.R



CONFIDENTIAL

GOOG-PLAY-000128895.R

## Challenges on the horizon

- Regulatory (EEA, China)
- Balanced set of partners
- Keeping partners healthy
- Switching
- Alternate 3P platforms
- Execution

Google



GOOG-PLAY-000128897.R



GOOG-PLAY-000128898.R



Google

Confidential + Proprietary

CONFIDENTIAL

GOOG-PLAY-000128899.R





Execution – increasingly complex and difficult to align internally, but an opportunity as well



Google

Confidential • Proprietary

GOOG-PLAY-000128902.R



| Id | Date | Text |
|----|------|------|
| 2 | 06/19/2019 21:42:34 | Jim to fill out |
| 1 | 06/19/2019 21:42:43 | Jim to fill out |

Google

Confidential • Proprietary

GOOG-PLAY-000128904.R



## SP & FP Markets Decline in 2018 with CN OEMs Share Rising

We are at single digit shipment growth overall. FP conversion is occurring, albeit slowly. Globally, top-6 OEMs to account for >65% market share and CN OEMs are expected to account for more than half of global SP shipment in '18. (TBD)

Source: IDC (go/idc-dashboard)
Note: All figures inc. Apple unless otherwise stated

Google

Confidential & Proprietary

## Android Compatibility Requirements

Believe this can be an appendix slide



1) Comply 100% with the requirements of the Compatibility Definition Document ("CDD")

2) Pass 100% of the Compatibility Test Suite ("CTS")
   CTS is composed of 1000s of automated test cases to ensure compatibility with platform

**Note: 1)** Google updates CDD and CTS for each version of Android and releases them as part of AOSP. 2) Also, we do a liberal exception/exemption policy to grandfather in older devices and/or address unique form factors

Google

Confidential • Proprietary

GOOG-PLAY-000128906.R

## Review of hypothetical scenarios

Believe this can be an appendix slide

| SCENARIO | YES | NO | NOTES |
|---|---|---|---|
| Can a mobile phone without Google Play and GMS core APIs run other Android apps? | ☑ | ☐ | Yes, as long as the apps don't require any APIs from GMS Core or they find ways to replicate API functionality (themselves or other 3P APIs) |
| Can someone effectively utilize GMS Core APIs without Google Play installed? | ☐ | ☑ | No, the APIs require and use Play's infrastructure |
| If a device has Google Play illegally sideloaded, can it access GMS Core APIs? | ☑ | ☐ | Can access GMS Core APIs, but we cannot validate the authenticity of the Core API functionality. This is why enforcing unlicensed devices is important. |
| Does Apple offer its own version of iOS "GMS Core APIs"? | ☑ | ☐ | iOS has a similar API model, but there are less APIs and they do not offer as deep functionality |

Google

Confidential + Proprietary

GOOG-PLAY-000128907.R



GOOG-PLAY-000128908.R

# Exhibit D4
# Public Redacted Version

# EXHIBIT 4

| Message | |
|---|---|
| **From:** | Lawrence Koh [lawrencekoh@google.com] |
| **Sent:** | 2/13/2020 6:31:34 PM |
| **To:** | Brian Brazinski [brazinski@google.com]; Christian Cramer [cramer@google.com]; Cyrous Jame [cyrous@google.com]; George Yousling [gyousling@google.com]; Josh OConnor [joshoconnor@google.com]; Karan Gambhir [kgkaran@google.com]; Mike Marchak [marchak@google.com]; Purnima Kochikar [kochikar@google.com]; Tamar Fruchtman [tamarf@google.com] |
| **Subject:** | Fwd: [Privileged & Confidential] Riot - Update |

Privileged and confidential +Tamar Fruchtman for guidance

Per the other thread wanted to share some additional context on why changing the comarketing amount/structure for will be difficult so sharing this email thread from last March to help provide some context on how it eventually led to the GVP commercial offer that we're discussing right now.



tl;dr: ██████████████████████████████████████████████████████████████████████
████████████████████████████████████.  To convince Riot and their BoD to change their strategy, we tried putting our best foot forward with the following deal (this was pre-GVP/Project Hug being approved by BC) below in advance of the Riot board meeting that happened in early April last year.

████████████████████████████████████
██████████████████████████████████████████
███████████████████████████
██████████████████████████

At this time, we didn't ask for contractual commitments ██████████████████████████ the focus was getting Riot to shift their focus away from launching their off-Play distribution platform.  Once Riot agreed to put aside their off-Play distribution platform and launch on Play in April, we decided to move to the next phase of leveling up our partnership last summer with Riot by asking them to commit to the ███████████████
██████████████████████████████████████████████████████████████████████

---------- Forwarded message ---------
From: **Lawrence Koh** <lawrencekoh@google.com>
Date: Sun, Mar 24, 2019 at 11:24 AM
Subject: Re: [Privileged & Confidential] Riot - Update
To: Jamie Rosenberg <jamiero@google.com>, Purnima Kochikar <kochikar@google.com>, Shafiq Ahmed <shafiqahmed@google.com>, Samer Sayigh <ssayigh@google.com>, Mike Marchak <marchak@google.com>, Karan Gambhir <kgkaran@google.com>, Bob Borchers <bborchers@google.com>, Andreas Preuer <andreaspreuer@google.com>
Cc: Tia Arzu <tiaa@google.com>

Hi everyone,

I just wanted to let everyone know that Riot will be making the decision to move forward with the Play partnership during their Board meeting on **Tues, April 9th**.  The meeting was originally scheduled to happen early this week but due to internal scheduling conflicts, the Board meeting got pushed back by a couple of weeks.

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Despite the delay, an increasing number of key stakeholders at Riot have expressed strong support for the Play partnership in the last week.  We recently heard that Riot's President of Publishing and Head of International are supportive and also just heard over the weekend that Brandon Beck (co-founder of Riot) is excited about the partnership.  The narrative around Play being able to help with Riot's New User Growth, International Expansion, and Long Term Engagement objectives have resonated strongly with the Riot team throughout this process and they have expressed interest in being able to partner closely with us to unlock the full lifecycle partnership potential of Play.

While we wait for the formal approval from Riot's exec team, both Riot and Play are planning on continuously engaging on a few work threads ranging from performance marketing, tech consulting, and growth consulting discussions and we will start planning on setting up discussions between marketing (& merch) teams from both Riot and Play to get aligned on the go-to-market plans for the 2 new mobile games which are expected to get announced during LoL's 10yr anniversary event in Sept.

Will keep everyone updated as we learn more about Riot's decision.  Please let me know if you have any questions.

Best,
Lawrence




On Sun, Mar 3, 2019 at 10:46 PM Lawrence Koh <lawrencekoh@google.com> wrote:
 [Privileged & Confidential]

 Hi everyone,

 I wanted to give a quick update and heads up about next steps for Riot as I expect key decisions from Riot being made later this month about our potential partnership.  Riot is currently working on scheduling their BoD meeting to decide on their publishing strategy for their new 2 mobile games and we believe it's going to happen either on the week of Mar 25th or the week of Apr 1st.  Based on recent discussions, our expectation is that the outcome of Riot's BoD meeting will be a positive outcome for Play and Play will be their primary publishing partner vs. Riot moving forward with their own platform.  We still have a lot of work to get done over the next month but we're on the right path.

 **Current Status**:
 - Riot's 2 new games will be jointly announced on Sept 2019 as part of a larger Riot event

 o        Project Bacon (TCG): Riot's Hearthstone competitor will be a cross platform offering right from the beginning.  They are currently planning on starting pre-reg shortly after announce and looking to officially launch in late Q4 2019.

 o        Project Lighting Rush (MOBA): this is LoL on mobile and will initially be mobile only with possible cross platform play with their main LoL product at a future date.  Pre-reg for this will also start shortly after announce and game will officially launch in Q1 2020

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY-007035841

- Our strategy of jointly working with Riot on the business case has been working out well as it has already given us a deeper level of access to the team and insights about their strategy and priorities with their 2 new games.  The 3 key themes of the business case that we were able to get aligned on are:

- ███████████████████████████████████████████████████
  █████████████████████████████

- ███████████████████████████████████████████████████
  ██████████████████████████

- ██████████████████████████████████████████████████████
  ███████████████

- Andreas has been doing a great job of running point throughout the engagement and facilitating key working sessions with DevTech, Performance Marketing, and eSports.  In the case of DevTech, Riot's dev team has already been seeing immediate value as our team has been able to provide valuable insights/solutions

- Riot has shared with us that their studio dev and marketing teams have already expressed their interest in continuously partnering with us.  With the broader team being supportive of partnering, Riot believes if we can demonstrate that we're committed to making this the "largest Android gaming launch", it will be an easy discussion at the BoD meeting.  Basically, Riot will like to know how much Google is willing to invest in this launch.

- Just a couple of days ago, we received Riot's planned first 12mo marketing budgets to support the 2 new games.  This was shared so that we can get a better gauge of the level of investment that they are committing for their new games.  ████████████████████████████████████
  █████████████████████████████████████████████.  We have additional regional details and have started discussions with our strategy team (Marchak/Karan/Samer) to review and explore a proposal.

**Next Steps:**

- We're going to work with the strategy team this week to explore the service packs that we budgeted for supporting Riot as part of Project Hug.  We're going to aim for having an initial proposal ready by end of this week that we can use to initiate discussions with Riot and show how much Google is investing in the new games.  As part of this initial proposal, it will include ███████████████████████████
  ██████████████████████████████  Per Riot's request, Riot asked that we roll-up the ███████
  ███████ with our proposal so that the Riot team can see one holistic Google offering.

- As we work on the initial proposal, I'll also like to give the heads up that we will likely need to parallel path the budget approval for supporting Riot vs. the broader Project Hug budget ask timeline given the time sensitivity for the Riot project.  We will make sure all parties continue to stay updated throughout this process.

Please let me know if you have any questions.  Will send over another update once we have our initial proposal ready later this week.

Best,
Lawrence


--
Lawrence Koh
Google Play Games
lawrencekoh@google.com
cell: 650-906-1283

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

--
Lawrence Koh
Google Play Games
lawrencekoh@google.com
cell: 650-906-1283


--
Lawrence Koh
Google Play Games
lawrencekoh@google.com
cell: 650-906-1283
--
Lawrence Koh
Google Play Games
lawrencekoh@google.com
cell: 650-906-1283

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-007035843

# Exhibit D5
# Public Redacted Version

# EXHIBIT 5

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF CALIFORNIA
3              SAN FRANCISCO DIVISION
4  _____x

IN RE GOOGLE PLAY STORE           Case No.
5  ANTITRUST LITIGATION              3:21-md-02981-JD
6  THIS DOCUMENT RELATES TO:
7  Epic Games Inc. v. Google LLC, et al.,
   Case No: 3:20-cv-05671-JD
8
   In re Google Play Consumer
9  Antitrust Litigation,
   Case No: 3:20-cv-05761-JD
10
   In re Google Play Developer
11 Litigation,
   Case No: 3:20-cv-05792-JD
12
13 State of Utah, et al., v.
   Google LLC, et al.,
14 Case No: 3:21-cv-05227-JD

   _____

15
16    HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
17       VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
18             DEPOSITION OF LAWRENCE KOH
19
20          Thursday, December 9, 2021
21  Remotely Testifying from San Francisco, California
22
23  Reported By:
24   Hanna Kim, CLR, CSR No. 13083
25   Job No. 4969626

HIGHLY CONFIDENTIAL

Page 17

1                         LAWRENCE KOH,

2            having been administered an oath over

3                   videoconference, was examined

4                    and testified as follows:

5

6                         EXAMINATION

7    BY MS. MOSKOWITZ:

8        Q.   Good morning, Mr. Koh.  As you heard, my

9    name is Lauren Moskowitz, and I represent Epic

10   Games, and I'll be starting the questioning this

11   morning.

12            Thank you for being here.

13            Can you just please state your full name

14   again for the record.

15       A.   My name is Lawrence Koh.

16       Q.   And what is your address?

17       A.   I currently reside -- do you want the full

18   address?

19       Q.   You can tell me the -- the city and state.

20       A.   City, state, okay.  Yeah, I currently

21   reside in Lafayette, California.

22       Q.   And where are you located at the moment?

23       A.   I'm in downtown San Francisco, California.

24       Q.   You are at your counsel's offices?

25       A.   That is correct.

HIGHLY CONFIDENTIAL

Page 269

1    that again.  I think it's Lei Zhang, as you

2    already corrected me earlier.  Apologies.

3            The ans- -- the question Number 3 is,

4    ████████████████████████████  sounds fuzzy: is the

5    approximate  ████████████  the right market price for

6    such content" [as read], et cetera.

7            Do you see that?

8        A.   Yes, I do see it.

9        Q.   And this is a continuation of the same

10   topic that we were just discussing in the context

11   of the prior exhibit?

12           MR. BRADSHAW:  Object to the form.

13           THE WITNESS:  Yes, that is correct.

14   BY MS. MOSKOWITZ:

15       Q.   And "LK" here is your response?

16       A.   Yes, that is correct.

17       Q.   And you report here that you had discussed

18   this issue extensively with Ryan Wyatt; is that

19   right?

20       A.   That is correct.

21       Q.   And you report that you and Mr. Wyatt

22   "both agree that the  ████████████████  is

23   extremely aggressive and this will open up other

24   issues for the ecosystem (i.e., we potentially

25   create a valuation bubble for the games streaming

HIGHLY CONFIDENTIAL

Page 270

1    content industry.)"  [As read]
2              Do you see that?
3        A.    Yes, I do see that.
4        Q.    And in terms of what ultimately was
5    reached in terms of the █████████████████ of
6    the deal, I think we discussed earlier that your
7    understanding is that the final deal was
8    ███████████████████████ is that correct?
9        A.    That is correct.
██   ██  █████████████████████████████
██       █████████████████████████████
██       █████████████████████████████
██       ███████████████████████████
██       ████████
██   ██  ████████████████████
██       ████████████████████████████
17       Q.    And do you recall who was the primary
18   point of contact vis-à-vis the ██████ aspect of
19   the deal?
20       A.    I believe it was Ryan Wyatt.
21       Q.    Okay.  All right.
22             I'm going to mark the next document, which
23   should appear momentarily as Exhibit 150.
24             (Koh Deposition Exhibit 150 was marked.)
25   BY MS. MOSKOWITZ:

HIGHLY CONFIDENTIAL

Page 271

1       Q.    That is in there, and you should have it

2   accessible.  For the record, PX 150 is Google Play

3   007280918 through '0920.

4           Please let me know when you have it.

5       A.    I have it opened right now.

6       Q.    This is an e-mail at the top between you

7   and Mike Marchak on December 12, 2019, discussing

8   earlier e-mails in the chain?

9       A.    Yes, that is correct.

10      Q.    And this is an e-mail chain in what -- in

11  which you participated in the ordinary course of

12  your job at Google?

13      A.    Yes.

HIGHLY CONFIDENTIAL

Page 272

10    BY MS. MOSKOWITZ:

11        Q.    Does that refresh your recollection that

12    Google had taken a run at trying to mitigate some

13    of

14            MR. BRADSHAW:   Object to the form.

15            THE WITNESS:   I recall this conversation,

16    yes, around want- -- if -- if we were going to lean

17    into                              we all -- in

18    exchange we wanted them to make

19

20    BY MS. MOSKOWITZ:

HIGHLY CONFIDENTIAL

Page 273

```
1      that page ending '0919?
2           A.    Yes, I'm there.
3           Q.    The second bullet is a reference to ███
4      continuing to insist that there be a ████████
       ██ █████████████████████████████████████████████████
       ██ ██████████████████████████████████████████████████ .
7                Do you see that?
8           A.    Yes, I see it.
9           Q.    And there's a discussion of potentially
10     removing "█████████████████████████████████████████"
11     That's the second bullet from the end.
12               Do you see that?
13          A.    Yes, I see it.
14          Q.    He says -- well, sorry, Ms. Beatty reports
15     that "If this deal falls through, Mr. Zerza claims
16     that they will launch their own mobile
17     distribution platform ██████████████████████████████
       ██ ██████████████████████████████████████████████████
       ██ ███████████████████████████████████████████████████
       ██ ████████████████████████████████████████  [As
21     read]
22               Do you see that?
23          A.    Yes, I do see it.
24          Q.    So basically █████ was saying that if Google
25     backed out of █████████████████ , they may partner
```

HIGHLY CONFIDENTIAL

Page 283

1    BY MS. MOSKOWITZ:

HIGHLY CONFIDENTIAL

Page 284

```
 1    ████    ████  ██████████████████████
 2    ████    ████  ████████████████████████████████████
 3    ████  █████████████████████████████████████████████████
 4    ████  ████████████████████████████████████████████
 5    ████  ██████████████████████████████████████
 6    ████          ██████████████████████
 7    ████    ████  ████████████████████████████████████████
 8    ████    ████  █████████████████████████████
 9    ████    ████  ██████████████████
10          ████    ██████    ████████████████████████████
11          ████████████████████████████████████████████████
12          █████████████
```

13       A.   Yes, that is correct.

14       Q.   And the ██████████████████ is the --

15  whatever the signed version is of the exhibit we

16  looked at a moment ago?

17            MR. BRADSHAW:   Object to the form.

18            THE WITNESS:   I do not recall if there was

19  a ████████████████████████████████ but I do recall

20  the -- all these being linked together.

21  BY MS. MOSKOWITZ:

22       Q.   All right.  All right.

23            Google also signed a Project Hug agreement

24  with Riot in 2020; is that right?

25       A.   Yes, that is correct.

HIGHLY CONFIDENTIAL

Page 285

1      Q.   And you were personally involved in the
2   negotiation of that deal?
3      A.   Yes, I was involved.
4      Q.   And as we discussed earlier, Riot was, in
5   fact, planning and told you it was planning to
6   launch its own Android app store?
7           MR. BRADSHAW:  Object to the form.
8           THE WITNESS:  Yes, they did tell us that
9   when we initially engaged with them.
10  BY MS. MOSKOWITZ:
11     Q.   And when were you initially engaging with
12  them?
13     A.   I -- I -- I -- I personally got -- got
14  involved during my first month at Google.
15     Q.   So early 2019?
16     A.   Yes, that is correct.
17     Q.   All right.
18          The next document will be loaded
19  momentarily as Exhibit 154.
20          (Koh Deposition Exhibit 154 was marked.)
21  BY MS. MOSKOWITZ:
22     Q.   Just give it a moment.
23          All right.  It should be in now.  Exhibit
24  PX 154 is Google Play 007035840 [as read] through
25  '5843.

HIGHLY CONFIDENTIAL

1           Let me know when you have that?

2      A.   Yes, I have it opened.

3      Q.   This is an e-mail chain in which you

4  participated on February 13th, 2020, and earlier?

5      A.   Yes, that is correct.

6      Q.   And you participated in this e-mail in the

7  course -- ordinary course of your business at

8  Google?

9      A.   Yes.

10     Q.   There's -- the top e-mail from February is

11 forwarding and discussing a March 2019 e-mail; is

12 that right?

13     A.   Yes, that is correct.

14     Q.   And you're summarizing here in the second

15 paragraph that "Riot was on the verge of becoming

16 the next major game company to follow Epic in

17 moving forward with an off-Play Android

18 distribution strategy."

19          Do you see that?

20     A.   Yes, I see that.

21     Q.   And you said that you offered a Hug-like

22 deal to convince Riot to change that strategy;

23 right?

24     A.   Yes, that is correct.

25     Q.   And you also report that, at the time, you

1    didn't ask them for any contractual commitments of
2    ship -- sim-ship or any feature parity because you
3    were focused on getting Riot to shift away from
4    launching an off-Play Android distribution
5    platform; right?
6             MR. BRADSHAW:  Object to the form.
7             THE WITNESS:  Yes.  We felt that Riot
8    didn't have a full understanding of all the value
9    and benefits that Google Play provides, so we
10   wanted to educate them on our value and benefits.
11   BY MS. MOSKOWITZ:
12       Q.   Well, what this says is that you didn't
13   try to get any commitments from them that you
14   ordinarily would seek from a Hug developer as part
15   of a deal because your main focus was making sure
16   that they did not go forward and launch their
17   off-play Android distribution platform; right?
18       A.   Yes, we felt that it was premature to talk
19   about a contractual commitment when we recognized
20   that Riot didn't have even just a general
21   understanding of all the value and benefits that
22   Google Play can provide as they were making that
23   decision to launch outside of Google Play.
24       Q.   So the priority was to stop them from
25   doing that, and then you could talk further about

HIGHLY CONFIDENTIAL

                                                      **Page 424**

1                          CERTIFICATE OF REPORTER

2                    I, Hanna Kim, a Certified Shorthand

3          Reporter, do hereby certify:

4                    That prior to being examined, the witness

5          in the foregoing proceedings was by me duly sworn

6          to testify to the truth, the whole truth, and

7          nothing but the truth;

8                    That said proceedings were taken before me

9          at the time and place therein set forth and were

10         taken down by me in shorthand and thereafter

11         transcribed into typewriting under my direction and

12         supervision;

13                   I further certify that I am neither

14         counsel for, nor related to, any party to said

15         proceedings, not in anywise interested in the

16         outcome thereof.

17                   Further, that if the foregoing pertains to

18         the original transcript of a deposition in a

19         federal case, before completion of the proceedings,

20         review of the transcript [ ] was [ ] was not

21         requested.

22                   In witness whereof, I have hereunto

23         subscribed my name.

24         Dated:  10th day

25                           Hanna Kim, CLR, CSR No. 13083

# Exhibit D6
# Public Redacted Version

# EXHIBIT 6

# Games Velocity Program
## V1 Business Impact Assessment. V2 Introduction
### December 2020

1

ATTORNEY CLIENT PRIVILEGED // REFLECTS LEGAL
ADVICE

GOOG-PLAY-004146689.R

## Contents

- **Games Velocity Program (GVP) Refresher**

- **GVP 1.0 Impact Assessment**

  - ▪ ███████████████████
  - ▪ ████████████████████
  - ▪ ███████████████████

- **GVP 1.0 x-Google Financial Assessment**

- **GVP 2.0 introduction**

2

ATTORNEY CLIENT PRIVILEGED // REFLECTS LEGAL ADVICE

2: x-Google value?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Games Velocity Program Refresher

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
GOOG-PLAY-004146691.R



[Refresher] GVP 1.0 Context: In 2019, Google Play's growth and business model faced risk due to increasing competitive intensity & the emerging app store "tax" meme

**Competitors Aggressively Pursuing Gaming**

**"App Store Tax" Meme Emerging**

**Apple and Google Face Growing Revolt Over App Store 'Tax'**

Opinion: Google's 30% cut of Play Store app sales is nothing short of highway robbery

**Risk: Top Developer Churn from Play**
- Play margin loss: $840M likely margin exposure in 2022 (cumulative ~$2 Bn+ in 2019-2022)

**Opportunity: Deepen relationships with top developers and grow cross-Google product adoption**

AC PRIVILEGED // REFLECTS LEGAL ADVICE



## [Refresher] GVP 1.0 Proposal: We developed 'Games Velocity Program', a commercial program to unify & boost Google's value proposition to target developers

### Cross-Google Service Packs + Partner Pods

**Build & Test**
- GCP credits
- Technical consultations

**Launch**
- Play 'Growth Consulting'
- Co-marketing campaigns
- Play Store featuring
- YT influencers

**User Acquisition**
- Ads credits
- Ads consultations & ML integration

**Community Development**
- eSports tournaments & gaming events
- YT channel growth
- eSports sponsorships

**x-PA Partner Pod**

### Google Gives

- x-PA service pack support, including associated funding and services

### Google Gets (contractual)

- **Title distribution on Play** (titles must sim-ship on Play at launch)
- **Content & feature parity on Play**

5

AC PRIVILEGED // REFLECTS LEGAL ADVICE

**[Refresher]** GVP 1.0 Target Developers: GVP targeted 21 major game developers



**Drive disproportionate value to Google**
(e.g. ~20% of total Play consumer spend)

**Beacons of the ecosystem**

**Expressed discontent over lack of unified support from Google**

**May forgo Play (& Android)**
- Upcoming major new title launch
- Difficulty delivering hi-fidelity games on Android
- Capabilities to 'go-it-alone' on Android

Full Partner List

AC PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





## [Refresher] GVP 1.0 Goals, Non-Goals & Success Metrics

### Desired Developer Objectives

| Goal 1: Prioritize Play Users | Goal 2: Boost x-PA Product Adoption |
|---|---|
| **Ensure Play users are not disadvantaged** | **Unlock xPA value for partners & Google** |
| ■ Launch on Play on "day 1" of mobile launch<br>■ Co-invest in promoting Play title<br>■ Improve game quality and device reach<br>■ Maintain game parity across platforms | ■ **GCP:** win-rate acceleration; ARR increase, marquee titles on GCP<br>■ **YouTube:** mobile gaming watchtime uplift, Mobile gaming upload + creator uplift<br>■ **Ads:** UAC growth acceleration; best practice adoption |

**Goal 3: Improve Developer Sentiment**

**Non Goals:** Play exclusivity, drive additional xPA integrations (eg: [redacted]), xPA spend commitments

AC PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



product commits? Better than expected?
Link to source

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



GOAL 1: Prioritize Play Users

HOLDING OUT

is signing up to GVP obligations on a title by title basis due to their publisher led business model    ATTORNEY CLIENT PRIVILEGED // REFLECTS LEGAL ADVICE    10

GOOG-PLAY-004146698.R



**Cloud Deals:**



**TOTAL: ██M. Incremental: ████M**

**Cloud KPI Definitions:**
**-ARR acceleration: Defined as average YoY growth between BC 5-year total: $████**
**HUG BC 5-year total: $██████ and HUG new projected 5-year total: $████.**
**-Win-rate acceleration: Defined as conversion percentage increase from BC %.  BC**
**conversion was ██% w/o HUG and ██% with HUG ████████ = ██%. Already signed**
**12 out of 18 developers so ██% conversion. Estimating conservatively at ██%**
**through program duration. ████████ = ██%.**
**-Marquee titles on GCP: Defined as number of marquee titles on GCP from signed**
**developers. 9 titles include"**
**>> ████████████████████ migrating from ████**
**>> ████████████ - Expected to 13x spending**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

>>  - new customer

>> █████████████████████████████ and new title

>> ███████████████████ - Expected to 40x spending

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    GOOG-PLAY-004146700.R





[redacted]

**Qualitative assessment by BDMs**

- Outside of [redacted] singularly focused on rev share reduction, conversations with other partners has materially shifted from rev share to xGoogle opportunities.
- Some concern remains, given broader ecosystem-level agitation around app store business models.
- Significant uplift in xGoogle investment

Negative
Neutral
Positive

13

AC PRIVILEGED // REFLECTS LEGAL ADVICE

**GOAL 3: Improve Developer Sentiment**

## Beyond GVP - Quantitative assessment of partnership health* by xPA Finance teams

| [redacted] | | | | | | Comments |
|---|---|---|---|---|---|---|
| | 100% | 125% | 13183% | 34% | 13276% | Public appreciation about partnership with Play |
| | 108% | 38% | 27% | 42% | 91% | |
| | 56% | 842% | 90% | 114% | 61% | Launched Battle Pass subs exclusively on Play |
| | 29% | 245% | 141% | 59% | 58% | |
| | 54% | -39% | -2% | 21% | 54% | Strategic partnership with [redacted] |
| | 49% | 31% | 63% | 28% | 51% | CEO expressed excitement about expanding xGoogle partnership via GVP |
| | 38% | 13% | 211% | 83% | 38% | Multiple exec quotes on strength of GVP partnership |
| | 24% | 314% | 24% | 375% | 30% | *Signing in Q4 2020* |
| | 5% | 22722% | 181% | 14% | 24% | |
| | 8% | 224% | 97% | -22% | 20% | |
| [redacted] | | | | | | |
| | 8% | 34% | 205% | 21% | 13% | Extending GVP deal by +2 years to lean into GCP |
| | 4% | 887% | -17% | -3% | 10% | Reinvested GVP incentives to return to Play growth |
| | 10% | 54% | 8% | -31% | 10% | Changed launch processes to support GVP partnership |
| | -4% | 4% | 7% | 29% | -4% | |
| | -10% | 3021% | 107% | 42% | -4% | Stepped up exec relationships with Google |
| | -18% | 0% | 100% | 21% | -18% | |
| | -28% | 5410% | -50% | 93% | -26% | |
| | **23%** | **75%** | **85%** | **37%** | **32%** | |

<0% | 0%-10% | 10% - 50% | 50% - 100% | >100%

* xPA Finance assessment of developer investment with Google; not entirely attributable to GVP, but supported by GVP



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146704.R





## Google-wide ROI shows positive contribution of [redacted]

| | | 2019 | 2020 | 2021 | 2022 | | 2019-2022 |
|---|---|---|---|---|---|---|---|
| | Play Risk Mitigation | [redacted] | | | | | |
| Margin from Inc. Revenue | Ads | | | | | | |
| | Cloud | | | | | | |
| | Attributable Margin | | | | | | |
| Cost to Serve GVP Credits | Ads | | | | | | |
| | Cloud | | | | | | |
| | Marketing | | | | | | |
| | YT- esports + [redacted] | | | | | | |
| | Forecasted | | | | | | |
| | Total Cost to Serve | | | | | | |
| | Margin Net of Cost | | | | | | |
| | ROI | | | | | | |

*Call outs:*

**Ads**

- While Ads margin is -ve, incrementality from GVP surpasses BC expectations

**Cloud**

- [redacted]f incr. rev (from large commits) and high adoption make GCP credits margin +ve for GVP

**YouTube**

- YT costs are front-end weighted, with [redacted] of [redacted] package hitting 2020

**Assumes GVP at 5% reinvestment continues beyond 2020

As a result, GVP has been effective at mitigating margin loss risk from off-Play distribution

[redacted]

Better than expected risk mitigation with GVP investments improving sentiment towards Play

Developers prioritized Play users while launching new titles

Developers maintained feature and content parity for titles across platforms

1) Benchmarked operating metrics through July 2020 against risk milestones for FY2022

Mitigation driven by (1) signed developer spend under sim-ship contract, (2) other stores and (3) ) other devs (halo effect)
For more information on methodology of calculation, see here

GVP 1.0 is ROI positive even without ███ Play risk mitigation; outsized ███ investments diluted overall returns. 7/18 deals are positive, 3 more likely to be.



Program ROI positive even without ███ Play risk mitigation

Comarketing investments of ███ (over 2019-2024) expected to recoup ██ of invested value

██████ expected to sign incremental GCP commits ████ and turn ROI +ve

███ esports investment with ███ adversely impacted and program ROI

1  Ads has attributed GVP margin upside for the duration of the credits (2020 for most devs, 3 years fo ██████ of UAC margin uplift in 2019, and ██ thereafter
2  GCP has attributed GVP margin upside until 2024, due to commits secured via GVP, as well as long term nature of GCP partnerships
3  GCP upside does not yet include Play revenue deferrals to Cloud of ████ towards Cloud credits.  CloudPA would recognize this revenue upon credit utilization by developer
4  GVP will mitigate Play margin risk worth ███ by 2022

18

GOOG-PLAY-004146707.R



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



product commits? Better than expected?
Link to source

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    GOOG-PLAY-004146709.R



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146710.R



What we learnt

## GVP2.0 framework: Refine GVP 1.0 service packs; simplify operations; bolster consults, YT-Play engagement/features

| Service Pack | Developer Sentiment impact from GVP | | | ROI from Commercial Offers | Comments |
|---|---|---|---|---|---|
| | Commercial Offers | Consulting Offers* | Operationa l Delivery | | |
| Build & Test | | | | | [redacted] |
| Launch | | | | | |
| UA | | | | | |
| Community | | | | | |

**Build & Test:** GCP credits, GCP consultations, DevRel Consultations

**Launch:** Play featuring, G. Consulting, Comarketing, YouTube influencers

**User Acquisition:** UAC credits, Ads SVAs

**Community Dev.:** YouTube Channel growth, esports sponsorships & events

DRAFT 2

* Play featuring and PCO support has been included as part of Launch Consulting offers





## GVP 2.0 Proposal: Builds on GVP 1.0 and extends term to three years to deepen partnership with devs that matter most to our users.

**Cross-Google Service Packs + Partner Pods**

| Build & Test | Launch & Grow | User Acquisition | Community Development |
|---|---|---|---|
| • GCP credits<br>• Technical consults (DevRel)<br>• **Play Tech Solutions Consults** | • Play 'Growth Consulting'<br>• Co-marketing<br>• Play Store featuring<br>• YT influencers<br>• **Play Points, Promos** | • Ads credits **as AIP**<br>• Ads consultations & ML integration | • eSports tournaments & gaming events<br>• YT channel growth<br>• eSports sponsorships<br>• **Play - YT features, Project Ally** |

x-PA Partner Pod, with simplified ops

**Google Gives**

[redacted]

**Google Gets (contractual)**

[redacted]

**Blue items are new**

23

AC PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GVP delivered +ve Google margin while addressing dev sentiment; **if Runway addresses commercial concerns, could a limited but complimentary GVP drive xGoogle upside?**



**GVP** offered at ███ & met the following 3 objectives:

**Improve Sentiment** : decrease rev share agitation

**Prioritize Play** : devs launch on Play along with other platforms

**Increase xPA Adoption** : xPA incentives to grow Google footprint; ████ **incremental Google margin** against investment of ███

**Runway** may address 2/3 objectives:

**Improve Sentiment**: Addressed via reduced rev share

████ Runway may help address off Play monetization; however, without GVP we lose our ability to guarantee simship

**Increase xPA Adoption**: Without GVP, we lose our ability to create any "net new" Google upside and reduce Program cost

ATTORNEY CLIENT PRIVILEGED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**A limited GVP should anchor towards Google uplift; lead with tactics driving maximum ROI – double down on GCP, integrate Play Loyalty, ask for strategic product adoption**

| GVP tactic | Impact on ROI | Continue? | Comments |
|---|---|---|---|
| Ads | Neutral | | Program pivoting to AIP, however, expected to remain ROI neutral |
| Cloud | Positive | | Conditional to new / incremental GCP commit |
| Play* | Expected Positive (NPU, Buyer Retention, Product adoption) | | Offer Play investments linked to Play objectives, e.g., Loyalty, Strategic product adoption |
| YouTube | Presence Grants: Unknown esports rights: Negative | | YouTube helpful in improving developer sentiment, but is largely ROI negative |
| Marketing | Custom campaigns: positive Others: negative | | Unlink comarketing from GVP; continue supporting tentpole launches |

* Play did not have a commercial tactic in GVP. We are evaluating adding commercial tactics as part of GVP 2.0

ATTORNEY CLIENT PRIVILEGED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Evolve GVP as a Play+Cloud incentive program for top game developers; eligibility criteria expand beyond Play metrics to also address Cloud opportunity**

| "New" GVP = Play + Cloud enterprise developer program | |
|---|---|
| Google Gives | Google Gets |

**Eligibility criteria**: expand GVP criteria beyond Play metrics to include qualifiers for GCP opportunity

\* X to vary by developer based on what may drive best Google returns

ATTORNEY CLIENT PRIVILEGED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146717.R



er

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



GVP 2.0: Build on GVP 1.0 success, address gaps & focus on joint growth

product commits? Better than expected?
Link to source



## Comparing programs

| | GVP 1.0 | GVP 2.0 |
|---|---|---|
| Program Objective | Mitigate Play distribution risk | Incentivize joint growth |
| Eligibility criteria | **PC/Console Devs**<br>Lifetime Revenue of IP [redacted]<br><br>**Play Devs:**<br>Lifetime Spend [redacted] OR<br>Lifetime Spend [redacted] and growing [redacted] YoY | **PC/Console Devs**<br>Lifetime revenue of IP [redacted]<br><br>**Play Devs**<br>Lifetime Spend = [redacted] growing [redacted]<br>Lifetime Spend = [redacted] growing [redacted] |
| # of developers | [redacted] | [redacted] |
| % of Play Spend covered | [redacted] | [redacted] |
| Google Gives | **Commercial:**<br>Ads credits: [redacted] of eligible UAC spend, capped<br>GCP credits - [redacted] of Play Consumer Spend, uncapped<br>Comarketing - fixed allocation<br>YouTube Presence Grants - fixed allocation<br>eSports rights / sponsorships - fixed allocation<br><br>**Consultative**<br>Ads consulting, GCP consulting, Play business consulting, DevRel consulting | **Commercial:**<br>Ads credits: nn% of incremental UAC spend, capped (AIP Program)<br>GCP credits - [redacted] of Play Spend, uncapped<br>Comarketing - % of Play Spend, uncapped<br>YouTube Presence Grants - % of Play spend, uncapped<br>eSports rights / sponsorships - % of Play spend, uncapped<br><br>**Consultative**<br>~~Ads consulting,~~ GCP consulting, Play business and tech consulting, DevRel consulting |
| Google Gets | [redacted] | [redacted] |
| % investment | [redacted] of respective Play Consumer spend | [redacted] of respective Play Consumer spend |
| Term | [redacted] | [redacted] |
| Play Margin investment | $nnnM over three years:<br>$nnM to extend 1 year incentives to three for select devs | $nnnM over three years, $nnM in 2021 |
| Google Upside | $nnnM over three years: | Estimated... |

33



We are ran an effort to examine new Play GVP capabilities against a few main criteria

Live or in-flight

Measurable incrementality

...could go into contract with developers

...and we're pursuing three main focus areas for inclusion within GVP

**Google Play Points**

Exclusive spotlight campaigns for GVP partners (e.g. 10x Play Points promotion) to help drive incremental spend

**Battlestar**

Including language specific to the adoption of Battlestar can help align B* goals with GVP developers

**NBU localization incentives (bounty model)**

Devs can earn incentives if they create programmatic, localized investments in under-served frontier markets that speed up buyer growth

Attorney Client Privileged & Confidential

## Discussion

| Summary |
|---|
| **GVP 1.0 is working,** has helped mitigate off-Play distribution risk and had deepened overall developer partnership with Google |
| **Several major GVP gives expire in 2020 EOY** (except for GCP) and developers are actively asking for extensions. |
| **GVP 2.0 builds on the successes of 1.0,** actively addresses gaps, and shifts goals from off-Play risk to joint growth.  Extends term to three years to deepen partnerships. |

| Open questions |
|---|
| **Project Runway -** are there concerns about extending term to three years given Project Runway plans? |
| **AVP -** other PAs are getting wary of xPA deals - Cloud as AVP deals could have larger contra impact on them. Ads due to negative (albeit small) ROI.  Is this still the right approach? |

ATTORNEY CLIENT PRIVILEGED // REFLECTS LEGAL ADVICE          35

Play GVP cost > Google cost by ██████ mainly due to Play deferrals to GCP (<u>not</u> reflected in GCP upside)
GCP expects to recognize this revenue upon credit utilization by developer



36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146725.R



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146726.R



**Reduce words.**

**But developer+ partnership story first, then follow up with what it results in (and why it's good for) for the user.**

**Lead with the rationale, then follow with WIP ideas.**

**Add more examples of types of ideas.**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Break up by parties (dev, carrier, google), underneath is what they contribute**

**What they get out of it**

**Focus Slide 7 on the user centric view**
**Slide 7 on the developer centric view**

**Two ideas here -- include a bunch of ideas so we aren't pigeon-holed into the presented ideas if Nick / Sameer doesn't like it.**

**Set expectations with Nick / Sameer**



Explore the world of ████████████, interact with characters in augmented reality and capture your very own scenes to share with friends

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





## GCP Impact Analysis - Summary

| | Projected | Actual |
|---|---|---|
| [redacted] year Spend commits | N/A | [redacted] |
| *ARR acceleration* | [redacted] | |
| *Marquee titles on GCP* | XX | |

*BC Metrics*

### Key Highlights

- [redacted] receiving GCP credits via Hug
- Hug helped sign deals with [redacted] **of the top** [redacted] **developers** collectively expected to spend [redacted] on IT in 2021
- Helping devs expand x-platform GCP footprint in Gaming
- Deals expected to deliver **higher longer term upside** to Google due to sticky nature of Cloud partnerships

### Key Learnings

- Allowing commits & Hug credits to coexist was crucial to close large deals
- Need to spend time thinking about nuances of Cloud ecosystem, e.g. resellers, local taxes
- Highly operational & resource intensive; need to invest in standardizing approvals and operations

41

ATTORNEY CLIENT PRIVILEGED // REFLECTS LEGAL ADVICE

[redacted]

**GCP spend commit deals, including incremental attributable to Hug**



42

ATTORNEY CLIENT PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146731.R

The Gaming vertical has significant upside for GCP



**Insights**

- ▇▇▇ developers expected to deliver ▇▇ in IT spend in 2021. HUG helped GCP negotiate or sign a deal with ▇▇▇▇ developers

- **First-mover advantage is critical** in the gaming, once developer migrates a game or large workload, they are likely to remain entrenched on platform

- Gaming developers have **significant upside.** Usually **under-commit to GCP** (up to ▇▇▇) due to:
  - ○ Uncertainty about game launch timelines
  - ○ Existing contracts with AWS and unfamiliarity with GCP

- Offering GCP commits allows developers to feel **more comfortable migrating larger workloads** since incentives greatly exceed other Cloud offers

- A GCP commit offers **guaranteed return on HUG credits and ensures 1 or 2 large workloads will reside on GCP** ▇▇▇ uplift from standard GCP discounts, ▇▇▇ uplift from HUG w/o commit)

43

Google Play



YouTube Impact Analysis - Summary

| | Projected | Actual |
|---|---|---|
| *Mobile Game Watchtime* | ███████ | ████████ |
| *Creator / Upload Uplift* | XX | █████████ |
| *Sentiment* | XX | ███ |

*BC Metrics*

**Key Highlights**

- Presence grants enabled positive engagement with developers on content strategy & planning
- Most developers increased their YouTube content uploads / creator engagements / YouTube presence
- Funds being used across a variety of initiatives - live events, creator academies, community days

**Key Learnings**

- Longer than expected lead times, however useful foundational work and testing done with most devs
- Title popularity impacts effectiveness of funds; Riot and ███ saw decline in content creation / audience due to title popularity / age

44

ATTORNEY CLIENT PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



BC assumption of uplift was equivalent to [redacted] of released credits [redacted] actual)
- actual uplift range of [redacted] based on analysis performed
Note: Incrementality results obtained via 2 separate goliath analyses, and a CausalImpact analysis

Automate credit distribution via build of new payments tool to shift from manual credit memos to automated coupons



Note: Based on incrementality study, ████████████████████ is attributable to Hug, with the remaining █████ due to other factors.

Note: ████████████████████████████████████████
████████████████████████████
████████████████████████████████████
████████████████████████████████
██████████████████████████████████████████
█████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Ads Incrementality Analysis - Changes from Mar-20

- The total inferenced uplift attributable to Hug has **increased from** [redacted], based on the refreshed incrementality models with an additional 3 months of data *(all other variable held constant)*
- The additional uplift has **improved the ROI**, however, we are still **ROI negative** for the standalone Ads P&L

[redacted]

- Overall payout ratios need to be **reduced** if want Ads to be ROI neutral, or positive under this program
  - For reference, for **ads-only** AIP deals, the payout range is between **1-3%** (ROI 4-9x)

[redacted]

47

Avg credit earn rate through Jun-20 was [redacted] of total UAC spend (Hug was [redacted] on QS-only), so we still have a large gap from what we currently hold ads-only programs to



Time Period (mo) : Pre Hug = Post Hug: For example, a contract signed in Nov-19 ████████ is active 8 months as of Jun-20.  Therefore, pre-hug revenue is Mar-19 to Oct-19 (-8 months) and post-hug revenue is Nov-11 to Jun-20 (+8 months)

Note: ████████████████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████

[Refresher] Target Developers: GVP targeted 21 major game developers



GOOG-PLAY-004146738.R



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



GOAL 3: Improve Developer Sentiment

# Post-GVP, conversations shifted from Play's rev share to value creation with Google; developers deepened partnerships with Play

**Reduced Commercial Pressure**
(Developers no longer vocally agitating, or asking for rev share cuts)

Pre GVP → Post GVP

**NO new inquiries on revenue share** from developers who signed GVP[1]

Developers focused their growth efforts on Play

Riot launched on Play in recognition of the xGoogle value

[redacted]

**Improved Play Partnerships**
(Developers partnering deeply with Play on strategic initiatives)

Pre GVP → Post GVP

Developers **improved Play partnership** with increased participation in Play growth consulting, pilots etc

GVP deepened Play relationships with previously cautious developers like [redacted]

[redacted] Play's PC gaming strategy

1 Supercell who has not signed GVP is the only remaining rev share agitator

ATTORNEY CLIENT PRIVILEGED // REFLECTS LEGAL ADVICE 51



Program - results - roi external - roi internal - sentiment tracker



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | | GVP 1.0 | GVP 2.0 (proposed) |
|---|---|---|---|
| **Program Setup** | Eligibility criteria | ███████████ | ███████████ |
| | # of developers | 21 | 11 |
| | % of Play Spend covered | 22% | 18% |
| | Program Objective | Mitigate Play distribution risk | Incentivize joint growth |
| **Program Framework** | Google Gives | ███████████ | ███████████ |
| | Google Gets | ███████████ | ███████████ |
| **Program Financials** | Play % reinvested | ███████████ | ███████████ |

56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146745.R



**GVP 1.0 is ROI positive even without ███ Play risk mitigation; outsized ███ ████████. 7/18 deals are positive, 3 more likely to be.**

Program ROI positive even without ███ Play risk mitigation

Comarketing investments of ██████ (over 2019-2024) expected to recoupe ████ of value not reflected in ROI

███████████ expected to sign incremental GCP commits ████████) and turn ██

1   Ads has attributed GVP margin upside for the duration of the credits (2020 for most devs, ███████████ of UAC margin uplift in 2019, an██ thereafter
2   GCP has attributed GVP margin upside until 2024, due to commits secured via GVP, as well as long term nature of GCP partnerships
3   We are evaluating upside driven by Comarketing; while ROI is not +ve, we have recouped X% of comarketing investments which do not reflect in the chart above

57



product commits? Better than expected?
Link to source

BC narrative

59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
GOOG-PLAY-004146748.R

You approved GVP in April 2019; since then we have signed up 19/21 target devs; GVP met GVP's its objectives and success metrics

| GVP approved in April 2019 | GVP met its objectives | GVP exceeded most success metrics |
| --- | --- | --- |
|  |  |  |

60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146749.R

GVP created xGoogle value; developer sentiment improved, leading to better than expected risk mitigation; however, risk goalpost shifting from distribution to payments

| Developers improved sentiment & deepened xGoogle relationships | GVP mitigated more than expected risk | Risk definition is now evolving to off Play payments |
|---|---|---|
| | | |

61

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    GOOG-PLAY-004146750.R

Proposal: 1. expand & pivot GVP to an enterprise game-dev program 2. link incentives to Google upside 3. secure SKU and/or Price parity to address Play payments risk

| Offer GVP to enterprise game developers | Link incentives to Google upside; fix service packs to anchor on ROI | Address Play payments risk by securing SKU and Price parity |
|---|---|---|
| | | |

62

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146751.R

·····

63

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
GOOG-PLAY-004146752.R



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146754.R



product commits? Better than expected?
Link to source

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Build on GVP 1.0 success by expanding Developer reach & focusing on joint growth

| Implement Learnings from GVP 1.0 | Continue to foster Developer Retention | Double down on Joint Growth areas |
|---|---|---|
| • Address ROI gap in Ads offer<br>• Bolster consults, Play-YT engagement, features<br>• Simplify operations<br>• Expand from 1-year to multi-year deals to deepen partnership | • Keep leveraging GVP to address continuing top developer concerns<br>• Evolve GVP goals beyond simship to also focus on joint growth, as risk evolves from off-Play distribution to payments | • Double down on GCP credits<br>• Drive joint growth by aligning incentives with growth targets<br>• Support Android/Play platform growth by including product integration requirements<br>• Leverage investment in Play Points, Promos<br>• Continue to improve sentiment |

ATTORNEY CLIENT PRIVILEGED // REFLECTS LEGAL ADVICE 67

product commits? Better than expected?
Link to source

| Id | Date | Text |
|---|---|---|
| 3 | 02/04/2021 03:02:55 | This is too vague I'm not sure what you're trying to convey... do you mean: Utilize GVP partnership to address continuing top developer concerns |
| 7 | 02/04/2021 03:04:32 | Something like this also leads nicely into the next slide that intros new developers |
| 4 | 02/04/2021 03:17:42 | @kgkaran@google.com<br>Took a stab at this slide. Reshuffled/reorganized a bit.<br>We can discuss tomorrow. |
| 2 | 02/04/2021 03:18:50 | (just reconciling with the previous success slide that highlights margin improvements for Ads) |
| 5 | 02/04/2021 03:25:13 | I'm being extra careful with wording here (it's risk) |
| 6 | 02/04/2021 03:25:13 | But also Divya's wording is pretty clever. As we want to retain Developers using our services aka billing platform. |
| 1 | 02/04/2021 17:46:39 | How come Ads has great margins but negative ROI |
| 1 | 02/04/2021 17:46:39 | They reevaluated... earlier breakeven was calculated as ██ , but has been revised to ██ (breakeven is now defined at ██ in credits). Also, the ROI is based on "incremental" growth minus cost of credits, so while margins overall are great, cost of credits largely balances out incremental growth |

68

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004146757.R

# Exhibit D7
# Public Redacted Version

# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | **Case No. 3:21-md-02981-JD** |
| THIS DOCUMENT RELATES TO | Judge: Hon. James Donato |
| *Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | |

**OPENING EXPERT REPORT OF B. DOUGLAS BERNHEIM, PHD**

**October 3, 2022**

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

Opening Expert Report of B. Douglas Bernheim, PhD

Play," meaning no early release or pre-registration period on a competing app store.[1014] The document further states that ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████. [1015]

(441)   Finally, it is worth noting that Project Hug targeted many of the largest developers that Google considered most likely to go off Google Play.[1016] For example, a 2019 Google presentation titled "Project Hug: Risk & Leakage Model" describes Google's "major working hypotheses and assumptions" about developers as follows:

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████
██████████████ [1017]

(442)   Another Google presentation from April 2019 titled "Boosting Top Game Developer Support & Securing Play Distribution on Samsung Devices" describes the characteristics of "target developers":

████████████████████████████████

███████████████████

████████████████████████████████████████████

████████████████████ [1018]

(443)   The ████████████ Project Hug agreements, discussed in Section V.B.3.a, would also prevent a Hug developer from exclusively launching its content to differentiate any app store it may develop.[1019]

---

[1014] GOOG-PLAY-004146689 at -6697 (PX 0384) (December 2020 presentation titled "Games Velocity Program").

[1015] GOOG-PLAY-004146689 at -6706 (PX 0384) (December 2020 presentation titled "Games Velocity Program").

[1016] See additional detail in Section V.B.3.a.

[1017] GOOG-PLAY-000005203 at -5216 (February 2019 presentation titled "Project Hug: Risk & Leakage Model").

[1018] GOOG-PLAY-003332817 at -2830 (PX 0136; PX 1455) (April 2019 presentation entitled "Boosting Top Game Developer Support & Securing Play Distribution on Samsung Devices").

[1019] See Section V.B.4.c for a discussion of Hug developers, such as ABK and Riot, contemplating launching their own app stores or going off-Play.

Opening Expert Report of B. Douglas Bernheim, PhD

_____                    October 3, 2022
_____
B. Douglas Bernheim, PhD                                   Date

# Exhibit D8
# Public Redacted Version

# EXHIBIT 15

| Message | |
|---|---|
| **From:** | Karen Aviram Beatty [kaviram@google.com] |
| **Sent:** | 10/30/2019 6:28:19 PM |
| **To:** | Purnima Kochikar [kochikar@google.com]; Shanna Prevé [shanna@google.com] |
| **CC:** | Sunil Rayan [sunilrayan@google.com]; Marc Theermann [theermann@google.com]; Ryan Wyatt [rwyatt@google.com]; Erica Larson [larsone@google.com]; Lawrence Koh [lawrencekoh@google.com]; Vince Abney [vabney@google.com]; Jeff Birnbaum [jbirnbaum@google.com] |
| **Subject:** | Zeitgeist updates re ▇▇▇▇▇▇▇▇ |

Hi team,
I spent a good amount of time with Armin at Zeitgeist.  Shanna and Purmina (and Don) also had separate conversations with Armin.

Armin mentioned to me that we all had consistent messaging (ie rev share will not change), but it did feel like he was testing us!  So, thanks to you all and let's please continue to keep our strong communication lines open so we can also continue to be on the same page.

Some notes from my conversation with Armin:
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ He reiterated the fact older titles get less value on Play vs new titles.
Marc - Could you/Alex can help with this and we can look at the numbers differently?  For example, can we put ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
conversations in the next week or two but need a concrete proposal ASAP before we miss our chance/time window.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ I asked him if this was a done deal ... and sounds like it's not (ie they are still weighing the need).  He responded that this decision is dependent on if they can find the right deal/solution with us.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

- They are planning to make a decision on Cloud, Platform, Ads **BEFORE the holidays**.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇ ▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Shanna met with Armin after these comments and had a productive chat to address these concerns.  They are going to work on a Stadia structure together for an updated proposal and working on a follow up meeting (~Nov 15).


<u>@Purnima Kochikar</u>   Would love to hear your takeaways from your conversation with Armin as well.

<u>@Shanna Prevé</u> I think I summarized your status per our other email, but feel free to add any other color Armin may have mentioned about the other PAs.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Thanks all,
Karen

Karen Aviram Beatty | Managing Director, Global Partnerships | kaviram@google.com | Direct:
212-565-5961 Mobile: 917-284-8411

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit D9
# Public Redacted Version

# EXHIBIT 23

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>Epic Games Inc. v. Google LLC et al., Case No. 3:20-cv-05671-JD<br><br>In re Google Play Consumer Antitrust Litigation, Case No. 3:20-cv-05761-JD<br><br>State of Utah et al. v. Google LLC et al., Case No. 3:21-cv-05227-JD<br><br>Match Group, LLC, et al. v. Google LLC, et al., Case No. 3:22-cv-02746-JD | Case No. 3:21-md-02981-JD |

**EXPERT REPORT OF CATHERINE E. TUCKER**

**NOVEMBER 18, 2022**

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

b. The Schwartz Report claims Google "[is] not constrained by the possibility of OEMs developing their own mobile OSs."[704] However, this report does not conduct an actual SSNIP test.[705]

370. This is similar to the assertion in the Bernheim Report that justifies much of the empirical machinery that follows, which states: "In response to a SSNIP (or equivalent quality degradation) involving third-party OSs for Android smartphones, OEMs would not create their own OSs. Any such endeavor would be prohibitively costly, complex, and risky," and adds that "[e]ven if the economic burden of a SSNIP involving third-party OSs fell on users of third-party OS smartphones, those users would face high costs of switching to an iPhone or another computing device[.]"[706]

371. The Bernheim, Singer and Schwartz Reports list a number of unsuccessful attempts to create a new smartphone operating system and note that since 2015, there has been "no commercial release of a new third-party smartphone operating system outside of China."[707]

372. However, these assertions show that an operating system is indeed expensive and difficult to build in as high a quality an ecosystem as Android has, and that by investing in this enterprise, Android has allowed handset manufacturers, as part of the Android ecosystem, to compete effectively with Apple.

**C. Plaintiffs' Separation of the Android App Distribution and In-App Payment Processing Markets is Flawed**

*1. Plaintiffs' Definition of Single Components of the Android Ecosystem as Separate Markets Leads to Flaws in Their Alleged Market Definition Exercises*

373. Plaintiffs' expert reports seek to define separate markets for Android app distribution and in-app payment processing.

a. The Tadelis Report defines a market for "In-App Payment Solutions." The Tadelis Report goes on to compare the Google Play store's fees to the fees charged by third-party payment processors such as PayPal, Stripe, Square, and Braintree.[708] In addition, the Tadelis Report

---

[704] Schwartz Report, ¶ 204.
[705] Schwartz Report, ¶ 175.
[706] Bernheim Report, ¶ 145.
[707] Bernheim Report, ¶ 148. *See also* Singer Report, ¶ 59; Schwartz Report, ¶ 204.
[708] Tadelis Report, ¶¶ 37-38.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

adopts the Bernheim Report's opinion that "the market for Android App Distribution is a relevant antitrust market."[709] The Tadelis Report states: "the Android In-App Payment Solution market is a distinct, standalone market and one that is separable from Android app distribution services."[710]

b.   The Schwartz Report defines a market for "IAP Processing." The Schwartz Report agrees with Match Plaintiffs that there is "a relevant market for service providers that process payments for digital content within Android apps."[711] In addition, the Schwartz Report claims that the Android App Distribution is a relevant market stating that the "Android digital IAP processor market is downstream of, but distinct from, the Android app distribution market."[712]

c.   The Rysman Report defines a market for "In-App Billing Services." According to the Rysman Report, "Android in-app billing services … includes receiving payment and authorizing the unlocking of purchased in-app content and may also include invoicing, payment history, and refund processing.[713] In addition, the Rysman Report defines a separate market for Android App Distribution arguing that the "market for Android in-app transactions is separable from the market for Android App Distribution."[714]

d.   The Singer Report defines a market for an "In-App Aftermarket."[715] In defining the alleged aftermarket, the Singer Report states, "[t]o provide In-App Content, developers must be able to authorize consumers to use such content and consumers must be able to pay for it … distribution of In-App Content is not complete until the consumer can use those items, and that does not occur until payment is processed and the feature is unlocked."[716] In

---

[709]   Tadelis Report, ¶ 88, ("For the purposes of my analysis, I adopt Dr. Bernheim's opinion that the market for Android App Distribution is a relevant antitrust market. I have reviewed Dr. Bernheim's report and find it to be persuasive and consistent with my own views, but I offer no independent opinion on this point."), citing Bernheim Report, Section III.E.

[710]   Tadelis Report, ¶ 127.

[711]   Schwartz Report, ¶ 289.

[712]   Schwartz Report, ¶ 196-198, ("Match Plaintiffs allege that three markets are relevant to the analysis of the claims in the Complaint …b. Distribution of Android Apps … I analyze each of these alleged relevant markets … The analysis below demonstrates that each of these markets are relevant markets for purposes of this case.").

[713]   Rysman Report, ¶ 238.

[714]   Rysman Report, ¶ 277, ("I find the Android In-App Billing Services Market worldwide excluding China is a relevant antitrust market. The market for Android in-app transactions is separable from the market for Android App Distribution to the extent that third-party billing service providers and developers' own billing systems sufficiently meet developers' demand for Android in-app billing services and are considered as substitutes for Google Play Billing.").

[715]   Schwartz Report, Section 11; Tadelis Report, Section V.C; Rysman Report; Singer Report.

[716]   Singer Report, ¶ 142.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

addition, the Singer Report identifies as a distinct relevant market the "Android App Distribution Market, defined as the market for the sale and distribution of Apps for Android mobile devices,"[717] and claims that "the Android App Distribution Market and In-App Aftermarket are economically distinct."[718]

374.    For numerous reasons, Plaintiffs' expert reports' definition of separate markets does not make economic sense and mischaracterizes competitive realities faced by Google.

375.    First, as I explained in Section III.D, defining a market limited to app distribution results in a market that consists almost entirely of free products. This is because only ██% of downloads on the Google Play store in the United States from August 2019 to May 2021 were paid, meaning Google does not charge a service fee for most downloads.[719] Indeed, in 2021, just ██% of U.S. consumer spending on the Google Play store was for paid app downloads.[720] The fact that Plaintiffs' expert reports' proposed Android app distribution market consists almost entirely of free products suggests that this market definition fails to reflect important competitive realities regarding the Google Play store. While Plaintiffs' expert reports contend, as discussed in Section VIII, that Google is earning supracompetitive profits from the Google Play store by harming consumers in the Android app distribution market, they exclude virtually all of the monetized transactions from their analysis.

376.    Second, Plaintiffs' expert reports define a market for transactions in which developers use a particular monetization strategy (in-app payments) and in which transactions with alternative monetization strategies, or none at all, are excluded. However, as a matter of economics, a relevant antitrust market must include relevant transactions that are sufficiently substitutable to competitively constrain the focal firm's conduct. For example, users can use apps such as

---

[717] Singer Report, ¶ 86 ("In this section, I demonstrate that the Android App Distribution Market, defined as the market for the sale and distribution of Apps for Android mobile devices, is a distinct relevant antitrust market.").

[718] Singer Report, ¶ 87.

[719] App-level spend data, Consumers, GOOG-PLAY-005535886 and GOOG-PLAY-010801688; Monthly Aggregate Installs by Country, GOOG-PLAY-007376326. This percentage reflects U.S. downloads on the Google Play store between August 2019 and May 2021. The number of paid downloads on the Google Play store (████████) is equal to the total item_count for all app transactions in the App-level spend data, where the app_monetization_type is "APP SALE." I count the number of total downloads (of free apps and paid apps) on the Google Play store as the number of first-time installations, rather than the number of times that apps were downloaded, to avoid double-counting instances of an app being downloaded multiple times. Specifically, the total number of downloads (████████) is estimated by summing user_total_monthly_installs in the Monthly Aggregate Installs data, where country is "US," first_time is "FIRST_TIME" and acquisition_mechanism does not equal "PREINSTALL."

[720] App-level spend data, Consumers, GOOG-PLAY-005535886 and GOOG-PLAY-010801688.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

Candy Crush Saga, Tinder, and Pandora for free today, but can easily substitute to making in-app purchases or purchase a subscription version in the future.[721] By the same logic, users who make payments in these apps today can easily stop making in-app purchases or cancel the subscription if prices were to rise in the future. A market limited to in-app payments ignores the millions of free apps and billions of free app transactions that the Google Play store has facilitated, which has been critical to the Google Play store's success. Therefore, Plaintiffs' expert reports' proposed market limited to in-app payments ignores a large share of output of the Google Play store.

377.    Third, as explained in Section III.D, separating app downloads and other kinds of digital content transactions into separate markets does not make sense because the relationship between the two is important to Google's competitive strategy for the Google Play store. The evidence cited shows that charging developers nothing for free downloads and only charging a service fee when developers earn revenue from digital content transactions in apps downloaded from the Google Play store is a tool that Google uses to expand app distribution and make both the Google Play store and the Android ecosystem more competitive. It therefore does not make economic sense to separate app distribution and other digital content transactions into different markets.

> 2.    *Plaintiffs Conflate Google's Service Fee with a Fee for Payment Processing and Are Inconsistent Regarding Which Alleged Market Should Include Payments for App Downloads*

378.    Google's service fees are not payments for payment processing but rather a developer-friendly way of structuring Google's compensation for building and maintaining the Google Play store to facilitate transactions between users and developers. The fact that in Korea and Europe, Google has continued charging developers service fees on digital content transactions even

---

[721]    App Catalog Data, GOOG-PLAY-001507601.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

when they do not use the Google Play store's billing system[722] reinforces that Google's service fees are not primarily for payment processing.

379.   The Bernheim and Rysman Reports illustrate this point in taking inconsistent and unclear positions regarding whether Google's service fees are for app distribution or in-app payment processing, or both. The Bernheim Report, in stating that "commission rates and profits for in-app purchases are directly relevant for evaluating Google's monopoly power in app distribution,"[723] acknowledges the importance of accounting for the relationship between in-app purchases and app downloads. Similarly, as evidence of Google's purported monopoly power in the alleged Android app distribution market, the Rysman Report provides evidence of Google's "commission on developers' app revenues."[724] However, the Rysman Report cites to the same "commission for sales of apps and in-app purchases via Google Play Billing" as evidence of Google's purported monopoly power in the alleged Android In-App Billing Services Market.[725] The Rysman Report also specifically analyzes a combined market that includes both downloads as well as subscriptions and in-app purchases, reinforcing that it is not logical to divide these transactions into separate markets.[726] Similarly, the Singer Report relies on data sources that "aggregate" revenues from downloads and in-app purchases to argue that "the Play Store and the Apple App Store account for the vast majority of mobile app expenditures outside China".[727]

380.   All developers that use the Google Play store get access to billions of Android devices, Play Protect, Play console tools, app updates, user discovery features, user engagement tools, app

---

[722]   Li, Abner, "Google Play will allow alternate IAP billing in South Korea, charge reduced service fee," *9to5Google*, November 4, 2021, available at: https://9to5google.com/2021/11/04/google-play-store-korea/ ("Meanwhile, apps that use alternate billing and are distributed via Google Play will still be subject to service fees."); Werth, Estelle, "An update on Google Play billing in the EEA," *Google Keyword*, July 19, 2022, available at: https://blog.google/around-the-globe/google-europe/an-update-on-google-play-billing-in-the-eea/, ("Developers who choose to use an alternative billing system will need to meet appropriate user protection requirements, and service fees and conditions will continue to apply in order to support our investments in Android and Play. When a consumer uses an alternative billing system, the service fee the developer pays will be reduced by 3%.")
[723]   Bernheim Report, ¶ 462.
[724]   Rysman Report, ¶ 284.
[725]   Rysman Report, ¶ 348.
[726]   Rysman Report, ¶ 223.
[727]   Singer Report, ¶ 122.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

publishing and development tools, app analytics tools, and trust and safety measures.[728] The fact that Google decides to charge a service fee to developers of free apps only when users make payments for sales of digital content in those apps does not mean that Google's fee is only for processing that payment.

381.    More generally, it is not economically correct that a transaction platform that charges fees only when transactions are made rather than for upfront access is charging for processing the payments involved in the transactions. Transaction platforms across the economy do not charge (or charge small fees) for access to their platforms and instead only charge when transactions are completed, including: the Apple App Store;[729] Amazon Appstore;[730] Samsung Galaxy Store;[731] Microsoft Store;[732] Epic Games Store;[733] Steam;[734] Nintendo E-Shop;[735] Amazon Prime Video Direct;[736] Kindle Direct Publishing;[737] Nook;[738] Shutterstock;[739] Amazon

---

[728]    Google Presentation, "Play Value Model," August 8, 2019, GOOG-PLAY-000337564-631, at 572 ("Multiple sources of Play value … User acquisition … Play-owned discovery (e.g. PREX, Top charts, cat search, pre-reg, SMERCH)… Engagement (e.g., SMERCH, editorials, LiveOps, instant games, YT/Play integration … Publishing & distribution (e.g. WW distribution, device targeting, APK improvements) … Trust & safety (Play Protect, anti-piracy, ML models for malware, app signing) … Analytics and insights (e.g. store listing experiments, Console analytics) … Play services (e.g. GMS Core APIs)"); Google Presentation, "Play Business Model Thoughts," Undated Document, GOOG-PLAY-000565541-562, at 545 ("All of the developers who are out-of-scope for GPB (Play Billing) receive the benefits of: 1. Play's distribution network across 2.6B Android devices 2. Play Protect 3. Play Console tools (Beta testing, pre-launch reporting, store listing experiments, etc.) 4. App updates[.]").

[729]    Bohn, Dieter, "The Apple App Store: A Brief History of Major Policy Changes," *The Verge*, September 10, 2021, available at: https://www.theverge.com/22667242/apple-app-store-major-policy-changes-history.

[730]    "Amazon Developer Services Agreement," *Amazon Developer*, June 9, 2021, available at: https://developer.amazon.com/support/legal/da.

[731]    "Terms and Conditions," *Samsung Galaxy Store Seller Portal*, August 13, 2020, available at: https://seller.samsungapps.com/help/termsAndConditions.as.

[732]    "App Developer Agreement," *Microsoft Store*, June 16, 2022, available at: https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE4YJB0.

[733]    "Frequently Asked Questions," *Epic Games Store*, available at: https://www.epicgames.com/store/en-US/about, accessed on November 16, 2022.

[734]    "New Revenue Share Tiers and other updates to the Steam Distribution Agreement," *Steamworks Development*, November 30, 2018, available at: https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

[735]    Marks, Tom, "Report: Steam's 30% Cut is Actually the Industry Standard," *IGN*, October 7, 2019, available at: https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-industry-standard.

[736]    "Compensation details," *Prime Video Direct Support*, available at: https://videodirect.amazon.com/home/help?topicId=G202037410, accessed on August 25, 2022.

[737]    Wogahn, David, "The 2022 Guide to Amazon Fees and Royalties for Kindle eBooks and KDP Print," *Author Imprints*, January 5, 2022, available at: https://www.authorimprints.com/amazon-kdp-royalty-pricing/.

[738]    "Barnes & Noble Press Royalty and Payment " *B&N Press*, available at: https://press.barnesandnoble.com/legal/royalty-payment-terms, accessed on November 8, 2022.

[739]    "Shutterstock Earnings Schedule," *Shutterstock*, available at: https://submit.shutterstock.com/payouts, accessed on November 8, 2022.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

Music;[740] iTunes;[741] and Bandcamp.[742] These platforms are trying to attract consumers to the platform, not monopolizing payment processing. When Uber or Airbnb charges a service fee on a ride or stay, they are not charging users, drivers or hosts for merely processing the payment for the transaction; they are charging for the value that the platform has provided in facilitating the transaction. The same is true for the Google Play store: By not charging service fees on downloads of free apps and only charging fees on those apps for purchases of digital content in the apps, Google is trying to attract users and developers to make their apps available in the Google Play store. When Google collects its service fee on purchases of digital content in free apps downloaded via the Google Play store, Google is not charging for payment processing; it is collecting a fee for the service of facilitating the transaction—from making the download possible, to creating a secure platform where users and developers have the confidence to transact, and through the purchase of digital content in the app—that it had not yet collected.

### 3. Plaintiffs Fail to Consider Services Supporting Transactions After Apps Have Been Downloaded

382.    The Tadelis, Rysman, Singer and Schwartz Reports attempt to segregate downloads from later transactions also ignores that Google provides services to developers after apps have been downloaded. The Singer Report is not correct that the "Play Store is not needed" after an initial download.[743] For example, the Google Play store supports developers' updates to their apps, which can include fixing bugs, patching security issues, importing redesigns or launching new features that make new subscription or in-app payments content available.  Match Group's apps have pushed hundreds of version updates to users in recent years using the Google Play store. In 2021, Match Group released 32 version updates for Tinder on the Google Play store, while OkCupid, PlentyofFish, Match and Our Time had 69, 35, and 25, and 17 version updates on the Google Play store, respectively.[744] See Table 9. Such upgrades enable developers to deliver patches and new features to users and for users to be sure they have the most up-to-

---

[740]  "Amazon Music Unlimited FAQs," *Amazon Music*, available at: https://www.amazon.co.uk/b?ie=UTF8&node=11741995031, accessed on November 16, 2022.
[741]  Wingfield, Nick and Ethan Smith, "Music's New Gatekeeper," *The Wall Street Journal*, March 9, 2007, available at: https://www.wsj.com/articles/SB117340340327331757.
[742]  Ratliff, Ben, "Is Bandcamp the Holy Grail of Online Record Stores?," *The New York Times*, August 19, 2016, available at: https://www.nytimes.com/2016/08/20/arts/music/bandcamp-shopping-for-music.html.
[743]  Singer Report, ¶ 143.
[744]  Match Group App Updates on the Google Play Store, Match App Updates Data.xlsx, 2016-2022.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

date and secure apps. Google Play store users have installed tens of billions of version updates.[745]

**Table 9**
**Number of Match Group App Version Updates on the Google Play Store**
**United States, September 2016–August 2022**

| | Sep-Dec 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Jan-Aug 2022 | Total |
|---|---|---|---|---|---|---|---|---|
| OkCupid | 10 | 28 | 44 | 56 | 68 | 69 | 36 | **311** |
| Tinder | 18 | 34 | 48 | 38 | 28 | 32 | 18 | **216** |
| PlentyofFish | 9 | 35 | 31 | 33 | 39 | 35 | 19 | **201** |
| Match | 14 | 33 | 20 | 25 | 31 | 25 | 11 | **159** |
| Our Time | 10 | 5 | 13 | 8 | 14 | 17 | 5 | **72** |
| **Total** | **61** | **135** | **156** | **160** | **180** | **178** | **89** | **959** |

**Notes:**
[1] Number of version updates for an app in a particular year is based on unique values of "version_name" within that year. Data is filtered to version updates that were likely to be released in the United States, including versions that have "language_code" equal to "en-US" and versions where "language_code" variable is missing.
[2] App updates are calculated for the following "package_name" values: "com.tinder," "com.okcupid.okcupid," "com.pof.android," "com.match.android.matchmobile," and "com.peoplemedia.ourtime."
[3] Our Time updates include updates from August 25, 2016 to March 28, 2022.

**Source:**
Match Group App Updates on the Google Play Store, Match App Updates Data.xlsx, 2016-2022.

383.    The Google Play store also facilitates also facilitates subscription management services for developers, including allowing users to re-subscribe after cancelling subscriptions, receive refunds on subscriptions, pause subscriptions, restart payments or change the payment method.[746]

### D.  Plaintiffs' Proposed App Distribution Market is Flawed

384.    Notwithstanding that it is inappropriate as a matter of economics to define a separate app distribution market that does not include other digital content transactions, Plaintiffs' proposed Android app distribution market is also flawed and unsupported.

---

[745] For example, in October 2020 there were approximately ███████ installs worldwide including updates from the Google Play store, of which approximately ███████ were new downloads, suggesting more than ███████ updates or reinstallations served by the Google Play store. See cell C2 in Total Play and non-Play Installs, GOOG-PLAY-011142435 and cell BD76 in Google Play store Entitlements Data by Category, GOOG-PLAY-000808464.

[746] "Cancel, pause, or change a subscription on Google Play," *Google Play Help*, available at: https://support.google.com/googleplay/answer/7018481, accessed on November 3, 2021zippy=%2Ccancel-a-subscription-on-the-google-play-app%2Crestart-or-resubscribe-to-a-subscription, accessed on October 29, 2022.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

1.  *Plaintiffs Characterize Developer Decisions as Binary and Therefore Miss the Margin of Competition*

385.    The Bernheim, Rysman and Singer Reports argue that the Google Play store and the Apple App Store are complementary because most developers use both stores. These reports argue that developers view different platforms not as substitutes but as complements, and erroneously conclude that this means that developer multihoming does not constrain Google.[747] The key mistake is that they characterize competition for developers as binary, when in reality, competition in this market is continuous—the constant competition to try and ensure that developers devote time and effort to improving their app for that platform. This is something I elaborate on in Section IV, when I discuss the evidence of continuous competition between the Google Play store and the Apple App Store for sim-ship and parity in developer investment.

386.    For similar reasons, the Bernheim Report's argument that developers do not view consoles and smartphones as substitutes because developers "did not abandon Minecraft" on smartphones when it was released on Xbox and Nintendo Switch is flawed.[748] This, again, ignores that the Google Play store competes not only to have developers choose to distribute via the Google Play store but also to make investments in the apps they share via the Google Play store  as opposed to apps shared via another platform. To continue to make Minecraft available on an array of operating systems intensifies the continuous competition for revenue-generating Minecraft transactions and the broader competition for the facilitation of digital content transactions across platforms.

387.    Contrary to the Bernheim, Rysman and Singer Reports' characterization of the competition for developers between the Google Play store and the Apple App Store, I show in Section V that users multihome to access app content across different platforms, which reduces users' switching costs and gives developers options to monetize their content on these platforms. The fact that Google serves multihoming users who decide on which platform to access and pay for content and multihoming developers who decide how much time and effort to devote across platforms means that the Google Play store faces competition for the facilitation of digital content transactions on both sides of the platform.

---

[747]    Bernheim Report, Section III.E.4; Singer Report, ¶¶ 56-57; Rysman Report, ¶¶ 45, 192.
[748]    Bernheim Report, ¶ 209.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

2.  *Plaintiffs Are Incorrect that Web Apps Should Be Excluded from the Relevant Market*

a.  *Plaintiffs' Expert Reports Focus on Time Spent*

388.  The Bernheim and Rysman Reports' arguments for why web apps are not reasonable substitutes that should be included in the relevant market are flawed and ignore the competitive constraint that websites and progressive web apps exert on the Google Play store. The Bernheim Report states that "[t]he functional limitations of web apps result in much lower usage on smartphones than native apps."[749] The Rysman Report similarly claims that "consumers spend the overwhelming majority … of their time in native apps[.]"[750] These arguments ignore that time spent is not the sole measure relevant to assessing whether web apps and native apps are reasonable substitutes. Developers may focus their competitive efforts on growing the number of active users rather than, or in addition to, the time users spend on an app. Economic literature has shown that time spent online does not correlate with monetization potential. One study found that lower income individuals "are particularly likely to do time-consuming, inexpensive activities online[.]"[751] A focus on growing the number of users would be consistent with an developer's long-run incentives to maximize its user base and diversify the ways in which it can monetize that user base. A growing number of users who frequently and consistently access the app—even if people log on for just a few minutes each day—can reflect that an developer is providing a positive user experience.

389.  Figure 32.A replicates Exhibit 30 from the Bernheim Report but displayed as the total visitor count[752] on native apps and web apps instead of time spent share for each of the same app categories used in the Bernheim Report. These data reveal that the visitor count on web apps is substantial. I also recreate the exhibit using the top app categories ranked by total visitor count and find an even higher number of visitors who access an app via the mobile web (see Figure 32.B). Such usage highlights the substitutability between web apps and native apps accessed through the Google Play store.

---

[749]  Bernheim Report, ¶ 214.
[750]  Rysman Report, ¶ 216.
[751]  Goldfarb, Avi and Jeff Prince, "Internet adoption and usage patterns are different: Implications for the digital divide," *Information Economics and Policy*, Vol. 20, No. 1, 2008, (pp. 2-15), p. 14.
[752]  Total visitor count for native apps or web apps in a given category is calculated as the sum of Total Unique Visitors for all native apps or all web apps in that category in the Comscore data. See Appendix C.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

**Figure 32.A**
**Total Visitor Count for Top Categories by Total Minutes on Android Smartphones**
**United States, May 2022**



Notes and Sources:
See Appendix C.

**Figure 32.B**
**Total Visitor Count for Top Categories by Total Visitor Count on Android Smartphones**
**United States, May 2022**



Notes and Sources:
See Appendix C.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

390.    In addition, the Bernheim Report claims that there is little to no substitution in terms of time played between the use of Fortnite on smartphones and other devices.[753] The Bernheim Report evaluates a natural experiment based on the removal of the Fortnite app from the Google Play store and the Apple App Store on August 13, 2020. However, the Bernheim Report's analysis is not reliable and therefore cannot support the conclusion that substitution across devices is not sufficient for other platforms to competitively constrain Google for several reasons. To begin with, consoles and other app stores do not need to be perfect substitutes to the Google Play store in order to serve as a competitive constraint on the Google Play store. The Bernheim Report's analysis of the Fortnite natural experiment shows that Google Play store users do in fact use other platforms to access and spend on and play Fortnite. These alternative ways that users multihome to access app content competitively constrain the Google Play store. In addition, I show in Appendix E Section A that when I use the Bernheim Report's model to examine spending instead of time played, I find evidence that suggests that Google Play users substituted to making more monetized transactions on PCs and consoles after Fortnite was removed from the Google Play store.

    b.  *Plaintiffs Mostly Appear to Imply That The Internet Is Not Required For Apps Downloaded from an App Store*

391.    The Singer Report asserts that "[w]eb apps are no substitute for apps on the Play Store," because they "require an internet connection[.]"[754] The Rysman Report asserts simply that "web apps require connection to the internet" and that "consumers do not find web-based apps as to be sufficiently adequate substitutes for native Android mobile apps[.]"[755] However, many native apps require the internet to be functional. For example, the Fortnite App needs an internet connection to operate.[756] The Tinder app likewise needs an internet connection to operate.

---

[753]   Bernheim Report, ¶¶ 196, 199-201, Appendix C.
[754]   Singer Report, ¶ 104.
[755]   Rysman Report, ¶¶ 213, 218.
[756]   "Can I play Fortnite in offline mode?," *Epic Games*, available at: https://www.epicgames.com/help/en-US/fortnite-c5719335176219/technical-support-c5719372265755/cani-play-fortnite-in-offline-mode-a5720402868507, accessed on November 9, 2022.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

3.  *Plaintiffs Misinterpret and Mischaracterize Evidence on the Substitutability of Sideloading and Alternative App Stores and the Google Play Store*

392.   The Bernheim, Rysman and Singer Reports also claim that sideloading is not a viable alternative to access content outside of the Google Play store.[757] However, Plaintiffs' expert reports provide no explanation for data that indicate that ▇% of apps on Android smart devices are installed through means other than the Google Play store. Specifically, based on the source cited in the Rysman and the Schwartz Reports, replicating the calculations used in their reports suggests that only ▇%[758] of apps on Android smart devices are user-installed via the Google Play store and that ▇% of apps in the underlying data source are pre-installed apps that do not update through the Google Play store.[759] These data highlight that the majority of apps are updated outside of the Google Play store. Further, the Plaintiffs' expert reports ignore that ▇% of Android phones and tablets in the United States as of July 2021 had a third-party app store pre-installed.[760] Data from August 2020 to June 2022 suggest that a substantial portion of users employ these pre-installed or other non-Google Play store options to download apps. For example, in June 2022, ▇% of Android devices in the United States had at least one non-pre-installed app installed from a non-Google Play store source.[761] In addition, even if observed rates of user-initiated installs from non-Google Play store sources were low, evidence of high pre-installation but low usage simply indicates that users prefer to download apps from the Google Play store.

4.  *The Bernheim Report Incorrectly Excludes Tablets from the Relevant Market*

393.   The Bernheim Report would exclude tablet transactions from its proposed Android app distribution market "[b]ecause users are reluctant to migrate their app usage to other devices, developers would not find it profitable to terminate app distribution on Android in response to

---

[757]   Rysman Report, ¶ 425; Bernheim Report, ¶ 407; Singer Report, ¶ 241.
[758]   Apps by Source, GOOG-PLAY-001508603.
[759]   Apps by Source, GOOG-PLAY-001508603. These pre-installed apps include system apps, which users may not see or interact with. See also Rysman Report, ¶ 52; Schwartz Report, ¶ 265.h.
[760]   Third Party App Store Data, GOOG-PLAY-007203253, ("Devices with multiple app store"). Other app stores include Samsung Galaxy Store, Amazon Appstore, LG Smart World, Xiaomi Market, Huawei App Gallery, ONE Store, Oppo, Vivo and ShareIT.
[761]   Devices with at least one non-Play, non-preloaded app installed, GOOG-PLAY-011354602. Data are restricted to GMS devices and provided as monthly snapshots. In June 2022, ▇ percent of Android devices worldwide (excluding China) had at least one non-pre-installed app installed from a non-Google Play source.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

a SSNIP."[762] The distinction the Bernheim Report draws between smartphones and tablets is overstated. For example, the Bernheim Report claims that "[t]he size difference makes tablets difficult to use with one hand and fit in a pocket."[763] However, the Bernheim Report includes phablets in its definition of smartphones. Phablets, defined as "smartphones with screen sizes from 5.5 to less than 7 inches"[764] and popular since 2012,[765] accounted for 87% of smartphone unit sales in the United States in 2020[766] and are also difficult to use with one hand and fit in a pocket.[767] Furthermore, the Bernheim Report's distinction makes no economic sense, given that users can download the same apps for mobile devices and tablets and use digital content on a phone that they purchased on a tablet and vice versa. As explained in Section IV.A.3, a large proportion of Android users also own a tablet, particularly an iPad. And in 2021, Google earned ▌% of U.S. consumer spending on the Google Play store from mobile device transactions in apps on tablets.[768] Importantly, tablets and other devices do not need to be perfect substitutes to smartphones in order to serve as a competitive constraint on the Google Play store. These alternative ways that users multihome to access app content competitively constrain the Google Play store. This reinforces that the Bernheim Report's proposed app distribution market is artificial.

---

[762] Bernheim Report, ¶ 173. See also, Bernheim Report, ¶¶ 129-135, 205.

[763] Bernheim Report, ¶ 130.

[764] IDC Quarterly Mobile Phone Tracker, GOOG-PLAY-005027814; IDC, "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2020," April 2020, GOOG-PLAY-010801633-669, at 636; See also, Parcell, Jacob, "Trends on Tuesday: Phablets to Top Tablets in 2015?," *Digital.gov*, November 4, 2014, available at: https://digital.gov/2014/11/04/trends-on-tuesday-phablets-to-top-tablets-in-2015 ("The International Data Corporation (IDC) predicts that 'phablets,' the popular term for smartphones with screen sizes from 5.5 to less than 7 inches, will outship portable PCs this year and tablets in 2015.").

[765] Hill, Simon, "History of Phablet," *Android Authority*, October 11, 2013, available at: https://www.androidauthority.com/phablet-history-279494/ ("[T]he search term 'phablet' began to gain real interest in January 2012.").

[766] IDC Quarterly Mobile Phone Tracker, GOOG-PLAY-005027814. Unit sales are defined as the number of new smartphones sold to users or distributors. Phablets are identified as smartphones in IDC data where "Product" variable is equal to "Phablet."

[767] See, e.g., "Best Phablet 2022," *Venture Beat*, October 19, 2022, available at: https://venturebeat.com/product-comparisons/best-phablet-reviews/ ("Some models are hard to use one-handed, and most won't fit comfortably into pants' pockets, at least when the user is sitting down.").

[768] Transactions Data, GOOG-PLAY-007203251 and GOOG-PLAY3-000018260. Spending is calculated as the sum of post-tax sales revenue. Spending on mobile devices is identified by transactions for which the device class was "PHONE," "TABLET," or "TABLET_LARGE." Spending on tablets is identified by transactions for which the device class was "TABLET" or "TABLET_LARGE." Transactions data used in this analysis are limited to orders where the delivery state was "DELIVERED," the payment state was "CHARGED," the payment instrument was not associated with test purchases ("TEST_INSTRUMENT" or "NO_INSTRUMENT"), and the sales revenue was positive and not missing and had a currency code of "USD."

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

5. *Plaintiffs Misapply SSNIP Tests to Support their Android App Distribution Market*

a. *The Bernheim Report's SSNIP Test in the Android App Distribution Market*

394.     The Bernheim Report purports to use a SSNIP test to define an Android app distribution market. The Bernheim Report's SSNIP test systematically overstates the extent to which a hypothetical monopolist can profitably raise prices. These flaws are reflected in the fact that the model used by the Bernheim Report predicts that the hypothetical monopolist can profitably raise the service fee rate by more than 500%. Specifically, the model predicts that the hypothetical monopolist can profitably raise the service fee rate from 15% to 92%. A profitable price increase of this magnitude is driven by the conceptual flaws in the model used by the Bernheim Report. The Bernheim Report's analysis also implies that Google's current service fee rate, which ranges from 15% and 30%, is far below the service fee rate that could be profitably charged by a hypothetical monopolist. This undermines the claim that Google has monopoly power.

395.     Further flaws regarding the Bernheim Report's SSNIP calculations are discussed in Appendices F and G, including:

a. The Bernheim Report's SSNIP calculations rely on arbitrary assumptions, including the assumption that the competitive profit margin is half of the Google Play store's alleged actual gross profit margin. Once the competitive profit margin is set at this assumed level, the results of the Bernheim Report's SSNIP test in the alleged Android app distribution market follow mechanically;

b. While the Bernheim Report acknowledges that "app distribution is a two-sided market serving both users and developers," the Bernheim Report's SSNIP calculations inappropriately assume that the alleged Android app distribution market is one-sided, based on the claim that "the facts of this case are such that a SSNIP in the market for app distribution on Android smartphones is more straightforward than in other two-sided markets" because of "limited developer substitution between app distribution on Android smartphones and app distribution on other devices and web apps.[769]; and

---

[769]   Bernheim Report, ¶¶ 219-220.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

c.  The Bernheim Report relies on instrumental variable regressions to estimate the price elasticity of app demand. The instrument it relies on is not valid, as recognized by economic literature, including literature cited by the Rysman Report. Furthermore, the Bernheim Report aggregates Google's transaction data to estimate the price elasticity of app demand, which causes the Bernheim Report's estimation to mistakenly attribute unrelated changes in demand to price changes.

   b.  *The Rysman Report's HMT in the Android App Distribution and In-App Payments Processing Market*

396.   The Rysman Report also purports to use a SSNIP test to define an Android app distribution market.[770] The Rysman Report applies its SSNIP calculations to a hypothetical monopolist of both Android app distribution and in-app payments processing, even though it claims that these are two separate markets.[771] It justifies this approach by citing the horizontal merger guidelines, which say that "[t]he hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market."[772]

397.   The Rysman Report's decision to perform a joint SSNIP across both these markets is further support for the claim that Plaintiffs' expert reports have improperly carved up the Android ecosystem into three narrow artificial markets.

398.   The flaws in the Rysman Report's SSNIP calculations are discussed in Appendices F and H, including:

---

[770]  Rysman Report, ¶ 220 ("[T]he hypothetical monopolist test for Android App Distribution would need to be modified to analyze whether a hypothetical monopolist of Android App Distribution could profitably impose a SSNIP on both consumers and developers together."); ¶ 231 ("Therefore, in my view, the 10% combined SSNIP on the Android App Distribution and Android In-App Billing Services Market is profitable and thus the combined market does not include any constraints from outside the Android App Distribution or In-App Billing Services markets (such as the Apple App Store and associated billing services.").

[771]  Rysman Report, ¶ 223 ("In conducting my SSNIP analysis, I start by asking whether the market is broader than App Distribution and In-App Billing Services on Android … I ask whether a hypothetical monopolist of both markets would find it profitable to impose a 10% SSNIP on both Android App Distribution and Android In-App Billing Services combined. To be clear, this does not mean that Android App Distribution and Android In-App Billing Services on Android are in one broad market."); Rysman Report, ¶ 277 ("I find the Android In-App Billing Services Market … is a relevant antitrust market. The market for Android in-app transactions is separable from the market for Android App Distribution.").

[772]  Rysman Report, ¶ 223; *Horizontal Merger Guidelines*, U.S. Department of Justice and the Federal Trade Commission, August 19, 2010, available at: https://www.justice.gov/atr/horizontal-merger-guidelines-08192010, p. 9.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

a.  The Rysman Report does not correctly account for the competitive constraints faced by Google from competing platforms, ignoring the fact that alternative platforms benefit from network effects.

b.  The Rysman Report does not include free digital content transactions in the SSNIP calculations. Absent a full modeling of paid and unpaid transactions, costs incurred by the platform will be underestimated, and one cannot reliably determine if a SSNIP would or would not be profitable for Google. By ignoring the impact of the SSNIP on the costs incurred by Google to process unpaid transactions, the Rysman Report overstates the hypothetical monopolist's profits after a SSNIP.[773]

   c.  *The Singer Report's HMT in the Android App Distribution Market*

399.  The Singer Report also purports to use three SSNIP tests to define an Android app distribution market.[774] The Singer Report's SSNIP tests, too, are flawed for several reasons.

400.  The Singer Report models Google's pricing decisions using a highly stylized Lerner Index framework that depends on Google's price-cost margin.[775] A price-cost margin is a normalized measure of a firm's profitability, defined as the difference between the price and the marginal costs of a good, divided by the price.[776] The primary assumptions with this framework are that Google's pricing should be close to the marginal cost that it incurs for facilitating the distribution of an app, and that Google's pricing decisions in the alleged Android app distribution market are independent and distinct from its operations outside of this alleged market. Neither of these assumptions are based on fact.

401.  Regarding pricing near to marginal cost, the Lerner Index framework ignores that Google incurs fixed costs and investment costs in developing and operating an operating system and the Google Play store. These costs are relevant for Google's pricing decisions, especially in a

---

[773]  Rysman Report, ¶ 577, ("I use the monthly app revenue data produced by Google … I understand these data include paid-for purchases only; transactions relating to free purchases/downloads are not included in the data.").

[774]  Singer Report, ¶¶ 93, 96, 98.

[775]  See, Singer Report, ¶¶ 295, 301, for a description of the theoretical framework; ¶¶ 297, 303, for a description of the model applied to the Google Play store.

[776]  The Lerner Index is another term for the price-cost margin. Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization* Fourth Ed., Pearson, 2015, p. 117.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

platform setting where fixed and investment costs can be substantial. As economists have explained, the Lerner Index is not an appropriate tool for these circumstances:[777]

> The most important limitation of the Lerner Index … is that the Index 'does not recognize that some of the deviation of P from MC comes from either efficient use of scale or the need to cover fixed costs'. … The cost structure of firms in many technology-driven industries (e.g., software, pharmaceuticals) is markedly front-loaded. Marginal cost pricing in these industries is neither feasible nor desirable.

402.   In fact, the Singer Report's modeling framework is designed to result in a finding that Google's pricing is above what it allegedly would charge in a competitive setting. This is because, in a platform context, the marginal cost of a transaction to Google may be close to zero, and the Singer Report's modeling framework estimates that Google's prices should be close to this marginal cost. But the Singer Report compares these estimated prices in a hypothetical competitive setting to Google's actual prices that are not actually based on the marginal cost of a transaction, but rather are also based on costs associated with the development and operation of the Android ecosystem and the Google Play store.[778] These actual prices will therefore be higher than what the Singer Report estimates for a competitive setting, not because of Google's alleged monopoly power, but because the Singer Report ignores the actual way in which Google determines its prices.

403.   The Singer Report also ignores the fact that the Google Play store does not simply provide a platform to download apps and separately a platform to make in-app payments. Instead, the Google Play store provides continuous support and feedback that enhances the relationship between the user and the developer within a digital ecosystem and on the transaction platform. The Singer Report also systematically ignores the millions of free apps and billions of free digital content transactions that the Google Play store has facilitated as part of the freemium business model, along with the costs associated to support those transactions. This means that, contrary to the Singer Report's modeling assumptions, Google does not determine its service

---

[777]   Elzinga, Kenneth G. and David E. Mills, "The Lerner Index of Monopoly Power: Origins and Uses," *American Economic Review*, Vol. 101, No. 3, May 2011, (pp. 558-564), pp. 559-660.

[778]   Samat Deposition, Day 1, pp. 77:14 - 78:2 ("Q. … do you have a sense for what the costs are to Google of having to process that transaction, that marginal incremental transaction? A. I mean, there is a lot of factors it depends on. I think the question is really how that all got to be generated in the first place, right. There's a lot more that goes into providing an ecosystem where developers and users can be successful and connect with each other in that way than just the transaction, right."); Samat Deposition, Day 2, p. 592:14-19 ("A. What is the purpose of pricing? The pricing is we want to set a point where we have participation from developers but yet we can still invest in our overall ecosystem.").

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

fee for the alleged App distribution market in isolation of its other revenue streams. Any analysis of Google's profit maximizing decisions would need to take into account the entirety of its transaction platform, which would include paid and unpaid transactions, downloads and in-app transactions, and the dynamics of indirect network effects where both developers and users benefit from a larger developer and user base.

404.   Further flaws regarding the Singer Report's SSNIP calculations are discussed in Appendix I, including:

a.   Relying on a flawed calculation of the Google Play store's marginal cost for the distribution of apps that is based on the Google Play store's aggregate profit and loss (P&L) data and not indicative of Google's actual costs to sell an app;[779] and

b.   Making an unfounded and baseless assumption that Google's market share would be 60% in the App Distribution market if it were to allegedly be competitive because that was what AT&T market share was in 1993 "after losing its monopoly" in the interstate long-distance telephone market.[780] The Singer Report makes this assumption even though the long-distance telephone market was heavily regulated at this time by state regulated duties to deal, which involved a system of cross subsidies, price caps, and obligations for firms "to provide service to all customers, including at a loss[.]"[781] This regulated marketplace is not representative of the competitive landscape in which the Google Play store operates or would likely operate were it to allegedly face additional competition. Consumers' preferences for the services provided by long distance telephone companies and digital content providers are different, as is the substitutability of products provided by firms in each of the two industries, such that it makes no sense to claim that market shares would be similar across these settings.

---

[779]   Singer Report, ¶ 304, footnote 683; ¶ 324, footnote 741; ¶ 386, footnote 918.

[780]   Singer Report, ¶ 304, footnote 686; ¶ 386, footnote 920; Kahai, Simran K., David L. Kaserman, and John W. Mayo, "In the "Dominant Firm" Dominant? An Empirical Analysis of AT&T's Market Power," *The Journal of Law & Economics*, Vol. 39, No. 2, 1996, (pp. 499-517), p. 510.

[781]   Hurwitz, Gus, "Digital Duty to Deal, Data Portability, and Interoperability," *The Global Antitrust Institute Report on the Digital Economy*, Vol. 28, 2020, (pp. 1024-1058), p. 1038.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

**E.  Plaintiffs' In-App Payments Processing Market is Flawed**

405.     This subsection describes the flaws in the Tadelis, Rysman, Singer and Schwartz Reports' approach to defining a separate market for in-app payment fees. This ignores that the service fee for select digital content transactions on the Google Play store is a monetization strategy that helps fund the entire ecosystem and all the value unlocked within it and cannot be separated from the alleged Android App distribution market. It also ignores that as a monetization strategy it unlocks value for users and developers, and that the Google Play store is only paid if it creates sufficient value. Conflating this monetization strategy with an in-app payment processing market is not economically coherent. The Schwartz and Tadelis Reports' attempt at a SSNIP test reflects these flaws.

*1.  Plaintiffs Mistakenly Define a Distinct Market for In-App Payment Processing*

406.     The Rysman and Tadelis Reports assert that payments for digital content outside of an app are not a reasonable substitute for payment for the same content inside the app. The Rysman and Tadelis Reports claim that there are high frictions to transacting through substitutes such as web browsers and non-smartphones.[782] The Rysman Report claims that "frictions that discount the user experience likely lead to consumers abandoning in-app purchases that cannot be completed within the app."[783] The Tadelis Report claims that "browser-based payment solution services are associated with markedly higher frictions in the payment process than exist for in-app payment solution services," and that "Google's anti-steering provisions…prohibit developers from linking or directing users to websites selling in-app digital goods, or even telling users that such websites exist."[784]

407.     The Rysman and Tadelis Reports misrepresent the ease with which users can purchase digital content outside of the Google Play store that can be used in apps downloaded via the Google Play store. As I show in Section V, users can and do make substantial payments outside of the Google Play store, for example, on Fortnite. Many users may still prefer to pay via the Google Play store but that may simply reflect consumer preference for the security and controls it offers rather than any evidence of friction associated with payments on other platforms.

---

[782] Rysman Report, ¶¶ 273-274; Tadelis Report, ¶¶ 101-115.
[783] Rysman Report, ¶ 273.
[784] Tadelis Report, ¶ 102.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

408.    As explained in Section VI.D.2, the Bernheim Report's analysis of the Fortnite natural experiment shows that Google Play users do in fact use other platforms to access and spend on and play Fortnite. In addition, I show in Appendix E.A that when I use the Bernheim Report's model to examine revenues instead of time played, I find evidence that suggests that Google Play users substituted to making more monetized transactions on PCs and consoles after Fortnite was removed from the Google Play store.

409.    Plaintiffs' experts also do not explain why Google would have reduced service fees for developers that can offer subscriptions outside of the Google Play store if making payments for digital content outside of the Google Play store was not a substitute for purchasing the content in an app downloaded from the Google Play store.

   *2.   Plaintiffs Misunderstand the Digital Competitive Landscape When They Claim Users are "Locked in"*

410.    The Singer Report's misunderstanding of the economics of the current digital landscape is reflected in the way that it compares the alleged "lock in" of users into the Android operating system to "hotel guests who pay supra-competitive prices for movie rentals," as they "simply do not wish to incur the costs of leaving the movie theater (or hotel) to find a cheaper substitute for the ancillary product."[785] This example illustrates exactly the opposite of what the Singer Report asserts. Due to the digital age and the evolution of competition across platforms, hotels have lost the market power they once had over the price of movie rentals. In 2022, rather than being locked into watching movies on a hotel TV, hotel guests can choose to watch movies on their phone, tablet or PC. Consumers' ability to switch to these other platforms has created competitive pressure on hotel and movie theaters: many hotels now offer access to streaming services built into the TVs in their rooms.[786] Other platforms available on multiple devices exert a similar competitive constraint on the Google Play store by enabling users to leave the Google Play store to purchase digital content—including access to the same cross-platform streaming services that have put pressure on hotels and movie theaters.

---

[785]  Singer Report, footnote 86.
[786]  "Why you should offer a streaming device to your hotel guests?," *InnSpire*, September 7, 2022, available at: https://www.innspire.com/why-you-should-offer-a-streaming-device-to-your-hotel-guests/ ("Today, streaming devices in hotel rooms are more of a guest requirement than an unheard-of service.").

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

### 3. Plaintiffs' SSNIP Tests for the Hypothetical Payments Processing Market are Flawed

411.    A subset of Plaintiffs' expert reports use a SSNIP test to define an in-app payment processing market. These SSNIP tests are flawed and uninformative.

412.    The Tadelis Report argues that Google "is able to charge significantly more than a SSNIP above the price that would likely prevail but for the alleged misconduct[.]"[787] In conducting its SSNIP test, the Tadelis Report conflates the Google Play store's service fee with a payment processing fee. The Tadelis Report states, "the maximum effective percentage commission of any alternative provider is 8.8 percent (PayPal), as compared to Google's typical 30 percent commission rate charged on such transactions."[788] However, it does not make sense to compare Google's fee to payment processing fees, because as I discuss in Section VI.C.2, Google's fee is not simply a payment processing fee but rather a means of supporting the services that Google provides for its ecosystem.

413.    The Singer Report conducts a SSNIP test on the alleged in-app payments market that has several conceptual and empirical flaws. Many of these flaws are the same as those discussed in Section VI.D.5.c regarding its tests on the app distribution market, including:

   a.   Using a highly stylized Lerner Index framework that ignores fixed and investment costs in developing and operating an operating system and the Google Play store which are relevant to Google's profit maximizing decisions;

   b.   Relying on a model of the alleged in-app payments market that ignores the facts regarding Google's freemium business model and the related aspects of the Android ecosystem. That is, contrary to the Singer Report's overly simplified model of Google's pricing decisions, Google does not determine its pricing in an alleged App Distribution market in isolation of the rest of the Google Play store's business and revenue streams;

   c.   Relying on a flawed calculation of the Google Play store's marginal cost for in-app payment transactions that is based on the Google Play store's aggregate P&L data and not indicative of Google's actual costs to service an in-app payment;[789] and

---

[787]   Tadelis Report, V.C.2.
[788]   Tadelis Report, ¶ 96.
[789]   Singer Report, ¶ 324, footnote 741; ¶ 386, footnote 918.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

d.  Making the baseless assumption that Google's market share would be 60% in the alleged in-app payments market if it were to allegedly be competitive because that was what AT&T market share was in 1993 "after losing its monopoly" in the interstate long-distance telephone market.[790]

414.  In addition, the Singer Report's SSNIP test for the alleged in-app payment processing market makes an unsupported assumption regarding the supply elasticity of competing firms in an allegedly competitive setting. The test assumes a response equal to that of a "fringe firm" in the interstate long-distance telephone market from the 1980s and early 1990s.[791] Again, the long-distance telephone market was heavily regulated at this time by state regulated duties to deal, which involved a system of cross subsidies, price caps, and obligations for firms "to provide service to all customers, including at a loss."[792] Consumers' preferences for the services provided by long distance telephone companies and digital content providers is different, as is the substitutability of products provided by firms in each of the two industries. The long-distance telephone market from 30-40 years ago is unrepresentative of the competitive landscape in which the Google Play store operates and it makes no sense to claim that the Google Play store's competitors would adjust their output in response to a price change from Google at a rate similar to that of land-line telephone companies from changes to other telephone companies' prices. These flaws are discussed further in Appendix I.

415.  The Bernheim, Rysman, Singer and Tadelis Reports' SSNIP tests on both the Android app distribution and in-app payments markets also suffer from relying on estimates of average spending among consumers and making claims about Google's ability to sustain supracompetitive prices. But given the concentration of spending among certain high-value users, as I discuss in Section VI.B.5, for whom an increase in price or decline in quality in the Google Play store would be of a much higher magnitude than average app spend would suggest, an analysis of the potential impacts of an increase in price or a decline in quality of the Google Play store would need to take into account the heterogeneous effects of those

---

[790]  Singer Report, ¶¶ 328, 331, 386, footnote 920; Kahai, Simran K., David L. Kaserman, and John W. Mayo, "In the "Dominant Firm" Dominant? An Empirical Analysis of AT&T's Market Power," *The Journal of Law & Economics*, Vol. 39, No. 2, 1996, (pp. 499-517), p. 510.

[791]  Singer Report, ¶ 328; Kahai, Simran K., David L. Kaserman, and John W. Mayo, "In the "Dominant Firm" Dominant? An Empirical Analysis of AT&T's Market Power," *The Journal of Law & Economics*, Vol. 39, No. 2, 1996, (pp. 499-517), pp. 507-508.

[792]  Hurwitz, Gus, "Digital Duty to Deal, Data Portability, and Interoperability," *The Global Antitrust Institute Report on the Digital Economy*, Vol. 28, 2020, (pp. 1024-1058), p. 1038.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

changes. Plaintiffs' expert reports' analyses ignore the differential impact that such changes may have on users or developers, and therefore fail to properly demonstrate that Google's current service fee for in-app payments is supracompetitive.

## VII.   THE RELEVANT GEOGRAPHIC MARKET IS THE UNITED STATES

416.    This section explains that in defining a geographic market, an economist must consider the same questions of substitutability as in a product market. It then explains why differences in laws, compliance, and consumer needs mean that for users, different alternatives to using Android and the Google Play store outside of the US are not a reasonable substitute. It also explains that the Plaintiffs' expert reports' arguments to exclude China are inconsistent.

### A.  Defining Geographic Markets

417.    As I explain in Section III, the product in this case is the facilitation of digital content transactions between users and developers. The economic evaluation of the geographic dimensions of the relevant market involves principles similar to those used when evaluating the relevant product market. Economists identify a geographic dimension of the relevant market because there may be geographic limits on the products to which consumers would switch in the event of a price increase or decline in quality even if two products available in different places are essentially the same. For example, consider someone who needs urgent medical care in Maine. A provider in Portland, Oregon is not a substitute for a provider offering the same quality of care in Portland, Maine. If the Maine provider reduces the quality or raises the price of care, people in Maine who need urgent medical care likely will not go to the provider in Oregon instead. Accordingly, the provider in Portland, Oregon should not be in the relevant geographic market for urgent medical care for people who live in Maine. More generally, if there are factors that affect the availability of products or services in one geography and limit consumers' access to those products and services in another geography, one must consider the effect of those factors on a potential substitution. In the urgent medical care example, the limiting factor is patients' willingness and ability to travel to obtain the services.

418.    Geographic limits on the set of products to which consumers would switch do not have to be physical. Pharmaceuticals are an example. Pharmaceutical products sold in different countries

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

only analyzes the Google Play store's margins from 2011 onwards.[1042] The Google Play store operated at a loss in each year from 2009 through 2012. In 2009 and 2010, internal presentations suggest that the operating loss was $51.7 million and $102.4 million.[1043] In 2011 and 2012, the Google Play store operated at a loss of $126 million and $72 million, and its operating profit margins were negative prior to 2013.[1044] Plaintiffs' Expert Reports' failure to take into account these losses reflects again the inadequacy of their margin's analysis to support their allegations of monopoly power.

Catherine E. Tucker
November 18, 2022

---

[1042] Bernheim Report, Figure 68.

[1043] Google Presentation, "Android OC Quarterly Review - Q2 2010," July 12, 2010, GOOG-PLAY-001490474-493, at 478; Google Presentation, "Android OC Quarterly Review – Q2 2011," July 26, 2011, GOOG-PLAY-005570952-972, at 958. Estimates reflect actual Android P&L for 2009 and 2010, which includes revenue from Ads. Christian Cramer, the Director of Play Finance, testified that he believes that Android Market P&Ls for 2009 and 2010 were not created. Deposition of Christian Cramer, *In Re Google Play Store Antitrust Litigation*, 3:21-md-02981-JD, January 13-14, 2022 ("Cramer Deposition"), Day 1, p. 124: 6-14. ("Q. Did Google track the Android market P&L's separately in 2008, 2009 and 2010? A. I don't think so. Q. So where was the Android market P&L tracked? A. I suspect there was no such thing as an Android market P&L. Q. For those years? A. Yes.").

[1044] Bernheim Report, ¶ 476, Figure 68.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

# Exhibit D10
# Public Redacted Version

# EXHIBIT 27

HIGHLY CONFIDENTIAL

```
                                              Page 1
 1            UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4   ------------------------------------------------x
 5   IN RE GOOGLE PLAY STORE          Case No.
     ANTITRUST LITIGATION             3:21-md-02981-JD
 6
 7   THIS DOCUMENT RELATES TO:
 8   Epic Games Inc. v. Google LLC et al.,
     Case No. 3:20-cv-05671-JD
 9
     In re Google Play Consumer Antitrust
10   Litigation, Case No. 3:20-cv-05761-JD
11
     In re Google Play Developer Antitrust
12   Litigation, Case No. 3:20-cv-05792-JD
13
     State of Utah et al. v. Google LLC et al.,
14   Case No. 3:21-cv-05227-JD
15
     Match Group, LLC et al. v. Google LLC et al.,
16   Case No. 3:22-cv-02746-JD
     ------------------------------------------------x
17
18    ** HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER ***
19
20           REMOTE VIDEOTAPED DEPOSITION OF
21                   KIRSTEN RASANEN
22             Wednesday, August 17, 2022
23
24   REPORTED BY:
25   RENEE HARRIS, CA CSR 14168, NJ CCR, RPR
```

```
                                                Page 13

 1        counsel for the State of Utah here today on

 2        behalf of 39 Attorney Generals.

 3             THE VIDEOGRAPHER:  Mr. Kravis?

 4             MR. KRAVIS:  Good morning, Jonathan

 5        Kravis from Munger Tolles & Olson for Google

 6        and the witness, and with me is Jamie Luguri,

 7        also from MTO, and Brian Smith from Google.

 8             THE VIDEOGRAPHER:  Thank you.  Will the

 9        Certified Court Reporter please swear in the

10        witness.

11

12                  KIRSTEN RASANEN,

13   called as a witness and having been first duly

14   sworn by the Certified Shorthand Reporter, was

15   examined and testified as follows:

16

17                  EXAMINATION

18

19    BY MR. WALCHAK:

20        Q.  Ms. Rasanen, you just heard just a moment

21   ago but my name is David Walchak.  I'm with the

22   Consumer Plaintiffs.  I am representing Consumer

23   Plaintiffs today with the law firm Korein Tillery,

24   and I'm going to begin asking you questions before

25   the other Plaintiffs' group take turns after me.
```

HIGHLY CONFIDENTIAL

Page 253

1          A.   That's right.

2          Q.   All right.  So I want to start with the

3     bottom e-mail on the chain, first in time, it's

4     dated April 17, 2017 at 4:49 p.m. from Samer

5     Sayigh, I apologize if I butchered the name.

6               Do you see that e-mail?

7          A.   Yes, I do.

8          Q.   And I think you mentioned him earlier.

9     What was his role at Google at this time?

10         A.   Samer Sayigh was on the Play strategy

11    team.

12         Q.   Was it the same team you were working on?

13         A.   I was on the Play business development

14    team.

15         Q.   So he writes, "Hi, Team, I sent a

16    previous e-mail on this topic but want to start

17    separate thread.  Kindle and Audible, both Amazon,

18    are two major non-subscription apps that would be

19    impacted by proposed apps policy change."

20              What was the proposed apps policy change

21    that Google was considering at this time?

22         A.   If you'll give me a moment to just orient

23    myself to where we are in time with this thread.

24              Okay.  Could you repeat your question?

25         Q.   Sure.

HIGHLY CONFIDENTIAL

1              What was the proposed policy apps -- I'm

2    sorry.   Strike that.

3              What was the proposed apps policy change

4    that Google was considering at this time?

5        A.   I think this was a change where we were

6    considering removing the downloadable content

7    exception from -- from the policy, the

8    downloadable content exception I mentioned

9    earlier.

10       Q.   And do you recall that exception said

11   that app developers are not required to use Google

12   Play Billing when a customer purchases digital

13   content that could be consumed outside the app

14   itself?

15       A.   That sounds familiar, yes.   I don't know

16   if those are the exact words; if you tell me they

17   are.

18            MR. REITER:   Why don't we -- just to be

19        clear, I'm going to introduce another

20        exhibit.   This will be marked PX 1435 -- 36.

21            (Exhibit 1436 was received and marked

22            for identification on this date and is

23            attached hereto.)

24   BY MR. REITER:

25       Q.   Let me know when you're able to see this

HIGHLY CONFIDENTIAL

Page 255

1    exhibit.

2         A.   Okay.

3         Q.   Okay.  Do you recognize this as a version

4    of Google's payments policy?

5         A.   I recognize -- yes, I recognize this as a

6    policy article in Google's Help Center.

7         Q.   And so is this a version of Google's

8    payments policy?

9         A.   It appears so, yes.

10        Q.   And do you see the sub-heading, "In-app

11   purchases"?

12        A.   Yes.

13        Q.   And the second bullet point says,

14   "Developers offering products within another

15   category of app downloaded on Google Play must use

16   Google Play In-App Billing as the method of

17   payment except for the following cases:"

18             And there's two exceptions listed there;

19   correct?

20        A.   Yes.

21        Q.   And the second exception says, "Payment

22   is for digital content that may be consumed

23   outside of the app itself."

24             Do you see that?

25        A.   I see that.

HIGHLY CONFIDENTIAL

1      Q.   And is that the -- so going back to

2    Exhibit PX 1435, at this point in time, April

3    2017, was Google considering removing that

4    exception from the payments policy?

5            MR. KRAVIS:  Object to form.

6            THE WITNESS:  I don't know if -- I'm

7        sorry, I don't recall if the -- if this was

8        removing it altogether or clarifying it and

9        changing it.

10    BY MR. REITER:

11      Q.   Okay.  But the policy change would have

12    had to do with that exception to the Google

13    payments policy; right?

14      A.   That's right.

15      Q.   Okay.  And for how long to your knowledge

16    did Google have that exception in its payments

17    policy?

18      A.   I don't -- as long as I worked there.  I

19    don't know when it was implemented.  So I can't

20    give you a total time.

21      Q.   Do you know when it was removed?

22      A.   I don't know if it ever actually was

23    removed.  I don't remember that we got there or

24    not.  So I'm sorry, I don't know.

25      Q.   That's okay.

```
1            And so my proposition here is that the
2    consumables that these other apps were selling,
3    were the same sort of item as was sold in a game.
4    But because they weren't specifically games, our
5    policy ambiguity allowed for this -- for them to
6    take advantage of the exception if they -- if they
7    had the website and the app.
8            Does that make sense?  Sorry.
9        Q.  Let me see if I can clarify.
10           So for dating apps that had a website,
11   Google treated those differently from games by not
12   requiring exclusive use of Google Play Billing; is
13   that right?
14       A.  No.  What I'm saying is because dating
15   apps are not games, it was not clear in the policy
16   as it was for games that consumables like boosts
17   and superlikes required in-app billing if the apps
18   were interpreting the policy based on the
19   ambiguity that we previously discussed.
20       Q.  I see.
21           But Google treated those apps differently
22   because unlike games, it didn't -- it did not
23   enforce the policy and require exclusive use of
24   Google Play Billing?
25           MR. KRAVIS:  Object to form.
```

                                        Page 273

1          THE WITNESS:  Yes, in practice, that's
2      what happened.
3          MR. REITER:  Okay.  I'm introducing
4      another exhibit.  This will be Plaintiff's
5      1437.
6          (Exhibit 1437 was received and marked
7            for identification on this date and is
8            attached hereto.)
9   BY MR. REITER:
10     Q.  Please let me know when you're able to
11  see it.
12     A.  Okay.
13     Q.  Actually before I ask about this e-mail,
14  you testified that you had been told the intent
15  behind the exception in the payments policy that
16  we were just looking at, was that it would apply
17  to downloads that you could use on a different
18  application, I believe, were your words.
19         Who told you that?
20     A.  I don't -- I don't remember who told me
21  specifically.  My recollection is that it was
22  commonly understood across the team that that was
23  the intent.  That's my recollection.  I don't -- I
24  don't recall conversation.
25     Q.  You never recall discussing this topic

Page 274

1  with your colleagues?

2       A.   I mean, yes, of course.  And clearly, we

3  had lots of discussions about it and about the

4  policy.  But again, like, who specifically said to

5  me the words, "this is what the intent was," I

6  don't remember.

7       Q.   And you've never spoken to anybody who

8  actually drafted that policy exception about what

9  they intended it to mean; is that right?

10       A.   Yeah, I don't know.  I mean, I may have.

11  I don't know who -- who wrote the policy.  So I

12  don't know if I talked to them or not.

13       Q.   Okay.  Exhibit 1437 is a multi-page

14  e-mail chain dated between December 16, 2016 and

15  January 17, 2017.  The first page is Bates stamped

16  GOOG-PLAY-838161.

17            Do you recognize this e-mail chain?

18       A.   I recognize this as an e-mail chain that

19  I was included on and maybe responded to, I'm not

20  sure.

21       Q.   Actually, if you look at the -- on the

22  first page, the second e-mail, do you see that

23  that's a response from you?

24       A.   Yes, I do.

25       Q.   So is this -- are these e-mails that you

HIGHLY CONFIDENTIAL

Page 275

1   would have sent and received in the ordinary

2   course of your business at Google?

3       A.  Yes.

4       Q.  Okay.  I'd like to start with the first

5   e-mail in time which is on page 838166 --

6       A.  May I have a moment to orient myself on

7   the content of this e-mail?

8       Q.  Sure.

9       A.  Okay.  I think I'm -- I think I know

10  where I am in time.

11      Q.  Okay.  So are you looking at the e-mail

12  that Brandon Barras sends on December 16, 2016 at

13  4:55 p.m.?

14      A.  Yes.

15      Q.  And who was Mr. -- who is Mr. Barras?

16      A.  Mr. Barras is the -- or was at the time,

17  I don't know if he still is, the partner manager,

18  the Play partner manager for the Match Group.

19      Q.  What were his responsibilities, if you

20  know, as the Play partner manager for the Match

21  Group?

22      A.  As described just like general

23  responsibilities of a Play BD manager, to work

24  with our partners to ensure that they were aware

25  of the latest Android developments, that they were

1    using all best practices in their apps for users,

2    and to help them grow their businesses on Play,

3    and clearly here, to talk also about -- to think

4    about implications of changes that those apps may

5    make.

6         Q.   Did Mr. Barras report to you at this

7    time?

8         A.   Yes, at this time.  Yes.

9         Q.   So in the first sentence of his e-mail he

10   writes, "There is growing concern that Tinder may

11   add additional billing options or move away from

12   Play Billing altogether in early 2017.  We would

13   like to discuss mitigating that risk by offering

14   ██████████████████████ to Match Group."

15            Do you recall that in December 2016,

16   Google had concerns that Tinder would add

17   additional billing options besides Google Play

18   Billing?

19        A.   I remember the concerns.  I didn't recall

20   the timing until looking at this e-mail, and I

21   recall it from the last thread you showed me where

22   we talked about Tinder expanding to a -- and

23   availing themselves of the ambiguous exception.

24        Q.   And why was -- why did Google have

25   concerns about Tinder offering additional billing

HIGHLY CONFIDENTIAL

Page 364

1    STATE OF CALIFORNIA      )

2                             )      ss.

3    COUNTY OF LOS ANGELES    )

4         I, RENEE HARRIS, do hereby certify that I

5    am a licensed Certified Shorthand Reporter, duly

6    qualified and certified as such by the State of

7    California;

8       That prior to being examined, the witness named

9    in the foregoing deposition was by me duly sworn

10   to testify to tell the truth, the whole truth, and

11   nothing but the truth;

12      That the said deposition was by me recorded

13   stenographically;

14      And the foregoing pages constitute a full,

15   true, complete and correct record of the testimony

16   given by the said witness;

17         That I am a disinterested person, not

18   being in any way interested in the outcome of said

19   action, or connected with, nor related to any of

20   the parties in said action, or to their respective

21   counsel, in any manner whatsoever.

22   DATED: August 18, 2022

23

24                      Renee Harris, CSR, CCR, RPR

                        CA CSR No. 14168,

25                      NJ CRR No. 30XI00241200