1   Brian C. Rocca, S.B. #221576            Glenn D. Pomerantz, S.B. #112503
    brian.rocca@morganlewis.com              glenn.pomerantz@mto.com
2   Sujal J. Shah, S.B. #215230              Kuruvilla Olasa, S.B. #281509
    sujal.shah@morganlewis.com               kuruvilla.olasa@mto.com
3   Michelle Park Chiu, S.B. #248421         Nicholas R. Sidney, S.B. #308080
    michelle.chiu@morganlewis.com            nick.sidney@mto.com
4   Minna Lo Naranjo, S.B. #259005           **MUNGER, TOLLES & OLSON LLP**
    minna.naranjo@morganlewis.com            350 South Grand Avenue, Fiftieth Floor
5   Rishi P. Satia, S.B. #301958             Los Angeles, California 90071
    rishi.satia@morganlewis.com              Telephone: (213) 683-9100
6   **MORGAN, LEWIS & BOCKIUS LLP**
    One Market, Spear Street Tower           Kyle W. Mach, S.B. #282090
7   San Francisco, CA 94105                  kyle.mach@mto.com
    Telephone: (415) 442-1000                Justin P. Raphael, S.B. #292380
8                                            justin.raphael@mto.com
    Richard S. Taffet, *pro hac vice*        Emily C. Curran-Huberty, S.B. #293065
9   richard.taffet@morganlewis.com           emily.curran-huberty@mto.com
    **MORGAN, LEWIS & BOCKIUS LLP**          Dane P. Shikman, S.B. #313656
10  101 Park Avenue                          dane.shikman@mto.com
    New York, NY 10178                       Rebecca L. Sciarrino, S.B. # 336729
11  Telephone: (212) 309-6000                rebecca.sciarrino@mto.com
                                             **MUNGER, TOLLES & OLSON LLP**
12  *Counsel for Defendants Google LLC, et al.*  560 Mission Street, Twenty Seventh Floor
                                             San Francisco, California 94105
13                                           Telephone: (415) 512-4000

14                                           Jonathan I. Kravis, *pro hac vice*
                                             jonathan.kravis@mto.com
15                                           **MUNGER, TOLLES & OLSON LLP**
                                             601 Massachusetts Avenue NW, Suite 500E
16                                           Washington, D.C. 20001
                                             Telephone: (202) 220-1100
17
                                             Neal Kumar Katyal, *pro hac vice*
18                                           neal.katyal@hoganlovells.com
                                             Jessica L. Ellsworth, *pro hac vice*
19                                           jessica.ellsworth@hoganlovells.com
                                             **HOGAN LOVELLS US LLP**
20                                           555 Thirteenth Street, NW
                                             Washington, D.C. 20004
21                                           Telephone: (202) 637-5600

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY CONSUMER ANTITRUST LITIGATION**<br><br>This Document Relates To:<br><br>*Epic Games Inc. v. Google LLC et al.,* Case No. 3:20-cv-05671-JD<br><br>*In re Google Play Consumer Antitrust Litigation,* Case No. 3:20-cv-05761-JD<br><br>*State of Utah et al. v. Google LLC et al.,* Case No. 3:21-cv-05227-JD<br><br>*Match Group, LLC et al. v. Google LLC et al.,* Case No. 3:22-cv-02746-JD | Case No. 3:21-md-02981-JD<br><br>**DEFENDANTS' STATEMENT OF RECENT DECISION REGARDING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:     Hon. James Donato<br>Ctrm:     11 |

-2-

DEFENDANTS' STATEMENT OF RECENT DECISION RE: SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

## STATEMENT OF RECENT DECISION

Defendants Google LLC et al. ("Google") respectfully refer the Court to the Third

Circuit's August 28, 2023 decision in *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*,

No. 22-2289, 2023 WL 5521221 (3d Cir. Aug. 28, 2023), attached hereto as Exhibit A, in

connection with the portion of Google's Motion for Partial Summary Judgment directed at

Plaintiffs' *per se* claims. *See* MDL Dkt. 488 at 9-13.

DATED:  September 13, 2023                    Respectfully submitted,


By:        */s/ Glenn D. Pomerantz*
          Glenn D. Pomerantz

          *Glenn D. Pomerantz, S.B. #112503*
          glenn.pomerantz@mto.com
          Kuruvilla Olasa, S.B. #281509
          kuruvilla.olasa@mto.com
          **MUNGER, TOLLES & OLSON LLP**
          350 South Grand Avenue, Fiftieth Floor
          Los Angeles, California 90071
          Telephone: (213) 683-9100
          *Counsel for Defendants Google LLC, et al.*

          Kyle W. Mach, S.B. #282090
          kyle.mach@mto.com
          Justin P. Raphael, S.B. #292380
          justin.raphael@mto.com
          Emily C. Curran-Huberty, S.B. #293065
          emily.curran-huberty@mto.com
          **MUNGER, TOLLES & OLSON LLP**
          560 Mission Street, Twenty Seventh Floor
          San Francisco, California 94105
          Telephone: (415) 512-4000

          Jonathan I. Kravis, *pro hac vice*
          jonathan.kravis@mto.com
          **MUNGER, TOLLES & OLSON LLP**
          601 Massachusetts Avenue NW, Suite 500E
          Washington, D.C. 20001
          Telephone: (202) 220-1100

Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*Counsel for Defendants Google LLC, et al.*

DEFENDANTS' STATEMENT OF RECENT DECISION RE: SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

# EXHIBIT A

2023 WL 5521221

Only the Westlaw citation is currently available.

United States Court of Appeals, Third Circuit.

WINN-DIXIE STORES, INC.; Bi-
Lo Holdings, LLC, Appellants

v.

EASTERN MUSHROOM MARKETING
COOPERATIVE, INC.; Robert A. Feranto, Jr., T/A Bella
Mushroom Farms; Brownstone Mushroom Farms, Inc.;
To-Jo Fresh Mushrooms, Inc.; Cardile Mushrooms, Inc.;
Cardile Bros. Mushrooms Packaging; Country Fresh
Mushroom Co.; Forest Mushroom, Inc.; Franklin Farms,
Inc.; Gino Gaspari & Sons, Inc.; Gaspari Bros. Inc.;
Giorgi Mushroom Company; Giorgio Foods, Inc.; Kaolin
Mushroom Farms, Inc.; South Mill Mushroom Sales,
Inc.; LRP Mushrooms Inc.; LRP-M Mushrooms LLC;
Leone Pizzini and Son, Inc.; Modern Mushrooms Farms,
Inc.; Sher-Rockee Mushroom Farm; C & C Carriage
Mushroom Co.; Oakshire Mushroom Farm, Inc.; Phillips
Mushroom Farms, Inc.; Harvest Fresh Farms, Inc.; Louis
M. Marson, Jr., Inc.; Mario Cutone Mushroom Co., Inc.;
M.D. Basciani & Sons, Inc.; Monterey Mushrooms, 
Inc.; Masha & Toto, Inc., T/a M&T Mushrooms; W &
P Mushroom, Inc.; Mushroom Alliance, Inc.; Creekside
Mushrooms Ltd; J-M Farms, Inc.; United Mushroom
Farms Cooperative, Inc.; John Pia; Michael Pia

No. 22-2289
|
Argued on April 26, 2023
|
(Opinion filed: August 28, 2023)

**Synopsis**

**Background:** Grocery-store company brought antitrust suit
against cooperative of mushroom farmers, individual farmers
belonging to cooperative, and certain downstream mushroom
distributors, alleging that defendants had violated § 1 of
the Sherman Act through a price-fixing agreement. After a
jury trial, the United States District Court for the Eastern
District of Pennsylvania, Berle M. Schiller, J., 2022 WL
2785910, entered judgment in favor of defendants based
on the jury's findings, made under the rule-of-reason test,
that although there was an overall conspiracy to artificially
increase mushroom prices, grocery-store company failed
to meet its burden of showing that the conspiracy had

anticompetitive effects. After the District Court, Schiller,
J., denied grocery-store company's post-trial motions for a
new trial and judgment notwithstanding the verdict (JNOV),
company appealed.

**Holdings:** The Court of Appeals, Krause, Circuit Judge, held
that:

challenged scheme was properly analyzed under the rule-of-
reason test, not the quick-look test, because it fell in between
being a purely horizontal or a purely vertical arrangement;

jury's findings about the existence of a conspiracy and its
membership were not irreconcilable and did not undermine
verdict;

jury's verdict was supported by sufficient evidence; and

district court's curative jury instruction rendered harmless
any improper references by defendant's counsel to challenged
scheme's supposed procompetitive benefits.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion in Limine;
Motion for New Trial; Motion for Judgment Notwithstanding
the Verdict (JNOV).

On Appeal from the United States District Court for the
Eastern District of Pennsylvania (D. C. No. 5-15-cv-06480),
District Judge: Honorable Berle M. Schiller

**Attorneys and Law Firms**

Patrick J. Ahern [ARGUED], Ahern & Associates, 590
N Sheridan Road, Lake Forest, IL 60045, Counsel for
Appellants

William A. DeStefano [ARGUED], Saxton & Stump, 100
Deerfield Lane, Suite 240, Malvern, PA 19355, Terri A.
Pawelski, Saxton & Stump, 123 S Broad Street, Suite
2800, Philadelphia, PA 19109, Counsel for Appellee, Eastern
Mushroom Marketing Cooperative, Inc.

Patrick J. Gallo, Jr. [ARGUED], Jane M. Shields, MacElree
Harvey, 17 W Miner Street, P.O. Box 660, West Chester,
PA 19382, Counsel for Appellee, United Mushroom Farms
Cooperative, Inc.

Before: JORDAN, KRAUSE and BIBAS, Circuit Judges

OPINION

KRAUSE, Circuit Judge.

 **\*1** Not every agreement to restrain trade violates the antitrust laws. Because some cases are more obvious than others, the law has evolved to use different tests depending on the closeness of the question. At one end of the spectrum are arrangements that can be condemned as illegal *per se*, or —as in the case of horizontal agreements—at least so likely to be unlawful that just a "quick look" is enough to recognize that anticompetitive effects may be presumed. At the other end of the spectrum are arrangements that are plainly lawful. And in between lie the vast majority, where careful scrutiny is necessary to decide. In this category—which includes purely vertical agreements, as well as hybrid agreements—the "quick-look" approach is inapt, and the plaintiff has the initial burden of showing anticompetitive effect under the "rule of reason."

The central—and dispositive—question in this case is which framework applies. Appellant Winn-Dixie Stores brought suit against Appellees—the Eastern Mushroom Marketing Cooperative, Inc. (EMMC), its individual mushroom farmer members, and certain downstream distributors—claiming their price-fixing agreement violated § 1 of the Sherman Act. 15 U.S.C. § 1. The District Court instructed the jury to apply the "rule-of-reason" test, and the jury returned a verdict in Appellees' favor. Winn-Dixie contends this was error, and had the judge applied the "quick-look" approach and instructed the jury to simply presume anticompetitive effects, it would have found Appellees' agreement to be an unlawful restraint of trade.

As plaintiff, Winn-Dixie understandably would have preferred the lower burden of proof. But because this hybrid scheme involved myriad organizational structures with varying degrees of vertical integration, the Court was right to apply the rule of reason. And because, under that more searching inquiry, the evidence at trial was sufficient to sustain the jury's verdict, we will affirm the judgment in favor of Appellees.

## I. Background

### A. The EMMC Conspiracy

Formed in 2001, the EMMC was a cooperative of agaricus mushroom growers that targeted the Eastern United States. At inception, the EMMC controlled over "90 percent of [the] supply of fresh agaricus mushrooms" in the relevant market. App. 1546. That share, however, declined steadily over time, falling to roughly 58% percent by 2005, and 17% percent by 2010. Participation in the cooperative fell in tandem, as the EMMC's twenty-plus initial members shrunk to fewer than five in that time.

The cooperative's stated purpose was to establish a "Minimum Pricing Policy," under which it would "circulat[e] minimum price lists along with rules and regulations requiring the member companies to uniformly charge those prices to all customers." EMMC Answering Br. 9. [1] Those minimums, critically, were "not the price at which [growers] sold the product," App. 112, but instead the price at which EMMC members hoped to coerce downstream distributors to go to market.

 **\*2** Broadly speaking, EMMC members had two types of arrangements with these downstream distributors. First, certain members operated as grower-only entities, lacking an exclusive relationship with a particular distributor. Second, and far more common, many members partnered with specific, often legally related downstream distributors. The precise nature of these relationships varied quite widely, both in terms of organizational structure and level of ownership overlap. Yet despite their functional and legal connections with members, downstream distributors were prohibited from actually joining the cooperative, and therefore were not required to follow the minimum prices of the EMMC.

Given these multifaceted relationships, the alleged conspiracy here can be distilled as an agreement by EMMC members to set the prices they themselves charged to vertically oriented distributors—some of which were integrated with EMMC members and some of which were not—in an effort to boost the prices those distributors charged to retailers.

Despite members' efforts, however, significant evidence at trial indicated that this scheme to "stabilize prices" did not work. Almost uniformly, EMMC members testified that "[n]o one" followed the minimum pricing policy schedule, *id.* at 2371, and that members routinely invoked exceptions to the policy that "swallowed up the minimum pricing rule," *id.* at 475. Numerous witnesses also testified that they faced

price-constraining competition from Canadian growers, non-EMMC stateside growers, and EMMC member infighting, and that the buying power of certain large retailers—like Walmart or Sysco—further constrained market prices. Most notably, Appellees' expert economist opined that, over the relevant time period, inflation-adjusted mushroom prices were "flat, or even down across the Eastern United States, ... not withstanding [sic] the fact that costs went up quite a bit." *Id.* at 1935.

That is not to say, however, that the record is devoid of support for Winn-Dixie's claims of supracompetitive pricing. To the contrary, internal contemporaneous EMMC documents touted the cooperative's success, and several EMMC members testified at trial that they adhered to the cooperative's pricing schedules. Likewise, Winn-Dixie's expert economist testified that unadjusted USDA mushroom pricing data indicated that "the EMMC minimums" caused a "big increase" for mushroom prices "in the marketplace as a whole," and that there was a "significant impact on Winn-Dixie's prices [specifically] from these minimum and target pricing policies," *id.* at 1562–63, which undoubtedly raises the specter of a valid § 1 claim.

Accordingly, in resolving this appeal, we confront a conspiracy involving interconnected horizontal and vertical elements and a mixed record that reflects two plausible competing narratives.

### B. Procedural History

The EMMC has a long history of both public and private antitrust scrutiny. In 2003, the DOJ Antitrust Division initiated an investigation into the EMMC's "supply control" program. *In re Mushroom Direct Purchaser Antitrust Litig.,* 655 F.3d 158, 161–62 (3d Cir. 2011). Under that program, the EMMC acquired various closed or bankrupt mushroom farms, after which it sold the underlying real estate with deed restrictions that precluded future use as a farm. *Id.* at 161. In 2005, the DOJ entered a consent judgment against the EMMC, requiring it to nullify the deed restrictions and end the program. *Id.* at 162.

Shortly thereafter, several retailers brought suit against the EMMC, its individual members, and downstream distributors. *Id.* Eventually, in June 2006, what had become seven class actions and one non-class action were consolidated before the Eastern District of Pennsylvania. *Id.* The plaintiffs in that action, like this one, alleged Sherman

Act violations for both the supply control program and the minimum pricing policy. *Id.*

**\*3** Winn-Dixie filed this complaint in 2015, while a motion for class certification in the consolidated case was still pending. When that class was eventually certified in 2016, Winn-Dixie opted out.

The case proceeded to trial in January 2022. Prior to trial, however, the parties filed two motions that are relevant on appeal. First, Winn-Dixie moved in limine for the District Court to apply "quick-look" scrutiny to its price-fixing claim, rather than the more robust "rule-of-reason" framework. The District Court denied that motion, opting for the rule of reason "because the effects of the minimum pricing policy [were] not 'obviously or facially anticompetitive.' " App. 17 (citation omitted). [2] Second, Appellees moved to introduce evidence of certain "procompetitive" benefits flowing from the EMMC's pricing policy, namely that the policy had saved member mushroom farms and decreased member losses. The District Court also denied that motion, reasoning that "the Sherman Act does not permit defendants to justify anticompetitive behavior by arguing that the behavior forestalls certain negative consequences where those consequences are the result of competition." *Id.* at 16.

After a fourteen-day trial, a jury returned a verdict in favor of Appellees. On a special verdict form, the jury found that (1) an overall conspiracy existed to artificially increase mushroom prices; (2) the EMMC itself participated in the conspiracy, but Winn-Dixie had not proven the participation of individual growers and distributors; and (3) Winn-Dixie also failed to carry its burden of proof on anticompetitive effects. [3]

Following that verdict, Winn-Dixie moved for a new trial and judgment notwithstanding the verdict, raising many of the same issues it does here. The District Court denied that motion, and Winn-Dixie filed this timely appeal.

## II. Discussion

On appeal, Winn-Dixie asserts that it is entitled to a new trial because (1) the District Court applied the rule-of-reason framework for determining antitrust harm, rather than Winn-Dixie's requested quick look; (2) the jury's answers on the special verdict form were internally inconsistent; (3) that verdict was against the "overwhelming" weight of the evidence; and (4) Appellees' repeated references to certain impermissible procompetitive benefits at trial, in

direct contravention of a pretrial order, prejudiced the jury. For the reasons explained below, none of these arguments is persuasive.

### A. Denial of Winn-Dixie's Quick-Look Motion

**\*4** In the vast majority of § 1 cases, a district court's application of the rule of reason, rather than quick-look or *per se* condemnation, dooms a plaintiff's price-fixing suit. *Nat'l Collegiate Athletic Ass'n v. Alston*, —— U.S. ——, 141 S. Ct. 2141, 2160–61, 210 L.Ed.2d 314 (2021). As such, our analysis here begins with the District Court's election of the rule of reason. We exercise plenary review over that decision, *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 829 n.7 (3d Cir. 2010), but recognize that "underpinning that purely legal decision are numerous factual questions," *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 733–34 (8th Cir. 2014).

### 1. Applicable Case Law

The rule of reason "presumptively applies" in § 1 cases. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006). When it does, a plaintiff bears the heavy initial burden of proving that a "challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, —— U.S. ——, 138 S. Ct. 2274, 2284, 201 L.Ed.2d 678 (2018). The quick-look approach, by contrast, is "an intermediate standard" of antitrust scrutiny, under which a court instead presumes the plaintiff has met her initial burden. *Deutscher Tennis Bund*, 610 F.3d at 830.[4] It applies only "where per se condemnation is inappropriate, but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint." *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993) (internal quotations omitted). Said another way, it applies if "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets," *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999), and it does not apply if "the contours of the market ... are not sufficiently well known or defined to permit the court to ascertain without the aid of extensive market analysis whether the challenged practice impairs competition," *Deutscher Tennis Bund*, 610 F.3d at 832 (internal quotations and citation omitted).

If this sounds like a test of "I know it when I see it," that is not far from the mark. There is no set methodology for determining when the quick look applies, and the Supreme Court has warned against drawing "categorical line[s] ... between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment." *Cal. Dental Ass'n*, 526 U.S. at 780–81, 119 S.Ct. 1604. The selection process is therefore more "art than science," and not subject to "[a]n overly-formalistic and literal approach." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1016 (N.D. Cal. 2008). It boils down to whether we have "amassed 'considerable experience with the type of restraint at issue' " such that we "can predict with confidence that it would be invalidated in all or almost all instances." *Alston*, 141 S. Ct. at 2156 (citation omitted).

In this case, where the arrangement has both horizontal and vertical components, our prediction will be guided by three cases: the Supreme Court's landmark decision in *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) and our opinions in *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008), and *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)—both of which grapple with the implications of *Leegin*. Because those cases bound the problem and their implications for the EMMC's arrangement depend in part on its resemblance to the arrangements they discuss, we will summarize each of them before applying their lessons here.

**\*5** In *Leegin*, the Supreme Court overruled its century-old "formalistic" *per se* condemnation of vertical price restraints, ruling instead that modern "economics literature is replete with procompetitive justifications for a manufacturer's use of resale price maintenance." 551 U.S. at 888–89, 127 S.Ct. 2705 (citation omitted). At the same time, the Court did not preclude the possibility that vertical restraints could lead to anticompetitive effects if, for example, resale restraints were used to "facilitate a manufacturer cartel" or "organize cartels at the retailer level." *Id.* at 892–93, 127 S.Ct. 2705. In such hybrid scenarios, the Court recognized, heightened scrutiny might be warranted. *Id.* Thus, it concluded that while "[a] horizontal cartel among competing manufacturers or competing retailers ... is, and ought to be, *per se* unlawful," if "a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it ... would need to be held unlawful under the rule of reason." *Id.* at 893, 127 S.Ct. 2705.

*Leegin* involved a purely vertical arrangement, but in *Toledo*, we had occasion to apply its guidance to a hybrid conspiracy and to expand on its "facilitation" language. 530 F.3d at 210. There, a plaintiff truck dealership alleged (1) that fellow Mack truck dealers had entered into a purely horizontal conspiracy to abstain from competing on price; and (2) that Mack—the upstream truck manufacturer—had agreed with certain downstream dealers to punish those dealers who violated geographic sales restrictions. *Id.* at 218–19. On appeal, we bifurcated these two claims, essentially treating each as a separate conspiracy. *Id.* at 211. We recognized that the first, "an agreement among Mack dealers ... involv[ing] horizontal competitors colluding to control prices[,] ... would be per se unlawful." *Id.* at 221. For the hybrid arrangement in the second conspiracy, however, we inferred from *Leegin* that "[t]he rule of reason analysis applies even when ... the purpose of the vertical agreement between a manufacturer and its dealers is to support illegal horizontal agreements between multiple dealers," *id.*, and we therefore rejected *per se* condemnation and applied the rule of reason to Mack's market allocation scheme.

Two years later, however, we bounded *Leegin*'s reach. In *In re Insurance Brokerage Antitrust Litigation*, plaintiffs—a class of insurance purchasers—alleged that certain insurance companies had engaged in bid rigging, using a broker as a "middle-man" to orchestrate "a hub-and-spoke conspirac[y], with the broker as the hub and its insurer-partners as the spokes." 618 F.3d at 327. In discerning the proper mode of antitrust inquiry, we explained that "[t]he critical issue" was "how the spokes are connected to each other," *id.*, and that horizontally situated "defendants cannot escape the per se rule ... simply because their conspiracy depend[s] upon the participation of a 'middle-man,' even if that middleman conceptualized the conspiracy, orchestrated it ... and collected most of the booty," *id.* at 337 (citation omitted). Neither the fact that a "vertical organizer" at a different level of the market structure "managed" the scheme, *United States v. Apple, Inc.*, 791 F.3d 290, 325 & n.20 (2d Cir. 2015), nor the "likelihood that the horizontal collusion would not have occurred without the [manager's] involvement" could "necessarily mitigate[ ]" "[t]he anticompetitive danger inherent" in horizontal collusion, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 338. So at least in the hub-and-spoke context, we held that a hybrid arrangement could still be subject to *per se* scrutiny or the quick-look approach. *Id.* at 327.

### 2. The Proper Mode of Inquiry for the EMMC's Arrangement

Applying the teachings of these cases here, we ask two questions: first, whether *Toledo*'s bifurcated approach should or could map onto Appellees' alleged price-fixing scheme, 530 F.3d at 210; *see also In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719, 728 (3d Cir. 2020), and second, whether the scheme here is (1) sufficiently akin to the horizontal arrangement in *Toledo* or the hub-and-spoke scheme in *Insurance Brokerage* to warrant *per se* or quick-look condemnation; (2) sufficiently akin to the vertical arrangements in *Leegin* or *Toledo* to trigger the rule of reason; or (3) dissimilar from both, indicating that we lack "considerable experience with the type of restraint at issue," and therefore should revert to the rule of reason, *Alston*, 141 S. Ct. at 2156 (citation omitted).

**\*6** Here, bifurcation is not an option. Unlike the distinctive nature of the respective restraints in *Toledo*, the "complex business arrangements" in this case preclude such clean line drawing. *Id.* Winn-Dixie alleges a singular effort among upstream farmers and downstream distributors, each of whom are vertically integrated to differing degrees. Because the success of that singular effort depended on coordination by multiple actors at multiple levels of the supply chain, this is simply not a situation where two distinct conspiracies contributed to the same price-fixing end goal.[5]

As for whether this hybrid scheme sufficiently resembles a purely horizontal or vertical arrangement, we conclude that it falls in between, so the rule of reason applies. That is because the interplay between the vertical and horizontal components of Appellees' scheme muddies the theoretical economic conclusions that a court might draw, in turn negating our ability to label it as "obviously anticompetitive." *Cal. Dental Ass'n*, 526 U.S. at 779, 119 S.Ct. 1604. On the one hand, the scheme's dependence on downstream, non-EMMC members precludes our drawing the anticompetitive inferences typically associated with purely horizontal price-fixing restraints, such as reduced output or increased prices. By Winn-Dixie's own admission, Appellees' scheme consisted of a "horizontal agreement among competitors (growers) to fix prices *at a different level of distribution*—the prices charged to retailers by affiliated packer/shippers." Pl. Mot. in Lim. 5, D. Ct. ECF No. 382 (emphasis added). So even if, as Winn-Dixie contends, each grower-distributor relationship formed to facilitate an upstream grower cartel,

*Leegin* instructs that those facilitating agreements must be analyzed under the rule of reason.

On the other hand, while this need for vertical coordination mirrors *Leegin* in key respects, *see* 551 U.S. at 883, 127 S.Ct. 2705, in view of the EMMC's upstream conspiratorial focus on "stabilizing prices," App. 821, it would make little sense to analyze each individualized grower-distributor vertical relationship in a vacuum. We cannot characterize this scheme as a single manufacturer imposing resale restrictions on a single distributor, *see, e.g.*, *Leegin*, 551 U.S. at 883, 127 S.Ct. 2705; *AT & T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 530 (3d Cir. 2006), nor as a manufacturer reinforcing an existing downstream horizontal conspiracy through additional vertical restraints, *Toledo*, 530 F.3d at 211–12.

Instead, we confront a tailored set of interrelated vertical and horizontal agreements among growers and distributors. Closest is the scheme the Supreme Court hypothesized in *Leegin*, which contemplated a situation where "a vertical agreement setting minimum resale prices is entered upon to facilitate" a horizontal agreement, 551 U.S. at 893, 127 S.Ct. 2705, and the scheme we confronted in *Toledo*, where the "purpose of the vertical agreement between a manufacturer and its dealers [was] to support illegal horizontal agreements between multiple dealers," 530 F.3d at 225. In both, the courts landed on the rule of reason as the proper mode of analysis. *Id.*; *Leegin*, 551 U.S. at 894, 127 S.Ct. 2705. Likewise, we conclude it is here.

**\*7** *Insurance Brokerage* does not convince us otherwise. In the EMMC's case, there is no set of horizontal spokes and nothing akin to a unilateral vertical conduit. To the contrary, downstream distributors in this arrangement have exhibited a remarkable lack of "unity of interest" with both competing distributors and upstream EMMC growers. *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 6322383, at \*14 (E.D. Pa. May 26, 2015) (quoting *In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274, 291 (E.D. Pa. 2009)). So this scheme does not closely resemble the arrangement in *Insurance Brokerage*, and we cannot say we have "amassed considerable experience" with this arrangement. *Alston*, 141 S. Ct. at 2156. As a result, quick-look or *per se* condemnation is simply not appropriate. *Id.*

That conclusion is confirmed by the jury's determination, after a fourteen-day trial, that Appellees' scheme did not, in fact, cause anticompetitive harm. Such a finding is "a

good indicator that the plaintiffs' demand for [the quick-look approach] is off base," *In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d at 730, and that the District Court correctly rejected quick-look condemnation, *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 341 n.10 (2d Cir. 2008) (Sotomayor, J., concurring) ("When empirical analysis is required to determine a challenged restraint's net competitive effect, neither a *per se* nor a quick-look approach is appropriate.").

As the District Court did not err in applying the rule of reason, Winn-Dixie is not entitled to a new trial on that basis.

### B. Inconsistent Jury Responses

Winn-Dixie next asserts that the jury's successive answers on its verdict form were "conflicting and irreconcilable." Opening Br. 24. In relevant part, that form asked:

> 1. Do you find ... that there was a single overarching conspiracy to raise the prices of agaricus mushrooms by: (1) circulating minimum or target price lists along with rules and regulations requiring EMMC members to charge those prices; and (2) acquiring properties ... [and] placing deed restrictions on the properties to prevent their future use as mushroom[ ] farms?

> 2. Do you find ... that any [of the entities listed] participated in the ... single overarching conspiracy to raise the prices of agaricus mushrooms?

App. 2499–500. The jury responded "yes" to question one. It then marked only the EMMC for question two, thus precluding liability for any individual cooperative member or downstream distributor. On appeal, Winn-Dixie contends that there is "no rational explanation for the jury's finding that the EMMC participated in a conspiracy that did not involve a single one of its members." Opening Br. 25.

That claim is unavailing, as Winn-Dixie fails to acknowledge the District Court's accompanying jury instruction: "A business that belongs to a trade association does not become liable for violating the antitrust laws simply because the trade association is liable for such violation." App. 2464. That instruction is supported by substantial precedent, *see, e.g.*, *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007 (3d Cir. 1994); *SmileDirectClub, LLC v. Tippins*, 31 F. 4th 1110, 1119 (9th Cir. 2022); *Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015), making clear why the jury's successive answers are not *per se* irreconcilable. While the District Court

had an "obligation to distill the law correctly" in giving its instruction, *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 190 (3d Cir. 2019), it met that obligation here. We therefore turn to whether the weight of the evidence supports the jury's findings.

### C. Sufficiency of the Evidence

**\*8** When a litigant challenges a jury verdict on sufficiency grounds, a district court may only grant a new trial where "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993) (citations omitted). On appeal, "[t]o demonstrate that the District Court erred in declining to grant it a new trial ..., [Winn-Dixie] must establish that (1) the jury reached an unreasonable result [*i.e.*, one that shocks our conscience], and (2) the District Court abused its broad discretion in not setting the verdict aside." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016).

Here, notably, the District Court did not specifically address whether the jury's alleged errors, without more, warranted a new trial. In denying Winn-Dixie's post-trial motion, the Court explained that "[e]ven *assuming*, for the purposes of this motion, ... the jury erred by not finding that there were additional members of the conspiracy beyond the EMMC," the jury's separate finding that the conspiracy failed to harm competition was independently dispositive. App. 9 (emphasis added). That reasoning was undoubtedly correct, as we will not overturn a jury verdict if "it is highly probable that [any] error[ ] did not affect the outcome of the case," *McQueeney v. Wilmington Tr. Co.*, 779 F.2d 916, 917 (3d Cir. 1985), meaning, in the antitrust context, the weight of the evidence does not overwhelmingly contradict the jury's finding that Appellees' scheme did not harm competition, *Greenleaf v. Garlock*, 174 F.3d 352, 365 (3d Cir. 1999). The threshold is a high one, and it is not crossed where the verdict, as a whole, does not "shock [the] conscience" or "cr[y] out to be overturned." *Klein*, 992 F.2d at 1290.

To satisfy its "initial burden" under the rule of reason, Winn-Dixie had to prove "a substantial anticompetitive effect," *Am. Express Co.*, 138 S. Ct. at 2284—that is, that the EMMC's arrangement either increased market prices, reduced market output, or decreased product quality, *id.*[6] In recognition of the "difficulty of isolating the[se] market effects," we "typically allow" a plaintiff to meet its burden by proving market power as a proxy, *Brown Univ.*, 5 F.3d at 668,[7] and

we will give Winn-Dixie that benefit as well, for if it cannot meet the lower burden of proving market power, it assuredly cannot meet the higher one of specific market effects.

### 1. Market Power

Market power is "the ability to raise prices above those that would prevail in a competitive market." *Id.* In assessing whether firms possess that ability, courts prescribe a myriad of typical factors for a jury to consider. *Weiss v. York Hosp.*, 745 F.2d 786, 827 n.72 (3d Cir. 1984); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). One "important factor," as the District Court accurately charged the jury here, "is the Defendant's market share, that is, it's [sic] percentage of the products or services sold in the relevant market by all competitors." App. 2461.

**\*9** But market share is just that—one factor. *See Allen-Myland, Inc. v. Int'l Bus. Machs. Corp.*, 33 F.3d 194, 208 (3d Cir. 1994); *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 253 n.13 (3d Cir. 2022). And this distinction, between market share and market power, is fatal to Winn-Dixie's claim.

On appeal, Winn-Dixie asserts only that the "undisputed evidence" of the EMMC's 90% market share in 2001 unequivocally "established market power." Opening Br. 15. The cases on which it relies, however, stand for the unremarkable proposition that "[m]arket share is relevant to the determination of the existence of market or monopoly power," *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 967 (10th Cir. 1990), and that less than a 90% share does not preclude a market-power finding, *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990); *Graphic Prods. Distribs. v. Itek Corp.*, 717 F.2d 1560, 1570–71 (11th Cir. 1983); *Barrett v. Fields*, 924 F. Supp. 1063, 1075 (D. Kan. 1996). But more importantly, those cases make clear that market share alone is "insufficient to establish market power." *Reazin*, 899 F.2d at 967 (citation omitted). So Winn-Dixie is simply incorrect that the evidence of the EMMC's initial 90% market share compelled any reasonable jury to conclude the consortium had market power.

By hanging its hat entirely on market share, Winn-Dixie also fails to address or even acknowledge the host of other factors that the District Court properly instructed the jury it could consider when assessing anticompetitive effects: (1) the effect of the restraint on prices, output, product quality, and service; (2) the purpose and nature of the restraint;

(3) the nature and structure of the relevant market; (4) the number of competitors in the relevant market, and the level of competition among them, both before and after the restraint was imposed; and (5) any facts unique to the fresh agaricus mushroom industry.

The trial record on those other factors was substantial and weighed against a finding of market power. That record included the testimony of the EMMC members' expert economist that inflation-adjusted prices actually *decreased* following the EMMC's formation. While the ultimate inquiry here is, of course, whether the market price for mushrooms would have been lower absent the alleged conspiracy, such downward or flat pricing trends may inform that inquiry because a "lack of evidence of increased price, decreased output, or other anticompetitive indicia in the relevant market [may] show[ ] that [a group of conspirators] lacks market power." *Nat'l Ass'n of Rev. Appraisers & Mortg. Underwriters, Inc. v. Appraisal Found.,* 64 F.3d 1130, 1135 (8th Cir. 1995). [8] A reasonable jury thus could have concluded that the EMMC lacked the ability to artificially raise prices.

**\*10** Likewise, the jury had before it evidence of the EMMC's steadily declining market share and could reasonably have concluded that this "reduced market share" over time indicated a "lack of durable market power" and an inability "to control prices or exclude competition." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.,* 748 F.3d 160, 175 (4th Cir. 2014); *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 347 (3d Cir. 1981). [9] The same is true of the structural factors that the EMMC members highlight on appeal: trial testimony and contemporaneous internal documents indicated that they faced pricing pressure from southern-Canadian mushroom growers, other non-EMMC growers, and fellow EMMC members, and that large downstream retailers, such as Walmart or Sysco, may have had sufficient buying power to constrain any attempt at supracompetitive pricing.

In short, while we recognize the probative value of the EMMC's 90% initial market share—which undoubtedly raises the specter of market power—that market share did not preclude a rational jury from finding the EMMC's members lacked market power. The jury's verdict therefore did not "shock the conscience," *Leonard,* 834 F.3d at 386; *Klein,* 992 F.2d at 1290, and the District Court did not abuse its discretion in denying a new trial on that ground.

### 2. Anticompetitive Effects

Because Winn-Dixie's market power challenge fails, so too does its detrimental effects challenge, as the former is a prerequisite for the latter. *Agnew v. Nat'l Collegiate Athletic Ass'n,* 683 F.3d 328, 335 (7th Cir. 2012). The EMMC's expert opined that real mushroom prices decreased over time—an opinion on which the jury was free to rely when assessing anticompetitive effects—and while Winn-Dixie leans heavily into a few contemporaneous statements from EMMC representatives touting the cooperative's success, countervailing trial testimony undercut the credibility of those statements. For example, one member representative testified that the EMMC's cited pricing metrics referenced the United States overall, and thus did not necessarily speak to whether "the EMMC had any impact" on the market. *See* App. 1877–80. Numerous cooperative members also testified that the EMMC's various written exceptions to the pricing floor policy, along with widespread cheating on that policy, undermined the scheme's efficacy and drove prices down to competitive levels. As at least one member starkly put it: "I don't think the minimum pricing was effective, at all." App. 475.

Because there was not, as Winn-Dixie contends, "overwhelming" evidence of conspiratorial success, and because there was more than sufficient evidence for the jury to make the findings it did, the District Court also did not err in denying Winn-Dixie's motion for a new trial on sufficiency grounds.

### D. References to Improper Procompetitive Benefits

Finally, Winn-Dixie asserts that it is entitled to a new trial because Appellees made "repeated references to the purpose of the EMMC and its minimum pricing as saving farms and decreasing losses ... in direct contravention to the District Court's ... ruling excluding increased producer prices, increased producer profits, decreased producer losses, or helping firms stay in operation [as] valid procompetitive benefits under the rule of reason." Opening Br. 43 (internal quotations omitted). Even if that were true, however, this final claim is also unavailing.

**\*11** To prevail on an improper assertion claim, an appellant must show that the "improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Fineman v. Armstrong World Indus.,*

*Inc.*, 980 F.2d 171, 207 (3d Cir. 1992) (citation omitted). For two reasons, no such probability exists here.

First and foremost, the jury did not actually reach the question of procompetitive benefits. Because the jury found that Winn-Dixie failed to show that the restraints here caused competitive harm, the jury had no occasion to further assess whether those restraints were "unreasonable." App. 2503. And it is at this step of the rule-of-reason analysis that defendants' proof of procompetitive benefits can overcome a plaintiff's prima facie showing of competitive harm. *Am. Express Co.*, 138 S. Ct. at 2284.

Second, the District Court offered a curative instruction that rendered any impropriety harmless. In relevant part, the Court charged: "You may not consider increased producer prices, increase[d] producer profits, decreased producer losses, or helping firms stay in operation as procompetitive benefits." App. 2462. Because "we presume that jurors follow curative instructions," *United States v. Fallon*, 61 F.4th 95, 125 (3d Cir. 2023), we see no basis here for disturbing the jury's verdict.

**III. Conclusion**

For the foregoing reasons, we will affirm the judgment of the District Court.

**All Citations**

--- F.4th ----, 2023 WL 5521221

## Footnotes

1    In full, the EMMC's form membership agreement stated that the "objective of the Cooperative" was to "improve conditions in the mushroom industry for the mutual benefit of its members as producers by[:] [1] promoting, fostering and encouraging the intelligent and orderly marketing of mushrooms through cooperation; [2] eliminating speculation, waste and fluctuating prices; [3] making the distribution of agricultural by-products between producers and consumers as direct as can be efficiently done, thereby eliminating any manipulation of the price by middlemen; [4] stabilizing the marketing of agricultural products; [5] encouraging efficiency and economy in marketing; [6] preventing the demoralizing of markets resulting from dumping and predatory practices; [7] mitigating the recognized evils of a marketing system under which prices are set for the entire industry by the weakest producer; and [8] fostering the ability of the members of this Cooperative to obtain prices for their mushrooms in competitive markets, which are fair prices but not prices inflated beyond the reasonable value of such products by reason of artificially created scarcity of such products or other predatory trade practices which would injure the public interest." App. 2516.

2    Although the District Court also made a pretrial finding that *per se* scrutiny applied to the supply control program, Winn-Dixie's expert conceded at trial that the program "[h]ad no direct [effect] on prices" for Winn-Dixie. App. 1599. The District Court instructed the jury accordingly, ultimately relying on a pretrial stipulation from Winn-Dixie that "the supply control program was implemented to support the EMMC's price-fixing," *id.* at 2245, to charge the jury on a single "overarching" price-fixing conspiracy subject to the rule of reason.

3    Given the jury's finding of a lack of competitive harm, the jury did not reach the final several questions: (1) whether that restraint was unreasonable (*i.e.*, offset by procompetitive benefits); (2) whether Winn-Dixie itself had been overcharged; (3) whether any defendants entered but withdrew from the conspiracy; and (4) damages.

4    As compared to *per se* condemnation, the quick look permits defendants to overcome that initial presumption of anticompetitive harm by "promulgat[ing] 'some competitive justification' for the restraint." *Deutscher Tennis Bund*, 610 F.3d at 831 (citation omitted).

5    In view of Winn-Dixie's pretrial stipulation that "the supply control program was implemented to support the EMMC's price-fixing," App. 2245, and its failure to raise any sort of bifurcation claim related to the pricing

policy and the supply control program on appeal, we need not dwell on whether the District Court erred by failing to bifurcate along these lines. And even if it had, that error would not warrant a new trial here because it was harmless: Winn-Dixie's expert conceded that Winn-Dixie itself did not suffer an antitrust injury as a result of the supply control program, and so had the jury considered this restraint in isolation, it would have had no effect on the result. *Graboff v. Colleran Firm*, 744 F.3d 128, 140 (3d Cir. 2014).

6    Should a plaintiff make that threshold showing, "then the burden shifts to the defendant[s] to show a procompetitive rationale for the restraint." *Id.* at 2284. If defendants successfully make that subsequent showing, the burden again "shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* Because Winn-Dixie failed to carry its burden at step one of the framework, and the jury's finding in that respect was supported by sufficient evidence, we have no occasion to assess these later steps.

7    The District Court's jury instructions accurately explained that a plaintiff can satisfy its burden at step one of the rule-of-reason framework "either by [1] directly proving the existence of an actual anticompetitive effect in a relevant market[—][i]n this case, higher mushroom prices than there would have been without the restraint[—]or [2] by proving the Defendants had market power in the relevant market." App. 2460.

8    *See also SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 968–89 (10th Cir. 1994); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petrol. Corp.*, 79 F.3d 182, 196–98 (1st Cir. 1996); *Metro Mobile CTS, Inc. v. NewVector Commc'ns Inc.* 892 F.2d 62, 63 (9th Cir. 1989); *cf. Allen-Myland, Inc. v. Int'l Bus. Machs. Corp.*, 33 F.3d 194, 211 n.18 (3d Cir. 1994).

9    While courts have typically relied on such market share trends in the § 2 monopolist context, *id.*, the same logic applies with equal force to the EMMC. We see no reason, for instance, why it would have been a "miscarriage of justice" for the jury to conclude that this steady EMMC exodus was due, at least in part, to the fact that the originally promised "price stabilization" never came to fruition.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.