# Exhibit A1
# Public Redacted Version

1  Paul J. Riehle (SBN 115199)
   paul.riehle@faegredrinker.com
2  **FAEGRE DRINKER BIDDLE & REATH**
   **LLP**
3  Four Embarcadero Center, 27th Floor
   San Francisco, CA 94111
4  Telephone: (415) 591-7500

5  Christine A. Varney (*pro hac vice*)
   cvarney@cravath.com
6  **CRAVATH, SWAINE & MOORE LLP**
   825 Eighth Avenue
7  New York, NY 10019
   Telephone: (212) 474-1000
8
   *Counsel for Plaintiff Epic Games, Inc. in Epic*
9  *Games, Inc. v. Google LLC et al.*

10 Karma M. Giulianelli (SBN 184175)
   karma.giulianelli@bartlitbeck.com
11 **BARTLIT BECK LLP**
   1801 Wewatta St., Suite 1200
12 Denver, CO 80202
   Telephone: (303) 592-3100
13
14 Hae Sung Nam (*pro hac vice*)
   hnam@kaplanfox.com
15 **KAPLAN FOX & KILSHEIMER LLP**
   850 Third Avenue
16 New York, NY 10022
   Telephone: (212) 687-1980
17
   *Co-Lead Counsel for the Class in In re Google*
18 *Play Consumer Antitrust Litigation*

Brendan P. Glackin (SBN 199643)
bglackin@agutah.gov
**OFFICE OF THE UTAH ATTORNEY**
**GENERAL**
160 E 300 S, 5th Floor
PO Box 140872
Salt Lake City, UT 84114-0872
Telephone: (801) 366-0260

*Counsel for the Plaintiff States*

Douglas J. Dixon (SBN 275389)
ddixon@hueston.com
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640

*Counsel for Plaintiffs Match Group, LLC, et al.*

28 [Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

**IN RE GOOGLE PLAY STORE
ANTITRUST LITIGATION**

THIS DOCUMENT RELATES TO:

*Epic Games, Inc. v. Google LLC et al.*,
Case No. 3:20-cv-05671-JD

*In re Google Play Consumer Antitrust Litigation*,
Case No. 3:20-cv-05761-JD

*State of Utah et al. v. Google LLC et al.*,
Case No. 3:21-cv-05227-JD

*Match Group, LLC et al. v. Google LLC et al.*,
Case No. 3:22-cv-02746-JD

Case No. 3:21-md-02981-JD

**PLAINTIFFS' PROPOSED REMEDY RE
GOOGLE'S DESTRUCTION OF CHAT
EVIDENCE**

Judge:  Hon. James Donato

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.    Google Intentionally Deprived Plaintiffs of Evidence That Would Have Strengthened Their Case. ........................................................................................................................ 4

    A.    Google Intentionally Deprived Plaintiffs of Evidence Regarding Anticompetitive Agreements with OEMs. ...................................................... 4

        i.    Revenue Sharing Agreements ........................................................... 5

        ii.    Mobile App Distribution Agreements ............................................... 6

        iii.    Google's Efforts to Pay Samsung Not to Compete ........................... 6

    B.    Google Intentionally Deprived Plaintiffs of Evidence Regarding Anticompetitive Agreements with Android Developers. ................................. 9

        i.    Project Hug .......................................................................................... 9

        ii.    Google's Agreements Not to Compete with ABK, Riot and Supercell ........... 10

    C.    Google Intentionally Deprived Plaintiffs of Evidence Regarding Post-Litigation Changes to Google Play's Business Model. ................................................... 11

        i.    September 2020 Policy Changes ...................................................... 11

        ii.    Project Runway .................................................................................. 13

    D.    Google Intentionally Deprived Plaintiffs of Evidence Regarding Google's Relationship with Apple. .............................................................................. 13

II.    A Permissive Adverse Inference Instruction Would Be Proportional. ..................... 14

III.    Google's Arguments Against an Adverse Inference Instruction Fail. ..................... 15

# TABLE OF AUTHORITIES

**Cases**                                                                                             **Page(s)**

*Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp 2d 1132 (N.D. Cal. 2012)...................................... 14, 15

*Glover v. BIC Corp.*, 6 F.3d 1318 (9th Cir. 1993)............................................................................ 3

*Io Group, Inc. v. GLBT, Ltd.*, 2011 WL 4974337 (N.D. Cal. Oct. 19, 2011) ...................................... 14

*Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401 (9th Cir. 2011) ............................................ 3

*Radio City, Inc. v. Celestron Acquisition, LLC*, 2023 WL 5519324 (N.D. Cal. Aug. 25, 2023)............................................................................................................................................. 14, 15

1

**<u>INTRODUCTION</u>**

2       After several rounds of briefing, two evidentiary hearings that included the testimony of four

3   Google employees and a production of over 210,000 additional documents, this Court made the

4   following findings:  "Google fell strikingly short" of its duty to preserve evidence (Dkt. 469 at 16);[1]

5   Google knowingly "gave each employee carte blanche to make his or her own call about what might

6   be relevant in this complex antitrust case," employing a "'don't ask, don't tell' policy for Chat

7   preservation, at the expense of its preservation duties" (*id.* at 17-18); and Google did so as part of a

8   deliberate, long-running scheme in which "intentionality manifested at every level within Google to

9   hide the ball with respect to Chat," with "individual users . . . conscious of litigation risks and valu[ing]

10  the 'off the record' functionality of Chat" (*id.* at 17).  Moreover, to perpetuate this scheme, Google

11  concealed its conduct from Plaintiffs and the Court—it "falsely assured the Court in a case

12  management statement in October 2020 that it had 'taken appropriate steps to preserve all evidence

13  relevant to the issues reasonably evident in this action,' without saying a word about Chats."  (*Id.*

14  at 16.)  Put simply, "Google intended to subvert the discovery process" by intentionally destroying

15  "relevant, substantive business communications."  (*Id* at 18.)  This Court has also already found that

16  Google's intentional Chat destruction "certainly" prejudiced Plaintiffs.  (*Id.*)

17      This Court held that "sanctions are warranted" to address Google's deliberate misconduct, but

18  it asked the parties to brief the appropriate sanctions, explaining that "[t]he remaining question is about

19  the remedy," and "[t]he remedy should fit the wrong."  (*Id.* at 1, 18-19.)  To determine "an appropriate

20  non-monetary sanction," the Court asked "to see the state of play of the evidence at the end of fact

21  discovery," so that Plaintiffs could "tell the Court what *might* have been lost in the Chat

22  communications," recognizing the inherent difficulty of showing that which no longer exists—or, as

23  the Court referred to it, "plaintiffs' dilemma of trying to prove the contents of what Google has

24  deleted."  (*Id.* at 19 (emphasis added).)  As the Court noted during the September 7, 2023 hearing:

25              [Y]ou can't talk about things you don't know about.  But you should be
            able to give me at least some informed sense of things that you expected
26          to have seen or you thought you would have seen or you saw a little bit
            of, or whatever, and you think the chat issue impacted that in a negative
27          way.  (September 7, 2023 Hearing Transcript at 35:20-25.)

28

---

[1] Citations to "Dkt." are to *In re Google Play Store Antitrust Litigation*, No. 3:21-md-02981-JD.

While no one can speak to the actual Chats that Google intentionally deleted, the record contains example after example of Google employees beginning to discuss topics highly relevant to this litigation and then quickly agreeing to turn history off to trigger automatic deletion and shield further discussion from discovery, necessarily ending the record available to Plaintiffs. These interrupted Chats are the tip of the iceberg and are powerful evidence of key information—which by any reasonable inference is information that Google thought would be harmful to its legal position if disclosed—being deliberately and permanently destroyed, and thus hidden from Plaintiffs and the Court.

Had all relevant Chats been preserved and produced, Plaintiffs believe they would have had additional evidence, which in all likelihood would include clearer and more candid communications, to prove the anticompetitive purpose of the contracts Google signed with original equipment manufacturers ("OEMs") and developers. For example, Plaintiffs believe that these deleted documents would have shown that Google's revenue share agreements with OEMs were meant to preserve Google Play's app distribution dominance and that Google's Project Hug agreements with would-be app store competitors were intended to pay them not to compete. Further, Plaintiffs believe Google employees discussed the true, anticompetitive motivations behind Google's post-litigation policy changes to Google Play, as well as its top-secret agreements with Apple. But Google employees were trained to speak freely about these topics and others without the risk of disclosure in this litigation by simply keeping history off in Chats, which they did in droves. (*See generally* Dkt. 469.)

The record before this Court easily justifies an adverse inference instruction. Google intentionally engaged in a scheme targeted specifically at concealing from discovery its most sensitive—and most damning—communications, including about the topics at the heart of this litigation. Google's assertion that Plaintiffs obtained most or all relevant communications is unfounded because Google itself does not know what information it destroyed. Moreover, the evidence squarely contradicts Google's assertion, unequivocally showing that Google employees deliberately took their most sensitive discussions, including those subject to litigation holds, from preserved formats to "History Off" Chats, and that Google did in fact delete hundreds of thousands— perhaps millions—of those Chats rather than produce them in litigation. This was standard practice at

Google.  Indeed, Google instructed its employees that history off Chats were protected from disclosure, encouraged copying counsel to apply attorney-client privilege (sometimes referred to as "fake privilege"), and warned employees that careless communications could end up being repeated in a courthouse.  For more than 10 years, Google automatically destroyed Chats, even for custodians under a legal hold during active litigation.  (Dkt. 429-3 ¶ 9.)  The only reasonable conclusion is that Google *succeeded* in its scheme and that the destroyed Chats would have been (at least on average) *more* sensitive and *more* damning to Google's positions in this litigation than the communications Google actually preserved and produced.  Google's only failure is that in this litigation, for the first time in more than a decade, it got caught and its scheme was exposed.

Despite all that, and in light of this Court deciding against a "terminating" remedy (Dkt. 469 at 19), Plaintiffs seek a relatively modest remedy:  a permissive adverse inference instruction that (i) sets forth at the beginning of trial the facts the Court has already found regarding Google's intentional destruction of Chats, and (ii) directs the jury at the end of trial that it "may" infer that the evidence Google destroyed would have been harmful to Google's case and helpful to Plaintiffs' case.  As explained further below, this adverse inference instruction is both an appropriate remedy as a matter of law and proportional to the conduct at issue.

## ARGUMENT

"[A] trial court . . . has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (citation omitted); *see Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401, 422 (9th Cir. 2011) (finding no abuse of discretion where an "instruction would 'creat[e] a presumption in favor of [defendant] that the spoliated evidence was unfavorable to [plaintiff]' (citation omitted)" if the factfinder (there, the jury) concluded that evidence was destroyed). This Court has already determined that sanctions are appropriate; the only unresolved aspect is determining that "the remedy fit the wrong."  (Dkt. 469 at 18-19.)

Google's deletion of Chats deprived Plaintiffs of the most candid and unsanitized discussions regarding Google's anticompetitive conduct.  Such evidence could have eradicated Google's defenses in this litigation, but is unavailable to Plaintiffs and the jury due to Google's intentional discovery

PLAINTIFFS' PROPOSED REMEDY RE GOOGLE'S DESTRUCTION OF CHAT EVIDENCE
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

3

misconduct.  Such evidence would not be duplicative of the evidence that *is* available to Plaintiffs, because Google's scheme was geared to destroying the *most* sensitive communications—and based on the evidence, that scheme succeeded.  Accordingly, an adverse inference instruction is proportional to the wrong and should be issued.

### I. Google Intentionally Deprived Plaintiffs of Evidence that Would Have Strengthened Their Case.

As discussed in detail below, Google's destruction of Chats made it more difficult for Plaintiffs to prove their case.  Google has deprived Plaintiffs of evidence regarding multiple critical aspects of its conduct, including its agreements with OEMs (Section I.A, below); its agreements with developers (Section I.B, below); its post-litigation changes to its business model (Section I.C, below); and its concealed business relationship with Apple (Section I.D, below).

### A. Google Intentionally Deprived Plaintiffs of Evidence Regarding Anticompetitive Agreements with OEMs.

Plaintiffs previously established that Google employees destroyed countless Chats regarding Google's Mobile Application Distribution Agreements ("MADAs") and Revenue Share Agreements ("RSAs"), as well as other aspects of its OEM partnerships.  (*See* Dkt. 468 at 2-3.)  These agreements are central to Plaintiffs' cases and Plaintiffs intend to prove that they restrain competition.  As noted above, Plaintiffs will be forced to prove this point with an incomplete record.  The top executives responsible for these agreements, including Jamie Rosenberg and Jim Kolotouros, deleted all their Chats.[2]  As Mr. Kolotouros recently testified at the Department of Justice's Search antitrust trial against Google, he was cognizant that Google was constantly under regulatory pressure and therefore approached his written communications in a manner designed "to protect Google."  (Moskowitz Decl., Ex. 31 at 956:12-958:3.)  Accordingly, Mr. Kolotouros—who has "used Chat with Mr. Rosenberg to discuss Samsung revenue share" (*id.* at 971:8-11)—never turned his history on (*id.* at 969:22-970:6).  Google has thus deprived Plaintiffs of valuable evidence regarding core issues in dispute in these cases that Plaintiffs could have used to great effect at trial.

---

[2] Moskowitz Decl.. Ex. 21 at 481:17-23 (Kolotouros testifying to having "had history off . . . for as long as I have been using Google Chat"); Ex. 29 at 103:14-17 (Rosenberg:  "I have not done anything to preserve chats for this litigation.").

### i.     *Revenue Share Agreements*

In 2019, Google recognized that "Chinese OEMs and Samsung were actively investing in creating their own bundles of apps and services that could be competing with the GMS suite of apps and services." (Moskowitz Decl., Ex. 21 at 244:22-245:3; Ex. 5 at 8107.R.) It needed a solution to "help[] stem the tide of emerging app stores" on Android. (Moskowitz Decl., Ex. 21 at 218:10-14; Ex. 1 at -9615.) The RSA 3.0 program provided that solution. Google decided "to spend ███████ in 2020 which would grow to [$]4.5 billion in 2023" in "the form of revenue share both from Google Search and Google Play." (Moskowitz Decl., Ex. 21 at 250:5-14.) In exchange, Google secured exclusivity agreements from nearly every major Android OEM—agreements that ensured the OEMs would "not . . . preinstall any other app store other than Google Play" (*id.* at 290:21-291:2). Google began entering into RSAs with Google Play exclusivity terms in 2020. Many were signed after this litigation began, and more are being negotiated and renewed through the present.

RSAs were a regular topic of discussion in Chats that have been destroyed. For example, the lead strategy executive for Android boasted, "I talk about RSA related things all day and I don't have history on for all my chats :)." (Dkt. 469 at 12.) When one of her colleagues noted that he was on a litigation hold (as was she) and thus was uncomfortable with having such discussions off the record, the strategy executive decided it was better to "take you off this convo      ," which she apparently did. (*Id.*) This was one of many Chats where this strategy executive instructed others to turn history off when discussing Google's RSAs or other relevant topics, including those directly subject to litigation holds. (*See, e.g.*, Dkt. 468-6 (RSAs); Dkt. 468-7 (OEM partnerships); Dkt. 468-8 (MADAs).)

Google has contended that its decision to pay OEMs to "install Google Play to the exclusion of their own app stores" is procompetitive because it prevents app store fragmentation, providing users with a better "out of the box" experience and making Android phones more competitive with Apple's iPhone. (Moskowitz Decl., Ex. 21 at 291:23-292:16.) Plaintiffs believe that Google's deleted Chats (including those from the *strategy* executive) would have flatly refuted that theory. For example, behind closed doors (as in their "History Off" conversations) employees may have chatted freely about the motivation for these provisions, revealing that the RSAs were about impeding competition rather than the party line of preventing app store "fragmentation." Or they may have celebrated that an

1  agreement was executed and another competitive threat was extinguished.  It is also likely that Google

2  employees discussed the success of the program in achieving Google's anticompetitive goals, such as

3  whether "the Chinese OEMs like Xiaomi, Oppo, [and] Vivo" in fact chose, as Google hoped, "to

4  forego their alternative app stores that they already had and preinstall only Google Play."  (*Id.*

5  at 291:3-10.)  Plaintiffs will never be able to show the Chats about these topics to the jury because

6  Google intentionally destroyed them.

### ii.    *Mobile Application Distribution Agreements*

8          Through the MADA, Google licenses to OEMs a bundle of 11 Google apps and hundreds of

9  thousands of APIs.  The bundle includes Google's most popular apps—such as YouTube, Maps and

10  Chrome—as well as Google Play.  The APIs are essential for Android smartphones; they "help support

11  functionality of all Android applications."  (*Id.* at 447:14-18.)  Through the MADA, Google ties

12  Google Play to its popular apps and APIs, because Google requires that "to the extent [OEMs] opt to

13  use even a single Google app or Google service, they must preinstall that entire bundle under the

14  MADA."  (*Id.* at 105:9-14.)  And Google "require[s] Google Play to be located on the default home

15  screen."  (Moskowitz Decl., Ex. 30 at 39:4-8.)  The MADA thus helps secure Google Play's

16  dominance, because it ensures that "Google Play is preinstalled on the default home screen of nearly

17  all Android smartphones."  (*Id.* at 44:14-18.)

18          Chats about the MADAs undoubtedly took place and were deleted during the pendency of these

19  lawsuits.  In one Chat Google produced, two employees began discussing the MADAs, and one

20  promptly asked:  "would it be too much to ask you to turn history off? . . . lots of sensitivity with legal

21  these days :)."  (Dkt. 468-8.)  Following this request, the Chat abruptly ended, revealing that history

22  was turned off and all further discussions that took place were destroyed forever.  This is effectively

23  conclusive proof that highly relevant communications were deleted, precisely *because* of their

24  relevance to litigation.  The loss of these sensitive Chats about foundational agreements to Google's

25  anticompetitive behavior undoubtedly prejudiced Plaintiffs, left to piece together Google's misconduct

26  from the sanitized remnants of Google's "Communicate with Care" training.  (*See* Dkt. 469 at 3-6.)

### iii.    *Google's Efforts to Pay Samsung Not To Compete*

28  Samsung devices are responsible for ███ ████ of Google Play's approximately ████

PLAINTIFFS' PROPOSED REMEDY RE GOOGLE'S DESTRUCTION OF CHAT EVIDENCE
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

6

1  in annual revenue.  (Moskowitz  Decl., Ex. 21 at 310:4-18; Ex. 5 at -8123.)  After Epic launched

2  Fortnite on Samsung's Galaxy Store—the first-ever major app to launch on that store and not on

3  Play—Google launched Project Banyan, which had a goal of eliminating the Galaxy Store as an

4  independent distribution channel for Android apps so as "to keep Play as the preeminent distribution

5  platform for Android."  (Moskowitz  Decl., Ex. 21 at 363:16-20; Ex. 2 at -8211.)  To further that goal,

6  senior Google executives met with top Samsung executives, and "Google offered to pay at this meeting

7  $200,000,000 over four years to Samsung."  (Moskowitz  Decl., Ex. 21 at 374:20-23.)  In exchange for

8  these payments, Google asked Samsung to effectively shut down the Galaxy Store.  (*Id.* at 375:18-22.)

9  "Samsung was receptive to Google's proposal that Google pay Samsung $200,000,000 in exchange for

10  this agreement not to have its own Samsung Galaxy Store."  (*Id.* at 376:13-19.)  Project Banyan ended

11  abruptly in 2019 because Google's legal team realized it was too much of a risk.

12        The destroyed Chats undoubtedly would have revealed the anticompetitive intent behind

13  Google's plans, and there is already evidence in the record establishing that Google employees

14  responsible for the relationship with Samsung discussed their strategy with respect to Samsung over

15  Chat.  (Moskowitz Decl., Ex. 29 at 93:1-10.)  Plaintiffs expect the Chats the jury will never see—

16  because Google destroyed them—would have revealed conversations about the need to stop the

17  Samsung Galaxy Store from competing with Play.  They would have discussed how Google could pay

18  off Samsung, like it had done with other competitors, and have Samsung forego pursuing app store

19  competition.  Employees would have also discussed the benefits Google would reap from preventing

20  competition and Google's disappointment at not being able to finalize the deal with Samsung.  These

21  sensitive discussions would have been conducted in the safety of "history off" Chats and then

22  permanently deleted.

23        Google reconceived Project Banyan in 2020, when it proposed to "pay Samsung ███████

24  over four years" under a new RSA "[i]n exchange for default home screen exclusivity" for Google

25  Play and other benefits.  (Moskowitz  Decl., Ex. 25 at 360:4-15; Ex. 8 at -8762.R.)  Google believed

26  this deal—which would require "that the Galaxy Store . . . be moved off of the home screen of

27  Samsung's devices" (Moskowitz Decl., Ex. 25 at 359:12-360:2)—would secure $████ for Google

28  "[a]t risk to Play via Samsung app store" (*id.* at 366:24-367:3; Moskowitz  Decl., Ex. 8 at -8768.R).

Google and Samsung signed three RSAs in November 2020, where Google "would pay out between ████████████████████████" (Moskowitz Decl., Ex. 25 at 388:9-15; Ex. 12 at -2105), but they ultimately did not require home screen exclusivity for Google Play.  When asked during his deposition why Google abandoned that term, Christopher Li, the lead Samsung partnership executive, claimed he could not "recall the exact specifics of how I reached that decision" and declined to elaborate.  (Moskowitz Decl., Ex. 25 at 377:1-378:6.)[3]  But Jamie Rosenberg had previously indicated that if Google "couldn't use rev share to secure confidence that [Samsung] won't drive down to ███" the fees Google charged to developers then Google "wouldn't do" an RSA agreement with Samsung at all.  (Moskowitz Decl., Ex. 4 at -7017.)  In the same email, he noted that any understanding reached would need to be "[s]ubject to lots of legal advice on what 'securing confidence' can mean."  (*Id.*)

Google employees unquestionably discussed Google's approach to eliminating competition from Samsung over Chat.  Mr. Rosenberg admitted to having such discussions during the January 12, 2023 hearing (Moskowitz Decl., Ex. 29 at 93:1-10), and admitted he had "not done anything to preserve chats for this litigation" (*id.* at 103:14-17).[4]  The deleted Chats likely would have explained why Google was prepared to pay hundreds of millions, ████████████, to move Samsung's app store off the home screen; why explicit formal agreements to do so were never executed; and whether Google arrived at any unwritten understandings with Samsung as part of their current ███████████ RSA deals that gave Google the "confidence" Mr. Rosenberg suggested would be the gating item for any deal.[5]  By deleting its Chats, Google deprived Plaintiffs of important evidence on these highly relevant topics.

---

[3] This executive, like so many others, could not recall turning his Chat history on even once during his custodial period.  (Dkt. 432-2 at 14, Ex. C.)

[4] The other executives most involved in Google's dealings with Samsung likewise ***never once*** turned on their Chat history, including Mr. Kolotouros, Mr. Li, Mr. Samat and Mr. Lockheimer. (Dkt. 432-2 at 14, Ex. C); Dkt. 469 ¶ 34 (finding that Google employees such as Mr. Rosenberg did not preserve their Chats while engaging in discussions material to this litigation).

[5] Moskowitz Decl., Ex. 29 at 103:14-17 (Rosenberg:  "I have not done anything to preserve chats for this litigation.").

1

2

    **B.**    **Google Intentionally Deprived Plaintiffs of Evidence Regarding Anticompetitive Agreements with Android Developers.**

3

    One of Plaintiffs' core claims is that Google had an initiative called "Project Hug" that

4

involved dozens of anticompetitive agreements with customers and would-be competitors.  By

5

intentionally ensuring the destruction of Chats, Google disadvantaged Plaintiffs at trial by depriving

6

them of evidence that would have helped prove that these agreements are intended to—and do—

7

restrain competition.

8

               **i.**    *Project Hug*

9

    In 2019, Google determined that "over $█████ of revenue was at risk over the course of

10

2019 to 2022 if developers moved to alternative Android app distribution platforms other than Google

11

Play."  (Moskowitz Decl., Ex. 19 at 169:16-23, Ex. 3 at -2825.)  By July 2022, Google entered into

12

agreements with at least 24 top developers that have "mitigated the risk that the developer[s] would

13

have an incentive to distribute outside of Play."  (Moskowitz Decl., Ex. 27 at 170:7-11; Ex. 11 at -

14

9919.)  Google paid these developers at least █████ dollars to avoid competitive risk.  (Moskowitz

15

Decl., Ex. 15 at 6705.R.)  Many of these agreements were negotiated and signed after these lawsuits

16

were filed.

17

    Project Hug was discussed over Chat during the period when Google's retention obligations for

18

this litigation were in force.  For example, Purnima Kochikar—Google's most senior developer

19

partnerships executive—admitted that she had her "default setting to delete chats every 24 hours"

20

(Moskowitz Decl., Ex. 27 at 22:2-9), and that "Project Hug" and related programs are her "day-to-day

21

work" (*id.* at 104:4-8).  Lawrence Koh, another lead executive who worked on Project Hug, admitted

22

that "[e]veryone at Google used it [Google Chat] at least on my team, used it on a daily basis."

23

(Moskowitz Decl., Ex. 19 at 113:14-114:8.)  Mr. Koh could not recall ever turning Chat to "history

24

on."  (*Id.* at 114:15-23; *see also* Moskowitz Decl., Ex. 20 at 31:4-11.)

25

    Google's destruction of its Project Hug Chats is highly prejudicial to Plaintiffs.  Google has

26

stated that it "will show at trial that these agreements are pro-competitive efforts to satisfy its

27

developer customers and compete with Apple."  (Dkt. 480 at 2.)  Plaintiffs disagree with these

28

contentions but will be forced to respond to them at trial using only the documents that Google decided

1    to preserve.  The candid, unfiltered Chats that Google intentionally destroyed undoubtedly contained

2    more frank discussions of Project Hug's true goal—preventing app store competition *within* Android.

3    Such evidence could defeat Google's defenses, but it is unavailable to Plaintiffs due to Google's

4    discovery misconduct.

5                    ii.    ***Google's Agreements Not To Compete with ABK, Riot and Supercell***

6           Activision Blizzard, Inc. ("ABK") and Riot Games, Inc. ("Riot") are among the Project Hug

7    developers who "specifically told Google that they were considering their own competing Android app

8    stores."  (Dkt. 376-9 at 200:4-20.)  When Google sought to enlist ABK in Project Hug, ABK told

9    Google that "[i]f this deal falls through . . . they will launch their own mobile distribution platform

10   (partnering with another 'major mobile company')."  (Dkt. 376-4 at -0919; *see also* Moskowitz Decl.,

11   Ex. 15 at -6694.R.)  Google agreed to pay ABK $360 million between 2020 and 2023 to stop that

12   threat.  (Dkts. 376-7, 376-8.)  Google and ABK were close to renewing their agreement for another

13   three years in late 2022, at which time Google was prepared to spend another ▓▓▓▓▓▓▓ to stop

14   ABK from launching its own store.  (Moskowitz Decl., Ex. 28 at -4347.)

15          In a similar deal (albeit on a smaller scale), Google agreed to pay Riot $28 million in marketing

16   support in 2020 (Dkts. 376-5, 376-6) with "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"  (Moskowitz Decl., Ex. 19 at 299:13-20; Ex. 7

18   at -8691.)  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  (Moskowitz

19   Decl., Ex. 6 at -0008.)  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

20   ▓▓▓▓▓▓  (Moskowitz Decl., Ex. 17 at -2563.)

21          Google also entered into an agreement not to compete with Supercell Oy ("Supercell"), another

22   major developer, in ▓▓▓▓▓▓▓▓▓  (Moskowitz Decl., Ex. 27 at 179:1-7.)  ▓▓▓▓

23   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24   ▓▓▓▓▓▓▓▓▓▓▓▓▓  (*Id.* at 178:6-10.)  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25   ▓▓▓▓▓▓▓▓▓▓▓"  (*Id.* at 179:10-13.)

26          Google claims that none of these agreements is in fact "an actual horizontal agreement not to

27   compete," because (Google brazenly asserts) there is no "direct evidence of a meeting of the minds"

28   between Google and the developers, and no "direct evidence of a promise not to open a competing app

1   store." (Dkt. 355 at 12-13.)  Plaintiffs disagree with Google's characterizations, but Google's

2   arguments make the prejudice of Google's Chat destruction clear.  Google's produced documents

3   represent just the tip of the iceberg in terms of Google's internal discussions about these major deals

4   and their true anticompetitive goals; consistent with Google's scheme and admonitions to its

5   employees, more candid "sensitive" discussions about the nature and goals of deals with these

6   developers would have been moved to off-the-record Chats—which Google destroyed.  Whereas the

7   Project Hug contracts and emails support a finding of a conspiracy, the Chats are where the conspiracy

8   would have been less circumspectly described.  Plaintiffs have thus been prejudiced by Google's

9   intentional destruction of Chats.

### C.   Google Intentionally Deprived Plaintiffs of Evidence Regarding Post-Litigation Changes to Google Play's Business Model.

After these lawsuits were filed, Google changed many of its policies and agreements

concerning Android app distribution and in-app payments.  Google has argued that these business

model changes are evidence that it listens to developer concerns and competes vigorously with Apple.

The limited documents Google has produced about these changes suggest otherwise:  that Google's

decisions were driven by litigation and regulatory pressure, rather than competition.

Chats in which employees planned and discussed these changes almost certainly would have

shown Google's true motives.  In addition, Google's post-litigation evaluations of its business model—

when legal risks and the likelihood of evidentiary disclosures would have been top of mind—assessed

broad changes that Google could have made to its business model if required by regulators.  Those

discussions over Chat could have demonstrated the existence of less-restrictive alternatives to its

challenged practices, and the Chats in which employees discussed them would have provided evidence

of their viability.  Here, as elsewhere, Google's destruction of Chats deprived Plaintiffs of the best

evidence they could have used to confront and impeach Google's witnesses in depositions and at trial.

Only an adverse inference instruction can address the prejudice Plaintiffs have suffered.

### i.   *September 2020 Policy Changes*

In the wake of this litigation, Google announced a change to its policy of issuing pretextual

security warnings to Android users who attempt to download apps from competing stores every time

PLAINTIFFS' PROPOSED REMEDY RE GOOGLE'S DESTRUCTION OF CHAT EVIDENCE
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

11

the user attempted such a download.  Google publicly positioned this announcement as an effort "to make it even easier for people to use other app stores" in the forthcoming Android 12.  (Moskowitz Decl., Ex. 32.)  Google is likely to argue this change was benevolent, made in the spirit of openness and as a response to requests from developers.  But in one of the few Chats Google produced on this topic, Android's Head of Security referred to this announcement as "PR crap" and wrote that the change was only made because one of the Play Store's lead executives, "Sameer [Samat,] wanted to *indicate* we[']re being flexible."  (Moskowitz Decl., Ex. 10 at -1967 (emphasis added).)  It is highly likely that other employees, such as Mr. Samat, spoke candidly on this topic in Chats, and admitted that it was driven by litigation and regulatory concerns and would not in fact make direct downloading easier.  The jury will never see those Chats because Google intentionally destroyed them.

It is also highly likely that Google deleted Chats explaining why YouTube—which is one of Google's own businesses—refused for years to use Google Play Billing ("GPB"), and instead used its own payment solution, until Google implemented another policy change in 2022.  In a Chat that Google did not destroy, the CEO of YouTube complained to Hiroshi Lockheimer, the Senior Vice President who runs Google Play and Android, that the policy change was "obviously a big change and our team feels it will hurt us competitively," that moving to GPB would require "extra eng from Sundar" (meaning extra resources), and that "Spotify is our competitor who is being exempted so we need to know how we can innovate on billing and not be stuck with a lot of larger prioritizations decisions that might be right for play billing but bad for YouTube."  (Dkt. 414-08 at 2-3.)  Likewise, Eric Chu, a YouTube employee and one of the few outlier custodians who actually turned history on and for whom a significant number of Chats were preserved, held candid discussions about the effects of YouTube's move to GPB, noting that it "will most likely result in features regression for YouTube and/or huge amount[s] of work for Play."  (Moskowitz Decl., Ex. 9 at -0816.)

While these admissions support Plaintiffs' arguments about the policy change, they are only the tip of the iceberg.[6]  The destroyed Chats likely would have offered valuable details about YouTube's reasons for resisting and the challenges it faced when it ultimately switched from its own payment

---

[6] Mr. Lockheimer could not recall turning on his Chat history even once.  (Dkt. 432-2 at 14, Ex. C.)  All of his Chats on this topic have been destroyed, unless, as apparently happened here, the other employee preserved them.

solution to GPB—an event that occurred and would have been discussed after this litigation began.

### ii.   *Project Runway*

On March 16, 2021, Google announced that it was reducing its revenue share "to 15% for the first $1M (USD) of revenue every developer earns each year."  (Moskowitz Decl., Ex. 33 at 1-2.)  This announcement was the outcome of Project Runway, a program that began shortly after this litigation commenced and through which Google considered much broader changes to the Google Play business model.  (Dkt. 468 at 4.)

Project Runway and Google's other business model changes are highly relevant because they recognize the viability of multiple less-restrictive alternatives to Google's challenged restraints and demonstrate that the incremental changes that Google did adopt were driven by regulation and litigation rather than competition, as well as Google's desire to extract more monopoly rents from developers.  It is clear that Project Runway was discussed over Chat, and the deleted Chats likely would have shed important light on these topics, as well as Google's reasons for rejecting broad changes to its business model in favor of the modest one that it announced.  For example, in a Project Runway "war room" Chat from the time of its March 2021 launch, one employee asked "why we moved to a small dev[eloper] framing"—a key question about Google's motive for the change it made—but others decided "to change from a room to a group chat to get the right settings here (i.e., history off)" without answering that question on the record.  (Dkt. 468-10.)  This is yet another example of conclusive evidence that shows relevant information that was intentionally deleted.  By destroying these Chats, Google has ensured that the record on Project Runway is incomplete.

### D.   Google Intentionally Deprived Plaintiffs of Evidence Regarding Google's Relationship with Apple.

Google has argued that a wide variety of its restraints—including Project Hug, Project Banyan, and the challenged MADA and RSA 3.0 terms—are "procompetitive" because they are driven by competition with Apple.  Plaintiffs will show that in fact, instead of competing, Google and Apple "hugely cooperate"—to quote one Google executive—including because of their ███████████ ████████ "revenue share deal."  (Moskowitz Decl., Ex. 21 at 74:14-75:11.)  According to Mr. Pichai, Google pays Apple "████████████████" under this agreement, and "████████████████████"

PLAINTIFFS' PROPOSED REMEDY RE GOOGLE'S DESTRUCTION OF CHAT EVIDENCE
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

13

(Moskowitz Decl., Ex. 30 at 28:5-13.)  In exchange, the agreement ensures that, "Google revenue from search coming from Apple was somewhere between ███████████ in 2021." (Moskowitz Decl., Ex. 26 at 345:20-346:2.)  For over a year, Google refused to produce to Plaintiffs core documents about this major commercial arrangement, claiming the agreement between the two companies was one of Google's and Apple's "most sensitive business documents."  (Moskowitz Decl., Ex. 16 at 1.)  Ultimately, Google reluctantly produced few documents discussing this agreement, and virtually no Chats—even though Mr. Pichai, who clearly approved the deal and meets with Apple's CEO to discuss it has testified that he does use Google Chat "for business purposes." (Moskowitz Decl., Ex. 30 at 185:23-25.)  Mr. Pichai, like many other Google employees, never turned on his Chat history and instructed others to turn it off when discussing sensitive topics (which Google admits the agreement with Apple undoubtedly is).  In one Chat, Mr. Pichai began discussing a substantive topic, and then immediately wrote: "also can we change the setting of this group to history off."  (Moskowitz Decl., Ex. 18 at -3593.)  Nine seconds later, Mr. Pichai apparently attempted (unsuccessfully) to delete this incriminating message.  (*Id.*)  Chats from Google's highest-ranking executive, including about the Apple agreement, would have been probative in this litigation, and their absence substantially prejudices Plaintiffs.

## II.   A Permissive Adverse Inference Instruction Would Be Proportional.

A permissive adverse inference instruction is an appropriate—even modest—remedy where, as here, a party intentionally and prejudicially destroyed an entire category of relevant evidence.  *Radio City, Inc. v. Celestron Acquisition, LLC*, 2023 WL 5519324, at *4 (N.D. Cal. Aug. 25, 2023); *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp 2d 1132, 1149-51 (N.D. Cal. 2012); *Io Group, Inc. v. GLBT, Ltd.,* 2011 WL 4974337, *8,  (N.D. Cal. Oct. 19, 2011).  Courts in this district have recognized that the "[s]anctions levied for the destruction of evidence 'should be designed to:  (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been absent the wrongful destruction of evidence by the opposing party.'"  *Radio City,* 2023 WL 5519324, at *4 (quoting *Apple*, 881 F. Supp. 2d at 1136).  The intentional nature of Google's conduct, combined with the pervasive nature of the destruction, make an adverse inference instruction appropriate.  (*See, e.g.*,

Dkt. 468-6 ("[C]an I ask you to turn off history :)"); Dkt. 468-7 (similar).)

A decision from this district involving less egregious facts is illustrative. In *Apple Inc. v. Samsung Electronics Co.*, the court found that Samsung committed a discovery violation where it "consciously disregarded" its obligation to preserve certain emails by failing to suspend an auto-deletion mechanism for certain custodians' emails. 881 F. Supp 2d 1132, 1149 (N.D. Cal. 2012). The court explained that it was "mindful, however, that any sanction must be the least drastic available to adequately mitigate the prejudice Apple suffered." *Id.* at 1150. The court determined that a permissive adverse inference satisfied that standard. It found that Apple suffered prejudice because "literally thousands of documents" were likely destroyed for certain custodians, and those custodians "are senior Samsung employees whose internal communications would have been especially probative to the claims at issue in this litigation." *Id.* at 1150.

Here, Google went much further than Samsung. While Samsung likely destroyed "thousands of documents," judging by the widespread preference among Google employees for off-the-record Chats, Google destroyed hundreds of thousands, if not millions. Moreover, unlike Samsung, Google intentionally directed and trained employees to use a certain medium for their most sensitive communications and then destroyed the entire category of relevant documents from that medium—*all* off-the-record Chats for *all* employees, including *all* custodians. And while the *Apple* plaintiff could have obtained some of the deleted emails from other sources (for example, other custodians who were copied on those emails), Plaintiffs do not have that safeguard here because there are no other sources. This means that, unlike in *Apple*, a significant component of the prejudice Plaintiffs suffered is that the Chats Google destroyed were likely to be among the most candid and sensitive conversations held by high-ranking Google employees, and they are unrecoverable and unavailable from any other source.

### III.     Google's Arguments Against an Adverse Inference Instruction Fail.

Google has suggested that instead of ordering an adverse inference instruction, the Court should "let [Plaintiffs] put on some evidence, not a lot, but some evidence to the jury." (8/3/2023 Tr. at 68:12-15.) Google has also proposed that "if Plaintiffs establish that they have been prejudiced by a gap in the record . . . Google should be permitted to introduce evidence of its preservation practices and the circumstances of this case to explain why it did not act with the intent to destroy

1 unhelpful documents and that the jury should not infer that any such documents would have been

2 helpful to Plaintiffs." (Dkt. 429 at 15.)  Google's proposals ignore that these issues have already been

3 litigated and decided.  The Court found that Plaintiffs "certainly" proved prejudice, and that Google's

4 objection "that the prejudice is limited . . . is not well taken."  (Dkt. 469 at 18.)  And the Court found

5 that "the intentionality manifested at every level within Google to hide the ball with respect to Chat."

6 (*Id.* at 17.)  Requiring Plaintiffs to present evidence regarding Google's Chat destruction, in order to

7 prove facts that they have already proven, would be no sanction at all and would force Plaintiffs to use

8 their valuable trial time to retread the same ground that an instruction by the Court could cover.  To the

9 contrary, it would *reward* Google by forcing Plaintiffs to devote precious trial time to matters other

10 than Google's core anticompetitive conduct.

11 Further, discovery since Plaintiffs' last submission on this topic has revealed that Google's

12 intentional destruction of relevant Chats is not an isolated instance of discovery misconduct, but rather

13 is one facet of a pervasive corporate culture in which Google deliberately encourages its employees to

14 shield evidence from discovery and instructs them how to do so.  Every additional production by

15 Google—including the production of Chats that the Court ordered Google to make as part of the Chats

16 proceedings—exposed additional layers of intentional discovery misconduct.

17 For example, in a January 26, 2021 Chat, a Google in-house attorney described "an email

18 thread where they [Google employees] looped me in for **fake privilege**."  (Moskowitz  Decl., Ex.  14

19 at -0332.)  In a March 17, 2022 Chat, the same Google attorney stated that the creation of a new

20 Google team will make her work easier, because that team will handle "**the fake**

21 **privilege!**"  (Moskowitz Decl., Ex.  23 at -0631.)  In a May 19, 2022 Chat, a Google employee who

22 was deposed in this case noted that Match had filed suit against Google, which prompted an employee

23 to ask "[w]hat about prior documentation [of Match deals]? I.e. do we need to revise?"

24 (Moskowitz Decl., Ex.  24 at -8223-24.)  The employee was advised to "avoid anything written where

25 possible" and told to make "no notes/emails/decks and make sure Legal is copied on everything." (*Id.*)

26 And in a January 8, 2021 Chat, a Google employee referenced a working document containing

27 "sensitive" information, "like, what do we want to do with MSFT [Microsoft]."  (Moskowitz Decl.,

28 Ex. 13 at -7173.)  Another employee decided to "go delete some senstivie [sic] stuff" and "remind[]

1  people" to "communicate with care," as per Google's training.  (*Id.* at -7173-74.)

2  These documents show that Google's culture of destroying and concealing evidence to protect

3  Google pervaded the entire company and extended well beyond destroyed Chat evidence.  As a result,

4  Plaintiffs have been deprived of even more evidence than the Chat hearings exposed.

5  *   *   *

6  A permissive adverse inference instruction would go no further than is needed to address the

7  serious harm caused by Google's conduct.  At the start of trial, the Court should instruct the jury of the

8  facts surrounding Google's Chat destruction, and at the end of trial it should instruct the jury that it

9  may, if it chooses, infer that the evidence Google destroyed would have been harmful to Google's case

10  and helpful to Plaintiffs' cases.

11  Plaintiffs therefore respectfully request that the Court order the adverse inference instruction

12  attached as Exhibit A.

13

14

15  Dated:  September 21, 2023          CRAVATH, SWAINE & MOORE LLP
                                        Christine Varney *(pro hac vice)*
16                                      Gary A. Bornstein *(pro hac vice)*
                                        Timothy G. Cameron *(pro hac vice)*
17                                      Yonatan Even *(pro hac vice)*
                                        Lauren A. Moskowitz *(pro hac vice)*
18                                      Justin C. Clarke *(pro hac vice)*
                                        Michael J. Zaken *(pro hac vice)*
19                                      M. Brent Byars *(pro hac vice)*

20                                      FAEGRE DRINKER BIDDLE & REATH LLP
                                        Paul J. Riehle (SBN 115199)
21
                                        Respectfully submitted,
22
                                        By: */s/ Lauren A. Moskowitz*
23                                          Lauren A. Moskowitz

24                                      *Counsel for Plaintiff Epic Games, Inc.*

25

26

27

28

PLAINTIFFS' PROPOSED REMEDY RE GOOGLE'S DESTRUCTION OF CHAT EVIDENCE
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

17

1    Dated:  September 21, 2023          BARTLIT BECK LLP
                                         Karma M. Giulianelli
2
                                         KAPLAN FOX & KILSHEIMER LLP
3                                        Hae Sung Nam

4                                        Respectfully submitted,

5                                        By: */s/ Karma M. Giulianelli*
                                         Karma M. Giulianelli
6
                                         *Co-Lead Counsel for the Class in In re Google Play*
7                                        *Consumer Antitrust Litigation*

8

9    Dated:  September 21, 2023          PRITZKER LEVINE LLP
                                         Elizabeth C. Pritzker
10
                                         Respectfully submitted,
11
                                         By: */s/ Elizabeth C. Pritzker*
12                                       Elizabeth C. Pritzker

13                                       *Liaison Counsel for the Class in In re Google Play*
                                         *Consumer Antitrust Litigation*
14

15

16   Dated:  September 21, 2023          OFFICE OF THE UTAH ATTORNEY GENERAL
                                         Brendan P. Glackin
                                         Lauren M. Weinstein
17
                                         Respectfully submitted,
18
                                         By: */s/ Lauren M. Weinstein*
19                                       Brendan P. Glackin

20                                       *Counsel for the Plaintiff States*

21

22   Dated:  September 21, 2023          HUESTON HENNIGAN LLP
                                         Douglas J. Dixon
23                                       Christine Woodin
                                         Joseph A. Reiter
24
                                         Respectfully submitted,
25
                                         By: */s/ Douglas J. Dixon*
26                                       Douglas J. Dixon

27                                       *Counsel for Plaintiffs Match Group, LLC et al.*

28

**EXHIBIT A**

Before this trial began, the Court ruled that Google intentionally destroyed relevant evidence. In reaching that conclusion, the Court found the following facts.

1.   Google employees use Google Chat every day to discuss a variety of topics, including substantive business issues, including matters relevant to this antitrust litigation.

2.   In the ordinary course, Google automatically deletes all private (1-on-1) and group Chats 24 hours after they are sent unless the Google employee manually turns on Chat history.  Such messages are referred to within Google as "off the record" or "History Off" Chats.

3.   Google instructed employees in trainings entitled "Communicate with Care" about strategies for seeking to make their written communications "protected by the attorney-client privilege," even when this status was not accurate.

4.   Google employees were trained that because Google is in the public eye and courthouse, chatting "off the record" is sometimes better than email.  The Court found evidence that Google employees regularly divert sensitive topics to Chat, and that Google employees are aware that their Chats are generally not preserved.

5.   Beginning no later than the filing of this lawsuit on August 13, 2020, Google had a legal obligation to preserve evidence, including Chats.

6.   Google chose not to comply with that obligation.  Even though Google could have preserved Chats using technology readily available to it, Google chose not to.

7.   Google also did not check to see if custodians—Google employees whose documents were turned over to Plaintiffs in this case—were actually preserving relevant Chats as directed by the litigation hold notice.

8.   As a result of Google's misconduct, Chat messages relevant to this case were systematically destroyed every 24 hours and cannot be recovered or restored.  You therefore will not see all the evidence that is relevant to this case.

9.   You may infer that Chat messages destroyed by Google would have been unfavorable to Google in this case.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **E-FILING ATTESTATION**

I, Lauren A. Moskowitz, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.


 */s/ Lauren A. Moskowitz*
Lauren A. Moskowitz

# Exhibit A2
# Public Redacted Version

# EXHIBIT 2



**Project Banyan**
Phase 1: Ecosystem Overview

WORK IN PROGRESS

*Privileged and Confidential*
Feb 2019

ATTORNEY CLIENT PRIVILEGED AND CONFIDENTIAL // REFLECTS LEGAL ADVICE

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Agenda

1. Project scope and milestones (including exec meeting cadence)
2. Overview of recent ecosystem events
3. Proposed list of scenarios
4. Initial scenario analysis (in-progress)

AC PRIVILEGED // REFLECTS LEGAL ADVICE

Wendy



Yooki

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY          GOOG-PLAY4-004258210

Existential Question

> How do we continue to keep Play as the
> preeminent distribution platform for Android?

AC PIRVILEGED // REFLECTS LEGAL ADVICE      4

Yooki

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY4-004258211

Three major milestones to agree on (1) scenarios to deep-dive, (2) overall response strategy, and (3) specific initiatives by mid Q2

| What are the biggest risks to Play's value proposition to partners? | What should be our priorities to address these risks? | What initiatives should we prioritize for 2019? |
|---|---|---|
| Identify the **needs** of developers, OEMs, carriers, and users that Play doesn't meet, and **assets** that potential players[1] bring to app distribution | Evaluate the **outcome** and **impact** (economic & strategic) of the most likely scenarios | Identify **existing & new initiatives** to implement the strategy |
| Identify the **most likely scenarios** for alternative app distribution, including **financial feasibility** of each | Identify the major **levers** to address the risks in the scenarios | Evaluate and prioritize initiatives based on **feasibility** and **impact** |
|  | Prioritize these levers and develop a high-level **strategy** |  |

**Milestone 1:** Agree on most likely scenarios for deep-dives

*In progress, targeting late Feb/early March*

**Milestone 2:** Agree on the highest-impact levers and a high-level response strategy

*ETA: ~end of March*

**Milestone 3:** Agree on a response plan (initiatives to kick off or expand)

*ETA: ~end of April*

1 Out of scope: MSFT launcher since this trend is not a Play specific issue, Subscriptions (e.g. Netflix) given their workarounds for Play billing are being addressed separately by Play team

AC PRIVILEGED // REFLECTS LEGAL ADVICE    5

Yooki

## Major deliverables by milestone

| **Milestone 1:** Agree on most likely scenarios for deep-dives | **Milestone 2:** Agree on the highest-impact levers and a high-level response strategy | **Milestone 3:** Agree on a response plan (initiatives to kick off or expand) |
| --- | --- | --- |
| *In progress, target late Feb/early Mar* | *ETA: ~end of March* | *ETA: ~end of April* |

**Ecosystem players analysis** (OEM, Carrier, developers, users, others e.g. Amazon) - Needs, assets, economics (where relevant)

**Scenario enumeration and modeling** - <u>how</u> each scenario plays out, and <u>why</u> it would happen

*Preliminary analysis for discussion today*

**Recommendation of most likely scenarios** for further deep-dives

**Impact analysis** of most likely scenarios, including strategic and economic implications for Play

**Enumerate available levers** for counteracting or mitigating impact of scenarios & criteria to evaluate them

**Recommended strategy** based on prioritized levers to address the highest-impact risks

Current or potential new initiatives to implement the recommended strategy

**Impact and feasibility analysis** of available initiatives, including high-level timelines and resourcing needs

**Recommended initiatives** for 2019H2 and beyond

AC PIRIVILEGED // REFLECTS LEGAL ADVICE          6

Yooki

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY4-004258213



## Stakeholders and updates

**Sponsors**
*Every ~4 weeks for milestone reviews*

Jamie Rosenberg, Sameer Samat

**Steering Team**
*TBC: every ~2 weeks for progress reviews and input as needed*

Paul Gennai, Tian Lim, Mike Hochberg, Shafiq Ahmed, Purnima Kochikar, Sri Krishnamachari

**Working Team**

| Strategy | BizOps | Analytics | Finance | Play BD | Product | Eng |
|---|---|---|---|---|---|---|
| Atul K<br>Tim M | Stephen K<br>Wendy L | Jon G<br>Sonia L | Mary O<br>Josh O | Lawrence K<br>Mike M | Matt H | TBD |

AC PRIVILEGED // REFLECTS LEGAL ADVICE 7

Yooki

Questions:
Timing for Jamie / Sameer meeting (will need help from Paul)
Try to have as needed meeting with Steering team

## Critical Strategic Initiatives: Project Hug and Project Banyan

Initiatives necessary to sustain Google Play growth and provide value to key constituencies in 2019 and beyond

| | Project Hug | Project Banyan |
|---|---|---|
| Context | • Today's mobile game devs have new and different needs from the mobile devs of five years ago<br>• Some **mobile devs are questioning the value of Google Play** as a distribution partner; **considering alternatives** | • Google Play is **facing increased competition from app store rivals and other distribution channels** (OEMs, carriers), causing fragmentation & mindshare loss<br>• Meanwhile, some partners are applying **price pressure and experimenting with direct distribution models** |
| Key Questions | • What are **the new needs of today's mobile game devs?**<br>• How can Google Play help with those needs beyond traditional value-add (reach, security)?<br>• In what ways we **expand our xGoogle value proposition** to mobile devs who are increasingly asking for it? | • What are some **future scenarios that would challenge Google Play's continued growth as the leading Android app store?** What are the driving forces? What is the impact?<br>• **How could Play prepare for these possible futures** by changing its **product or business model?** |
| Outputs, Outcomes? | • Priority game developer segments and needs<br>• **x-PA commercial programs to enhance Google's gaming value proposition**<br>• **Timeline: execute in 1H 2019 (pilots underway)** | • Scenario definition with underlying motives, levers and tactics<br>• **Prioritized Play product and commercial changes for different constituencies to address fragmentation**<br>• **Timeline: Start execution in H2 2019 - H1 2020** |

AC PIRVILEGED // REFLECTS LEGAL ADVICE

Tim

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY



**Recent developments:** Ecosystem partners are investing in Game Distribution + exclusive content acquisition; key developers are evaluating options

| STORE | | | GEO FOCUS | ACTIVITY | DETAILS |
|---|---|---|---|---|---|
| Mobile | OEM | Samsung | Global | • **70/30 standard rev share, 80/20 rev share for select partners**<br>• **Aggressively pursuing exclusive** deals with major Android game developers (e.g. $40M for exclusives from Niantic)<br>• Investing via **direct payments, silicon optimization, and or DevTech** resources<br>• **Galaxy store on device home screen** for S10 line | factpack |
| | Carrier | One Store | Korea | • **80/20 revenue share** (originally 70%)<br>• **More IAP promotions**<br>• **Titles listed on OneStore automatically co-listed on Samsung Store** | factpack |
| | Platform | Epic Store | Global | • **88/12 rev share (likely)** for new Android game store, based on rev share on PC<br>• **Building dev credibility** via Fortnite success and Unreal Engine brand<br>• **Fortnite MAUs / downloads on Android was subpar** (technical issues)<br>• Secured few exclusives | factpack |
| | | Amazon App Store | Japan | • **Latent risk:** stable MAU / catalog coverage, no major exclusives or new EoY promotions; ~15-20% IAP discounts | factpack |
| PC / Console | | Steam (Valve) | Global | • **3-tiered graduated rev share:** 70/30 (<$10M), 75/25 ($10-50M), 80/20 ($50M+)<br>• Lost some titles to Epic Store | factpack |
| | | Discord | Global | • **90/10 rev share;** self-publishing game platform<br>• Some 90d exclusive indie titles and monthly game subscription service | details |

AC PRIVILEGED // REFLECTS LEGAL ADVICE

Tim

GOOG-PLAY4-004258216

## Major working hypotheses & assumptions guiding our scenarios (1/2)
*FOR DISCUSSION*

**Ecosystem players**

**OEMs**
- **Samsung is the only OEM** with sufficient share **to plausibly build its own store in key Play markets** (71% share[1] of premium Android ($600+) in top 10 Play countries)
- **Chinese OEMs lack sufficient share today in Play markets** to be an immediate concern outside China, but are a long-term consideration

**Carriers**
- **Carriers stores would have limited appeal to global developers** — but carriers may play a role in pre-install of other (OEM, developer, or 3P) stores

**Developers**
- **Major games with strong existing user bases are the likely driver of any new distribution platform** (top 10 devs ~25% of Play app & game revenue)
- **Biggest concern are AAA / Hi-Fidelity games** or **geographic-focused games** where Play's value proposition is weakest  (~62% top AAA games[2] spend on Samsung devices, NCSoft / Mixi have 98% spend in KR / JP)
- **Other popular app categories lack a strong incentive to pursue alternative distribution**

1) Based on IDC last 24 months unit sales (2017-2018)  2) Based on set of 15  representative hi fidelity, hi spend games

AC PIRVILEGED // REFLECTS LEGAL ADVICE

Atul
AAA, Hi Fidelity games are most likely, because Play's broad Android reach is less helpful to these games (e.g. focus on high-end devices for XX% revenue)
Casual games are less likely drivers as Play's broad reach is more important (only XX% revenue on high end devices)

GOOG-PLAY4-004258217

## Major working hypotheses & assumptions guiding our scenarios (2/2)
*FOR DISCUSSION*

**Ecosystem players**


**Users**

- Users would <u>switch</u> to a new distribution channel only with a **strong draw - exclusive, high-profile titles**, and/or **sustained pricing advantage**

- Users would <u>stay</u> on on alternative channel with better pricing (discounts, loyalty programs), a sufficiently strong catalog over time, and transferability to new devices


**Other 3P platforms**

- **Amazon and MSFT are best positioned 3Ps** to disrupt games distribution with existing assets (Prime, Twitch, XBox), 1P titles (for MSFT e.g. Minecraft, Halo) and willingness to invest

**Macro trends**

**Emerging technology**

- **5G:** Significant improvement in bandwidth and latency opens up new distribution channels

- **Cloud Streaming:** could disrupt game distribution by bringing console/PC games to mobile and enabling more cross-platform experiences

AC PRIVILEGED // REFLECTS LEGAL ADVICE

Atul

AAA, Hi Fidelity games are most likely, because Play's broad Android reach is less helpful to these games (e.g. focus on high-end devices for XX% revenue)

Casual games are less likely drivers as Play's broad reach is more important (only XX% revenue on high end devices)

Carriers
US
Single Country: Verizon
Multi-country: T-Mo (deutch telecom), Sprint (Softbank), AT&T (owns some Latin American Telcos)
Japan (3 carriers own 85% of market)
NTT (some small overseas stakes, but mostly Japan)
KDDI (Mostly Japan)
Softbank (Lots of holdings in many tech companies, but Sprint is only telco)
Korea
SK Telcom (has subsidiaries in China and Vietnam)
LG (no overseas telcom)
KT (has some small subsidiaries in mongolia and a few eastern european countries)

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

## Scenarios list *FOR DISCUSSION*

| | Scenarios | Key assumptions // Likely players |
|---|---|---|
| **OEM** | **1** **Samsung app store goes big** with exclusive AAA games, building a gaming distribution platform | ● OEMs invest in exclusivity to gain user base for store & future rev share |
| **Developers** | **2** **Major gaming platforms builds a store** with titles from multiple developers | ● Epic Games, Steam, Tencent build mobile stores |
| | **3** **AAA gaming developer goes direct** through side- or pre-loading | ● Riot, Tencent, Activision, EA go direct |
| **3P platforms** | **4** **Amazon or Microsoft** launches a complete gaming platform with distribution | ● AMZN/MSFT drive uptake w/ exclusives & streaming ● Longer-term, AMZN builds out a complete app catalog |
| **Carriers** | **5** **OneStore goes big in Korea** — inspiring carriers in JP and US to duplicate | ● Likely driven by major US or JP carriers — biggest Play markets |
| | **6** **Carriers drive streaming distribution** — move high end gaming off Play to the Cloud | ● Carriers package game streaming with 5G network rollout (e.g., PlayGiga model, VZN cloud gaming) |
| **Other / multiple** | **7** **Multiple alternatives stores emerge,** and significantly erode the Android user experience | ● Multiple stores create fragmentation and user / developer confusion |

*Note: Focusing on Top 3 + Next 7 Play markets (64% + 18% rev in 2018), NBU/BRIIM strategy is out of scope*

AC PRIVILEGED // REFLECTS LEGAL ADVICE

Atul

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-004258219

**Scenario 1:** Samsung goes big w/exclusives to build successful Galaxy Store

*PRELIMINARY — for discussion.*
*<u>Underlined</u> assumptions discussed on next page*

**Challenging to see Galaxy Store becoming attractive enough to developers to be a successful, sustainable stand-alone business**

- To bootstrap adoption, need to spend ██████ to buy ██████ exclusive rights to ██████ ██████████████ per year

- Would need to offer ██████ revenue share (better than Play, but room to make margin)

- Need to believe that exclusives would build a user base loyal to the Galaxy Store (sufficient to drive ████ of Samsung device consumer spend for co-listed apps to Galaxy store)

- Need to believe user base and rev-share attract 50 of top 100 games to co-list on the Galaxy store - *challenging; is* ████ *in annual benefit sufficient to entice developers to co-list?*

- Net-net: successful store would yield margins of ██████ in long run for Samsung to offset ████ ████ net investment[1] for first 2 years

**Samsung *could* use game exclusives to drive hardware sales,** but this would not hinge on building a sustainable game distribution business

1) Net investment net revenue share less exclusivity payments

AC PRIVILEGED // REFLECTS LEGAL ADVICE

Stephen

50 of 100 games selected given is sufficiently big enough to be of note to Play, while still be plausible

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-004258220



## Scenario 1: Key assumptions and model output

**Phase 1**
**3 exclusive titles to bootstrap the Galaxy store**

- ███ exclusivity payment per title
  - $9M: foregone revenue from missing 2mo of revenue on non-Samsung devices
  - $12M: max Samsung could pay to breakeven on the store in 4 years
- ███ **exclusive titles for** ███: each title brings XM users and 20% of consumer spend, building a base large enough to attract users in Phase 2 (*in progress)
- ███ **revenue share:** to be sustainable long term, Samsung's revenue share needs to be more than their 15% store operations cost (assume same as Play)

**Phase 2**
**Galaxy Store with 50 co-listed games**

- ███ **of consumer spend of the 50 co-listed games** on Samsung Devices moves to **Galaxy Store:** one known high profile game currently co-listed in Korea (Black Desert), finance estimates 5-20% user shift
- ███ **revenue upside from co-listing** for each of 50 games
  - ███ average annual consumer spend on a Top 100 game on Play
  - ███ of consumer spend for these games on Samsung devices
  - ███ of consumer spend on Samsung shifts to Galaxy store from Play
  - ███ better revenue share on Galaxy store vs. Play *(assuming Play doesn't move from 70/30)*

**Net impact to Samsung**

- **Phase 1 (2 year investment):** + ███ rev share - (███████) exclusivity payment - ███ to operate the store = ███ investment per year x 2 years = ███
- **Phase 2 Profits:** ███ revenue share - ███ cost to operate the store = ███ / yr profit

AC PIRVILEGED // REFLECTS LEGAL ADVICE

Stephen



## Ecosystem Review: Device OEMs

| Unmet needs / motivation to pursue a Play alternative |
| --- |

1. **Differentiated software experience** (e.g. exclusive apps) to help turnaround slowing hardware sales

1. **New revenue streams** via apps & services to offset slowing hardware sales

| Assets OEMs bring to a Play alternative |
| --- |

1. **Distribution power** via base of installed devices, ability to set pre-loads and push updates

2. **Technical capabilities** to optimize apps & hardware, esp. for high-end games

3. **Brand power & marketing investment**, e.g. Samsung co-marketing with Fortnite, esports sponsorships

4. **Existing app stores** for local OEMs in China, Samsung

5. (Limited) **User FoP** e.g., Samsung Pay

| Scenario implications |
| --- |

**Strong incentive** for OEMs to act for both differentiation and service revenue

**Strong opportunity** for major OEMs to act - have the pieces needed for either <u>direct distribution</u> of select apps (e.g. Fortnite) or a broader <u>app store offering</u> (e.g. Samsung store)

**Focus on Samsung, Huawei, Xiaomi (TBC)** - high market share, esp. premium segment (most relevant to hi-fi games) and premium markets (KR, JP, US)

AC PIRVILEGED // REFLECTS LEGAL ADVICE

## Ecosystem Review: Developers

### Unmet needs / motivation to pursue a Play alternative

1. Developers would **prefer a better revenue share** and do not always feel that Play (or Apple) justify their 30% share - esp. those with large existing fan bases (e.g. AAA games) or limited global ambitions

1. Developers have product & technical needs to support the development lifecycle [details here]

### Assets Developers bring to a Play alternative

1. **Developers own IP** (apps, games, rights to franchises) — that **users spend money and time consuming**

1. **Small number of developers with the "best IP"** — the most desireable content with the most devoted fans, who will overcome significant barriers to get that IP

### Scenario implications

Developers who see the **least benefit** from Play's global distribution and discovery have **biggest incentive** to seek cheaper alternatives - in particular, AAA games (focus of Project Hug)

Games developers also have **significant technical needs** that are not well-met by Play/Google offerings (e.g. LiveOps support)

Only select developers with **committed audiences** likely to forgo Play distribution entirely.

[TBD] Developers have limited incentive to tackle complexity of **co-listing** in alternative stores unless they have significant reach

AC PRIVILEGED // REFLECTS LEGAL ADVICE

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-004258224

## Ecosystem Review: Other 3P Platforms

### Motivation to pursue mobile app/game distribution

1. **Amazon:** known **interest in gaming** (twitch, lumberyard), desire to **expand Prime ecosystem**, existing app store

1. **Microsoft:** Existing **gaming strength** (Xbox, PC), desire to **expand desktop services portfolio** to mobile (e.g., Bing)

### Assets Developers bring to a Play alternative

1. **Bring exclusive 1P IP** (MSFT Office, Minecraft, Halo)

1. Enable unique **integrations with 1P platforms** (Prime, Twitch, Xbox)

1. Influence OEMs with access to **new device sales channels** (Amazon.com, MSFT Enterprise Sales)

1. Integration or discounts on **development platforms** (AWS, Lumberyard, Azure)

1. Deep pockets and willingness to invest

### Scenario implications

Other 3P platforms have **compelling assets and deep pockets** to try to disrupt app/game distribution on Android...

...but **both have tried — and failed** — to do so in the past, but recent changes create opportunity:
- Openness of potential OEMs or Developers to partner
- Relative strength of platforms (e.g. complete gaming stack)
- Technology shifts (e.g., streaming, 5G, cloud)

AC PIRIVILEGED // REFLECTS LEGAL ADVICE

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

## Ecosystem Review: Carriers

**Unmet needs / motivation to pursue a Play alternative**

1. Increase subscriptions or subscription prices with **exclusive / differentiated apps**

1. **New revenue streams** via apps & services

**Assets Carriers bring to a Play alternative**

1. **Connection to the user**
   a. **FoP/DCB:** Carriers have a billing relationship w/users
   b. **Influence of user's device purchase decision** at POS in store & online (e.g., merchandising, commissions)

1. **Influence over the OEM: Pre-loading** of carrier apps & app stores negotiated in commercial agreements w/OEMs

1. **Influence over the Developers: Network control & paid prioritization** could potentially impact developers ability to serve their apps to users

**Scenario implications**

Carriers in **markets with significant Play revenue** and **strong carrier presence in device retail** in best position to pursue app distribution
- Carriers in Korea, Japan, and US best positioned (e.g. Onestore)

Carriers would still need to **strike deals with OEMs** to pre-install stores - but some could offer developers **broader reach** than a single OEM

AC PIRIVILEGED // REFLECTS LEGAL ADVICE

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY



GOOG-PLAY4-004258227

## Scenario 1: Baseline assumptions driving the model

| Assumption | Phase 1: 3 Exclusives | Phase 2: 50 co-listed games | Comment |
|---|---|---|---|
| Months of exclusivity for exclusive Samsung games | ▮ | | Moderate length exclusive to line up with critical first few months of a hardware launch |
| Number of exclusive games per year | ▮ | | Phase 1: Data request out to Play Analytics to validate Phase 2: No exclusives anymore — Galaxy store is self-sustaining |
| Share of consumer spend on top games on Samsung devices | ▮ | ▮ | Average of today based on representative apps. This is correlated with general market share of devices and would take time to shift |
| Share of consumer spend on Top 100 games on Samsung devices | | ▮ | Based on top 100 apps today. This is correlated with general market share of devices and would take time to shift |
| Galaxy store revenue share with devs | ▮ | ▮ | Assume it needs to be better than Play |
| Galaxy store revenue share for Samsung | ▮ | ▮ | Needs to be higher than 15% cost to operate the store |
| Galaxy Store share of Samsung device spend when exclusive | ▮▮ | ▮ | Game is exclusive — Galaxy store should get all of the spend |
| Galaxy Store share of Samsung device spend when co-listed | ▮ | ▮ | Based on high end of experience today of 5-20% for game Black Desert which is co-listed on Galaxy store for Phase |
| Number of top 100 titles co-listed on Galaxy store | ▮ | ▮ | Phase 1: Focus mostly on exclusives -- little other developer co-listing Phase 2: Significant co-listing among top 100 apps |
| Cost to operate the store as percent of store revenue | ▮ | ▮ | Based on number of Play finance |

AC PRIVILEGED // REFLECTS LEGAL ADVICE

Yooki / Stephen

GOOG-PLAY4-004258228

**Scenario 1:** Modest phone sales increases could fund Galaxy store investments, but unclear if exclusives or a store can affect units sales

**Context: Samsung Premium phone (>$700) sales 2018 were 57M units (ex-China)**

| Incremental Annual Unit sales | Incremental Units | Incremental Gross Profit for Samsung[1] |
|---|---|---|
| 0.5% | 295K | $75M |
| 1.0% | 590K | $150M |
| 1.5% | 885K | $225M |

*If Galaxy store exclusives and/or store loyalty can help drive small incremental phone sales vs. Samsung baseline — could easily be worth $100M+ per year*

However, unclear at this time if:

- Exclusive titles would be able to drive such an increment
- The additional effort in building a successful store would make a difference

1) Assume ASP of $853 (average of GS9, GS9+, Note 9) and Gross Margin of 30%
Reference: OEM market share analysis

AC PRIVILEGED // REFLECTS LEGAL ADVICE

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-004258229





NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

**Context:** Overview of revenue concentration



*Actuals up to 12/31/2018

AC PIRVILEGED // REFLECTS LEGAL ADVICE



FOP: Forms of Payment
A&G: Apps and Games
Store browsers: people who open the play store
Acquirers: people that download apps from the play store



# Exhibit A3
# Public Redacted Version

# EXHIBIT 3

**Boosting Top Game Developer Support**
**&**
**Securing Play Distribution on Samsung Devices**

April 9, 2019

ATTORNEY CLIENT PRIVILEGED AND CONFIDENTIAL // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

CONTENTS

**Executive Summary**

**Context & Mobile Gaming Trends**

**Risks**

**Program Proposals**

1. Top Game Developers

2. Samsung

**Financial Summary**

AC PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-003332819.R



*Both programs are needed*
*Need to invest in top devs now to ensure imminent launches happen on Play and reduce noise*
*Samsung is aggressively pursuing gaming, and indicated they're open to partnering with us (but a deal will take time to negotiate and implement)*

*Note: We're also beginning to explore ways to reduce 'app store tax' sentiment across the developer ecosystem, via new business model concepts*

GOOG-PLAY-003332820.R



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



- HVUs: ⬛ of buyers spend ⬛ of app & game spend
- Samsung concentration of ⬛ reflect 2018 actuals. Concentration is even higher in few key Play markets, eg, KR

GOOG-PLAY-003332822.R

## Recent ecosystem trends



| Competitors Aggressively Pursuing Gaming | "App Store Tax" Meme Emerging |
|---|---|

**Competitors Aggressively Pursuing Gaming**

Galaxy Store
- Homescreen icon on S10
- **20% rev share**
- Pursuing top tiles (exclusives and co-list)

EPIC GAMES
- Launching app store in 2019/20
- **12% rev share (on PC)**
- New **$100M developer fund** (no strings)
- Pursuing **exclusive content & winning on PC**

ONE
- **20% rev share**
- Allows 3P billing **(5% rev share)**
- Partnered w/ Samsung in KR

amazon apps
Funding in-app purchase **discounts (up to 20%)** to attract users

*Tencent investment*

**"App Store Tax" Meme Emerging**

**Apple and Google Face Growing Revolt Over App Store 'Tax'**

Opinion: Google's 30% cut of Play Store app sales is nothing short of highway robbery

**APPLE IMPOSES A DISCRIMINATORY 30% TAX**

**Apple taxes competitors to advantage their own services**

AC PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Major developers are increasingly considering distribution off Play. They also express discontent over Play rev share, and lack of unified Google offers / support



| | 2019 Play Spend* | Activity In Past 8 Months | |
|---|---|---|---|
| **EPIC** GAMES | **$0** | Launched hit title 'Fortnite' off Play (August 2018) | |
| ■ | | Imminently deciding whether to launch new mega title off Play | **AAA PC / Console devs with capabilities to bypass Play** |
| | | Actively evaluating whether to launch new mega title off Play | |
| | | Planning to co-list top grossing title on Samsung Store. Asked for revenue share cut | |
| | | Asked for revenue share cut "across the board" | **'Mobile Major' allies changing their tune** |
| | | Seeking commercial synergy across Google (Play + Ads) | |

*Projected. ■ spend projection is for 2020

AC PRIVILEGED // REFLECTS LEGAL ADVICE

GOOG-PLAY-003332824.R



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-003332825.R



Proposal: Unify and boost Google's value proposition to target developers, via expanded offers and service level



AC PRIVILEGED // REFLECTS LEGAL ADVICE



Improve sentiment about (1) Play revenue share, (2) building high-fi games for Android, and (3) Google's gaming value proposition
Android: reduced app distro fragmentation

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Cross-Google Service Pack Offering (Program Details & Asks)



| Offer to Developer | Primary PA Success Metric |
| --- | --- |

AC PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Target Developers



**Drive disproportionate value to Google**
($8B 2019 Play Spend projected; $XX X-PA rev)

**Beacons of the ecosystem**

**Expressed discontent over Play rev share and lack of unified support from Google**

**May forgo Play (& Android)**
- Upcoming major new title launch
- Difficulty delivering hi-fidelity games on Android
- Capabilities to 'go-it-alone' on Android

AC PRIVILEGED // REFLECTS LEGAL ADVICE

Dev List



[More developers](#)

[-Piloting Build & Test & Launch packs with ████ → good early traction](#)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    GOOG-PLAY-003332831.R





**Note that**
**P&L cost starts exceeding Cost to deliver value in 2020 & 2021 as ▮▮▮▮▮▮▮▮▮**
**▮▮▮▮▮▮▮▮ increases**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Jamie / Jim**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Proposal: strategic collaboration that advances Samsung goals, promotes Play on Samsung devices, and improves Android gaming experience

| | |
|---|---|
| **Financial Gives** | • Ads rev share from syndicated Google Ad products<br>• Co-marketing opportunities for Samsung-exclusive content and deals<br>• Up to **$10M in 'Play Points' discounts** for 1 year for Samsung phone buyers<br>• Up to **$60M annual payment for 4 years** |
| **Google Gets** | • Play hosts Galaxy Store games/apps, and provides billing, security, and updates<br>• Play and Galaxy Store are only app stores on Default Home Screen<br>• Samsung adheres to Android Gaming Standards |

AC PRIVILEGED // REFLECTS LEGAL ADVICE

- We want to collaborate with Samsung and bring multiple levers (not just cash) to the table. Some levers are win-win (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- Upfront cash payment is needed to address their Galaxy store P&L. We are anchoring on the range of net profit that we estimate Galaxy store makes
- Potential upside from ads syndication would be lucrative for both Samsung and Google (size depends on how much Samsung is willing to partner wrt surfaces & ads targeting parameters). Samsung does not need to build its own large sales team and court devs. Can participate in the upside as several large publishers do today.

- Marketing opportunities:

- Playpoints:

GOOG-PLAY-003332836.R





Ask to BC: Initial Approval of Top Dev Service Packs (including ████████████),
and 4 year Samsung deal

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





Confidential + Proprietary

Marketing line includes ███████████ and also accounts for incrementality from marketing spend

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-003332842.R



Developer Service Pack + Samsung deal would mitigate most of the risk

Privileged and Confidential

Net Value: Mitigation - Investment

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Risk builds over time

Privileged and Confidential

Play Revenue = Apps & Games + Ads on Play
2019 Assumptions:
Epic Store to launch Q4 2019
Risk from Samsung and Amazon store already underway with existing stores and
already known co-listing of top developers (███████████████████████████
████████)
A couple of partial exclusives off-play expected to occur in 2019
Play would still retain at least ~50% of the top developers in 2019 with most likely
defection of top developers ramping up to 100% in 2020


https://docs.google.com/spreadsheets/d/1e7ZzdGpYZJIEhOIESEvrYlNZ-M-
6wptQwT8Alxyf4Ns/edit?ts=5c807718#gid=1323652187

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Source sheet:
https://docs.google.com/spreadsheets/d/1e7ZzdGpYZJIEhOIESEvrYlNZ-M-6wptQwT8Alxyf4Ns/edit?zx=5yg339kwdcpm#gid=1323652187

GOOG-PLAY-003332845.R



Source sheet:
https://docs.google.com/spreadsheets/d/1e7ZzdGpYZJlEhOIESEvrYlNZ-M-6wptQwT8Alxyf4Ns/edit?zx=5yg339kwdcpm#gid=1323652187

GOOG-PLAY-003332846.R



Source sheet:
https://docs.google.com/spreadsheets/d/1e7ZzdGpYZJIEhOIESEvrYlNZ-M-6wptQwT8Alxyf4Ns/edit?zx=5yg339kwdcpm#gid=1323652187

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Marketing line includes <span style="background:black">█████████████</span> and also accounts for incrementality from marketing spend

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-003332848.R



Developer Value View



AC PRIVILEGED // REFLECTS LEGAL ADVICE

## Developer List



AC PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Developer Eligibility Criteria and Obligations



Ads SVAs for Hug Devs: ███ and █ FTE



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-003332853.R

for Hug devs:



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-003332854.R

## What about Unknown Sources?

- **Developers have choice on Android (key distinction from Apple). Changes to 'Unknown Sources' create legal / regulatory challenges**

- **We want developers to actively choose Google, and we want happy customers**

- **Risk still remains even with changes to Unknown Sources**

  - Worse developer sentiment; "app store tax" meme acceleration

  - Alternative stores can still be preloaded

  - Sideloading remains

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Epic / Fortnite

**Fortnite is active on ~6M Android devices**

**We estimate Fortnite would have been substantially more successful had they launched on Play**

**However, other developers might follow Epic's path for various reasons:**

- Every developer that follows Epic's path & launches on the Epic store will have less friction & a larger addressable user base than title before it.

- Developers can afford to take a ~20% performance hit on Epic store (due to 88% rev share) and still break-even. Or a ~30% hit in performance if they decide to go-it-alone.

- Developers place value on owning the entire customer relationship beyond what we assessed in our short-term analysis of Fortnite performance.

- PC / Console developers that have long term relationships with their customers already have a good knowledge of which users drive spend.  They can directly convert those players over to the mobile version.

- Tencent ownership of influential developers might bias their choices.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Play Concentration

**2019 Projected Play Spend =**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-003332859.R

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

To achieve our "gets" and help Samsung's goals, we recommend a set of Product and Financial "gives" based on guiding principles



Product

Financial

AC PRIVILEGED // REFLECTS LEGAL ADVICE

PRODUCT OFFERS — Play as backend to Galaxy Store frontend

## Play backend to Galaxy Store frontend - how it would work

| | |
|---|---|
| **Overview** | • **Surface area:** All Samsung-owned surface areas that facilitate download of Android mobile apps, including Galaxy Store and Game Launcher<br>• **Catalog:** Apps with unique functionality or offers for Samsung users<br>• **Store layout:** Samsung continues to curate content and do top-level promotion |
| **Risks and Mitigations** | **Lost Play Ads revenue due to shift of Play users to Galaxy Store**<br>*Mitigation:*<br>████████████████████████████████████████████<br>████████████████████████████████████████████<br>████████████████████████████████████████████<br><br>**Play brand dilution**<br>*Mitigation:* ████████<br>**Samsung reverts to 1P backend** and promotes Galaxy Store after deal expires<br>*Mitigation:*<br>• ████████████████████████████████████████████<br>• ████████████████████████████████████████████ |

AC PRIVILEGED // REFLECTS LEGAL ADVICE

FINANCIAL OFFERS — Lumpsum Payment
**Likely 2019 net profit of Galaxy Store**: -$30M to $60M profits
*Based on extrapolating public estimates of Samsung's Korean app business*

### Assumptions

[redacted]

**Samsung revenue share is 20-30%**
- $24-35M Samsung net revenue in KR

[redacted]

**250 HC OPEX to run the store**
- Roughly 15% size of Play team

**Ads revenue: ~$10M**
- Based on impressions and CTR data shared by Samsung at GDC

| Global estimate, $M | Low | High |
|---|---|---|
| Galaxy Store Consumer Spend | $360 | $545 |
| **Galaxy store revenue** (20-30% of spend) | $70 | $165 |
| Payment processing cost (~3% of spend) | -$10 | -$15 |
| Operating cost (~250 HC) | -$100 | -$100 |
| **Net profit (IAPs only)** | **-$40** | **$50** |
| Ads revenue | $10 | $10 |
| **Total net profit (incl Ads)** | **-$30** | **$60** |

Link to overall proposal

Source: Korean industry articles; Samsung Galaxy Apps partner program, Play Finance Galaxy Store profit model

AC PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

FINANCIAL OFFERS – Play Points

Integrate Samsung with ▬▬▬▬▬▬ to help drive Samsung device sales and user engagement

| Proposal | Details | Considerations |
|---|---|---|



AC PRIVILEGED // REFLECTS LEGAL ADVICE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit A4
# Public Redacted Version

# EXHIBIT 5



GOOG-PLAY-004488106.R

Privileged & Confidential

# Executive Summary - We are fine-tuning Android Search Rev share (ex Samsung) to protect Google from key strategic risks

**Update: RSA spend and enrollment behind the target we set with 2016 BC approval**

- 2016 BC approval targeted 85% Android base coverage at ~15% of Total Search Distribution Revenue via Android. Due to device by-device nature of the deal, we are (1) not getting protection on some devices and (2) getting very limited traction in the "bonus" tier that is supposed to align OEMs with Google's xPA priorities

**Since 2016, Android dynamics changed and we have higher exposure of Search and Play revenue than before**

- Chinese OEMs and Samsung are actively investing in creating own app and services ecosystems; Microsoft and Amazon pursuing distribution deals on devices not covered by RSA; and Android market share is under pressure in developed carrier led geos

**Ask: Spend** ██████████████████████████████████████ **in 2023 across Search and Play for carriers and non-Samsung OEMs to secure platform protections for Search, and Play and critical apps protections on more devices**

- **Introduce a new platform tier of RSA** to secure browser defaults and assistant DHS exclusivity & gesture at scale

- Offer up to ██ **Play rev share to OEMs** ██ to key CN OEMs, ██ to smaller OEMs), spending **est.** ██ **in 2020 and up to** ██ **in 2023** (steady state) in addition to the **bonus tier of current RSA** to secure **Play exclusivity, Android upgrades, and distribution for critical apps** (Comms suite, Pay, Photos, Gmail, Gcal, Discover suite)

- Offer additional **4ppt of Search & Assistant revenue share to most strategic partners** (for total of ██ ████████ and ██ for carriers) to incentivize clean UI devices with full set of Google apps

*Note: Total Search Distribution Revenue via Android Forecast Includes Non-RSA Partner Dist, Rev*

2

GOOG-PLAY-004488107.R

Privileged & Confidential

## Scope: Proposed changes will impact ~70% of Android activations and Search Distribution Revenue via Android



Formatting

GOOG-PLAY-004488108.R



Privileged & Confidential

# Rewind back to 2016 BC Approval: Goal to secure more access points / Assistant / security updates / apps across more devices

| Key "Gets" | Detail of the "Gets" | Key Terms / Outcome |
|---|---|---|
| **Set additional access points** | Secure 3rd party browser defaults (not covered by MADA) on more devices (in 2016 ~45% devices were covered) | **What worked:** ~68% activations/ 57% actives have protections for: <br> • Search Exclusivity (DHS in EU) <br> • Search defaults on 3P browsers <br> • Assistant DHS exclusivity <br> • Feed (~15% of activations) <br> • Security updates |
| **Ensure security updates** | Accelerating security updates is an Android ecosystem imperative | |
| **Account for Assistant considerations** | -Assistants increasingly seen as a future platform <br> -Amazon heavily investing in Alexa & globally pursuing distribution partnerships w/ Android OEMs & Carriers (US/CA, UK, ID, LATAM, IN) | |
| **Cover strategic regions** | Expand & grow coverage in key regions (JP, KR, IN, ID, LATAM) | **What did not work:** ~7% activations covered by additional app protections |
| **Get distribution for additional apps** | Secure defaults for 6 apps, critical for user experience (Mail, Photos, Calendar, Gboard, Messages, Duo) for additional 4ppt of revenue | |

In 2016, BC approved TAC to increase up to ~16-17% of Total Android Distribution Revenue in 2016-2023 assuming 100% Android devices would be covered by RSA (50% would be in the bonus tier):

| ($ in billions) | 2017A (Total \| Samsung \| X-Samsung) | 2018A (Total \| Samsung \| X-Samsung) |
|---|---|---|
| BC Approved TAC | | |
| % of Forecasted Distribution Revenue | | |
| TAC Actuals | | |
| % of Actual Distribution Revenue | | |

*Carrier and Samsung negotiations took longer than expected, so the anticipated shift in TAC to Carriers did not materialize

4

GOOG-PLAY-004488109.R



Privileged & Confidential

# Since 2016, ecosystem dynamics have changed and competition has increased. Gaps in coverage exist.

**1 Search and Assistant**

- **EC** ruling created opportunity for **rivals to secure full Search exclusivity** on devices in EEA
- **Microsoft and Amazon actively pursuing deals for Bing/Alexa** on devices not covered by RSA (e.g. Bing is a default search on Xiaomi & Vivo in India; Alexa is prominent on LG/ Moto Prime phones)

**2 Play / Android**

- Chinese OEMs have **alternative stores preloaded on ~80% of Android devices,** and have a meaningful overlap with Play offering; **Huawei working on their own OS**
- **Samsung ramped up investments into their own store** with S10 launch
- **If Play is less relevant for OEMs, MADA protections may be at risk** (leading to higher TAC)

**3 Other apps**

- Chinese OEMs have **~90% services overlap with GMS apps and are at an inflection point on expanding their services** outside China & India, e.g. Xiaomi made $125M in service revenue in India in 2018
- iOS users expect **cohesive set of services** incl. Messages, Photos, Music, Mail, etc. and view lack of unified offering on Android as a deterrent for **switching**

**4 Android reach [Carriers]**

- Android **share is under pressure in US** (lost 6ppt in 2018; 2% DAU decline), and **developed markets where most of the last year Android gains were driven by** ███████ ██████████

NOTES: 1) Based on MagicEye *study* of Android One devices, controlling for user, device, and geo

5



Privileged & Confidential

**New proposed structure (GDAF):** Offer partners choice of 3 tiers of Google experience

OLD: RSA Base tier (device by device) | OEM ONLY RSA Bonus tier (device by device)

NEW: ① NEW Core Experience (platform) · Optimized Experience (device by device as-is) | 2 – 4 Google Forward (device by device)

Split protections **into 2 separate components (platform and device-by-device)** to get browser and assistant coverage on 100% of Android devices, and full RSA coverage in the higher tier

Find **financially responsible way** to (1) **support OEMs** via services revenue and (2) **align OEMs with Google's vision of Mobile on Android**, including app distribution, upgrades, UX, apps, deep integration with Google services (e.g. Assistant, Feed, Camera/Photos, Pay, Comms)

**No incremental TAC %, higher 2023 spend (▮▮▮▮) only due to increased coverage**

▮▮▮▮ **incremental revenue share in 2023 (▮▮▮▮ for Google forward devices + ▮▮▮ for devices with Play protection only)**

6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                GOOG-PLAY-004488111.R



Privileged & Confidential

## OEMs: We are proposing a 3-tiered deal framework that can be customized for individual partner via the fallbacks:

| *NEW* Core Experience (platform) | Optimized Experience (device level, conditional on Core) | Google Forward (device, conditional on Optimized) |
|---|---|---|
| [redacted] ***Browser search revenue share 0% on GSA Widget ([redacted] overall Search rev share)*** | [redacted] **Search revenue share (as TODAY base)** | [redacted] **Search (as TODAY bonus)**<br>[redacted] ***Play revenue share ([redacted] of spend) for [redacted] for selected smaller OEMs***** |
| ● OEM browser search defaults *(waived in EEA)*<br>● *Assistant DHS, hotword and gesture exclusivity*<br>● *No search exclusivity* | ● *Full* exclusivity for Search & Assistant incl. Visual Search *(+DHS icon for Assistant)*<br>● Defaults for Feed (minimum shared) & Gboard | ● *Google apps as defaults for all key functions (i.e., Photos,Comms, Pay, Gmail, Calendar, etc.)*<br>● *Play as primary/ exclusive source of 3p downloads*<br>● *All access points for Search/Assistant/Lens*<br>● *Deeper product/ technical collaboration*<br>● *Google has approval over final UI*<br>● *Google retains rights to evolve the program over time*<br>*Expected 1: [redacted] & [redacted]: Drop U /app requirements (& reduce Search revenue to Optimized level), but keep Play rev share*<br>*Expected 2: Xiaomi: +4ppt of Search rev**** |

**Also includes Transsion;*
***We pay on Google-portion of Non-DCB Apps & Games Revenue & Play ads excl. transaction costs; Lower (4%) Play revenue share to be offered to LG, Lenovo, Sony, Asus and other smaller OEMs;*

7

OS Upgrades and Play Exclusivity
Google approves the UX/SW experience, subject to change by Google, which today includes: deep integrations for Assistant, Clean UI, Defaults/ exclusivity for Comms, Pay, Photos, News/Podcast, Gmail, GCal)



Privileged & Confidential

# Carriers: Similar 3-tiered deal framework that can be customized for individual partner via the fallbacks:

*NEW*

| Core Experience (platform) | Optimized Experience (device level, conditional on Core) | Google Forward (device, conditional on Optimized) |
|---|---|---|
| [redacted] *GROSS Search rev share* | [redacted] GROSS Search rev share (as TODAY base) | [redacted] GROSS Search rev share (no Play) |
| *Require carriers to spend [redacted] (ramp) of Google payout on promoting Android & Search* | | *Spend [redacted] of the incremental revenue from this tier on Google forward devices* |
| ● OEM browser search defaults *(waived in EEA)*<br>● *Assistant DHS, hotword and gesture exclusivity*<br>● *No search exclusivity* | ● *Full* exclusivity for Search & Assistant incl. Visual Search *(+DHS icon for Assistant)*<br>● Defaults for Feed (minimum shared) & Gboard | ● *Google apps as defaults for all key functions (i.e., Photos,Comms, Pay, Gmail, Calendar, etc.)*<br>● *Play as primary/ exclusive source of 3p downloads*<br>● *All access points for Search/Assistant/Lens*<br>● *Deeper product/ technical collaboration*<br>● *Google has approval over final UI*<br>● *Google retains rights to evolve the program over time* |

** Revenue share paid on Google-portion of Apps & Games Revenue, and on Play Ads*



Guiding principles
P0: Core Search and Play provisions are non-negotiable. We reserve the right with OEMs to also request implementation of additional revenue generating features (e.g. Play FOP setup in OOB)
P1: Assistant integrations are top priority. Only negotiable items are provisions where OEM BOM is impacted (e.g. HW buttons, DSP integrations, etc.). Waiving such provisions will result in a lower pay-out for the partner
P1: Cohesive phone experience (i.e. UI and app preload approval): Non-negotiable (including no duplication of GMS apps). Google reserves the right to change/evolve the list of requested apps based on feature availability (e.g. Comms in JP), or changed priorities (e.g. require Camera integration, GPay additional features, etc. in the future)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004488114.R



**Privileged & Confidential**

## How are we spending the ▮▮▮ in 2023: Protecting Search, Assistant, Play and getting 483M clean, Google forward devices

**1&2  Revenue at Risk Hedging:** ▮▮▮
(▮▮▮ search + ▮▮▮ Play)

**1  Search & assistant** ▮▮▮

- Hedge ▮▮▮ **non-covered** revenue (▮▮▮ of browser and ▮▮▮ in Europe revenue)
- Secure **critical Assistant access** points (~85% of Assistant invocations) on incremental ▮▮▮ devices

**2  Play on Oppo/Vivo/ Transsion** ▮▮▮

- Hedge ▮▮▮ **non-covered Play** revenue for the CN OEMs which are not likely to agree to UI/apps requirements

**3&4  Google forward devices:** ▮▮▮
(▮▮▮ search + ▮▮▮ Play)

- ▮▮▮▮▮▮▮▮ in Search + ▮▮▮ in Play **in lieu of individual bounties**
- **Non CN OEMs (336M actives):** ▮▮▮ in Search + ▮▮▮ in Play **in lieu of individual bounties**
- **Carriers (35M actives):** ▮▮▮ in Search to get clean devices (likely Pixel) and help incentivize them to sign up to **spend** ▮▮▮ **in co-marketing**

10



Strategic
Aligns rapidly growing CN OEMs with Google before they pass the pivotal moment in 1P services growth (e.g. Xiaomi generated [redacted] revenue from 1P services and ads in IN/ID)
Promotes Android and Google by advancing cleaner, more secure, fresher UX

App efficiency
Per device** and operational savings by consolidating standalone bounties:
Xiaomi: [redacted]
LG: [redacted]
Other non CN OEMs: [redacted] savings per device (incl. HW button)

Additional potential upside (not part of the deal model)
[redacted] in marketing by carriers (might require additional 1-2 HC to manage)
3-5pts revenue uplift for Google Forward devices via Search & Play
Clean devices are 15-20% more likely to attract iOS switchers



Privileged & Confidential

# Search protections on 892M more actives, plus 483M Google forward actives would cost Google incremental [redacted] in 2023

GDAF TAC Payments by Tier ($M)

[redacted]

| *($ in millions)* | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Status Quo TAC | [redacted] | | | | | |
| Incr Search Dist RevShare from Expansion of Coverage | | | | | | |
| Incr Search Dist RevShare from Mix Shift between 8-12% | | | | | | |
| Incr Search Dist RevShare from (+4%) GFWD TAC Rate | | | | | | |
| Incr GFWD Play NRE Payment / Revenue Share | | | | | | |
| **Total** | | | | | | |

[redacted] Search Revshare

[redacted] Incr above Status Quo

*Note: Status Quo assumes current RSA rates and split between base and bonus Tier will continue for each OEM, with the revenue under RSA increasing at a natural historical rate until a general cap of 70% (except for OEMs that have already reached actuals 70%+). GDAF model assumes partners who take GDAF will have 100% of revenue through GDAF devices within 3 years. GDAF enrollment is generally 90-100% GFWD - details on Search Model Assumptions slide in Appendix*

Other OEMs includes rampdown from Huawei RSA devices



Privileged & Confidential

# Overall economic impact (expected case): Total incremental payment will reach [redacted] in 2023 ([redacted] from Play; [redacted] Search)

2-year term

| ($ in millions) | 2018A | 2019E | 2020F | 2021F | 2022F | 2023F | Two Year Term |
|---|---|---|---|---|---|---|---|
| Total Search Distribution Revenue via Android | [redacted] | | | | | | [redacted] |
| Non-Samsung Search RSA Revenue (Status Quo) | | | | | | | |
| Non-Samsung Search RSA Revenue (GDAF) | | | | | | | |
| **Total Status Quo Search TAC** | | | | | | | |
| *% of Search Dist Rev via Android* | | | | | | | |
| Incremental GDAF Search TAC | | | | | | | |
| Expansion of Coverage | | | | | | | |
| Mix Shift between 8-12% | | | | | | | |
| TAC % Incr above Bonus Rate | | | | | | | |
| **Total GDAF Search TAC** | | | | | | | |
| *% of Search Dist Rev via Android* | | | | | | | |
| Play Rev Eligible for Rev Share | | | | | | | |
| Incr GDAF Play RevShare | | | | | | | |
| **Total GDAF Payment** | | | | | | | |
| **Total Incremental GDAF Payment** | | | | | | | |
| Mandated Carrier Reinvestment into Android | | | | | | | |

*Note: Total Search Distribution Revenue via Android Forecast includes Samsung and Non-RSA Partner Dist, Rev and and does not include the removal of Huawe[redacted]evenue; All other line items incorporate Huawei's ramp down (revenue momentum redistributed among other OEMs according to past user switching behavior)*
*Carrier reinvestment is based on percentages of two set of revenue share: GFWD and Other Tiers. For GFWD revenue share, required reinvestment is 50%. For Other Tiers, required reinvestment of 10% in 2019-2020, 15% in 2021-2022 and 20% in 2023*

13

Mandated carrier reinvestment is [redacted] in each year
Other OEMs includes rampdown from Huawei RSA devices





Privileged & Confidential

# GTM / Roll-out strategy

**Phasing**

1. **P0 OEMs/Carriers + Samsung**; **GFwd program** P&E to lead the xPA collaboration on implementation
2. **P&E/PEX review** of progress & decision on fallbacks for negotiable terms → **BC email update**
3. **Include other OEMs** as appropriate; **Adjust carrier pitch** re Play & incl. P1/P2 carriers
4. **Device ramp** → **BC email update**

**Key Dates**

*Next Week: HK OEM Summit to introduce new structure to OEMS*

| | **Today:** BC | Jul/Aug 2019 | Nov/Dec 2019 | Feb 2020 | Apr/May 2020 | Aug 2020 | March 2021 |
|---|---|---|---|---|---|---|---|
| *Carrier Expiration dates* | | AMX, **DT, Sprint**, **T Mobile**, Roger, USC, KDDI, Optus | Bell, Comcast, Charter, Hutch, TIM | **ATT**, Bouygues, Telus, Telstra | **Orange**, Telenor, Vodafone AU | EE(BT), **Vodafone** | **Telefonica** |
| *OEM Expiration dates* | | **Samsung**, LG, **Xiaomi**, Lenovo, HMD, BQ, Transsion, Positivo | **Oppo**, **Vivo**, Sony, TCL, Wiko | | | | Asus |

GOOG-PLAY-004488120.R



**Overall economic impact (Expected Case): Total incremental TAC payment will reach ████ in 2023**

① Payments to OEMs assume all devices will be covered by a rev share agreement (because GDAF will be platform-wide) by 2023 and that enrollment of devices will generally be between ████ GFWD

② Payments to Carriers increases due to the expansion of RSA to KR/JP Carriers and the enrollment of ████

③ Incremental Payment above Bonus Rate is the portion of the Total Incremental Payments that is due to increasing TAC % above current bonus rates ███ for most OEMs and ██ for Carriers)

Other OEMs includes rampdown from Huawei RSA devices





Privileged & Confidential

# 1&2: We plan to spend [redacted] to cover [redacted] in key financial risks for Search and Play in addition to current deals

*(2023F estimates)*

| *Case 1:* Keep RSA deals as-is | *[Recommendation]* *Case 2:* Implement GDAF proposal | *Case 3:* Let all RSAs expire |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

**Other risk**

| Case 1 | Case 2 | Case 3 |
|---|---|---|
| • Assistant coverage<br>• Fragmented app experience<br>• MADA less relevant | • In the short run, slower velocity for some apps (Gboard, Feed) than standalone distribution deals | • Significant relationship damage<br>• Assistant coverage<br>• MADA less relevant |

*Note: Protected Search revenue: contractually protected Access points for Google (e.g. search widget outside of EEA protected by MADA; search defaults on 3rd party browsers protected by RSA); EEA search revenue at-risk assumes 5% non-Google choice; Organic winback of Google based on 20% organic search usage*

17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004488123.R



**GDAF Financial Expectation Range**

Privileged & Confidential

| ($ in billions) (% of Dist Rev) | % Enrollment in GFWD | Total Revenue Share over 2-year Deal Term | | | | 2023 Steady State Revenue Share | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Search (OEM) | Search (Carriers) | Play | Total | Search (OEM) | Search (Carriers) | Play | Total |
| High Case | | | | | | | | | |
| Expected Case | | | | | | | | | |
| Low Case | | | | | | | | | |

Notes: Total Revenue Share over 2-year Deal Term is showing expectations for 2020-2021.

19

Other OEMs includes rampdown from Huawei RSA devices

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004488124.R



Privileged & Confidential

# Sensitivity Analysis of exposed revenue in 2023F under current market dynamics

| Risk Vector | Low End Risk *(2023F)* | High End Risk *(2023F)* | Max At-Risk *(2023F)* |
|---|---|---|---|
| Search in 3P Browser | [redacted] *3P browser in hotseat from Chinese partners[1] point to rival, with full Firefox-level organic winback[2]* | [redacted] *3P browser in hotseat from Chinese partners[1] point to rival, with 50% of Firefox-level organic winback[2]* | [redacted] *3P browser revenue in hotseat with 0% winback* |
| Search in Europe | [redacted] *Rivals buy-out [redacted] devices in EEA, equal to non-RSA 2.0 devices[3]* | [redacted] *Rivals buy-out 30% of Chinese OEM devices in EEA* | [redacted] *All GDAF partner EEA revenue* |
| Play on CN Oems | [redacted] *Chinese partners[1] secure 33% of Play revenue (low-end usage % of Aptoide, [redacted]* | [redacted] *Chinese partners[1] secure 56% of Play revenue (high-end usage % of Aptoide, [redacted])* | [redacted] *Chinese partners[1] secure 100% of Play revenue* |

*Notes: 1) Chinese OEMs include [redacted] 2) Organic recovery after Firefox search default change was ~45-55% on U.S. desktops, 3) Xiaomi in Q1 '19 enrolled ~70% in RSA 2.0*

20

Other OEMs includes rampdown from Huawei RSA devices



## Overall Play Exposure (Expected Case)

Privileged & Confidential

Play revenue would only be affected if it was earned on a GFWD GDAF device with one of the latest two OS letters

⬛ of Play revenue is from RSA Partner OEM devices

~50% (at most) of actives are expected to have the last two OS letters

Play revenue share for GFWD devices would be paid out to OEMs, even if devices have a Carrier Client ID

21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Privileged & Confidential

# Volume of devices under RSA continues to increase despite reduction of Huawei actives

| | Actives (Non-Samsung) | | | | | |
|---|---|---|---|---|---|---|
| *(in millions)* | 2018A | 2019E | 2020F | 2021F | 2022F | 2023F |
| Xiaomi | [redacted] | | | | | |
| Oppo / Vivo | | | | | | |
| Huawei | | | | | | |
| Other OEMs | | | | | | |
| Carriers | | | | | | |
| **Total Actives** | | | | | | |
| | | | | | | |
| *% of Revenue under RSA* | | | | | | |

*Ramped down over 3 years and momentum is redistributed according to table below*

| | *Non-Android / iOS* | *Samsung* | *Xiaomi* | *Other OEMs* |
|---|---|---|---|---|
| ***Huawei Redistribution of Revenue*** | [redacted] | | | |

22

Other OEMs includes rampdown from Huawei RSA devices



Privileged & Confidential

# Search Model Assumptions

## Underlying Assumptions

- Revenue team's distribution revenue forecast [redacted]
- [redacted] of Huawei's revenue momentum expected to leave Android

| *($ in millions)* | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Search Dist Rev via Android | [redacted] | | | | |

| Huawei Re-allocation of Revenue | | | |
|---|---|---|---|
| iOS or Other Non-Android | Samsung | Xiaomi | Other Smaller Android OEMs |
| [redacted] | | | |

## Status Quo

- % of Distribution revenue for each OEM continues historical trend, with maximum [redacted] of revenue under RSA (except for Asus, Lenovo, and HMD)
- Historical TAC rates (ratio split between Base and Bonus are maintained), with maximum of [redacted] and minimum of [redacted] (except for Sony and Asus which have a Bonus [redacted] TAC rate from RSA 2.0)

## GDAF Expected Case

- % of Distribution Revenue under RSA increases to [redacted] either at historical trend or within 3 years of current RSA expiry, whichever comes first
- OEMs
  - TAC Rate of [redacted] for Optimized and [redacted] for GFWD for most partners [redacted] GFWD for Xiaomi, Sony, and Asus)
  - Enrollment between [redacted] GFWD for most partners
    - [redacted] GFWD in all geographies: Asus, HMD, Lenovo, LG, Sony
    - [redacted] Optimized in all geographies for TCL
    - [redacted] GFWD / [redacted] Optimized for all other Partners (except [redacted] for Xiaomi in IN/ID)
  - Oppo / Vivo / Transsion expected to take Fallback #1 [redacted] search rate while still receiving Play revshare)
- Carriers
  - TAC Rate of [redacted] for Optimized and [redacted] for GFWD
  - Enrollment [redacted] Optimized, [redacted] GFWD
- KR and JP Carriers are also under consideration (if we decide to pursue RSA contracts with them)
  - Their potential revenue is represented by [redacted] (steady state) of KR & JP revenue for Kyocera, Sharp, Lenovo, Xiaomi and Sony devices
  - Their ramp is expected to be 5 years instead of 3 because of historically slow ramp time for past deals in

23

Other OEMs includes rampdown from Huawei RSA devices



Privileged & Confidential

# Play Model Assumptions

**Underlying Assumptions**

- Play finance team's Apps/Games/Ads forecast utilized (assumed ramp up to steady state within ~3 years of current RSA expiration)
- OEM share of Play revenue assumed to shift according to historical trends and follow 28DA forecasts (similar to Search Model)
- Removal of [redacted] of forecasted Play App/Games revenue to remove DCB revenue from Play Revenue Share eligibility
- 50% of devices assumed to have the last two OS letter updates
- Play revenue share to OEMs is paid on all manufactured devices (regardless of Client IDs)
  - Revenue Share is only paid on GFWD devices (except for Oppo/Vivo/Transsion where we expect fallback terms to occur so that they will receive Play RevShare even if they do not meet all GFWD requirements)
  - Revenue Share Rates:
    - Xiaomi, Oppo, Vivo and Transsion will have [redacted] RevShare
    - Fly Mobile will [redacted]
    - HMD, Lenovo, LG and Sony will have [redacted] RevShare
    - All other OEMs will have [redacted] RevShare
  - Enrollment:
    - Expected to be the same as Search Model's Core/Optimized/GFWD enrollment for each OEM in each geography
    - Even if a device has a Carrier Client ID, we expect GDAF tier enrollment to be the same as if it was OEM Client ID
- Sharp (not a current RSA Partner) devices will also potentially be eligible for Play revenue share, with assumed 100% GFWD enrollment at a [redacted] Revenue Share rate

Other OEMs includes rampdown from Huawei RSA devices

Privileged & Confidential

# Detailed Materials (Appendix)

1: (Pre-read) Context on Android ecosystem
2: (Pre-read) 2016 RSA overview
3: (Pre-read) Europe impact
4: Detailed review of GDAF proposal

25



Privileged & Confidential

## Global phone shipments are stalling; shipments declined by 2% Y/Y in 2018, with all segments experiencing losses

- **Smartphone shipments declined by 1.2% y/y in 2018** (Android -1.1%, iOS -1.2%)
  - ○ All of iOS decline was in Q4 (-10% Y/Y) with less successful 2019 launches
  - ○ Overall shipment decline due to shrinking entry segment, increasing device age and growing secondary market
- **Feature phone shipments declined by 5% y/y in 2018**, with JioPhone success unable offset overall category decline

27

GOOG-PLAY-004488132.R



Privileged & Confidential

## Android global share of smartphones has increased slightly (1ppt), but regional numbers highlight share loss in N.America

Y/Y Android share relatively steady outside expected Q4 seasonality

Apple grew its ~40% share in the US while Samsung and Huawei helped gain share in APAC and Europe

New iPhones launched

| 2017Q1 | 2017Q2 | 2017Q3 | 2017Q4 | 2018Q1 | 2018Q2 | 2018Q3 | 2018Q4 |
|---|---|---|---|---|---|---|---|
| 17% | 14% | 14% | 22% | 17% | 14% | 16% | 21% |
| 83% | 86% | 85% | 78% | 83% | 85% | 84% | 79% |

| Region | Smartphone Sales Growth (Y/Y) | Android Share (Q4 2018) | Android Share Change (Y/Y) |
|---|---|---|---|
| Developing APAC | 6% | 98% | 1% |
| L'EMEA* | -3% | 93% | 2% |
| North America | -7% | 49% | -6% |
| EEA | -3% | 70% | 3% |
| Developed APAC | -1% | 59% | 3% |
| Global | -1.2% | 79% | +2% |

*LatAm, non EEA Europe and MEA

28

GOOG-PLAY-004488133.R



Privileged & Confidential

# Shift to ultra-premium prominent in developed geos; Samsung in APAC and Huawei in Europe drove share gain for Android

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY GOOG-PLAY-004488134.R



## Declines in entry-level not recovered by shift to mid-tier; Drivers: increase in device lifespan + secondary market growth

<$400 Shipment Growth by Region (2017 → 2018)

- Average **Android device age** in emerging markets is ~44 months (+13% Y/Y), 1.7x higher than in developed geos

- **Secondary sales** are growing at 15% Y/Y; and Apple controls most of the segment due to long device lifespan and low average price ($190-$220)

Note: All data for smartphones only; Source: 3P IDC shipment data     *LatAm, non EEA Europe and MEA



## We need to invest in Android OEMs to hedge against ecosystem fragmentation

| Android Today | Worst Case Scenario | Mitigations |
|---|---|---|
| | Samsung's Ecosystem | Samsung deal (incl. Banyan) |
| | China Ecosystem | Today's proposal |
| Non CN OEMs<br>● 350M activations, -12% y/y<br>● $2.8B Play, $5.5B Search | "Google's Android" | |

*CN OEMS: Huawei, Xiaomi, Oppo, Vivo, TCL, ZTE, Transsion, Lenovo*

Privileged & Confidential

31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Source: Android Data; excluding China; Represent all Search and Play revenue flowing through Xiaomi/Huawei devices on all client_ids

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-004488137.R

Privileged & Confidential

# Clean Android devices still represent a very small (<5%) part of Android Ecosystem



- **Android Go:** Growth continues to accelerate, reaching 45M actives (8M Apr'19 actvns). Samsung and Transsion alone account for 45% of these activations, but achieved it in different ways. Samsung offerings were limited to the J2 Core and J4 Core, while Transsion had over 42 distinct models.
- **Android One:** Xiaomi and Nokia continue to be the two most engaged partners; Xiaomi alone represented 48% of 28DAs as of Apr'19. However, recent strength in Nokia's budget and mid-tier lineup (3, 5, 6) enabled it to pull ahead of Xiaomi (0.45M versus 0.38M actvns in Apr'19)
- **GMS Express:** Despite graduation to head OEM status, Transsion remains the dominant GMSE partner, accounting for 52% of 28DAs and 43% of actvns in Apr'19

33

GOOG-PLAY-004488138.R

Privileged & Confidential

## Aptoide powered OEM stores see very meaningful traction on Android devices



Install rate = % of OEM's 28DAU with store installed; Usage rate = % of lockbox 28DAU that had app open in foreground for at least 3 seconds

34

GOOG-PLAY-004488139.R



Privileged & Confidential

# Chinese OEMs have significant overlap with GMS apps and are actively monetizing these apps through ads

**Google Forward (ROW ex. RU)**

**99%** of ads revenue

NO

~~**Mi Store**~~
~~**Mi Browser**~~
~~**-1**~~
~~Security Center~~
~~Files Manager~~
~~Calendar~~
~~Music~~
~~Video~~
~~Message/Dialer~~
~~Theme Store~~
~~Gallery~~
~~Weather~~
~~Folder ads~~

YES

Drop
Community

**Optimized Experience (IN/ID)**

NO

~~***Mi Store on DHS***~~
~~***Mi Browser as Default***~~
~~**-1**~~

YES

Drop
Community
Security Center
Files Manager
Calendar
Music
Video
Message/Dialer
Theme Store
Gallery
Weather
Folder ads

*Global UI has a team of 400
*All apps listed are Xiaomi first party

Privileged & Confidential

## Chinese OEM own apps are often getting substantially more traction on their devices than substitute GMS apps



Privileged & Confidential

# Intrusive ads are enabled by default across the MIUI experience

**Mi Browser** start page

**Downloads** page

**MIUI Security** app

**MIUI system/settings**

- Ads also show up in MIUI Music app, File Explorer, Home Screen Folders, App Installer
- While there are options to remove the ads, the process is hidden and complex



GOOG-PLAY-004488144.R



Privileged & Confidential

## **Today:** Two core agreements (MADA, RSA) supplemented with an array of subsequent deals & programs

**MADA**

**Non monetary barter.** Access to Google apps in exchange for placement and security updates

**RSA**

**Revenue share (2 tiers).** Premium placement, defaults + exclusivity for Search & Assistant; Feed and Gboard intended, but carved out of most of the devices ***(Samsung, HOVX)***

**Other Deals**

**Various (bounties, etc.).** Mostly cover preload gaps and access points not covered by MADA and RSA

In the current world, each partner deals with multiple teams / deals to build an end-to-end view of how to work with Google

40

Introduction to what Android core commercial agreements are, and their basic premise



**Recap:** RSA Deal terms - BC approved (non Samsung) 31/10/16

Privileged & Confidential

| | RSA Base tier (device by device) | RSA BONUS tier (OEM ONLY, device by device) |
|---|---|---|
| Preloads | MADA (11 GMS apps) | MADA(11 GMS apps) + Messages (*opt*), Gboard, Calendar |
| Exclusivity | **Search:** Full exclusivity (DHS in Europe)<br>**Assistant:** DHS + OOB gesture & hotword exclusivity | **Search:** Full exclusivity (DHS in Europe)<br>**Assistant:** DHS + OOB gesture & hotword exclusivity |
| Defaults | MADA (Assistant)<br>**Search:** OEM browser default<br>**Chrome:** Default browser (*optional*)<br>**Apps:** None | MADA (Assistant)<br>**Search:** OEM browser default<br>**Chrome:** Default browser (*optional*)<br>**Apps:** All relevant defaults |
| Placement | MADA (DHS placement for QSB, Play & Google Folder)<br>**Search:** Feed on -1 (*carved out on 70%+ of RSA devices*) | MADA (DHS placement for QSB, Play & Google Folder)<br>**Search:** Feed on -1<br>**Apps:** Duo on DHS |
| Safety | 90d security freshness (now also covered by MADA) | 90d security freshness (now also covered by MADA) |
| **Consideration**<br>**Uptake** | ███ Search & Assistant ads revenue (OEMs / carriers)<br>██ **Android activations,** ██ **actives** | █ of all Search & Assistant ads revenue<br>██ **Android activations,** █ **actives** |

GOOG-PLAY-004488146.R



GOOG-PLAY-004488147.R

Privileged & Confidential

## Additional Context: Apps Contractual coverage (excl. Search, Chrome, Play and Assistant)



| | MADA | GDAF Core (incremental to MADA) | GDAF Optimized (incremental to Core) | GDAF Google Forward (incremental to Optimized) | Separate distribution deal? | Additional Context |
|---|---|---|---|---|---|---|
| Youtube | preload | - | - | - | - | |
| Maps | preload | - | - | - | - | |
| Photos | preload | - | - | default | yes, defaults | Missing some features prioritized by OEMs |
| Drive | preload | - | - | - | - | |
| Gmail | preload | - | - | default | - | |
| Duo | preload | - | - | default | Comms suite, default | |
| Play Movies | preload | - | - | - | - | |
| YT (Play) Music | preload | - | - | - | - | |
| Messages | - | - | - | default | Comms suite, default | Carriers block it in US, JP |
| Gboard | - | - | default | - | yes, defaults | |
| Pay | - | - | - | preload, gestures | yes, preload | |
| Lens | - | - | - | exclusively, camera integration | under consideration | Amazon has competing app |
| Calendar | - | - | - | default | - | |
| Google One | - | - | - | - | yes, preload | |
| Dialer | - | - | - | default | Comms suite, default | Carriers block it in US, JP |
| Contacts | - | - | - | default | Comms suite, default | Carriers block it in US, JP |
| Android Auto | headless APK | - | - | - | - | |
| Docs/Sheets/Slides | - | - | - | - | yes, preload | |
| Keep | - | - | - | - | - | |
| Translate | - | - | - | - | - | |
| News | - | - | - | preload | yes, preload | |
| Podcasts | - | - | - | preload | yes, preload | |
| Shopping | - | - | - | preload | yes, preload | |
| Play Books | - | - | - | - | - | |
| Fit | - | - | - | - | - | |
| Digital Wellbeing | headless APK | - | - | - | - | |
| Family link | headless APK | - | - | - | - | |
| Files | preload on Go | - | - | - | - | |
| Calculator | - | - | - | - | - | |
| Clock | - | - | - | - | - | |

43





Privileged & Confidential

## **RSA Timelines:** Current RSA deals starting to expire, giving us opportunity to re-think and optimize the terms

| | Today | Jul/Aug 2019 | Nov/Dec 2019 | Feb 2020 | Apr/May 2020 | Aug 2020 | March 2021 |
|---|---|---|---|---|---|---|---|
| EEA Carriers | | DT | Hutchinson, TIM | Bouygues | Orange Telenor | EE(BT), Vodafone *(+1yr autorenewal)* | Telefonica |
| ROW Carriers | | AMX, Sprint T Mobile, Roger, USC, KDDI, Optus | Bell, Comcast, Charter | ATT, Telus, Telstra | Vodafone AU | | |
| OEMs | | Samsung, LG, Xiaomi, Lenovo, HMD, BQ, Transsion, Positivo | Huawei, Oppo, Vivo, Sony, TCL, Wiko | | | | Asus |

GOOG-PLAY-004488150.R



Privileged & Confidential

## In EEA: We recommend continuing RSA deals to ensure Google distribution

**Not recommended:** Only relying on activation bounty is not a sufficient deterrent to prevent rivals from buying out search exclusivity and browser defaults

>60% top OEM's revshare comes from EEA. Taking away these funds will further incentivise OEM deals w/ rivals

Continuing RSA (GDAF) ensures:

- **Platform tier:** *Negates rival's ability to cherry-pick devices for exclusivity*

- **Browser defaults:** *Continues to secure 3P browsers\**

- **Assistant, Discover and other apps:** *Valuable 'Gets' even in the choice screen scenario*

- **Downside protection:** *Incentive alignment as no payout to partners if Google not chosen by users*

Bar chart labels: $11 — Current average Google bounty; $20 — Average est. Microsoft's ability to Pay

*\* Buyouts of Samsung devices by rivals is deterred due to a large install base of paying devices on RSA. Samsung does not want to risk the ~$1B+ / yr, majority of which is via the install base*

46

Privileged & Confidential

## Worst case scenario: Devices with exclusive rival providers for search, assistant and browser

**MSFT / AMZN distribution:**

- **Search app exclusive on device**
- **Exclusive search widget + icon placement on DHS**
- Competitor launcher set OOB **with all search access points set to competing search service**
- **Browser default and *exclusive on device*,** with competitor search service as default
- **Assistant icon on DHS** and **enabled** with OOB hotword and gesture
- **−1 screen** controlled by competitor search app / feed



*Estimated average rival offering ->> $20/device*        $14/device ++        47



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Privileged & Confidential

## GDAF: 3-tiered RSA structure, aiming to give partners more incentives to go all Google while securing key access points

| New terms | Core Experience PLATFORM | Optimized Experience DEVICE BY DEVICE | Google Forward DEVICE BY DEVICE |
|---|---|---|---|
| Preloads | MADA | MADA + GBoard | MADA + Google defined payload; Google has approval on all preloads; PAI used |
| Exclusivity | **Assistant:** DHS + OOB gesture & hotword exclusivity | **Search:** Full exclusivity<br>**Assistant:** Full exclusivity | Google exclusivity and defaults for all preloaded apps; use stock Android UI; No apps with APK install rights |
| Defaults | **Search:** No exclusivity<br>OEM browser default<br>**Chrome:** Default browser *(optional)* | **Search:** OEM browser default<br>**Chrome:** Default browser *(optional)*<br>**Gboard:** Default | |
| Placement & Gestures | MADA<br>**Search:** Feed on -1 required (shared tab with partner default okay)<br>**Assistant:** Powertap | MADA<br>**Search:** Feed on -1 required *(shared tab with Google default as fallback)*<br>**Assistant:** icon on DHS + powertap | MADA<br>**Search:** Feed on -1<br>**Assistant:** icon on DHS, enhanced integrations *(Google defined payload e.g. dedicated button)* |
| Play | MADA | MADA | Exclusivity |
| Safety & Updates | | | 60d security freshness, last 2 letter updates |

GOOG-PLAY-004488155.R



1 // SPLITTING BASE TIER

Privileged & Confidential

**Core & Optimized:** Splitting up current base RSA into 2 tiered experience to secure platform protections for browser & Assistant







Privileged & Confidential

## 1&2: We plan to spend [redacted] to cover [redacted] in key financial risks for Search and Play in addition to current deals

| | Hedged ('23F) | Details |
|---|---|---|
| 1 Search in 3P Browser | [redacted] | [High risk/ immediate] Google as 3P browser default could be replaced, exposing [redacted] **of annual Google distribution revenue** (e.g. Bing is already default on some Vivo/Xiaomi devices in India partially contributing to [redacted] **search rev decline in 2018***) |
| 1 Search in Europe | [redacted] | [High risk/ mid term] Without offering further incentive, **rivals can get full exclusivity** for search widgets and browsers exposing [redacted] **of Google revenue** in '23F (high risk, but Google likely to win some portion back) |
| 1 Assistant | [redacted] of queries | [High risk/ mid term] **Alexa** could be preloaded and deeply integrated (icon on DHS, hotword, hardware affordance - access points that account for **85%+ of Android's Google Assistant queries**). This already happens on **14M Amazon Prime devices** (growing 14% y/y) |
| 2 Play on CN OEMs | [redacted] | [High risk/ mid term] With a vibrant CN developer community and heightened geopolitical concerns, there is increased pressure for **Huawei and other CN OEMs to double down on their own app stores** putting [redacted] of Play revenue at risk |

*NOTES: * Per user search revenue decline also driven users moving search into apps (e.g. video search into Tik Tok) and lower searchiness on non-Chrome (e.g. UC browser)*

Privileged & Confidential

## 3&4: We propose investing [redacted] in getting [redacted] devices promoting best Google experience on Android ([redacted] per device)

### 3&4 Strategic Reasons

- **Aligns rapidly growing CN OEMs with Google** before they pass the pivotal moment in 1P services growth (e.g. [redacted])
- **Promotes Android and Google** by advancing cleaner, more secure, fresher UX

| | | | |
|---|---|---|---|
| -50% | System crashes* | +20% | Battery efficiency* |
| +40-50% | GMS app usage uplift | 2x | User NPS scores |

### 3&4 Efficiency

**Per device**** **and operational savings** by consolidating standalone bounties:

- [redacted]
- [redacted]
- **Other non CN OEMs:** [redacted] **savings per device** (incl. HW button)

### 3&4 Additional potential upside

*(not part of the deal model)*

- [redacted] **in marketing by carriers** (might require additional 1-2 HC to manage)
- [redacted] **revenue uplift** for Google Forward devices via Search & Play
- Clean devices are **15-20% more likely to attract iOS switchers** (observed in Western Europe)

** Xiaomi A-One devices vs. same-spec'ed Xiaomi MIUI devices; **Varies by OEM*

Privileged & Confidential

# Per Unit Comparison: Bounties compared to GFWD Portion of Incremental Payment

| | (A) | (B) | (C) = (A) + (B) | (D) | (A) - (D) | (C) - (D) |
|---|---|---|---|---|---|---|
| | Avg App Bounty | Button Bounty | Total App and Button Bounty | GFWD Portion of Incremental Pmt Per Unit in 2020 | Savings from apps only in GFWD | Savings if we can get the HW button in GFWD |
| Xiaomi | [redacted] | | | | | |
| Sony | | | | | | |
| Lenovo | | | | | | |
| LG | | | | | | |
| HMD | | | | | | |

Additional "gets" are Clean UI, Play Protections, Letter Upgrades, GMail, GCal

Play included

Other OEMs includes rampdown from Huawei RSA devices



Privileged & Confidential

## **Why:** converting MIUI devices to a cleaner, fresher, and more secure UI also improves UX through fewer crashes and better battery

| | Device | Mean time between failures[1] (days) | System crashes per device-day | Projected battery hrs per 1000mAh | System jank rate %[2] |
|---|---|---|---|---|---|
| Android One | Mi A1 | [redacted] | | | |
| | Mi A2 | | | | |
| | Mi A2 Lite | | | | |
| MIUI | Redmi Note 4 *(A1 peer[3])* | | | | |
| | Redmi Note 5 *(A2 peer[4])* | | | | |
| | Redmi 6 Pro *(A2 Lite peer[5])* | | | | |
| | A-One average | | | | |
| | MIUI average | | | | |

Source: Android Device Health dashboard.Data for latest/most popular builds of devices with sufficient data for April 2019 period
1.Device MTBF can be higher than length of time in market as MTBF is projected from crash rates from active devices. 2. Average of System UI and System apps jank rates
3. Note 4 has same display, chipset, RAM as A1 but with bigger battery. 4. Note 5 has slightly worse processor, similar RAM, bigger battery vs. A2. 5. Redmi 6 Pro has same specs as A2 Lite

13% Play and 17% Search growth for rest of ecosystem



## So how do partner economics work?
(Illustrative Example: Xiaomi in 2020)

Privileged & Confidential

Google forward experience (26M MAUs)

### Overall Payout

| (in millions) | | 2019E | 2020F | 2021F | 2022F | 2023F |
|---|---|---|---|---|---|---|
| Status Quo (just RSA) | | | | | | |
| GDAF Incremental Search | | | | | | |
| GDAF Incremental Play | | | | | | |
| *RSA Actives* | | | | | | |
| *Total OEM Client ID Actives* | | | | | | |

*App bounties would include: $0.5 for Feed; $0.08 for News; $0.08 for Podcasts; $0.11 for Gboard; $0.05 for Pay and $0.06 for Comms

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





**ALTERNATIVE 1**

## Search & Play revenues are top priority for Google forward tier
*All gets incremental to Optimized tier; Google can update asks during the deal*

| *Prioritization logic* | **Must have** | **Negotiable / Fallbacks** |
|---|---|---|
| **[P0]** Secure and grow **Search and Play revenue** | **Search:** exclusive Feed on -1<br>**Play:** DHS exclusivity | **Play:** Full exclusivity; Play FOP setup in OOB experience   **Pay less**<br>**Search & Play:** Letter upgrades |
| **[P1]** Make the **Assistant** more helpful | **Integrations:** BOM-neutral physical affordance, lockscreen integration<br>**Apps:** Gmail, Calendar default | **Integrations:** Dedicated button |
| **[P1]** Create cohesive **phone experience** | **Apps:** Messages default (in geos where it's possible); GPay preload<br>**UI & 3rd party apps:** No duplication for GMS apps + Google approval | **Substitute with other asks**<br>● Rest of Comms Suite<br>● Additional GPay integrations<br>● Default for Photos<br>● Camera integrations incl. Lens<br>● Preload of News, Podcasts |

58

GOOG-PLAY-004488163.R

Privileged & Confidential

## Additional Context: Apps Contractual coverage (excl. Search, Chrome, Play and Assistant)



| | | MADA | GDAF | Separate distribution deal? | Additional Context |
|---|---|---|---|---|---|
| | Youtube | preload | - | - | |
| | Maps | preload | - | - | |
| | Photos | preload | default | yes, defaults | Missing some features prioritized by OEMs |
| | Drive | preload | - | - | |
| | Gmail | preload | default | - | |
| | Duo | preload | default | Comms suite, default | |
| | Play Movies | preload | - | - | |
| | YT (Play) Music | preload | - | - | |
| | Messages | | default | Comms suite, default | Carriers block it in US, JP |
| | Gboard | | default | yes, defaults | |
| | Pay | | preload, gestures | yes, preload | |
| | Lens | | exclusivity, camera integration | under consideration | Amazon has competing app |
| | Calendar | | default | - | |
| | Google One | | | yes, preload | |
| | Dialer | | default | Comms suite, default | Carriers block it in US, JP |
| | Contacts | | default | Comms suite, default | Carriers block it in US, JP |
| | Android Auto | headless APK | - | - | |
| | Docs/Sheets/Slides | | - | yes, preload | |
| | Keep | | - | - | |
| | Translate | | - | - | |
| | News | | preload | yes, preload | |
| | Podcasts | | preload | yes, preload | |
| | Shopping | | | yes, preload | |
| | Play Books | | - | - | |
| | Fit | | - | - | |
| | Digital Wellbeing | headless APK | - | - | |
| | Family link | headless APK | - | - | |
| | Files | preload on Go | - | - | |
| | Calculator | | - | - | |
| | Clock | | - | - | |

59

GOOG-PLAY-004488164.R

# Exhibit A5
# Public Redacted Version

# EXHIBIT 6

# FILED UNDER SEAL

# EXHIBIT A5
# to
# C. Cramer Declaration