Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000

*Counsel for Defendants Google LLC, et al.*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
Nicholas R. Sidney, S.B. #308080
nick.sidney@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
Rebecca L. Sciarrino, S.B. # 336729
rebecca.sciarrino@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
Lauren Bell, *pro hac vice*
lauren.bell@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY CONSUMER ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
| This Document Relates To: | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' PROPOSED REMEDY REGARDING CHATS** |
| *Epic Games Inc. v. Google LLC et al.,* Case No. 3:20-cv-05671-JD | Judge:    Hon. James Donato |
| *In re Google Play Consumer Antitrust Litigation,* Case No. 3:20-cv-05761-JD | |
| *State of Utah et al. v. Google LLC et al.,* Case No. 3:21-cv-05227-JD | |
| *Match Group, LLC et al. v. Google LLC et al.,* Case No. 3:22-cv-02746-JD | |

# **TABLE OF CONTENTS**

**Page**

I.     PLAINTIFFS' PROPOSED REMEDY AMOUNTS TO AN IMPERMISSIBLE MANDATORY INFERENCE ................................................................................. 2

II.    PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY HAVE BEEN DEPRIVED OF ANY RELEVANT EVIDENCE THROUGH LOST CHATS ................. 4

    A.    The Phone Manufacturer Agreements Predate Google's Preservation Obligations in this Case and Plaintiffs Have Abundant Evidence on this Topic ........................................................................................................... 6

        1.    The Mobile Application Distribution Agreement ("MADA") Predates Google's Preservation Obligations in this Case ............................ 6

        2.    The Revenue Sharing Agreements ("RSAs") Predate Google's Preservation Obligations in this Case and Plaintiffs Have Abundant Evidence on these Agreements ................................................... 7

    B.    Plaintiffs' Allegations Regarding Samsung Predate Google's Preservation Obligations in this Case and Are Not Relevant .......................................... 8

    C.    Google's Agreements with App Developers Largely Predate Google's Preservation Obligations in this Case and Plaintiffs Have Abundant Evidence on these Agreements ......................................................... 10

    D.    Plaintiffs' Allegations Regarding the Play Service Fee Model Predate Google's Preservation Obligations in this Case ........................................ 12

    E.    Plaintiffs' Allegations Regarding Google's Relationship with Apple Predate Google's Preservation Obligations in this Case ..................................... 13

III.    PLAINTIFFS ARE NOT ENTITLED TO THEIR PROPOSED REMEDY ...................... 15

-i-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' PROPOSED REMEDY RE CHATS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**FEDERAL CASES**

4

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
   881 F.2d 1396 (7th Cir. 1989) ...................................................................................5

5

*Apple Inc. v. Samsung Elecs. Co.*,
   888 F. Supp. 2d 976 (N.D. Cal. 2012) ...................................................................2, 16

6

7

*Burns v. Medtronic, Inc.*,
   No. 8:15-cv-2330-T-17TBM, 2017 WL 11633269 (M.D. Fla. Aug. 9, 2017) ........................16

8

*Garcia v. City of Santa Clara*,
   No. 10-CV-02424-SI, 2017 WL 1398263 (N.D. Cal. Apr. 19, 2017) ......................................15

9

10

*Io Group Inc. v. GLBT Ltd.*,
   No. C-10-1282 MMC DMR, 2011 WL 4974337 (N.D. Cal. Oct. 19, 2011)...........................17

11

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   341 F.R.D. 474 (S.D.N.Y. 2022)..................................................................................15

12

13

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ...............................................................................................4

14

*Leon v. IDX Sys. Corp.*,
   464 F.3d 951 (9th Cir. 2006)....................................................................................15

15

16

*Ohio v. American Express Co.*,
   138 S. Ct. 2274 (2018) .............................................................................................4

17

18

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010).....................................................................................15

19

*Radio City, Inc. v. Celestron Acquisition, LLC*,
   No. 5:20-CV-03642-EJD, 2023 WL 5519324 (N.D. Cal. Aug. 25, 2023) ...............................17

20

21

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .....................................................................................5

22

23

**FEDERAL RULES**

24

Fed. R. Civ. Proc. 37 ...................................................................................1, 15, 18

25

26

Fed. R. Evid. 404...................................................................................................9

27

28

-ii-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' PROPOSED REMEDY RE CHATS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1    The Court has made clear that, while Plaintiffs will be permitted to present evidence on

2  chats at trial, "[t]his antitrust case will not be decided on the basis of lost Chat communications."

3  ECF No. 469 at 19.[1]  Yet that is what the Plaintiffs seek here.  Their proposed remedy would

4  begin the trial with an instruction on chats, before the jury hears any substantive evidence in the

5  case, *and* end the trial with a list of facts to be read to the jury by the Court as part of an adverse

6  inference instruction.  This severe remedy is not proportional as required by Federal Rule of Civil

7  Procedure 37.

8    First, as this Court has already recognized,  Plaintiffs' proposal that the Court read the jury

9  a list of facts would not be appropriate because it "would be basically a mandatory

10  inference."  Declaration of Jonathan Kravis ("Kravis Decl.").  ¶ 26, Ex. 16, ECF No. 446, 1/31/23

11  Hr'g Tr. at 230:12-16.  Such "severe measures . . . should not be used when the information lost

12  was relatively unimportant or lesser measures . . . would be sufficient to redress the loss."  ECF

13  No. 469 at 18-19 (quoting Comm. Notes, Subdivision (e)(2)).

14    Second, Plaintiffs' submission does not show that Google's post-August 13, 2020 chat

15  preservation practices deprived them of evidence that would have strengthened their case.  The

16  vast majority of the conduct discussed in Plaintiffs' motion took place before this lawsuit was

17  filed—in many cases *years* before this lawsuit was filed—and therefore any chats on these topics

18  would have been permissibly deleted pursuant to Google's document retention policy long before

19  Google's preservation obligations arose.  In other words, the deletion of the evidence Plaintiffs

20  point to had nothing to do with the conduct the Court addressed in its chats ruling, and should not

21  be the basis for an adverse inference, let alone the severe sanction proposed by Plaintiffs.  With

22  respect to chats post-dating the filing of the lawsuit, Plaintiffs say that these chats would have

23  revealed Google's subjective motivation for the challenged conduct, but the inquiry in this

24  antitrust case focuses on *effect*, not *intent*.  And Plaintiffs' assertion that missing chats on these

25  topics would have been relevant–let alone helpful–is pure speculation.

26

27
_____
28  [1] All docket references are to the MDL docket, Case No. 3:21-md-02981-JD, unless otherwise noted.

1    Rather than the severe and unwarranted remedy proposed by Plaintiffs, the Court should

2    adopt its previously-suggested approach:  The jury should be allowed to reach its own conclusions

3    about the chats evidence presented at trial.  Kravis Decl. ¶ 26, Ex. 16, 1/31/23 Hr'g Tr. at 214:12-

4    17.  As the Court has explained, Plaintiffs "have to put on a little case to the jury" and then "let

5    them decide did, in fact, Google not preserve documents and chat."  *Id.*  That evidence could be

6    presented to the jury through a stipulation of undisputed facts negotiated by the parties, and

7    supplemented with any witness testimony that the Court may deem necessary.  *Id.* at 231:3-

8    232:9.  As with every other category of evidence, the Court can wait until the end of trial to

9    determine whether any jury instruction is needed.  At that point, the Court will be in a position to

10   view the chats evidence in the context of all the other evidence presented at trial.  If the Court is

11   inclined to craft a final jury instruction on this issue now, then the Court should adopt a far more

12   measured instruction than the one proposed by Plaintiffs, such as a permissive instruction modeled

13   on the one given in *Apple v. Samsung*.[2]  In their motion, Plaintiffs rely on the *Samsung* magistrate

14   judge's report recommending an adverse inference instruction, but they do not mention or even

15   cite the district court decision rejecting that recommendation as too severe.

16   **I.    PLAINTIFFS' PROPOSED REMEDY AMOUNTS TO AN IMPERMISSIBLE**
         **MANDATORY INFERENCE.**

17

18       This Court has already rejected a less-severe remedy than the one now proposed by

19   Plaintiffs, based on the same recitation of documents and arguments marshaled in their instant

20   filing.  At that time, the Court explained that the approach of reading a set of facts to the jury

21   followed by an adverse inference instruction would amount to an unwarranted mandatory

22   inference.  The remedy that Plaintiffs now propose is even more severe than the version the Court

23   rejected, as Plaintiffs now ask the Court to instruct the jury on chats at the outset of the case,

24   before the jury has heard any evidence related to the merit, *and* read a set of facts to the jury and

25   _____

26   [2] The magistrate judge order on which Plaintiffs rely was modified by the district court, which
     ultimately ordered the following adverse inference instruction: "Samsung Electronics Company
27   has failed to preserve evidence for Apple's use in this litigation after its duty to preserve arose.
     Whether this fact is important to you in reaching a verdict in this case is for you to decide." *Apple*
28   *Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 995 (N.D. Cal. 2012) (granting motion for relief
     from Magistrate Judge's order).

-2-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' PROPOSED REMEDY RE CHATS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1    give an adverse inference instruction at the end of the case.

2         In advance of the chats closing argument hearing on January 31, 2023, Plaintiffs submitted

3    a list of factual findings to be read to the jury by the Court followed by an adverse inference

4    instruction.  At the January hearing, the Court explained that such a remedy would not be

5    proportionate because it "would be basically a mandatory inference."  Kravis Decl. ¶ 26, Ex. 16,

6    1/31/23 Hr'g Tr. at 230:14-15.  The Court explained, "you want me to give a list of here are ten

7    findings from the Court.  And by the way, do what you want with them.  What do you think the

8    jury's going to do?  They're going to say: You heard what the judge said, so I guess we'll just

9    check this box 'yes.'"  Id. at 230:19-24.  This is because "when the judge speaks, it can have too

10   much of a volume, particularly for jurors.  That's why we all, as judges, are very careful about

11   that."  Id. at 232:2-4.

12        Instead, the Court explained, "[y]ou're going to have to put on a little case to the

13   jury.  You're going to have to tell the jury–let them decide did, in fact, Google not preserve

14   documents and chat."  Id. at 214:12-15.  The Court described Plaintiffs' proposed list of factual

15   findings to be read to the jury as "like a Wall Street Journal op-ed piece," and concluded, "I'm not

16   going to do anything close to this.  Okay?  I'm just not."  Id. at 234:18-20.

17        Ignoring the Court's prior warnings, Plaintiffs ask the Court to instruct the jury on chats

18   evidence at the start of the trial, *before* the jury has heard anything about the substantive evidence

19   in the case.  This is a blatant attempt to make this case about and have the jury decide the case

20   based on chats preservation, which the Court has already said would be

21   inappropriate.  Unsurprisingly, Plaintiffs cite no case in which any court provided such an

22   instruction at the outset of trial.  Further, in addition to all the facts that Plaintiffs previously

23   proposed, Plaintiffs now also ask that the Court instruct the jury on findings regarding Google's

24   training on attorney-client privilege, an issue that the Plaintiffs have never challenged through a

25   motion in this case and that was not addressed in the Court's conclusions of law in its chats order.

26   *See* ECF No. 469.

27

28

## II. PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY HAVE BEEN DEPRIVED OF ANY RELEVANT EVIDENCE THROUGH LOST CHATS.

Plaintiffs' motion offers no basis to revisit the Court's prior guidance on this issue. Plaintiffs focus on five topics: (1) agreements with phone manufacturers, (2) communications with Samsung, (3) agreements with developers through the Games Velocity Program (also known as Project Hug), (4) Google Play's service fee structure, and (5) Google's relationship with Apple. Plaintiffs do not say that they lack information to understand any of these subjects or their effects, which is the focus of this antitrust case. Rather, Plaintiffs argue that "Google's destruction of chats made it more difficult for Plaintiffs to prove their case." Mot. at 4. The record belies this assertion. While each category of conduct is addressed individually below, Plaintiffs' arguments suffer from four overarching flaws.

*First*, the vast majority of the conduct discussed in Plaintiffs' motion took place before this lawsuit was filed—in many cases *years* before this lawsuit was filed—and therefore any chats on these topics would have been permissibly deleted long before Google's preservation obligations arose. "Under Google's standard retention policy, one-on-one Google Chats with history off are retained for 24 hours only." ECF No. 469 at 6. Therefore, at the time the first lawsuit in this MDL was filed in August 2020, such chats had already been deleted. *See id.* at 15 n.4 (noting that "Plaintiffs made some effort at the evidentiary hearing to move" the date of Google's preservation obligation "forward" from August 2020, and concluding, "[t]he Court focuses on the August 2020 time period for this MDL."). Information deleted pursuant to Google's standard retention policy before any duty to preserve existed in this case cannot be the basis for an adverse inference.

*Second*, Plaintiffs argue repeatedly that lost chats would have shown Google's intent or subjective motivation. But in this antitrust case, the inquiry focuses on *effect*, not *intent*. Courts apply the rule of reason to "distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)). Thus, in an antitrust case, intent is relevant only to the extent that it sheds light on the effects of Google's conduct, and Plaintiffs do not argue

-4-

that they are missing evidence regarding the effects of Google's conduct.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) (recognizing that in an antitrust case the "focus is upon the effect of that conduct, not upon the intent behind it").  As the Seventh Circuit has explained, in the antitrust context "[i]ntent does not help to separate competition from attempted monopolization and invites juries to penalize hard competition," and therefore "the evidence offered to prove intent" is frequently "even more ambiguous than the economic data it seeks to illuminate."  *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989).  Indeed, with one exception (Match's claim for attempted monopolization of the in-app billing market), intent is not an element of any claim brought by Plaintiffs.

*Third*, Plaintiffs' motion severely mischaracterizes the testimony of Google employees about their use of chats.  Plaintiffs misleadingly string together snippets of testimony to suggest that these employees testified that they used chat to communicate about relevant topics during the relevant time period.  In fact, the full testimony of many of these witnesses shows that they did not testify that they used chats to communicate regarding the subjects that Plaintiffs claim.

*Fourth,* Plaintiffs offer nothing more than rank speculation that any missing chats would have been relevant—let alone helpful—to their case.  At the last status hearing, the Court asked Plaintiffs to "tell me what you think you're missing."  Kravis Decl. ¶ 27, Ex. 17, 9/7/2023 Hr'g Tr. at 35:17-18.  The Court explained, "you should be able to give me at least some informed sense of things that you expected to have seen or you thought you would have seen or you saw a little bit of … and you think the chat issue impacted that in a negative way."  *Id.* at 35:21-25.  Plaintiffs' motion does not provide such an "informed sense."  Plaintiffs repeatedly argue that a single document indicating that a topic was discussed in chats shows that they have lost unique and highly incriminating evidence on that topic.  That just does not follow.  Plaintiffs have not substantiated their overwrought suggestion that lost chats "could have eradicated Google's defenses in this litigation."  ECF No. 608 (Plaintiffs' Proposed Remedy Re Google's Destruction of Chat Evidence ("Mot.")) at 3.

-5-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' PROPOSED REMEDY RE CHATS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

A.    **The Phone Manufacturer Agreements Predate Google's Preservation Obligations in this Case and Plaintiffs Have Abundant Evidence on this Topic.**

    1.    **The Mobile Application Distribution Agreement ("MADA") Predates Google's Preservation Obligations in this Case.**

Since Android launched as an open-source operating system in 2008, Google has offered phone manufacturers (known as "OEMs") the opportunity to enter into an agreement that allows them to pre-install a suite of Google's most popular apps on their Android phones for free.  Kravis Decl. ¶ 11, Ex. 1 at 42:13-44:9; Ex. 2 at 97:9-98:16.  This agreement, called the Mobile Application Distribution Agreement (MADA), is voluntary—phone manufacturers can use the Android operating system free of charge to build their phones even if they do not enter into a MADA.  *Id.* at 42:13-44:9.  The MADA enables the manufacturers to *also* get popular Google apps for free.  The evidence at trial will show that the MADA is a critical tool that Google uses to make Android phones competitive with the iPhone because it enables OEMs to build Android phones that offer a consistent, high-quality experience right out of the box comparable to the experience that users get with an iPhone, often at a fraction of the cost.

The terms of the MADA have not changed significantly in the last 15 years.  Notably, Google's app store (first called Android Market and now Google Play) has been included in the MADA suite of apps from the very beginning.  Kravis Decl. ¶ 11, Ex. 1 at 173:24-175:7.  This history belies Plaintiffs' claim that Google's failure to save chats after August 2020—12 years after the first MADA was signed—has "undoubtedly prejudiced Plaintiffs."  Mot. at 6.  In fact, Plaintiffs' exhibit and witness lists show that Plaintiffs have abundant evidence on the MADA, including 188 MADA agreements—183 of which were executed prior to August 13, 2020.  Kravis Decl. ¶ 3.  Plaintiffs' exhibit list also contains numerous emails and slide decks dating back to at least 2009 discussing the MADA, its terms, and Google's rationale for offering the agreement.  *Id.* ¶ 4.  Plaintiffs' witness list includes deposition designations from an OEM executive regarding the MADA and designations from the testimony of two Google employees who participated in the founding of Android and the strategy behind the original MADAs.  *Id.* ¶ 5.

Plaintiffs' sole support for their prejudice argument is a single chat from February 2021

referencing the MADA written by an employee who is not a custodian in this case and whom

Plaintiffs have never sought to depose, even after reviewing her chats.  *See* ECF. No. 468-8.

Plaintiffs engage in pure speculation when they suggest, based on this single chat, that the critical

evidence of the effect of these agreements resides in chats sent after August 2020.  Nor is there

any basis to conclude that such chats would support Plaintiffs' claims.

> **2.      The Revenue Sharing Agreements ("RSAs") Predate Google's Preservation Obligations in this Case and Plaintiffs Have Abundant Evidence on these Agreements.**

In addition to the MADA, Google has offered some OEMs the option to enter into revenue

sharing agreements since the early days of Android.  Revenue sharing agreements give OEMs the

opportunity to share in the revenue generated by certain Google products, in exchange for

configuring devices in a way that makes them more competitive with Apple iPhones.  Kravis Decl.

¶ 13, Ex. 3 at 90:12-18, 262:3-13.

The particular revenue sharing agreement discussed by Plaintiffs, called RSA 3.0, was

presented to Google's Business Council in June 2019 and was first offered to OEMs in late 2019.

Kravis Decl. ¶ 13, Ex. 3 at 234:14-236:9; 216:17-217:3.  RSA 3.0 allowed OEMs to opt into a

"premier tier" on a device-by-device basis.  *Id.* at 285:1-17.  The premier tier offered a higher

revenue share as an incentive to build high-end Android phones that would compete with the

iPhone by offering a cleaner user experience, with fewer unwanted pre-installed applications on

the phone and greater security protections.  *Id.* ¶ 14, Ex. 4 at 139:25-141:1; 301:3-25; *id.* ¶ 13, Ex.

3 at 291:23-294:16.  One of the requirements of the premier tier is that Play is the only app store

pre-installed on the phone.  *Id.* ¶ 13, Ex. 3 at 290:15-291:2.  Devices that OEMs have chosen to

opt into the RSA 3.0 premier tier make up a very small percentage of active Android phones in the

world (excluding China) today.  *Id*. ¶ 15, Ex. 5 at Exhibit 33, at 225.  The largest Android phone

manufacturer, Samsung, offers no premier tier devices.  *Id.* ¶ 13, Ex. 3 at 222:8-22.  All Samsung

phones come with a competing app store—the Samsung Galaxy Store—preinstalled on the phone

right next to Play.

Plaintiffs' exhibit list includes fifteen RSA 3.0 agreements with OEMs, all of which were

executed prior to August 13, 2020.  Kravis Decl. ¶ 6.  Plaintiffs' exhibit list also includes nearly

-7-

50 emails and slide decks on RSA 3.0.  *Id.* ¶ 7.  Those documents discuss Google's rationale for these agreements in depth; several of them are quoted in Plaintiffs' expert reports on this topic. Indeed, Plaintiffs' expert testified that he had all of the information he needed to address the issues in his report, which included the RSA 3.0 program.  *See id.* ¶ 16, Ex. 6 at 26:11-14. Plaintiffs have not provided any reason to believe that the true purposes behind this agreement are to be found, not in these documents, but rather in chats sent months after the agreements were implemented.

Here again, Plaintiffs' sole basis for asserting that relevant communications about these agreements were lost consists of a few statements in the chats of a single Google employee who was not a document custodian, was not deposed in this case, and is not listed as a sponsoring witness of a single document on either side's exhibit list (apart from the handful of chats Plaintiffs cite in their brief).  Kravis Decl. ¶ 10.  Plaintiffs speculate that "employees may have chatted freely about the motivation for these provisions" or "may have celebrated that an agreement was executed and another competitive threat was extinguished."  Mot. at 5-6.  Such broad speculation based on a few statements by a single employee is unwarranted.  That is particularly the case where, as here, Plaintiffs' speculation focuses almost entirely on statements about the subjective intent behind the conduct at issue.

## B.    Plaintiffs' Allegations Regarding Samsung Predate Google's Preservation Obligations in this Case and Are Not Relevant.

Plaintiffs' contention that they were deprived of chats concerning "Google's efforts to pay Samsung not to compete" also makes no sense.  Mot. at 6.  As Plaintiffs concede, Google's negotiations with Samsung (named Project Banyan) ended in 2019 without reaching an agreement. *Id.* at 7.  Under Google's standard preservation practices, chats from that time period were deleted long before any preservation obligation arose in this case.

Providing Plaintiffs' proposed instruction as to Project Banyan would be particularly disproportionate and unfair because it would invite the jury to draw inferences about Google with respect to agreements that were never made.  Indeed, communications on this topic are not even relevant because (as Plaintiffs admit) Project Banyan did not result in any agreement, and therefore this conduct had no anticompetitive *effect*, which is required in order to establish

-8-

antitrust liability.  *See* Google Omnibus Mot. in Limine at 7-9.  Plaintiffs' suggestion (Mot. at 7) that they would use chats on Project Banyan to show "the anticompetitive intent behind Google's plans" runs afoul of the prohibition on character evidence in Federal Rule of Evidence 404, which prohibits the admission of other acts evidence "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1); *see also* Google Omnibus Mot. in Limine at 8-9.

Recognizing they have no credible argument that Google had an obligation to preserve any chats that might have discussed Project Banyan, Plaintiffs rely on the revenue sharing agreement between Google and Samsung from November 2020, shortly after this lawsuit was filed.  Mot. at 7-8.  Here again, Plaintiffs are forced to concede that the challenged conduct—an agreement to make Play the exclusive app store on the home screen of Samsung phones—never actually happened.  *See id.* at 8 (conceding that no such agreement was executed).  As Plaintiffs admit, to this day the Samsung Galaxy Store is pre-installed on nearly every Samsung phone on the home screen right next to Play.  Because the challenged conduct never occurred, chats about "why Google was prepared" to offer an agreement to Samsung and "why … agreements … were never executed," *id.*, are not relevant and constitute inadmissible character evidence under Rule 404.

Plaintiffs provide no support from Google, Samsung, or anywhere, for their insinuation that Google chats would have unearthed "unwritten understandings with Samsung."  Mot. at 8.  Plaintiffs' reliance on the testimony and emails of Jamie Rosenberg is highly misleading.  Plaintiffs cite Mr. Rosenberg's testimony that he "admitted to having … discussions" about Samsung's revenue share agreement.  *Id.*  In fact, Mr. Rosenberg was testifying about an email exchange discussing such a chat from June 2019, more than a year before Google's preservation obligations arose.  *See* Kravis Decl. ¶ 28, Ex. 18, ECF No. 418, 1/12/23 Hr'g Tr. at 92:12-93:4; ECF No. 414-6 at 1.  Similarly, the email Plaintiffs cite in their motion regarding Mr. Rosenberg's work on this subject is dated June 19, 2019.  ECF No. 609-5.  As discussed above, during that time period, one-on-one chats with the history setting turned off were permissibly deleted pursuant to Google's standard retention policy.  Because Google's preservation obligations in this case did not arise until August 2020, evidence from June 2019 does not

-9-

remotely support the proposition that Plaintiffs are missing chats that should have been preserved on this topic.

      **C.**    <u>**Google's Agreements with App Developers Largely Predate Google's Preservation Obligations in this Case and Plaintiffs Have Abundant Evidence on these Agreements.**</u>

Starting in 2019, Google began offering agreements to popular game developers to incentivize those developers to distribute their apps on Play.  (The name of this program was the Games Velocity Program, also known as Project Hug.)  Kravis Decl. ¶ 17, Ex. 7 at  70:12-72:1.  These written agreements were voluntary—developers could reject them and still have access to the Play store.  *Id.* ¶ 18, Ex. 8 at 105:19-106:21; 128:25-129:12.  Even if developers chose to take advantage of the incentives, they were not required to distribute their apps exclusively on Play, *id.* ¶ 19, Ex. 9 at 391:16-392:15, and the agreements did not prohibit the developers from opening competing Android app stores.  *See* ECF No. 483 at 12; *see also* ECF No. 480-11 at 4-6; ECF No. 480-12 at 3-4.  The agreements simply provided that if developers wanted special incentives, they could not give the Play store second-class treatment by launching apps first on the Apple App Store or other app stores.  Kravis Decl. ¶ 19, Ex. 9 at 391:16-392:15.  The evidence at trial will show that, far from constituting anti-competitive conduct, these agreements are powerful evidence of Google's healthy competition for the attention and resources of developers.  The evidence will show that Google offered these agreements because developers have choices when it comes to app distribution and monetization, and Google competes for developers to choose Play.

The key events related to these agreements occurred before Google had a duty to preserve and are memorialized in numerous documents and emails.  Planning for the Games Velocity Program began in 2018.  Kravis Decl. ¶ 18, Ex. 8 at 91:21-92:22; 104:25-105:16.  The Program was presented to the Google Business Council on April 9, 2019, more than a year before Epic filed its lawsuit. *Id.* at 119:11-16; 127:3-10.  Plaintiffs' exhibit list includes numerous decks and emails on the initial strategy behind the Games Velocity Program—including long, detailed presentations on the program's rationale, partners, and success metrics. *Id.* ¶ 8.  The Activision agreement was signed in January 2020. *Id.* ¶ 20, Ex. 10 at 132:16-133:2.  The Riot agreement was signed in

-10-

1  March 2020.  *Id.* ¶ 19, Ex. 9 at 384:9-21.  All of this occurred before any obligation to preserve

2  arose in this case.  Accordingly, Google could not have violated any duty to preserve chats when

3  these agreements were developed, offered, and executed.

4          Moreover, Plaintiffs' exhibit and witness lists show that Plaintiffs have abundant evidence

5  on this topic: 230 documents on Plaintiffs' exhibit list reference this program.  Kravis Decl. ¶ 8.

6  This evidence includes the Games Velocity Program agreements themselves, over 40 Google slide

7  decks or documents and over 40 emails substantively discussing the agreements, deposition

8  testimony from Activision and Riot, and documents concerning the agreements produced by Riot.

9  *Id.* ¶ 8.  (Plaintiffs did not seek documents or testimony from any other Games Velocity Program

10  developers.)  And Plaintiffs' experts have analyzed these agreements at length.

11          Epic and Match also represented to this Court that their amended complaints to add *per se*

12  claims relating to these agreements were designed to "simply conform Epic's and Match's claims

13  to evidence obtained through discovery."  ECF No. 376 at 1.  They elaborated that "deposition

14  testimony taken as recently as September 22, 2022 has crystalized the nature and scope of these

15  agreements" and that the claims have "have been fully explored via extensive discovery by all

16  Parties."  *Id.* at 2.  In fact, Match and Epic went so far as to confirm for the Court that "[d]iscovery

17  and motion practice have fully adduced the relevant facts underlying the proposed claims, so that

18  no additional discovery . . . is warranted."  *Id.* at 9.  Having represented to the Court that the

19  Games Velocity Program agreements were fully explored in discovery, Plaintiffs cannot credibly

20  argue that they have been prejudiced by missing chats.

21          Relying on testimony of two Google employees, Purnima Kochikar and Lawrence Koh,

22  Plaintiffs nevertheless insist that "Project Hug was discussed over Chat during the period when

23  Google's retention obligations for this litigation were in force."  But Plaintiffs cite no such

24  testimony.  In fact, Ms. Kochikar testified at her deposition that she followed the instructions in

25  the litigation hold, and she was never asked whether she communicated by chat about any

26  substantive matters at all, let alone about the Games Velocity Program agreements.  *See* Kravis

27  Decl. ¶ 18, Ex. 8 at 21:24-22:1.  Mr. Koh left Google in December 2020, just a few months after

28  the litigation hold was issued in this case.  And he was also not asked whether he communicated

-11-

by chat about any substantive matters, or about the Games Velocity Program agreements specifically.

Likewise, Plaintiffs cite nothing to support their speculation that Google may have entered into a "conspiracy" with three game developers to restrain competition through agreements that do not actually appear in the text of the Games Velocity Program contracts themselves and that "the Chats are where the conspiracy would have been less circumspectly described."  Mot. at 11.  Plaintiffs do not have any evidence from Google—or from the game developers themselves— showing such a supposed conspiracy.

**D.**      **Plaintiffs' Allegations Regarding the Play Service Fee Model Predate Google's Preservation Obligations in this Case.**

Google does not charge users to access the Play store.  When millions of users download free apps like Epic's Fortnite or the Match Plaintiffs' dating apps, Google charges those developers nothing.  Instead, Google charges a service fee only when the developer makes a sale of their app or sells a subscription or in-app purchase in an app downloaded from the Play store. This service fee compensates Google for all the benefits that Play provides and allows Google to continue investing in Play.  And by not charging any fee for these benefits until the developer makes a sale, Google enables developers to obtain a large user base without incurring costs until they earn revenue from some of those users.

Over the years, Google has considered changes to this business model through internal studies with names like Project Runway and Project Magical Bridge.  In 2018, Google lowered its service fee on subscriptions older than one year to 15%, following a similar service fee reduction by the Apple App Store.  Kravis Decl. ¶ 21, Ex. 11 ¶ 463.  In 2021, Google lowered its service fee to 15% for the first $1 million of revenue earned by every developer every year, again following a similar reduction by Apple.  *Id.* ¶ 464.

Plaintiffs are simply incorrect that chats "almost certainly would have shown Google's true motives" for these and other policy changes that Plaintiffs cannot glean from other evidence.  Mot. at 11.  Plaintiffs try to suggest that Google has destroyed some secret information, but they omit that Google has stated in its Responses to Plaintiffs' Requests for Admission that, in addition to

-12-

competition with Apple, this litigation was a motivation for its service fee reductions.  Kravis

Decl. ¶ 22, Ex. 12 at 16-17.  Further, Plaintiffs' exhibit list includes numerous slide decks stating

that Google took into account regulatory considerations around the Play service fee, in addition to

competition with Apple and addressing developer concerns, in implementing Project Runway. *Id.*

¶ 9. Plaintiffs do not mention any of this evidence, let alone try to explain why chats would have

provided meaningfully different evidence about "Google's true motives."

Nor do Plaintiffs explain how chats would have shown "the viability of multiple less-

restrictive alternatives."  Mot. at 13.  The business model alternatives considered in Project

Runway and Project Magical Bridge are discussed in detail in numerous slide decks that Google

produced in discovery, many of which appear on Plaintiffs' exhibit list.  Kravis Decl. ¶ 9.

Plaintiffs' experts have also discussed these documents.  Plaintiffs also do not explain how

Google's changes to Android 12—let alone Google's motivations to make those changes—are

relevant to their claims.  Plaintiffs do not challenge the Android 12 changes or Project Runway

(where Google *lowered* its service fee) as anti-competitive.  The notion that chats would have

given Plaintiffs helpful evidence on these subjects is, once again, nothing more than pure

speculation.

### E.   Plaintiffs' Allegations Regarding Google's Relationship with Apple Predate Google's Preservation Obligations in this Case.

Plaintiffs allege that the Google Play store does not compete with the Apple App Store.  In

fact, the evidence will show that the two app stores compete intensely on price, quality and

security, so that users and developers will choose their respective platforms—Android for Google

and iOS for Apple.  The evidence at trial will show that the Play store and the Apple App Store are

a critical element of this platform-level competition.  Documents and testimony will show that, for

this reason, Google and Apple employees are intensely focused on the competition between their

respective app stores.  And, as set forth in Google's motion in limine, Epic is collaterally estopped

from asserting that the Play store and the Apple App Store do not compete in the same

market.  *See* Google Omnibus Mot. in Limine at 1-3.

Epic's failure to prove separate markets for Apple and Android despite full access to

-13-

massive discovery destroys any inference that any lost internal Google chats would make a difference to the market definition issue in this case.  Moreover, Plaintiffs' theory that missing chats would have shown that Google and Apple do not compete is belied by documents and testimony showing that the Google Play store and the Apple App Store compete intensely on price, quality and security.  This evidence is completely inconsistent with Plaintiffs' artificial theory that these stores compete in separate markets.

Plaintiffs have not come close to providing a basis for evading this real-world evidence with an adverse inference.  Plaintiffs do not argue that any chats would have shown that the Google Play store and the Apple App Store do not compete.  Instead, Plaintiffs engage in misdirection by pointing to an agreement that is not part of the challenged conduct in this case: a revenue sharing agreement concerning Google's search engine, not the Google Play store, that pre-dates Android's launch 15 years ago.  *See* Kravis Decl. ¶ 23, Ex. 13 at 323:18-25.

Because Plaintiffs have not shown that any chats regarding Google's agreement with Apple created after this litigation was filed were destroyed, they resort to misleading and baseless claims about the deposition testimony of Google's CEO.  But Mr. Pichai's testimony was clear: he typically does not use Google Chat to discuss matters covered by litigation holds and he did not recall using Google Chat to discuss issues relevant to this case, including competition with Apple.  *See* Kravis Decl. ¶ 24, Ex. 14 at 186:10-18; 188:1-5.  Mr. Pichai testified specifically that he does not "discuss substantive issues with respect to Apple in [his] Chats."  *Id.* at 188:6-14.  Further, Mr. Pichai's testimony that he has turned history on, *id.* at 187:18-25, directly contradicts Plaintiffs' assertion that Mr. Pichai has "never turned on his Chat history." Mot. at 14.  And the single chat cited by Plaintiffs in which Mr. Pichai suggested turning history off has nothing to do with this case or Google's agreement with Apple.  The chat references a document related to a "Leaders Circle" meeting on Google Cloud, which is not at issue in this case.  Kravis Decl. ¶ 25, Ex. 15.  Google did not have a duty to preserve that chat for this litigation, and Plaintiffs' assertion that Mr. Pichai attempted to delete this "incriminating message" is both misleading and baseless.

-14-

III.   **<u>PLAINTIFFS ARE NOT ENTITLED TO THEIR PROPOSED REMEDY.</u>**

The evidence discussed above does not support the severe remedy requested by Plaintiffs—an instruction to the jury on chats at the outset of the trial, before the jury has heard any other evidence in the case, *and* a list of facts to be read to the jury by the Court at the conclusion of the trial, *and* an adverse inference jury instruction.  This remedy is wholly disproportionate, and is not supported by the authorities cited by Plaintiffs.  Instead, the Court should adopt the remedy it has already suggested: a limited presentation of chats evidence to the jury through stipulated undisputed facts and any witness testimony that may be necessary, while deferring consideration of any jury instruction on chats until after the Court has heard all the evidence.

A remedy under Rule 37(e)—even when the Court has found the requisite "intent to deprive"—"should fit the wrong," and the Court should not employ drastic sanctions when "lesser measures . . . would be sufficient to redress the loss." Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.  "A district court's adverse inference sanction should be carefully fashioned to deny the wrongdoer the fruits of its misconduct yet not interfere with that party's right to produce other relevant evidence."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 386–87 (9th Cir. 2010); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 529 (S.D.N.Y. 2022) (noting that a "narrow range of prejudice 'weigh[s] against imposing the harsh sanctions that [Plaintiffs] seek'"); *Garcia v. City of Santa Clara*, No. 10-CV-02424-SI, 2017 WL 1398263, at *4 (N.D. Cal. Apr. 19, 2017) (finding adverse inference sanction "too harsh" given availability of other evidence).

Plaintiffs' proposed remedy would not "fit the wrong" here.  The "prejudice inquiry looks to whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (alterations and internal quotation marks omitted).  For the reasons set forth above, with respect to each of the identified topics, Plaintiffs have failed to demonstrate that any missing chats impaired their ability to go to trial or threaten to interfere with the rightful decision of this case.  Virtually every topic discussed in Plaintiffs' motion occurred *before* August

-15-

2020, when Google's preservation obligations arose.  Plaintiffs' description of the evidence they say they would have found in chats focuses almost entirely on intent, which is not the central inquiry in this antitrust case and which is not an element of their claims with one minor exception.  And Plaintiffs' assertions about that evidence lack the "informed basis" that this Court requested.  *See Burns v. Medtronic, Inc.*, No. 8:15-cv-2330-T-17TBM, 2017 WL 11633269, at *6 (M.D. Fla. Aug. 9, 2017) ("[B]lanket and conclusory statements about what could have existed does not compel a finding of prejudice.").

        Plaintiffs' overzealous desire to have this case decided on the basis of sanctions rather than the merits is best exemplified by their reliance on a magistrate judge's order that was overruled in part and modified by the District Court *because it was too severe*.  Plaintiffs do not mention this fact in their brief, and they do not include the subsequent district court decision modifying the magistrate judge's order in their case citation.  *See Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 980 (N.D. Cal. 2012) (granting in part motion for relief from magistrate judge's order).  In *Samsung,* Apple sought an adverse inference sanction due to Samsung's failure to suspend an automatic deletion policy for custodians' email accounts.  *See id*. at 992.  However, Samsung still produced over 12 million pages of documents and Apple had the opportunity to depose custodians whose emails were not preserved.  While Judge Koh agreed that the failure to preserve emails was sanctionable, the Court observed that "some courts have denied requests for an adverse inference instruction even where the three-part test for spoliation was satisfied, upon concluding that the degree of fault and level of prejudice were insufficient to justify imposition of the sanction."  *Id.* at 993.  And the fact that an adverse inference is less severe than dismissal "does not mean it should be imposed casually."  *Id.* at 994 (collecting cases).  Taking this caution and the alternative discovery available to Apple into consideration, Judge Koh rejected the magistrate judge's recommended adverse inference instruction because "Apple has not made a showing of prejudice sufficient to warrant a strong adverse inference instruction."  *Id.* at 995.[3]  Plaintiffs here are in a

---

[3] The instruction ultimately imposed by Judge Koh is materially different from that relied on by Plaintiffs: "Samsung Electronics Company has failed to preserve evidence for Apple's use in this

1  similar if not better position than Apple was in the *Samsung* case with respect to alternative

2  discovery:  Google has produced over 3.3 million documents, spanning 21.7 million pages, made

3  over 40 current and former employees available for deposition, and produced terabytes of

4  transactional data.

5      Plaintiffs' other authorities also do not support their requested remedy.  *Io Grp. Inc. v.*

6  *GLBT Ltd.* addressed the loss of infringing content and internal emails in a copyright infringement

7  case, where the defendant's "motivation and state of mind . . . is key to Plaintiffs' claim of

8  secondary infringement based on inducement."  No. C-10-1282 MMC DMR, 2011 WL 4974337,

9  at *8 (N.D. Cal. Oct. 19, 2011).  That is not the case here.  As explained above, Google's intent is

10  at most secondary to the market effects of its conduct, and Plaintiffs have received voluminous

11  evidence of Google's actual conduct during the time period relevant to Plaintiffs'

12  claims.  Plaintiffs also rely on dicta from *Radio City, Inc. v. Celestron Acquisition, LLC*, No. 5:20-

13  CV-03642-EJD, 2023 WL 5519324 (N.D. Cal. Aug. 25, 2023), for the proposition that an adverse

14  inference sanction is a "modest" remedy.  Mot. at 14.  The spoliation before the court in *Radio*

15  *City* related to irreplaceable physical documents on a key issue in the case, which is wholly unlike

16  the chats at issue here where Plaintiffs have received voluminous evidence on their claims.

17      Unable to justify their proposed remedy based on chats, Plaintiffs rely on communications

18  referencing attorney-client privilege, an issue that Plaintiffs have never raised with the Court until

19  this filing.  As set forth in Google's motion in limine to exclude this evidence, Plaintiffs chose not

20  to file any motion in this case challenging Google employees' contemporaneous privilege

21  assertions on business documents and emails, which were carefully reviewed by outside counsel

22  prior to production.  *See* Google Omnibus Motion in Limine at 4.  Having brought no such

23  challenge, Plaintiffs should not be permitted to argue that particular documents referencing

24  attorney-client privilege somehow support an adverse inference instruction.

25      In any event, the few documents cited by Plaintiffs do not remotely suggest any

26

27  ─────────────────

28  litigation after its duty to preserve arose. Whether this fact is important to you in reaching a verdict
    in this case is for you to decide." *Id.*

misconduct.  Plaintiffs cite two chats in which two in-house lawyers use the term "fake privilege."  As with all communications on Google's privilege log, any communications subject to redaction or withholding for privilege based on the inclusion of one of these lawyers were reviewed by outside counsel prior to production.  Google recently offered to re-review those designations, but Plaintiffs did not respond.  Nor did Plaintiffs challenge the privilege designation of any of these documents, or any other document on Google's privilege logs, by filing a motion.  As Google has previously explained to Plaintiffs in a letter dated June 22, 2023, the May 2022 chat they cite concerned the technical accounting treatment of funds that Match deposited into escrow consistent with the stipulation between Match and Google resolving Match's motion for a preliminary injunction.  As Google also explained in that letter, the document referenced in the January 2021 chat was not modified on or around the date of the chat.

Rather than the severe remedy proposed by Plaintiffs, the Court should adopt the remedy it has already suggested:  The parties present evidence on chats to the jury through a stipulation of undisputed facts and any witness testimony that the Court may deem necessary, and the jury can reach a conclusion about that evidence.  This remedy, unlike Plaintiffs' proposal, is proportionate to the facts.  It gives the jury information about chats without the risk that the jury will take those facts as effectively a mandatory inference.  Because the jury will hear evidence about chats during trial along with the other evidence in the case, there is no need to instruct—and thereby taint—the jury on chats at the outset of the trial.  Plaintiffs cite no case in which a court has approved a jury instruction at the outset of the trial as a remedy under Rule 37.

The Court should defer any decision on a chats jury instruction until the conclusion of trial.  At that point, the Court will have heard both the chats evidence and the non-chats evidence, and will be in a position to assess any jury instruction that may be proportional and necessary.  If the Court is inclined to rule on a final jury instruction now, the Court should adopt an instruction that is far more measured than the one proposed by Plaintiffs, and without additional commentary about the Court's prior findings.

1    DATED:  October 5, 2023              Respectfully submitted,

2

3
                                         By:      */s/ Jonathan I. Kravis*
4                                               Jonathan I. Kravis

5                                               Glenn D. Pomerantz, S.B. #112503
                                                glenn.pomerantz@mto.com
6                                               Kuruvilla Olasa, S.B. #281509
                                                kuruvilla.olasa@mto.com
7
                                                **MUNGER, TOLLES & OLSON LLP**
8                                               350 South Grand Avenue, Fiftieth Floor
                                                Los Angeles, California 90071
9                                               Telephone: (213) 683-9100
                                                *Counsel for Defendants Google LLC, et al.*
10

11                                              Kyle W. Mach, S.B. #282090
                                                kyle.mach@mto.com
12                                              Justin P. Raphael, S.B. #292380
                                                justin.raphael@mto.com
13                                              Emily C. Curran-Huberty, S.B. #293065
                                                emily.curran-huberty@mto.com
14                                              **MUNGER, TOLLES & OLSON LLP**
15                                              560 Mission Street, Twenty Seventh Floor
                                                San Francisco, California 94105
16                                              Telephone: (415) 512-4000

17                                              Jonathan I. Kravis, *pro hac vice*
18                                              jonathan.kravis@mto.com
                                                **MUNGER, TOLLES & OLSON LLP**
19                                              601 Massachusetts Avenue NW, Suite 500E
                                                Washington, D.C. 20001
20                                              Telephone: (202) 220-1100

21

22

23

24

25

26

27

28

                                          -19-

Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*Counsel for Defendants Google LLC, et al.*

DEFENDANTS' OPPOSITION TO PLAINTIFFS' PROPOSED REMEDY RE CHATS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD