# EXHIBIT 9

HIGHLY CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4  _____x
    IN RE GOOGLE PLAY STORE            Case No.
 5  ANTITRUST LITIGATION                3:21-md-02981-JD
 6  THIS DOCUMENT RELATES TO:
 7  Epic Games Inc. v. Google LLC, et al.,
    Case No: 3:20-cv-05671-JD
 8
    In re Google Play Consumer
 9  Antitrust Litigation,
    Case No: 3:20-cv-05761-JD
10
    In re Google Play Developer
11  Litigation,
    Case No: 3:20-cv-05792-JD
12
13  State of Utah, et al., v.
    Google LLC, et al.,
14  Case No: 3:21-cv-05227-JD
    _____
15
16    HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER
17        VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
18              DEPOSITION OF LAWRENCE KOH
19
20              Thursday, December 9, 2021
21   Remotely Testifying from San Francisco, California
22
23   Reported By:
24    Hanna Kim, CLR, CSR No. 13083
25    Job No. 4969626
```

HIGHLY CONFIDENTIAL

Page 17

1        LAWRENCE KOH,
2     having been administered an oath over
3         videoconference, was examined
4            and testified as follows:
5
6                  EXAMINATION
7   BY MS. MOSKOWITZ:
8       Q.   Good morning, Mr. Koh.  As you heard, my
9   name is Lauren Moskowitz, and I represent Epic
10  Games, and I'll be starting the questioning this
11  morning.
12           Thank you for being here.
13           Can you just please state your full name
14  again for the record.
15      A.   My name is Lawrence Koh.
16      Q.   And what is your address?
17      A.   I currently reside -- do you want the full
18  address?
19      Q.   You can tell me the -- the city and state.
20      A.   City, state, okay.  Yeah, I currently
21  reside in Lafayette, California.
22      Q.   And where are you located at the moment?
23      A.   I'm in downtown San Francisco, California.
24      Q.   You are at your counsel's offices?
25      A.   That is correct.

Page 384

1    mark a couple of those documents?
2            MS. GIULIANELLI:  I was.  Thank you.
3    We -- we -- Daniel has only reminded us five times,
4    including one second ago.  So I would like to mark,
5    just to authenticate them, a couple of agreements
6    that we're putting in right now.  I don't see them
7    yet.
8    BY MS. GIULIANELLI:
9        Q.   Okay.  Do you see Exhibit 162 up there?
10       A.   Yes, I do see it.
11           (Koh Deposition Exhibit 162 was marked.)
12   BY MS. GIULIANELLI:
13       Q.   What is 162?
14       A.   The -- the Games Velocity Program
15   Addendum.
16       Q.   And is that the addendum that is the Games
17   velocity addendum between Google and Riot?
18       A.   Yes, that does look to be correct.
19       Q.   And it was signed by Riot in March 9th,
20   2020, it looks like?
21       A.   Yes, that is correct.
22       Q.   And just for identification, I think
23   there's one other one; right?
24           MR. BRADSHAW:  Object to the form.  Is
25   that a question?

Page 391

1  their game content distribution platform into the
2  mobile ecosystem, which would impact Google Play's
3  positioning as a preferred destination for game
4  developers and game consumers.  And a good example
5  was the X Cloud streaming technology that we
6  discussed earlier.  That was a good example of
7  X- -- Microsoft and Xbox bringing their console
8  distribution platform into the mobile ecosystem.
9  BY MR. BRADSHAW:
10       Q.   Did you see streaming services as
11  competition to the Play Store for the distribution
12  of apps?
13            MS. MOSKOWITZ:  Objection.
14            THE WITNESS:  Yes, we did.
15  BY MR. BRADSHAW:
16       Q.   Going back to Project Hug, was there
17  anything about Project Hug that provided
18  exclusivity to Google?
19            MS. MOSKOWITZ:  Objection.
20            THE WITNESS:  No, we did not exclus- -- we
21  did not ask or request any exclusive features or
22  content on our platform.  We just only asked that
23  we be treated equally with all the other
24  distribution considerations that a game developer
25  was making.

Page 392

1  BY MR. BRADSHAW:
2      Q.   So a developer had every opportunity to
3  offer its games on another platform?
4           MS. MOSKOWITZ:  Objection.
5           THE WITNESS:  Yes, that is correct.
6  BY MR. BRADSHAW:
7      Q.   And nothing in Project Hug altered that
8  opportunity for game developers to offer their
9  content on other platforms?
10          MS. MOSKOWITZ:  Objection.
11          THE WITNESS:  No.  And when they would
12 ask, we would encourage and support them, again, as
13 long as they -- they met the sim-ship parity, sim
14 ship and parity, you know, asks that we had in
15 Project Hug.
16 BY MR. BRADSHAW:
17     Q.   Lawrence, did there come a time after you
18 started at Google when you reached out to Epic
19 Games?
20     A.   Yes.
21     Q.   Can you describe --
22     A.   That was the summer of 2019.
23     Q.   Sorry -- sorry, to interrupt.
24          Can you describe the circumstances under
25 which you did that?