# EXHIBIT 1

Brendan Glackin (SBN 199643)
bglackin@agutah.gov
Lauren M. Weinstein (*pro hac vice*)
lweinstein@agutah.gov
David N. Sonnenreich (*pro hac vice*)
dsonnenreich@agutah.gov
UTAH OFFICE OF THE ATTORNEY GENERAL
160 East 300 South, Fifth Floor
P.O. Box 140874
Salt Lake City, UT 84114
Telephone: (801) 366-0375

*Attorneys for Plaintiff State of Utah*

(Additional Counsel on Signature Page)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF UTAH<br>160 E 300 S, 5th Floor<br>P.O. Box 140872<br>Salt Lake City, UT 84114<br><br>STATE OF NEW YORK<br>28 Liberty Street<br>New York, NY 10005<br><br>STATE OF NORTH CAROLINA<br>P.O. Box 629<br>Raleigh, NC 27602<br><br>STATE OF TENNESSEE<br>P.O. Box 20207<br>Nashville, TN 37202<br><br>STATE OF ARIZONA<br>400 W. Congress St., Suite S-215<br>Tucson, AZ 85701<br><br>STATE OF COLORADO<br>1300 Broadway, 7th Floor<br>Denver, CO 80203 | )<br>)<br>)   Case No. 3:21-cv-05227<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **SECOND AMENDED COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

STATE OF IOWA                                        )
1305 E. Walnut St., 2nd Floor                        )
Des Moines, IA 50319                                 )
                                                     )
STATE OF NEBRASKA                                    )
2115 Nebraska State Capitol                          )
Lincoln, NE 68509-8920                               )
                                                     )
STATE OF ALABAMA                                     )
501 Washington Avenue                                )
Montgomery, AL 36130                                 )
                                                     )
STATE OF ALASKA                                      )
1031 W. Fourth Avenue, Suite 200                     )
Anchorage, AK 99501                                  )
                                                     )
STATE OF ARKANSAS                                    )
323 Center Street, Suite 200                         )
Little Rock, AR 72201                                )
                                                     )
STATE OF CALIFORNIA                                  )
455 Golden Gate Ave, Suite 11000                     )
San Francisco, CA 94102                              )
                                                     )
STATE OF CONNECTICUT                                 )
165 Capitol Avenue                                   )
Hartford, CT 06106                                   )
                                                     )
STATE OF DELAWARE                                    )
820 N. French St., 5th Floor                         )
Wilmington, DE 19801                                 )
                                                     )
DISTRICT OF COLUMBIA                                 )
400 6th Street, N.W, 10th Floor                      )
Washington, D.C. 20001                               )
                                                     )
STATE OF FLORIDA                                     )
PL-01, The Capitol                                   )
Tallahassee, FL 32399                                )
                                                     )
STATE OF GEORGIA                                     )
40 Capitol Square, SW                                )
Atlanta, GA 30334                                    )
                                                     )
STATE OF HAWAII                                      )
425 Queen Street                                     )
Honolulu, HI 96813                                   )

| | |
|---|---|
| STATE OF IDAHO<br>954 W. Jefferson Street, 2nd Floor<br>P.O. Box 83720<br>Boise, ID 83720 | ) ) ) ) ) |
| STATE OF ILLINOIS<br>115 S. LaSalle St.<br>Chicago, IL 60603 | ) ) ) ) |
| STATE OF INDIANA<br>302 West Washington Street<br>IGCS – 5th Floor<br>Indianapolis, IN 46204 | ) ) ) ) ) |
| STATE OF KANSAS<br>120 SW 10th Ave., Fl. 2<br>Topeka, KS 66612 | ) ) ) ) |
| COMMONWEALTH OF KENTUCKY<br>1024 Capital Center Drive, Suite 200<br>Frankfort, KY 40601 | ) ) ) ) |
| STATE OF LOUISIANA<br>P.O. Box 94005<br>1885 North 3rd Street<br>Baton Rouge, LA 70804-9005 | ) ) ) ) ) |
| STATE OF MAINE<br>6 State House Station<br>Augusta, ME 04333 | ) ) ) ) |
| STATE OF MARYLAND<br>200 St. Paul Place, 19th Floor<br>Baltimore, MD 21202 | ) ) ) ) |
| COMMONWEALTH OF<br>MASSACHUSETTS<br>One Ashburton Place, 18th Fl.<br>Boston, MA 02108 | ) ) ) ) ) |
| STATE OF MICHIGAN<br>P.O. Box 30736<br>Lansing, MI 48909 | ) ) ) ) |
| STATE OF MINNESOTA<br>445 Minnesota Street, Suite 1400<br>St. Paul, MN 55101 | ) ) ) ) |

SECOND AMENDED COMPLAINT          3

STATE OF MISSISSIPPI )
P.O. Box 220 )
Jackson, MS 39205 )
)
STATE OF MISSOURI )
815 Olive St., Ste. 200 )
St. Louis, MO 63101 )
)
STATE OF MONTANA )
302 N. Roberts Street )
Helena, MT 59601 )
)
STATE OF NEVADA )
100 N. Carson St. )
Carson City, NV 89701 )
)
STATE OF NEW HAMPSHIRE )
One Granite Place South )
Concord, NH 03301 )
)
STATE OF NEW JERSEY )
124 Halsey Street, 5th Floor )
Newark, NJ 07102 )
)
STATE OF NEW MEXICO )
408 Galisteo St. )
Santa Fe, NM 87504 )
)
STATE OF NORTH DAKOTA )
1720 Burlington Drive, Suite C )
Bismarck, ND 58504-7736 )
)
STATE OF OHIO )
30 E. Broad St., 26th Floor )
Columbus, OH 43215 )
)
STATE OF OKLAHOMA )
15 W. 6th Street, Suite 1000 )
Tulsa, OK 74119 )
)
STATE OF OREGON )
100 SW Market Street )
Portland, OR 97201 )
)
COMMONWEALTH OF PENNSYLVANIA )
Strawberry Square, 14th Floor )
Harrisburg, PA 17120 )
)

COMMONWEALTH OF PUERTO RICO )
P.O. Box 9020192 )
San Juan, PR 00902-0192 )
)
STATE OF RHODE ISLAND )
150 South Main Street )
Providence, RI 02903 )
)
STATE OF SOUTH CAROLINA )
1000 Assembly Street, Suite 500 )
P.O. Box 11549 )
Columbia, SC 29211 )
)
STATE OF SOUTH DAKOTA )
1302 E. Hwy. 14, Suite 1 )
Pierre, SD 57501 )
)
STATE OF TEXAS )
300 W. 15th Street )
Austin, TX 78701 )
)
STATE OF VERMONT )
109 State Street )
Montpelier, VT 05609 )
)
COMMONWEALTH OF VIRGINIA )
202 North 9th Street )
Richmond, VA 23219 )
)
TERRITORY OF THE VIRGIN ISLANDS OF )
THE UNITED STATES )
213 Estate La Reine, RR1 Box 6151 )
Kingshill, VI 00850 )
)
STATE OF WASHINGTON )
800 Fifth Ave., Suite 2000 )
Seattle, WA 98104 )
)
STATE OF WEST VIRGINIA )
1900 Kanawha Boulevard East )
Capitol Complex, Building 6, Suite 401 )
P.O. Box 1789 )
Charleston, WV 25326 )
)
STATE OF WISCONSIN )
17 W. Main St. )
Madison, WI 53703 )

STATE OF WYOMING                          )
109 State Capitol                         )
Cheyenne, WY 82002                        )
                                          )
      *Plaintiffs*,                         )
                                          )
v.                                        )
                                          )
GOOGLE LLC, GOOGLE IRELAND                )
LIMITED, GOOGLE COMMERCE LIMITED,         )
GOOGLE ASIA PACIFIC PTE. LIMITED,         )
GOOGLE PAYMENT CORP., and ALPHABET        )
INC.,                                     )
                                          )
      *Defendants*.                        )
                                          )
                                          )
                                          )

**TABLE OF CONTENTS**

FIRST AMENDED COMPLAINT ............................................................................ 10

NATURE OF THIS ACTION ................................................................................... 10

JURISDICTION, PARTIES, AND VENUE ............................................................ 17

FACTUAL ALLEGATIONS ................................................................................... 20

    I.   Google Unlawfully Maintains its Power Over Android App Distribution ...................... 20

        A. Google Has a Monopoly in the Market for Licensable Mobile Operating Systems .... 20

        B. Google Monopolizes the Market for Android App Distribution ................................. 23

            1. The Market for Android App Distribution Is a Relevant Antitrust Market ........... 23

            2. The Relevant Geographic Market is Worldwide (Excluding China) or, Alternatively, the United States ........................................................................ 27

            3. Google Has Monopoly Power in the Android App Distribution Market ............... 28

        C. Google Also Has Market Power in A Market for Mobile App Distribution ............... 29

        D. Google Closes the Android App Distribution Market to Competitors ....................... 29

            1. Google Imposes Technical Barriers to Effectively Prevent Third Parties from Distributing Apps Outside the Google Play Store ................................................. 30

            2. Google Uses Contracts to Prevent OEMs from Circumventing Technical Barriers ....................................................................................................... 37

            3. Google Uses Contracts to Block Competing App Stores from Distribution on the Play Store ................................................................................ 38

            4. Google Unlawfully Ties Advertising with Google App Campaigns to the Google Play Store ......................................................................................... 39

        E. Google Uses Exclusionary Contracts to Foreclose Competing App Distribution through Pre-Installation ................................................................................. 40

            1. Google Forces OEMs to enter MADAs that Effectively Block the Entry of Competing App Stores .............................................................................. 41

                 *a.*   Google Forces OEMs to Enter MADAs ......................................................... 41

                 *b.*   Google's MADAs Discourage the Entry of Competing App Stores .............. 42

            2. Google Shares its Monopoly Profits with OEMs and MNOs to Disincentivize the Entry of Competing App Stores ................................................................ 44

        F. Google Disincentivizes the Creation of Competing App Stores with Payments to and Restrictive Contracts with Potential Competitors ................................................ 46

1.  Google Offered to Buy Off Samsung to Keep It from Developing Its
     Competing App Store ....................................................................... 46

2.  Google Bought Off Key App Developers to Stifle Competition in the
     Android App Distribution Market .................................................... 50

G. Anticompetitive Effects in the Android App Distribution Market ............................ 53

II.  Google Has Unlawfully Maintained a Monopoly in the Android In-App Payment
     Processing Market.......................................................................................... 55

A. Google Has Unlawfully Tied Google Play Billing to the Google Play Store ............. 55

B. Google Uses Its Unlawful Tie to Maintain its Monopoly in the IAP Processing
     Market................................................................................................ 57

1.  The IAP Processing Market is a Relevant Antitrust Market.................................... 57

2.  The Relevant Geographic Market for IAP Processing is Worldwide or,
     Alternatively, the United States .................................................... 60

3.  Google Has Monopoly Power in the IAP Processing Market................................ 60

4.  Google's IAP Processing Tie is Not Necessary to Incentivize its Investment
     in the Play Store or Android ........................................................ 61

C. The Origin and Rates of Google's Supracompetitive Commission Illustrate that
     Google Sets Prices at Will .............................................................. 62

D. Google's IAP Processing Monopoly Harms Competing Streaming and Other
     Subscription Services....................................................................... 63

E. Google's Unlawful Tie Has Led to Anticompetitive Effects in the IAP
     Processing Market ............................................................................ 66

III.  Google is Engaging in Unfair and Deceptive Conduct that Harms Consumers ............... 70

A. Google's False or Misleading Statements About Sideloading Apps Constitute
     Unfair and Deceptive Conduct ........................................................ 71

B. Google's False or Misleading Statements About "Openness" Constitute Unfair
     and Deceptive Conduct.................................................................... 73

C. Google's Statements and Conduct Regarding Google Play Billing Constitute
     Unfair and Deceptive Conduct ........................................................ 75

VIOLATIONS ALLEGED........................................................................................ 78

Third Cause of Action: Sherman Act § 1 Unreasonable Restraints of Trade
     Concerning Android App Distribution: App Developers....................... 81

Fourth Cause of Action: Sherman Act § 1 Unlawful Tying of Google Play Billing to
     Use of Google Play Store ........................................................... 82

Fifth Cause of Action: Sherman Act § 2 Monopoly Maintenance in the In-App
    Payment Processing Market ........................................................................ 85

Sixth Cause of Action: Sherman Act § 1 Unreasonable Restraints of Trade in
    the In-App Payment Processing Market ...................................................... 86

Seventh Cause of Action: Sherman Act § 1 Unlawful Exclusive Dealing in the
    In-App Payment Processing Market ............................................................. 88

Eighth Cause of Action: State-Specific Claims ................................................... 91

PRAYER FOR RELIEF ........................................................................................ 138

## SECOND AMENDED COMPLAINT

1.      The States, Commonwealths, Districts, and Territories of Utah, New York, North Carolina, Tennessee, Arizona, Colorado, Iowa, Nebraska, Alabama, Alaska, Arkansas, California, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Texas, Virginia, The Virgin Islands of the United States, Vermont, Washington, West Virginia, Wisconsin, and Wyoming, by and through their respective Attorneys General, bring this civil enforcement action against Defendants Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited, Google Payment Corp., and Alphabet Inc. (collectively, "Google") under federal and state antitrust and consumer protection statutes, to enjoin Google from unlawfully restraining trade and maintaining monopolies in the markets for Android software application ("app") distribution and for payment processing of digital content purchased within Android apps, and to obtain redress for consumers.

## NATURE OF THIS ACTION

2.      Google acquired the Android mobile operating system ("Android") in 2005. Google promised repeatedly that Android would be the basis for an "open" ecosystem in which industry participants could freely compete, and, in Google's words, have "[f]ull control of [their] brand and business." Google has not kept its word.

3.      Instead, Google has taken steps to close the ecosystem from competition and insert itself as the middleman between app developers and consumers. Unbeknownst to most consumers who own a mobile device running Android, every time they purchase an app from the Google Play Store, or purchase digital content or subscriptions within an app, up to 30% of the money they pay goes to Google.

4.      To collect and maintain this extravagant commission, Google has employed anticompetitive tactics to diminish and disincentivize competition in Android app distribution. Google has not only targeted potentially competing app stores, but also has ensured that app developers themselves have no reasonable choice but to distribute their apps through the Google Play Store.

5.      Google did not stop at excluding potential threats to its app distribution monopoly and extracting monopoly rents for app distribution. Google also ensured it could continue to reap windfall commissions from apps *after* the Google Play Store distributed them to consumers— often months or even years later. Namely, Google imposed the same extravagant commission of up to 30% of any future digital purchase a consumer might make within an app. For all apps that consumers obtain from the Google Play Store, Google requires that consumers purchase any in-app digital content through Google Play Billing. By imposing this unduly restrictive and anticompetitive tie, Google can indefinitely collect supracompetitive commissions from consumers who purchase in-app digital content.

6.      Mobile devices, including smartphones and tablets, are essential tools in contemporary American life.[1] They are indispensable to consumers for personal communication, as well as for access to and participation in the modern economy. What makes a mobile device "smart" are the myriad apps that can run on the device and are compatible with its mobile operating system. U.S. consumers now spend more time using mobile devices than they do desktop computers, laptop computers, or televisions. Mobile internet usage is rising while desktop internet usage continues to fall, and U.S. consumers spend nearly 90% of their mobile internet time within apps instead of mobile browsers. They also spend over $32 billion a year purchasing apps and digital content within apps. App developers likewise invest hundreds of millions of dollars to build and distribute apps for mobile devices.

---

[1] As used herein, "mobile device" means a "smart" mobile device that has multi-purpose computing functionality; can connect wirelessly to the internet; has a large graphical user interface (as compared to "feature phones" common in past decades) which is often accessed through a touch-capacitive screen; and is optimized to run third-party mobile apps.

SECOND AMENDED COMPLAINT                    11

7.      Android is the only viable operating system available to license by mobile device manufacturers that market and sell their devices to U.S. consumers. The barriers to entry in the licensable mobile operating system market are high, and even highly resourced entrants, such as Microsoft and Amazon, have failed. Google, which controls approximately 99% of this market, has durable monopoly power in the market and considerable leverage over mobile device manufacturers and Android app developers.

8.      In the absence of Google's anticompetitive conduct, there would be two main channels for U.S. consumers to obtain apps on an open Android operating system: (i) direct downloading and installation of apps or app stores; and (ii) apps or app stores pre-installed on devices by device manufacturers and/or mobile network operators.

9.      But Google has closed off its purportedly "open" Android operating system from competition in app distribution. To accomplish this, Google degraded direct distribution channels, and then cut deals to discourage and disincentivize any remaining potential competition.

10.      Through its Google Play Store, Google maintains a monopoly in the market for distributing Android apps. Google Play Store distributes over 90% of all Android apps in the United States. No competing Android app store has more than 5% of the market.

11.      Google also requires all app developers that sell content through the Google Play Store to sell any digital in-app content through Google Play Billing. Though it has been inconsistent in the past, Google now stringently enforces this tie by preventing apps distributed through the Google Play Store from using, directing consumers to, or even informing consumers about alternative payment processing options that may provide lower prices. Consumers who want to purchase any such content must, therefore, do so through Google Play Billing. This illegal tie gives Google an additional monopoly in the market for Android in-app payment processing for digital products.[2] Google has not yet extended its tie to in-app purchases of

---

[2] Consumers who purchase apps or in-app digital content from the Google Play Store pay Google directly. From that purchase price, Google takes up to 30%, and transfers the remaining revenue

physical goods and services and requires the use of an alternative payment provider.

Accordingly, "in-app purchases" as used herein refers to purchases of digital content, not those

of physical goods and services.

12.     Google has steadily expanded its illegal tie: effective September 2021,

subscription streaming services for music and video—which Google previously exempted—must

either submit to Google's tie or deny consumers the ability to purchase subscriptions from their

Android apps. Google's comparable streaming services will gain an enormous competitive

advantage. Moreover, the non-Google payment processors that these services currently use will

be forced out of the in-app payment ("IAP") market as to these services. Google has also

recently expanded the enforcement of its illegal tie to subscription services, including those on

job search, dating, fitness, and other apps.

13.     Google's anticompetitive conduct harms consumers and app developers, both at

the point of app distribution and when a consumer later purchases in-app digital products.

Consumers are direct purchasers of apps in the Google Play Store. Consumers are harmed

because Google forces them to pay a supracompetitive commission of up to 30% to purchase any

non-"free-to-download" app. Google's anticompetitive conduct further harms consumers by

depriving them of the potential benefits of true competition in app distribution, including better

features or improved data security. App developers also suffer from Google's anticompetitive

conduct. Developers lose profits because potential customers may forgo purchases of existing

apps in response to the higher prices caused by Google's conduct. Moreover, Google's

supracompetitive commission impedes developers from researching, developing, and bringing to

market innovative new apps, resulting in further lost profits for them and less innovation and

choice for consumers.

---

to the app developer. *See Google Pay Help*, GOOGLE,
https://support.google.com/paymentscenter/answer/7159343?hl=en ("The transaction fee for all
purchases in Google Play (apps and in-app purchases) is 30% of the price the customer pays. In
other words, developers get 70% of the payment and the remaining 30% goes to the distribution
partner and operating fees.").

14.     Consumers are likewise direct purchasers of in-app digital products using Google Play Billing. Because Google's tie prevents their use of other payment processors for in-app purchases, consumers are harmed by paying Google's supracompetitive commission of up to 30%. Consumers are further harmed by the loss of competition among payment processors, which may offer substantially lower commissions, as well as enhanced payment features, customer service, and data security. App developers are also harmed by Google's tying conduct, which may cause some potential consumers to forgo in-app purchases, resulting in lost profits. Further, Google Play Billing disintermediates developers from their customers and prevents them from providing tailored customer service on critical customer interactions such as payment history and refund requests. And competition in payment processing—which is vibrant in other forms of online transactions and would be here but for Google's tie—is completely foreclosed.

15.     As set forth below, Google's durable monopoly power in the markets for Android app distribution and in-app purchases, and alternatively its durable market power in the market for mobile app distribution, is not based on competition on the merits. These monopolies are maintained through artificial technological and contractual conditions that Google imposes on the Android ecosystem.

16.     Today, Google enjoys virtually unchallenged power over Android app distribution and Android in-app purchases of digital content that extends to every state, district, and territory in the United States. Because of Google's anticompetitive conduct, Google Play Store's market share—which is well over 90%—faces no credible threats, and market forces cannot exert pressure on its supracompetitive commissions for app and in-app purchases. Google's conduct has deterred new entry and/or prevented would-be competitors from achieving the scale that might constrain Google's power.

17.     Over the years, Google has steadily expanded and refined the tactics it uses to impede competition in Android app distribution and in-app purchases. Instead of simply producing a better app distribution experience, Google uses anticompetitive barriers and

SECOND AMENDED COMPLAINT               14

mandates to protect its monopoly power and grow its supracompetitive revenue from the Google Play Store and Google Play Billing.

18.     This Complaint focuses on five categories of anticompetitive conduct through which Google has obstructed competition in Android app distribution and in-app purchases. Google has no legitimate justification for any of this conduct.

19.     First, Google creates and imposes broad practical, technological, and contractual impediments to effectively close the Android app distribution ecosystem. Google deters consumers from directly downloading and installing apps, or app stores that might compete with the Google Play Store by, among other things, (a) imposing needlessly broad restrictions on direct downloading of apps and app stores, which Google calls "sideloading"; (b) using contracts with Android device manufacturers to prevent the manufacturers from modifying the operating system to circumvent the sideloading or code restrictions imposed by Google; (c) blocking competing app stores from distribution on the Play Store; and (d) preventing non-Play app stores and apps from purchasing advertising on key Google properties, including YouTube and the Google search engine results page.

20.     Second, Google disincentivizes and discourages competition from the only market participants that could otherwise avoid the technological restrictions and be well-positioned to compete in app distribution—Android device manufacturers and mobile network operators. Google recognized these competitive threats and sought to eliminate them through a carrot-and-stick approach. The carrot is revenue share agreements that Google provides Android device manufacturers and mobile network operators—sharing Google's monopoly rents and, thereby, disincentivizing or restricting them from attempting to create or foster a competing app store. The sticks are contracts that require Android device manufacturers to preload Google Play Store on the default home screen, render it undeletable from the device, and ensure that no other preloaded app store has a more prominent placement than the Google Play Store.

21.     Third, Google has focused its anticompetitive strategies on Samsung, the largest manufacturer of Android devices sold in the United States. Google has taken the extraordinary

step of attempting to buy off Samsung to limit competition from the Samsung Galaxy app store by, among other things, offering incentives for Samsung to turn the Galaxy store into a mere "white label" for the Google Play Store—meaning that Samsung would use the backend services of the Google Play Store, including Google Play Billing, while retaining its Samsung Galaxy Store branding.

22.     Fourth, Google launched incentive programs to share monopoly profits with large app developers that might be capable of disrupting Google's app distribution monopoly. Google did so to prevent these large app developers from fostering their own app store or moving en masse to a competing app store like Samsung's.

23.     Fifth, Google mandates that consumers who download apps from the Google Play Store also use Google Play Billing for all in-app purchases. This unlawful tie effectively precludes an Android app consumer from purchasing additional digital content directly from the app developer or via the app developer's chosen payment processing service; Google forces the consumer to continue doing business with it and to indefinitely pay Google's supracompetitive commissions.

24.     In a more competitive environment, Google's app distribution monopoly could be disrupted. Instead, because of Google's exclusionary conduct, even Amazon, one of the biggest and most sophisticated content distributors, has tried but failed to create a competitive Android app store that could weaken Google's app distribution monopoly through free and fair competition.

25.     In the absence of Google's unlawful tying conduct—requiring essentially all Android app customers to use Google Play Billing for in-app purchases of digital content—there would be vigorous competition in the Android in-app payment processing market, as exists in other payment processing markets. Google uses its durable monopoly power in the Android in-app payment processing market to extract a supracompetitive 30% commission from consumers—a figure over ten times greater than what other payment processors charge for

purchases of non-digital goods through Android apps or for digital and non-digital goods on the internet.

26.     For these reasons, the Plaintiff States, by and through their Attorneys General, bring this action to end Google's anticompetitive conduct and the harm to the States, their economies, and their residents that has flowed, and continues to flow, from that conduct. Plaintiff States seek to restore competition and prevent Google from engaging in similar conduct in the future.

## JURISDICTION, PARTIES, AND VENUE

27.     Plaintiff States, by and through their respective Attorneys General, bring this action as the chief legal officers of their respective States. Federal and state competition and consumer protection laws authorize States to bring actions to protect the economic well-being of their States and obtain injunctive and other relief to redress harm caused by violations of those laws.

28.     The Attorneys General appear in their respective sovereign or quasi-sovereign capacities and under their respective statutory, common law, and equitable powers, and as *parens patriae* on behalf of natural persons residing in their respective States pursuant to § 4C of the Clayton Act, 15 U.S.C. § 15c.

29.     States have a quasi-sovereign interest in protecting residents from illegal anticompetitive conduct and the resulting ongoing economic harm. By preventing competition in the markets for Android app distribution (or alternatively, mobile app distribution) and for payment processing of digital content purchased within Android apps in the United States, Google has deprived the Plaintiff States and their residents of the benefits of a competitive marketplace and harmed the economic well-being of each State's residents.

30.     Google's anticompetitive conduct has caused residents in each State to pay higher prices for apps on Android devices and for Android in-app payments, which has constituted ongoing, actual financial losses and has diverted resources that could otherwise be directed toward other purposes to the benefit of each State. Consumers are also harmed because Google's

anticompetitive conduct deprives them of the potential benefits of true competition, including better services and improved data security. But for Google's actions, other market participants could provide innovative alternatives in the relevant markets, to the benefit of each State's economy and general prosperity.

31.   Due to the pervasiveness and vital importance of mobile devices, mobile ecosystems, and apps, as alleged herein, Google's anticompetitive conduct and the corresponding lack of competition in the relevant markets has caused and continues to cause substantial injury to the economic health and well-being of a substantial number of each State's residents. Mobile device manufacturers, wireless carriers, and app developers are all dependent on mobile ecosystems such as Android and rely on the ability to distribute apps on those ecosystems. There are some 130 million Android smartphone users in the United States. In-app purchases and app purchases comprise significant economic activity within each State, with billions of dollars in domestic revenue generated from in-app purchases in 2019. Anticompetitive practices in app distribution and in-app payments thus have the potential to "stifle, impede, or cripple old industries and prevent the establishment of new ones," and thus "arrest the development of a State or put it at a decided disadvantage."[3]

32.   Further, the pervasive reliance of businesses in each state on apps in mobile ecosystems means that anticompetitive conduct in the app distribution market can significantly impact "competition within the state."

33.   Google's activities have had and continue to have a substantial effect upon the trade and commerce within each of the Plaintiff States.

34.   The Attorneys General further assert these claims based upon their independent authority to bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and to obtain injunctive and accompanying equitable relief based upon Google's anticompetitive practices in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. In addition, as

---

[3] *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 450 (1945).

set forth below, individual states are asserting claims under state antitrust and consumer protection statutes.

35.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California, and a wholly owned subsidiary of Alphabet Inc. Google LLC owns and operates consumer services such as Android, Chrome, Gmail, Google Drive, Google Maps, Google Play, Google Search, YouTube, Google Cloud, and a wide range of digital advertising products for advertisers, advertising agencies, internet publishers, and app developers. Google LLC contracts with U.S. app developers that distribute their Android apps through the Google Play Store and is thus a party to the anticompetitive conduct at issue here.

36.     Defendant Google Ireland Limited is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland. It is a subsidiary of Google LLC. Google Ireland contracts with U.S. app developers that distribute their Android apps through the Google Play Store and is thus a party to the anticompetitive conduct at issue here.

37.     Defendant Google Commerce Limited is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland. It is a subsidiary of Google LLC. Google Commerce contracts with U.S. app developers that distribute their Android apps through the Google Play Store and is thus a party to the anticompetitive conduct at issue here.

38.     Defendant Google Asia Pacific Pte. Limited is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore. It is a subsidiary of Google LLC. Google Asia Pacific contracts with U.S. app developers that distribute their Android apps through the Google Play Store and is thus a party to the anticompetitive conduct at issue here.

39.     Defendant Google Payment Corp. is a Delaware corporation with its principal place of business in Mountain View, California. It is a subsidiary of Google LLC. Google

Payment provides in-app payment processing services to Android app developers and users. Google Payment collects a commission of up to 30% on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within those apps, and thus is a party to the anticompetitive conduct at issue here.

40.     Defendant Alphabet Inc. is a Delaware corporation with its principal place of business in Mountain View, California. Google LLC is a wholly owned subsidiary of Alphabet Inc.

41.     This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. §§ 4 and 26, and 28 U.S.C. §§ 1331, 1337, and 1367. Google LLC contracts with app developers that distribute their Android apps to U.S. consumers through the Google Play Store.

42.     This Court has personal jurisdiction over the Defendants, and venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants transact business and are found within this District.

43.     Venue is proper in this District pursuant to 28 U.S.C § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to the Plaintiff States' claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

**FACTUAL ALLEGATIONS**

I.     **Google Unlawfully Maintains its Power Over Android App Distribution**

    A.     **Google Has a Monopoly in the Market for Licensable Mobile Operating Systems**

44.     Mobile devices are the ubiquitous handheld, portable electronic devices that allow users to perform myriad communications and computing functions, such as browsing the internet, navigating traffic, paying bills, accessing social media, playing games, and streaming

videos and music. For many consumers, mobile devices such as smartphones and tablets have largely replaced laptop and desktop computers for a wide variety of computing tasks.

45.     Mobile devices, like personal computers, require an operating system ("OS") to provide the multi-purpose computing functionality such devices are capable of. A mobile OS is one built for a mobile device.

46.     To be useful to consumers, a mobile OS must be able to run software applications, or "apps." Apps let users perform most of the functions associated with mobile devices—tasks like navigation, web browsing, ordering groceries, playing games, and communicating through email and text messaging. A mobile OS facilitates the use of apps through code, such as application programming interfaces ("APIs"), which app developers use to create apps that are compatible with the OS (see Section I.E.1).

47.     Entities that manufacture mobile devices are referred to as original equipment manufacturers ("OEMs"). The most well-known OEMs in the United States include Apple, Samsung, LG, and Motorola.

48.     OEMs pre-install an OS on each mobile device so that a consumer has immediate access to basic functions, such as cellular or WiFi connectivity, camera and video recording, and the installation, operation, and update of mobile apps. Mobile devices are designed to work with a particular mobile OS, and there is no appreciable aftermarket for mobile OSs.

49.     Most OEMs, besides Apple, do not develop their own OS but instead license a third party's OS for their devices. Therefore, there is a relevant market for licensable mobile OSs, which OEMs license and install on their mobile devices.

50.     By contrast, Apple uses a proprietary OS ("iOS") for its mobile devices, including iPhones and iPads, and does not license iOS to other OEMs. The market for licensable mobile OSs does not include OSs that are proprietary and cannot be licensed by OEMs (such as Apple's iOS).

51.     The licensable mobile OS market also excludes OSs that are unsuitable for mobile devices, such as OSs for simple cell phones, "flip phones," or feature phones, or for other

electronic devices (such as laptop computers, desktop computers, and gaming consoles, e.g., Nintendo DS, Xbox, PlayStation) that are not mobile devices.

52.     Almost all mobile devices and the mobile OSs they run require consumers to contract with a mobile network operator ("MNO") to communicate and access the internet wirelessly. Prominent MNOs in the United States include Verizon Wireless, T-Mobile, and AT&T Mobility.

53.     In 2005, Google acquired the Android OS, which it makes available under an open-source license. "Open-source" means, in theory, that the code can be accessed, used, and modified by anyone, for free. But in practice and as described further in Sections I.D.2, I.D.3, and I.E below, Google tightly controls Android and thwarts commercial use of anything but the Google-sanctioned version.

54.     Android is now "open-source" in name only. The Google-certified version of Android OS powers nearly all current Android devices (going forward, "Android" will refer to the Google-certified version of the Android OS). As of July 2020, over 99% of smartphones with licensed mobile OSs were powered by Android.

55.     There are extremely high barriers to entering the licensable mobile OS market, including the cost of research and development, powerful network effects that give rise to barriers to entry, and high switching costs for consumers and app developers from one OS to another. Large companies such as Microsoft and Amazon have attempted to enter and gain viable scale in the market, with only very limited success.

56.     Google currently possesses durable monopoly power in the market for licensable mobile OSs.

57.     The relevant geographic market for the licensable mobile OSes is worldwide (excluding China).  Alternatively, the United States is a relevant geographic market for licensable mobile OSes.

58.     As described below, Google leverages its monopoly power with Android to unlawfully maintain its monopoly in the Android app distribution market. Given their

dependence, OEMs have little bargaining power when it comes to accepting Google's anticompetitive requirements around Android devices.

**B. Google Monopolizes the Market for Android App Distribution**

59.     Google has, through its anticompetitive conduct, unlawfully maintained monopoly power in the market for distributing apps on Android.

60.     Apps on mobile devices are akin to software applications on a personal computer. As with applications on a personal computer, some apps may be pre-installed by the OEM, but consumers typically obtain additional applications or apps to meet their specific needs and preferences.

61.     On personal computers, application distribution is competitive and diffuse. Consumers download applications from a variety of sources, including the application developer's website or stores on websites such as Amazon, Apple, Microsoft, Google, or Steam.

62.     On Android devices, however, Google has substantially foreclosed potential competition from alternative means to download apps, effectively eliminating consumers' choice. The Google Play Store is the only practical means to obtain apps for the vast majority of Android consumers in the United States.

**1.  The Market for Android App Distribution Is a Relevant Antitrust Market**

63.     There is a relevant product market for the distribution of apps to users of Android mobile devices (the "Android App Distribution Market").

64.     The market includes all channels by which Android apps on mobile devices may be distributed to consumers.[4] This includes the dominant Google Play Store, which accounts for well over 90% of Android mobile app distribution. It also includes smaller app stores such as those maintained by Samsung, Amazon, and Aptoide. In addition, it includes direct downloading

---

[4] To the extent smartphones and tablets are in separate relevant markets, Plaintiff States make each allegation herein for both markets.

of apps by consumers without using an app store, which Google terms "sideloading." Competing app stores that are not preinstalled can also be sideloaded.

65. The Android App Distribution Market does not include mobile distribution of apps that are compatible with other OSs, such as Apple's iOS. A monopolist app distributor on Android mobile devices is not constrained from raising prices, or reducing quality or innovation, by app distribution on Apple's devices (or on any other mobile devices that use an alternative to Android or on desktop devices), due to market imperfections such as high switching and information costs.

66. In the face of a small price increase (or a small reduction of quality) in app distribution within Android, a consumer would be highly unlikely to switch to an Apple device for three primary reasons. First, the consumer who would switch away from using one or more Android devices (e.g., smartphone and tablet) to an Apple device (or devices) would lose much of her financial investment in the previously purchased mobile devices—often hundreds of dollars—as well as digital content consumable only through Android apps. The consumer may also lose efficient, or any, access to many kinds of data on that device or data associated with those apps. Because of the functional and data integration between devices within the same ecosystem (e.g., among an Android phone, Android tablet, and peripherals like smartwatches, smart home speakers and "internet of things" devices), many consumers owning multiple Android devices would be reluctant to switch to an Apple device unless committing to switching all devices—a significant financial commitment. Second, many Americans pay for their devices under installment contracts, limiting their ability to switch mobile OS ecosystems. Third, even if a consumer is in the market for a new device (or multiple devices), she typically considers many other factors when deciding between an Apple device or one of the many devices that license the Android OS. These factors include the consumer's existing comfort with an OS, any previous investment in apps or other products that are compatible with an OS (e.g., a smartwatch), device design, processing power, and battery life. Different OSs have distinct designs, controls, and functions that consumers learn to navigate and become familiar with over time. These and other

costs of switching mobile OSs deter most consumers from switching, and thus availing themselves of the app distribution alternatives available on another mobile OS.

67.     In addition, a consumer in the market for a new device cannot reliably determine the lifecycle price. In other words, consumers cannot reliably predict all of the future apps or in-app content they may eventually purchase. Even if some consumers believe they can do so, their preferences and patterns of app usage can change over the device's life, especially as new apps and app functionalities emerge. Because consumers typically cannot predict their future costs when purchasing mobile devices, they cannot effectively take Google's anticompetitive conduct into account when making mobile device purchasing decisions.

68.     Nonetheless, consumers might attempt to factor Google's conduct into their decisions to move away from Android, but Google has inhibited consumers' ability to make that informed choice. Most consumers are unaware of Google's supracompetitive commissions, which Google does not publicize or itemize on its Play Store billing statements. Google likewise conceals the anticompetitive technological and contractual constraints that give the Google Play Store an unfair competitive advantage in Android app distribution. Indeed, Google has continually made false or misleading representations to consumers and others regarding Android's and the Play Store's purported "openness," which consumers would reasonably understand to mean that Google does not engage in these anticompetitive practices (Section III). There is significant information asymmetry between Google and consumers, who cannot easily discover and make informed decisions based on Google's anticompetitive conduct, let alone consent to them simply because they purchase an Android mobile device.

69.     Moreover, the Google Play Store and the Apple App Store do not compete directly, because they and the apps they distribute function with only one mobile OS and cannot work on an incompatible mobile device. As the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary concluded in its October 2020 report, "Investigation of Competition in Digital Markets," (hereafter referred to as the "House Majority Report"):

> Apps are not interoperable between operating systems—native apps developed for [Apple's] iOS only work on iOS devices, and native apps developed for Android only work on Android devices. The [Apple] App Store and the Play Store do not compete against one another. Android users cannot access the Apple App Store and iOS users cannot access the Google Play Store, so the dominance of the Play Store is not constrained by the App Store and vice versa.

70.     Consumers who purchase Android devices are thus effectively locked into Android and whatever app distribution is available in the Android ecosystem. Google's control of Android gives it special access to Google Play Store consumers that app distribution competitors lack and cannot obtain, due to Google's anticompetitive restrictions discussed below.

71.     Google's market power over app distribution is also not constrained by the Apple App Store, because for developers, distribution on iOS is not an adequate substitute for distribution on Android. First, apps written for iOS cannot be run on an Android device, and vice versa. The operating systems are written in different programming languages, and each app must be written to be compatible with the underlying OS. Thus, the switching costs of "porting" an existing app to a new OS are large, as the app must be significantly rewritten. Second, most developers of apps that are popular in the United States cannot reasonably choose between iOS or Android but develop their apps for both operating systems. Just as major personal computer software developers like Microsoft and Adobe must create software versions compatible with both the Microsoft Windows OS and Apple macOS to satisfy consumer expectations, major app developers like Netflix, Spotify, Match Group, Facebook, and Epic Games must incur the costs of developing apps compatible with iOS and Android, or their apps would not be accessible by a significant portion of U.S. mobile device users. This is particularly true for apps that facilitate interaction among users (e.g., dating, online gaming, and social media apps) or serve as platforms for two or more groups of users (e.g., digital commerce and ridesharing).

72.     Because of Google's anticompetitive conduct, the Android App Distribution Market is currently dominated by a single method of distribution, the Google Play Store. But for Google's anticompetitive conduct, the Google Play Store would face real competition from other

app stores—such as Samsung's Galaxy Store or Amazon's Appstore—and other methods of app distribution, like direct downloads from websites. Google's successful campaign to quash competition in app distribution has ensured that these alternative methods of distribution now account for only a small share of the market, and the vast majority of app developers and consumers do not consider them reasonable substitutes for the Google Play Store.

73.    To the extent that the Android App Distribution Market may be or is a two-sided market, Google's anticompetitive conduct harms both consumers and developers (see Section I.G). Google's exclusionary conduct also reduces overall output by damaging or destroying alternative avenues of app distribution that consumers and developers would otherwise use. Rather than competing on the merits, and creating more efficient, innovative, or less expensive app distribution, Google simply blocks its competitive threats.

### 2.    The Relevant Geographic Market is Worldwide (Excluding China) or, Alternatively, the United States

74.    The geographic scope of the Android App Distribution Market (or the alternative Mobile App Distribution market, see paragraphs 81-83) is worldwide, excluding China. Outside of China, app distribution channels, including app stores, are developed and distributed on a global basis. OEMs, in turn, make app stores, such as the Google Play Store, available on Android devices on a worldwide basis (except in China).  China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Google Play Store, within China. Additionally, app stores prevalent in China are not available, or have little presence, outside of China.

75.    Alternatively, the United States is a relevant geographic market for Android App Distribution (or the alternative Mobile App Distribution Market). The apps available, and desirable, to consumers vary on a country-by-country basis. For instance, app stores frequently have country-specific "storefronts," and U.S. consumers cannot access the storefront available to users in another country. Google also sets certain app distribution and payment requirements for developers on a country-by-country basis, including in-app sales currency and price range

requirements. App distribution markets available in other countries are not reasonable substitutes for app distribution markets in the United States.

### 3.  Google Has Monopoly Power in the Android App Distribution Market

76.   Google possesses a durable monopoly in the Android App Distribution Market, causing ongoing harm to competition and injury to consumers. The Google Play Store's monopoly power is evidenced by (a) its market share and lack of meaningful competition; (b) Google's large profit margins (see Section II.B.4 below); and (c) Google's ability to control the price that consumers must pay to purchase an app on the Google Play Store (see Section II.C below).

77.   Through its anticompetitive conduct, Google corrals Android mobile device users into downloading apps through one channel—the Google Play Store. As a result, well over 90% of apps on Android devices are acquired from the Google Play Store. A 2017 internal Google report confirmed that "Play Store dominates in all countries," including the United States. Another Google report stated that off-Play Store installations—chiefly apps downloaded from Samsung's and Amazon's respective app stores, or sideloaded—comprised only 4.4% of U.S. Android app downloads from June to September 2016.

78.   Although Google leaves open the technical possibility for Android consumers to acquire some apps without using the Play Store, this can only be accomplished through a competing app store installed on the device (either through preloading by an OEM or through the user sideloading the store), or through sideloading of individual apps. Google takes various steps to discourage OEMs from directly competing or sponsoring any app store competition. Google makes the sideloading process unnecessarily cumbersome and impractical by adding superfluous, misleading, and discouraging security warnings and by deterring users by requiring them to grant permission multiple times for a single app installation (discussed in more detail in Sections I.D. and I.E. below). The effect of Google's conduct is to practically eliminate competition in Android app distribution.

**C.  Google Also Has Market Power in A Market for Mobile App Distribution.**

79.     Alternatively, there exists a relevant, economically distinct antitrust product market for the distribution of mobile apps to users of all mobile devices, whether Android or Apple's iOS ("Mobile App Distribution"). A hypothetical monopolist of Mobile App Distribution could charge supra-competitive prices without losing significant business to alternative distribution channels.  There are no meaningful substitutes for Mobile App Distribution, because consumers expect that mobile devices will grant them access to a wide variety of compatible apps.

80.     Google has durable market power in the Mobile App Distribution market.  For example, it has a market share globally (excluding China) of approximately 53% by revenue and 84% by downloads, and an estimated market share in the United States of over 30%.  The Google Play Store's market power in this market is also evidenced by (a) the absence of price competition; (b) Google's large profit margins (see Section II.B.4 below); and (c) Google's power to directly control the supracompetitive commission rate that consumers must pay to purchase apps from, or make IAPs within apps distributed by, the Google Play Store.

81.     Google and Apple have erected significant barriers to meaningful entry and expansion that foreclose competition in the Mobile App Distribution Market (see Sections I.A, I.D, and I.E).  These barriers include technical barriers to third party app stores and sideloading, as well as Google's illegal contractual restrictions with OEMs and developers that are the subject of this Complaint.

**D.  Google Closes the Android App Distribution Market to Competitors**

82.     Google employs various tactics to foreclose competitive distribution of Android apps, including imposing needlessly broad restrictions on direct downloads; using contracts with OEMs to prevent them from circumventing Google's direct-downloading restrictions by modifying the OS; blocking competing app stores from distribution on the Play Store; and preventing non-Play apps and app stores from purchasing advertising on key Google properties including YouTube, Google Search, and the Google Display Network.

**1. Google Imposes Technical Barriers to Effectively Prevent Third Parties from Distributing Apps Outside the Google Play Store**

83.     Google owns the Android OS, which is used in 99% of U.S. mobile devices that run a licensable mobile OS. Google's control of Android enables it to impose technical barriers that effectively prevent third parties from distributing apps and app stores outside the Google Play Store. Google claims that, outside the Play Store, consumers "are able to install additional app stores if they choose." In reality, Google imposes a series of technological challenges and pretextual warnings designed to prevent users from directly downloading—or "sideloading"—these apps or app stores. The term "sideloading" reveals Google's view of the Android App Distribution Market: consumer use of the default Google Play Store is encouraged and expected, whereas use of a competing means of distribution is an aberration.

84.     Having recognized that sideloading constitutes a competitive risk to its business, Google has been waging "an arms race to prevent sideloading" by degrading the consumer experience. To do this, Google embeds its generally misleading warnings and hurdles to sideloading into the Google-certified Android OS.

85.     Figure 1 presents three examples of the obstacles and ominous warnings about the supposed danger of directly downloading and installing apps that consumers encounter during this process. In one, Google warns that the installation file "can harm your device." Next, Google simply blocks the attempted download, stating "your phone is not allowed to install unknown apps from this source" and presenting to the user only "Cancel" and "Settings" options (with no indication that installation is possible through the "Settings" option). In the third, Google warns that the user's "phone and personal data are more vulnerable to attack by" the "unknown app," and requires the user to actively opt in to select a feature by which he agrees that he is "responsible for any damage" to the phone "or loss of data that may result" from the installation.



**Figure 1**

## Download apps from other sources

**Important:** If you download apps from unknown sources, your phone and personal information can be at risk.

- Your phone could get damaged or lose data.
- Your personal information could be harmed or hacked.

| Help Google protect against bad apps from other sources | ^ |
|---|---|

- If you install apps from outside of Google Play, your phone can send Google information about those apps.

- This information helps Google better protect everyone from harmful apps. The information can include log information, URLs related to the app, device ID, Android version, and IP address. Learn about Google Play Protect.

**Figure 2**

86. Google's own website promotes the misleading and overbroad premise that directly downloading apps from "unknown sources" other than the Play Store inherently presents dangers to the device irrespective of source, as illustrated in Figure 2.

87. Google staff have acknowledged internally that the hurdles it erects to sideloading lead to a "[p]oor user experience," in that there are "15+ steps to get app vs 2 steps with Play or on iOS," as a 2018 presentation to senior executives stated. Google knows that it is degrading the

user experience with its sideloading obstacles in order to protect its Android app distribution monopoly.

88.     Downloading and installing an app on a mobile device is not materially different from downloading and installing software on a personal computer. Millions of personal computer users do this safely and easily every day. Amazon described the process for downloading alternative app stores as follows:

> [E]ven for consumers who discover and download an alternate store outside of the Play Store, Google has configured Android to block the installation of that store. Consumers are unable to install downloadable app stores unless the consumer first navigates to and changes Android's obscure "Unknown Sources" setting to allow installation of apps from sources other than the Play Store. When consumers attempt to change this setting, Google displays a message warning that "Your [device] and personal data are more vulnerable to attack by apps from unknown sources. You agree that you are solely responsible for any damage to your [device] or loss of data that may result from using these apps."

89.     The House Majority Report provided a similar description:

> Google has created significant friction for sideloading apps to Android devices. One developer explained to Subcommittee staff that sideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading. Additionally, software developers that have left the Play Store to distribute software to Android users via sideloading have experienced precipitous declines in downloads and revenue and report problems updating their apps. Thus, the option for sideloading apps on mobile devices does not discipline the market power of dominant app stores.

90.     Google's warnings to users grossly exaggerate the risk of sideloading. A 2015 presentation to OEMs stated that "potentially harmful applications" constituted a mere fraction of a percentage point of all app installs and that given the low security risks "some of the third-party security services that are required on other platforms (such as AV [anti-virus software] and anti-malware) are not necessary on Android." Rather, "the single largest threat to Android security" instead flowed from failures by OEMs to update users' devices with security patches.

91.     Google's public claims about the security of Android belie the warnings it provides users who attempt to sideload, in several ways. First, Google claims that it "analyzes

every app that it can find on the internet" and categorizes a subset of them as "Potentially

Harmful Applications," or PHAs. Yet its user warnings falsely describe even a highly popular

app from a well-known developer, such as the Amazon Appstore, as an "unknown app." This

gives consumers the false impression that even apps Google certainly must have analyzed and

determined were not PHAs nevertheless present an appreciable risk of "damage" to the user's

phone, causing data loss, or exposing the user's personal information.

92.    Second, Google touts Android's built-in security measures as scanning "more

than 100 billion apps every day." Android then directs users to take action against PHAs it finds

on their devices or automatically disables them. Given its unique access to app usage data and

expertise in app security and privacy, Google has an unparalleled ability to provide accurate

information and warnings on PHAs. Yet it chooses to provide inaccurate information instead.

Even if an app has been sideloaded by thousands of other users, scanned repeatedly by Google,

and found to be harmless, Google will warn each additional user who tries to sideload the app

that it is potentially harmful and from an "unknown source." This practice is misleading and

exclusionary.

93.    Third, Google tells users that Android is "secure to the core," and that "we guard

each app at the operating system level, so other apps won't snoop on what you do." According to

a 2020 Google white paper:

> Application sandboxing isolates and guards Android apps,
> preventing malicious apps from accessing private information.
> Android also protects access to internal operating system
> components, to help prevent vulnerabilities from becoming
> exploitable. Mandatory, always-on encryption helps keep data safe,
> even if devices fall into the wrong hands.

94.    If Android security is as robust as Google claims, its warnings against sideloading

falsely overstate any potential "harm"—particularly as to widely used apps and app stores, from

reputed developers, which Google has analyzed and found to be harmless. It is impossible to

reconcile Android's robust security features and Google's own estimations of Android's superior

safety features with the idea that direct user downloading of apps is dangerous. Android safety

mechanisms like sandboxing operate regardless of how an app was downloaded—whether from the Google Play store or another source.

95.     Moreover, Google's own data demonstrates that its warnings overstate the potential "harm" of sideloading. A 2018 Google white paper stated that PHAs are present on "only 0.08% of devices that exclusively used Google Play" and on "0.68% of devices that installed apps from outside of Google Play." Even taken at face value, the miniscule proportion of Android devices that sideload apps and were found to harbor PHAs does not justify Google's misleading and unfairly broad-brush warnings against sideloading. Nor should these figures necessarily be taken at face value, because they include PHAs that (1) were installed by OEMs, not users; (2) were explicitly sought out by users who understood their underlying risks, such as "power users" who want to customize their devices; and (3) are not harmful to a user, such as "click fraud apps … that may harm advertising networks but not users."

96.     Even if a user overcomes Google's obstacles to direct downloading, the user faces continuous additional difficulties in keeping the sideloaded app or app store up to date. This is because Google prevents sideloaded apps and app stores from updating in the background. Instead, users who sideload apps or app stores must manually approve every update via a multistep process. Amazon's website describes that process: "1. Open the app store you used to install the app on your device. 2. Search for the app and open the app's detail page. 3. If an update is available, an Update option displays." This multi-step process for updates further discourages consumers from using alternatives to the Play Store.[5]

---

[5] Google last month announced plans to reduce some of its impediments to third-party app stores—after some 10 years—in the forthcoming version of the Android OS, Android 12. Sameer Samat, *Listening to Developer Feedback to Improve Google Play*, ANDROID DEVELOPERS BLOG (September 28, 2020), https://android-developers.googleblog.com/2020/09/listening-to-developer-feedback-to.html. Specifically, initial Google documentation suggests that it will enable automatic updating of sideloaded app stores under certain conditions. *See* Mishaal Rahman, *Android 12 will finally let alternative app stores update apps without bothering the user*, XDA DEVELOPERS (May 19, 2021), https://www.xda-developers.com/android-12-alternative-app-stores-update-apps-background/.

97.     Google created Android to allow sideloading, in order to gain scale and maintain its image of "openness." After achieving dominance, however, Google increasingly saw sideloading as a threat to the Play Store and erected numerous barriers to thwart it.

98.     Google knew that these barriers would work to protect its app distribution monopoly. For example, when considering the possibility that Epic might launch Fortnite as a direct download, Google noted in internal communications the technical difficulties that it had created. Google "knew from [their data]" that the "install friction" associated with sideloading "is not only a bad experience" for users but would also "drastically limit [Fortnite's] reach." In addition to the poor user experience associated with sideloading, "future updates will be challenged re: targeting, update experience via web," "the approach will create significant user confusion, since the store will attract billions of users who will search for Fortnite and run into dead ends that aren't clear how to resolve," and "launching this way makes it hard to work on top tech issues, e.g. can't easily go back and graft on a piracy solution, collaborate on other experiences/tech issues." The "app update experience" for sideloading apps was poor compared to that of Play-distributed apps. "By using sideloading, every single Fortnite update will need to be approved by the user by clicking on 'INSTALL' in a dialog . . . . After that user[] must wait for completion. Since Fortnite is a large app . . ., [the] update will likely take a long time to be installed. Meanwhile, Play could provide auto-updates in the background that are nearly invisible to the user."

99.     Google also discussed the viability of Amazon's app store given its distribution through the Amazon website via a sideloading process. To allow a sideloaded app to install other apps, the user must enable unknown sources for the app that will perform the installations (*e.g.,* Chrome, Amazon App Store, *etc*.)." This is not a simple process. The user must first enable the "unknown sources" download permission within Android's settings to allow the download of the store itself. After completing this step, a further step is required each app install through that app store. As Google explained, when the app store downloads apps through the new store, the user "do[esn't] get a silent install. The user will still need to click on 'INSTALL' to confirm. The

only way to install directly without this dialog is to have a system permission (like Play does, or FB installer). Non system apps can't get this permission."

100.     Google's warnings against sideloading are another barrier that thwart competition from competing app stores and the threat of apps distributing directly via sideloading. For example, consumers who tried to use Aptoide, a competitor Android app store, received the message shown in Figure 3.



**Figure 3**

101.     An independent study of Android app stores published in 2017 ranked Aptoide as the safest among the Android app stores analyzed and safer than Google Play Store itself. But as a result of Google's misleading warning that to keep the Aptoide App would be "UNSAFE" and Google's further actions to actually remove Aptoide from users' phones without users' knowledge, Aptoide lost 15-20% of its user base between June 2018 and June 2019. While a Portuguese court barred Google from removing the app store without users' knowledge in response to related litigation, Google retains its exclusionary warnings and technological hurdles.

102.     Google acknowledges that the security settings and warnings associated with sideloading limit even mainstream, non-malicious apps and app stores from reaching Android

users. Even secure, highly curated Android apps and app stores like Fortnite and the Amazon Appstore are subject to such warnings. When Fortnite's developer decided to launch the app via sideloading, Google noted internally that its Android reach without the Play Store would be significantly lower as only 15% of Android users in the United States (a top revenue market for Fortnite) had "unknown sources" enabled. In the same document, Google discussed how the security warnings and barriers affected the viability of Amazon's app store, asking "How difficult is it [for Amazon] to get users to understand what to do?" and noting that "users need[] to understand unknown sources."

103.    Google's conduct harms consumers and competition, as demonstrated by a 2016 internal Google report indicating that only a negligible percentage of Android app downloads in the United States were sideloaded. If not for Google's restrictions on sideloading, more app distributors and developers would directly distribute their apps and app stores to consumers. Google makes sideloading substantially and unnecessarily difficult and in some cases prevents it entirely.

104.    Even assuming, *arguendo*, that there is a legitimate justification for Google's conduct—and there is not—Google has pursued those goals by methods that are substantially more restrictive than necessary.

### 2.    Google Uses Contracts to Prevent OEMs from Circumventing Technical Barriers

105.    To prevent frictionless sideloading of competing app stores, Google imposes contractual restraints on OEMs. An OEM that wishes to market an Android device with Google's proprietary apps and services must first sign an Anti-Fragmentation Agreement (AFA) or, more recently, an Android Compatibility Commitment (ACC). AFAs and ACCs have two key provisions: signatories must (1) refrain from "any actions that may cause or result in the fragmentation of Android" ("anti-fragmentation provision"); and (2) agree to restrictions on the manufacture and sale of devices running forked versions of Android ("anti-forking provision").

The agreements also require OEMs to comply with the Compatibility Definition Document and the requirements of Google's Compatibility Test Suite.[6]

106.    The AFA and ACC compatibility standards require OEMs to implement Google's restrictions and warnings about sideloading. As such, these agreements foreclose OEMs from modifying Android to offer frictionless sideloading of competing app stores, which Google would consider an impermissible "Android fork."

### 3.  Google Uses Contracts to Block Competing App Stores from Distribution on the Play Store

107.    Google forces app developers, as a condition of appearing in the Google Play Store, to sign a non-negotiable Developer Distribution Agreement ("DDA"). Section 4.5 of the DDA prohibits developers from using "Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." In other words, no app on the Play Store may compete in the Android App Distribution Market. The DDA also gives Google the right to remove and disable any Android app that Google determines violates this agreement.

108.    Google has imposed this restriction since at least 2009, when the section was labeled "Non-Compete" and applied to distribution through Android Market (the name of Google's app store before it was rebranded as the Google Play Store). Over time, Google has tightened the anticompetitive restrictions in Section 4.5 in response to specific threats posed by app distribution competitors such as Amazon.

109.    The original language of the DDA was limited to apps that had a "primary purpose" of facilitating distribution of apps outside of Android Market, which allowed some flexibility for developers to use the Play Store to distribute Android apps that also linked to apps

---

[6] Anti-fragmentation provisions in the AFAs and ACCs prevent manufacturers and carriers from distributing software and hardware that is not "Android compatible" and from creating or distributing software development kits (SDKs) that compete with Google's SDK (the software development tool that developers must install in their apps to access the Google Play Services APIs). Manufacturers are prohibited under the agreements from taking actions that result in the fragmentation of Android.

that could be downloaded outside Google's app store. In 2012, however, when Amazon attempted to distribute its app store to consumers directly through its Amazon Store app, distributed on the Play Store, Google took swift action. Amazon used a browser within the app to direct users to a page to download Android application files, which use the extension ".apk." This effectively allowed customers to download Amazon apps without going through the Play Store. Google alleged this was a violation of the DDA agreement and threatened to remove Amazon from the app store, days before Black Friday.

110.    Google eventually changed its policy in response to Amazon's Store app. In September of 2014, Google updated Section 4.5 of the DDA to "provide additional clarity around the distribution of third-party apps on Google Play to maintain a secure ecosystem." Eventually, Amazon was forced to disable this functionality, and its app store was only available via sideloading, a process that makes it significantly harder to reach Android users for the reasons discussed in Section I.D.1.

### 4.    Google Unlawfully Ties Advertising with Google App Campaigns to the Google Play Store

111.    Google also degrades potential alternative app distribution channels by preventing app developers from advertising these channels through Google's marketing properties. This requirement unreasonably raises the cost of customer acquisition for the competing app distribution channels, as they cannot reach consumers through widely used forms of advertising that are uniquely effective in reaching users who are immediately prepared to acquire an app but instead must find alternative means of advertising to reach users.

112.    Google's App Campaigns program allows developers to promote apps through ad placements on key online advertising channels, including *inter alia*, Google Search, YouTube, Discover on Google Search, and the Google Display Network. These placements are optimized for the advertising of mobile apps and have proven successful: according to Google, one out of every four users discovers an app through a search engine. And because Google Search is the overwhelmingly dominant search engine in the United States (and most of the world), it is a vital

channel for app developers to reach customers. Ads on Google's YouTube are likewise a key means for developers to reach consumers. Google's dominance in Android app advertising is illustrated by its ability to reduce consumer choice within App Campaigns: since late 2017, Google has forced all marketers to relinquish their control over app ad targeting to fully automated "black box" machine learning tools, which have been criticized for penalizing smaller budget advertisers. But within the Android ecosystem, the crucial App Campaigns program is limited to app developers who list their app in the Google Play Store. Android app developers must list their apps in the Google Play Store if they want to reach consumers through the vital channel of Google advertising.

113.    Denying competing apps and app stores the ability to advertise on Google properties erects significant barriers to entry. The net effect of this conduct is to harm consumers, including by depriving them of choice in how to download their desired apps and app stores.

### E.  Google Uses Exclusionary Contracts to Foreclose Competing App Distribution through Pre-Installation

114.    As noted above, Google forecloses OEMs from enabling frictionless sideloading of competing app stores with the AFAs and ACCs, which require OEMs to implement Google's restrictions, warnings, and messaging about sideloading. To disincentivize OEMs and MNOs from pre-installing viable competing app stores, Google goes further by imposing additional contractual restraints under the terms of two additional contracts: Mobile Application Distribution Agreements ("MADAs") and Revenue Share Agreements ("RSAs"). Google's anticompetitive contracts with OEMs and MNOs have existed since shortly after the launch of the Android platform and Android Market, and the evolution of those contracts to become ever more restrictive mirrors the increasing strength of Google's monopoly.

115.    For example, in June 2019, Google stated that "[w]e are fine-tuning Android Search Rev share (ex Samsung) to protect Google from key strategic risks." One key strategic risk Google listed was "higher exposure of Search and Play revenue."

1

**1. Google Forces OEMs to enter MADAs that Effectively Block the Entry of Competing App Stores**

2    116.    Having signed an AFA or ACC, an OEM can then license Google's proprietary

3    apps and APIs and market its devices as Google-certified Android devices by entering into a

4    MADA with Google. MADAs authorize distribution of Google Mobile Services, a bundle of

5    Google's proprietary apps including the Play Store, along with the Google Play Services APIs

6    that enable apps to access key functionalities. The MADAs also require manufacturers to make

7    certain Google apps, like the Google Play Store, undeletable, and to give Google the most

8    valuable and prominent real estate on the default home screen.

9                    ***a.* Google Forces OEMs to Enter MADAs**

10   117.    Google employs various coercive tactics to force OEMs to enter its MADAs, such

11   as withholding key inputs for mobile devices (e.g., must-have Google apps and Google Play

12   Services) and revenue share payments unless they agree to enter a MADA with Google.

13   118.    Google does not allow OEMs to manufacture Android devices or use the Android

14   trademark unless the OEM enters into a MADA with Google.

15   119.    Google also conditions licensing of Google Mobile Services on an OEM entering

16   into a MADA. Google Mobile Services includes a bundle of proprietary Google apps, including

17   the Play Store and various must-have apps such as Gmail, YouTube, and Google Maps.

18   120.    In addition, OEMs are not given access to Google Play Services unless the OEM

19   agrees to enter into a MADA with Google. Google Play Services is a set of proprietary

20   application programming interfaces ("APIs") that enable apps to perform many essential tasks

21   but are excluded from the "open-source" Android code. APIs are interfaces for accessing

22   "libraries" of prepackaged computer code that assist different pieces of software in

23   communicating with one another. App developers typically use APIs when they want their app to

24   request data from the operating system or from other applications, among other tasks.

25   121.    The Google Play Services APIs are essential to app developers for building app

26   functionalities like push notifications, locating a user, displaying a user's location on a map, and

27

28

maximizing ad revenue.[7] The great majority of the top paid and unpaid Android apps employ APIs found only in Google Play Services. While some of the APIs in Google Play Services relate directly to Google's products and services, others offer basic "OS" functionality, like accessing the device's sensors and streaming video to a television. By locking up this essential functionality within Google Play Services, then bundling Google Play Services with the Play Store, Google entrenches the Play Store's dominance.

122.    The MADA bundles the Android trademark, the core functionality provided by Google Play Services, the Play Store, and its proprietary apps—those that OEMs and consumers demand, as well as those they do not—into one take-it-or-leave-it package. There is no legitimate justification for bundling these disparate products together. Further, the MADA bundle is available only to OEMs that agree to the coercive and anticompetitive provisions of the AFA or ACC.

123.    As described in Section I.E.2 below, Google also withholds revenue share payments from OEMs unless they agree to enter into a MADA with Google.

### b. Google's MADAs Discourage the Entry of Competing App Stores

124.    The MADAs prevent OEMs from promoting competing app stores over the Play Store via pre-installation.

125.    First, Google's MADAs require OEMs to preinstall and place the Google Play Store icon on the home screen of Android devices,[8] and that no competing app store be any more

---

[7] "A [push] notification is a message that pops up on the user's device. Notifications can be triggered locally by an open application, or they can be 'pushed' from the server to the user even when the app is not running. They allow [an app's] users to opt-in to timely updates and allow [apps] to effectively re-engage users with customized content. Push Notifications are assembled using two APIs: the Notifications API and the Push API. The Notifications API lets the app display system notifications to the user. The Push API allows a service worker to handle Push Messages from a server, even while the app is not active. The Notification and Push APIs are built on top of the Service Worker API, which responds to push message events in the background and relays them to [an] application." *Introduction to Push Notifications*, GOOGLE, https://developers.google.com/web/ilt/pwa/introduction-to-push-notifications.

[8] The home screen appears by default when the device is active (i.e., not in "sleep mode") but no app is open. "By default, your main Home screen shows the date, weather, and a few apps," as well as a large Google Search "widget." *Change what's on your Home screen on Android*, GOOGLE, https://support.google.com/android/answer/9440648?hl=en.

prominent. This placement requirement for Google Play Store, which makes it the default app store on Android, gives Google a significant advantage because users rarely change their default settings. While other app stores may be preloaded on an Android device, Google's restrictions ensure that none can acquire the Play Store's default advantage.

126.    A 2017 Google presentation on Amazon's app store described the power of the Play Store's default placement with unusual frankness: "If we were honest we would admit that most users and developers aren't consciously 'choosing' they are going with the default. If they really had to choose, how would they do that and would they choose us?"

127.    Similarly, Google stated during its negotiations with Samsung that home screen placement exclusivity "limits discoverability for Amazon [app store]." Nokia communicated to the European Commission that "[w]here a product is preloaded by default, consumers tend to stick to this product at the expense of competing products—even if the default product is inferior to competing products." Yahoo likewise said that only "a small percentage of users download applications that compete with the pre-installed choices."

128.    Second, Google's MADAs require OEMs to preinstall a suite of Google proprietary apps, to make it impossible to delete or remove many of these Google apps, and to provide all of them preferential placement on device home screens or the very next screen. In 2009, Google required the pre-installation of as many as a dozen Google apps; by 2013 it required two dozen; now, Google requires OEMs to pre-install up to thirty Google apps. This conduct shields Google from competition by crowding out competing app stores, and also stifles innovation by apps with functions that overlap with those of Google's preinstalled suite of proprietary apps. Google knows that its MADA bundling requires OEMs to accept many undesirable Google apps in order to get desirable ones, at the expense of consumers.

129.    If Google loosened its restrictions and allowed OEMs to distribute Android devices without the Google Play Store, OEMs could theoretically opt to instead preinstall only third-party app stores (such as the Samsung Galaxy Store or the Amazon Appstore). But because Google Play Services is bundled with the Play Store, most of the top apps in those third-party

stores wouldn't work. For example, without Google Play Services, any app using location and mapping functionality (e.g., ride-sharing and real estate apps), push notifications (e.g., many apps that create reminders, location-based triggers, or personalized notifications), or Google's AdMob (i.e., apps that monetize through in-app advertising) will not properly function. Google Play Services also provides security updates and related services for Android devices, meaning that devices lacking the bundled Play Store would not receive such updates. By bundling Google Play Services with the Google Play Store, Google ensures that, while competing app stores can technically be on an Android device, the Play Store *must* be on the device for apps to function correctly.

### 2. Google Shares its Monopoly Profits with OEMs and MNOs to Disincentivize the Entry of Competing App Stores

130.    OEMs of Android devices who have signed a MADA can enter into Revenue Share Agreements (RSAs), which give the OEM a "share" of Google's advertising and Play Store revenue from Android phones they distribute in exchange for complying with a long list of requirements. RSAs serve as an inducement to enter into the AFA/ACC and MADA, as both are required to be signed before an OEM may receive revenue shares. MNOs are required to sign only the AFA/ACC before entering an RSA. The agreements also require the parties to refrain from competing against Google, and refrain from any act that Google might see as a violation of its deliberately vague and frequently changing web of contracts and requirements.

131.    In 2009, shortly after the launch of Android, Google began discussing using revenue share agreements to address the "challenge" of MNOs and OEMs looking to create their own app stores. Google's goal was to "[i]ncentivize partner[s] to drive developer and user communities towards Android Market" and discourage the OEMs and MNOs from creating competing app stores.

132.    Google increased the market share of Android Market by adopting revenue share agreements that split the revenue from app purchases with certain MNOs. Google knew at the time that "Mobile operators are not willing to give up the revenue stream on content

distribution—Will block Market if we don't share revenue." In 2009, Google entered into revenue share agreements with various MNOs that split Android Market revenue between app developers, MNOs, and Google. Under these arrangements, app developers typically received 70% of a given purchase, while MNOs received 25%, and Google received the remaining 5% for its "operating and transaction costs." Google understood that this 25% revenue share for MNOs "Provide[d] an incentive for operators to distribute Android Market" by "offset[ing the] opportunity cost" of giving up their siloed app distribution channels. Google also gave separate revenue shares to some OEMs and MNOs through Mobile Search revenue sharing agreements and eventually gave select OEMs Android Market revenue shares.

133.    Google ultimately provided separate revenue shares to both OEMs and MNOs to help protect the increasing revenue from the Google Play Store. By 2016, for example, Google had approved RSA spend of approximately "15% of Total Search Distribution Revenue via Android."

134.    At times Google's revenue share agreements with OEMs have outright prohibited the preloading of competing app stores, apart from OEM or MNO-branded stores in some cases. Google knew that these revenue shares would work with the MADA's default placement requirement to ensure that any OEM or MNO-branded app stores would pose no real competitive threat to the Play Store, foreclose third-party app stores from the vital distribution channel of preloading, and give the Play Store effective exclusivity. For instance, a 2014 email from a senior Google executive regarding negotiations with an OEM stated that "MADA gets us default home screen placement for Play store" while the "revenue share deal gets us exclusivity for Play store (but 'Company may distribute its own or its customers' branded Alternative Store'[)]."

135.    But, by mid-2019, Google recognized that "Android dynamics changed" and that "Play revenue" faced "higher exposure." To meet this challenge, Google required a multiprong approach which included: (1) offering substantially higher revenue shares through a new tier called "Google Forward"—which required Google Play Store exclusivity; (2) a separate, even more costly agreement, with the primary threat to Google's app distribution monopoly—

Samsung, which Google initially dubbed project "Banyan,"; and (3) pay-offs to key app developers that might work with Samsung, or with another app distribution competitor, which Google called project "Hug."

### F.   Google Disincentivizes the Creation of Competing App Stores with Payments to and Restrictive Contracts with Potential Competitors

#### 1.   Google Offered to Buy Off Samsung to Keep It from Developing Its Competing App Store

136.     Google understands that dominating the Android App Distribution Market is critical to retaining monopoly profits from app distribution. As discussed above, though Google's exclusionary conduct covers all the dominant OEMs and MNOs that build or distribute Android devices, in recent years, Google recognized that one OEM, Samsung, was "the only OEM with sufficient share to plausibly build its own store in key Play markets." A March 2019 Google Play presentation identifies "incorporat[ing] Play protections into OEM rev share contracts (primarily Samsung)" as a solution to risks posed by alternate stores to Play's business.

137.     Samsung is the dominant manufacturer of Android devices in the United States. Samsung devices now make up approximately 60% of Android devices in the United States,[9] and an even higher proportion of premium Android devices, *i.e.*, those costing over $600. Google felt deeply threatened when Samsung began to revamp its own app store, the Samsung Galaxy Store. Historically, Samsung's app store had performed poorly, and Samsung had sought out deeper integrations with the Play Store to distribute Samsung-specific apps. Google estimated that users spent only 3% of the time on the Samsung Galaxy Store that they spent on the Google Play Store, and that the Galaxy Store did not cannibalize the Play Store's revenue. But the Google team feared Samsung's ability to add "exclusive hit-titles," such as high-end games, on the Galaxy Store. In 2018, Samsung partnered directly with top game developer Epic

---

[9] *Mobile Vendor Market Share United States Of America* (May 2020 - May 2021), STATCOUNTER, https://gs.statcounter.com/vendor-market-share/mobile/united-states-of-america.

to launch the mobile version of Epic's ultra-popular game Fortnite exclusively on the Samsung Galaxy Store. Epic's bypassing of the Play Store led to lost revenues that Google estimated at $300 million. This exclusive agreement threatened Google on multiple fronts. First, it represented an attempt by Samsung to build out its app store by competing on substantially more generous terms for top app developers. Second, Samsung was allowing Epic to launch not merely an app in its store, but also an app installer that would allow Epic in the future to offer content directly to its customers.

138.    Samsung also pursued exclusive deals with other popular app developers such as Riot Games, Activision, and Blizzard. At the same time, Samsung indicated its intent to place the Samsung Galaxy Store on the home screen of its next generation of devices, threatening the Play Store's exclusive home screen placement advantage.

139.    Google saw any nascent competition from the Galaxy Store in Android app distribution as a threat it needed to preemptively quash. It immediately launched multiple coordinated initiatives designed to block the emergence of a competing Galaxy Store by preventing Samsung from developing any meaningful app distribution relationship with developers or end users. One such initiative, Project Hug, focused on "relationship with at risk top dev[elopers]" and attempted to cement the dependence of popular mobile games on Google's proprietary ecosystem to discourage any dealings with Samsung (see Section I.F.2 below). In parallel, a second set of initiatives aimed at convincing Samsung to abandon its "stated desire to 'own customer relationship.'" Project Banyan—later renamed Project Agave—was a direct attempt to pay Samsung to abandon relationships with top developers and scale back competition through the Samsung Galaxy Store. Google viewed these projects as an integrated approach to eliminating the threat of more developers following Epic's lead by either partnering with Samsung or distributing directly to consumers through sideloading (see Figure 4). Project Hug and Project Banyan/Agave were complementary, self-reinforcing, and balanced against each other. When discussing the best ways to "defend[] Play," Google assessed which project would provide the "best ROI" and "what the best use of that dollar [was]."

140.     Google was willing to offer Samsung myriad benefits and concessions in order to prevent Samsung's Galaxy Store from being built out. According to Google, Samsung was interested in discussing "how the stores can collaborate." With Project Banyan, Google initially proposed paying Samsung a sum of money; in return, Samsung would give up its direct commercial relationships in app distribution with consumers and developers. Google estimated that this financial incentive would be lower than Google's net revenue loss from Samsung's competition, but higher than Samsung's immediate economic benefits from additional app distribution, and thereby would "help Samsung's services revenue goal and justify deprioritizing the Galaxy Store." At the same time, Google would obtain "additional 'gets' for Android and not 'divulge' Play business economics." These "additional gets" would include Google Play Store exclusivity on the default home screen and the adoption of Android game device standards devised by Google. To curtail Samsung's desire and ability to cultivate independent relationships with developers, Google also considered additional product offers, such as:

(1) transforming the Galaxy Store into Google Play's partner for delivering apps to users (Google offered this option so that Samsung would "[g]ive[] up end-user and developer commercial relationship");

(2) promoting Samsung-exclusive game content, deals, and events on Google Play Store and YouTube (Google assessed that "content exclusives" were "fine," whereas "title exclusives" were "more problematic" as they increased the Galaxy Store's competitive value); and

(3) integrating the Galaxy Store as an AdMob advertising publisher (Google intended to "push [Samsung] not to build an ad sales team" directly interfacing with developers).

With these proposals, Google also fostered Samsung's "tighter and long-term integration with Play" to make competition in Android app distribution less attractive to Samsung.

141.    Project Banyan was scheduled for implementation between 2019 and early 2020, when Samsung's broader 2017 revenue share agreement was due for renewal. However, when Google initially made the proposal to Samsung in June 2019, Samsung "was relatively clear that the amounts that [Google] proposed . . . were too low and signaled that a rev-share would be more appropriate."

142.    At the same time, Google was aware that if Samsung actually saw Google's returns from control of the Google Play Store, it would be harder to keep Samsung from competing in the app distribution market. Google employees repeatedly emphasized the need to "avoid divulging Play business economics and YoY growth" to OEMs, including Samsung. As a practice, Google generally prefers to negotiate a fixed dollar amount with OEMs as opposed to agreeing on a revenue share percentage, to avoid the "optics of a small percentage" figure and the substantial "financial impact of small percentage point increases." Google foresaw that Samsung would want a Play Store revenue share percentage as opposed to a lump sum. As a countermeasure, Google prepared to combine Samsung's Search revenue share with its Play Store revenue share in order to "obfuscate Play business margins" when it presented its offer to Samsung. Given the information asymmetry between Samsung and Google, Samsung is dependent on Google's declaration of its Play Store revenues to calculate the revenue share that it is entitled to, pursuant to its Revenue Share Agreement.

143.    Project Banyan negotiations between Samsung and Google eventually came to a halt. By July 2019, Google's business team terminated Project Banyan and embarked on a new effort titled "Project Agave."

144.    Central to the Agave proposal was the offer to pay Samsung a percentage of net revenues. That proposal would directly disincentivize Samsung from seeking to add popular

titles from the Play Store to the Galaxy Store or to partner with developers on exclusive new titles for the Galaxy Store.

145.    Agave also included a proposal to provide a platform to Samsung. Any app that is fulfilled by this platform would be subject to Google Play's terms and policies and all Store Services user interfaces would be co-branded with Google Play. If adopted, this proposal would make the Samsung Galaxy Store essentially a white label for Google's app distribution services, eliminating a nascent competitor.

146.    Google's overarching scheme to maintain its monopoly in the Android App Distribution Market is laid bare by its repeated direct overtures. With Projects Banyan and Agave, Google intended to pay its most threatening competitor to stop competing.

### 2. Google Bought Off Key App Developers to Stifle Competition in the Android App Distribution Market

147.    To support Projects Banyan and Agave, Google also bought off key app developers to deter them from making their apps available outside the Google Play Store, either through direct distribution or through competing app stores. To do so, Google shared its monopoly profits by providing these app developers in-kind services and adding distribution restrictions through an addendum to the DDA. Google coined this strategy Project Hug, aptly derived from "Bear Hug."

148.     Figure 4 depicts Google's buyoffs of Samsung and the app developers as two sides of its overarching scheme: "Hug reduces the risk of the Samsung scenario, but [without Projects Banyan and Agave] significant risk remains."



**Figure 4**

149.     Google feared that key app developers might have strong enough relationships with customers and enough brand recognition to attempt to distribute their apps outside the Play Store—either through launches with other app stores or through sideloading. If they did so, smaller developers might follow, and consumer interest in alternative app stores or consumer comfort with sideloading might increase as a result.

150.     As a direct consequence of Epic bypassing the Play Store with its Fortnite mobile launch in 2018 (see Section I.F.1 above), Google anticipated that the potential concentration of a few top app developers could "create[] disintermediation threats to Google Play and Android." Google quantified the "downstream impact" of Epic's decision as "550M (up to $3.6B) potential

revenue loss if broad contagion to other developers." For Google, the worst-case scenario was that "Fortnite may legitimize 'Samsung' store & 3rd party stores; fragmenting app distribution on Android." This threat is what Google described internally as "contagion"—to Google, competition in app distribution is a virus to be eliminated.

151.    Google also understood that if app developers were to grow powerful enough and discontented enough, they could threaten Google's lucrative model by drawing the attention of regulators. Staff felt that "[r]egulatory wise: the only way to shore up our business is to be CONSISTENT...If no one complains (ie we don't make a change) there's a chance regulators will poke at inconsistencies, but it's made more likely when developers complain, which will be more likely if we make a change(?)"

152.    As shown in the Google internal presentation excerpted in Figure 5, Google viewed its Agave, Hug, and other projects, as well as its extension of its anticompetitive IAP tie to subscription streaming and major dating apps (see Section II.D), as parts of a unified strategy to lock key app developers into the Play Store and combat the "[g]rowing reach of 3P [app] stores."



**Figure 5**

153.     According to Google, the Hug program succeeded in keeping another major app developer, Riot, from following Epic's lead and launching an app that would be distributed outside the Play Store. Google saw Project Hug's overarching purpose as an "insurance policy" to protect Play Store revenues by "De-risking 3P[third party] stores" while allowing Google to "hold the line on 30%." By the end of 2020, approximately 20 top app developers had agreed to Google's buyoff.

### G.   Anticompetitive Effects in the Android App Distribution Market

154.     Google's anticompetitive conduct forecloses competition in the Android App Distribution Market, causing anticompetitive harm and antitrust injury to consumers, app developers, and competing Android app stores. Google's anticompetitive practices stifle innovation, limit choice, raise prices, depress output, and reduce developer profits.

155.     Consumers participate directly in the market for Android App Distribution (as direct purchasers), and Google's anticompetitive restrictions are aimed squarely at and cause harm in that market. Irrespective of whether some of Google's restraints are more directly imposed on other market participants, the harm to consumers is an inevitable and primary intended consequence: Google places restraints on OEMs and developers specifically to prevent consumers from using alternative app distribution channels—which the restrained parties would otherwise be well-positioned to create—and to impose its supracompetitive commission on consumers.

156.     Google's anticompetitive conduct harms consumers by, *inter alia*, impeding competition among app distributors, which would otherwise innovate new models of app distribution and offer consumers alternatives to the Google Play Store. Consumers are limited to the Play Store, where Google controls which apps are featured, identified, or prioritized in user searches. For example, Amazon created an innovative new model of app distribution and monetization through Amazon Underground, which allowed Amazon to pay developers directly based on the amount of time that consumers spent interacting with apps. However, Amazon Underground was eventually shuttered because of Google's restrictions on the distribution of app stores (including its restrictions on sideloading). Loss of such innovation and choice directly harms consumers in the Android App Distribution Market.

157.     Consumers are also harmed by Google's anticompetitive practices by way of increased prices and reduced output. As explained above, Google imposes a supracompetitive commission of up to 30% on the purchase price of apps sold through the Google Play Store, which is much higher than would exist in a market unimpaired by Google's anticompetitive conduct. For example, in the face of competition, Google charges substantially lower fees on its Chrome Web Store at only 5% of each app download.

158.     In addition, developers are harmed by Google's conduct. Without Google's supracompetitive commission, consumers would purchase more apps and digital content, and developers would earn greater profits.

159.     Developers also lose the opportunity to select from multiple viable options for distributing their apps, which would likely lead to greater sales and better distribution options.

160.     For example, competition for app distribution could encourage app stores to create more innovative ways for developers to advertise or for consumers to discover new apps they may enjoy. Competition might also encourage app stores to specialize for certain segments—like education, games, fitness, career development, and others—which would make niche apps more discoverable. Instead, to attract users, many app developers must also purchase Google's Play Store (and other) advertisements, further reducing developers' potential profits.

## II.   Google Has Unlawfully Maintained a Monopoly in the Android In-App Payment Processing Market

161.     Google coerces developers into exclusively using its services in the separate market for Android in-app payment processing for digital content, hereafter referred to as the IAP Processing Market.

### A.   Google Has Unlawfully Tied Google Play Billing to the Google Play Store

162.     As a condition of distribution through the Google Play Store, Google requires app developers to exclusively use Google Play Billing, Google's in-app payment processor, to process all in-app purchases of digital content. Digital content means all products and services consumed in the app as opposed to tangible goods and services consumed outside the digital environment, which must use a payment processor other than Google Play Billing.

163.     Google requires app developers to enter its standardized DDA as a condition of having their apps distributed through the Google Play Store. The DDA unlawfully ties use of Google's in-app payment processor to distribution through the Google Play Store. It also constitutes an unlawful exclusive-dealing arrangement.

164.     Under Section 3.2 of the DDA, developers are required to enter into a separate agreement with Google Payment, a Google subsidiary that is not part of Google's Play Store business unit, to use Google Play Billing for all digital content sold in apps downloaded through the Play Store.

165.     Further, Section 4.1 of the DDA requires that app developers comply with Google's Developer Program Policies. Those policies require that "1. Developers charging for apps and downloads from Google Play must use Google [Play Billing] as the method of payment. 2. Play-distributed apps must use Google [Play Billing] as the method of payment if they require or accept payment for access to features or services, including any app functionality, digital content or goods." By contrast, Google's policies require that developers may not use Google Play Billing to process payments "for the purchase or rental of physical goods (such as groceries, clothing, housewares, electronics); for the purchase of physical services (such as transportation services, cleaning services, airfare, gym memberships, food delivery, tickets for live events); or a remittance in respect of a credit card bill or utility bill (such as cable and telecommunications services)." "[F]or physical products and services," Google's policies require a payment processor other than Google Play Billing.

166.     Furthermore, for payments subject to Google's requirement to use Google Play Billing, developers are prohibited from "lead[ing] users to a payment method other than Google [Play Billing]." This provision bars developers from linking to a website or other service that would process payments more cheaply. The restrictions are comprehensive: "Within an app, developers may not lead users to a payment method other than Google Play's billing system. This includes directly linking to a webpage that could lead to an alternate payment method or using language that encourages a user to purchase the digital item outside of the app."

167.     Together, these provisions make Google Play Billing the only in-app payment processor that an Android developer may use for digital content within Android apps. As explained more fully below, Google's contractual tie of Google Play Billing to Google Play Services illegally maintains its monopoly in the IAP Processing Market.

**B. Google Uses Its Unlawful Tie to Maintain its Monopoly in the IAP Processing Market**

**1. The IAP Processing Market is a Relevant Antitrust Market**

168.   There exists a relevant antitrust market for in-app payment processing services for digital content within Android apps, the IAP Processing Market.

169.   Payment processing services consist of software employed by merchants that performs the necessary steps to verify and accept (or decline) a customer's purchase (or attempted purchase). Payment processing services frequently provide additional customer-facing functionalities such as invoicing, payment history, and refund processing.

170.   The IAP Processing Market comprises (i) Google Play Billing and (ii) alternative payment processing services that, absent Google's illegal tie, Android developers could employ to process payments for in-app digital content. Such competitors or potential competitors include PayPal, Braintree, Adyen, WorldPay, Chase Limited, and proprietary payment processing software written by app developers. These alternatives would enter the IAP Processing Market, but for Google's anticompetitive tie. Indeed, Google is now forcing these alternatives *out* of the market as to digital streaming services, to which Google is currently extending its unlawful tie (Section II.D).

171.   The ability to make quick, seamless purchases within an app itself is critical to the consumer's experience and to the likelihood of purchase. If a consumer were required to purchase digital content only outside the mobile app, that user might simply abandon the purchase or stop interacting with the app altogether. And in-app purchases are critical to app developers: the revenue generated from in-app purchases is substantially greater than the revenue generated by pay-to-download apps.

172.   Accordingly, app developers seek to make their in-app purchase experience as frictionless as possible. Users similarly seek to consummate in-app transactions with the least interruption of their use of the app. A payment processing product that requires the user to exit an app to complete a transaction cannot substitute for one that consummates transactions within

SECOND AMENDED COMPLAINT                    57

the app. The more friction and time a payment requires, the less likely a consumer is to complete the transaction. Developers and consumers alike would not regard a payment processing product that required exiting the app as reasonably interchangeable with payment processors that support in-app payment.

173.    In particular, purchasing through a developer's website is not a substitute for in-app payment processing. Not only would this require the user to exit the app, but Google's policies prohibit developers from referring or directing users to websites for payment outside the app environment.

174.    Moreover, the IAP Processing Market is distinct from app distribution, as they are separate products and separate demand exists for each.

175.    In other digital ecosystems, payment and distribution services are routinely sold separately. In fact, Google already allows this within the Android mobile ecosystem: Android app developers may use a third-party payment processor like Adyen, PayPal, and Braintree for in-app purchases of physical products and out-of-app services such as those offered through Amazon, Airbnb, and Uber.[10] For in-app purchases of digital content, however, app developers must use Google Play Billing as their exclusive payment processor if they wish to distribute their apps through the Google Play Store.

176.    Moreover, tying together these two distinct services—app distribution and in app-payment processing—is not technologically necessary. Third-party payment companies operate safely and effectively in other digital and real-world ecosystems, including, for example, desktop computers and in-app purchases of physical goods. Companies like PayPal and Braintree offer payment processing at a significantly lower price than Google Play Billing. These major payment processors have all aligned on the same fee (to the cent), 2.9% + 30 cents, which is ten times lower than Google Play Billing's 30% supracompetitive commission. These companies also compete on various dimensions of convenience, speed, security, privacy, and customer

---

[10] The developer may also use a proprietary payment solution.

service. Google, in contrast, faces no competitive pressure to provide consumers quality

customer service or meaningful privacy protections from its own data harvesting.

177.     Android developers often choose to use a competitor, rather than Google's

offerings, for their payment processing where Google's enforcement practices permit, as with in-

app purchases of streaming services.[11] Google's competitors typically offer far lower costs, more

favorable terms of service, more timely payment to merchants, more payment method options

(e.g., Apple Pay, Venmo, bank transfer), and more freedom to set prices than Google offers.

These competitors' products could readily be adapted (or continue to be permitted) for use in the

IAP Processing Market, i.e., for in-app purchases of Android digital content. Google's unlawful

contracts and policies are the primary reason these competitors have negligible market share

right now. Third-party payment processors stand ready to compete, but Google's illegal tying

arrangement prevents them from doing so.

178.     Consumers are largely unaware of Google's tie, face high information costs in

learning about it, and do not provide informed consent to it when purchasing an Android device.

Further, consumers who purchased Android devices prior to Google's September 2020

announcement to developers that streaming services would be forced to use Google Play

Billing—which is far from a forthright disclosure to consumers of Google's monopolistic

commission and foreclosure of competition—could not possibly have known that Google's tie

would affect their future purchases of streaming service subscriptions and content from Google

Play apps.

179.     Insofar as the IAP Processing Market is or may be a two-sided market, Google's

anticompetitive tie harms both consumers and developers. Google's restraints also reduce overall

output by eliminating alternative avenues for IAP payment processing that consumers and

developers would otherwise use. Rather than competing on the merits, and creating more

---

[11] See Section II.D, which describes Google's recent policy change expanding its tie to content
streaming services.

SECOND AMENDED COMPLAINT                    59

efficient, innovative, or less expensive payment processing, Google simply blocks its competitive threats.

### 2. The Relevant Geographic Market for IAP Processing is Worldwide or, Alternatively, the United States

180.    The geographic scope of both the tying (Android App Distribution) and tied (IAP Processing) Markets is worldwide (excluding China). Alternatively, the geographic scope of both the tying and tied markets is the United States.

181.    Because the Google Play Store and Google Play Billing both operate across all states and involve transactions between consumers and developers in different states, this illegal tying substantially affects interstate commerce in the tied market.

### 3. Google Has Monopoly Power in the IAP Processing Market

182.    Google possesses monopoly power in the IAP Processing Market. It enjoys a market share exceeding 90% (consistent with Google's market share for Android app distribution), and it can set prices and exclude competitors at will.

183.    Google's monopoly power in the IAP Processing Market is a result of its monopoly power over Android app distribution combined with its unlawful contractual requirement that Android app developers distributing on the Play Store must use Google Play Billing to process payments for digital content.

184.    By its nature, this monopoly power is durable, because Google's unlawful tie of Google Play Billing to the Google Play Store, and its monopoly power in the Android App Distribution Market, deter any significant entry into the market. Together, these pose insurmountable barriers to entry.

185.    Android app developers and consumers have no meaningful alternative to the Google Play Store (see Section I above), and Google's unlawful tie of the Google Play Store to Google Play Billing means they have no meaningful alternative to Google Play Billing either. App developers and consumers thus have no choices in the Android App Distribution Market to discipline Google's misconduct and overreach in the IAP Processing Market.

186.     App developers cannot feasibly use proprietary payment processing solutions as they have no workarounds to Google's policies. Developers that have attempted to compete with Google Play Billing by offering their own payment services for in-app payment processing have been removed from the Google Play Store (as was Epic Games' app Fortnite). The threat of removal from the Google Play Store prevents other app developers from attempting the same. Any developer that wishes to distribute an app to Android users is therefore forced to use Google's app distribution and in-app payment services, or it will lose efficient access to nearly all the users of the approximately 130 million Android devices in the United States.

### 4.   Google's IAP Processing Tie is Not Necessary to Incentivize its Investment in the Play Store or Android

187.     Google's tie is not necessary for it to reap significant profits from the Google Play Store and the Android ecosystem, nor for it to continue to invest in the quality of these products. Google's core business model for Android is to collect detailed personal data from Android users and monetize that data through targeted advertising. Part of "the core assignment of the Play team … is defense of Android (& thus Search revenue)," a longtime Google engineer wrote in 2020. As early as 2010, Google's CEO claimed that "Android is likely to be financially successful to Google without even any of the applications that are possible." This was because of Google Search revenues Android would generate: "Android puts smart phones in more peoples [sic] hands…. What do they do when they get these phones? Search…. So this is how Android is profitable for Google." The CEO was correct: less than a decade later, "Search made up ~78% of overall [Android] Search and Play 2018 revenues," which totaled some $32 billion.

188.     Google earns substantial revenues from other digital advertising as well: the display advertising it sells on third-party sites; ads within the Google-owned-and-operated apps it mandates that OEMs preinstall; ads within the Play Store; and Google's AdMob, which is among the most popular services app developers use to monetize through advertising. The latter two earn Google billions of dollars solely from or via app developers, and app developers spend billions on Google's other advertising channels to reach consumers.

189.     Nor is the tie necessary to prevent "free riding" by app developers as to distribution via the Google Play Store. In fact, Google's current model encourages free riding. Among the apps that benefit from being on the Google Play Store but do not sell digital goods are many categories of very valuable commercial apps such as, for example, those used by banks and other financial institutions, brokerages, insurance companies, and real estate services to interact with customers, in addition to those apps that sell billions of dollars of physical goods (e.g., Amazon), services (e.g., Uber), or advertising (e.g., Facebook). Google could elect to charge a reasonable fee for the Google Play Store's distribution services, but it does not. Instead, it reaps a monopolistic windfall from Android in-app payments—a commission overwhelmingly paid by consumers of a small subset of highly popular apps, most of them games, that use an in-app payment monetization model.

190.     The tie creates enormous profit margins for the Play Store, even if one considers only direct revenue and not the various other ways Google profits from Android. In 2019, the Play Store collected $11.2 billion in overall revenue and booked $8.5 billion in "Gross Profit" and $7 billion in "Operating Income"—an operating margin of over 62% that combines IAP revenue with Play Ads revenue.

### C. The Origin and Rates of Google's Supracompetitive Commission Illustrate that Google Sets Prices at Will

191.     The bounds of Google's in-app payments policy, and the commission rate Google charges on IAP processing, are not the result of the technical interdependence of Android app distribution and in-app payments, competitive pressure, or other commercial considerations. Rather, they are entirely a function of Google's power in the marketplace.

192.     Google's monopoly power in the IAP Processing Market is evident from its ability to unilaterally set the price for its services at will, unconstrained by competitive forces.

193.     Google has acknowledged that its monopolistic profits from Google Play Billing are derived not from a fair exchange of value with developers and consumers, but rather from its ability to hold the line on its supracompetitive commission by tamping down competition in the

Android app distribution and IAP processing markets. When contemplating Google's commission, one employee asked "[w]here does the 30% rev share number come from," and another responded, "pretty sure Steve Jobs just made it up for itunes."

194.    Similarly, Google appears uncomfortable with its own exploitative commission: "We want to feel good about the rev share that we charge—have it make sense to us. And it feels like there's discomfort with what we are charging." Google's internal meeting minutes further note, "[W]e would probably have a stronger backbone if we felt secure about the value exchange."

195.    By contrast, in the Google Chrome Web Store, Google's app store for its personal computer version of the Chrome browser—where Google faces competition—Google charges a commission of only 5% per transaction for consumer purchases of digital content.

196.    Similarly, when determining a viable price for Google's payment processing for subscription streaming services accessed not through Android apps but through Google Search, Google staff suggested that a 5% commission would be appropriate due to considerations such as competition from Stripe, noting that developers "can already use payment platforms like Stripe at 2-4%." Google even discussed branding its billing services differently (as "GPay" instead of "Google Play") in order to limit "contagion."

197.    In its payment policies, Google offers no rationale for why the payment services it provides for digital content justify its supracompetitive 30% fee, nor any rationale for why sales of physical content are exempt from its supracompetitive fee.

**D.  Google's IAP Processing Monopoly Harms Competing Streaming and Other Subscription Services**

198.    For years, Google has tried to enforce its commission on third-party providers of streaming and other subscription services. Having failed with the carrot of more favorable pricing for major streaming services like Netflix, Hulu, and Spotify—and other subscription services like Tinder and LinkedIn—Google turned to the stick of its exclusive payment processor contractual provisions.

199.    On September 28, 2020, Google publicly announced that, effective September 30, 2021, it would require content streaming and other subscription services to use Google Play Billing for their subscriptions.

200.    Google's policy effective prior to September 2020 expressly exempted from its Google Play Billing requirement cases where "Payment is for digital content that may be consumed outside of the app itself (e.g. songs that can be played on other music players)." But as further discussed in Section III.C below, Google claimed its September 28, 2020 policy change was a mere "clarification" of a "long standing policy" that had always been in place.

201.    The September 2020 policy change gives Google an unfair and overwhelming competitive advantage against streaming service developers who offer similar subscription services to Google.

202.    To conform with Google's new policy, these services must either (1) offer an Android app in which consumers pay Google's 30% commission for subscriptions purchased through that app; or (2) offer only a "streaming only" (non-transactional) version of the app in the Google Play Store, which per Google's terms cannot even inform consumers of the option to purchase a subscription elsewhere or direct them outside the app for payment.

203.    In addition to the competitive advantage it already enjoys from its subscription streaming apps being preloaded on every Android device, Google will also be positioned to gain market information about its streaming competitors and their customers.

204.    Offering a "streaming only" app—one of the two options under the September 2020 policy—would have disastrous consequences for many streaming services.

205.    A "freemium" music streaming service like Spotify, for example, offers a "free," ad-supported version of its service. Though the user base of the ad-supported service is typically large, the service earns a small percentage of its revenue from those users. The large majority of its revenue comes from the smaller number of users who purchase a premium monthly subscription which features no ads. Running a profitable service requires converting many users of the "free" version into paid subscribers.

206.     The vast majority of streamed music is now consumed on mobile devices. Thus, a music streaming service typically has no effective communication channel with its subscribers apart from the app from which they purchased their subscriptions. By prohibiting a "streaming only" music app to provide potential subscribers with information about and an opportunity to purchase a premium subscription, Google can drastically raise the service's cost of acquiring customers and foreclose it from acquiring a substantial number of potential customers altogether. The "choice" Google imposes is between being significantly foreclosed from acquiring customers or making its customers pay Google's huge commission.

207.     As Spotify, one of the world's most popular music streaming services that nevertheless has persistent operating losses, stated in its 2020 20-F securities filing:

> [W]here the owner of a platform is also our direct competitor, the platform may attempt to use this position to affect our access to users and ability to compete. … [O]nline platforms may force us to use the platform's payment processing systems that may be inferior to, and more costly than, other payment processing services available in the market.

208.     Google's conduct is especially injurious to competition in music streaming because those businesses must pay 65% or more of their revenues in royalties to the rights holders in the music they stream. Google's premium music streaming offerings will thus gain a significant, unfair competitive advantage over Spotify and similar services. For Google, the monopolistic expansion of its IAP processing tie is a win-win: Google will either take a huge portion of the streaming services' profits if they capitulate to the illegal tie, or it will poach many of their subscribers or potential subscribers if they do not. Regardless, Google's IAP monopoly will grow in scope and strength.

209.     Google is well aware that its policy change—a sudden imposition of its anticompetitive IAP tie on major subscription streaming services that helped Android grow its user base, to Google's benefit—will result in higher prices and diminished sales for competitors in music and video streaming.

210.     Google's recent decision to change its policy and require subscription-based digital content purchased through an app to be paid for using Google Play Billing thus poses a grave threat to streaming and other subscription-based businesses and will likely lead to reduced consumer choice, less innovation, and higher prices.

### E. Google's Unlawful Tie Has Led to Anticompetitive Effects in the IAP Processing Market

211.     Google Play Store has a monopoly in the Android App Distribution Market. By requiring that apps purchased through the Google Play Store also use Google Play Billing for the purchase of digital content within apps, Google has illegally engaged in tying and exclusive dealing, extending its monopoly to the IAP Processing Market. Google's anticompetitive conduct has demonstrable anticompetitive effects on the IAP Processing Market that harm competition and injure app developers, payment processors, and consumers.

212.     Google's supracompetitive commission on in-app purchases raises prices for consumers, reduces profits for app developers, and chills the market for app development and digital content development by making digital content less profitable.

213.     Google could not maintain this extravagant commission in a competitive market free from Google's illegal tying, exclusive dealing, and other anticompetitive conduct. The fee is an order of magnitude higher than fees for platforms in which there is competition for electronic payment processing.

214.     Without Google's exclusive-dealing mandate, developers would have more options for in-app payment processing; with the potential for higher profits, app developers could dedicate more money to research and development, marketing, and creating new apps, further increasing output.

215.     By requiring that apps purchased through the Play Store use Google Play Billing for the purchase of digital content, developers lose features like the following, which are not offered by Google Play Billing but are available through app developers' own proprietary payment systems or processors like Adyen and WorldPay:

a.  Key information about failed consumer IAP transactions, such as the specific reason for the failure (e.g., insufficient funds). Google Play Billing indicates only that a problem exists with the transaction without further description.

b.  Features that minimize "involuntary churn," or the inadvertent loss of users through short-term credit card issues such as a credit card expiring or being put on hold.

c.  Data indicating that a given consumer card has been recently used successfully with other merchants. This data can increase an app developer's confidence that the consumer is likely to pay.

d.  Free trial services. Some app developers want to offer free trial experiences periodically (a feature available through some non-Google payment processors), but Google Play Billing allows only one free trial service per lifetime per product.

e.  Customized cancellation experiences. When a user discontinues in-app subscriptions (for example, after finding a job with a job-seeking app or finding a dating partner with a dating app), developers would like to learn about the user's decision to discontinue and, where appropriate, upsell the user. Google Play Billing does not permit developers flexibility to gather this information or offer additional services.

216.   Acknowledging the inferiority of Google Play Billing relative to one of its competitors, a Google executive stated during an internal meeting, "Our billing doesn't perform as well as their billing."

217.   In a competitive market for in-app payment processing, developers could create their own payment infrastructure, or accept third party payment processing—just as retailers accept different types of payment including credit, debit, and prepaid cards. Developers could offer payment systems based on alternative currencies or billing to cell phone carriers. These innovations are foreclosed by Google's anticompetitive contractual requirements.

218.     Indeed, native and third-party payment processing products can be better tailored to developers' needs. Absent Google's exclusive-dealing requirements, app developers could compete in the IAP Processing Market themselves or partner with third-party payment processors that charge a fraction of what Google extracts. This would allow developers to offer not only competitive pricing but also a variety of payment options tailored to their users' needs. For example, in many countries outside the United States, users can purchase pre-paid "Paysafecards" in convenience stores that can then be used to purchase in-game content in Fortnite without connecting to a credit card or bank account. Developers like Netflix and Epic have the best information on their own business models and are thus best placed to select their own payment processing solutions.

219.     Google's anticompetitive conduct harms potential payment processing competitors who would otherwise be able to innovate and offer developers and consumers alternative payment processing tools that provide better functionality, lower prices, and better security, but are barred from entering the IAP Processing Market. Because Google prevents them from accessing a large portion of the market, their sales and profits are also lower than they would be but for Google's conduct.

220.     Google also harms consumers and developers by preventing information flows regarding the availability of lower-priced payment options for in-app purchases and app subscriptions (see Section I.D.3 above for a description of the DDA). Google's policies gag app developers from efficiently informing consumers about better deals, meaning developers are forced to incur great costs to communicate through other means. Developers whose only relationship with their customers is through their app are effectively foreclosed from providing this information. Communication through an app is low-cost and efficient. But Google stops any such communication that threatens its IAP processing monopoly, thus distorting the competitive process and harming consumers, many of whom are unable to learn about better deals.

221.     There are no procompetitive efficiencies from Google's tie of distribution and payment processing services that outweigh the harm to consumers, developers, and potentially

SECOND AMENDED COMPLAINT                    68

competitive payment processors. All market participants are harmed by Google's forced intermediation of in-app payments.

222.     While Google defends the tie by citing security concerns, security is equally important to payment systems for both digital and physical content, and yet Google locks in Google Play Billing only for digital content. Further, there are many highly secure and reliable payment processing systems that are used on computers. If Google were truly concerned about security, it would simply require that payment processors use reasonable technical security protocols. Instead, Google's internal strategy around pricing and policy for in-app payments reveals that its invocation of security concerns is simply a public-relations strategy—a means of justifying Google's anticompetitive conduct as opposed to a genuine security concern.

223.     Google's tie of app distribution through the Google Play Store with developers' exclusive use of Google Play Billing to process in-app purchases of digital content also enables Google to gather information on consumers making in-app purchases, thereby harming consumers who would otherwise have the choice to use payment processors that do not share their information with Google. There are no welfare-enhancing or otherwise legitimate justifications for this tie. Any security or consistency that Google can offer consumers in the payment processing market can still be offered in a competitive market, at a competitive price. Nor does Google need to monetize the Play Store in this manner in order to maintain the Android ecosystem at large.

224.     In short, Google has used its monopolistic control over the Android App Distribution Market to force developers to use Google Play Billing as their exclusive in-app payment processor. Google thus deprives consumers of choice among in-app payment options and of the benefits of competitive pricing and innovation in payment services for in-app purchases of digital content.

225.     In addition, Google's supracompetitive commission—and the resulting increased prices for in-app purchases—likely deters some consumers from making purchases and reduces app developers' profitability for purchases that consumers do make, therefore depriving app

developers of resources they could use to develop new apps and content. Developers are harmed by profits lost from Google's imposition of a supracompetitive commission, and by the inability to offer efficient, inexpensive in-app purchase options that are integrated into the app itself, which would increase demand. Other payment processors are harmed by the inability to offer payment processing services in competition with Google Play Billing.

226.    Consumers (including natural persons) are direct purchasers of services from Google in the Android App Distribution Market and in the IAP Processing Market. Consumers are direct purchasers of apps and in-app digital content sold through the Google Play Store. When consumers purchase Android apps, they do so directly from the Google Play Store and pay Google directly, using their credit card or other payment method. When consumers purchase in-app digital content, they do so through the Google Play Store, using the pre-established payment streams set up when purchasing that app or other apps on the Play Store. When consumers purchase the in-app digital content, they pay Google directly.

227.    Consumers must enter into a contractual agreement with Google to use Google Play Billing. In its interlocking series of consumer contracts and terms (which it unilaterally changes at will), Google does not disclose its huge IAP commission of up to 30%, nor does it disclose its foreclosure of competition in the IAP Processing Market. On the contrary, Google's fee disclosures state that it charges $0 for nearly all transactions, and fractions of a percentage point for others. This is despite the fact that, as a matter of law, consumers as direct purchasers pay the entirety of Google's IAP commission. Insofar as Google makes *any* disclosure of its IAP processing tie and foreclosure, nearly all consumers are unaware of them and have not knowingly consented to them.

228.    The tie is imposed in the antitrust market where consumers participate and are harmed—the IAP Processing Market.

### III.    Google is Engaging in Unfair and Deceptive Conduct that Harms Consumers

229.    In addition to the anticompetitive and monopolistic conduct described above, Google has repeatedly engaged in unfair, fraudulent, and/or deceptive conduct regarding the

Google Play Store. This includes, *inter alia*, numerous statements Google has made about the Google Play Store that have had, and continue to have, the capacity, tendency, or effect of deceiving or misleading consumers and/or app developers.

**A. Google's False or Misleading Statements About Sideloading Apps Constitute Unfair and Deceptive Conduct**

230.     As explained in more detail in Section I.D.1 above, Google uses a series of technological barriers and pretextual warnings that are designed to prevent users from sideloading (i.e., directly downloading) Android apps and app stores onto their Android devices. Google's website promotes the misleading and overbroad premise that it is harmful to download apps from "unknown" sources, which includes every source other than the Play Store. In particular, Google's website states under the heading *Download apps from other sources*: "Important: If you download apps from unknown sources, your phone and personal information can be at risk. Your phone could get damaged or lose data. Your personal information could be harmed or hacked."

231.     Google's pretextual security claims regarding the dangers of sideloaded apps have the capacity, tendency, or effect of deceiving or misleading consumers and/or app developers. Google acknowledges that the security settings and warnings associated with sideloading limit even mainstream, non-malicious apps and app stores, such as the Amazon Appstore and Fortnite, from reaching Android users. Yet Google makes no effort to differentiate harmful apps and app stores from the rest and instead labels all non-Play Store apps and app stores as harmful.

232.     In addition to posting warnings on its website, Google takes the following steps when users attempt to sideload apps and/or app stores to their devices:

> (1) it displays an ominous warning that the installation file "can harm your device;"
>
> (2) it blocks the attempted download and states that "your phone is not allowed to install unknown apps from this source," presenting the user with two options only—"Cancel" or "Settings"—with no

indication that installation is possible through the "Settings" option; and

(3) it warns the user that his "phone and personal data are more vulnerable to attack by" the "unknown app," and requires the user to select a feature by which he agrees that he is "responsible for any damage" to the phone "or loss of data that may result" from the installation, warnings that are designed to scare the user into abandoning the attempt.

In other contexts, Google labels sideloaded apps and app stores like Aptoide "UNSAFE."

233.    Google represents to users that it is looking out for their best interests. On its website, Google claims that it "analyzes every app that it can find on the internet" and categorizes a subset of them as "Potentially Harmful Applications," or PHAs. If it finds a PHA on a user's device, it directs actions against the PHA or automatically disables the PHA for the user. Additionally, it tells users that Android is "secure to the core," and that "we guard each app at the operating system level, so other apps won't snoop on what you do."

234.    These representations would lead users to believe Google when it displays warnings that the apps or app stores they are attempting to sideload are "unknown," harmful, and could damage their devices. Despite its claims of Android's superior security, Google purposefully deceives users by presenting warnings that falsely describe highly popular apps from well-known developers as an "unknown app," which gives the user the false or misleading impression that apps and app stores downloaded from any source other than the Play Store are PHAs or that they are otherwise harmful.

235.    Google displays these misleading warnings in order to ensure that users exclusively use the Play Store to download apps and thus keep users within Google's walled garden. Google's statements regarding the dangers of sideloading were knowingly false when made.

**B. Google's False or Misleading Statements About "Openness" Constitute Unfair and Deceptive Conduct**

236.     In 2008, Google launched the Google Play Store's predecessor, Android Market, which at the time offered fewer than fifty apps. Android Market was distributed as part of the open-source Android OS, and it became the de facto app store on early Android devices. Google described Android Market as "an open content distribution system" similar to YouTube. In August 2008, Google informed the public through its Android blog: "We chose the term 'market' rather than 'store' because we feel that developers should have an open and unobstructed environment to make their content available."

237.     Early on, Google had a suite of partnership agreements with OEMs and MNOs. These partners negotiated with Google for different degrees of control over Google's proprietary app pre-loading, app placement, and user experience. OEMs had bargaining power because they chose which OS to install on devices and whether to distribute Google's proprietary apps, including Android Market. MNOs had bargaining power because they could customize devices, preinstall apps and app stores, and offer "direct carrier billing" for Android Market purchases, which allows purchases to be charged to a user's mobile phone bill.

238.     Google assured MNOs, OEMs, and consumers that it would operate Android Market as an "open system" for the benefit of Google's partners and app developers. For example, in a November 2009 communication with a Samsung representative, a high-level Google executive pledged:

> We certainly believe that a single "app store" is an essential piece of the strategy to make the overall Android ecosystem successful, and we are putting significant investment into making Android Market that single *open* distribution system. That will maximize distribution and revenue to developers, maximize the applications available to every Android-compatible device, and drive value for the operators (as we will offer revenue-share). Google operates Android Market as a revenue-neutral service—we do not seek to profit off of application sales, and we invest in Market because it is essential to the open ecosystem.

239.     Google also pledged to consumers that the Android source code was an "open-source platform" that was "available for anyone to view, download, modify, enhance, and redistribute."

240.     Google understood early on that its promise of Android's "openness" and revenue sharing largesse were key to securing critical mass for Android Market, and that it could later use that dominance to control the Android ecosystem. Google documents from this period indicate that Google's "openness" commitments to OEMs and MNOs were knowingly false when made and were material to Google's obtaining a monopoly in app distribution.

241.     Google promised repeatedly that Android would be the basis for an "open" ecosystem in which industry participants could freely compete, and, in Google's words, have "[f]ull control of [their] brand and business." For instance, in August 2008, Google informed the public through its Android blog that developers should have "an open and unobstructed environment to make their content available." In a 2009 presentation, a Google executive answered the question "Why don't we license Android?" by stating, "We need the highly-fragmented mobile industry [to] adopt Android. You can't beat free." The executive posed another question, "Why not take a rev-share on Market?" The answer: "We don't have a dominant market position right now."

242.     In 2010, Google stated that "Google was historically seen as a threat to operators [MNOs], [in that] giving up control was a key component of operators adopting Android." But, "If we gave it away, how can we ensure we get to benefit from it?" The answer lay in controlling the app store—Android Market and, later, the Google Play Store. "We created the first app store for Android and it got critical mass quickly. The store now has value and partners want access to it because of the number of apps available." Google intended to "Own the ecosystem [it] enabled" by using the app store.

243.     Looking back in 2019, Google recognized that: "[t]he novelty of smartphones and apps, combined with a material utility advantage relative to the Web, gave Apple and Android an

opportunity to define new *closed* Internet ecosystems. These new closed ecosystems centralized Content distribution via app stores…[and] payments via app store services" (emphasis added).

244.    To own the ecosystem, Google intended to "[s]et the rules." Having driven adoption of Android by promising an open platform outside its control, Google intended to close the ecosystem once it had the power to do so.

245.    Closing the ecosystem also empowered Google to claim a larger share of the revenue generated through the distribution of Android apps through its app store. To do this, however, Google had to renege on its repeated assurances that Android Market operated as revenue-neutral—promises that had been a key factor in driving adoption of Google's app store.

246.    Google understood that its ostensible "partners" would not be happy with its bait-and-switch tactic. Nonetheless, Google launched the branded Google Play Store in 2012 and ran it for its own benefit, not for that of the "Android ecosystem."[12] Breaking its promises to operate the Play Store in a revenue-neutral manner for the benefit of the ecosystem allowed Google to capitalize on the lucrative revenue stream coming from app purchases.

247.    Google operates the Play Store as a closed system despite its repeated representations that such a system would be open for the benefit of Google's partners and app developers. Google's knowingly false statements regarding its intention to keep the Play Store and its predecessor open had the capacity, tendency, and/or effect of deceiving or misleading consumers and app developers.

### C.   Google's Statements and Conduct Regarding Google Play Billing Constitute Unfair and Deceptive Conduct

248.    As described more fully in Section II above, Google tied Google Play Billing to use of the Google Play Store in order to force users and developers to use Google Play Billing to process payments for all digital content purchased (i.e., "in-app purchases") and thus pay Google's supracompetitive commission. Even when lower-priced alternatives are available, such

---

[12] Jamie Rosenberg, *Introducing Google Play: All your entertainment, anywhere you go*, GOOGLE OFFICIAL BLOG (March 6, 2012), https://googleblog.blogspot.com/2012/03/introducing-google-play-all-your.html.

as through an app developer's website, Google gags app developers by prohibiting them from informing their users of the other lower-priced options.

249.    Google also made false and misleading statements regarding its in-app purchase billing policies. Google's policy effective prior to September of 2020 expressly exempts from its Google Play Billing requirement cases where "Payment is for digital content that may be consumed outside of the app itself (e.g. songs that can be played on other music players)." On September 28, 2020, however, Google announced that effective September 30, 2021, it would require content streaming services such as Netflix and Spotify to use Google Play Billing for their subscription services. Google publicly claimed that this was simply a "clarification" of the intention of a "long standing policy" in response to "feedback that our policy language could be more clear regarding which types of transactions require the use of Google Play's billing system, and that the current language was causing confusion." Google also claimed that "this isn't new" and that it had "*always* required developers … to use Google Play's billing system if they offer in-app purchases of digital goods, and pay a service fee from a percentage of the purchase." Google's statements about its prior billing policies were false and misleading with respect to streaming services, which were expressly exempt under the prior policy.

250.    Consumers have been harmed as a result of Google's unfair conduct. They are harmed because Google forces them to pay a supracompetitive commission of up to 30% to purchase any app other than those that are "free-to-download."

251.    Google actively gags app developers by prohibiting them from informing their consumers about the 30% commission and the possibility of obtaining lower prices through alternative channels. It does this by preventing information flows regarding the availability of lower-priced payment options for in-app purchases of digital content and app subscriptions (see Section I.D.3 above for a description of the DDA). Google's policies gag app developers from efficiently informing consumers about better deals, meaning developers are forced to incur significant costs to communicate through other means. Developers whose only relationship with their customers is through their apps are effectively foreclosed from providing this information.

Communication through an app is low-cost and efficient. But Google stops any such communication, thereby harming consumers, many of whom are unlikely to learn about better deals.

252.    In addition, Google's conduct harms consumers by depriving them of the potential benefits of true competition in app distribution, including better services like enhanced app discovery features or improved data security. The effects of Google's supracompetitive commission impede developers from researching, developing, and bringing to market innovative new apps, resulting in further lost profits for them and less innovation and choice for consumers.

253.    Google's conduct also impedes competition among app distributors, who would otherwise innovate new models of app distribution and provide consumers with alternatives to the Google Play Store. This limits consumers' ability to discover new apps of interest to them. Consumers are left to search among millions of apps in one monopolized app store, where Google controls which apps are featured, identified, or prioritized in user searches.

254.    Google defends its tie of Google Play Billing by citing security concerns, but those assertions are false and misleading. Security is equally important to payment systems for both digital and physical content, and yet Google requires the use of Google Play Billing for digital content only. If Google were genuinely concerned about security, it would simply require that payment processors use reasonable technical security protocols—similar to the highly secure and reliable payment processing systems used on personal computers.

255.    Instead, Google's internal strategy around pricing and policy for in-app payments reveals that its claimed security concerns are simply a public-relations strategy.

256.    Consumers and app developers have actually and reasonably relied on Google's actions and false representations to their detriment. Moreover, Google knows that its conduct is harmful to developers and users. As such, Google's false representations have had and continue to have the tendency or effect of deceiving or misleading consumers or app developers.

# VIOLATIONS ALLEGED

## *First Cause of Action: Sherman Act § 2 Monopoly Maintenance in the Android App Distribution Market*

### *(Against all Defendants except Google Payment)*

257.    Plaintiff States repeat and reallege every preceding allegation of this Complaint as if fully set forth herein.

258.    This cause of action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

259.    Google has monopoly power in the Android App Distribution Market and/or, alternatively, the Mobile App Distribution Market.

260.    Google has unlawfully maintained its monopoly power through the conditions that it has placed on the licensing of the Android trademark, Google Play Store and other Google services, including but not limited to Anti-Fragmentation Agreements and Android Compatibility Commitments with original equipment manufacturers and mobile network operators, Mobile Application Distribution Agreements with OEMs, Developer Distribution Agreements with app developers, and revenue share agreements with OEMs and MNOs. These conditions provide the Google Play Store with preferential placement on mobile devices and treatment by manufacturers, limit the distribution of Android apps through means other than the Google Play Store, impose technological obstacles on both OEMs and app developers, and deter manufacturers, carriers, and developers from developing or implementing competing app stores.

261.    Google's conduct has substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation and quality of service, and lowered output of apps.

262.    Google's conduct affects a substantial volume of interstate commerce.

263.    Google has engaged in a continuous course of unlawful anticompetitive conduct.

264.    There are no procompetitive justifications for Google's conduct. Alternatively, to the extent that any such procompetitive benefits exist, they are outweighed by the

SECOND AMENDED COMPLAINT                78

anticompetitive effects of Google's conduct and could have been achieved through less anticompetitive and less harmful means.

265.    Google's anticompetitive conduct has harmed competition and harmed the general economies and a substantial number of residents of the Plaintiff States in a manner the antitrust laws were intended to prevent. Residents of the Plaintiff States have paid more for Android apps than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff State residents were further injured because Google's establishment and maintenance of supracompetitive pricing has caused a reduction in the output, supply, quality, and innovation of Android apps, all of which would have been more abundant in a competitive market.

266.    As a result of Google's anticompetitive conduct, Plaintiff States and their residents and general economies have suffered and continue to suffer damages. Additionally, Plaintiff States have suffered and continue to suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct. Plaintiff States have a quasi-sovereign interest in preventing illegal anticompetitive conduct affecting a large number of their residents and the economy of the State generally.

### Second Cause of Action: Sherman Act § 1 Unreasonable Restraints of Trade Concerning Android App Distribution: OEMs

#### (Against all Defendants except Google Payment)

267.    Plaintiff States repeat and reallege every preceding allegation of this Complaint as if fully set forth herein.

268.    This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

269.    Google entered into agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market (or alternatively, the Mobile App

Distribution Market). These include anti-forking agreements, MADAs, and other agreements with OEMs that condition their access to the Google Play Store and other "must have" Google services on the OEM's agreement to offer the Google Play Store as the primary (and often only) app store on Android mobile devices.

270.   Google's conduct has substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation and quality of service, and reduced output of apps.

271.   These agreements serve no legitimate or procompetitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Distribution Market (or alternatively, the Mobile App Distribution Market). Alternatively, to the extent that these agreements provide any procompetitive benefits, those benefits are outweighed by the anticompetitive effects of the agreements and could have been achieved through less anticompetitive and less harmful means.

272.   Google's conduct affects a substantial volume of interstate commerce.

273.   Google has engaged in a continuous course of unlawful anticompetitive conduct.

274.   Google's anticompetitive conduct has harmed competition and harmed the general economies and a substantial number of residents of the Plaintiff States in a manner the antitrust laws were intended to prevent. Residents of the Plaintiff States have paid more for Android apps than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff State residents were further injured because Google's establishment and maintenance of supracompetitive pricing has caused a reduction in the output and supply of Android apps, which would have been more abundantly available in a competitive market.

275.   As a result of Google's anticompetitive conduct, Plaintiff States and their residents and general economies have suffered and continue to suffer damages. Additionally, Plaintiff States have suffered and continue to suffer irreparable injury for which no adequate

1    remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct.

2    Plaintiff States have a quasi-sovereign interest in preventing illegal anticompetitive conduct

3    affecting a large number of their residents and the economy of the State generally.

4    ***Third Cause of Action: Sherman Act § 1 Unreasonable Restraints of Trade Concerning***
       ***Android App Distribution: App Developers***

5

6                       ***(Against all Defendants except Google Payment)***

7        276.    Plaintiff States repeat and reallege every preceding allegation of this Complaint as

8    if fully set forth herein.

9        277.    This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. §

10   1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy,

11   in restraint of trade or commerce among the several States, or with foreign nations."

12       278.    Google compels app developers to enter its standardized DDA, including

13   Developer Program Policies and Addenda integrated into that Agreement, as a condition of their

14   apps being distributed through the Google Play Store. The relevant provisions of these

15   agreements unreasonably restrain competition in the Android App Distribution Market (or

16   alternatively, the Mobile App Distribution Market) by prohibiting or discouraging developers

17   from offering apps that compete with the Google Play Store and/or from distributing apps on

18   platforms that compete with the Google Play Store. Google also requires Android app developers

19   to distribute their apps on the Google Play Store if they wish to participate in Google's App

20   Campaigns program—a critical program for many app developers.

21       279.    Google's conduct has substantial anticompetitive effects, including increased

22   prices to consumers and costs to developers, reduced innovation and quality of service, and

23   reduced output of apps.

24       280.    These agreements serve no legitimate or procompetitive purpose that could justify

25   their anticompetitive effects, and thus unreasonably restrain competition in the Android App

26   Distribution Market (or alternatively, the Mobile App Distribution Market). Alternatively, to the

27   extent that these agreements provide any procompetitive benefits, those benefits are outweighed

28

by the anticompetitive effects of the agreements and could have been achieved through less anticompetitive and less harmful means.

281.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

282.    Google has engaged in a continuous course of unlawful anticompetitive conduct.

283.    Google's anticompetitive conduct has harmed competition and harmed the general economies and a substantial number of residents of the Plaintiff States in a manner the antitrust laws were intended to prevent. Residents of the Plaintiff States have paid more for Android apps than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff State residents were further injured because Google's establishment and maintenance of supracompetitive pricing has caused a reduction in the output and supply of Android apps, which would have been more abundantly available in a competitive market.

284.    As a result of Google's anticompetitive conduct, Plaintiff States and their residents and general economies have suffered and continue to suffer damages. Additionally, Plaintiff States have suffered and continue to suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct. Plaintiff States have a quasi-sovereign interest in preventing illegal anticompetitive conduct affecting a large number of their residents and the economy of the State generally.

### Fourth Cause of Action: Sherman Act § 1 Unlawful Tying of Google Play Billing to Use of Google Play Store

#### (Against all Defendants)

285.    Plaintiff States repeat and reallege every preceding allegation of this Complaint as if fully set forth herein.

286.     This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. §
1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy,
in restraint of trade or commerce among the several States, or with foreign nations."

287.     Google has illegally tied its in-app payment services to its app distribution
services by requiring any app distributed through the Google Play Store to use Google Play
Billing for any in-app payments for digital content. Through its Developer Program Policies and
DDAs with app developers, Google has contractually ensured that developers cannot offer
consumers in-app payment services other than Google's.

288.     The Google Play Store and Google Play Billing are separate products in separate
markets. These two products can be sold separately, and there is demand for separate products on
the part of both consumers and developers. In other digital ecosystems such as Mac and PC
personal computers, applications can and do offer multiple payment options or develop their own
payment services. Even within the Android ecosystem, payment services for physical products
and services are decoupled from app distribution.

289.     Google has coerced developers into using its in-app payment services by
leveraging its market power in the relevant tying market for Android App Distribution (or
alternatively, the Mobile App Distribution Market). As evidence of that market power, Android
users download well over 90% of Android-compatible mobile apps through the Google Play
Store.

290.     The purpose and effect of this tie is to prevent developers from offering different
in-app payment services. As a result, Google can charge a supracompetitive price of up to 30%
for its payment services, which results in higher costs to consumers of in-app digital content.
That cost also reduces app developers' capacity to invest in and create additional apps and in-app
content that would otherwise benefit consumers.

291.     Other third-party payment services offer pricing at less than one tenth of Google's
supracompetitive price but are foreclosed from offering their services within apps that are
distributed through the Google Play Store.

292.     There are no procompetitive efficiencies from this tie that outweigh the harm to consumers. App developers and app users are each harmed by Google's forced intermediation of in-app payment processing. Alternatively, to the extent that any such procompetitive benefits exist, they are outweighed by the anticompetitive effects of Google's conduct and could have been achieved through less anticompetitive and less harmful means.

293.     This illegal tying substantially affects interstate commerce in the tied market.

294.     Google has engaged in a continuous course of unlawful anticompetitive conduct.

295.     Google's anticompetitive conduct has harmed competition and harmed the general economies and a substantial number of residents of the Plaintiff States in a manner the antitrust laws were intended to prevent. Residents of the Plaintiff States have paid more for Android apps and in-app purchases than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff State residents were further injured because Google's establishment and maintenance of supracompetitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

296.     As a result of Google's anticompetitive conduct, Plaintiff States and their residents and general economies have suffered and continue to suffer damages. Additionally, Plaintiff States have suffered and continue to suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct. Plaintiff States have a quasi-sovereign interest in preventing illegal anticompetitive conduct affecting a large number of their residents and the economy of the State generally.

297.     Google has thus engaged in a *per se* illegal tying arrangement; the Court does not need to assess the anticompetitive effects of Google's conduct or its purported justifications. In the alternative only, even if Google's conduct does not constitute a per se illegal tie, an analysis of Google's tying arrangement demonstrates that it violates the rule of reason and is illegal.

### Fifth Cause of Action: Sherman Act § 2 Monopoly Maintenance in the In-App Payment Processing Market

#### (Against all Defendants)

298.     Plaintiff States repeat and reallege every preceding allegation of this Complaint as if fully set forth herein.

299.     This cause of action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

300.     The IAP Processing Market worldwide (excluding China) or, alternatively, within the United States, is the product and geographic market relevant to this claim.

301.     Google has monopoly power in the IAP Processing Market through Google Play Billing.

302.     Google has unlawfully maintained that monopoly power through the conduct and contractual relationships described above.

303.     Google's conduct has substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation and quality of service, and lowered output of apps.

304.     Google's conduct affects a substantial volume of interstate commerce.

305.     Google has engaged in a continuous course of unlawful anticompetitive conduct.

306.     There are no procompetitive justifications for Google's conduct. Alternatively, to the extent that any such procompetitive benefits exist, they are outweighed by the anticompetitive effects of Google's conduct and could have been achieved through less anticompetitive and less harmful means.

307.     Google's anticompetitive conduct has harmed competition and harmed the general economies and a substantial number of residents of the Plaintiff States in a manner the antitrust laws were intended to prevent. Residents of the Plaintiff States have paid more for Android apps and in-app purchases than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play

Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff State residents were further injured because Google's establishment and maintenance of supracompetitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

308.    As a result of Google's anticompetitive conduct, Plaintiff States and their residents and general economies have suffered and continue to suffer damages. Additionally, Plaintiff States have suffered and continue to suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct. Plaintiff States have a quasi-sovereign interest in preventing illegal anticompetitive conduct affecting a large number of their residents and the economy of the State generally.

### Sixth Cause of Action: Sherman Act § 1 Unreasonable Restraints of Trade in the In-App Payment Processing Market

#### (Against all Defendants)

309.    Plaintiff States repeat and reallege every preceding allegation of this Complaint as if fully set forth herein.

310.    This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

311.    Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through the Google Play Store. The relevant provisions of these agreements unreasonably restrain competition in the IAP Processing Market.

312.    Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Google Payment, in order to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases of digital content. Further, compliance with Google's Developer Program Policies,

which Section 4.1 of the DDA makes obligatory, requires that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases. Google's Developer Program Policies exclude only certain, limited types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself."

313.    Google's conduct has substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation and quality of service, and reduced output of apps.

314.    Google's conduct affects a substantial volume of interstate commerce.

315.    Google has engaged in a continuous course of unlawful anticompetitive conduct.

316.    There are no procompetitive justifications for Google's conduct. Alternatively, to the extent that any such procompetitive benefits exist, they are outweighed by the anticompetitive effects of Google's conduct and could have been achieved through less anticompetitive and less harmful means.

317.    Google's anticompetitive conduct has harmed competition and harmed the general economies and a substantial number of residents of the Plaintiff States in a manner the antitrust laws were intended to prevent. Residents of the Plaintiff States have paid more for Android apps and in-app purchases than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff State residents were further injured because Google's establishment and maintenance of supracompetitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

318.    As a result of Google's anticompetitive conduct, Plaintiff States and their residents and general economies have suffered and continue to suffer damages. Additionally, Plaintiff States have suffered and continue to suffer irreparable injury for which no adequate

remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct. Plaintiff States have a quasi-sovereign interest in preventing illegal anticompetitive conduct affecting a large number of their residents and the economy of the State generally.

### *Seventh Cause of Action: Sherman Act § 1 Unlawful Exclusive Dealing in the In-App Payment Processing Market*

#### *(Against all Defendants)*

319.     Plaintiff States repeat and reallege every preceding allegation of this Complaint as if fully set forth herein.

320.     This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

321.     Google maintains a monopoly in the Android App Distribution Market, where the Google Play Store commands a market share of well over 90%.  Alternatively, Google enjoys market power in the Mobile App Distribution Market.

322.     Google requires app developers to enter into its standardized DDA, including Google's Developer Program Policies integrated into the DDA, as a condition of having their apps distributed through the Google Play Store.

323.     Section 3.2 of the DDA requires that developers enter into a separate agreement with Google's payment processor, Google Payment, to receive payment for apps distributed through the Google Play Store as well as payments for in-app purchases of digital content.

324.     Section 4.1 of the DDA obligates developers to adhere to Google's Developer Program Policies. Those policies state that apps distributed through the Google Play Store "must use Google Play Billing [offered by Google Payment] as the method of payment" for in-app purchases. While there are limited exceptions to this rule, Google expressly applies its exclusive-dealing mandate to digital content, every "game downloaded on Google Play" and to all purchased "game content."

325.     Through these provisions, the DDA requires developers to deal exclusively with Google Payment for almost all in-app payment processing services for digital content.

326.     Because Google maintains a monopoly in the Android App Distribution Market and requires developers to use only Google Payment for payment processing services if they wish to access that market, Google also maintains monopoly power in the IAP Processing Market. Given its greater than 90% market share in the Android App Distribution Market, Google is believed, and therefore alleged, to have a similar 90% or more market share in the IAP Processing Market.  Alternatively, Google exercises market power in the Mobile App Distribution Market, which allows it to exercise and maintain power in, and an over 90% share of, the IAP Processing Market.

327.     The DDA prevents any third-party payment processor or developer from processing in-app payments for digital content on apps distributed through the Google Play Store, and well over 90% of apps on Android devices are distributed through the Google Play Store. Therefore, Google's exclusive in-app payment processing arrangement with developers forecloses competition in a substantial share of the IAP Processing Market.

328.     Google's exclusive-dealing arrangement has substantial anticompetitive effects, including:

   a.  preventing competing payment processors, including third-party payment processors and app developers, from accessing any meaningful portion of the IAP Processing Market,

   b.  allowing Google to charge a supracompetitive commission of up to 30% on all in-app purchases for digital content in the market,

   c.  deterring consumers from making purchases because of the supracompetitive commission Google folds into each transaction,

   d.  deterring developers from developing new apps and from investing funds to create high-quality apps because of the supracompetitive commission Google folds into each transaction, and

e.   inhibiting innovation in payment processing services because competitors cannot access the market and challenge Google's current product with new, more innovative payment processing services.

329.   Google's conduct affects a substantial volume of interstate commerce.

330.   Google has engaged in a continuous course of unlawful anticompetitive conduct.

331.   There are no procompetitive justifications for Google's conduct. Alternatively, to the extent that any such procompetitive benefits exist, they are outweighed by the anticompetitive effects of Google's conduct and could have been achieved through less anticompetitive and less harmful means.

332.   Google's anticompetitive conduct has harmed competition and harmed the general economies and a substantial number of residents of the Plaintiff States in a manner the antitrust laws were intended to prevent. Residents of the Plaintiff States have paid more for Android apps and in-app purchases than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff State residents were further injured because Google's establishment and maintenance of supracompetitive pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.

333.   As a result of Google's anticompetitive conduct, Plaintiff States and their residents and general economies have suffered and continue to suffer damages. Additionally, Plaintiff States have suffered and continue to suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct. Plaintiff States have a quasi-sovereign interest in preventing illegal anticompetitive conduct affecting a large number of their residents and the economy of the State generally.

***Eighth Cause of Action: State-Specific Claims***

***(Against all Defendants)***

**Alaska**

334.    The State of Alaska repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

335.    The acts alleged in Causes of Action 1 – 7 also constitute antitrust violations pursuant to the Alaska Restraint of Trade Act, AS 45.50.562 - .596

336.    Alaska seeks all remedies available under federal law and the Alaska Restraint of Trade Act, AS 45.50.562 - .596, including, without limitation, the following:

    a.    Pursuant to AS 45.50.577, monetary relief on behalf of persons doing business or residing in the state under *parens patriae* authority, for injuries directly or indirectly sustained by reason of any violation of AS 45.50.562 - .570;

    b.    An award, as monetary relief, three times the total damage sustained as described in AS 45.50.577(a) and (b);

    c.    Injunctive and other equitable relief, including restitution, pursuant to AS 45.50.580;

    d.    Civil penalties pursuant to AS 45.50.578(b), which provides that the Court may impose a civil penalty in an amount up to $50,000,000;

    e.    Costs and attorney's fees pursuant to AS 45.50.577(d); and

    f.    Other remedies as the court may deem appropriate under the facts and circumstances of the case.

337.    The acts alleged in Section III of the Complaint also constitute violations of the Alaska Unfair Trade Practices and Consumer Protection Act, AS 45.50.471, *et. seq*. ("AUTPCPA").

338.    Specifically, Google violated AS 45.50.471(b)(11) and (b)(12) by misleading, deceiving, and damaging Alaskans. Among other things, Google omitted material facts, namely its anti-competitive conduct, knowing this would harm Alaskans.

339.     Alaska seeks all remedies available under the AUTPCPA including, without limitation, the following:

    a.   Injunctive and other equitable relief, including restitution, pursuant to AS 45.50.501;

    b.   Pursuant to AS 45.50.551, a civil penalty of not less than $1,000 and not more than $25,000 for each violation of AS 45.50.471;

    c.   Costs and attorney's fees pursuant to AS 45.50.537(d); and

    d.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Arizona**

340.     The state of Arizona repeats and realleges every preceding allegation of this Complaint.

341.     The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to Arizona Revised Statutes ("A.R.S.") § 44-1401 *et seq*.

342.     Arizona seeks all remedies available under federal law or A.R.S. § 44-1401 *et seq*. including, without limitation, the following:

    a.   Injunctive relief, civil penalties, other equitable relief (including but not limited to disgorgement), fees and costs, and such other relief as this Court deems just and equitable pursuant to A.R.S. §§ 44-1407 and 1408;

    b.   Civil penalties pursuant to A.R.S. § 44-1407 which provides that: "The court may assess for the benefit of the state a civil penalty of not more than one hundred fifty thousand dollars for each violation of this article.";

    c.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

343.     The conduct described in the preceding paragraphs of this Complaint constitutes deception, deceptive or unfair acts or practices, fraud, false pretenses, false promises, misrepresentations, or concealment, suppression or omission of material facts with intent that

others rely on such concealment, suppression or omission, in connection with the sale or advertisement of merchandise in violation of A.R.S. §§ 44-1521 to -1534, including, but not limited to:

    a.   Defendants engaged in unfair acts and practices by tying Google Play Billing to the use of Google Play Store, thereby forcing app developers to use Google Play Billing to process in-app payments;

    b.   Defendants engaged in deceptive and unfair acts and practices by falsely representing that the Android OS was "open," when in fact Google shut down and sought to "own" the Android ecosystem as soon as it was feasible to do so, effectively trapping consumers and app developers in that ecosystem;

    c.   Defendants engaged in deceptive and unfair acts and practices by concealing, suppressing, or omitting the material fact that Google planned to shut down and "own" the Android ecosystem as soon as it was feasible to do so, effectively trapping consumers and app developers in that ecosystem;

    d.   Defendants engaged in deceptive and unfair acts and practices by providing misleading warnings to consumers that falsely suggest that a direct download of an app will lead to disastrous consequences for the user and his or her device; and

    e.   Defendants engaged in deceptive and unfair acts and practices by concealing, suppressing, or omitting the material fact that a direct download of an app would not lead to disastrous consequences for the user and his or her device.

    f.   The unfair acts and practices alleged in the preceding paragraphs caused or were likely to cause substantial injury to consumers that was reasonably avoidable by consumers and was not outweighed by countervailing benefits to consumers or to competition.

    g.   With respect to the concealments, suppressions, or omissions of material fact described above, Defendants did so with intent that others rely on such concealments, suppressions, or omissions; and

h. Defendants' violations of the Arizona Consumer Fraud Act were willful, in that they knew or should have known that their conduct was of the nature prohibited by A.R.S. § 44-1522.

344. Arizona seeks all remedies available under the Arizona Consumer Fraud Act including, without limitation, the following:

a. Disgorgement and restitution pursuant to A.R.S. § 44-1528;

b. Injunctive and other equitable relief pursuant to A.R.S. § 44-1528;

c. Civil penalties pursuant to A.R.S. § 44-1531(A), which provides that for every willful violation, "the attorney general… may recover from the person on behalf of the state a civil penalty of not more than ten thousand dollars per violation";

d. Costs and attorney's fees pursuant to A.R.S. § 44-1534;

e. Pre-judgment and post-judgment interest pursuant to A.R.S. § 44-1201; and

f. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Arkansas**

345. The State of Arkansas repeats and re-alleges every preceding allegation of this Complaint as if fully set forth herein.

346. The acts alleged in causes of action 1-7 constitute antitrust violations pursuant to The Arkansas Unfair Practices Act § 4-75-201 *et seq.* and Arkansas law on Monopolies § 4-75-301 *et seq.*

347. The State of Arkansas seeks all remedies available under the Arkansas Antitrust Act including, without limitation, the following:

a. Actual damages pursuant to Ark. Code Ann. § 4-75-212(a)(3) and § 4-75-315(a)(3);

b. Restitution for loss incurred either directly or indirectly pursuant to Ark. Code Ann. § 4-75-212(a)(3) and § 4-75-315(a)(3);

c. Injunctive and other equitable relief pursuant to Ark. Code Ann. § 4-75-212 (a)(4) and § 4-75-315(a)(4);

d. Civil penalties of up to one thousand dollars ($1,000) per violation, costs, and attorney's fees pursuant to Ark. Code Ann. § 4-75-212(a)(4) and § 4-57-315(a)(4).

348.    The acts and practices alleged in Section III of this Complaint constitute unfair methods of competition in violation of The Arkansas Deceptive and Unfair Trade Practices Act, Ark. Code Ann. § 4-88-100 *et seq.*

349.    The State of Arkansas seeks all remedies available under The Arkansas Deceptive and Unfair Trade Practices Act, including, without limitation, the following:

a. Damages for consumers, pursuant to Ark. Code Ann. § 4-88-113;

b. Injunctive and other equitable relief pursuant to Ark Code Ann. § 4-88-113;

c. Civil penalties up to $10,000 per violation pursuant to Ark. Code Ann. § 4-88-113(a)(3);

d. Attorney's fees, expenses, and costs pursuant to Ark. Code Ann. § 4-88-113(e).

**California**

350.    The State of California repeats and realleges every preceding allegation of this Complaint.

351.    Google's acts and practices detailed above violate California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. See id. §§ 16720, 16726.

352.    Google's acts and practices detailed above also violate California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits any unlawful, unfair, or fraudulent business act or practice.

353.    In bringing its state claims, Plaintiff State of California is entitled to, without limitation, the following:

    a.   Injunctive and equitable relief in the form of disgorgement of Defendants' ill-gotten gains under the Cartwright Act (Cal. Bus. & Prof. Code § 16750, *et seq.*);

    b.   As *parens patriae*, treble damages with interest, on behalf of natural persons residing in the State of California, in an amount according to proof (Cal. Bus. & Prof. Code § 16760);

    c.   Injunctive, restitution and other equitable relief under the UCL (Cal. Bus. & Prof. Code § 17203);

    d.   Civil penalties assessed at up to $2,500 for each violation of the UCL (Cal. Bus. & Prof. Code § 17206); and

    e.   Costs of suit, including reasonable attorney's fees, and such other relief as may be just and equitable (Cal. Bus. & Prof. Code §§ 16750, 16754, 16754.5, and 16760).

**Colorado**

354.    The state of Colorado repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

355.    The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Colorado Antitrust Acts of 1992 and 2023, Colo. Rev. Stat. § 6-4-101, *et seq.*

356.    Colorado seeks all remedies available under federal law or the Colorado Antitrust Acts of 1992 and 2023, Colo. Rev. Stat. § 6-4-101, *et seq*., including, without limitation, the following:

    a.   Damages for natural persons under *parens patriae* authority, pursuant to Colo. Rev. Stat. § 6-4-112(3)(a);

    b.   Injunctive and other equitable relief, including disgorgement and restitution, pursuant to Colo. Rev. Stat. § 6-4-112(1);

    c.   Civil penalties pursuant to Colo. Rev. Stat. § 6-4-113(1);

    d.   Costs and attorney's fees pursuant to Colo. Rev. Stat. § 6-4-112(4); and

    e.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

357.     The acts alleged in Section III of the Complaint also violate the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et. seq*. Google's acts and practices constitute deceptive trade practices and violate § 6-1-105(1), including but not limited to § 6-1-105(1)(e), (i), (n), and (kkk).

358.     Colorado seeks all remedies available under the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et. seq*., including, without limitation, the following:

       a.   Injunctive and other equitable relief, including disgorgement and restitution, pursuant to Colo. Rev. Stat. § 6-1-110(1);

       b.   Civil penalties pursuant to Colo. Rev. Stat. § 6-1-112, which provides for civil penalties in an amount up to $20,000 per violation pursuant to Colo. Rev. Stat. § 6-1-112(1)(a), or $50,000 per violation pursuant to Colo. Rev. Stat. § 6-1-112(1)(c);

       c.   Costs and attorney's fees pursuant to Colo. Rev. Stat. § 6-1-113(4); and

       d.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

359.     Colorado does not seek damages on behalf of any governmental or public entity.

**<u>Connecticut</u>**

360.     The State of Connecticut repeats and realleges each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

361.     Defendants' actions as alleged herein violate the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-26 and 35-28, in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of Connecticut and elsewhere.

362.     Defendants' actions as alleged herein have damaged, directly and indirectly, the prosperity, welfare, and general economy of the State of Connecticut and the economic wellbeing of a substantial portion of the People of the State of Connecticut and its citizens and businesses at large.

363.     Plaintiff State of Connecticut seeks recovery of such damages as parens patriae on behalf of the State of Connecticut and the People of the State of Connecticut pursuant to Conn. Gen. Stat. § 35-32(c)(2).

364.     Defendants' actions as alleged herein also constitute unfair methods of competition and/or unfair or deceptive acts or practices in trade or commerce in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b *et seq.*

365.     Defendants knew or should have known that their conduct violated the CUTPA.

366.     The State of Connecticut seeks all remedies available under CUTPA, including, without limitation, the following:

    a.   Damages and restitution for Connecticut consumers, pursuant to Conn. Gen. Stat. § 42-110m;

    b.   Disgorgement, pursuant to Conn. Gen. Stat. § 42-110m;

    c.   Injunctive and other equitable relief, pursuant to Conn. Gen. Stat. § 42-110m;

    d.   Civil penalties for each willful violation of CUTPA committed by the Defendants, pursuant to Conn. Gen. Stat. § 42-110o;

    e.   Costs and attorney's fees, pursuant to Conn. Gen. Stat. § 42-110m; and

    f.   Other remedies as the Court may deem appropriate under the facts and circumstances of the case.

**Delaware**

367.     The State of Delaware repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

368.     The acts alleged in causes of action 2, 3, 4, 6, and 7 also constitute antitrust violations pursuant to the Delaware Antitrust Act ("DAA"), Del. Code tit. 6, § 2101 *et. seq.*.

369.     The State of Delaware seeks all remedies available under federal law or the DAA including, without limitation, the following:

    a.   Damages for natural persons under *parens patriae* authority, pursuant to Del. Code tit. 6, § 2108(b);

b.   Disgorgement and restitution pursuant to Del. Code tit. 6, § 2107;

c.   Injunctive and other equitable relief pursuant to Del. Code tit. 6, § 2107;

d.   Civil penalties pursuant to Del. Code tit. 6, § 2107 which provides for a civil penalty for the benefit of the State of not less than $1,000 nor more than $100,000 for each violation of the DAA;

e.   Costs and attorney's fees pursuant to Del. Code tit. 6, § 2108(b); and

f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**District of Columbia**

370.   The District of Columbia re-alleges and incorporates by reference the preceding paragraphs, as if set forth fully herein.

371.   The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the District of Columbia Antitrust Act, D.C. Code § 28-4501 *et seq.*

372.   The District of Columbia seeks all remedies available under federal law or District of Columbia Antitrust Act including, without limitation, the following:

a.   Damages for natural persons under *parens patriae* authority, pursuant to D.C. Code §§ 28-4507 and 28-4509;

b.   Disgorgement and restitution pursuant to D.C. Code § 28-4507;

c.   Injunctive and other equitable relief pursuant to D.C. Code § 28-4507;

d.   Civil penalties pursuant to D.C. Code § 28-4507 which provides that "[a]ny individual who knowingly commits any violation of this chapter shall be liable for civil penalties not to exceed $100,000" and "[a]ny person, other than an individual in paragraph (1) of this subsection, that knowingly commits any violation of this chapter shall be liable for civil penalties not to exceed $1 million";

e.   Costs and attorney's fees pursuant to D.C. Code § 28-4507; and

f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

373.   The acts alleged in Section III of the Complaint, in addition to the following acts, also constitute violations of the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*:

a.   The services that that Defendant offers, markets, sells, and supplies to consumers are purchased for personal, household or family purposes, and, therefore, are consumer goods and services.

b.   Defendant, in the ordinary course of business, markets, offers, sells, and supplies consumer goods and services, and is a merchant under the CPPA.

c.   Merchants who violate the CPPA may be subject to restitution, damages, civil penalties, temporary or permanent injunctions, the costs of the action, and reasonable attorneys' fees. D.C. Code § 28-3909.

d.   The CPPA prohibits any person from engaging in unfair and deceptive trade practices, including by:

i.   "misrepresent[ing] as to a material fact which has a tendency to mislead," *id.* § 28-3904(e); and

ii.   "fail[ing] to state a material fact if such failure tends to mislead," id. § 28-3904(f).

e.   Defendants' representations to consumers that sideloading apps is harmful, impossible, and/or leaves the consumer vulnerable to attack is a misrepresentation of a material fact per § 28-3904(e).

f.   Defendants' failure to inform consumers that sideloading is in fact possible on their phones is a material omission that tends to mislead in violation of D.C. Code § 28-3904(f).

374.   The District of Columbia seeks all remedies available under the District of Columbia Consumer Protection Procedures Act including, without limitation, the following:

SECOND AMENDED COMPLAINT                    100

    a.   Economic damages, pursuant to D.C. Code § 28-3909;

    b.   Restitution pursuant to D.C. Code § 28-3909;

    c.   Injunctive and other equitable relief pursuant to D.C. Code § 28-3909;

    d.   Civil penalties pursuant to D.C. Code § 28-3909;

    e.   Costs and attorney's fees pursuant to D.C. Code § 28-3909; and

    f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**<u>Florida</u>**

375.    The State of Florida repeats and re-alleges every preceding allegation of this Complaint as if fully set forth herein.

376.    The acts alleged constitute antitrust violations pursuant to The Florida Antitrust Act, Fla. Stat. § 542.15 *et seq.*

377.    The State of Florida seeks all remedies available under the Florida Antitrust Act including, without limitation, the following:

    a.   Damages for natural persons under *parens patriae* authority, pursuant to Fla. Stat. § 542.22;

    b.   Injunctive and other equitable relief pursuant to Fla. Stat. § 542.23;

    c.   Civil penalties pursuant to Fla. Stat. § 542.21 which provides that any person other than a natural person is subject to a penalty of up to $1 million and that "[a]ny person who knowingly violates any of the provisions. . .or who knowingly aids in or advises such violation, is guilty of a felony, punishable by a fine not exceeding $1 million if a corporation."

    d.   Costs and attorney's fees pursuant to Fla. Stat. § 542.23.

378.    The acts and practices alleged constitute unfair methods of competition in violation of The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204 *et seq.*

379.    Further, Defendants' actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers in the State of Florida in violation of Fla. Stat. § 501.204 *et seq.*

380.    The State of Florida seeks all remedies available under The Florida Deceptive and Unfair Trade Practices Act, including, without limitation, the following:

      a.    Damages for consumers, pursuant to Fla. Stat. § 501.207;

      b.    Disgorgement and restitution pursuant to The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204 *et seq.;*

      c.    Injunctive and other equitable relief pursuant to Fla. Stat. § 501.207;

      d.    Civil penalties pursuant to Fla. Stat. § 501.2075, which provides that anyone who engages in a willful violation "is liable for a civil penalty of not more than $10,000 for each such violation."

      e.    Costs and attorney's fees pursuant to Fla. Stat. § 501.2105.

**Idaho**

381.    The state of Idaho repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

382.    The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Idaho Competition Act, Idaho Code §§ 48-104 and 48-105.

383.    Google's conduct as alleged in the Complaint establishes that Google engages in commerce in Idaho as defined in Idaho Code § 48-103(1).

384.    Idaho seeks all remedies available under federal law or the Idaho Competition Act, Idaho Code §§ 48-108 and 48-112, including, without limitation, the following:

      a.    Damages for persons under *parens patriae* authority, pursuant to Idaho Code § 48-108(2)(a);

      b.    Disgorgement and restitution pursuant to Idaho Code §§ 48-108(1)(b) and 48-112(2) and (4);

c. Injunctive and other equitable relief pursuant to Idaho Code §§ 48-108(1)(a)-(b) and 48-112(1);

d. Civil penalties pursuant to Idaho Code § 48-108(1)(d), which provides up to $50,000 for each violation of Idaho Code §§ 48-104 and 48-105;

e. Costs and attorney's fees pursuant to Idaho Code §§ 48-108(1)(d) and 48-112; and

f. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Indiana**

385. The state of Indiana repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

386. The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to Chapter Two of the Indiana Antitrust Act, Ind. Code §§ 24-1-2-1 and 24-1-2-2.

387. Indiana seeks all remedies available under federal law or the Indiana Antitrust Act including, without limitation, the following:

a. Damages for natural persons under Indiana's *parens patriae* authority;

b. Disgorgement and restitution pursuant to Ind. Code § 24-1-2-5.1;

c. Injunctive and other equitable relief pursuant to Ind. Code § 24-1-2-5.1;

d. Costs pursuant to Ind. Code § 24-1-2-5.1; and

e. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

388. The acts alleged in Section III of the Complaint also constitute violations of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.*:

389. Indiana seeks all remedies available under the Indiana Deceptive Consumer Sales Act including, without limitation, the following:

a. Disgorgement and restitution pursuant to Ind. Code § 24-5-0.5-4(c)(2);

b. Injunctive and other equitable relief pursuant to Ind. Code § 24-5-0.5-4(c)(1);

c. Civil penalties pursuant to Ind. Code § 24-5-0.5-4(g) which provides that the attorney general may recover civil penalties for knowing violations of the Indiana Deceptive Consumer Sales Act and Ind. Code § 24-5-0.5-8 which provides that the attorney general may recover civil penalties for incurable deceptive acts done as part of a scheme, artifice, or device with intent to defraud or mislead.

d. Costs pursuant to Ind. Code § 24-5-0.5-4(c)(4); and

e. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**<u>Iowa</u>**

390.    The state of Iowa repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

391.    The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to Iowa Code Chapter 553.

392.    Iowa seeks all remedies available under federal law and under Iowa Code § 553.1 *et seq.* including, without limitation, the following:

a. Injunctive and other equitable relief, including divestiture of profits, pursuant to Iowa Code § 553.12(1);

b. Damages resulting from the conduct pursuant to § 553.12(2); and

c. Civil penalties pursuant to Iowa Code § 553.13.

393.    The acts alleged in Section III of the Complaint also constitute unfair and deceptive acts in violation of Iowa Consumer Fraud Act, Iowa Code. § 714.16 *et seq.*

394.    Iowa seeks all remedies available under the Iowa Consumer Fraud Act including, without limitation, the following:

a. Restitution for consumers pursuant to Iowa Code § 714.16(7);

b. Disgorgement pursuant to Iowa Code § 714.16(7);

c. Injunctive and other equitable relief pursuant to Iowa Code § 714.16(7);

d. Civil penalties pursuant to Iowa Code § 714.16(7) which provides that the attorney general may request "a civil penalty not to exceed forty thousand dollars per violation against a person found by the court to have engaged in a method, act, or practice declared unlawful under this section; provided, however, a course of conduct shall not be considered to be separate and different violations merely because the conduct is repeated to more than one person;

e. Costs and attorney's fees pursuant to Iowa Code § 714.16(11); and

f. Other remedies as the court may deem appropriate under the facts and circumstances of the case and pursuant to Iowa Code § 714.16(7).

**Kentucky**

395. The Commonwealth of Kentucky hereby reincorporates by reference all other paragraphs of this Complaint.

396. The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to Ky. Rev. Stat. § 367.175.

397. Defendants engaged in and are engaging in unlawful conduct in the course of trade or commerce in the Commonwealth of Kentucky, within the meaning of Ky. Rev. Stat. § 367.175, that has harmed and is harming the Commonwealth and its persons.

398. The Commonwealth of Kentucky seeks all remedies available under federal law or Kentucky law for violations of Ky. Rev. Stat. § 367.175 including, without limitation, the following:

a. Damages for its persons under *parens patriae* authority, pursuant to Ky. Rev. Stat. § 15.020, Ky. Rev. Stat. § 367.110 through Ky. Rev. Stat. § 367.990, and common law;

b. Disgorgement and restitution pursuant to Ky. Rev. Stat. § 15.020, Ky. Rev. Stat. § 367.110 through Ky. Rev. Stat. § 367.990, and common law;

c. Injunctive and other equitable relief pursuant to Ky. Rev. Stat. § 15.020, Ky. Rev. Stat. § 367.110 through Ky. Rev. Stat. § 367.990, and common law;

d.  Civil penalties pursuant to Ky. Rev. Stat. § 367.990(8);

e.  Costs and attorneys' fees pursuant to Ky. Rev. Stat. § 367.110 through Ky. Rev. Stat. § 367.990, Ky. Rev. Stat. § 48.005(4), and common law; and

f.  Other remedies as the court may deem appropriate under the facts and circumstances of the case.

399.   The acts alleged in Section III.A. of the Complaint, in addition to the following acts, also constitute violations of Ky. Rev. Stat. § 367.170:

a.  Defendants engaged in and are engaging in unlawful conduct in the course of trade or commerce, within the meaning of Ky. Rev. Stat. § 367.170, that has harmed and is harming the Commonwealth and its persons. The above-described conduct has been and is willful within the meaning of Ky. Rev. Stat. § 367.990.

b.  The Commonwealth states that the public interest is served by seeking a permanent injunction to restrain the acts and practices described herein. The Commonwealth and its persons will continue to be harmed unless the acts and practices complained of herein are permanently enjoined pursuant to Ky. Rev. Stat. § 367.190.

400.   The Commonwealth of Kentucky seeks all remedies available under Kentucky law for violations of Ky. Rev. Stat. § 367.170 including, without limitation, the following:

a.  Damages for its persons under *parens patriae* authority, pursuant to Ky. Rev. Stat. § 15.020, Ky. Rev. Stat. § 367.110 through Ky. Rev. Stat. § 367.990, and common law;

b.  Disgorgement and restitution pursuant to Ky. Rev. Stat. § 15.020, Ky. Rev. Stat. § 367.110 through Ky. Rev. Stat. § 367.990, and common law;

c.  Injunctive and other equitable relief pursuant to Ky. Rev. Stat. § 367.190 and common law;

d.  Civil penalties pursuant to Ky. Rev. Stat. § 367.990(2);

e.  Costs and attorneys' fees pursuant to Ky. Rev. Stat. § 367.110 through Ky. Rev. Stat. § 367.990, Ky. Rev. Stat. § 48.005(4), and common law; and

f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Louisiana**

401.   The State of Louisiana repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

402.   The Attorney General of Louisiana brings this suit under his authority designated by LA. Const. Art. IV § 8.

403.   The acts alleged in causes of action 1-7 also constitute antitrust violations pursuant to the Louisiana Monopolies Act—LA. R.S. § 51:121, *et seq.*

404.   Louisiana seeks all remedies available under federal law and Louisiana antitrust laws, including, without limitation, the following:

a.   Damages (including treble damages) pursuant to LA. R.S. § 51:137; including damages (trebled or otherwise) for natural persons under the Attorney General's *parens patriae* authority. LA. R.S. § 51:138;

b.   Injunctive and other equitable relief under LA. R.S. § 51:128;

c.   Costs and attorney's fees pursuant to LA. R.S.  § 51: 136; and

d.   All other remedies the court may deem appropriate.

405.   The acts alleged are also in violation of the Louisiana Unfair Trade Practice Act ("LUTPA")—LA. R.S. § 51:1401, *et seq.*  Louisiana seeks all remedies available under federal law and Louisiana Unfair Trade Practice laws, including, without limitation, the following:

a.   Civil penalties with regard to LA. R.S. § 51:1407;

b.   Injunctive relief as authorized by LA. R.S. § 51:1407;

c.   Restitution, damages, and additional relief as empowered by LA. R.S. § 51:1408; and

d.   All other remedies the court may deem appropriate.

**Maryland**

406.   The state of Maryland repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

407.   The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to The Maryland Antitrust Act, Md. Com. Law Code Ann §11-201 et. seq.

408.   Maryland seeks all remedies available under federal law or Maryland's Antitrust Statute including, without limitation, the following:

   a.   Damages for natural persons under *parens patriae* authority, pursuant to Md. Com. Law Code Ann §11-209(b)(5);

   b.   Disgorgement and restitution pursuant to Md. Com. Law Code Ann §11-209(a);

   c.   Injunctive and other equitable relief pursuant to Md. Com. Law Code Ann §11-209(a);

   d.   Civil penalties pursuant to Md. Com. Law Code Ann §11-209(a) which provides that "In addition to the equitable remedies or other relief authorized by this section, the court may assess against any person who violates §11-204 of this subtitle a civil penalty not exceeding $10,000 for each violation ….and "[e]ach day that a violation of §11-204 of this subtitle continues is a separate violation.";

   e.   Costs and attorney's fees pursuant to Md. Com. Law Code Ann §11-209(a); and

   f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Massachusetts**

409.   The Commonwealth of Massachusetts repeats and realleges each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

*410.*   The acts alleged in the aforementioned paragraphs of the Complaint constitute unfair methods of competition and/or unfair or deceptive acts or practices in trade or commerce in violation of the Massachusetts Consumer Protection Act, M.G.L c. 93A, § 2 *et seq.*

411.     Defendants knew or should have known that their conduct violated the Massachusetts Consumer Protection Act, M.G.L c. 93A, § 2 *et seq.*

412.     The Commonwealth of Massachusetts seeks all remedies available under M.G.L. c. 93A, § 4, including, without limitation, the following:

    a.   Damages for natural persons under *parens patriae* authority, pursuant to M.G.L. c. 93A, § 4;

    b.   Restitution for Massachusetts consumers pursuant to M.G.L. c. 93A, § 4;

    c.   Disgorgement pursuant to M.G.L. c. 93A, § 4;

    d.   Injunctive and other equitable relief pursuant to M.G.L. c. 93A, § 4;

    e.   Civil penalties for each violation committed by the Defendants pursuant to M.G.L. c. 93A, § 4;

    f.   Costs and attorney's fees pursuant to M.G.L. c. 93A, § 4; and

    g.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

413.     The Commonwealth of Massachusetts notified the Defendants of this intended action at least five days prior to the commencement of this action and gave the Defendants an opportunity to confer in accordance with M. G. L. c. 93A, § 4.

**__Minnesota__**

414.     The state of Minnesota repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

415.     The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-325D.66.

416.     Minnesota seeks all remedies available under federal law or Minn. Stat. §§ 325D.49-325D.66 including, without limitation, the following:

    a.   Damages for natural persons under *parens patriae* authority, pursuant to Minn. Stat. § 325D.57 and Minn. Stat. § 8.31 subd. 3a;

b. Disgorgement and restitution pursuant to Minn. Stat. § 325D.59 and Minn. Stat. Ch. 8;

c. Injunctive and other equitable relief pursuant to Minn. Stat. § 325D.58 and Minn. Stat. § 8.31, subd. 3;

d. Civil penalties pursuant to Minn. Stat. § 325D.56 and Minn. Stat. 8.31, subd. 3, which provide for civil penalties of $50,000 and $25,000, respectively;

e. Costs and attorney's fees pursuant to Minn. Stat. § 325D.57 and Minn. Stat. § 8.31, subd. 3a; and

f. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Mississippi**

417. The state of Mississippi repeats and realleges every preceding allegation of this Complaint as if fully set forth herein. The Mississippi Attorney General has the ability to bring this suit as the chief legal officer of the State of Mississippi pursuant to Miss. Code Ann. § 7-5-1 and as *parens patriae* of Mississippi residents.

418. The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to Miss. Code Ann. § 75-21-1 *et seq.*

419. Mississippi seeks all remedies available under federal law and under Miss. Code Ann. § 75-21-1 *et seq.* including, without limitation, the following:

a. Restitution for Mississippi consumers under the Attorney General's *parens patriae* authority, due to the state's quasi-sovereign interest in the direct and indirect effect of the Defendant's illegal conduct;

b. Injunctive and other equitable relief pursuant to Miss. Code Ann. §§ 75-21-1; 75-21-3;

c. Civil penalties pursuant to Miss. Code Ann. §§ 75-21-1; 75-21-7; 75-21-9 which provides that:

[a]ny person, association of persons, corporation, or corporations, domestic or foreign, who shall be a party or belong to a trust and combine shall be guilty of crime and upon conviction thereof shall, for a first offense be fined in any sum not less than one hundred dollars ($100.00) nor more than five thousand dollars ($5,000.00) …;

420.   The acts alleged in Section III of the Complaint also constitute unfair and deceptive acts in violation of Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1 *et seq.*:

421.   Mississippi seeks all remedies available under the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1 *et seq.* including, without limitation, the following:

a.   Restitution for consumers pursuant to Miss. Code Ann. § 75-24-11;

b.   Disgorgement pursuant to Miss. Code Ann. §§ 75-24-11 and 75-24-23 and as an equitable remedy pursuant to common law;

c.   Injunctive and other equitable relief pursuant to Miss. Code Ann. §§ 75-24-9; 75-24-11;

d.   Civil penalties pursuant to Miss. Code Ann. § 75-24-19(1)(b) which provides that, "[i]n any action brought under Section 75-24-9, if the court finds from clear and convincing evidence, that a person knowingly and willfully used any unfair or deceptive trade practice, method or act prohibited by Section 75-24-5, the Attorney General, upon petition to the court, may recover on behalf of the state a civil penalty in a sum not to exceed Ten Thousand Dollars ($10,000.00) per violation…"

e.   Costs and attorney's fees pursuant to Miss. Code Ann. § 75-24-19(b) and pursuant to common law, and

f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case and pursuant to Miss. Code Ann. §§ 75-24-23; 11-45-11.

422.     Other remedies as the court may deem appropriate.

**<u>Missouri</u>**

423.     The state of Missouri repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

424.     The acts alleged in causes of action 1 – 7 also constituted antitrust violations pursuant to the Missouri Antitrust Law, RSMo. §§416.011 *et seq.*

425.     Missouri seeks all remedies available under federal law or the Missouri Antitrust Law, including, without limitation, the following:

    a.  Damages (including treble damages) for all persons under *parens patriae* authority, pursuant to RSMo. §§416.061 and 416.121;

    b.  Disgorgement and restitution pursuant to RSMo. §416.071;

    c.  Injunctive and other equitable relief pursuant to RSMo. §416.071;

    d.  Costs and attorney's fees pursuant to RSMo. §416.121; and,

    e.  Other remedies as the court may deem appropriate under the facts and circumstances of the case.

426.     The acts alleged in this Complaint also violate the Missouri Merchandising Practices Act, RSMo. §§407.010 *et seq.*, as further interpreted by 15 CSR 60-8.010 *et seq.* and 15 CSR 60-9.010 *et seq.* Google's conduct constitutes unfair practices, which 15 CSR 60-8.020 defines to include any practice which "(A) either (1) offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decision; (2) or is unethical, oppressive or unscrupulous; and (B) presents a risk of, or causes, substantial injury to consumers." Google's conduct also constitutes unfair practices as defined in 15 CSR 60-8.090 to include "any method, use, or practice which (A) violates state or federal law intended to protect the public and (B) presents a risk of, or causes substantial injury to consumers." Google's conduct also constitutes deception, misrepresentation, and the concealment, suppression, or omission of material fact as defined in 15 CSR 60-9.020, 9.070-090, and 9.110.

427.     Missouri seeks all remedies under the Missouri Merchandising Practices Act including, without limitation, the following:

    a.   An order of restitution for all persons pursuant to RSMo. §407.100;

    b.   Disgorgement pursuant to RSMo. §407.100;

    c.   Injunctive and other equitable relief pursuant to RSMo. §407.100;

    d.   A civil penalty in the amount of one thousand dollars ($1,000.00) for each violation of the Missouri Merchandising Practices Act pursuant to RSMo. §407.100;

    e.   Attorney's fees, court costs, and costs of investigation pursuant to RSMo. §407.130;

    f.   An additional award in the amount of ten percent (10%) of the total restitution awarded pursuant to RSMo. §407.140, to be paid into the Missouri state treasury to the credit of the merchandising practices revolving fund; and,

    g.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Montana**

428.     The state of Montana repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

429.     Defendant's acts and practices alleged in Sections I through III and causes of action 1 through 7 violate Montana's Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. §-30-14-101 et seq., including § 30-14-103, and Unfair Trade Practices Generally, Mont. Code Ann. § 30-14-201 *et seq.*, including § 30-14-205(2).

430.     Mont. Code Ann § 30-14-103 prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Montana's standard for "unfairness" as prohibited under Mont. Code Ann. § 30-14-103 is articulated in *Rohrer v. Knudson*, 203 P.3d 759 (Mont. 2009) as an act or practice which "offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious

to consumers." The acts and practices alleged in Sections I through III and causes of action 1 through 7 violate Mont. Code Ann. § 30-14-103 and the *Rohrer* standard.

a. The acts and practices alleged in Sections I and II and causes of action 1 through 7 violate Mont. Code Ann. § 30-14-205 (2), subsections (b), (c), (d) and (g). Violations of Mont. Code Ann. § 30-14-205(2) also constitute methods of competition and unfair acts or practices violating § 30-14-103.

b. The acts and practices alleged in Section III of the complaint were and are unfair methods of competition and unfair or deceptive in violation of Mont. Code Ann. § 30-14-103 and the *Rohrer* standard.

c. Defendant's anticompetitive and unfair and/or deceptive acts and practices as delineated in Sections I through III and causes of action 1 through 7 of the Complaint occurred in the conduct of trade and commerce as defined in Mont. Code Ann. § 30-14-102(8).

d. Defendant's acts and practices as delineated in Sections I through III and causes of action 1 through 7 of the Complaint were and are willful for purposes of Mont. Code Ann. § 30-14-142(2), (4).

e. The State of Montana seeks all remedies available under federal law and Montana Code Ann. §§ 30-14-101 through 30-14-226, including, without limitation, injunctive and equitable relief, restitution, disgorgement of profits, and the maximum civil penalties available under Mont. Code Ann. § 30-14-101 et seq. and § 30-14-201 et seq., including but not limited to Mont. Code Ann. §§ 30-14-111(4), -131, 142(2), and -222. Plaintiff State of Montana also seeks reasonable attorney's fees and costs.

**Nebraska**

431.    The state of Nebraska repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

432.     The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Unlawful Restraint of Trade Act, Neb. Rev. Stat. § 59-801 *et seq.*

433.     Nebraska seeks all remedies available under federal law or its Unlawful Restraint of Trade Act including, without limitation, the following:

a.   Damages for natural persons under *parens patriae* authority, pursuant to Neb. Rev. Stat. § 84-212;

b.   Disgorgement and restitution pursuant to Neb. Rev. Stat. § 84-212;

c.   Injunctive and other equitable relief pursuant to Neb. Rev. Stat. § 59-819;

d.   Civil penalties pursuant to Neb. Rev. Stat. § 59-1614 which provides that "Any person who violates section 59-1603 or 59-1604 or the terms of any injunction issued as provided in the Consumer Protection Act shall forfeit and pay a civil penalty of not more than five hundred thousand dollars. Any person who violates section 59-1602 shall pay a civil penalty of not more than two thousand dollars for each violation, except that such penalty shall not apply to any radio or television broadcasting station which broadcasts, or to any publisher, printer, or distributor of any newspaper, magazine, billboard, or other advertising medium who publishes, prints, or distributes advertising in good faith without knowledge of its false, deceptive, or misleading character and no such good faith publication, printing, or distribution shall be considered a violation of section 59-1602."

e.   Costs and attorney's fees pursuant to Neb. Rev. Stat. § 84-212; and

f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**<u>Nevada</u>**

434.     The state of Nevada repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

435.    The acts alleged in causes of action 1 – 7 produced, and continue to produce, harm across the Plaintiff States, including in Nevada, and also constitute antitrust violations pursuant to the Nevada Unfair Trade Practice Act, NRS 598A.010 *et seq*.

436.    Nevada seeks all remedies available under federal law and the Nevada Unfair Trade Practice Act, NRS 598A.010 *et seq*., including, without limitation, the following:

     a. Damages for natural persons under *parens patriae* authority, pursuant NRS 598A.160(1);

     b. Disgorgement pursuant to NRS 598A.070;

     c. Injunctive and other equitable relief pursuant to NRS  598A.070(1)(c)(1);

     d. Civil penalties pursuant to NRS 598A.070(1)(c)(2) and NRS 598A.170;

     e. Costs and attorney's fees pursuant to NRS 598A.210; and

     f. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

437.    The acts alleged in Section III of the Complaint were overtly deceptive, not merely anticompetitive, and also constitute violations of the Nevada Deceptive Trade Practices Act, NRS 598.0903, *et seq*.:

     a. NRS 598.0915(5) renders it unlawful to knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith; and

     b. NRS 598.0915(15) renders it unlawful to knowingly makes any other false representation in a transaction.

     c. NRS 598.0923(1)(b) renders it unlawful to fail to disclose a material fact in connection with the sale or lease of goods or services;

     d. NRS 598.0923(1)(c) renders it unlawful to violate a state or federal statute or regulation relating to the sale or lease of goods or services; and

e. NRS 598.0923(1)(d) renders it unlawful to use coercion, duress or intimidation in a transaction.

438. Nevada seeks all remedies available under the Nevada Deceptive Trade Practices Act, NRS 598.0903, *et seq*., including, without limitation, the following:

a. Restitution pursuant to NRS 598.0963(3) and NRS 598.0975(3)(b);

b. Disgorgement pursuant to NRS 598.0963(3);

c. Injunctive and other equitable relief pursuant to NRS 598.0963(3);

d. Civil penalties pursuant to NRS 598.0999(2) for each and every violation of the Nevada Deceptive Trade Practices Act as alleged herein;

e. Civil penalties pursuant to NRS 598.0973 for each and every violation of the Nevada Deceptive Trade Practices Act directed toward an elderly person or a person with a disability;

f. Costs and attorney's fees pursuant to NRS 598.0999(2); and

g. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

## **New Hampshire**

439. The state of New Hampshire repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

*440.* The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to N.H. RSA §356, *et. seq.*

441. New Hampshire seeks all remedies available under federal law and/or N.H. RSA §356:4, including, without limitation, the following:

a. Damages for natural persons under *parens patriae* authority, pursuant to N.H. Rev. Stat. Ann.§ 356:4-a, II;

b. Injunctive and other equitable relief pursuant to N.H. Rev. Stat. Ann. § 356:4-a;

c. Civil penalties pursuant to N.H. Rev. Stat. Ann. § 356:4-a;

    d.   Costs and attorney's fees pursuant to N.H. Rev. Stat. Ann. § 356:4-b and/or § 356:10; and

    e.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

442.    The acts alleged in Section III of the Complaint also constitute unfair methods of competition and/or unfair or deceptive acts or practices in trade and commerce in the state in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A, *et. seq.*

443.    New Hampshire seeks all legal and equitable remedies available under N.H. Rev. Stat. Ann. § 358-A, *et. seq.*, and common law, including, without limitation, the following:

    a.   Disgorgement and restitution pursuant to N.H. Rev. Stat. Ann. § 358-A:4;

    b.   Injunctive and other equitable relief pursuant to N.H. Rev. Stat. Ann. § 358-A:4;

    c.   Civil penalties pursuant to N.H. Rev. Stat. Ann. § 358-A:4;

    d.   Costs and attorneys' fees pursuant to N.H. Rev. Stat. Ann. § 358-A:6, IV; and

    e.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

444.    New Hampshire notified the Defendants of this intended action at least ten days prior to the commencement of this action and gave the Defendants an opportunity to confer in accordance with N.H. Rev. Stat. Ann. § 358-A:5.

**<u>New Jersey</u>**

445.    The State of New Jersey repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

446.    The acts alleged in paragraphs 44 to 228 also constitute antitrust violations pursuant to the New Jersey Antitrust Act, N.J.S.A. 56:9-1 *et seq.*, in that Defendants acted with the purpose and/or effect of unreasonably restraining trade and commerce within the State of New Jersey and elsewhere pursuant to N.J.S.A. 56:9-3.

447.    New Jersey seeks all remedies available under federal law, New Jersey State law, and the New Jersey Antitrust Act including, without limitation, the following:

a.  Injunctive and other equitable relief pursuant to N.J.S.A. 56:9-10(a);

b.  Civil penalties pursuant to N.J.S.A. 56:9-10(c) which provides that: "any person who violates the provisions of this act shall be liable to a penalty of not more than the greater of $100,000.00 or $500.00 per day for each and every day of said violation";

c.  Treble damages, together with attorney's fees, filing fees, and reasonable costs of suit, including, but not limited to the expenses of discovery and document production fees pursuant to N.J.S.A. 56:9-12(a); and

d.  Other remedies as the court may deem appropriate under the facts and circumstances of the case.

448.    The acts alleged in paragraphs 229 to 256 of the Complaint also constitute violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.*

449.    New Jersey seeks all remedies available under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.*, including, without limitation:

a.  Injunctive and other equitable relief pursuant to N.J.S.A. 56:8-8;

b.  Civil penalties pursuant to N.J.S.A. 56:8-13 which provides that: "[a]ny person who violates any of the provisions of the act . . . shall, in addition to any other penalty provided by law, be liable to a penalty of not more than $10,000 for the first offense and not more than $20,000 for the second and each subsequent offense";

c.  Costs and attorney's fees pursuant to N.J.S.A. 56:8-11 and -19; and

d.  Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**New Mexico**

450.    The State of New Mexico repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

451.    The Attorney General of the State of New Mexico has determined that bringing this case is in the interest of the people of the State of New Mexico.

452.    As alleged in Paragraphs 16 and 30-33, *supra*, Defendants' anti-competitive behavior and deceptive trade practices have affected and continue to affect trade or commerce throughout the United States, including in New Mexico.

453.    Defendants are "persons" as defined in the New Mexico Antitrust Act, NMSA 1978, Section 57-1-1.2 (1987) ("NMAA"), and in the New Mexico Unfair Practices Act, NMSA 1978, Section 57-12-2 (2019) ("NMUPA").

454.    The State of New Mexico, by and through its Attorney General, brings this action pursuant to Section 57-1-3(B) and -7 of the NMAA, and pursuant to Section 57-12-8 of the NMUPA.

455.    Defendants knowingly and willfully engaged in this anti-competitive behavior and these unfair, deceptive, and/or unconscionable trade practices in the regular course of their business.

456.    The actions and omissions alleged in Paragraphs 44-228, *supra*, constitute violations of the NMAA, NMSA 1978, Sections 57-1-1 and -2 (1891, as amended through 1987).

457.    Defendants actively concealed their anticompetitive behavior which the State could not have uncovered through normal diligence, and therefore the NMAA's four-year statute of limitation should be tolled.

458.    The actions and omissions alleged in Paragraphs 229-256, *supra*, constitute unfair or deceptive trade practices per the NMUPA, NMSA 1978, Section 57-12-2(D) (2019), and are therefore unlawful under Section 57-12-3 (1971).

459.    The actions and omissions alleged in Paragraphs 229-256, *supra*, constitute unconscionable trade practices per the NMUPA, NMSA 1978, Section 57-12-2(E), and are therefore unlawful under Section 57-12-3.

460.    For their violations of the NMAA, New Mexico seeks the following relief:

    a.    The voiding of all contracts made in violation of the NMAA per Section 57-1-3;

b.   Civil penalties of up to $250,000 per Section 57-1-7;

c.   All appropriate injunctive and equitable relief per Sections 57-1-3 and -8, including but not limited to disgorgement;

d.   Reasonable attorney fees and costs per Section 57-1-3; and

e.   All other relief deemed necessary or proper by the Court.

461.   For their violations of the NMUPA, New Mexico seeks the following relief:

a.   Civil penalties of up to $5,000 for each violation per Section 57-12-11;

b.   A temporary and permanent injunction per Section 57-12-8;

c.   All appropriate equitable relief, including but not limited to disgorgement; and

d.   All other relief deemed necessary or proper by the Court.

462.   For their violations of federal law as alleged above in Causes of Action 1-7, New Mexico seeks all relief available under federal law.

**New York**

463.   The state of New York repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

464.   The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to New York's antitrust law, the Donnelly Act, New York Gen. Bus. Law §§ 340 *et seq.*, and violations of § 63(12) of New York's Executive Law, in that Defendants engaged in repeated and/or persistent illegal acts—violations of Sections 1 and 2 of the Sherman Act as well as the Donnelly Act—in the carrying on, conducting, or transaction of business within the meaning and intent of Executive Law § 63(12).

465.   The acts alleged in Section III.A also constitute violations of Gen. Bus. Law § 349, in that Defendants engaged in deceptive acts and practices, and violations of § 63(12) of New York's Executive Law, in that Defendants engaged in repeated and/or persistent fraudulent and/or illegal conduct.

466.     New York seeks all remedies available under federal law or the Donnelly Act, New York Gen. Bus. Law §§ 340-347, 349 and 350-d, and Executive Law § 63(12) including, without limitation, the following:

     a.   Damages, disgorgement, and restitution pursuant to Executive Law § 63;

     b.   Injunctive and other equitable relief pursuant to New York Gen. Bus. Law § 342 and Executive Law § 63;

     c.   Civil penalties pursuant to New York Gen. Bus. Law § 342-a and 350-d;

     d.   Costs and attorney's fees; and

     e.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**North Carolina**

467.      The state of North Carolina repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

468.     The acts alleged in the First and Fifth causes of action stated above are antitrust violations pursuant to N.C.G.S. § 75-2.1, in that they constitute unlawful monopolization of a part of trade or commerce in North Carolina. The acts alleged in the Second, Third, Fourth, Sixth, and Seventh causes of action stated above are also antitrust violations pursuant to N.C.G.S. §§ 75-1 and 75-2, in that they constitute contracts in restraint of trade or commerce in North Carolina, and acts and contracts in in restraint of trade or commerce which violate the principles of the common law.

469.     North Carolina seeks all remedies available for claims under federal law and claims under N.C.G.S. §§ 75-1, 75-2, and 75-2.1, including, without limitation, the following:

     a.   Damages for natural persons under *parens patriae* authority, pursuant to 15 U.S.C. § 15c; N.C.G.S. §§ 75-9, 75-15, 75-15.1, and 75-16; and the common law of North Carolina;

     b.   Disgorgement and restitution pursuant to N.C.G.S. § 75-15.1 and the common law of North Carolina;

  c. Injunctive and other equitable relief pursuant to N.C.G.S. § 75-14 and the common law of North Carolina;

  d. Civil penalties pursuant to N.C.G.S. § 75-15.2, which provides a penalty of up to $5,000 per violation;

  e. Costs and attorney's fees pursuant to N.C.G.S. § 75-16.1; and

  f. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

470. The acts alleged in Section III of the Complaint also constitute violations of the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75 1.1, because:

  a. all violations of N.C.G.S. §§ 75-1, 75-2, and 75-2.1 are per se unfair or deceptive acts or practices within the meaning of N.C.G.S. § 75-1.1, and

  b. the acts complained of violate N.C.G.S. § 75-1.1 independent of any violation of the antitrust laws, as they are unfair or deceptive; and

  c. the acts complained of occurred in or affected commerce.

471. North Carolina seeks all remedies available for claims under N.C.G.S. § 75-1.1, including, without limitation, the following:

  a. Damages for natural persons under *parens patriae* authority, pursuant to N.C.G.S. §§ 75-9, 75-15, 75-15.1, and 75-16; and the common law of North Carolina;

  b. Disgorgement and restitution pursuant to N.C.G.S. § 75-15.1 and the common law of North Carolina;

  c. Injunctive and other equitable relief pursuant to N.C.G.S. § 75-14 and the common law of North Carolina;

  d. Civil penalties pursuant to N.C.G.S. § 75-15.2, which provides a penalty of $5,000 per violation;

  e. Costs and attorney's fees pursuant to N.C.G.S. § 75-16.1; and

  f. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**North Dakota**

472.    The state of North Dakota repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

473.    The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Uniform State Antitrust Act, North Dakota Century Code (N.D.C.C.) § 51-08.1-01 *et seq.*

474.    The State of North Dakota seeks all remedies available under federal law or N.D.C.C. § 51-08.1-01 *et seq.*, including, without limitation, the following:

   a.   Damages sustained pursuant to N.D.C.C. § 51-08.1-08;

   b.   Disgorgement and restitution pursuant to N.D.C.C. §§ 51-08.1-07 and 51-08.1-08;

   c.   Injunctive and other equitable relief pursuant to N.D.C.C. §§ 51-08.1-07 and 51-08.1-08;

   d.   Civil penalties pursuant N.D.C.C. § 51-08.1-07, which provides that the trier of fact may assess for the benefit of the state a civil penalty of not more than fifty thousand dollars for each violation of N.D.C.C. chapter 51-08.1;

   e.   Costs and attorney's fees pursuant to N.D.C.C. § 51-08.1-07; and

   f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

475.    The acts alleged in Section III of the Complaint also constitute violations of the Consumer Fraud Law, North Dakota Century Code (N.D.C.C.) § 51-15-01 *et seq.*, Unlawful Sales or Advertising Practices.

476.    The State of North Dakota seeks all remedies available under N.D.C.C. § 51-15-01 *et seq.*, including, without limitation, the following:

   a.   Damages for North Dakota persons under *parens patriae* authority pursuant to N.D.C.C. § 51-15-07;

   b.   Disgorgement and restitution pursuant to N.D.C.C. § 51-15-07;

   c.   Injunctive and other equitable relief pursuant to N.D.C.C. § 51-15-07;

d.   Civil penalties pursuant to N.D.C.C. § 51-15-11, which provides that the court may assess for the benefit of the state a civil penalty of not more than five thousand dollars for each violation of N.D.C.C. chapter 51-15;

e.   Attorney's fees, investigation fees, costs, and expenses pursuant to N.D.C.C. § 51-15-10; and

f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Oklahoma**

477.   Plaintiff State of Oklahoma repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

478.   The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.*

479.   Plaintiff State of Oklahoma seeks all remedies available under federal law or the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.*, including, without limitation, the following:

a.   Damages for natural persons under *parens patriae* authority, pursuant to 79 O.S. § 205;

b.   Disgorgement and restitution pursuant to 79 O.S. § 205;

c.   Injunctive and other equitable relief pursuant to 79 O.S. § 205;

d.   Costs and attorney's fees pursuant to 79 O.S. § 205;

e.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

480.   The acts alleged in Section III of the Complaint also constitute violations of the Oklahoma Consumer Protection Act, 15 O.S. §§ 751, *et seq.*

481.   Plaintiff State of Oklahoma seeks all remedies available under the Oklahoma Consumer Protection Act, 15 O.S. §§ 751, *et seq.,* including, without limitation, the following:

a.   Injunctive and other equitable relief pursuant to 15 O.S. § 756.1;

SECOND AMENDED COMPLAINT                    125

b. Civil penalties pursuant to 15 O.S. § 761.1, which provides that "Any person who is found to be in violation of the Oklahoma Consumer Protection Act in a civil action . . . shall forfeit and pay a civil penalty of not more than Ten Thousand Dollars ($10,000.00) per violation, in addition to other penalties that may be imposed by the court, as the court shall deem necessary and proper";

c. Costs and attorney's fees pursuant to 15 O.S. § 761.1; and

d. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Oregon**

482.   The State of Oregon repeats and realleges every preceding allegation of this Complaint.

483.   The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to Oregon Revised Statutes ("ORS") 646.705, ORS 646.725, ORS 646.730, *et seq.* These violations had impacts within the State of Oregon and substantially affected the people of Oregon.

484.   The State of Oregon seeks all remedies available under federal law and ORS 646.705 *et. seq.* including, without limitation, the following:

a. Damages for natural persons under *parens patriae* authority, pursuant to ORS 646.775;

b. Disgorgement and other equitable relief pursuant to ORS 646.770 and ORS 646.775;

c. Injunctive and other equitable relief pursuant to ORS 646.760(2); ORS 646.770; ORS 646.775.

d. Civil penalties pursuant to ORS 646.760(1) which provides that a court may assess for the benefit of the state a civil penalty of not more than $250,000 for each violation,

e.   Costs, including expert witness fees and costs of investigation, and attorney's fees pursuant to ORS 646.760, ORS 646.770, ORS 646.775; and

f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Pennsylvania**

485.   The Commonwealth of Pennsylvania repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

486.   The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Pennsylvania common law doctrine against restraint of trade and monopolies.

487.   The Commonwealth of Pennsylvania seeks all remedies available under federal law or Pennsylvania law for violations of the Pennsylvania common law doctrine against restraint of trade and monopolies.

488.   The acts alleged also constitute violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.* ("PUTPCPL"):

a.   Defendants are persons within the meaning of Section 2(2) of the PUTPCPL. 73 P.S. § 201-2(2).

b.   Defendants have engaged in trade and commerce within the meaning of Section 2(3) of the PUTPCPL. 73 P.S. § 201-2(3).

c.   The Pennsylvania Attorney General has reason to believe that Defendants are using or are about to use any method, act, or practice declared by Section 3 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law to be unlawful, and that proceedings would be in the public interest under Section 4 of the PUTPCPL. 73 P.S. § 201-4.

d.   Defendants' acts and practices constitute unfair methods of competition and unfair or deceptive acts or practices in violation of Section 3 of the PUTPCPL within the meaning of Section 2(4)(xxi) of the PUTPCPL. 73 P.S. § 201-3; 73 P.S. § 201-2(4)(xxi).

489.    The Commonwealth of Pennsylvania seeks all remedies available under Pennsylvania law for violations of 73 P.S. § 201-3 including, without limitation, the following:

    a.  Injunctive and other equitable relief pursuant to 73 P.S. § 201-4;

    b.  Disgorgement and restitution pursuant to 73 P.S. § 201-4.1;

    c.  Civil penalties pursuant to 73 P.S. § 201-8(b);

    d.  Costs and attorneys' fees pursuant to 73 P.S. § 201-4.1; and

    e.  Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Rhode Island**

490.    The state of Rhode Island repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

491.    The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Rhode Island Antitrust Act, R.I. Gen. L. §§ 6-36-1, et. seq.

492.    Rhode Island seeks all remedies available under federal law or the Rhode Island Antirust Act including, without limitation, the following:

    a.  Damages for natural persons under *parens patriae* authority, pursuant to R.I. Gen. L. § 6-36-12;

    b.  Disgorgement and restitution pursuant to R.I. Gen. L. § 6-36-11;

    c.  Injunctive and other equitable relief pursuant to R.I. Gen. L. § 6-36-10;

    d.  Civil penalties pursuant to R.I. Gen. L. 6-36-10(c) which provides that "any person who violates this chapter may be liable for a civil penalty of not more than fifty thousand dollars ($50,000) for each violation.";

    e.  Costs and attorney's fees pursuant to§ 6-36-11(a); and

    f.  Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**South Dakota**

493.     The State of South Dakota repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

494.     The acts alleged constitute antitrust violations pursuant to South Dakota Codified Laws (SDCL) § 37-1-3.1, *et seq*.

495.     South Dakota seeks all remedies available under federal law or SDCL § 37-1-3.1, *et seq*. including, without limitation, the following:

      a.   Injunctive and all other legal and equitable relief pursuant to SDCL § 37-1-14.2;

      b.   Civil penalties pursuant to SDCL § 37-1-14.2 which provides that: "The court may assess for the benefit of the state a civil penalty of not more than fifty thousand dollars for each violation of this chapter";

      c.   All costs and attorney's fees available under SDCL § 37-1-3.1 *et seq*.;

      d.   Monetary relief for natural persons under *parens patriae* authority, pursuant to SDCL §§ 37-1-23, 37-1-24, and 37-1-25; and

      e.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

496.     The acts alleged also constitute violations of the South Dakota Deceptive Trade Practices and Consumer Protection statutes, SDCL ch. 37-24.

497.     The Attorney General of the State of South Dakota is authorized to bring an action in the name of the State against any person who is using, has used, or is about to use any act or practice declared unlawful by SDCL § 37-24-6.  The Attorney General has reason to believe that the Defendants have used and are using the acts alleged in this Complaint, which violate SDCL § 37-24-6.

498.     South Dakota seeks all remedies available under SDCL ch. 37-24 including, without limitation, the following:

      a.   Injunctive and other equitable relief pursuant to SDCL § 37-24-23;

b.  Civil penalties pursuant to SDCL § 37-24-27 which provides for a penalty of not more than two thousand dollars per violation;

c.  Costs and attorney's fees pursuant to SDCL § 37-24-23; and

d.  Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Texas**

499.  The State of Texas repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

500.  The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Texas Free Enterprise and Antitrust Act, Texas Business and Commerce Code § 15.01 *et seq.*, including § 15.05(b).

501.  Texas seeks all remedies available under federal law or Texas Business and Commerce Code § 15.20 *et seq.* including, without limitation, the following:

a.  Damages for natural persons under *parens patriae* authority, pursuant to Texas Business and Commerce Code § 15.21;

b.  Injunctive relief, civil penalties, other equitable relief (including but not limited to disgorgement), and such other relief as this Court deems just and equitable pursuant to Texas Business and Commerce Code § 15.20;

c.  Costs and attorney's fees pursuant Texas Business and Commerce Code § 15.20 and 15.21; and

d.  Other remedies as the court may deem appropriate under the facts and circumstances of the case.

502.  At all times described herein, Google has engaged in conduct which constitutes "trade" and "commerce" defined in § 17.45(6) of the Texas Deceptive Trade Practices – Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41 – 17.63 ("Texas DTPA").

503.  Plaintiff State of Texas has reason to believe that Google has engaged in, and will continue to engage in, the unlawful practices set forth herein, has caused and will cause adverse

effects to legitimate business enterprises which lawfully conduct trade and commerce in this State, and will cause damage to the State of Texas and to persons in the State of Texas. Therefore, the Consumer Protection Division of the Office of the Attorney General of the State of Texas believes and is of the opinion that this matter is in the public interest.

504.     Through its false, deceptive, or misleading acts, Google has violated § 17.46(a) of the Texas DTPA, including by engaging in conduct specifically defined to be false, deceptive, or misleading by § 17.46(b) such as:

    a. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not have, in violation of Texas DTPA § 17.46(b)(5);

    b. Representing that goods or services are of a particular standard, quality, or grade, if they are of another, in violation of Texas DTPA § 17.46(b)(7);

    c. Advertising goods or services with the intent not to sell them as advertised, in violation of Texas DTPA § 17.46(b)(9);

    d.  Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law, in violation of Texas DTPA § 17.46(b)(12); and

    e. Failing to disclose information concerning goods or services which was known at the time of the transaction with the intent to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed in violation of Texas DTPA § 17.46(b)(24).

505.     By means of the foregoing unlawful acts and practices, Google has acquired money or other property from persons to whom such money or property should be restored.

506.     Texas seeks all remedies available under the Texas DTPA including, without limitation, the following.

    a. Injunctive and other equitable relief pursuant to Texas DTPA § 17.47;

b.   To restore all money or other property acquired by means of unlawful acts or practices, or in the alternative, to compensate identifiable persons for actual damages pursuant to Texas DTPA § 17.47(d);

c.   Civil penalties of up to $10,000.00 per violation for each and every violation of the DTPA pursuant to Texas DTPA § 17.47(c)(1);

d.   Costs of Court, costs of investigation, and reasonable attorneys' fees pursuant to Texas DTPA § 17.47 and Tex. Govt. Code Ann. § 402.006(c); and

e.   Other remedies as the Court may deem appropriate under the facts and circumstances of the case.

**Utah**

507.   The state of Utah repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

508.   The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Utah Antitrust Act, Utah Code §§ 76-10-3101, *et. seq.*

509.   Utah seeks all remedies available under federal law or the Utah Antitrust Act including, without limitation, the following:

a.   Damages for natural persons under *parens patriae* authority, pursuant to Utah Code § 76-10-3108(1);

b.   Disgorgement and restitution pursuant to Utah Code § 76-10-3108(1);

c.   Injunctive and other equitable relief pursuant to Utah Code § 76-10-3108(1);

d.   Civil penalties pursuant to Utah Code § 76-10-3108(2) which provides that: "Any person, other than an individual, who violates this act is subject to a civil penalty of not more than $500,000 for each violation.";

e.   Costs and attorney's fees pursuant to Utah Code § 76-10-3109(3); and

f.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

510.     The acts alleged in Section III.A of the Complaint also constitute violations of the Utah Consumer Sales Practices Act, Utah Code §§13-11-1, *et. seq*. This claim asserting violations of the Utah Consumer Sales Practices Act is brought by the Utah Division of Consumer Protection through the Utah Attorney General's Office acting as their counsel.

511.     Google is a "supplier" engaged in "consumer transactions" pursuant to Utah Code §§ 13-11-3(2), (6).

512.     Utah seeks all remedies available under Utah Consumer Sales Practices Act including, without limitation, the following:

     a.   Damages for consumers pursuant to Utah Code §13-11-17;

     b.   Injunctive and other equitable relief pursuant to Utah Code §13-11-17(1);

     c.   A fine pursuant to Utah Code §13-11-17(1) determined in accordance with the criteria enumerated in Utah Code §13-11-17(6) as determined at trial;

     d.   Attorney's fees, court costs, and costs of investigation pursuant to Utah Code §13-11-17.5; and

     e.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**<u>Vermont</u>**

513.     The state of Vermont repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

514.     The acts alleged in causes of action 1 – 7 also constitute unfair methods of competition in commerce in violation of Vermont's Consumer Protection Act, 9 V.S.A. § 2453, *et. seq*.

515.     Vermont seeks all remedies available under federal law and/or 9 V.S.A. § 2458, including, without limitation, the following:

     a.   Restitution pursuant to 9 V.S.A. § 2458(b)(2);

     b.   Disgorgement pursuant to 9 V.S.A. § 2458(b)(4);

     c.   Injunctive and other equitable relief pursuant to 9 V.S.A. § 2458(a);

d. Civil penalties pursuant to 9 V.S.A. § 2458(b)(1), which provides for "the imposition of a civil penalty . . . of not more than $100,000.00 for an individual or $1,000,000.00 for any other person for each unfair method of competition in commerce";

e. Costs and attorney's fees pursuant to 9 V.S.A. § 2458(b)(3); and

f. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

516. The acts alleged in Section III of the Complaint also constitute unfair and deceptive acts and practices in commerce in violation of Vermont's Consumer Protection Act, 9 V.S.A. § 2453, *et. seq.*

517. Vermont seeks all legal and equitable remedies available under 9 V.S.A. § 2458, and common law, including, without limitation, the following:

a. Restitution pursuant to 9 V.S.A. § 2458(b)(2);

b. Disgorgement pursuant to 9 V.S.A. § 2458(b)(4);

c. Injunctive and other equitable relief pursuant to 9 V.S.A. § 2458(a);

d. Civil penalties pursuant to 9 V.S.A. § 2458(b)(1), which provides for "the imposition of a civil penalty not more than $10,000.00 for each unfair or deceptive act or practice in commerce";

e. Costs and attorney's fees pursuant to 9 V.S.A. § 2458(b)(3); and

f. Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Virginia**

518. The Commonwealth of Virginia repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

519. The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Virginia Antitrust Act, Virginia Code § 59.1-9.1 *et seq.*

SECOND AMENDED COMPLAINT                134

520.     Virginia seeks all remedies available under federal law or the Virginia Antitrust Act including, without limitation, the following:

    a.   Disgorgement and restitution pursuant to Virginia Code § 59.1-9.15(a);

    b.   Injunctive and other equitable relief pursuant to Virginia Code § 59.1-9.15(a) and (d);

    c.   Civil penalties pursuant to Virginia Code § 59.1-9.15(a) and Virginia Code § 59.1-9.11, which provides that "the court may assess for the benefit of the Commonwealth a civil penalty of not more than $100,000 for each willful or flagrant violation of this chapter."

    d.   Costs and attorney's fees pursuant to Virginia Code § 59.1-9.15(a) and

    e.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**Virgin Islands of the United States**

521.     The Territory of the Virgin Islands of the United States repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

522.     The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Virgin Islands Monopolies and Restraints of Trade Act, 11 V.I.C. § 1501 *et seq.*

523.     The Virgin Islands of the United States seeks all remedies available under federal law or the Virgin Islands Monopolies and Restraints of Trade Act including, without limitation, the following:

    a.   Injunctive and other equitable relief pursuant to 11 V.I.C. § 1507(1);

    b.   Civil penalties pursuant to 11 V.I.C. § 1507(4);

    c.   Costs and attorney's fees pursuant to 11 V.I.C. § 1507(2); and

    d.   Other remedies as the court may deem appropriate under the facts and circumstances of the case.

524.     The acts alleged also constitute violations of the Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. § 301 *et seq.*

525.     The Virgin Islands of the United States seeks all remedies available under the Virgin Islands Consumer Fraud and Deceptive Business Practices Act including, without limitation, the following:

    a.  Injunctive and other equitable relief pursuant to 12A V.I.C. § 328(a);

    b.  Civil penalties pursuant to 12A V.I.C. § 328(b);

    c.  Costs and attorney's fees pursuant to 12A V.I.C. § 332; and

    d.  Other remedies as the court may deem appropriate under the facts and circumstances of the case.

**<u>Washington</u>**

526.     The state of Washington repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

527.     The acts alleged in causes of action 1 – 7 also constitute antitrust violations pursuant to the Washington Consumer Protection Act, RCW 19.86.020, 19.86.030, and 19.86.040.

528.     Washington seeks all remedies available under federal law or the Washington Consumer Protection Act including, without limitation, the following:

    a.  Disgorgement and restitution pursuant to RCW 19.86.080;

    b.  Injunctive and other equitable relief pursuant to RCW 19.86.080;

    c.  Civil penalties pursuant to RCW 19.86.140;

    d.  Costs and attorney's fees pursuant to RCW 19.86.080; and

    e.  Other remedies, including interest, as the court may deem appropriate under the facts and circumstances of the case.

529.     The acts alleged in Section III of the Complaint also constitute unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the Washington Consumer Protection Act, RCW 19.86.020.

530.     Washington seeks all remedies available under the Washington Consumer Protection Act including, without limitation, the following:

SECOND AMENDED COMPLAINT                     136

1      a.   Disgorgement and restitution pursuant to RCW 19.86.080;

2      b.   Injunctive and other equitable relief pursuant to RCW 19.86.080;

3      c.   Civil penalties pursuant to RCW 19.86.140;

4      d.   Costs and attorney's fees pursuant to RCW 19.86.080; and

5      e.   Other remedies, including interest, as the court may deem appropriate under the

6          facts and circumstances of the case.

7  **West Virginia**

8      531.   The state of West Virginia repeats and realleges every preceding allegation of this

9  Complaint as if fully set forth herein.

10     532.   The acts alleged in causes of action 1 – 7 also constitute violations of the West

11  Virginia Antitrust Act, W.Va. Code § 47-18-1 *et seq.*

12     533.   West Virginia seeks all remedies available under federal law or the West Virginia

13  Antitrust Act including, without limitation, the following:

14      a.   Damages for natural persons under *parens patriae* authority, pursuant to W.Va.

15          Code § 47-18-17;

16      b.   Disgorgement and restitution pursuant to the court's equitable authority;

17      c.   Injunctive and other equitable relief pursuant to W.Va. Code § 47-18-8;

18      d.   Civil penalties pursuant to W.Va. Code § 47-18-8;

19      e.   Costs and attorney's fees pursuant to W.Va. Code § 47-18-8 and 47-18-17; and

20      f.   Other remedies as the court may deem appropriate under the facts and

21          circumstances of the case.

22  **Wisconsin**

23     534.   The state of Wisconsin repeats and realleges every preceding allegation of this

24  Complaint as if fully set forth herein.

25     535.   The acts alleged in causes of action 1 – 7 also constitute violations of the

26  Wisconsin Antitrust Act, Wis. Stat. § 133.03 *et seq.*

27

28

SECOND AMENDED COMPLAINT       137

536.     These violations substantially affect the people of Wisconsin and have impacts within the State of Wisconsin.

537.     Wisconsin, under its antitrust enforcement authority set forth in Wis. Stat. Ch. 133, seeks all remedies available at law or equity under Wis. Stat. §§ 133.03, 133.14, 133.16, 133.17, and 133.18.

**PRAYER FOR RELIEF**

538.     Plaintiff States are entitled as *parens patriae* to recover, and should be awarded, treble damages on behalf of their natural person residents pursuant to the Clayton Act, 15 U.S.C. §15c(a). Individual Plaintiff States are also entitled to recover additional damages (including treble or other enhanced damages where applicable) as specified in their state law claims above.

539.     Notwithstanding any other allegation in this Complaint, no Plaintiff State seeks remedies for any injuries suffered by state agencies, municipalities, or other political subdivisions ("Public Entities"), or by the State or any Public Entity in any proprietary capacity. Public Entities are not parties to this action, including for discovery purposes.

540.     Plaintiff States are entitled to, and should be awarded, a remedy of disgorgement against Google for any unjust income that Google received as a result of the unlawful conduct described herein which is not income derived from natural persons (or others under state laws where applicable) that is subject to recovery under *parens patriae* authority. For example, such income could include (but is not necessarily limited to) income from sales of advertising inside the Google Play Store or from data associated with in-app purchases acquired by Google through Google Play Billing. Further, if Plaintiff States are denied recovery of *parens patriae* damages, Plaintiff States are entitled to, and should be awarded, disgorgement against Google for income Google derived from natural persons (or others under state laws where applicable).

541.     Plaintiff States pray that the Court adjudge and decree as follows:

　　　　　a.  That Google's overbroad and/or pretextual technological obstacles and warnings in the process of sideloading Android apps, as described in Section I.D.1 above,

violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the State laws identified in Plaintiff States' eighth cause of action;

b.  That Google's use of contractual and other restraints—including but not limited to Anti-Fragmentation Agreements, Android Compatibility Commitments, Mobile Application Distribution Agreements, and Revenue Sharing Agreements—to unreasonably restrict competition in the Android App Distribution Market (or, alternatively, the Mobile App Distribution Market) violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the State laws identified in Plaintiff States' eighth cause of action;

c.  That Section 4.5 of Google's Developer Distribution Agreement, which prohibits developers from using "Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play," violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the State laws identified in Plaintiff States' eighth cause of action;

d.  That Google's conditioning of developers' access to Google App Campaigns on placement of their apps in the Google Play Store violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the State laws identified in Plaintiff States' eighth cause of action;

e.  That Google's attempts to pay Samsung to abandon relationships with top developers and scale back competition through the Samsung Galaxy Store, as described in Section I.F.1 above, violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the State laws identified in Plaintiff States' eighth cause of action;

f.  That Google's in-kind payments to key app developers to deter them from directly competing with the Google Play Store, as described in Section I.F.2 above,

violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the State laws identified in Plaintiff States' eighth cause of action; and

g. That Google's contractual provisions and payment policies requiring app developers to exclusively use Google Play Billing to process in-app purchases of digital content—including Developer Distribution Agreement Sections 3.2 and 4.1, and Google's Developer Program Policies—violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the State laws identified in Plaintiff States' eighth cause of action.

542.    Plaintiff States are entitled to, and should receive, injunctive relief against Google as appropriate, including structural remedies, to remedy Google's unlawful conduct and to prevent similar or related future unlawful conduct. Accordingly, Plaintiff States pray that the Court adjudge and decree that Google, all persons acting on its behalf or under its direction or control, and all successors thereto, be enjoined from:

a. Imposing needless technological obstacles or inaccurate warnings in the user experience of sideloading Android apps for apps that meet reasonable industry safety standards;

b. Using contracts or other restraints—including but not limited to Anti-Fragmentation Agreements, Android Compatibility Commitments, Mobile Application Distribution Agreements, and Revenue Sharing Agreements—to unreasonably restrict competition in the Android App Distribution Market (or, alternatively, the Mobile App Distribution Market) (by, for example, prohibiting an OEM from preloading a competing app store with or in lieu of the Google Play Store, or requiring premium placement of the Google Play Store on the device's home screen);

c. Prohibiting developers from using Google Play to distribute apps or app stores that may be used to facilitate the distribution of apps on Android devices outside of Google Play;

d.  Conditioning access to Google App Campaigns on placement of an app in the Google Play Store;

e.  Paying Samsung or other OEMs to abandon relationships with app developers or to otherwise scale back competition through competing app stores such as the Samsung Galaxy Store;

f.  Paying app developers, directly or through in-kind services, to deter them from making their apps available outside the Google Play Store;

g.  Requiring the developers of apps in the Google Play Store to use or offer Google Play Billing or any other Google service to process payments for in-app purchases;

h.  Using any information obtained by Google Play Billing for any purpose other than clearing the financial transaction at issue;

i.  Sharing any information obtained by Google Play Billing with any other part of Google for any reason, and from using any such information for any business purpose (e.g., for advertising purposes) other than clearing the financial transaction at issue; and

j.  Additional conduct as may be advisable based upon the facts of the case as it is proven at trial.

543.    Plaintiff States are also entitled to, and should receive, additional injunctive relief against Google as appropriate that may include, but is not necessarily limited to, the following:

a.  Prohibiting Google from additional conduct, and requiring Google to take additional actions, as may be advisable based upon the facts of the case as it is proven at trial both to remedy Google's past and current unlawful conduct and to reasonably reduce the possibility of future similar unlawful conduct; and

b.  Requiring Google to employ a neutral monitor to ensure compliance with the foregoing injunctive relief, and to report periodic verifications of such compliance or non-compliance to the Plaintiff States at reasonable intervals, for a period of not less than twenty years.

544.     Plaintiff States are entitled to recover, and should be awarded, civil penalties as provided herein. Consistent with the total dollar limits set forth in all such authorities, the Court should make a single award of civil penalties in an amount sufficient to deter Google and others similarly situated from future unlawful conduct of the sort at issue in this case. The Court could authorize the Plaintiff States to allocate such a civil penalties award among themselves as they may deem appropriate, or the Court could allocate such a civil penalty award among the states in accordance with each states' laws. Plaintiff States will seek a specific award which they deem appropriate based upon the facts of the case as it is proven at trial. Discovery specifically concerning the calculation of civil penalties by the Plaintiff States should be deferred until after trial.

545.     Plaintiff States are entitled to recover, and should be awarded, their reasonable attorney's fees, expenses, and costs of suit, as provided for in 15 U.S.C. §15c(a) and under specific state law claims.

546.     Plaintiff States seek such further and additional relief as may be appropriate based upon the facts of the case as it is proven at trial.


Respectfully submitted,

**December __, 2023**


**FOR PLAINTIFF STATE OF UTAH:**

SEAN D. REYES, Attorney General

 /s/ David N. Sonnenreich
DAVID N. SONNENREICH, Deputy Attorney General
MELISSA HOLYOAK, Solicitor General
MARIE W.L. MARTIN, Assistant Attorney General
SCOTT RYTHER, Assistant Attorney General

Office of the Utah Attorney General
160 E 300 S, 5th Floor
Salt Lake City, Utah 84114
Phone: 801-845-6862
Email: dsonnenreich@agutah.gov

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES, Attorney General

/s/ Bryan L. Bloom
ELINOR R. HOFFMANN, Chief, Antitrust Bureau
BRYAN L. BLOOM, Senior Enforcement Counsel
MORGAN J. FEDER, Assistant Attorney General
BENJAMIN COLE, Assistant Attorney General

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Phone: 212-416-8262
Email: Elinor.Hoffmann@ag.ny.gov
        Bryan.Bloom@ag.ny.gov
        Morgan.Feder@ag.ny.gov
        Benjamin.Cole@ag.ny.gov

**FOR PLAINTIFF STATE OF NORTH CAROLINA:**

JOSHUA H. STEIN, Attorney General

/s/ Jessica V. Sutton
JESSICA V. SUTTON, Special Deputy Attorney General
SARAH G. BOYCE, Deputy Attorney General and General Counsel
JONATHAN MARX, Special Deputy Attorney General

North Carolina Department of Justice
P.O. Box 628
Raleigh, NC 27602
Phone: 919-716-6000
Email: jsutton2@ncdoj.gov

**FOR PLAINTIFF STATE OF TENNESSEE:**

JONATHAN SKRMETTI, Attorney General and Reporter

/s/ David McDowell
J. DAVID MCDOWELL, Deputy Attorney General
S. ETHAN BOWERS, Senior Assistant Attorney General
HAMILTON MILLWEE, Assistant Attorney General

Tennessee Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Phone: 615-741-8722
Email: David.McDowell@ag.tn.gov
Ethan.Bowers@ag.tn.gov

**FOR PLAINTIFF STATE OF ARIZONA:**

KRISTIN K. MAYES, Attorney General

/s/ Jayme L. Weber
JAYME L. WEBER, Senior Litigation Counsel
ROBERT A. BERNHEIM, Unit Chief Counsel

Arizona Office of the Attorney General
400 W. Congress St., Ste. S-215
Tucson, Arizona 85701
Phone: 520-628-6609
Email: Jayme.Weber@azag.gov


**FOR PLAINTIFF STATE OF COLORADO:**

PHILIP J. WEISER, Attorney General

/s/ Bryn Williams
BRYN WILLIAMS, First Assistant Attorney General
STEVEN KAUFMANN, Deputy Solicitor General

Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: 720-508-6236
Email: Bryn.Williams@coag.gov
        Steve.Kaufmann@coag.gov


**FOR PLAINTIFF STATE OF IOWA:**

BRENNA BIRD, Attorney General

/s/ Noah Goerlitz
NOAH GOERLITZ, Assistant Attorney General

Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Phone: 515-281-5926
Email: Noah.Goerlitz@ag.iowa.gov

**FOR PLAINTIFF STATE OF NEBRASKA:**

MIKE HILGERS, Attorney General

 /s/ Colin P. Snider
COLIN P. SNIDER, Assistant Attorney General
JOSEPH M. CONRAD, Assistant Attorney General

Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
Phone: 402-471-3840
Email: Joseph.Conrad@nebraska.gov
        Colin.Snider@nebraska.gov

**FOR PLAINTIFF STATE OF ALABAMA:**

STEVE MARSHALL, Attorney General

/s/ Olivia W. Martin
OLIVIA W. MARTIN, Chief, Consumer Interest Division

Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
Phone: 334-242-7300
Email: Olivia.Martin@AlabamaAG.gov

**FOR PLAINTIFF STATE OF ALASKA:**

TREG TAYLOR, Attorney General

 /s/ Jeff Pickett
JEFF PICKETT, Senior Assistant Attorney General

Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Phone: 907-269-5100
Email: Jeff.Pickett@alaska.gov

**FOR PLAINTIFF STATE OF ARKANSAS**:

TIM GRIFFIN, Attorney General

 /s/ Amanda J. Wentz
AMANDA J. WENTZ, Assistant Attorney General

Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: 501.682.1178
Fax:  501.682.8118
Email: Amanda.Wentz@Arkansasag.gov


**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA, Attorney General

 /s/ Brian Wang
PAULA BLIZZARD, Senior Assistant Attorney General for Antitrust
MICHAEL JORGENSON, Supervising Deputy Attorney General
BRIAN WANG, Deputy Attorney General
CAROLYN JEFFRIES, Deputy Attorney General

Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
Phone: 415-510-3487
Email: Brian.Wang@doj.ca.gov


**FOR PLAINTIFF STATE OF CONNECTICUT:**

WILLIAM TONG, Attorney General

 /s/ Jeremy Pearlman
JEREMY PEARLMAN, Associate Attorney General
NICOLE DEMERS, Deputy Associate Attorney General

Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5440
Email: Jeremy.Pearlman@ct.gov

**FOR PLAINTIFF STATE OF DELAWARE:**

KATHLEEN JENNINGS, Attorney General

 /s/ Michael A. Undorf
MICHAEL A. UNDORF, Deputy Attorney General

Delaware Department of Justice
820 N. French St., 5th Floor
Wilmington, DE 19801
Phone: 302-683-8816
Email: Michael.Undorf@delaware.gov


**FOR PLAINTIFF DISTRICT OF COLUMBIA:**

BRIAN SCHWALB, Attorney General

 /s/ Adam Gitlin
ADAM GITLIN, Chief, Antitrust and Nonprofit Enforcement Section
ELIZABETH G. ARTHUR, Assistant Attorney General
MEHREEN IMTIAZ, Assistant Attorney General

Office of the Attorney General for the District of Columbia
400 6th Street, N.W, 10th Floor
Washington, D.C. 20001
Phone: 202-442-9864
Email: Adam.Gitlin@dc.gov


**FOR PLAINTIFF STATE OF FLORIDA:**

ASHLEY MOODY, Attorney General

 /s/ R. Scott Palmer
R. SCOTT PALMER, Special Counsel and Chief of Complex Enforcement
JOHN GUARD, Chief Deputy Attorney General
LEE ISTRAIL, Assistant Attorney General
CHRISTOPHER KNIGHT, Assistant Attorney General
ANDREW BUTLER, Assistant Attorney General

Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, FL 32399
Phone: 850-414-3300
Email: scott.palmer@myfloridalegal.com

1

2

**FOR PLAINTIFF STATE OF GEORGIA:**

CHRISTOPHER M. CARR, Attorney General

3

/s/ Charles Thimmesch
MARGARET K. ECKROTE, Deputy Attorney General
JEFFREY W. STUMP, Senior Assistant Attorney General
CHARLES THIMMESCH, Senior Assistant Attorney General

4

5

Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334
Phone: 404-458-3626
Email: cthimmesch@law.ga.gov

6

7

8

9

**FOR PLAINTIFF STATE OF HAWAII:**

ANNE E. LOPEZ, Attorney General

10

11

/s/ Rodney I. Kimura
RODNEY I. KIMURA, Deputy Attorney General

12

13

Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
Phone: 808-586-1180
Email: Bryan.C.Yee@hawaii.gov
        Rodney.I.Kimura@hawaii.gov

14

15

16

**FOR PLAINTIFF STATE OF IDAHO:**

17

RAÚL LABRADOR, Attorney General

18

 /s/ Stephanie N. Guyon
STEPHANIE N. GUYON, Deputy Attorney General
JOHN K. OLSON, Deputy Attorney General

19

20

Office of the Attorney General
954 W. Jefferson St., 2nd Fl.
P.O. Box 83720
Boise, ID 83720-0010
Phone: 208-334-2424
Email: stephanie.guyon@ag.idaho.gov

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT                    148

**FOR PLAINTIFF STATE OF ILLINOIS:**

KWAME RAOUL, Attorney General

/s/ Elizabeth L. Maxeiner
ELIZABETH L. MAXEINER, Chief, Antitrust Bureau

Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
Phone: 773-790-7935
Email: Elizabeth.maxeiner@ilag.gov


**FOR PLAINTIFF STATE OF INDIANA:**

TODD ROKITA, Attorney General

/s/ Scott L. Barnhart
SCOTT L. BARNHART, Chief Counsel and Director, Consumer Protection Division
MATTHEW MICHALOSKI, Deputy Attorney General
CHRISTI FOUST, Deputy Attorney General
RYAN FRASHER, Deputy Attorney General

Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Phone: 317-232-6309
Email: Scott.Barnhart@atg.in.gov


**FOR PLAINTIFF STATE OF KANSAS:**

KRIS KOBACH, Attorney General

/s/ Lynette R. Bakker
LYNETTE R. BAKKER, First Assistant Attorney General

Office of the Kansas Attorney General
120 SW 10th Ave., Fl. 2
Topeka, KS 66612
Phone: 785-296-3751
Email: Lynette.Bakker@ag.ks.gov

**FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:**

DANIEL CAMERON, Attorney General

/s/ Philip R. Heleringer
PHILIP R. HELERINGER, Executive Director of Consumer Protection
J. CHRISTIAN LEWIS, Commissioner of Consumer & Senior Protection
JONATHAN E. FARMER, Deputy Executive Director of Consumer Protection
ZACHARY J. RICHARDS, Assistant Attorney General

Office of the Attorney General, Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Phone: 502-696-5647
Email: Philip.Heleringer@ky.gov

**FOR PLAINTIFF STATE OF LOUISIANA:**

JEFF LANDRY, Attorney General

/s/ Patrick Voelker
PATRICK VOELKER, Assistant Attorney General, Public Protection Division

Office of the Attorney General
P.O. Box 94005
1885 North 3rd Street
Baton Rouge, LA 70804-9005
Phone: 225-326-6458
Email: voelkerp@ag.louisiana.gov

**FOR PLAINTIFF STATE OF MAINE:**

AARON M. FREY, Attorney General

/s/ Christina M. Moylan
CHRISTINA M. MOYLAN, Chief, Consumer Protection Division

Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Phone: 207-626-8800
Email: Christina.Moylan@maine.gov

**FOR PLAINTIFF STATE OF MARYLAND:**

ANTHONY G. BROWN, Attorney General

/s/ Schonette J. Walker
SCHONETTE J. WALKER, Assistant Attorney General and Chief of the Antitrust Division
GARY HONICK, Assistant Attorney General and Deputy Chief of the Antitrust Division

Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Phone: 410-576-6470
Email: swalker@oag.state.md.us
        ghonick@oag.state.md.us

**FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:**

ANDREA CAMPBELL, Attorney General

/s/ William T. Matlack
WILLIAM T. MATLACK, Assistant Attorney General, Chief, Antitrust Division
DANIEL LEFF, Assistant Attorney General

Office of the Attorney General
One Ashburton Place, 18th Fl.
Boston, MA 02108
Phone: 617-963-2414
Email: William.Matlack@mass.gov

**FOR PLAINTIFF STATE OF MICHIGAN:**

DANA NESSEL, Attorney General

/s/ Scott A. Mertens
SCOTT A. MERTENS, Assistant Attorney General, Corporate Oversight Division

Michigan Department of Attorney General
P.O. Box 30736
Lansing, MI 48909
Phone: 517-335-7632
Email: MertensS@michigan.gov

**FOR PLAINTIFF STATE OF MINNESOTA:**

KEITH ELLISON, Attorney General

 /s/ Justin Moor
JUSTIN MOOR, Assistant Attorney General
JAMES W. CANADAY, Deputy Attorney General
ZACH BIESANZ, Senior Enforcement Counsel

Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2130
Phone: 651-757-1060
Email: Justin.Moor@ag.state.mn.us

**FOR PLAINTIFF STATE OF MISSISSIPPI:**

LYNN FITCH, Attorney General

 /s/ Hart Martin
HART MARTIN, Special Assistant Attorney General, Consumer Protection Division

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205
Phone: 601-359-4223
Fax: 601-359-4231
Email: Hart.Martin@ago.ms.gov

**FOR PLAINTIFF STATE OF MISSOURI:**

ANDREW BAILEY, Attorney General

 /s/ Michael Schwalbert
MICHAEL SCHWALBERT, Assistant Attorney General

Missouri Attorney General's Office
815 Olive St., Ste. 200
St. Louis, MO 63101
Phone: 314-340-7888
Email: Michael.Schwalbert@ago.mo.gov

**FOR PLAINTIFF STATE OF MONTANA**:

AUSTIN KNUDSEN, Attorney General

 /s/ Anna K. Schneider
ANNA K. SCHNEIDER, Bureau Chief, Office of Consumer Protection
ANDREW BUTLER, Assistant Attorney General

Montana Department of Justice
302 N. Roberts Street
Helena, MT 59601
Phone: 406-444-4500
Email: Anna.Schneider@mt.gov
          Andrew.Butler@mt.gov


**FOR PLAINTIFF STATE OF NEVADA:**

AARON D. FORD, Attorney General

 /s/ Lucas J. Tucker
LUCAS J. TUCKER, Senior Deputy Attorney General
MICHELLE C. BADORINE, Senior Deputy Attorney General

Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Phone: 775-684-1100
Email: LTucker@ag.nv.gov


**FOR PLAINTIFF STATE OF NEW HAMPSHIRE:**

JOHN M. FORMELLA, Attorney General

 /s/ Alexandra C. Sosnowski
ALEXANDRA C. SOSNOWSKI, Assistant Attorney General

New Hampshire Department of Justice
Office of the Attorney General
One Granite Place South
Concord, NH 03301
Phone: 603-271-2678
Email: Alexandra.C.Sosnowski@doj.nh.gov

**FOR PLAINTIFF STATE OF NEW JERSEY:**

MATTHEW J. PLATKIN, Attorney General

/s/ Isabella R. Pitt
ISABELLA R. PITT, Assistant Section Chief for Antitrust and Deputy Attorney General

New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07102
Phone: 973-648-7819
Email: Isabella.Pitt@law.njoag.gov


**FOR PLAINTIFF STATE OF NEW MEXICO:**

RAÚL TORREZ, Attorney General

/s/ Mark Swanson
MARK SWANSON, Assistant Attorney General
JUDITH PAQUIN, Assistant Attorney General

New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Phone: 505-717-3500
Email: mswanson@nmag.gov


**FOR PLAINTIFF STATE OF NORTH DAKOTA:**

DREW WRIGLEY, Attorney General

/s/ Elin S. Alm
ELIN S. ALM, Assistant Attorney General, Consumer Protection and Antitrust Division

Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Phone: 701-328-5570
Facsimile: 701-328-5568
Email: ealm@nd.gov

**FOR PLAINTIFF STATE OF OHIO:**

DAVE YOST, Attorney General

/s/ Sarah Mader
SARAH MADER, Assistant Attorney General, Antitrust Section
BETH A. FINNERTY, Section Chief, Antitrust Section

Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Phone: 614-466-4328
Email: Sarah.Mader@ohioago.gov

**FOR PLAINTIFF STATE OF OKLAHOMA:**

GENTNER DRUMMOND, Attorney General

/s/ Caleb J. Smith
CALEB J. SMITH, Assistant Attorney General, Consumer Protection Unit

Office of the Oklahoma Attorney General
15 W. 6th Street, Suite 1000
Tulsa, OK 74119
Phone: 918-581-2230
Email: Caleb.Smith@oag.ok.gov

**FOR PLAINTIFF STATE OF OREGON:**

ELLEN F. ROSENBLUM, Attorney General

/s/ Timothy D. Smith
TIMOTHY D. SMITH, Senior Assistant Attorney General
CHERYL F. HIEMSTRA, Assistant Attorney General
TIM D. NORD, Special Counsel

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Phone: 503-934-4400
Facsimile: 503-378-5017
Email: Tim.Smith@doj.state.or.us

**FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:**

MICHELLE A. HENRY, Attorney General

/s/ Tracy W. Wertz
TRACY W. WERTZ, Chief Deputy Attorney General
JOSEPH S. BETSKO, Assistant Chief Deputy Attorney General

Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: 717-787-4530
Email: twertz@attorneygeneral.gov
        jbetsko@attorneygeneral.gov

**FOR PLAINTIFF COMMONWEALTH OF PUERTO RICO:**

DOMINGO EMANUELLI HERNÁNDEZ, Attorney General

/s/ Guarionex Díaz Martínez
GUARIONEX DÍAZ MARTÍNEZ, Deputy Attorney General

Puerto Rico Department of Justice
Office of Monopolistic Affairs
P.O. Box 9020192
San Juan, PR 00902-0192
Phone: 787-721-2900
Email: gdiaz@justicia.pr.gov

**FOR PLAINTIFF STATE OF RHODE ISLAND:**

PETER F. NERONHA, Attorney General

/s/ Stephen N. Provazza
STEPHEN N. PROVAZZA, Unit Chief Counsel for Consumer and Economic Justice

Rhode Island Office of the Attorney General
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov

**FOR PLAINTIFF STATE OF SOUTH CAROLINA:**

ALAN M. WILSON, Attorney General

/s/ Rebecca M. Hartner
REBECCA M. HARTNER, Assistant Attorney General
W. JEFFREY YOUNG, Chief Deputy Attorney General
C. HAVIRD JONES, Senior Assistant Deputy Attorney General
MARY FRANCES JOWERS, Assistant Deputy Attorney General
CLARK C. KIRKLAND, Assistant Attorney General

South Carolina Office of the Attorney General
1000 Assembly Street, Suite 500
P.O. Box 11549
Columbia, SC 29211
Phone: 803-734-5855
Email: rhartner@scag.gov

**FOR PLAINTIFF STATE OF SOUTH DAKOTA:**

MARTY JACKLEY, Attorney General

/s/ Jonathan K. Van Patten
JONATHAN K. VAN PATTEN, Assistant Attorney General

South Dakota Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501
Phone: 605-773-3215
Email: Jonathan.VanPatten@state.sd.us

**FOR PLAINTIFF STATE OF TEXAS:**

KEN PAXTON, Attorney General

/s/ James Lloyd
JAMES LLOYD, Deputy Attorney General for Civil Litigation and Chief, Antitrust Division
TREVOR YOUNG, Deputy Chief, Antitrust Division
COULTER GOODMAN, Assistant Attorney General, Antitrust Division

Office of the Attorney General
300 W. 15th Street
Austin, TX 78701
Phone:  512-463-1579
Email: James.Lloyd@oag.texas.gov
          Coulter.Goodman@oag.texas.gov

**FOR PLAINTIFF STATE OF VERMONT:**

CHARITY R. CLARK, Attorney General

 /s/ Merideth Chaudoir
MERIDETH CHAUDOIR, Assistant Attorney General

Office of Attorney General
109 State Street
Montpelier, VT 05609
Phone: 802-828-5479
Email: Merideth.Chaudoir@vermont.gov


**FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:**

JASON S. MIYARES, Attorney General

 /s/ Tyler T. Henry
TYLER T. HENRY, Assistant Attorney General

Office of the Attorney General for Virginia
202 North 9th Street
Richmond, VA 23219
Phone: 804-692-0485
Email: THenry@oag.state.va.us


**FOR PLAINTIFF TERRITORY OF THE VIRGIN ISLANDS OF THE UNITED STATES:**

ARIEL M. SMITH, Attorney General

/s/ Julie Beberman
JULIE BEBERMAN, Assistant Attorney General

Virgin Islands Department of Justice
213 Estate La Reine, RR1 Box 6151
Kingshill, VI 00850
Phone: 340-773-0295
Email: Julie.Beberman@doj.vi.gov

**FOR PLAINTIFF STATE OF WASHINGTON:**

ROBERT W. FERGUSON, Attorney General

/s/ Amy N.L. Hanson
AMY N.L. HANSON, Managing Assistant Attorney General
BROOKE HOWLETT LOVROVICH, Assistant Attorney General

Washington State Office of the Attorney General
800 Fifth Ave., Suite 2000
Seattle, WA 98104
Phone: 206-464-5419
Email: Amy.Hanson@atg.wa.gov

**FOR PLAINTIFF STATE OF WEST VIRGINIA:**

PATRICK MORRISEY, Attorney General

/s/ Douglas L. Davis
DOUGLAS L. DAVIS, Senior Assistant Attorney General

Office of the West Virginia Attorney General
1900 Kanawha Boulevard East
Capitol Complex, Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25326
Phone: 304-558-8986
Email: douglas.l.davis@wvago.gov

**FOR PLAINTIFF STATE OF WISCONSIN:**

JOSH KAUL, Attorney General

/s/ Gwendolyn J. Lindsay Cooley
GWENDOLYN J. LINDSAY COOLEY, Assistant Attorney General

Wisconsin Department of Justice
17 W. Main St.
Madison, WI 53703
Phone: 608-261-5810
Email: Gwendolyn.Cooley@wisconsin.gov

**FOR PLAINTIFF STATE OF WYOMING:**

BRIDGET HILL, Attorney General

/s/ Ryan Schelhaas
RYAN SCHELHAAS, Chief Deputy Attorney General

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
Phone: 307-777-5786
Email: Ryan.Schelhaas@wyo.gov