Brendan P. Glackin (SBN 199643)
Lauren M. Weinstein (*pro hac vice*)
bglackin@agutah.gov
lweinstein@agutah.gov
**OFFICE OF THE UTAH**
**ATTORNEY GENERAL**
160 E 300 S, 5th Floor,
PO Box 140872
Salt Lake City, UT 84114-0872
Telephone: (801) 366-0620

*Counsel for the Plaintiff States*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-cv-05227-JD |
| THIS DOCUMENT RELATES TO:<br><br>*State of Utah et al. v. Google LLC* et al., Case No. 3:21-cv-05227-JD | **STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge: Hon. James Donato<br>Courtroom: 11, 19th Floor<br>Date: February 8, 2024 at 10:00 a.m. |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 8, 2024, at 10:00 a.m., in Courtroom 11 of the above-entitled Court, located on the 19th floor of 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable James Donato, the State Attorneys General (the "States"), will and hereby move the Court for an order finding that the settlement is sufficiently fair, reasonable, and adequate for the Court to approve issuing notice of it to Eligible Consumers pursuant to Section 15c of the Clayton Act. 15 U.S.C. § 15c.

This Motion is based on this notice of motion and motion, the memorandum of points and authorities that follows, the concurrently filed Declaration of Paula L. Blizzard in Support of the States' Unopposed Motion to Give Notice of Proposed *Parens Patriae* Settlement and exhibit thereto, the concurrently filed Declaration of Eric Schachter in Support of the States' Unopposed Motion to Give Notice of Proposed *Parens Patriae* Settlement and exhibits thereto, the concurrently filed Declaration of Lana Cooper in Support of the States' Unopposed Motion to Give Notice of Proposed *Parens Patriae* Settlement, the pleadings, papers, and other documents on file in this action, and such other evidence and argument presented to the Court at or prior to any hearing in this matter.

Case No. No. 3:21-cv-05227-JD

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

ISSUE TO BE DECIDED ........................................................................................................... 1

INTRODUCTION ....................................................................................................................... 1

FACTUAL BACKGROUND........................................................................................................ 2

    I.   The Alleged Conduct .................................................................................................. 2

    II.  The States' Vigorous Prosecution of this Case............................................................ 3

    III. The Mediation Process ............................................................................................... 4

    IV. The Terms of the Proposed Settlement Agreement ...................................................... 5

        A.  Injunctive Relief ................................................................................................ 5

        B.  Monetary Payment and Distribution.................................................................... 7

        C.  Release of Claims .............................................................................................. 8

LEGAL FRAMEWORK ............................................................................................................. 9

ARGUMENT ........................................................................................................................... 10

    I.   The Settlement Is Fair, Reasonable, and Adequate ................................................... 10

        A.  The States Have Adequately – and Zealously – Represented Consumers ................... 10

        B.  The Settlement Agreement Was Negotiated at Arm's Length ....................................... 10

        C.  The Relief Provided for Consumers Is Adequate ......................................................... 10

            1.   The Trial and Appeal Would Be Costly, Risky, and Protracted................................. 10

            2.   The Proposed Method for Distributing Relief to Consumers Is Effective ................ 15

            3.   The Amount Paid into the States' Monetary Fund Is Fair and Reasonable.............. 19

            4.   There Are No Other Related Agreements ............................................................... 20

            5.   The Settlement Agreement Treats Consumers Equitably........................................ 20

        D.  The Settlement Satisfies the District's Procedural Guidance ........................................ 20

            1.   The Releases Track the Allegations in the Complaint............................................. 21

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

2.   The Settlement Administrator Selection Process and Costs are Reasonable ............ 21

3.   Service Awards .................................................................................................. 23

4.   Cy Pres .............................................................................................................. 23

5.   Past Distributions .............................................................................................. 23

CONCLUSION .................................................................................................................25

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## TABLE OF AUTHORITIES

### Federal Cases

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ........... 9

*Cohorst v. BRE Props., Inc.,* No. 3:10-cv-2666-JM-BGS, 2011 WL 7061923 (S.D. Cal. Nov. 14, 2011) ............................................................................................ 16

*Cottle v. Plaid, Inc., No. 20-cv-3056-DMR,* 2021 WL 541525 (N.D. Cal. Nov. 19, 2021) ........... 6

*Epic Games Inc. v. Apple Inc.*, 2021 WL 6755197 (9th Cir. Dec. 8, 2021) ................................. 14

*Epic Games v. Apple*, 559 F. Supp. 3d 898 (N.D. Cal. 2021) ...................................................... 13

*Epic Games v. Apple*, 67 F.4th 946 (9th Cir. 2023) ..................................................................... 13

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972) ......................................................................... 9

*California v. eBay, Inc.,* No. 5:12-CV-05874-EJD, 2014 WL 4273888 (N.D. Cal. Aug. 29, 2014) .................................................................................................. 9

*Norcia v. Samsung Telecommunications Am. LLC,* No. 14-cv-00582-JD, 2021 WL 3053018 (N.D. Cal. July 20, 2021) ................................................................. 16

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) ..................................... 11

*State of California v. Frito Lay Inc.*, 474 F.2d 774 (9th Cir. 1973) ................................................ 9

*Taylor v. Shutterfly, Inc.,* No. 5:18-cv-00266, 2021 WL 5810294 (N.D. Cal. Dec. 7, 2021) ................................................................................................... 16

*Wal-Mart Stores Inc. v. Visa USA Inc.*, 396 F.3d 96 (2d Cir. 2005) ............................................ 12

### Federal Statutes

15 U.S.C. § 15c ...................................................................................................................... 1-2, 7-9

15 U.S.C. § 15e ......................................................................................................................... 17, 19

### Federal Rules

Federal Rule of Civil Procedure Rule 23 .............................................................................. 9, 15-16

### State Statutes

Cal. Bus. & Prof. Code § 16750 ...................................................................................................... 19

Cal. Gov't Code § 12526 ................................................................................................................. 19

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**ISSUE TO BE DECIDED**

Whether the settlement with Google is sufficiently fair, reasonable, and adequate for the Court to approve issuing notice pursuant to Section 15c of the Clayton Act. 15 U.S.C. § 15c.

**INTRODUCTION**

More than two years ago, 39 Plaintiff States brought this case alleging federal and state antitrust claims, as well as state consumer protection claims, against Google and certain of its affiliates. The States sought damages as *parens patriae* on behalf of their residents and non-*parens* relief, including disgorgement, restitution, civil penalties, attorneys' fees, and injunctive relief.

For over two years, the States, along with counsel for the class this Court had originally certified ("Consumer Counsel") and other co-plaintiffs, vigorously litigated this case, as explained in further detail below. Simultaneously, the States pursued a negotiated resolution short of trial. The mediation process took hundreds of hours and involved senior counsel for the States, the proposed Consumer Class, and Google, as well as a team of experienced mediators. The settlement provides significant monetary relief to Eligible Consumers and unprecedented injunctive relief that should re-invigorate competition.[1]

The Settlement Agreement has three major components:

- Creation of a $630 million common fund to be distributed to Eligible Consumers (net of authorized expenses and Consumer Counsel fees and costs);

- Creation of a $70 million fund to be distributed to the States to resolve their non-*parens* claims (*e.g.*, for penalties, restitution, disgorgement, and fees); and

- Injunctive relief designed to reduce barriers to competition in the markets for app distribution and payment processing services.

While 39 jurisdictions brought this litigation initially, ***all 50 States, the District of Columbia, and two territories*** have now decided to join the settlement because they believe it will enhance

---

[1] The full Settlement Agreement is attached as Exhibit A to the Declaration of Paula L. Blizzard ("Blizzard Decl."). Capitalized terms have the meanings ascribed to them in the Settlement Agreement.

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

competition in the relevant markets and properly redress consumers' injuries.[2] The States have proposed a distribution plan designed to minimize costs and maximize the number of Eligible Consumers who will recover: The settlement administrator conservatively estimates that at least 70% of Eligible Consumers will collect damages directly via automated payments that will not require consumers to submit a claim. The settlement's combination of monetary relief to consumers and injunctive relief to open the markets to competition qualifies as sufficiently fair, reasonable, and adequate for the Court to approve issuing notice of it to Eligible Consumers. *See* 15 U.S.C. § 15c(b).

## FACTUAL BACKGROUND

### I.   The Alleged Conduct

The facts of this case are familiar to the Court. The States' First Amended Complaint alleges claims for (1) monopoly maintenance, (2) tying, and (3) unreasonable restraints of trade in the markets for Android app distribution and for payment processing on Android devices, in violation of the Sherman Act.[3] The Complaint also alleges state-law antitrust and consumer protection claims. Specifically, the States allege that Google has unreasonably restrained trade and monopolized Android app distribution and payment-processing services through anticompetitive conduct.[4] This includes entering into anticompetitive contracts with OEMs and mobile service providers to prevent other app stores from being preloaded on Android devices, buying off key app developers to keep them from launching their own app stores or offering exclusive launches or special discounts to other app stores, and erecting technological hurdles to deter consumers from directly downloading (*i.e.*, sideloading) apps and app stores to their devices.[5]

---

[2] Prior to the expansion of the States' group in September, consumers in the jurisdictions that were not represented by States' Attorneys General were represented by Consumer Counsel as part of the formerly certified class. As discussed below, the States and Consumer Counsel agreed to collectively represent consumers nationwide through their Joint Prosecution Agreement, which was previously submitted to the Court. *See* Joint Prosecution Agreement, No. 3:21-md-02981, Dkt. No. 251-2. All references to the docket in this motion are to the docket for the States' case, No. 3:21-cv-05227-JD.
[3] First Amended Compl., Dkt. 188, Counts 1-7.
[4] *Id.* ¶¶ 83-153; 162-67.
[5] *Id.* ¶¶ 114-53.

1    As a result of Google's unlawful conduct, the States alleged, Google has been able to extract

2  enormous sums from consumers.[6] With certain limited exceptions, when a consumer buys a paid app

3  or in-app content, Google takes 30% of the money.[7] Google collects its 30% cut by forcing consumers

4  to use Google Play Billing to buy apps and in-app content, and by prohibiting app developers from

5  suggesting alternative ways to purchase content (*e.g.*, purchasing directly from the developer's

6  website, bypassing Google altogether).[8] The Complaint seeks damages, restitution, disgorgement,

7  attorneys' fees, civil penalties, and injunctive relief.[9]

8  **II.    The States' Vigorous Prosecution of this Case**

9    For over two years, and following several months of coordinated investigation, the States and

10  Consumer Counsel pursued claims in this Court on behalf of consumers nationwide. The States,

11  Consumer Counsel, Epic, and Match served over 1,000 requests for production and hundreds of

12  interrogatories and/or requests for admission. The States deposed over 40 individuals from Google,

13  20 third-party witnesses from over a dozen companies or organizations, and over a half-dozen expert

14  witnesses. The States and the other plaintiffs opposed Google's Motion for Partial Summary

15  Judgment, and the States argued the critical question of the States' and Consumers' standing to bring

16  damages claims for in-app purchases.[10] The States spent hundreds of hours developing the record that

17  resulted in Google being sanctioned for its willful destruction of Chats, working with Consumer

18  Counsel and the other co-plaintiffs.[11] And the States served expert reports on behalf of five experts,

19  totaling thousands of pages of testimony. One of these experts, Dr. Rysman, advanced a well-

20  founded, but novel model that calculated the value to consumers of lost variety in the app market, as

21  opposed to a traditional overcharge model.

22

23

24  _____

25  [6] *Id.* ¶¶ 157, 212, 220.
   [7] *Id.* ¶ 157.

26  [8] *Id.* ¶¶  82-113.
   [9] *Id.* at ¶¶ 524-532.

27  [10] Aug. 3, 2023 H'rg Tr., Dkt. 425, at 32-38.

28  [11] Decl. of Lauren M. Weinstein in Support of Plaintiffs' Statement of Proposed Attorneys' Fees and
   Costs, Dkt. 385-1.

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

### III. The Mediation Process

This Settlement resulted from an intensive mediation process. Throughout, the States worked diligently to ensure that any settlement would include strong injunctive relief that would open up the relevant markets to competition.[12] Senior antitrust enforcers from California, New York, North Carolina, Tennessee, and Utah devoted hundreds of hours over more than a year negotiating alongside Consumer Counsel to obtain the relief reflected in the Settlement Agreement from Google.

Talks began in earnest in August 2022, with a Zoom mediation session including the States, Consumer Counsel, and Google, moderated by Judges Daniel Weinstein and Rebecca Westerfield.[13] The representatives for the States were: Melissa Holyoak, the Solicitor General for the State of Utah; Paula Blizzard, Senior Assistant Attorney General for the Antitrust Section for the State of California; Elinor Hoffmann, Chief of the Antitrust Bureau for the State of New York; Sarah Boyce, Deputy Attorney General and General Counsel for the State of North Carolina; and David McDowell, Consumer Protection & Antitrust Chief for the State of Tennessee.[14] These senior officials continued to represent the States throughout the mediation process. Consumer Counsel also attended with representatives from the Plaintiffs' Steering Committee and co-lead counsel, Karma Giulianelli and Hae Sung Nam.

In October 2022, counsel for the States, Consumer Counsel, and Google held the first in-person mediation session.[15] That session lasted two full days, overseen by Judges Weinstein and Westerfield.[16] The States, Consumer Counsel, and Google continued to meet regularly for the next eleven months, with assistance from Judges Weinstein and Westerfield.[17] Most of these sessions were virtual, but the parties met for a second two-day, in-person session in late July 2023.[18]

---

[12] Blizzard Decl. ¶ 5.
[13] Blizzard Decl. ¶ 7.
[14] *Id.* ¶ 9.
[15] Blizzard Decl. ¶ 8.
[16] *Id.*
[17] *Id.* ¶ 10.
[18] *Id.*

The mediation process started coalescing around a set of terms in late July 2023.[19] The parties continued to negotiate the final details of the settlement through late August, while simultaneously preparing to go to trial.[20] After the Court excluded the testimony of the proposed Consumer Class's economics expert, Dr. Hal Singer, and announced its intention to decertify the proposed Consumer Class on August 28, 2023,[21] the States expanded their coalition to include all fifty States, as well as the District of Columbia, Puerto Rico, and the Virgin Islands.[22] This ensured that all affected U.S. consumers would still have relief and provided a path to the global peace that Google required.

Over the 2023 Labor Day weekend, the States, Consumer Counsel, and Google finally reached tentative settlement terms.[23] On September 5, 2023, the States, Consumer Counsel, and Google notified the Court that they had reached a settlement in principle, although it still required approval by all 53 Attorneys General.[24] On October 12, 2023, the States notified the Court that all 53 Attorneys General had approved the settlement, although final signatures and formatting were still being addressed.[25] On November 17, 2023, the States notified the Court that the settlement had been finalized and executed in full.[26]

**IV.     The Terms of the Proposed Settlement Agreement**

    **A.  Injunctive Relief**

The Settlement contains six categories of robust injunctive terms that address the anticompetitive effects of Google's unlawful conduct.[27] Google would be enjoined from continuing or restarting certain anticompetitive conduct related to Android and the Google Play Store for at least

---

[19] Blizzard Decl. ¶11.

[20] *Id.* ¶12.

[21] *Id*. ¶13; *see* Order re Merits Opinions of Dr. Hal J. Singer, Dkt. 436; Order re Decertification and Class Notice, 3:21-md-2981-JD, Dkt. 589

[22] *Id.* ¶14. Thus, Eligible Consumers in all fifty States and the three covered territories will receive relief under the Settlement Agreement. *Id.* ¶19.

[23] Blizzard Decl. ¶15.

[24] *Id.* ¶16; *see* Stipulation re Tentative Settlement, Dkt. 443.

[25] *Id.* ¶17; *see* Minute Order for Oct. 12, 2023 Status Conference and Mot. Hr'g, Dkt. 497.

[26] *Id*. ¶18; *see* Notice of Executed Settlement and Stipulated [Proposed] Order Regarding Date for Filing Motion to Give Notice of Proposed *Parens Patriae* Settlement, Dkt. 516.

[27] Blizzard Decl. ¶19.

1   four to seven years. An Independent Compliance Professional ("ICP"), paid for by Google but

2   selected by Google and the States, will monitor Google's compliance for five years.[28]

3        **Exclusivity and preloading.** The Settlement prohibits Google from (i) for at least five years,

4   entering into or enforcing deals with OEMs that require preload exclusivity or home screen

5   exclusivity for the Google Play Store; (ii) for at least four years, entering into or enforcing OEM deals

6   that block the granting of "installer rights" to preloaded apps; and (iii) for at least five years, requiring

7   that OEMs obtain its consent before preloading third-party app stores.[29]

8        **Sideloading.** The Settlement requires Google (i) to continue to allow installation of third-

9   party apps, including third-party app stores, from outside the Google Play Store, for at least seven

10  years; and (ii) to simplify the process for installing apps from outside Google Play, including by

11  combining certain warning screens and updating user interface language, for at least five years.[30]

12       **Android Support for Third-Party App Stores.** The Settlement requires that Google

13  maintain Android operating system support for third-party app stores installed through non-Play-

14  Store channels, including by enabling automatic background updates of apps installed from those

15  third-party app stores, for at least four years.[31]

16       **Most Favored Nation ("MFN") Clauses.** The Settlement prohibits Google from offering or

17  enforcing (i) for at least four years, any "simultaneous shipping" (or "sim ship") MFN clauses that

18  require a developer to launch their app catalog on Google Play Store at the same time as on other

19  Android app stores, or to offer their titles with the same or better features on Google Play Store as on

20  other app stores;[32] and (ii) for at least five years, any price parity MFN clauses.[33]

21

22

23

---

24  [28] *Id.*, Ex. A (Settlement Agreement), §§ 1.21, 7.

25  [29] Settlement Agreement §§ 6.6, 6.7, 6.8.

    [30] Settlement Agreement §§ 6.2, 6.10.

26  [31] Settlement Agreement § 6.9.

27  [32] Settlement Agreement § 6.5. The Settlement permits Google to negotiate "sim ship" for individual apps or to negotiate a developer-wide sim ship after 2 years, if the competing platform is controlled by a company with revenues exceeding $100 billion.

28  [33] *Id.* § 6.4.

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**User Choice Billing.** The Settlement requires Google to give **all developers**, including game developers, the option to add alternative in-app billing systems for at least five years. At checkout, users will be able to choose which in-app billing system to use.[34]

**Anti-Steering.** Under the settlement, Google must allow developers to steer consumers away from the Google Play Store and toward alternative billing systems. Specifically, Google must (i) allow developers to contact users out-of-app (such as via email) using information obtained from within or outside the app to promote alternatives to Google's billing system for at least six years; (ii) allow apps without in-app purchase capability to notify users about purchasing options and prices (*e.g.*, "available on our website for $9.99") outside of Google Play, for at least six years; and (iii) allow apps with in-app purchase capability to notify users about alternative purchasing options and prices (*e.g.*, "available on our website for $9.99") outside of Google Play, for at least five years. The Settlement also prohibits Google from barring developers from telling consumers about Google's service fees for at least six years.[35]

*       *       *

Injunctive terms of this breadth are **unprecedented** in U.S. antitrust regulation of Big Tech. The negotiated terms will offer significant, meaningful, long-lasting relief for consumers throughout the country. No other U.S. antitrust enforcer has yet been able to secure remedies of this magnitude from Google, or, for that matter, from any of the other major digital platforms.

### B.  Monetary Payment and Distribution

The Settlement provides for a total payment of $700 million: $630 million will be deposited into a *parens patriae* Settlement Fund ("Settlement Fund Amount"), and $70 million will be deposited into a non-*parens* States' Monetary Fund ("States' Monetary Fund Amount").[36] Google will transfer the Settlement Fund Amount into an escrow account within 45 days of the granting of

---

[34] Settlement Agreement § 6.3

[35] Settlement Agreement §§ 6.3, 6.11. Google need not allow developers to include external links in their apps, nor must it include calls to action beyond what is required in *Epic v. Apple*, No. 4:20-cv-05640-YGR (N.D. Cal.), *id.* § 6.11.

[36] The *parens patriae* Settlement Fund resolves claims for damages sought under 15 U.S.C. § 15c and any state-law claims that require court approval. The non-*parens* States' Monetary Fund resolves the States' monetary claims asserted under state law that do not require court approval.

this motion.[37] Distribution of funds can commence within ten days of the Effective Date (*i.e.*, the date when the Court has granted final approval, and appellate review is exhausted).[38] Prior to that, the fund will earn interest that will inure to the benefit of consumers. The Consumer Compensation and the Notice and Distribution plans are explained in greater detail below (at pp. 15-18). The proposed long and short form Notices are attached as Exhibits A and B, respectively, to the Declaration of Eric Schachter in Support of States' Motion to Give Notice of Proposed *Parens Patriae* Settlement ("Schachter Decl."). The Distribution Plan is described in detail in the Declaration of Lana Cooper in Support of States' Motion to Give Notice of Proposed *Parens Patriae* Settlement ("Cooper Decl.").

The $70 million States' Monetary Fund is intended to resolve the States' non-*parens* state antitrust and consumer protection claims, including claims for restitution, disgorgement, attorneys' fees, and civil penalties. The States' Monetary Fund shall be apportioned among the States according to a distribution agreement negotiated among the States. Unlike the *parens* claims asserted under § 15c, settlement of these non-*parens* claims does not require court approval.

As explained in Section 5.6 of the Settlement Agreement, the States intend to use the States' Monetary Fund for one or more of the following purposes: (i) antitrust or consumer protection law enforcement; (ii) deposit into a state antitrust or consumer protection account (*e.g.*, revolving account, trust account), for use in accordance with state laws governing that account; (iii) deposit into a fund exclusively dedicated to assisting state attorneys general to enforce the antitrust laws by defraying the costs of (a) experts, economists, and consultants in multistate antitrust investigations and litigation, (b) training or continuing education in antitrust for attorneys in state attorney general offices, or (c) information management systems used in multistate antitrust investigations and litigation; (iv) payment of States' Attorneys' Fees and Expenses; or (v) for any other purpose as the Attorneys General deem appropriate, consistent with the various states' laws.

### C.  Release of Claims

The Settlement Agreement provides that upon entry of a Final Approval Order and following

---

[37] Settlement Agreement § 5.3.2.
[38] *Id.* §§ 1.14, 5.3.6.

the exhaustion of all appeals, the States shall be deemed to have released, to the extent permitted by law, all "Released Claims," as defined in the Settlement.[39]

## LEGAL FRAMEWORK

States have long-standing authority to bring *parens patriae* actions for antitrust law violations. In *Hawaii v. Standard Oil Co*., 405 U.S. 251 (1972), the Supreme Court affirmed the "right of a State to sue as *parens patriae* to prevent or repair harm to its 'quasi-sovereign' interests."[40] In 1976, Congress enacted the Hart-Scott-Rodino Antitrust Improvements Act, which sets out an explicit statutory framework for antitrust *parens* claims and authorized the States to pursue damages on behalf of consumers.[41] That provision requires that *parens* actions for monetary relief "shall not be dismissed or compromised without the approval of the court" and requires the dissemination of "notice of any proposed dismissal or compromise."[42] Because federal and state antitrust statutes do not "set[ ] forth a standard by which proposed *parens patriae* settlements are approved … federal courts have adopted the approval procedure and standards used for preliminary approval in class action settlements under Federal Rule of Civil Procedure Rule 23."[43]

Under Rule 23(e), if the Court determines that it "will likely be able to" approve the settlement after a hearing and a "finding that [the settlement] is fair, reasonable, and adequate," the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). To determine whether the Court will likely be able to approve the class, Rule 23(e) directs the Court to consider certain specific factors. The Preliminary Approval section of the District's Procedural Guidance for Class Action Settlements ("Procedural Guidance") sets out additional criteria to be assessed in connection with disseminating notice.[44]

---

[39] Settlement Agreement §§ 1.14, 1.35, 11.
[40] *See generally State of California v. Frito Lay Inc.*, 474 F.2d 774 (9th Cir. 1973).
[41] *See* 15 U.S.C. § 15c(a)(l).
[42] *Id.* § 15c(c).
[43] *California v. eBay, Inc.*, No. 5:12-CV-05874-EJD, 2014 WL 4273888, at *13-14 (N.D. Cal. Aug. 29, 2014); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *1 (N.D. Cal. Apr. 3, 2013) (applying standard to *parens* settlement).
[44] *Procedural Guidance for Class Action Settlements*, United States District Court for the Northern District of California, Aug. 4, 2022, https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/ (retrieved Dec. 5, 2023) ("Procedural Guidance").

1  **ARGUMENT**

2  **I.    The Settlement Is Fair, Reasonable, and Adequate**

3       The factors set forth in Rule 23 favor dissemination of notice in this case.

4       **A.  The States Have Adequately – and Zealously – Represented Consumers**

5       The States have vigorously represented the interests of their citizens in this action for more

6  than two years. As explained above (at p. 3), the States, working together with Consumer Counsel

7  and the other co-plaintiffs, engaged in extensive discovery and motion practice and actively

8  contributed to all aspects of the coordinated prosecution of this case.

9       **B.  The Settlement Agreement Was Negotiated at Arm's Length**

10      As discussed above (at pp. 4-5), the Settlement resulted from arm's length negotiations

11  between the States, Consumer Counsel, and Google. Senior law enforcement officials from

12  California, New York, North Carolina, Tennessee, and Utah represented the States. Negotiations

13  started in earnest in August 2022, and the mediation process took hundreds of hours, including

14  multiple two-day, in-person negotiation sessions overseen by experienced mediators. Throughout, the

15  States pushed forcefully for strong injunctive relief. The settlement terms reflect the parties' most up-

16  to-date assessments at the time of the strengths and weaknesses of the case and the relative risks of

17  trial versus settlement.

18      **C.  The Relief Provided for Consumers Is Adequate**

19          ***1.   The Trial and Appeal Would Be Costly, Risky, and Protracted***

20      The unprecedented injunctive relief that the States obtained from Google will bring

21  significant, immediate, and certain relief to consumers, and will bring down barriers to competition

22  in the relevant markets. Under the terms of the Settlement Agreement, consumers will face

23  significantly fewer obstacles to installing apps, including third-party app stores, from non-Play Store

24

25

26

27

28

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

sources.[45] They will also be able to keep those apps updated automatically.[46] Device manufacturers will have more freedom to pre-load third-party app stores,[47] and consumers will be able to receive discounts from, and find exclusive titles on, third-party app stores.[48] Developers will no longer be prohibited from telling consumers about better, cheaper ways to pay for in-app content,[49] and consumers will be able to use multiple payment methods to transact on the Play Store.[50] No other U.S. antitrust enforcer has been able to achieve comparable results.

The monetary component of the settlement also reflects a reasonable compromise and allocation of risk. The States' economic expert estimated damages to all U.S. consumers at approximately $10.5 billion, depending on the assumptions used.[51] The $630 million *parens patriae* fund available to consumers is roughly 6% of the estimated nationwide single damages. This percentage is fair and adequate under the circumstances. First, the amount of compensatory relief must be considered in light of the strength of the injunctive relief.[52] Most antitrust settlements do not

---

[45] Settlement Agreement §§ 6.2.1 (Google may not convert Android to a walled garden in the manner of iOS for 7 years); *id.* § 6.9.1 (requiring Google, on current versions of Android, to allow sideloaded third-party app stores to automatically update the apps they install without separate user consent for each update); *id.* § 6.10 (requiring reduced friction in the sideloading process and modified sideloading warnings for 5 years).

[46] *Id.* § 6.9.2 (requiring Google to permit sideloaded app stores with user permission to be automatically updated, for 4 years).

[47] *Id.* § 6.6.1 (Google may not enter into or enforce any contract requiring preload exclusivity or home screen exclusivity for Google Play for 5 years); *id.* § 6.7 (Google may not enter into or enforce any contract that prevents OEMs from granting installer rights to preloaded app stores or applications for 4 years); *id.* § 6.8 (Google may not require consent before an OEM includes a third-party app store on a phone, nor condition approval of a Mobile Device Build on whether it does so, for 5 years).

[48] *Id.* § 6.5 (Google may not enter or enforce a contract requiring developers to launch new titles on the Play Store at the same time as, or earlier than, on other stores (often referred to as "sim ship"), for 5 years); *id.* § 6.4 (Google may not enter or enforce a contract conditioning developer's access to Play Store on offering developer's best available pricing there, for 5 years.)

[49] *Id.* § 6.11 (antisteering provision requiring, *inter alia*, that Google allow developers to offer lower prices in-app if users choose the developer's billing method, and allowing in-app calls to action that prompt the user to purchase outside the app at a lower price, in parity with the antisteering injunction that emerged from *Epic v. Apple*).

[50] *Id.* § 6.3 (User Choice Billing requirements).

[51] Blizzard Decl., Ex. B (excerpt of Rysman Powerpoint deck used as demonstrative during merits hot tub hearing and reflecting damages ranges).

[52] *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015) ("'It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness.'").

1    include injunctive relief of this magnitude. Second, this case was unusually risky and difficult to

2    litigate, even for an antitrust case. Indeed, at the time the States and Consumer Counsel decided to

3    settle, there was a substantial probability, for the following reasons, that proceeding to trial may have

4    resulted in a defense verdict or in a plaintiffs' verdict with a small damages figure.

5        **Damages and Injury.** Even if the States and Consumer Counsel prevailed on liability,

6    damages would have posed a significant trial risk. Indeed, "the history of antitrust litigation is replete

7    with cases in which antitrust plaintiffs succeeded at trial on liability but recovered no damages, or

8    only negligible damages, at trial, or on appeal."[53] Google successfully excluded Dr. Singer's

9    testimony. At trial, the States would have relied on the expert testimony of Dr. Rysman, who

10   advanced a structural model calculating the dollar value to consumers of lost variety in the app market,

11   as opposed to a traditional overcharge model. Although well-grounded in economic literature, no

12   model like Dr. Rysman's variety model has ever been tested in antitrust litigation. Google also

13   challenged the aggregate nature of the calculation and the appropriateness of variety losses as a

14   measure of damages under the Clayton Act. And the exclusion of Dr. Singer's testimony, which

15   occurred one week before the parties agreed to the settlement in principle, meant that the States would

16   have had no damages model if the Court had granted Google's pending motions against Dr. Rysman's

17   testimony.

18       Finally, there was the risk that jurors would have thought that $10.5 billion dollars in damages,

19   or anything approaching that, was simply too much. Even at the low end, Dr. Rysman's damages

20   calculations far exceed the largest-ever antitrust verdict of which the States are aware.[54] The States

21   believe Dr. Rysman's calculations accurately capture the scope of Google's wrongful conduct. But

22   some jurors might have struggled to award damages of that magnitude.

23       **Epic and Match as Co-Plaintiffs.** The States and Consumers would likely have been going

24   to trial with Epic Games and Match and may have suffered from that juxtaposition. There would have

25   been significant tension between the States' claim that consumers suffered damages and injury, and

26   the claim of Match and Epic that developers bore the harm, especially Match's claim for millions of

---

[53] *Wal-Mart Stores Inc. v. Visa USA Inc.*, 396 F.3d 96, 118 (2d Cir. 2005).

[54] *See Burnett v. Nat'l Ass'n of Realtors*, Dkt. 1294, 4:19-cv-332 (W.D. Mo.) ($1.785 billion verdict).

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

dollars in direct damages. Furthermore, Google asserted counterclaims against Epic and Match and argued, with some force, that Epic acted in bad faith. Indeed, it argued at trial that Epic deceived Google about its intentions with Project Liberty and intentionally breached its developer agreement. A joint trial risked becoming about Epic's alleged misconduct, not Google's, and the States may well have struggled to distance themselves from Epic and Match.

**Market Definition and Power.** At trial, Google would have argued, as it did in its trial against Epic, that Android competes fiercely against Apple in the same markets and thus that Google is not a monopolist.[55] Apple won similar arguments concerning competition between Apple and Google in the *Epic Games v. Apple* litigation.[56] The Ninth Circuit affirmed the trial court's finding that Apple and Google "compete with one another" and that Google "operates in the same market" as Apple.[57] While the decision in the *Apple* litigation of course would not bind the jury in a trial against Google, Apple's win at the trial and appellate level demonstrated the power of the argument at the time of settlement.

**Exclusionary Conduct and Procompetitive Justifications.** Google may also have been able to capitalize on the differences between its conduct and Apple's. Unlike iOS, Android permits consumers to download third-party app stores, including from well-resourced companies like Amazon and Samsung; unlike the Apple App Store, Google Play is not the only app store available on Android. Additionally, Samsung's app store is typically preloaded on its smartphones, which comprise the majority of Android smartphones sold in the United States. Google may have been able to convince a jury that competing stores simply had inferior products.[58]

Moreover, some of the conduct at issue, like sideloading warnings and certain technical restrictions on the current operations of third-party app stores, have facially plausible security justifications. Here again, Google may have been able to gain traction with the jury by comparing itself to Apple's locked-down ecosystem. That is, by maintaining a degree of openness, Android

---

[55] Defendants' Trial Brief, Dkt. 479, at 2.
[56] 559 F. Supp. 3d 898, 977-78 (N.D. Cal. 2021).
[57] *Epic Games v. Apple*, 67 F.4th 946, 992, 1031 (9th Cir. 2023).
[58] Defendants' Trial Brief, Dkt. 479, at 9.

differentiated itself from iOS, while the challenged conduct also constituted action to safeguard Android against the greater malware risk resulting from that very openness.[59] While the States and Consumers have vigorously argued that Google's security justifications are pretextual, there was substantial risk at the time of settlement that a jury would have agreed with Google that its restrictions strike the right procompetitive balance.

**Anticompetitive Effects.** Google would have argued at trial that plaintiffs cannot show anticompetitive harm because the evidence shows "expanding output and improved quality" of devices, apps, and app transactions.[60] A jury could well have rejected as speculative the argument that absent the challenged conduct, Android smartphones would be even richer in apps, features, and choices.

**Appellate Risk and Cost of Delay.** Given the factual and legal complexity of this case, there was no guarantee that a verdict in favor of the States would withstand appeal. The appropriate market definition and the admissibility of Dr. Rysman's variety model stand out as issues likely to have attracted close scrutiny, with no guarantee of a favorable resolution in the Ninth Circuit or beyond.

And even if the States succeeded at trial and on appeal, that would come at a cost: delay. In *Epic v. Apple*, about 19 months elapsed between the district court's decision (September 2021) and the Ninth Circuit's opinion (April 2023), and the Ninth Circuit stayed the district court's antisteering injunctive relief pending appeal.[61] Even now, more than two years since the trial verdict, Epic and Apple are still waiting for the Supreme Court to decide whether to take up their case. If that same pattern held here, consumers would have to wait until the end of 2025—and perhaps later—to obtain relief. That delay has a cost, both in terms of the time value of damages that cannot yet be distributed and the delayed implementation of injunctive relief, which would further cement Google's dominance.

For instance, absent the settlement, there is no guarantee that Google would allow all Android developers to offer user choice billing to all U.S. customers at any point in the future, let alone

---

[59] Defendants' Trial Brief, Dkt. 479, at 10.
[60] Defendants' Trial Brief, Dkt. 479, at 5.
[61] *Epic Games Inc. v. Apple Inc.*, 2021 WL 6755197 (9th Cir. Dec. 8, 2021).

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

immediately.[62] Moreover, the other injunctive provisions, such as the terms effectively allowing developers to offer exclusive titles and lower prices on competing app stores, will only begin to loosen Play Store's grip on the app distribution market once they go into effect.

Securing a certain recovery and robust injunctive relief in the face of significant litigation risk represents an excellent result for consumers. Moreover, having the injunctive relief take effect immediately, and the monetary relief paid out promptly, is itself of significant value to consumers and other market participants.

### 2. The Proposed Method for Distributing Relief to Consumers Is Effective

**Notice.** The notice process uses account information provided by Google to provide direct notice via email to virtually all Eligible Consumers, in addition to publication notice. The States' proposed Long Form Notice[63] and Summary Notice[64] include all the information required by Rule 23(c)(2)(B), including basic information about the case and the settlement, as well as information about the process and deadline for opting out. The States propose a notice program managed by A.B. Data, a firm with deep experience in representative actions. The notice program will include direct notice by email, as well as publication notice via digital advertising, *PR Newswire Online,* and a dedicated notice website.[65] The States will publish notice on their State Attorney General websites.

For direct email notice, A.B. Data will use e-mail addresses and other data provided by Google to send out an email version of the Summary Notice.[66] In this case direct notice offers the best notice practicable because the notice provider will have contact information for nearly every Eligible Consumer and can send direct notice electronically and affordably. Electronic notice by

---

[62] Although various Congressional committees have considered bills that would require Apple and Google to reform their app stores and implement User Choice Billing, none have ever passed a floor vote. And while Google has implemented user choice billing in other countries, it offers it in the U.S. only as a "pilot program" – and then only for non-game apps that make up a small minority of Play's revenue. *See* Google, *Enrolling in the User Choice Billing Pilot,* https://support.google.com/googleplay/android-developer/answer/12570971?hl=en.

[63] Schachter Decl., Ex. A.

[64] *Id.* Ex. B.

[65] *Id.* ¶¶9-16.

[66] Schachter Decl. ¶¶9-10 & Ex. B.

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   email is routinely used in technology, data privacy, and other representative actions to provide notice

2   to affected claimants and has been held to satisfy due process and Rule 23.[67]

3           For publication notice, A.B. Data will utilize a paid media campaign that includes digital and

4   social media components and a national press release.[68] It will include mobile web ads, mobile in-

5   app ads, banner ads, newsfeed ads, and text ads through venues such as Google Display Networks,

6   YouTube, Facebook, Instagram, and Google AdWords, and will target U.S. adults who have an

7   Android smartphone.[69] All ads will include an embedded link to the dedicated notice website, which

8   will contain all of the information in the Long Form Notice.[70] In addition to the digital media, A.B.

9   Data will issue a news release via PR Newswire's US1 newswire.[71] A.B. Data estimates that direct

10  notice will reach the vast majority of Eligible Consumers, and publication notice, including the

11  media campaign, will be supplemental.[72]

12          The direct email notice will guide Eligible Consumers who would like to exclude themselves

13  from or object to the settlement to the dedicated notice website.[73] The dedicated notice website, also

14  reachable through publication notice, will have an online exclusion form, along with instructions on

15  how Eligible Consumers may mail in an exclusion request.[74] The dedicated notice website will also

16  contain instructions on how Eligible Consumers may object to the Settlement.[75]

17          The States propose that the notice process should commence within 14 days of the Order

18  Preliminarily Approving *Parens Patriae* Settlement and Directing Dissemination of Notice, and be

19  _____

20  [67] *See, e.g.*, *In re Facebook Internet Tracking Litig.*, No. 5:12-md-02314-EJD, Dkt. No. 241 (N.D. Cal. March 31, 2022); *Taylor v. Shutterfly, Inc.*, No. 5:18-cv-00266, 2021 WL 5810294, at *2 (N.D. Cal. Dec. 7, 2021); *Cottle v. Plaid, Inc.*, No. 20-cv-3056-DMR, 2021 WL 541525, at *5-6 (N.D. Cal. Nov. 19, 2021); *Norcia v. Samsung Telecommunications Am. LLC*, No. 14-cv-00582-JD, 2021 WL 3053018, at *2 (N.D. Cal. July 20, 2021); *In Re USC Student Health Center Litig.*, No. 2:18-cv-04258-SVW-GJS, Dkt. No. 148 (C.D. Cal. June 12, 2019); *Cohorst v. BRE Props., Inc.*, No. 3:10-cv-2666-JM-BGS, 2011 WL 7061923, at *2 (S.D. Cal. Nov. 14, 2011).

[68] Schachter Decl. ¶¶ 11-17.

[69] *Id*. ¶¶ 11-13. The ad campaign will be purchased on an arms' length basis from Google and is an effective element of notice campaigns that A.B. Data has used in many past notice efforts. *Id*. ¶ 11.

[70] *Id*. ¶ 14 & Ex. A.

[71] *Id*. ¶ 17.

[72] *Id*. ¶ 10.

[73] Schachter Decl. ¶ 9.

[74] *Id*. ¶¶ 19-20.

[75] *Id*. ¶ 19.

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

complete within 60 days of the date of that Order.[76] The States further propose that all requests for exclusion and all objections must be received within 90 days of the date of that Order.[77]

**Distribution.** The proposed distribution plan will make automatic and direct payments to Eligible Consumers, who are defined as natural persons with a "Legal Address" in their Google payments profile in one of the States when they purchased an app from Google Play or made an in-app purchase (including subscriptions) through Google Play Billing from August 16, 2016 through September 30, 2023.[78] The States understand that the lawyers for the proposed Consumer Class will make an application for payment of attorneys' fees and costs against the Settlement Fund Amount, as the Settlement Agreement and the Joint Prosecution Agreement contemplate.[79] The funds remaining in the Settlement Fund—net of any award to the lawyers for the proposed Consumer Class, taxes, notice and claims administration costs, or other payments authorized by the Court—shall be distributed to Eligible Consumers until the amount of remaining unclaimed funds makes it no longer feasible or cost-effective to continue distribution. At that point, the States will seek the Court's approval to distribute the remaining unclaimed funds to the States as penalties pursuant to Title 15, Section 15e(2).

The distribution plan will make automatic and direct payments to Eligible Consumers *without a claims submission process*. Each Eligible Consumer is eligible to receive at least $2 and may receive additional payments in proportion to their Google Play spending from August 16, 2016 through September 30, 2023, unless the consumer has filed a timely request for exclusion.[80] If the Eligible Consumer's email address associated with his or her Google Play account matches an email address associated with an existing PayPal or Venmo account, then the payments will be made directly to that PayPal or Venmo account.[81] The Eligible Consumer will receive an email from PayPal or Venmo notifying the consumer that these funds have been deposited and are now available. If the

---

[76] Schachter Decl. ¶8.
[77] *Id.*
[78] Settlement Agreement § 1.15.
[79] *Id.* §§ 5.1.1, 5.4.1; *see* Joint Prosecution Agreement, No. 3:21-md-02981, Dkt. No. 251-2, at 3.
[80] Cooper Decl. ¶8.
[81] *Id.* ¶9.

1   Eligible Consumer's email address associated with the consumer's Google Play Account does not

2   match an email address associated with an existing PayPal or Venmo account, that Eligible Consumer

3   will receive an email notifying the consumer of the available payment and the opportunity to create a

4   new PayPal or Venmo account, redirect the payment to an existing PayPal or Venmo account at

5   another email address, or select another payment mechanism such as a written check or an ACH

6   transfer.[82]

7        After these payments have been made, Eligible Consumers who have not received payment

8   through PayPal, Venmo, or another means and are entitled to payment above a certain threshold will

9   be sent a written check.[83] Payments to Eligible Consumers are for over-charges and are not deemed

10  reportable for tax purposes.

11       The settlement administrator believes that Eligible Consumers who can receive automatic

12  payments will account for the vast majority of funds to be distributed.[84] PayPal has 237,000,000

13  accounts in the United States, with a domestic market share of 82%.[85] In the last five years, 70% of

14  U.S. adults have used PayPal.[86] Venmo has 90,000,000 active accounts in the United States.[87] In

15  addition, consumers with significant Google Play spending—those who will receive most of the

16  funds—are probably even more likely than the average US consumer to have digital payment

17  accounts such as PayPal or Venmo.[88] Because most of the funds will be distributed to Eligible

18  Consumers automatically, the States conservatively expect a 70% distribution rate, which compares

19  extremely well with similar settlements.[89]

20       The States anticipate that any unclaimed funds will be distributed pro-rata in subsequent

21  rounds of payment to Eligible Consumers to whom payments were previously made. When the

22

23  _____

[82] *Id.*

24  [83] Cooper Decl. ¶ 9.
    [84] Cooper Decl. ¶ 11.

25  [85] *Id.* ¶ 10.

26  [86] *Id.*
    [87] *Id.* .

27  [88] *Id.* ¶ 11.
    [89] *See id.*; *see, e.g.*, Reply ISO Motion for Final Approval at 2, Dkt. No. 1161 filed Aug. 4, 2023 in

28  *In re: Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 3:18-md-02843-VC (N.D. Cal.)
    (5.2% claims rate for a $725 million class action settlement).

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

amount of remaining unclaimed funds is low enough that the States, in consultation with the settlement administrator, believe that it is no longer feasible or cost-effective to continue to distribute funds to Eligible Consumers, the States will seek the Court's approval to distribute the remaining unclaimed funds to the States' Monetary Fund.[90] No Settlement Funds will return to Google.

### 3.   The Amount Paid into the States' Monetary Fund Is Fair and Reasonable

Google will transfer $70 million into a separate States' Monetary Fund to resolve the non-*parens* state claims, including for restitution, disgorgement, and civil penalties. This States' Monetary Fund—10% of the Settlement total—is consistent with California state law.[91] The States will apportion and use this States' Monetary Fund in accordance with state law.[92] Payment for the States' attorneys' fees and costs—including expert costs—will come from the States' Monetary Fund.

The States understand that, consistent with the principle of *quantum meruit*, the Joint Prosecution Agreement between the States and Consumer Counsel, and the Settlement Agreement, Consumer Counsel will petition the Court to receive fees and litigation expenses from the *parens* Settlement Fund.[93] Consumer Counsel has advised the States that they have invested a total of $64,191,411.15 in attorney time and approximately $8,630,018.87 in costs in this matter. Consumer Counsel have further advised the States that they will seek a fee award of no more than $122,850,000, which would amount to a 1.91 multiplier and 19.5% of the *parens* fund, as well as reimbursement of litigation expenses of approximately $8,630,018.87.[94] If the Court were to grant the maximum possible request, a remaining fund of nearly $500 million for payments to consumers well justifies disseminating notice. The States take no position at this time on any fee request by Consumer Counsel.

---

[90] *See* 15 U.S.C. § 15e(2).
[91] *See, e.g.*, Cal. Bus. & Prof. Code § 16750(c) (allocating to the California Attorney General 10% of total recovery obtained under the Cartwright Act for deposit into the AG antitrust account).
[92] *See, e.g.*, Cal. Gov't Code § 12526 (funds in the antitrust account are "available to the Department of Justice for expenditure in carrying out the antitrust activities of the department").
[93] *See* Joint Prosecution Agreement, No. 3:21-md-02981, Dkt. No. 251-2; Settlement Agreement §§ 5.1.1, 5.4.1.
[94] The States and Consumer Counsel continue to discuss the amount Consumer Counsel will seek.

### *4.   There Are No Other Related Agreements*

The States have not entered into any related agreements requiring disclosure under Federal Rule of Civil Procedure 23(e)(3). The Joint Prosecution Agreement with Consumer Counsel has already been disclosed.[95]

### *5.   The Settlement Agreement Treats Consumers Equitably*

Each Eligible Consumer will receive at least $2 and will receive additional payments in proportion to their Google Play spending during the period between August 16, 2016 and September 30, 2023. Any unclaimed funds will be distributed in additional rounds of distribution to Eligible Consumers for whom payment can be issued. Consumers will not be required to submit claims. Payments will be made to Eligible Consumers' accounts on PayPal or Venmo or, if the Eligible Consumer elects, through an alternative method of distribution.

### D.  The Settlement Satisfies the District's Procedural Guidance

This District's Procedural Guidance on the approval of class action settlements does not by its terms apply to a *parens* settlement. Nevertheless, in accordance with it, above, the States have provided relevant information regarding: (1)c. the consumer recovery under the settlement and the potential consumer recovery if the States were to fully prevail; (1)e. the proposed allocation plan; (1)f. the expected participation by consumers in the settlement; (1)g. the non-reversion of unclaimed funds; (3-5) the proposed notice including (9) the opt-out and objection timeline; and (6) States' attorneys' fees and costs. Information regarding (1)a. differences between the settlement class and the class proposed in the complaint and (10) compliance with CAFA are not applicable since this is a *parens* settlement and not a class settlement.

Discussed below are the remaining relevant provisions of the Procedural Guidance regarding (1)b. differences between the claims to be released and the claims alleged in the operative complaint; (1)d. any other cases that will be affected by the settlement; (2)a. and b. the settlement administrator, the selection process, and the anticipated administrative costs; (7) named plaintiff incentive awards; (8) *cy pres* awards; and (11) past distributions in comparable class settlements.

---

[95] Joint Prosecution Agreement, No. 3:21-md-02981, Dkt. No. 251-2.

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

### 1. *The Releases Track the Allegations in the Complaint*

Procedural Guidance, Preliminary Approval section (1)b. instructs parties to explain any differences between the claims to be released in the settlement and claims asserted in the complaint. The Settlement Agreement defines Claims as follows: "For the avoidance of doubt 'Claims' includes, and this agreement releases, only claims that arise from the factual allegations or claims made in any complaint filed in the Actions." Paragraph 11.6 of the Settlement Agreement further states: "For avoidance of doubt, the releases in this Settlement do not include consumer protection claims, antitrust claims, or non-antitrust claims that do not arise from the factual allegations or claims in the Actions." The releases therefore track the claims in the operative complaint.

### 2. *The Settlement Administrator Selection Process and Costs are Reasonable*

Procedural Guidance, Preliminary Approval section (2), instructs parties to identify (i) the proposed settlement administrator, (ii) the settlement administrator selection process, (iii) the number of proposals submitted, (iv) counsel's history of engagements with the settlement administrator over the last two years, (v) procedures for securely handling consumer data, (vi) liability and insurance coverage in case of errors, (vii) anticipated administration costs, (viii) the reasonableness of those costs in relation to the value of the settlement, and (ix) who will pay the costs. The Guidance also instructs the parties to identify the methods of notice and claims payment proposed, which the States have done above (at pp. 15-18). Here, the answers to each of these questions support the fairness and adequacy of the proposed settlement administration process.

**Selection Process.** KCC will implement the distribution plan for the Settlement. Prior to selecting KCC, the States solicited and received proposals from three nationally recognized class action claims administrators. KCC has been appointed as notice, claims, and/or settlement administrator in large consumer and antitrust cases, including previous *parens patriae* actions.[96] Representative examples of KCC's experience are set forth in the Cooper Declaration.[97]

**Counsel's History of Engagements with KCC.** KCC has previously worked with the States to administer distributions in at least the following actions: a settlement between fifty states and

---

[96] Cooper Decl. ¶¶ 2-3.
[97] *Id.* ¶ 3.

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

districts with Moneygram Payment Systems, Inc. to resolve an investigation of money transfer services; *Illinois v. Hitachi Ltd., et al.* No. 12 CH 35266 (Cook Cnty., Ill.); *State of Arizona, ex rel. Brnovich v. Volkswagen AG, et al.,* No. CV 2016-005112 (Maricopa Cnty., Ariz.); and *State of Iowa v. Uber Technologies, Inc.*, No. EQCE083577 (Polk Cnty., Iowa). In addition, KCC has handled the administration of California's Consumer Recovery Fund for consumers affected by bankrupt motor vehicle dealers who failed to fulfill contractual obligations.[98]

**Data Security and Liability Coverage.** KCC has developed a comprehensive information and cybersecurity framework that applies to all business units. KCC's proprietary technology and data-handling processes set the industry standard for security and quality.[99] Its cryptographic solutions protect data using industry-leading practices to implement strong encryption for authentication and transmission of information. KCC's Information Security team actively monitors the internal and external threat environment to ensure that its security controls are appropriate and effective.[100] KCC also has a team dedicated to fraud prevention that develops prevention measures customized for each administration.[101]

KCC maintains insurance applicable to its services. KCC's errors and omissions insurance covers any claim that arises out of any wrongful professional act (subject to terms and conditions of the policy) with a policy limit of $50 million. KCC's crime insurance covers all thefts and dishonest acts (subject to terms and conditions of the policy) with a policy limit of $50 million.[102]

**Administration Costs.** The total cost of the notice and distribution program is currently estimated to be approximately $15 million. The administration costs are to be paid from the Settlement Fund, and the cost of administration—both in dollar terms and as a percentage of the Fund—compare favorably with comparable settlements in this district, as explained below.

---

[98] Cooper Decl. ¶ 3.
[99] Cooper Decl. ¶ 5.
[100] *Id.* ¶ 4.
[101] *Id.* ¶ 5.
[102] Cooper Decl. ¶ 6.

Case No. 3:21-cv-05227-JD

1

### 3.  Service Awards

2    The States do not anticipate seeking service awards. The States understand that the six

3   individual plaintiffs in the proposed Consumer Class action intend to request service awards. The

4   States take no position at this time on any such request.

5

### 4.  Cy Pres

6    The States do not presently intend to perform any sort of *cy pres* distribution.

7

### 5.  Past Distributions

8    As shown below, the expected claims rate and administrative costs for this case compare

9   favorably to similar settlements in this district along the metrics specified by Procedural Guidance,

10  Preliminary Approval section (11).[103]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

27  [103] The chart below compares this Settlement to the settlements in (i) *In re: Facebook, Inc. Consumer
Privacy User Profile Litigation*, Case No. 3:18-md-02843-VC (N.D. Cal.), and (ii) *In re TFT-LCD
(Flat Panel) Antitrust Litig.*, No. 07-md-01827-SI (N.D. Cal.). These figures reflect best estimates
based on publicly available records.

28

| Case | In re Google Play Parens (Proposed) | Facebook Consumer Privacy | TFT-LCD (IPPs) |
|---|---|---|---|
| **Total Settlement Amount** | $630 million *parens* Settlement Fund; $70 million non-*parens* States' Monetary Fund | $725 million | $1,082 million |
| **Total Estimated Number of Consumers** | Approximately 102 million | 253.5 million | 175 million |
| **Total Number of Direct Notice Sent** | Approximately 102 million | 164.7 million individual consumers received in-app notice | 0 |
| **Methods of Notice** | Email direct notice, indirect publication notice | In-app direct notice, indirect publication notice | Indirect publication notice |
| **Number of Claims Submitted** | No claims will be submitted. The current estimate is that at least 71.4 million (70%) of consumers will receive funds.[104] | 13.08 million (5.2%) | 247,558 (0.14%) |
| **Expected Residual** | $0 | $0 | $0 |
| **Attorneys' Fees** | The States will recover their fees from the 10% of the settlement allocated to the State Monetary Fund.

The States understand that Consumer Counsel intend to request attorneys' fees not in excess of 19.5% of the *parens* settlement fund, or 17.55% of the total recovery, as well as litigation expenses which are approximately $8,630,018.87. | $91.2 million (25%) | $309.7 million (28.6%) |
| **Litigation Costs** | | $4.1 million (0.56%) | $8.7 million (0.81%) |
| **Administrative Costs** | $15 million (2.4%) | $4.2 million (0.58%) | $39.5 million (3.7%) |

[104] *See* Cooper Decl. 11.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, the States respectfully request that this Court enter an order finding that the Settlement is likely to be approved, directing dissemination of notice to Eligible Consumers, and establishing a final approval hearing schedule.

Dated: December 18, 2023                    OFFICE OF THE UTAH ATTORNEY GENERAL
                                            Brendan P. Glackin
                                            Lauren M. Weinstein

                                            Respectfully submitted,

                                            By:   */s/      Brendan P. Glackin*
                                                  Brendan P. Glackin


                                            *Counsel for the Plaintiff States*

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-FILING ATTESTATION**

I, Jessica V. Sutton, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the signatory identified above has concurred in this filing.

*/s/      Jessica V. Sutton*
Jessica V. Sutton

Case No. 3:21-cv-05227-JD

STATES' UNOPPOSED MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF