ROB BONTA
Attorney General of California
PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
MICHAEL W. JORGENSON (SBN 201145)
Supervising Deputy Attorney General
BRIAN D. WANG (SBN 284490)
CAROLYN D. JEFFRIES (SBN 319595)
Deputy Attorneys General
**OFFICE OF THE ATTORNEY GENERAL**
**OF CALIFORNIA**
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-4400
  Fax: (415) 703-5843
  E-mail: Paula.Blizzard@doj.ca.gov
*Counsel for Plaintiff State of California*

(Additional Counsel on Signature Page)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-cv-05227-JD |
| THIS DOCUMENT RELATES TO: | **STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| *State of Utah et al. v. Google LLC* et al., Case No. 3:21-cv-05227-JD | |
| *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | Judge: Hon. James Donato<br>Courtroom: 11, 19th Floor<br>Date: April 30, 2026 at 11:00 a.m. |

Case No. 3:21-cv-05227-JD

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on April 30, 2026, at 11:00 a.m., in Courtroom 11 of the above-entitled Court, located on the 19th floor of 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable James Donato, the State Attorneys General (the "States"), will and hereby move the Court for an order finally approving the settlement pursuant to Section 4C of the Clayton Act, 15 U.S.C. § 15c.

This Motion is based on this notice of motion and motion, the memorandum of points and authorities that follows, the concurrently filed Declaration of Jayme L. Weber in Support of States' Unopposed Motion for Final Approval of *Parens Patriae* Settlement and exhibits thereto, the concurrently filed Declaration of Rochelle J. Teichmiller in Support of States' Unopposed Motion for Final Approval of *Parens Patriae* Settlement and exhibits thereto, the concurrently filed Declaration of Lana Cooper in Support of States' Unopposed Motion for Final Approval of *Parens Patriae* Settlement, the concurrently filed Declaration of Kevin Bandoian in Support of States' Unopposed Motion for Final Approval of *Parens Patriae* Settlement, the pleadings, papers, and other documents on file in this action, and such other evidence and argument presented to the Court at or prior to any hearing in this matter.

Case No. 3:21-cv-05227-JD

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND........................................................................................................1

      I.      The Alleged Conduct.............................................................................................1

      II.     The Terms of the Proposed Settlement Agreement .......................................................2

            A.      Injunctive Relief .................................................................................2

            B.      Monetary Payment and Distribution.............................................................5

            C.      Release of Claims .................................................................................6

LEGAL FRAMEWORK ..............................................................................................................8

ARGUMENT.................................................................................................................................9

      I.      The Settlement Is Fair, Reasonable, and Adequate .......................................................9

            A.      The Court-Approved Notice Process Meets Applicable Guidelines and Has Been Fully Implemented..................................................................10

            B.      The Distribution Plan Will Ensure that the Vast Majority of the Settlement Fund is Distributed to Settlement Consumers ...........................13

      II.     The Court Should Appoint Berkeley Research Group, LLC ("BRG") to Assist the States with Finalizing the Distribution Amounts for Settlement Consumers ......................................................................................................17

CONCLUSION............................................................................................................................19

- i -          Case No. 3:21-cv-05227-JD

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**TABLE OF AUTHORITIES**

**Federal Cases**

*California v. eBay, Inc.,* No. 5:12-CV-05874-EJD, 2015 WL 5168666 (N.D. Cal. Sept. 3, 2015) .................................................................................................................. 8, 9

*Cohorst v. BRE Props., Inc.,* No. 3:10-cv-2666-JM-BGS, 2011 WL 7061923 (S.D. Cal. Nov. 14, 2011) .......................................................................................................... 10

*Cottle v. Plaid, Inc.,* No. 20-cv-03056-DMR, 2021 WL 541525 (N.D. Cal. Nov. 19, 2021) ................................................................................................................... 10

*Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR, 559 F. Supp. 3d 898 (N.D. Cal. Sept. 10, 2021) ......................................................................................................... 4

*Hastings v. Principal Life Ins. Co.,* No. 21-cv-00047, 2021 WL 6061916 (S.D. Iowa July 28, 2021) .................................................................................................................. 7

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972) .......................................................... 8

*In re Facebook Internet Tracking Litig.,* No. 5:12-md-02314-EJD, Dkt. No. 241 (N.D. Cal. Mar. 31, 2022)............................................................................................... 10

*In re Google Play Developer Antitrust Litigation,* No. 3:20-cv-05792-JD, Dkt. No. 218-1 (N.D. Cal. June 30, 2022) ......................................................................................... 8

*In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.,* No. 14-md-2541-CW, 2017 U.S. Dist. LEXIS 201104 (N.D. Cal. Dec. 6, 2017) ............................................................. 7

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.,* No. 05-MD-1720, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ......................................... 7

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) .......... 8

*In Re USC Student Health Center Litig.,* No. 2:18-cv-04258-SVW-GJS, Dkt. No. 148 (C.D. Cal. June 12, 2019) ............................................................................... 10

*Lane v. Facebook, Inc.,* 696 F.3d 811 (9th Cir. 2012)...................................................... 9

*Norcia v. Samsung Telecommunications Am. LLC,* No. 14-cv-00582-JD, 2021 WL 3053018 (N.D. Cal. July 20, 2021) ................................................................. 10

*State of California v. Frito Lay Inc.*, 474 F.2d 774 (9th Cir. 1973) ................................ 8

*Taylor v. Shutterfly, Inc.,* No. 5:18-cv-00266, 2021 WL 5810294 (N.D. Cal. Dec. 7, 2021) ..................................................................................................................... 10

*Texas v. Am. Tobacco Co.,* 463 F.3d 399 (5th Cir. 2006) ......................................... 7

**Federal Statutes**

15 U.S.C. § 15e ............................................................................................................... 13, 16

15 U.S.C. § 15c ............................................................................................................... 1, 5, 6, 8

**Federal Rules**

Federal Rule of Civil Procedure Rule 23 ...................................................................... 8, 9

Case No. 3:21-cv-05227-JD
STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**ISSUE TO BE DECIDED**

Whether the settlement with Google should receive final approval pursuant to Section 4C of the Clayton Act, 15 U.S.C. § 15c.

**INTRODUCTION**

All 50 States, the District of Columbia, Puerto Rico, and the Virgin Islands (the "States") submit this memorandum in support of their motion for final approval of their *parens patriae* settlement with Google. Pursuant to the Court's March 18, 2024 order directing Google to deposit the settlement funds into escrow, the $630 million Settlement Fund for distribution to consumers has grown to more than $660 million through careful investment and the $70 million States' Monetary Fund has grown to more than $75 million. After the Court granted preliminary approval and directed dissemination of notice to Eligible Consumers on November 20, 2025, over 106 million Eligible Consumers received direct email notice of the settlement while the accompanying publication notice received over 70 million views. At the conclusion of the notice period, there were fewer than 500 opt-outs and no objections. Final approval of this settlement will, after five years, bring the States' case to a conclusion and provide nationwide relief to consumers harmed by Google's conduct.

**FACTUAL BACKGROUND**

**I.    The Alleged Conduct**

The facts of this case are well-known to the Court, and the States' motion for preliminary approval discussed their vigorous prosecution of the case and the mediation process. On January 16, 2024, in order to bring the additional 14 jurisdictions into the case for the purpose of settlement, all 53 of the States filed a Second Amended Complaint alleging claims for (1) monopoly maintenance, (2) tying, and (3) unreasonable restraints of trade in the markets for Android app distribution and for Android in-app payment processing, in violation of the Sherman Act.[1] The Complaint also alleges state-law antitrust and consumer protection claims. Specifically, the States allege that Google has unreasonably restrained trade and monopolized Android app distribution and Android in-app

---

[1] Second Amended Compl., Dkt. 531, Counts 1-7.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

payment-processing services through anticompetitive conduct.[2] This includes entering into anticompetitive contracts with OEMs and mobile service providers to prevent other app stores from being preloaded on Android devices, buying off key app developers to keep them from launching their own app stores or offering exclusive launches or special discounts to other app stores, and erecting technological hurdles to deter consumers from directly downloading (*i.e.*, sideloading) apps and app stores to their devices.[3]

As a result of Google's unlawful conduct, the States allege, Google has been able to extract enormous sums from consumers.[4] Indeed, Google imposes a supracompetitive commission of up to 30% on the purchase price of apps sold through the Google Play Store, which is much higher than would exist in a market unimpaired by Google's anticompetitive conduct.[5] Google collects its 30% cut by forcing consumers to use Google Play Billing to buy apps and in-app content and by prohibiting app developers from suggesting alternative ways to purchase content (*e.g.*, purchasing directly from the developer's website, bypassing Google altogether).[6] The Complaint seeks damages, restitution, disgorgement, attorneys' fees, civil penalties, and injunctive relief.[7]

## II.     The Terms of the Proposed Settlement Agreement

### A.  Injunctive Relief

The Settlement contains 6 categories of robust injunctive terms that address the anticompetitive effects of Google's unlawful conduct. The Settlement Agreement and its three amendments are attached as Exhibits A-D to the Declaration of Jayme L. Weber in Support of States' Unopposed Motion for Final Approval of *Parens Patriae* Settlement ("Weber Decl."). Under the Settlement, Google will be enjoined from continuing or restarting certain anticompetitive conduct related to Android and the Google Play Store for at least 4 to 7 years after the Settlement's Effective Date, which is when the Court's final approval order has become a final judgment no longer subject

---

[2] *Id.* ¶¶ 83-153, 162-67.
[3] *Id.* ¶¶ 114-53.
[4] *Id.* ¶¶ 157, 212, 220.
[5] *Id.* ¶ 157.
[6] *Id.* ¶¶ 162-67.
[7] *Id.* ¶¶ 524-32.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

to appellate review of any kind.[8] An Independent Compliance Professional ("ICP"), paid for by Google but selected by Google and the States, will monitor Google's compliance for 5 years.[9]

**Exclusivity and preloading.** The Settlement prohibits Google from (i) for at least 5 years, entering into or enforcing deals with OEMs that require preload exclusivity or home screen exclusivity for the Google Play Store; (ii) for at least 4 years, entering into or enforcing OEM deals that block the granting of "installer rights" to preloaded apps; and (iii) for at least 5 years, requiring that OEMs obtain its consent before preloading third-party app stores.[10]

**Sideloading.** The Settlement requires Google (i) to continue to allow installation of third-party apps, including third-party app stores, from outside the Google Play Store, for at least 7 years; and (ii) to simplify the process for installing apps from outside Google Play, including by combining certain warning screens and updating user interface language, for at least 5 years.[11]

**Android Support for Third-Party App Stores.** The Settlement requires that Google maintain Android operating system functionality for third-party app stores installed through non-Play-Store channels, including by enabling automatic background updates of apps installed from those third-party app stores, for at least 4 years.[12]

**Most Favored Nation ("MFN") Clauses.** The Settlement prohibits Google from offering or enforcing (i) for at least 4 years, any "simultaneous shipping" (or "sim ship") MFN clauses that require a developer to launch its app catalog on the Google Play Store at the same time as on other Android app stores, or to offer its titles with the same or better features on the Google Play Store as on other Android app stores;[13] and (ii) for at least 5 years, any price parity MFN clauses.[14]

---

[8] Weber Decl. Ex. A (Settlement Agreement), § 1.14.
[9] Settlement Agreement §§ 1.21, 7.
[10] Settlement Agreement §§ 6.6, 6.7, 6.8.
[11] Settlement Agreement §§ 6.2, 6.10.
[12] Settlement Agreement § 6.9.
[13] Settlement Agreement § 6.5. The Settlement permits Google to negotiate "sim ship" for individual apps or to negotiate a developer-wide sim ship after 2 years, if the competing platform is controlled by a company with revenues exceeding $100 billion.
[14] Settlement Agreement § 6.4.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**User Choice Billing.** The Settlement requires Google to give all developers, including game developers, the option to add alternative in-app billing systems for at least 5 years. At checkout, users will be able to choose which in-app billing system to use.[15]

**Anti-Steering.** Under the Settlement, Google must allow developers to steer consumers away from the Google Play Store and toward alternative billing systems. Specifically, Google must (i) allow developers to contact users out-of-app (such as via email) using information obtained from within or outside the app to promote alternatives to Google's billing system, for at least 6 years; (ii) allow apps without in-app purchase capability to notify users about alternative purchasing options and prices (*e.g.*, "available on our website for $9.99"), for at least 6 years; and (iii) allow apps with in-app purchase capability to notify users about alternative purchasing options and prices (*e.g.*, "available on our website for $9.99"), for at least 5 years. The Settlement also prohibits Google from barring developers from telling consumers about Google's service fees, for at least 6 years.[16]

**ICP.** The Settlement requires Google to prepare an initial report for the ICP within four months (120 days) of the Settlement's Effective Date, followed by four annual reports in twelve-month increments until the final report is submitted about five years after the Settlement takes effect.[17] The ICP will review Google's reports and supporting documentation to "evaluate the accuracy" of Google's assertions and will prepare an addendum to Google's report stating the results of the ICP's evaluation and investigation along with confirmation that Google fully cooperated.[18] Google is solely responsible for paying the ICP and ICP staff.[19]

Pursuant to the Third Amendment to the Settlement Agreement, Mandy Pote of Coalfire Systems, Inc. has been named as the ICP.[20] The States conducted extensive due diligence during the process of selecting the ICP and actively worked with Google to identify the right candidate with

---

[15] Settlement Agreement § 6.3.
[16] Settlement Agreement §§ 6.3, 6.11. Google also must allow developers to include "calls to action" within their apps in line with what the Court required of Apple in *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR, 559 F. Supp. 3d 898 (N.D. Cal. Sept. 10, 2021), although the Settlement does not require Google to allow developers to include external links in their apps. *Id.* § 6.11.
[17] Settlement Agreement § 7.2.8.
[18] Settlement Agreement §§ 7.2.3, 7.2.6.
[19] Settlement Agreement § 7.3.3.
[20] Weber Decl. Ex. D; *see also* Weber Decl. Exs. B, C.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

the right skills and independence necessary to fulfill the role.[21] An earlier candidate for ICP was not selected after a detailed interview process, during which the States concluded that that candidate did not have the right set of skills for the role.[22] The States conducted two separate interviews of Mandy Pote, during which the States affirmatively verified that Ms. Pote's knowledge, skills, experience, and independence are suitable for the ICP role.[23]

*    *    *

As discussed at length in the parties' joint statement filed on February 10, 2025,[24] the Settlement will provide enforceable commitments that extend beyond the terms of the *Epic* Injunction and neither conflict with nor dilute the provisions of that decree. The negotiated terms will offer significant, meaningful, long-lasting relief for consumers throughout the country. No other U.S. antitrust enforcer has yet been able to secure remedies of this magnitude from Google, or, for that matter, from any of the other major digital platforms.

### B.  Monetary Payment and Distribution

The Settlement provided for a total payment of $700 million: $630 million to be deposited into a *parens patriae* Settlement Fund for the benefit of Eligible Consumers ("Settlement Fund"), and $70 million to be deposited into a non-*parens* States' Monetary Fund ("States' Monetary Fund").[25] On March 18, 2024, the Court directed Google to deposit the settlement funds into escrow.[26] Since that time, the $630 million Settlement Fund for consumers has grown to more than $660 million and the $70 million States' Monetary Fund has grown to more than $75 million.[27] Under the Settlement Agreement, distribution of the money from the Settlement Fund can commence within 10 days of the Effective Date, which is when the Court's final approval order is no longer subject to appellate review.[28] The Distribution Plan is described in detail in the Declaration

---

[21] Weber Decl. ¶ 7.
[22] Weber Decl. ¶ 8.
[23] Weber Decl. ¶ 9.
[24] Dkt. 586.
[25] The *parens patriae* Settlement Fund resolves claims for damages sought under 15 U.S.C. § 15c and any state-law claims that require court approval. The non-*parens* States' Monetary Fund resolves the States' monetary claims asserted under state law that do not require court approval.
[26] Dkt. 547; *see also* Weber Decl. Ex. C.
[27] Weber Decl. ¶ 10.
[28] Settlement Agreement §§ 1.14, 5.3.6.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;<br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

of Lana Cooper in Support of States' Unopposed Motion for Final Approval of *Parens Patriae* Settlement ("Cooper Decl."). The methodology for determining how much each Settlement Consumer should receive from the Settlement Fund is described in detail in the Declaration of Kevin Bandoian in Support of States' Unopposed Motion for Final Approval of *Parens Patriae* Settlement ("Bandoian Decl.").

The States' Monetary Fund is intended to resolve the States' non-*parens* state antitrust and consumer protection claims, including claims for civil penalties, attorneys' fees, and disgorgement. The States' Monetary Fund shall be apportioned among the States according to a distribution agreement negotiated among the States. Unlike the *parens* claims asserted under 15 U.S.C. § 15c, settlement of these non-*parens* claims does not require court approval.

As explained in Section 5.6 of the Settlement Agreement, the States intend to use the States' Monetary Fund for one or more of the following purposes: (i) antitrust or consumer protection law enforcement; (ii) deposit into a state antitrust or consumer protection account (*e.g.*, revolving account, trust account), for use in accordance with state laws governing that account; (iii) deposit into a fund exclusively dedicated to assisting state attorneys general to enforce the antitrust laws by defraying the costs of (a) experts, economists, and consultants in multistate antitrust investigations and litigation, (b) training or continuing education in antitrust for attorneys in state attorney general offices, or (c) information management systems used in multistate antitrust investigations and litigation; (iv) payment of States' attorneys' fees and expenses; or (v) for any other purpose as the Attorneys General deem appropriate, consistent with their various state laws.

### C. Release of Claims

The Settlement Agreement provides that upon entry of a Final Approval Order and following the exhaustion of all appeals, the States shall be deemed to have released, to the extent permitted by law, all "Released Claims," as defined in the Settlement.[29] Specifically, in exchange for the significant monetary and injunctive relief provided in the Settlement, the States released a range of claims "that were asserted in [this case] or could have been asserted" by a state Attorney General,

---

[29] Settlement Agreement §§ 1.6, 1.14, 1.35, 11.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

whether in a sovereign capacity or in a *parens patriae* capacity on behalf of consumers.[30] Section 1.6 of the Settlement identifies the claims as those "that were asserted [or] could have been asserted, known or unknown, against [Google], that have accrued as of the Effective Date or that accrue no later than seven years after the Effective Date," so long as the claims arise from an "identical factual predicate" to the claims in the States' and Consumers' cases.[31]

Importantly, the release does not apply to any consumer claims arising out of a *different* factual predicate, including claims brought by the Settlement Consumers[32] who will get relief under this Settlement. The release also does not apply to any consumer who first purchased an app from Google Play or first made an in-app purchase through Google Play Billing after September 30, 2023—even if they seek to bring a claim arising out of the same factual predicate—nor to any consumer who decided to opt out of the Settlement. The release also contains a seven-year limitation such that all consumers—even those getting relief under the Settlement—will be free to bring even the exact same claims in seven years based on exactly the same facts.

Courts regularly approve settlements that include the release of future claims, sometimes for a fixed number of years and sometimes indefinitely. *Compare In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-MD-1720, 2019 WL 6875472, at *209-24 (E.D.N.Y. Dec. 16, 2019) (releasing future claims that "accrue no later than five years after" the settlement became final), *with, e.g., Texas v. Am. Tobacco Co.*, 463 F.3d 399, 401 (5th Cir. 2006) (describing a settlement releasing all past and future claims); *In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*, No. 14-md-2541-CW, 2017 U.S. Dist. LEXIS 201104, at *16-18 (N.D. Cal. Dec. 6, 2017) (approving settlement releasing "any and all past, present, and future claims"); *Hastings v. Principal Life Ins. Co.*, No. 21-cv-00047, 2021 WL 6061916, at *38 (S.D. Iowa July 28, 2021) (upholding a release of future claims of breach of an ERISA fiduciary duty). The developer class settlement

---

[30] Settlement Agreement §§ 11.1-11.3.
[31] Settlement Agreement § 1.6.
[32] "Settlement Consumers" are Eligible Consumers who did not opt out of the Settlement. Settlement Agreement § 1.41. "Eligible Consumers" are individuals with a legal address in their Google Payments Profile in one of the States when they purchased an app from Google Play or made an in-app purchase through Google Play Billing from August 16, 2016 through September 30, 2023. *Id.* § 1.15.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

approved in this case included a similar release of "any and all past, present, and future claims . . . that were brought, could have been brought, or arise from the same facts underlying the claims asserted in the Action." *In re Google Play Developer Antitrust Litigation*, No. 3:20-cv-05792-JD, Dkt. No. 218-1 (Ex. B, § 13.1) (N.D. Cal. June 30, 2022).

**LEGAL FRAMEWORK**

States have long-standing authority to bring *parens patriae* actions for antitrust law violations. In *Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972), the Supreme Court affirmed the "right of a State to sue as *parens patriae* to prevent or repair harm to its 'quasi-sovereign' interests."[33] In 1976, Congress enacted the Hart-Scott-Rodino Antitrust Improvements Act, which sets out an explicit statutory framework for antitrust *parens* claims and authorized the States to pursue damages on behalf of consumers.[34] That provision requires that *parens* actions for monetary relief "shall not be dismissed or compromised without the approval of the court" and requires the dissemination of "notice of any proposed dismissal or compromise."[35] Because federal and state antitrust statutes do not "set[ ] forth a standard by which proposed *parens patriae* settlements are approved, . . . federal courts have adopted the approval procedure and standards used for approval in class action settlements under Federal Rule of Civil Procedure 23."[36]

Under Rule 23(e), the Court may approve the Settlement after holding a hearing and finding that it is "fair, reasonable, and adequate" considering certain factors, which are also considered for preliminary approval.[37] "Having already completed a preliminary examination of the agreement, the

---

[33] *See generally State of California v. Frito Lay Inc.*, 474 F.2d 774 (9th Cir. 1973).
[34] *See* 15 U.S.C. § 15c(a)(l).
[35] *Id.* § 15c(c).
[36] *California v. eBay, Inc.*, No. 5:12-CV-05874-EJD, 2015 WL 5168666, at *2 (N.D. Cal. Sept. 3, 2015); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *1 (N.D. Cal. Apr. 3, 2013) (applying standard to final approval of *parens* settlement).
[37] Fed. R. Civ. P. 23(e)(2).

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

court reviews it again, mindful that the law favors the compromise and settlement of class action suits."[38]

ARGUMENT

## I.    The Settlement Is Fair, Reasonable, and Adequate

The factors set forth in Rule 23 and the Northern District of California's Procedural Guidance for Class Action Settlements (the "District's Procedural Guidance") supported preliminary approval of the Settlement and support final approval. As discussed in the States' motion for preliminary approval, the States, alongside counsel for the class this Court had originally certified ("Consumer Counsel"),[39] have more than adequately represented the interests of consumers throughout this litigation and negotiated the Settlement at arm's length.[40] At the conclusion of the litigation and mediation process, the States secured adequate relief for consumers.[41] Lead counsel for Consumers concur that the Settlement is fair, reasonable, and adequate and concur that it should be approved.

Although Epic went on to secure a favorable jury verdict and ruling from the Ninth Circuit after the States reached their Settlement with Google, proposed settlements are assessed as of the time they were entered.[42] From the States' vantage point in fall 2023, taking their case against Google to trial—and most likely appeal—would have been costly, risky, and protracted. Unlike Epic's injunction-only case, the States would have needed to prove not only liability but also damages, first to a jury and then to the Ninth Circuit.

At trial, the States would have relied on the expert testimony of Dr. Marc Rysman, who advanced a structural model calculating the dollar value to consumers of lost variety in the app market, as opposed to a traditional overcharge model. Although well-grounded in economic literature, no model like Dr. Rysman's variety model has ever been tested in antitrust litigation.

---

[38] *California v. eBay*, 2015 WL 5168666, at *2.
[39] The Settlement also includes the named Individual Plaintiffs represented by Consumer Counsel. For ease, this motion refers to the "States" throughout.
[40] *See* Dkt. 522 at 3-5; Fed. R. Civ. P. 23(e)(2)(A)-(B).
[41] *See* Fed. R. Civ. P. 23(e)(2)(C).
[42] *See Lane v. Facebook, Inc.*, 696 F.3d 811, 824 (9th Cir. 2012) ("a class-action settlement necessarily reflects the parties' pre-trial assessment as to the potential recovery").

Google also challenged the aggregate nature of the calculation and the appropriateness of variety losses as a measure of damages under the Clayton Act. And the exclusion of Dr. Hal Singer's overcharge damages model, which occurred one week before the parties agreed to the settlement in principle, meant that the States would have had no damages model if the Court had granted Google's pending motion to exclude Dr. Rysman's testimony.

Additionally, in fall 2023, the States were facing the prospect of going to trial with two prominent developers, Epic Games and Match Group. In a joint trial, there would have been significant tension between the States' claim that consumers suffered damages and injury, and the claim by Match and Epic that developers bore the harm, particularly given Match's claim for millions of dollars in direct damages. Finally, as was the case for the Epic injunction, appellate proceedings could have delayed the implementation of any final judgment by a year or more.

**A. The Court-Approved Notice Process Meets Applicable Guidelines and Has Been Fully Implemented**

The results of the Court-approved notice process are described in detail in the Declaration of Rochelle J. Teichmiller in Support of States' Unopposed Motion for Final Approval of *Parens Patriae* Settlement ("Teichmiller Decl."). The notice process used account information provided by Google to provide direct notice via email to the vast majority of Eligible Consumers, in addition to publication notice. The Court-approved Long Form Notice and Summary Notice included all the information required by Rule 23(c)(2)(B) for class actions, including basic information about the case and the settlement, as well as information about the process and deadline for opting out or objecting. The notice program included direct notice by email, as well as publication notice via digital advertising, *PR Newswire Online,* and a dedicated notice website.[43]

For direct email notice, A.B. Data used email addresses provided by Google to send out an email version of the Summary Notice.[44] Of the nearly 123 million unique email addresses provided by Google, A.B. Data was able to validate almost 110 million and ultimately successfully deliver

---

[43] Teichmiller Decl. ¶¶ 2-9.
[44] Teichmiller Decl. ¶¶ 3-6 & Ex. A.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

the email Summary Notice to over 106 million.[45] Thus, the direct notice campaign alone had an approximately 86% successful delivery rate.[46] In this case, direct notice offered the best notice practicable because A.B. Data could send direct notice electronically and affordably. Electronic notice by email is routinely used in technology, data privacy, and other representative actions to provide notice to affected claimants and has been held to satisfy due process and Rule 23.[47]

For publication notice, A.B. Data utilized a paid media campaign that included digital and social media components and a national press release.[48] It included mobile web ads, banner ads, newsfeed ads, and text ads through Facebook, Google Display Networks, Google AdWords, YouTube, and Instagram, and targeted U.S. adults who have an Android smartphone.[49] All ads included an embedded link to the dedicated notice website, which contains all of the information in the Long Form Notice.[50] This supplemental digital media campaign delivered over 70 million impressions to potential Eligible Consumers.[51] In addition to the digital media, A.B. Data issued a news release via *PR Newswire*'s US1 National Newsline.[52]

A.B. Data set up a case-specific website, www.GooglePlayStateAGAntitrustLitigation.com, which includes the Court-approved Long Form Notice and Summary Notice, the court filings related to the Settlement, the online exclusion request form, and a page where potential Eligible Consumers can submit their contact information.[53] A.B. Data has received over 800,000 contact information submissions through the website.[54] Accompanying the website, A.B. Data established and continues

---

[45] Teichmiller Decl. ¶¶ 3-6.
[46] Teichmiller Decl. ¶ 6.
[47] *See, e.g.*, *In re Facebook Internet Tracking Litig.*, No. 5:12-md-02314-EJD, Dkt. No. 241 (N.D. Cal. Mar. 31, 2022); *Taylor v. Shutterfly, Inc.*, No. 5:18-cv-00266, 2021 WL 5810294, at *2 (N.D. Cal. Dec. 7, 2021); *Cottle v. Plaid, Inc.*, No. 20-cv-03056-DMR, 2021 WL 541525, at *5-6 (N.D. Cal. Nov. 19, 2021); *Norcia v. Samsung Telecommunications Am. LLC*, No. 14-cv-00582-JD, 2021 WL 3053018, at *2 (N.D. Cal. July 20, 2021); *In Re USC Student Health Center Litig.*, No. 2:18-cv-04258-SVW-GJS, Dkt. No. 148 (C.D. Cal. June 12, 2019); *Cohorst v. BRE Props., Inc.*, No. 3:10-cv-2666-JM-BGS, 2011 WL 7061923, at *2 (S.D. Cal. Nov. 14, 2011).
[48] Teichmiller Decl. ¶¶ 7-8.
[49] Teichmiller Decl. ¶ 7 & Ex. B.
[50] Teichmiller Decl. ¶ 7 & Ex. B.
[51] Teichmiller Decl. ¶ 7.
[52] Teichmiller Decl. ¶ 8 & Ex. C.
[53] Teichmiller Decl. ¶ 9.
[54] Teichmiller Decl. ¶ 9.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

to maintain a case-specific toll-free phone line, which provides callers with an automated interactive voice response system that responds to basic questions and instructs callers requiring further assistance to email the case-specific email address.[55]

**Exclusions.** The direct email notice directed Eligible Consumers to the dedicated notice website and provided the deadline for requesting exclusion or objecting to the settlement.[56] The dedicated notice website, which was and is also reachable through the publication notices and an online search, had an online exclusion form, along with instructions on how Eligible Consumers could mail in an exclusion request.[57] In total, A.B. Data received 457 requests for exclusion from the Settlement, 451 through the online portal and 6 via mail.[58] The exclusion request form asked those seeking exclusion to identify the city where they are currently living, and the responses show that the exclusion requests came from individuals not just in the United States but around the world.[59] This number of exclusions represents a tiny fraction of Eligible Consumers, far below the 10% threshold built into the Settlement.[60]

**Objections.** The direct email notice, news release, and dedicated notice website all contained instructions on how Eligible Consumers could object to the Settlement.[61] _Not a single person formally objected._ There were, however, three individuals who emailed A.B. Data expressing their thoughts on the Settlement. One of these was a Canadian citizen who understood himself not to be an Eligible Consumer but who appears to have filed a small claims court case against Google in Canada and believes Google is not complying with the Settlement's terms (which have yet to take effect and only apply within the United States).[62] The second individual stated that he had suffered significant financial and personal loss and wished to be excluded from the Settlement; he was

---

[55] Teichmiller Decl. ¶ 10.
[56] Teichmiller Decl. Ex. A.
[57] Teichmiller Decl. ¶¶ 9, 12.
[58] Teichmiller Decl. ¶ 12.
[59] Teichmiller Decl. ¶ 12 & Ex. D.
[60] _See_ Settlement Agreement § 13.1.
[61] Teichmiller Decl. ¶¶ 8, 9, 11 & Ex. A, C.
[62] _See_ Settlement Agreement §§ 1.14 (defining the Settlement's "Effective Date"), 1.26 (defining "Mobile Device" for purposes of the Settlement as those sold within the United States), 1.51 (defining "User" for purposes of the Settlement as those within the United States).

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF _PARENS PATRIAE_ SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

directed to the exclusion request form and is one of the 457 individuals on the exclusion list. Finally, the third individual stated that there is a vulnerability in Google's Advanced Protection Program and that the Settlement should not be approved while the vulnerability persists; A.B. Data directed this individual to the Court-approved objection procedure, but he did not submit a formal objection.[63]

### B. The Distribution Plan Will Ensure that the Vast Majority of the Settlement Fund is Distributed to Settlement Consumers

The Distribution Plan is described in detail in the Cooper Declaration. The Settlement Administrator, Verita, will make automatic, direct payments to Settlement Consumers, who are defined as natural persons with a "Legal Address" in their Google payments profile in one of the States when they purchased an app from Google Play or made an in-app purchase (including subscriptions) through Google Play Billing from August 16, 2016 through September 30, 2023 and who did not opt out of the Settlement.[64]

Consumer Counsel made an application for payment of attorneys' fees and costs from the Settlement Fund, specifically for $85 million in attorneys' fees, $8,585,761.38 in unreimbursed expenses, and $5,000 in incentive awards for each of the six individual consumer plaintiffs (for a total of $30,000 in incentive awards).[65] Consumer Counsel's $85 million fee request represents about 13.5% of the $630 million Settlement Fund and an implied lodestar multiplier of about 1.34. California, New York, North Carolina, Tennessee, and Utah—the lead states that prosecuted the matter and negotiated the Settlement—unanimously agree that Consumer Counsel worked diligently and productively during the course of the litigation and materially contributed to the joint prosecution of this case and in bringing this matter to a successful conclusion, and although the States do not endorse any specific amount, no State objects to Consumer Counsel's fee request.

The funds remaining in the Settlement Fund—net of any award to Consumer Counsel, taxes,

---

[63] The Settlement Agreement does not require Google to make any changes to its Advanced Protection Program.
[64] Settlement Agreement §§ 1.15, 1.41.
[65] *See* Counsel for Consumer Plaintiffs' Renewed Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards for Individual Plaintiffs, No. 3:21-md-02981, Dkt. No. 1129, at 15.

notice and settlement administration costs, or other payments authorized by the Court—shall be distributed to Settlement Consumers until the amount of remaining unclaimed funds makes it no longer feasible or cost-effective to continue distribution. Based on Verita's experience, the Distribution Plan, including the process for making residual payments discussed below, should enable distributions from the Settlement Fund to continue until there is $50,000 or less remaining.[66] At that point, any remaining unclaimed funds should be transferred to the States' Monetary Fund as penalties pursuant to 15 U.S.C. § 15e(2).

The Distribution Plan will make automatic, direct payments to Settlement Consumers without a claims submission process. Each Settlement Consumer is eligible to receive at least $2 and may receive a higher amount in proportion to his or her Google Play spending from August 16, 2016 through September 30, 2023.[67] Payments to Eligible Consumers are for overcharges and are not deemed reportable for tax purposes. The Distribution Plan will follow a waterfall approach.

At the first level of the waterfall, Verita will attempt to send payments to Settlement Consumers via PayPal, which associates each person's account with an email address or mobile phone number.[68] As noted above, A.B. Data was able to validate almost 110 million email addresses for the direct notice campaign; Verita will attempt to validate the remaining 13 million email addresses from the notice data before beginning distributions.[69] If the Settlement Consumer's email address associated with the consumer's Google Play account or provided through the settlement website matches an email address associated with an existing PayPal account, then payment will be processed to that account and the Settlement Consumer will receive an email notification that the funds have been deposited and are now available.[70] Otherwise, the Settlement Consumer will receive an email on the 7th day and again on the 14th day notifying him or her of the opportunity to create a new PayPal account or redirect the payment to an existing account at another email address.[71]

---

[66] Cooper Decl. ¶ 23.
[67] Cooper Decl. ¶ 16.
[68] Cooper Decl. ¶ 17.
[69] Cooper Decl. ¶ 15 n.3.
[70] Cooper Decl. ¶ 17.
[71] Cooper Decl. ¶ 17.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

The second level of the waterfall is Venmo, which associates each person's account with a mobile phone number or email address.[72] There are significantly fewer mobile phone numbers in the Google Play consumer account data than email addresses, so the Venmo level of the waterfall will occur simultaneously with the PayPal level but be limited to Settlement Consumers who have a mobile phone number associated with their Google Play accounts or who provided a mobile phone number through the settlement website.[73] After completing its spam cleanse process, Verita will send payments using Venmo to Settlement Consumers who have not been sent their payments via PayPal.[74] If the Settlement Consumer's mobile phone number associated with the consumer's Google Play account or provided through the settlement website matches a mobile phone number associated with an existing Venmo account, then payment will be processed to that account.[75] Otherwise, the Settlement Consumer will have an opportunity to create a new Venmo account or redirect the payment to an existing account at another mobile phone number.[76]

Based on Verita's experience with class action distributions in which settlement proceeds are "pushed" to recipients via digital token without an election process, the successful delivery rate for any given platform (e.g., PayPal or Venmo) ranges from 60% to 90% depending on how current the data is,[77] the payment amounts, and the recipients' ages and other demographics.[78] In this case, given the demographics of Google Play users and PayPal's and Venmo's strong market share and continued year-over-year growth in the digital payment space, Verita believes the combination PayPal-and-Venmo waterfall approach will achieve a blended success rate of 80-90%.[79] Verita will establish and maintain a secure online reissue portal on the settlement website to give Settlement Consumers who did not receive payment successfully the opportunity to provide updated contact information for another attempt at PayPal or Venmo or to select an alternative payment method such

---

[72] Cooper Decl. ¶ 18.
[73] Cooper Decl. ¶ 23 & Ex. A.
[74] Cooper Decl. ¶¶ 15, 18.
[75] Cooper Decl. ¶ 18.
[76] Cooper Decl. ¶ 18.
[77] Google provided the consumer email addresses for the direct notice campaign in January 2024 and the consumer phone numbers for the Distribution Plan in March 2026.
[78] Cooper Decl. ¶ 20.
[79] Cooper Decl. ¶ 20.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

as Zelle or an ACH transfer.[80] For Settlement Consumers who will receive payments above $5,000, Verita will contact the consumers directly via email to obtain ACH transfer or Wire Instructions.[81]

After Verita has attempted to send payments—primarily via PayPal or Venmo or both—to all Settlement Consumers whose contact information can be validated, Verita will activate a secure online reissue portal on the settlement website for Settlement Consumers to request a reissuance of their payments and provide updated contact information.[82] At this time, Verita will also send email notifications to Settlement Consumers who have not yet received a payment from the Settlement Fund directing them to request a reissuance of payment via the secure online reissue portal.[83] The States can also publish information about the reissue period on their State Attorney General websites.

Finally, after the reissue period closes, Verita will conduct an analysis of the successful payments and the amount remaining in the Settlement Fund for distribution and will recommend a residual distribution.[84] The residual distribution will maintain the $2 minimum payment and proportionality of the initial payments but will provide these additional payments to a subset of Settlement Consumers who successfully received payments initially and who had relatively higher Google Play spending.[85] Verita will perform either a single residual distribution or multiple residual distributions if needed, until the Settlement Fund has a balance of $50,000 or less, which is, based on Verita's experience, when it will no longer be economically feasible or cost-effective to continue residual distributions.[86] At that point, the remaining unclaimed funds should be transferred to the States' Monetary Fund.[87] No money from the Settlement Fund will return to Google.

---

[80] Cooper Decl. ¶ 22.
[81] Cooper Decl. ¶ 19.
[82] Cooper Decl. ¶ 22.
[83] Cooper Decl. ¶ 22.
[84] Cooper Decl. ¶ 23.
[85] Cooper Decl. ¶ 23.
[86] Cooper Decl. ¶ 23.
[87] *See* 15 U.S.C. § 15e(2).

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## II. The Court Should Appoint Berkeley Research Group, LLC ("BRG") to Assist the States with Finalizing the Distribution Amounts for Settlement Consumers

Under the Settlement, more than half a billion dollars in monetary relief will be distributed using an innovative process with an exceptionally high success rate. The Settlement established a Settlement Fund of $630 million to settle claims on behalf of the Settlement Consumers and to pay the costs of notice and settlement administration, taxes, and any award of Consumer Counsel fees, costs, and incentives.[88] In the States' April 17, 2024 supplemental brief, the States estimated that, after accounting for those costs, $515 million would be available for distribution to Settlement Consumers. Although the States expect the number will be higher in light of the interest earned in the Settlement Fund over the past two years, the States will need to do a final accounting after the Court grants final approval and determines Consumer Counsel's fees, costs, and incentive payments awards and after Verita files the 2025 taxes for the Settlement Fund and pays any amounts due.

During the litigation of this case, the States obtained anonymized U.S. consumer transactional data from Google that Saul Solomon of BRG analyzed in his expert report.[89] The data set contained approximately 13 billion records including information on payment status, delivery status, currency codes, refund indicators, instrument type, pre-tax spend amounts, transaction date, and consumer identifiers.[90] The transactional data did not contain any consumer names or contact information.[91] When the Court asked the States for more information about how much money Settlement Consumers would receive under the Settlement, the States obtained additional transactional data from Google to add to what BRG already had in order to cover the full time period of August 16, 2016 through September 30, 2023.[92] It was BRG's analysis of Google's transactional data that enabled the States to tell the Court what the payments would be to Settlement Consumers with a $2 minimum and proportionality based on how much the consumers spent on Google Play.[93]

---

[88] Settlement Agreement § 5.1.1.
[89] Bandoian Decl. ¶¶ 5-6 & n.2.
[90] Bandoian Decl. ¶ 6.
[91] Bandoian Decl. ¶ 6.
[92] *See* Bandoian Decl. ¶ 7.
[93] *See* Bandoian Decl. ¶ 8.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

In order to determine how much money each Eligible Consumer spent in the Google Play Store and, correspondingly, how much money each Eligible Consumer should receive from the Settlement Fund, BRG applied five filters to the Google transactional data. Using these filters, BRG was able to identify the transactions that involved consumer payments greater than $0 that were in fact charged and delivered without being refunded.[94] For foreign currency transactions, BRG converted charged amounts to U.S. dollars using applicable exchange rates on the transaction date.[95] The States directed BRG to calculate the expected distribution on a modified pro-rata basis assuming a $2 minimum distribution guarantee to all Eligible Consumers.[96] This methodology required BRG first to allocate $2 to each Eligible Consumer and then to distribute the remaining amount on a pro-rata basis to those Eligible Consumers who would have received $2 or more on a pro-rata basis without the $2 minimum.[97]

The States now request that the Court appoint BRG to assist the States with finalizing the distribution amount for each Settlement Consumer, of which there are over 100 million. BRG has already spent significant time working with Google's transactional data and is best positioned to prepare a file that can be sent to Verita identifying each Settlement Consumer's Google Play spend and corresponding settlement distribution amount. BRG is currently hosting approximately seven terabytes of Google Play Store transactional data,[98] which will need to be matched up with consumer email address and phone number information in order to effectuate the Settlement Distribution Plan.[99] BRG is in the best position both to calculate the final distribution amounts and to match up the Google ID numbers across data sets to give Verita as close to a final Distribution List as possible.[100] BRG's estimate for the cost of this work is $350,000,[101] to be paid from the Settlement Fund as a settlement administration expense.

---

[94] Bandoian Decl. ¶ 7.
[95] Bandoian Decl. ¶ 8.
[96] Bandoian Decl. ¶ 8.
[97] Bandoian Decl. ¶ 8.
[98] Bandoian Decl. ¶ 9.
[99] Bandoian Decl. ¶¶ 10-11.
[100] Bandoian Decl. ¶¶ 12-13.
[101] Bandoian Decl. ¶ 14.

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**CONCLUSION**

For the foregoing reasons, the States respectfully request that this Court grant final approval of the Settlement and appoint BRG to assist the States with finalizing the distribution amounts for all Settlement Consumers.

Dated:  March 23, 2026                                    Respectfully submitted,

OFFICE OF THE ARIZONA                    OFFICE OF THE CALIFORNIA
ATTORNEY GENERAL                          ATTORNEY GENERAL

By:    */s/ Jayme L. Weber*                        By:    */s/ Paula L. Blizzard*
         Jayme L. Weber                                      Paula L. Blizzard
                                                                      Michael W. Jorgenson
                                                                      Brian D. Wang
                                                                      Carolyn D. Jeffries

                                                              OFFICE OF THE NEW YORK
                                                              ATTORNEY GENERAL

                                                              By:    */s/ Elinor Hoffmann*
                                                                       Elinor Hoffmann

                                                              OFFICE OF THE NORTH CAROLINA
                                                              DEPARTMENT OF JUSTICE

                                                              By:    */s/ Kunal Choksi*
                                                                       Kunal Choksi

                                                              OFFICE OF THE UTAH
                                                              ATTORNEY GENERAL

                                                              By:    */s/ Matthew Michaloski*
                                                                       Matthew Michaloski
                                                                       Marie W.L. Martin

                                                              OFFICE OF THE TENNESSEE
                                                              ATTORNEY GENERAL AND
                                                              REPORTER

                                                              By:    */s/ S. Ethan Bowers*
                                                                       S. Ethan Bowers
                                                                       Tyler T. Corcoran

                                                              *Counsel for the Plaintiff States*

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## E-FILING ATTESTATION

I, Jayme L. Weber, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the signatories identified above have concurred in this filing.


*/s/ Jayme L. Weber*
Jayme L. Weber

Case No. 3:21-cv-05227-JD

STATES' UNOPPOSED MOTION FOR FINAL APPROVAL OF *PARENS PATRIAE* SETTLEMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF